1

IN THE UNITES STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 21-02500

-----------------------------------------x

COLLEN BEHM,

        Plaintiff,

    v.

MACK TRUCKS, INC., and

UNITED AUTO WORKERS LOCAL 677,

        Defendants.

-----------------------------------------x

                  1601 Cherry Street

                  Philadelphia, Pennsylvania

                  March 8, 2022

                  10:10 a.m.

        DEPOSITION of COLLEEN BEHM, the
Plaintiff, held at the above-entitled time and
place, taken before Carolyn Crescio, a
Professional Shorthand Reporter and Notary
Public of the State of Pennsylvania.

              *     *     *

2

1
2     A P P E A R A N C E S:
3

      LAW OFFICES OF ERIC A. SHORE, P.C.
4     Attorneys for Plaintiff
          1500 JFK Boulevard
5         Suite 1240
          Philadelphia, Pennsylvania 19110
6     BY: GRAHAM F. BAIRD, ESQ.
7

8

      JACKSON LEWIS, PC
9     Attorneys for Defendant MACK TRUCKS, INC.
          15 South Main Street
10        Suite 700
          Greenville, South Carolina 29601
11    BY: ELLISON F. MC COY, ESQ.
      -and-
12    D. RANDLE MOODY, II, ESQ.
13

14

      CLEARY, JOSEM & TRIGANI, LLP
15    Attorneys for Defendant United Auto Workers Local
      67
16        325 Chestnut Street
          Suite 200
17        Philadelphia, Pennsylvania 19106
      BY: CASSIE R. EHRENBERG, ESQ.
18

19

20    ALSO PRESENT:
      Kaitlyn O'Neill
21

22

23

24

25

1

2            THE COURT REPORTER:  The

3        attorneys participating in this

4        deposition acknowledge that I am not

5        physically present in the deposition

6        room and that I will be reporting

7        this deposition remotely.

8            They further acknowledge that, in

9        lieu of an oath administered in

10       person, I will administer the oath

11       remotely.

12           The parties further agree that if

13       the witness is testifying from a

14       state where I am not a Notary, that

15       the witness may be sworn in by an

16       out-of-state Notary.

17           If any party has an objection to

18       this manner of reporting, please

19       state now.

20           [NO RESPONSE]

21           THE COURT REPORTER:  Hearing

22       none, we can proceed.

23           -        -        -

24   C O L L E E N  B E H M, the witness herein, after

25   having been first duly sworn by a Notary Public of

4

C. BEHM

1    the State of Pennsylvania, was examined and

2    testified as follows:

3    BY THE COURT REPORTER:

4         Q.    Please state your name for the

5    record.

6         A.    Colleen Behm.

7    EXAMINATION

8    BY MR. MC COY:

9         Q.    Good morning.

10        A.    Good morning.

11        Q.    I'm sorry, I've been saying

12   Ms. Behm.  It's Behm; is that right?  I just

13   want to make sure.

14        A.    Behm.

15        Q.    Behm.  Okay.  I apologize if I --

16        A.    It's okay.

17        Q.    -- if I mispronounce it.

18        A.    Behm, Behm, I'll know who you're

19   talking about.

20        Q.    I'll apologize up front.  Okay?

21        Good morning.  My name is Ellison McCoy.

22   I'm an attorney with Jackson Lewis.  Actually,

23   we are here at your offices in Philadelphia, but

24   I practice in our office in South Carolina.

C. BEHM

1
2       With me today is my colleague, Randy

3  Moody, who is also in the South Carolina office.

4  I believe you know who Kaitlyn O'Neill is; one

5  of the human resources business partners at Mack

6  Trucks.

7       A.    Yes.

8       Q.    And, also, Cassie Ehrenberg who is

9  attorney for the Local UAW in this case.

10       We are here today for the purpose of

11  taking your deposition in the lawsuit that you

12  have filed against Mack Trucks.  Have you ever

13  had a deposition taken before?

14       A.    No.

15       Q.    So let me just give you a little bit

16  of background.  Your attorney may have explained

17  this to you already.  I can't just pick up the

18  phone and call you and ask you why you're suing

19  my client.  So we have to do it in this somewhat

20  formal setting before a court reporter.

21       So this is my opportunity to ask you

22  questions about your lawsuit.  And so I'm here

23  to find out information.  I'm not trying to

24  trick you or anything like that, so if at any

25  point in time during the deposition you don't

C. BEHM

1

2  understand my question, you're confused by my

3  question, just let me know.  I'll be glad to

4  restate it, repeat it, do whatever we need to do

5  to make sure the record is clear.

6      If you don't understand what I'm asking

7  you, just let me know.  If you don't hear what

8  I'm saying -- you know, I do have a little bit

9  of an accent, but, you know --

10      A.    My parents are from South Carolina.

11      Q.    Oh, really?  Where?

12      A.    Ladson.

13      Q.    Oh, wow.  So you're used to the

14  accent.

15      A.    Yes.

16      Q.    Okay.  So, hopefully, we won't have

17  an issue, but if we do, just let me know.

18      When you answer my question, I'm going to

19  assume that you heard my question, that you

20  understand my question, and that you're giving

21  me a complete and truthful answer to that

22  question; is that fair?

23      A.    Yes.

24      Q.    I would ask that you please try to

25  give verbal answers to my questions.  I know we

1    C. BEHM
2    like to nod or shake our heads, but that doesn't
3    show up very well on the transcript --
4         A.    Okay.
5         Q.    So if you shake your head or nod
6    your head, I'm may ask you, Is that a "yes" or
7    "no"? I'm not being rude.  I'm just, again,
8    trying to make sure the record is clear.
9         A.    Absolutely.
10         Q.    If, during the deposition, you have
11    any questions, I would ask you to direct them to
12    me.  If there's something I need to discuss with
13    your attorney, I'll be glad to do so, but now
14    that we are on the record, you need to address
15    any questions and or concerns to me.
16         A.    Okay.
17         Q.    And if you need to take a break for
18    any reason, just let me know.  I will take
19    breaks because I had a couple of cups of coffee
20    this morning, but if you need one, just let me
21    know.  The only caveat I would say is if there's
22    a question pending, I would ask that you answer
23    the question, and then we can take a break.
24         A.    Okay.
25         Q.    Do you understand the instructions

C. BEHM

1   I've given you?

3       A.    Yes.

4       Q.    All right.  I'm going to ask you a

couple of personal questions.  The reason for

these questions is to make sure that our record

is clear today.

Are you on any sort of medication today

that will impair your ability to answer my

questions completely and truthfully?

11      A.    No.

12      Q.    Have you consumed any alcoholic

beverages in the past eight hours?

14      A.    No.

15      Q.    Do you have any physical or mental

condition that would impair your ability to

answer my questions completely and truthfully

today?

19      A.    No.

20      Q.    Now, is there any other reason that

you are not prepared to proceed with your

deposition at this time?

23      A.    No.

24      Q.    And you understand you've been

placed under oath and that the Court can impose

C. BEHM

1   penalties if you fail to tell the truth?

2   A.    Yes.

3   Q.    Thank you.  All right.

4   Can you please give me your full name?

5   A.    Colleen Sara Behm.

6   Q.    How do you spell Sara?

7   A.    S-A-R-A.

8   Q.    And what is your Social Security

9   number?

10  A.    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.

11  Q.    I always like to tell witnesses, I'm

12  asking that for the record.  We will not put

13  your Social Security record into anything we

14  file in this case.  It's just for verification

15  purposes.

16  Where do you currently live?

17  A.    West Lawn, Pennsylvania.

18  Q.    What's your street address there?

19  A.    216 Halsey, H-A-L-S-E-Y, Avenue --

20  West Lawn, two words -- Pennsylvania, 19609.

21  Q.    Who currently lives with you at that

22  address?

23  A.    Me, my daughter, and my son.  And,

24  occasionally, my boyfriend spends the night.

1                          C. BEHM

2          Q.    What is your daughter's name?

3          A.    Jana.

4          Q.    Can you spell that for me, please?

5          A.    J-A-N-A.   Same last name.

6          Q.    How old is she?

7          A.    Four.

8          Q.    And your son, what's his name?

9          A.    Brodee, B-R-O-D-E-E.   Last name,

10   C-A-N-N-O-N.

11         Q.    How old is he?

12         A.    Twelve.

13         Q.    And who is your boyfriend?

14         A.    Corey.   E-Y.

15         Q.    And what's his last name?

16         A.    Same as mine.

17         Q.    So this would also be your

18   ex-husband?

19         A.    Ex-husband.

20         Q.    What is your date of birth?

21         A.    May 22nd, 1989.

22         Q.    And where were you born?

23         A.    Pottstown.

24         Q.    Pennsylvania?

25         A.    Yes.

                                   C. BEHM

1

2        Q.    Did you attend high school?

3        A.    Yes.

4        Q.    Where did you go to high school?

5        A.    Governor Mifflin.

6        Q.    What town was that located in?

7        A.    Shillington.

8        Q.    Did you graduate from Governor

9    Mifflin High School?

10       A.    Yes.

11       Q.    What year?

12       A.    2007.

13       Q.    All right.  After you finished high

14   school, did you go on to college?

15       A.    I took some classes.  I never

16   graduated from college.

17       Q.    Where did you take classes?

18       A.    Berks Career Technology Center for

19   cosmetology.  Berks Technical Institute for

20   criminal justice.

21       Q.    Let me stop you.  The first one,

22   berks Career -- what was it?

23       A.    Berks Career Technology Center.

24       Q.    And that was for cosmetology

25   classes?

                              C. BEHM

1

2        A.    Yes.

3        Q.    When did you take those classes?

4        A.    In 11th and 12th grade.  And for a

5   year after I graduated high school.

6        Q.    Why did you stop taking those

7   classes?

8        A.    I wasn't interested.

9        Q.    Have you ever worked in the

10  cosmetology field?

11       A.    No.

12       Q.    All right.  So then you also said,

13  Berks --

14       A.    Technical Institute.

15       Q.    -- Technical College -- Technical

16  Institute.  Okay.

17       A.    Uh-huh.

18       Q.    And you studied criminal justice

19  there?

20       A.    Yes.

21       Q.    When did you take those classes?

22       A.    I took those classes from, I would

23  say, around 2011 to 2013, is when I stopped.

24       Q.    Were you taking those classes while

25  you were working?

13

C. BEHM

1

2      A.    Yes.

3      Q.    How far along did you get in the

4  criminal justice program?

5      A.    About two years in.

6      Q.    Did you earn a degree?

7      A.    No.  I stopped classes.

8      Q.    Why did you stop those classes?

9      A.    Because I got a DUI in 2013.  And I

10 wasn't sure how that would affect my career.

11     Q.    Besides those, the Berks Career

12 Technology Center and the Berks Technical

13 Institute, have you taken any other college

14 classes?

15     A.    McAllister Institute.

16     Q.    Where is that located?

17     A.    It was online classes, but they are

18 based out of New York.

19     Q.    What kind of courses were you

20 taking?

21     A.    Funeral directing.

22     Q.    When did you take those courses?

23     A.    I took those courses from 20 -- end

24 of 2016 to the end of 2017.

25     Q.    And do you, like, earn a certificate

14

C. BEHM

1

2     in that?  What do you -- is there a degree?

3            A.    No.  I stopped classes for that,

4     also.

5            Q.    I'm just curious.  I mean, would you

6     have earned a degree, potentially?

7            A.    Yes, funeral directing.

8            Q.    Okay.  And why did you stop taking

9     those classes?

10           A.    Because I was offered a job at Mack.

11           Q.    How did you get interested in

12    funeral directing?

13           A.    I got really interested because of

14    criminology in the criminal justice system, and

15    I got so used to seeing uncomfortable situations

16    with homicide and everything, so I thought, Oh,

17    I could do this, and with cosmetology

18    background, also, be pretty good.

19           Q.    And you have not gone back and taken

20    any more of those classes?

21           A.    No.

22           Q.    All right.  Any other college-level

23    courses since you graduated high school?

24           A.    No.

25           Q.    Do you currently have any

1                         C. BEHM

2    professional certifications or licenses?

3         A.    No.

4         Q.    Do you currently belong to any

5    organizations or associations?

6         A.    No.

7         Q.    Do you have a church that you

8    regularly attend?

9         A.    No.

10        Q.    You mentioned that your parents are

11   from South Carolina.  Do they currently live in

12   Pennsylvania?

13        A.    My dad and stepmom are from South

14   Carolina.

15        Q.    Where do they currently live?

16        A.    Ladson.

17        Q.    So they are still in South Carolina?

18        A.    Yes.

19        Q.    When did your dad and stepmom move

20   to South Carolina?

21        A.    My dad moved there when I was two,

22   and that's where he met my stepmom.

23        Q.    What about your mother?  Is she

24   still alive?

25        A.    Yes.  She came here from Poland.

C. BEHM

1

2     Q.    Where does she live?

3     A.    In Shillington, Pennsylvania.

4     Q.    What is your mother's name?

5     A.    Joanna.

6     Q.    What's the last name?

7     A.    Weaver.

8     Q.    I didn't ask, and I apologize.

9  What's your dad's name?

10    A.    Glenn.  Last name John, J-O-H-N.

11    Q.    What about your stepmother?  What is

12 her name?

13    A.    Pam, Pamela.

14    Q.    Is your mother married?

15    A.    Yes.

16    Q.    What is her husband's name?

17    A.    Bryan Weaver.

18    Q.    Is your mother currently employed?

19    A.    Yes.

20    Q.    Where does she work?

21    A.    She's a clinical director for the

22 Children's Clinic of Wyomissing.

23    Q.    And how about Bryan?  Is he

24 employed?

25    A.    Yes.

C. BEHM

1

2    Q.    Where does he work?

3    A.    I don't know the company name.  He's

4 a welder.

5    Q.    Do you have any grandparents that

6 live in Pennsylvania?

7    A.    Yes.

8    Q.    Tell me their -- the ones that live

9 in Pennsylvania, can you please tell me their

10 names?

11    A.    I don't know my father's biological

12 parents' names.  He was adopted, but my

13 grandmother is Anita Turner.  She's in Exeter.

14    Q.    Anybody else?

15    A.    Uh-uh.

16    Q.    Is she employed anywhere?

17    A.    No.

18    Q.    Do you have any siblings?

19    A.    Yes.

20    Q.    How many?

21    A.    I have an older sister, Bridget.

22 Last name, John.  She's in Johnstown,

23 Pennsylvania.  And I have a half brother named

24 Nicholas, in South Carolina.

25    Q.    Is his last name John, as well?

18

1                           C. BEHM

2          A.     Yes.

3          Q.     Is Bridget currently employed?

4          A.     Yes.

5          Q.     Where does she work?

6          A.     Children's Clinic of Wyomissing.

7     She's an LPN.

8          Q.     Any other siblings?

9          A.     No.  Do step-siblings count?

10         Q.     Well, do you have any that live in

11    Pennsylvania?

12         A.     Yes.

13         Q.     Okay.  Then, yes, please let me

14    know.

15         A.     Okay.  Bryan Weaver.  That's my

16    stepbrother.

17         Q.     Where does he live?

18         A.     I do not know.  Lebanon area.

19         Q.     Do you know if he is employed?

20         A.     I don't.

21         Q.     Any other step-siblings?

22         A.     No.

23         Q.     All right.  I take it you're not

24    currently married to Mr. Behm?

25         A.     No.  I divorced him.

19

C. BEHM

1

2      Q.      When did you get married to
3  Mr. Behm?

4      A.      In 2018, July 7th.

5      Q.      And when did you get divorced from
6  him.

7      A.      The divorce was finalized in
8  March of 2019 -- no, I'm sorry, 2020.

9      Q.      His name is Corey?

10      A.      Yes.

11      Q.      Is Corey currently employed?

12      A.      Yes.

13      Q.      Where does he work?

14      A.      He was just doing terrazzo in New
15  York City, and he's switching companies.  I
16  don't know the company name.

17      Q.      What is terrazzo?

18      A.      Like flooring in airports.  He was
19  working in a subway at Grand Central Station,
20  and flooring that.

21      Q.      I know you indicated that Corey
22  sometimes visits your house.  Where does he
23  reside?

24      A.      Everywhere.  He travels for work,
25  so...

JA000019

C. BEHM

1

2      Q.    Does he have a house or an

3   apartment?

4      A.    His parents just moved to the

5   Poconos, so sometimes there because of New York.

6      Q.    What are Corey's parents' names?

7      A.    Penny Behm and Robert Behm.

8      Q.    I know at one point Robert worked at

9   Mack, correct?

10     A.    Yes.  He's still employed.

11     Q.    Is he in management?

12     A.    No.

13     Q.    And what about Penny, is she

14  employed?

15     A.    She sells on Mercari, so I guess

16  self-employed.

17     Q.    Okay.  And you said they just moved

18  to the Poconos?

19     A.    Yes.

20     Q.    What town do they live in?

21     A.    I don't know.  Somewhere in Poconos

22  Mountains.

23     Q.    Does Corey have any siblings?

24     A.    Yes.

25     Q.    What are their names?

21

1                              C. BEHM

2          A.    Nicholas.  He's older.  And Jesse,

3     same last names.

4          Q.    Where does Nicholas live?

5          A.    Fleetwood.

6          Q.    Do you know if he's employed?

7          A.    That, I don't know.

8          Q.    What about Jesse?  Is Jesse a "she"

9     or a "he"?

10         A.    He.  J-E-S-S-E.  He's in Blandon.

11         Q.    Do you know if Jesse is employed?

12         A.    He's a stay-at-home father.

13         Q.    Outside your marriage to Mr. Behm,

14    have you been married previously?

15         A.    No.

16         Q.    Now -- and let me just -- I ask all

17    of these questions about family members because,

18    obviously, this is a -- you know, you requested

19    a jury trial in this case.  So if the case goes

20    to trial, then we need to know a lot of

21    background information to make sure --

22         A.    That's fine.

23         Q.    -- we don't end up with a relative

24    on the jury.

25         A.    Uh-huh.

22

C. BEHM

1
2       Q.    I noticed one of your children has a
3  different last name, correct?
4       A.    Yes.
5       Q.    So who is the father of that child?
6       A.    Andrew Cannon.
7       Q.    And you were not married to
8  Mr. Cannon?
9       A.    No.
10      Q.    Do you know where Mr. Cannon lives?
11      A.    West Lawn, Pennsylvania.
12      Q.    Do you know if he's employed?
13      A.    He is.
14      Q.    Where does he work?
15      A.    Bimbo Bakeries.  He's a supervisor.
16      Q.    And I take it Corey Behm is
17  the father of your daughter?
18      A.    Yes.
19      Q.    And do you have any stepchildren?
20      A.    He has a son.  Aiden, A-I-D-E-N.
21      Q.    How old is he?
22      A.    Thirteen.
23      Q.    I've gone through your immediate
24  family members.  And, you know, again I'm going
25  to ask you a general question again.  This is

23

1                          C. BEHM

2    for in case we, you know, pick a jury in this

3    case.

4          Do you have any other relatives that we

5    have not covered so far that live in Eastern

6    Pennsylvania?  If so, can you give me their last

7    names, please?

8          A.    My -- I guess my dad's stepbrother,

9    Charles.  Charles -- Chuck Turner.  And my

10   cousins.

11         Q.    Do you know their last names?

12         A.    Ian Soderstrom.

13         Q.    Can you spell that last name for me?

14         A.    S-O-D-E-R-S-T-R-O-M.

15         Q.    You didn't know this was going to be

16   a spelling test.

17         Anybody else?

18         A.    His mother, Elizabeth.  That's my

19   aunt.

20         Q.    Same last name?

21         A.    Same last name.  And my other

22   cousin, Charlie Turner.

23         Q.    Anybody else other than those?

24         A.    No.

25         Q.    Outside of the existing lawsuit

24

C. BEHM

1

2  against Mack and the local UAW, have you ever

3  sued anybody before?

4       A.    My son's father for a credit card.

5  That's it.

6       Q.    And I assume that's Andrew Cannon?

7       A.    Yes.

8       Q.    Tell me about that lawsuit.  It was

9  over a credit card?

10       A.    Yeah.  We had a joint credit card,

11  and when we separated, he didn't want to make

12  payments on it.  So I sued him.

13       Q.    What was the result of that lawsuit?

14       A.    We split it down the middle.

15       Q.    So did you settle it, or did it go

16  to a trial?

17       A.    We settled it.  It was just with a

18  magisterial judge.

19       Q.    Do you know when that took place?

20       A.    Maybe 2011, around that time.

21       Q.    Where did you file that lawsuit?

22  What -- geographically?

23       A.    Pennsylvania.

24       Q.    Would that have been in, like, West

25  Lawn or --

25

C. BEHM

1

2     A.     It was in Mohnton, M-O-H-N-T-O-N.

3     Q.     Other than the lawsuit against

4     Mr. Cannon, have you filed any other lawsuits?

5     A.     No.

6     Q.     It's my understanding that you have

7     agreed to settle your claims against the UAW in

8     this particular lawsuit; is that correct?

9     A.     Yes.

10    Q.     Have you ever been sued by anybody

11    before?

12    A.     No.

13    Q.     Have you ever been a witness in a

14    lawsuit where you had to testify in a trial?

15    A.     No.

16    Q.     Now, you mentioned earlier that you

17    had previously had a DUI.  So when did that

18    occur?

19    A.     2013.

20    Q.     And were you convicted of a DUI?

21    A.     Yes, I had ARD.

22    Q.     Tell me what ARD is.

23    A.     First-time offense.  You get a slap

24    on the hand.

25    Q.     Did you have to go through, like,

26

```
1                         C. BEHM
2      classes or how --
3           A.    Uh-huh.
4                 MR. BAIRD:  You have to say
5                 "yes."
6           A.    Yes.  Yes, I did.
7           Q.    Did you lose your license, at all,
8      as a result?
9           A.    For 60 days.
10          Q.    Did you have to do any jail time
11     because of that?
12          A.    No.
13          Q.    Other than the DUI, have you been
14     arrested any other times?
15          A.    Yes.
16          Q.    When else were you arrested?
17          A.    In either 2011 or 2012.
18          Q.    What were you arrested for then?
19          A.    I punched Andrew in the face.
20          Q.    So did you -- was it a domestic
21     violence charge?
22          A.    No, no charges.
23          Q.    You did not -- what did you get
24     arrested for?
25          A.    Why did I get arrested?
```

C. BEHM

1

2      Q.    Okay.  So you got arrested, but did

3   not get charged; is that what you're saying?

4      A.    Correct.

5      Q.    Did he also get arrested?

6      A.    No.

7      Q.    Okay.  Any other arrests?

8      A.    No.

9      Q.    All right.  Again, outside of the

10   present case against Mack and the UAW, have you

11   ever filed a charge of discrimination against an

12   employer?

13      A.    No.

14      Q.    Have you ever made a claim of

15   discrimination or harassment with an employer

16   other than Mack or --

17      A.    No.

18      Q.    Have you ever filed a grievance with

19   an employer other than Mack or the UAW?

20      A.    I don't know if a grievance was ever

21   filed at Mack, but I have brought it to the

22   attention of my union reps.

23      Q.    Okay.  But, again, outside of the

24   present case?

25      A.    No.

28

1                         C. BEHM
2          Q.    Outside of your employment at Mack,
3     have you ever filed a Workers' Comp claim?
4          A.    No.
5          Q.    Have you ever personally filed for
6     bankruptcy?
7          A.    No.
8          Q.    Have you ever filed for bankruptcy
9     on behalf of a business?
10         A.    No.
11                   MR. MC COY:  Please mark that as
12                   Exhibit 1.
13                   (Employment Application is
14                   received and marked as Exhibit 1 for
15                   identification, as of this date.)
16         Q.    Ms. Behm, from time to time in the
17    case, I'm going to have some documents to show
18    you.
19         A.    Okay.
20         Q.    What we will do is I'll hand them to
21    the court reporter, she will mark them, and then
22    I'll give them to you.  And once you receive
23    them, I'd ask you to just take a minute, take a
24    look at it, and once you've reviewed it, let me
25    know when you're ready to answer questions about

C. BEHM

1

2     it.

3          So, Ms. Behm, you've been handed what's

4     been marked as Exhibit Number 1.  Can you tell

5     me what that document is?

6          A.    It's my employment application for

7     Mack Trucks.

8          Q.    Okay.  And on the back of that is

9     a -- it appears to be a copy of your resume; is

10    that right?

11         A.    Yes.

12         Q.    What I want to do right now, I want

13    to talk a little bit about your employment prior

14    to the time you came to work at Mack Trucks.

15         A.    Okay.

16         Q.    Right before you worked at Mack

17    Trucks, you were employed by PetSmart; is that

18    correct?

19         A.    Yes.

20         Q.    Tell me what you did at PetSmart?

21         A.    I was responsible for taking care of

22    the animals and sometimes cash register and

23    sales.

24         Q.    What years did you work at PetSmart?

25         A.    2015 to 2017, 2018, roughly.

30

C. BEHM

1

2      Q.    And where was the PetSmart --

3      A.    Wyomissing --

4      Q.    -- located?  I'm sorry, excuse me

5  for talking over you.

6      A.    Wyomissing, Pennsylvania.

7      Q.    Okay.  Did you receive any

8  disciplinary actions when you worked at

9  PetSmart?

10     A.    No.

11     Q.    Why did you leave PetSmart?

12     A.    Mack Trucks.  Better employment.

13     Q.    So it looks like, to me, you left

14  PetSmart in June of 2017?

15     A.    I believe I have marked down to

16  August, so...

17     Q.    On your application it indicates

18  June, I believe.  So...

19     A.    Yes.

20     Q.    Do you recall if it was June or

21  August when you left?

22     A.    Yeah, somewhere around there.

23     Q.    Okay.  And when did you actually

24  start work at Mack Trucks?

25     A.    January 2nd of 2018 was my first

1                          C. BEHM

2      day.

3           Q.    So what did you do between the end

4      of PetSmart and starting work at Mack Trucks?

5           A.    I was a dancer at Utopia, but it was

6      formerly known as Divas, and formerly known as

7      Babydolls.

8           Q.    Tell me, is that a strip club?

9           A.    Yes.  Gentlemen's club.

10          Q.    Where is it located?

11          A.    Douglassville.

12          Q.    And when were you working there?

13     Just for that period, 2017, beginning of --

14          A.    It was on and off from October of

15     2012, until 2017.

16          Q.    When you were working there, what

17     was the name of the club?

18          A.    In the beginning it was Divas, and

19     then it went to Utopia.

20          Q.    When was the last time you worked at

21     Utopia?

22          A.    I worked a night at Utopia in

23     February of 2019.

24          Q.    Since February of 2019, you have not

25     worked there, at all?

32

1                    C. BEHM

2        A.    Not to my knowledge.  Not that I can

3   remember.

4        Q.    Have you worked at any other

5   gentlemen's club other than Divas or Utopia?

6        A.    I worked at Cheerleaders in New

7   Jersey last month.

8        Q.    That would have been in February of

9   '22?

10       A.    Yes, and a night in January, also.

11       Q.    You've only worked there two nights

12  total?

13       A.    Yes.

14       Q.    What town in New Jersey?

15       A.    I don't know.  I went with a

16  girlfriend that works there.

17       Q.    Anywhere else that you've -- any

18  other gentlemen's clubs you've worked in?

19       A.    I worked one night in Atlantic City

20  in 2013.  It was called Scores.

21       Q.    Any other gentlemen's clubs you

22  worked in?

23       A.    No.

24       Q.    So -- all right.  So you left -- you

25  indicated to me that you left PetSmart for Mack

33

                              C. BEHM

1

2       Trucks; is that correct?

3            A.    Uh-huh.

4            Q.    But you didn't start at Mack -- you

5       didn't even apply at Mack Trucks until December;

6       is that right?

7            A.    I was looking for better employment,

8       so...

9            Q.    Did you -- were you terminated from

10      the job at PetSmart?

11           A.    No.

12           Q.    All right.  Prior to PetSmart, it

13      looks like you worked at Elite Sportswear?

14           A.    Yes.

15           Q.    What is Elite Sportswear?

16           A.    That's where they make cheerleader

17      uniforms and gymnastics.

18           Q.    Is it a manufacturing facility?

19           A.    Yes, in Muhlenberg or that area.

20           Q.    What were you doing at Elite

21      Sportswear?

22           A.    I was a lead on the gluing area.  I

23      did heat transfer.  I did -- I don't know the

24      exact term.  The gem machine.

25           Q.    But you were in a production

34

C. BEHM

1

2    position?

3         A.    Yes.

4         Q.    And looks like you worked there from

5    2012 until 2014; is that right?

6         A.    Uh-huh.  Yes.

7         Q.    And why did you leave that job?

8         A.    There was no good pay.

9         Q.    Did you have any disciplinary action

10   when you worked at Elite Sportswear?

11        A.    No.

12        Q.    Were you terminated from the job at

13   Elite Sportswear?

14        A.    No.

15        Q.    Prior to that, it looks like you

16   worked at a place called Property Damage

17   Appraisers?

18        A.    Yes.

19        Q.    Tell me what kind of job that was.

20        A.    I was an office manager.

21        Q.    What kind of business is that?

22        A.    They ran estimates on all types of

23   equipment; tractor-trailers, stuff like that.

24        Q.    So as office manager, what were your

25   responsibilities?

C. BEHM

1

2      A.      Sending the appraisers out, making

3  their schedules, filing supplements, contacting

4  the customers to make sure the time frame was

5  okay for them, and keep them informed on the

6  steps of the process.

7      Q.      How long did you work at that -- at

8  Property Damage Appraisers?

9      A.      About a year.

10      Q.      Why did you leave that job?

11      A.      It was family-owned.  It was

12  just temporary.  I was helping out.  It was

13  mutual, leaving.

14      Q.      So when you say it's -- was it owned

15  by your family?

16      A.      No.

17      Q.      Was it a family that you knew?  You

18  said you were helping out.  Was it a family that

19  you knew that owns this --

20      A.      Yes.  When I was a waitress, I met

21  the owner, and he asked me if I could help out

22  with his company a little bit.

23      Q.      Were you terminated from that job?

24      A.      No.

25      Q.      All right.  And then if you look

1                        C. BEHM

2      at -- on the application itself, and from time

3      to time, just -- I'll tell you, on the bottom of

4      the page are what we call Bates numbers.  You

5      see it says "Mack," and it has a number.

6           A.    Okay.

7           Q.    So if you flip back to the page that

8      is Mack 14 --

9           A.    Okay.

10          Q.    -- looks like you also worked at

11     Unos?

12          A.    Yes.

13          Q.    And you worked there, it looks like,

14     from 2007 to 2012; is that correct?

15          A.    Yes.

16          Q.    And you were a waitress at Unos?

17          A.    Waitress, bartender, hostess, prep,

18     trainer, you name it.

19          Q.    So did you continue working there

20     once you went to work at Property Damage

21     Appraisers?

22          A.    No.  Unos closed.  It switched to

23     another restaurant that lasted not even six

24     months.  I don't remember the name of it.

25          Q.    Once it switched, did you continue

C. BEHM

1   
2   working for the new restaurant?

3       A.   Yeah, yeah.

4       Q.   Do you remember what that was

5   called?

6       A.   No.  No, I don't remember the name

7   of it.  It didn't last long.

8       Q.   Okay.  Uno was in Wyomissing?

9       A.   Yes.

10      Q.   I didn't ask you, but according to

11  your resume, Elite Sportswear was in Reading?

12      A.   Yeah.  You can put Reading,

13  Muhlenberg.

14      Q.   That's right.  I did ask you that.

15  I'm sorry.

16      A.   That's okay.

17      Q.   I did not ask you where Property

18  Damage Appraisers was located, though.

19      A.   That is like West Lawn.

20      Q.   Sinking Springs?

21      A.   Yes, Sinking Springs, West Lawn --

22      Q.   Same area?

23      A.   -- Reading.  Yeah.

24      Q.   All right.  And so since 2007, so I

25  would say, since you started work at Unos, have

38

C. BEHM

1

2  you had any other jobs prior to coming to work

3  at Mack Trucks?

4      A.    After high school or --

5      Q.    Well, let's start at 2007 through

6  when you started at Mack Trucks, which was

7  beginning of '18, I believe.

8      A.    I would help out at Maple Grove

9  Raceway.

10     Q.    Where is that located?

11     A.    Mohnton.  Adamstown area.

12     Q.    What were you doing there?

13     A.    Concessions.  I think I did maybe

14  two days there, just helping a friend that had

15  to stay in there.

16     Q.    When you say "Raceway," is that like

17  automobile raceway?

18     A.    Yeah.  Yeah, like drag racing.

19     Q.    All right.  Anywhere else that you

20  worked during that time period, 2007-2018?

21     A.    Not that I recall.

22     Q.    I'm going to skip over for just a

23  minute the employment at Mack.  We'll come back

24  to that, obviously.

25     A.    Okay.

39

C. BEHM

1

2      Q.    I want to talk about what you've

3  done since you left Mack.  It's my understanding

4  that you resigned from employment at Mack in

5  February of 2021?

6      A.    Uh-huh.

7      Q.    So, first of all, between -- during

8  the time period that you worked at Mack, from

9  2018 through February of 2021, did you ever look

10  for another job during that time period?

11      A.    Yes.

12      Q.    Where did you look for another job?

13      A.    Nestle.  Stanley Black & Decker.

14  Ocean Spray.  Coca-Cola.  Amcor.  I briefly

15  worked at Amcor.

16      Q.    And, again, just to make sure I'm

17  clear, this was while you were still employed,

18  before you --

19      A.    No, Amcor, I worked at Amcor after

20  Mack.

21      Q.    But did you apply -- the other jobs

22  you listed; Nestle, Stanley Black & Decker,

23  Ocean Spray, and Coca-Cola, did you apply for

24  those jobs before you resigned from Mack Trucks?

25      A.    Nestle, I did.

C. BEHM

1

2     Q.     Do you recall when you applied for

3     that job?

4     A.     When there was talk about layoff.

5     So January, February of 2020.

6     Q.     Any other jobs that you -- these

7     that you listed, that you applied for prior to

8     February of 2021?

9     A.     Car Tech, Carpenter Technology.

10     Q.     When did you apply for that job?

11     A.     Around the same time, so January,

12     February of 2020.

13     Q.     Did you apply for any other jobs

14     prior to February of 2021?

15     A.     Not that I can recall.

16     Q.     The Nestle position that you applied

17     for, did you -- I take it you did not get hired

18     for that position?

19     A.     Correct.

20     Q.     Did you have any follow-up

21     interviews with them?

22     A.     No.

23     Q.     What did you do to apply there?

24     A.     It was online application.

25     Q.     Did you get any feedback after you

41

C. BEHM

1

2       submitted an online application?

3              A.    Yes.

4              Q.    What was that feedback?

5              A.    Pretty much the same schedule as

6       Mack, but 12-hour shifts and later, so it didn't

7       work with day care for my daughter.

8              Q.    And then Carpenter Tech, how did you

9       apply for that job?

10             A.    Online.

11             Q.    Did you get any feedback from them?

12             A.    No.

13             Q.    Carpenter Tech, what kind of job was

14      that?

15             A.    Manufacturing.

16             Q.    During the time period again, while

17      you were working at Mack Trucks, I'm talking

18      about January of 2018 through January of 2021,

19      did you work any other jobs during that time

20      period?  We talked about Utopia so I know about

21      that.  Other than that, did you work any other

22      jobs while you were at Mack?

23             A.    No.

24             Q.    And, again, same time period, so

25      beginning of 2018 through February of 2021, the

42

C. BEHM

1

2  period when you worked at Mack, did you earn

3  income from any other source during that time

4  period?

5          A.    I would sell on eBay or Mercari.

6  That would be, like, clothes my daughter grew

7  out of or --

8          Q.    You made reference to Mercari.

9          A.    Mercari, yeah.

10          Q.    Is that -- tell me what that is.

11  I'm not --

12          A.    It's the same as eBay, just a

13  different platform.

14          Q.    Got you.

15          Now, I know in your discovery responses

16  you indicated that you have an OnlyFans account?

17          A.    Yes.

18          Q.    Do you have -- did you --

19          A.    I don't have it anymore, but I did.

20          Q.    And you had that while you were

21  employed by Mack Trucks?

22          A.    No.

23          Q.    When did you start the OnlyFans

24  account?

25          A.    That was -- I know I gave Graham a

43

                        C. BEHM

1

2    paystub thing.

3         Q.    We can talk about that later.

4    That's fine.

5         So that was not -- you did not have that

6    while you were with Mack Trucks?

7         A.    No.

8         Q.    All right.  And did you also do some

9    modeling during that time period?

10        A.    Yes.

11        Q.    Did you get paid to do modeling?

12        A.    No.

13        Q.    Tell me about your modeling that you

14   were doing.

15        A.    I would do it with friends, and did

16   it for peace of mind.

17        Q.    How did you get into that?

18        A.    My friend, Des.  She asked me if I

19   would do a modeling shoot with her and get

20   glammed up.

21        Q.    How many times did you do that?

22        A.    Maybe a dozen or so times.

23        Q.    When did you start doing the

24   modeling?

25        A.    Maybe June of 2019.

44

C. BEHM

1

2     Q.    When was the last time you did that?

3     A.    Maybe three months ago.  October.

4     Q.    October of '21?

5     A.    Yes.

6     Q.    Have you worked with a modeling

7  agency?

8     A.    No.

9     Q.    Who takes the pictures?

10     A.    Photographers that would find me on

11  Instagram.

12     Q.    So not one particular --

13     A.    No.  And I would meet them through

14  my friend, Des, who's been doing it for at least

15  a decade.

16     Q.    Does your friend, Des, work at Mack

17  Trucks?

18     A.    No.

19     Q.    Has she ever worked at Mack Trucks?

20     A.    No.

21     Q.    Where does she work?

22     A.    Cheerleaders in New Jersey.

23     Q.    So she's the one that you went to

24  New Jersey with?

25     A.    Yes.

C. BEHM

1

2        Q.     Have you ever earned any money at

3    all from your modeling?

4        A.     No.

5        Q.     All right.  Since you left Mack

6    Trucks in February of 2021, what have you done

7    to look for other work?

8        A.     Applied for jobs.

9        Q.     Now, you mentioned a few jobs

10   already; Stanley Black & Decker, Ocean Spray,

11   Coca-Cola, and Amcor, correct?

12       A.     Yes.  I briefly worked at Amcor.

13       Q.     Are there any other places besides

14   those four that you've applied since February of

15   2021?

16       A.     Yes.  I just worked at TaylorMade

17   Cleaning Company.

18       Q.     When did you apply for that job?

19       A.     Two weeks ago.

20       Q.     Did I hear you correctly, you said

21   you worked for --

22       A.     I worked last week for them, yeah,

23   all last week.

24       Q.     And are you scheduled to work more

25   for them?

46

                              C. BEHM

1

2        A.    That's up in the air right now.

3        Q.    Why is that?

4        A.    Because Friday, the girl I was

5   working with drove her car stoned and rear-ended

6   someone.

7        Q.    And were you in the car with her?

8        A.    Yes.  I actually just applied for my

9   LLC, to open my own cleaning company.

10       Q.    Were you injured in that accident,

11  at all?

12       A.    No.  I wasn't happy.

13       Q.    Were you aware if she was stoned

14  when you were riding with her?

15       A.    I had an indication because I could

16  smell marijuana, but I mean, you walk through

17  the streets of Philadelphia, and you smell

18  marijuana.

19                  (Whereupon, an off-the-record

20                  discussion was held.)

21       Q.    So did you learn after the fact that

22  she was stoned?

23       A.    Yeah.  When she giggled and said,

24  excuse my French, Oh, I don't have fucking car

25  insurance.  So, yeah.

47

C. BEHM

1

2      Q.      How much money did you earn last

3      week from TaylorMade Cleaning?

4      A.      That, I don't know.  I didn't get my

5      paystub, but it was 14 an hour, and I worked

6      between four and six hours a day from Monday,

7      Tuesday, Wednesday, Thursday.  And Friday was

8      only two hours because then the car accident.

9      Q.      So just to make sure I understand,

10     as of right now, you're not scheduled to work

11     any more days for them?

12     A.      No.

13     Q.      You haven't been terminated from

14     that job?

15     A.      No.

16     Q.      I didn't -- we kind of jumped ahead.

17     Were you hired by TaylorMade Cleaning

18     Company?

19     A.      Yes.

20     Q.      So you were an employee?

21     A.      Yes.

22     Q.      All right.  So I want to go back now

23     to the other jobs that you applied for.

24     Other than what we've listed so far, did

25     you apply for any other jobs in the past -- and

48

C. BEHM

1
2      I'll just say, "past year" -- so since
3      February of 2021?
4          A.    What all did I say?  Coca-Cola,
5      Stanley Black & Decker, Ocean Spray.
6          Q.    Amcor.
7          A.    Amcor that I briefly worked at.
8          Q.    TaylorMade.
9          A.    TaylorMade.  There's another one out
10     in my area.  I can't remember the name of it.  I
11     believe I applied for MED-ED for customer
12     service.  And I can't remember the one
13     manufacturing company by my house.
14         Q.    Okay.  So, obviously, you were hired
15     by TaylorMade Cleaning Company.
16         A.    Yes.
17         Q.    And I believe you said you also have
18     worked at Amcor.
19         A.    Yes.
20         Q.    Tell me what kind of business Amcor
21     is.
22         A.    I was doing blow-mold injections
23     there.
24         Q.    What do they make?
25         A.    Like the plastic for plastic water

49

C. BEHM

1
2   bottles and stuff for Coca-Cola, and hand
3   sanitizers, and...
4        Q.    When did you start working at Amcor?
5        A.    I don't remember the exact date.  It
6   was maybe a week after I quit Mack.  A week or
7   two.
8        Q.    How much did you make at Amcor?
9        A.    Around 22.  Twenty-two, 23.
10       Q.    Did you receive any benefits in that
11  job?
12       A.    I was supposed to.  I was only there
13  for two days.
14       Q.    What benefits were you supposed to
15  receive?
16       A.    Health insurance.  Dental.
17  Retirement.
18       Q.    So why did you leave that job?
19       A.    I left because I was going through
20  some health issues.  I was diagnosed with
21  sarcoidosis, and we weren't sure the extent of
22  it.  And they weren't following COVID-19
23  guidelines, so that could have potentially led
24  to lymph nodes in my lungs swelling.
25       Q.    When you said they weren't following

C. BEHM

1

2   COVID-19 guidelines, tell me what you mean by

3   that.

4        A.    No masks, no distancing.  Screaming

5   in each other's faces because you couldn't hear

6   each other because of the machinery.

7        Q.    Did you complain about that to

8   anybody at Amcor?

9        A.    Yes.  Yeah, when I left.

10        Q.    Well, let me ask you this:  Did you

11   complain about it before you resigned the job?

12        A.    No.

13        Q.    I take it you resigned?

14        A.    Yes.  That night.  That night.

15        Q.    So, prior to resigning, you did not

16   complain to anybody at Amcor?

17        A.    No.  I just knew it wasn't for me.

18        Q.    And so after you resigned, who did

19   you tell about your concerns?

20        A.    The guy who hired me.  I don't

21   remember his name.  I told him that the people

22   were rude.

23        Q.    When you say the people were rude,

24   what do you mean by that?

25        A.    They were screaming in your face.

                         C. BEHM

1

2       Q.    Anything else they did that was

3   rude?

4       A.    I mean --

5       Q.    I understand it was during COVID.

6       A.    Yeah.

7       Q.    I'm just asking, was there anything

8   else, besides screaming in your face without a

9   mask on, that they did that was rude?

10      A.    Oh, well, the one guy told me --

11  again, excuse my French -- You better fucking

12  learn quick.  I guess they have a high turnover

13  rate there.

14      Q.    Anything else you considered to be

15  rude?

16      A.    No.  The supervisor was very

17  friendly.  He offered to put me on the other

18  rotating shift.  I just declined.  It was a nice

19  company, just not for me.

20      Q.    What was your work schedule at

21  Amcor?

22      A.    Two days on, two days off.  And then

23  every other weekend.  So two days on, two days

24  off, then three days, two days off, two days on.

25  Because it was 12-hour shifts.

52

C. BEHM

1

2     Q.    Got you.  And the 12 hours, what --

3     A.    Seven to seven.

4     Q.    I assume 7 a.m. to 7 p.m.?

5     A.    No.  It was 7 p.m., to 7 a.m.  Not

6  the best.

7     Q.    Did they run two shifts?

8     A.    Two shifts, yes.

9     Q.    As a new hire, you got the --

10    A.    Yeah.  I got the night.  But they

11  said within a month I could switch to first

12  because they didn't have -- like I said, they

13  had a high turnover rate.

14    Q.    All right.  So the Amcor job was a

15  couple of weeks after you left Mack?

16    A.    Yes.

17    Q.    And then TaylorMade was a couple of

18  weeks ago.

19    A.    Uh-huh.

20    Q.    Between Amcor and TaylorMade, did

21  you have any other employment?

22    A.    No.

23    Q.    Did you have any income between

24  working at Amcor and working at TaylorMade?

25    A.    Selling Mercari.  That was pretty

1                          C. BEHM

2    much it.

3          Q.    Have you received any other job

4    offers other than Amcor and TaylorMade?

5          A.    No.

6          Q.    So since you began work at Mack

7    Trucks in early 2018, we talked about the --

8    obviously you earned income from Mack.  You

9    earned income from working at Utopia and a

10   couple of the other two clubs you mentioned.

11         A.    Well, those other two clubs I didn't

12   go to while I was at Mack.

13         Q.    No, I'm saying, since Mack.

14         A.    Yes.

15         Q.    To the present.

16         A.    Yes.

17         Q.    From 2018 to the present, you worked

18   at Mack Trucks, you worked at the clubs, you've

19   worked a couple of days at Amcor, and you worked

20   a week at TaylorMade.

21         A.    Yes.

22         Q.    Other than those items, have you had

23   any other source of income since January of

24   2018?

25         A.    OnlyFans.

C. BEHM

1

2      Q.    And then OnlyFans?

3      A.    Yes.

4      Q.    How much income have you earned from

5  OnlyFans?

6      A.    No more than 1800.  I was only on it

7  from roughly August, September, until about a

8  month ago.

9      Q.    So August, September of last year?

10     A.    Yes.

11     Q.    What is OnlyFans?

12     A.    People pay to see anything from

13  workout to porn.  Cooking classes.  You name it,

14  it's on there.

15     Q.    And what were they paying you to

16  see?

17     A.    I mowed my lawn topless, so stuff

18  like that.

19     Q.    Why did you stop doing OnlyFans?

20     A.    Just for my mental health.  It was

21  becoming very demanding.

22     Q.    Why did you say it was becoming

23  demanding?

24     A.    Because people just want more and

25  more.

55

C. BEHM

1

2      Q.    So they make requests to you through

3  the site?

4      A.    They can, they can, yeah.

5      Q.    And I take it the more -- I guess --

6  I'm not sure of the right word, the more

7  customer --

8      A.    The more you show, the more they

9  want.

10     Q.    The more customers you have, the

11  more money you make; is that right?

12     A.    Yes.

13     Q.    Is OnlyFans -- do you have like a

14  name on there?  How is that set up?

15     A.    Like for me or for the people?

16     Q.    Right.  I'm talking about for you.

17  Is it like an Instagram or, you know, Twitter

18  page where you have an account name?

19     A.    Yes.

20     Q.    And what was your account name?

21     A.    I think it went by cocopuffs,

22  C-O-C-O-P-U-F-F-S.

23     Q.    Have you taken down your site?

24     A.    Yes.

25     Q.    Besides OnlyFans and the other

1                          C. BEHM

2    things we have talked about, have you had any

3    other source of income since January of 2018?

4          A.    No.

5                    MR. MC COY:  Why don't we --

6                    let's take a five-minute break.

7                    (A break was taken.)

8          Q.    Ms. Behm, we are back on the record.

9    I'll just remind you, you're still under oath.

10         I want to go back now.  We've talked about

11   pre-Mack Trucks and post-Mack Trucks, so let's

12   talk about Mack Trucks.

13         A.    All right.

14         Q.    Okay.  So I want to go back --

15   Exhibit 1, which you have in front of you, we

16   already talked about, was your employment

17   application.  When did you submit that

18   employment application to Mack?

19         A.    December 12, 2017.

20         Q.    What position were you applying for

21   at Mack?

22         A.    Production or part-runner.

23         Q.    Aside from completing the

24   application that's in front of you -- and I

25   didn't ask you, I apologize.  If you would go

57

C. BEHM

1

2      over to page that is marked Mack 16.  Is that

3      your signature on the document?

4              A.    At that time, yes.

5              Q.    And at that point in time, your name

6      was Colleen John; is that correct?

7              A.    Yes.

8              Q.    That was prior to your marriage?

9              A.    Yes.

10             Q.    So aside from filling out this

11     application, what else did you have to do to

12     apply for the job at Mack Trucks?

13             A.    We had to go and take a little

14     assessment.  I believe it was called Manpower.

15     And they time you to see how quick you can screw

16     on bolts.  Answer questions on a computer

17     screen.

18             Q.    Did you do that at the plant?

19             A.    No.  And then I had to go to the

20     plant, submit a drug test through hair follicle.

21     And I believe that was it.

22             Q.    So when you say Manpower, you're

23     talking about, like, Manpower, the temporary

24     service?

25             A.    Yes.

C. BEHM

1

2     Q.    So you originally went to their

3     office to do the assessment?

4     A.    Yes, that's who Mack had us do it

5     through.

6     Q.    Got you.

7     A.    So it wasn't a temporary employment,

8     it was just --

9     Q.    They were assisting at hiring.

10    Were you interviewed for the job at Mack?

11    A.    I don't recall.  I believe it was

12    application, go in, do an assessment and drug

13    test, start date, orientation.  Here you go.

14    Q.    I'll hand you what we have marked as

15    Exhibit Number 2.

16              (Macungie Shop HBU Interview

17               Guide is received and marked as

18               Exhibit 2 for identification, as of

19               this date.)

20    Q.    Take a minute and look at that

21    document.

22    Okay.  You're ready?

23    A.    I'm ready.

24    Q.    Have you ever seen this document

25    before?

59

1                        C. BEHM

2          A.     Yes.

3          Q.     Where have you seen this document

4     previously?

5          A.     December 12, 2017.

6          Q.     Okay.  Does this refresh your memory

7     as to having an interview at Mack Trucks?

8          A.     I wouldn't -- even though it said

9     "Interview Guide," I wouldn't necessarily say

10    it's interview.  I'd say it's a piece of paper

11    to answer questions to push through the hiring

12    process.  They were hiring over 400 people at

13    that time.

14         Q.     So did you -- did you fill out this

15    form?

16         A.     I did.

17         Q.     Okay.  So the signature on the last

18    page of this document on Mack page 21 looks like

19    maybe a Carmen Rivera -- I'm not even sure if

20    that's the right name.  You did not fill out

21    that page, I take it, right?

22         A.     No.

23         Q.     But the first two pages of this

24    document, Mack 19 and Mack 20, are pages that

25    you completed?

60

C. BEHM

1

2          A.     Yes.

3          Q.     Okay.  If I can ask you to look on

4     the second page of this, Mack 20.

5          A.     Yes.

6          Q.     There's a question there about

7     attendance.  It says if you are -- question

8     Number 9A:  If you were a manager at Mack

9     Trucks, what would you expect from your

10    employees in terms of attendance?

11         What was your answer?

12         A.     One hundred percent.

13         Q.     And then question 10, down below

14    that, says:  This position involves standing,

15    walking, stooping, kneeling, crouch or crawl.

16    Employee must be able to lift and/or move

17    objects up to 10 pounds and occasionally up to

18    50 pounds.  Are there any barriers to meeting

19    these requirements?

20         What did you answer?

21         A.     No barriers.

22         Q.     And then the next question, 11:  Do

23    you have any limitation in regards to working

24    specific shifts, working overtime daily,

25    including weekends?

61

                        C. BEHM

1

2          What was your answer?

3          A.    No limitations.

4          Q.    So after you had the -- submitted

5    the application, completed the assessment, went

6    to the plant, did all the tests, what happened

7    next?

8          A.    I worked.

9          Q.    Did you receive a job offer?  I'm

10   assuming.

11         A.    Yes.  I did receive a job offer.

12               (Job offer letter is received and

13               marked as Exhibit 3 for

14               identification, as of this date.)

15         Q.    I'm showing you what we have marked

16   as Exhibit 3.  Do you recognize that document,

17   Exhibit 3, Ms. Behm?

18         A.    Yes.

19         Q.    Is this your offer of employment

20   that you received from Mack Trucks?

21         A.    That I filled out and they handed to

22   me, yes.

23         Q.    So you filled out your own job

24   offer.

25         A.    It appears so.

62

C. BEHM

1

2       Q.    And looks like this job offer was

3   made to you on December 19 of 2017, correct?

4       A.    Correct.

5       Q.    And what was your start date

6   anticipated to be?

7       A.    January 2nd of 2018.

8       Q.    I think you just mentioned that at

9   that point in time, Mack was hiring a bunch of

10  employees.

11      A.    Yes.

12      Q.    How many employees were hired?

13      A.    Over 400.  And less than 200, I

14  believe, made it through the 90-day probation.

15      Q.    So did you actually start work on

16  January 2nd of 2018?

17      A.    I did.

18      Q.    When you started work at Mack, what

19  position were you assigned to?

20      A.    Production flex.

21      Q.    What does production flex mean?

22      A.    It means -- do you want my

23  definition of it, or Mack's definition of it?

24      Q.    Well, let's start with Mack's

25  definition.

C. BEHM

1

2      A.    Mack's definition:  Production flex

3  is you complete someone else's job that they

4  couldn't complete in time.  Because the truck is

5  going through an area, they can't go past that

6  area.  So flex would come in, finish the job.

7  Or if someone called out, I would go to that

8  job.

9      Q.    So if I understand you correctly, it

10  might be -- would you also, like, step in if

11  somebody was taking a break?  Would that be part

12  of flex?

13      A.    We all took breaks at the same time.

14      Q.    So you would either -- you know, the

15  truck would come down the line, it wasn't

16  complete, you would step in and complete it --

17      A.    Correct.

18      Q.    -- or you would have to potentially

19  fill in for somebody who wasn't there that day?

20      A.    Correct.

21      Q.    So how does your definition differ?

22      A.    It was, Here you go, this is your

23  job, this is paperwork.  Do it right.  No

24  training.

25                (Production tech job description

64

1                      C. BEHM

2              is received and marked as Exhibit 4

3              for identification, as of this

4              date.)

5         Q.    I'm handing you what has been marked

6    as Exhibit 4.

7         A.    Okay.

8         Q.    You indicated your first job was a

9    production flex position.

10        A.    Yes.

11        Q.    So I've handed you what has been

12   marked as Exhibit 4, which appears to be -- is

13   this a job description for a production tech

14   position at the Mack Trucks plant?

15        A.    Yes.  This is not my job that I was

16   hired as.

17        Q.    So that's not the job you started

18   in?

19        A.    No.

20        Q.    Did you ever work in a production

21   tech position at Mack Trucks?

22        A.    For about two weeks at the end,

23   before I went out.

24        Q.    When you say, "at the end," do you

25   mean in 2020?

65

C. BEHM

1

2      A.     Yes.

3      Q.     So it would have been February of

4   2020?

5      A.     Yes.

6      Q.     Is this an accurate job description

7   of the production tech position that you

8   performed in 2020?

9      A.     Yes -- no.  The salary is incorrect.

10      The safe loading and unloading of trailers

11   from dock area and back trailers safely; that is

12   incorrect.

13      I never operated mobile transport of a

14   lift truck, high stacker.  This may say

15   "production tech," but this is not production

16   tech.

17      Q.     Okay.

18      A.     And my signature is not on it.  I've

19   never seen this.

20      Q.     Okay.  I recognize this doesn't have

21   your signature on it.  I just want to know if

22   that is an accurate job description.

23      A.     No.

24      Q.     So this is not the job you were

25   doing.

66

C. BEHM

1

2     A.    No.

3     Q.    Fair enough.  All right.  So you

4  started in -- we will circle through the

5  positions that you worked at Mack in just a

6  minute.

7        When you started as -- in a production

8  flex position, what was your pay rate?

9     A.    I started at -- I believe it was

10  19.72.

11     Q.    And I'm assuming you received pay

12  increases during your time period at Mack?

13     A.    Over a six-year period I think it

14  was going to go up a couple dollars.

15     Q.    And that's all pursuant to the

16  collective bargaining agreement, correct?

17     A.    Yes.  So when I left Mack, I believe

18  I was getting paid 21.12, but that also had

19  shift differential in it, I believe.

20     Q.    What benefits did you receive when

21  you worked at Mack?

22     A.    I had a 401(k).  I had health

23  insurance.  I had dental.  I had vision.

24     Q.    Any life insurance?

25     A.    Yes.

1                        C. BEHM

2        Q.    How much life insurance did you

3   have?

4        A.    I don't recall.

5        Q.    Was that just for you or for

6   dependents?

7        A.    I think I had my kids on it in case

8   of -- I think it was like a $10,000 to help with

9   funeral expenses if something happened to one of

10   my children.

11        Q.    You said you had a 401(k).  Was

12   there a pension at Mack Trucks?

13        A.    I did not have a pension.

14        Q.    So by the time you started, there

15   was not a pension?

16        A.    Correct.

17        Q.    Did Mack Trucks contribute to your

18   401(k)?

19        A.    Yes.

20        Q.    How much?

21        A.    I don't recall.

22        Q.    Was it a matching percentage?

23        A.    I don't recall.  It wasn't much.

24        Q.    Now, one of the things -- obviously,

25   we will talk more about this -- but you also --

68

C. BEHM

1

2      there's an accident and sickness benefit at

3      Mack?

4              A.     A&S.   Yes.

5              Q.     Tell me what A&S is.

6              A.     If you got hurt and it wasn't

7      Mack-related, they gave you time off with

8      60 percent of your pay.

9              Q.     So it's, you know, like a short-term

10     disability benefit?

11             A.     Yes, through the company.

12             Q.     Right.   And how long could you

13     receive A&S benefits?

14             A.     I believe it was no more than a year

15     and then you had to go out on Social Security,

16     like a long-term disability.

17             Q.     Did you have any long-term

18     disability insurance benefits through Mack?

19             A.     Not that I recall.

20             Q.     When you went to work at Mack, did

21     you join the UAW?

22             A.     Yes.

23                    (UAW Application is received and

24                    marked as Exhibit 5 for

25                    identification, as of this date.)

1         C. BEHM

2         Q.    Ms. Behm, I have handed you what has

3    been marked as Exhibit 5.  If you'd take a

4    moment and look at that, please.  Let me know

5    when you're ready to answer questions.

6         A.    Okay.

7         Q.    So, Ms. Behm, is this your

8    application for membership in the UAW Local 677

9    at Mack?

10        A.    Yes.

11        Q.    And is that your signature -- at the

12   time, your signature down at the bottom of that

13   first page?

14        A.    Yes.

15        Q.    And it looks like you submitted this

16   on your first day of employment --

17        A.    I did.

18        Q.    -- January 2nd, 2018.

19        All right.  If you look at the second page

20   of the document, which is marked UAW-10 down at

21   the corner --

22        A.    Yes.

23        Q.    -- you see in the middle of the page

24   your -- what was your seniority date?

25        A.    January 2nd, 2018.

C. BEHM

1

2     Q.     Okay.  And then attached, the next

3 few pages showed the dues that you paid to the

4 UAW during the remainder of your employment; is

5 that correct?

6     A.     Correct.

7     Q.     Did you ever hold any position with

8 the local union at Mack?

9     A.     No.

10     Q.     Did you have any relatives that are

11 officers with the local union at Mack?

12     A.     No.

13     Q.     When you started work at Mack, did

14 you receive a copy of the collective bargaining

15 agreement?

16     A.     The book?

17     Q.     Yes.

18     A.     Yes.

19     Q.     And during the course of your

20 employment at Mack, did that collective

21 bargaining agreement change?

22     A.     Yes.

23     Q.     It was renegotiated, right?

24     A.     Yes.

25     Q.     Did you-all go on strike while you

1                          C. BEHM

2   were there?

3        A.    Yes.

4        Q.    For how long?

5        A.    It wasn't long, maybe a month.

6        Q.    Did you get paid when you were out

7   on strike?

8        A.    Through the union.

9        Q.    So when -- once the new collective

10  bargaining agreement went into place, did you

11  receive another book with the new CBA?

12       A.    Eventually, yes.

13       Q.    I'm not going mark these as an

14  exhibit, just because I don't want to make the

15  record too long, but I'm going to hand these to

16  you.

17            Would that be the CBA that was in effect

18  when you started work at Mack?

19       A.    Yes.

20       Q.    Okay.  And then a new one was

21  entered sometime in 2019?

22       A.    Correct.

23       Q.    Okay.  We'll ask you about that.

24            Now, does the CBA contain rules regarding

25  seniority?

72

C. BEHM

1

2        A.     Yes.

3        Q.     And is seniority important under the

4   CBA?

5        A.     I'm sorry, what?

6        Q.     Is seniority important under the

7   CBA?

8        A.     I would say, to an extent.

9        Q.     Why is seniority important to an

10   extent?

11        A.     There is a lot of rule breakage at

12   Mack, so it's -- it says that it goes by

13   seniority, but there's favoritism.

14        Q.     So you're saying there are

15   exceptions made to the seniority rule?

16        A.     Not in the book, but behind closed

17   doors, yes.

18        Q.     And, specifically, in what regard

19   are there exceptions made?

20        A.     I would have to say, with people

21   asking for -- they are called courtesy moves.

22   So if someone doesn't like a job they can say,

23   Can you give me a courtesy move?  And they

24   would.  They would bump anyone out of their job.

25   Didn't matter how long they were there, they

73

C. BEHM

1

2     would do that.

3          Q.     And if you have enough seniority,

4     are you allowed to make courtesy moves?

5          A.     You can make a courtesy move if it

6     was your first day.

7          Q.     But if you don't have seniority,

8     could you bump somebody out of another job to

9     take their --

10         A.     It's happened, yes.

11         Q.     According to the CBA, can you do

12    that?

13         A.     According to the book, you can't,

14    but it happens.

15         Q.     You're saying exceptions are made

16    for that?

17         A.     Absolutely.  I worked with people

18    that had that exception made.

19         Q.     Do you recall specifically any

20    individuals who had exceptions made like that?

21         A.     Absolutely.  There were people on

22    C line that had incidences at work, and they

23    couldn't keep up so they would be moved to

24    kitting area.  So either working on the line or

25    kitting area.  And they would move to kitting.

1              C. BEHM

2    And some people would have to move to the line.

3         There was a woman at the beginning of

4    L line.  She didn't like the vibration.  And

5    that's straight in the production flex.  They

6    had to -- or production technician in your

7    Exhibit 4, that they had to deal with that.  She

8    didn't like that.  So they moved her to

9    something else.  It happened all the time.

10        Q.   Do you remember the names of those

11   individuals?

12        A.   I don't.  It's been a couple of

13   years.

14        Q.   Do you know if there was -- the

15   individual who couldn't deal with the

16   vibrations, do you know if there was a medical

17   reason she had to be moved?

18        A.   No.

19        Q.   No, you do not know, or no, she did

20   not have a medical reason?

21        A.   No, she didn't have a medical

22   reason.  And she told me I could not wear

23   perfume around her.  And I wasn't told by any

24   supervisor or anything.  And I didn't even wear

25   perfume.

C. BEHM

1

2      Q.    And you do not remember her name?

3      A.    No.

4      Q.    But pursuant to the provisions of

5  the CBA, is seniority supposed to be used in

6  making transfer decisions?

7      A.    Supposed.

8      Q.    And what about in layoffs?  Is

9  seniority supposed to be used in layoffs?

10     A.    Supposed.

11     Q.    When you started work at Mack, did

12  you go through an orientation process?

13     A.    Yes.  With 400 other people.

14     Q.    Tell me what you did during that

15  orientation process.

16     A.    We -- everyone was assigned -- I

17  believe it was a letter, like A, B, C, or D, and

18  depending on your letter it was where you went,

19  because they had so many people.  So we had a

20  tour of the facility.  We had, I believe it was

21  two days at an organ center.  Like right down

22  the street from Mack they played some type of

23  piano or whatever, but they rented it out.

24     Q.    Right.

25     A.    And the head of HR pretty much told

```
 1                        C. BEHM
 2   us about the company, and that was that.  It was
 3   a four-day orientation.
 4        Q.    And were you paid during that
 5   orientation process?
 6        A.    Yes.
 7        Q.    Did you cover any policies during
 8   that orientation process?
 9        A.    Yes.
10        Q.    Did you talk about the CBA during
11   that orientation process?
12        A.    Yes.  They had the company speak to
13   us and the union speak to us.
14                  (Acknowledgment is received and
15                  marked as Exhibit 6 for
16                  identification, as of this date.)
17        Q.    Ms. Behm, you've been handed what
18   has been marked as Exhibit Number 6.
19        Do you recognize that document?
20        A.    Yes.
21        Q.    Does this indicate that you received
22   copies of policies when you started work at
23   Mack?
24        A.    Yes.
25        Q.    And what's the date on this
```

                              C. BEHM

1

2    document?

3         A.    January 2nd, 2018.

4         Q.    Is that your signature?

5         A.    Yes.

6         Q.    Do you recall receiving copies of

7    the policies that are listed on this document?

8         A.    When I was hired, the policies also

9    changed with the renewal.

10        Q.    When you say "with the renewal,"

11   what do you mean?

12        A.    Of the contract, the union contract.

13        Q.    So you're saying the company

14   policies changed when the CBA was -- the new CBA

15   came into effect?

16        A.    They would hand out things

17   throughout the plant whenever they wanted to

18   change something.  There was no attendance

19   policy when I got hired.  About 30 days in,

20   the -- a point system came.  They handed out

21   papers saying we couldn't say anything about

22   Mack on social media.  And I never received any

23   copies of anything that would have changed when

24   the union contract changed.

25        Q.    But you would have received a new

                         C. BEHM

1    copy of the CBA?

2         A.    Yes.

3         Q.    To the extent policies are addressed

4    in the CBA, you had a copy of the CBA?

5         A.    What do you mean?  Like when it

6    would change?

7         Q.    Correct.

8         A.    I didn't sign anything when the

9    contract changed.

10        Q.    I understand that.  You received --

11        A.    I refused to sign a lot of papers.

12        Q.    But you received a new copy -- when

13   the CBA was revised in 2019, you received a copy

14   of that new CBA?

15        A.    Of the book, yes.

16               (Volvo Human Resources Policies

17               and Procedures is received and

18               marked as Exhibit 7 for

19               identification, as of this date.)

20        Q.    Ms. Behm, I'm handing you what has

21   been marked as Exhibit 7.  If you would take a

22   moment and look at that and let me know when

23   you're ready to answer questions.

24        A.    Okay.

79

1        C. BEHM

2        Q.    Ms. Behm, you've been handed --

3    Exhibit 7 is a copy of the harassment policy for

4    Volvo.  Is this a copy of the policy you

5    received when you started work in January of

6    2018?

7        A.    I don't recall receiving it.  So

8    this is, I believe, the first time actually

9    reading it.

10       Q.    So you don't recall receiving this

11   policy?

12       A.    No.

13       Q.    According to Exhibit Number 6, you

14   received a copy of the harassment policy when

15   you started, correct?

16       A.    Yes.  It says that.

17       Q.    Do you remember what the harassment

18   policy you received when you started, said?

19       A.    I believe every company has a policy

20   in place, stating it's not tolerated.

21       Q.    They should.

22       A.    Yes.

23       Q.    But do you remember what the policy

24   said when you started work at Mack?

25       A.    I believe so, yes.

C. BEHM

1

2      Q.    What did the policy -- when you

3  started at Mack, what did the policy tell you

4  you were supposed to do if you had an issue of

5  harassment in the workplace?

6      A.    Well, when we started, they didn't

7  separate the union workers from HR, so we were

8  able to go to human resources because they were

9  in a trailer outside.

10     Shortly after I started, they separated

11 human resources, and we had to go through our

12 union rep to even get an appointment with human

13 resources.  We weren't allowed in their

14 quarters, you could say.

15     Q.    Okay.

16     A.    So this policy, yes, it says:  Go to

17 human resources, but when I was harassed, it was

18 nearly impossible to go to human resources,

19 because they separated us.

20     Q.    I just want to make sure I

21 understand correctly.  Once they moved human

22 resources, you were not allowed to go directly

23 to human resources?

24     A.    Correct.  We had to go through a

25 union rep.

C. BEHM

1

2      Q.    For any reason, you couldn't go?

3      A.    For any reason, absolutely any

4  reason, even if our pay was off by one penny,

5  had to go through a union rep.

6      Q.    Did you ever -- and I'll talk more

7  about this later, but with regard to the

8  harassment issue that you had that you allege in

9  this case, did you ever communicate with anyone

10  in human resources at Mack about that issue?

11      A.    Can you clarify?

12      Q.    Did you ever communicate with anyone

13  in human resources at Mack about the harassment

14  issue that you're alleging in this case?

15      A.    Not in human resources.  To the

16  union, yes.

17      Q.    Again, human resources is different

18  from the union, right?

19      A.    Correct.

20      Q.    Did -- when you started work at

21  Mack, was there also a policy in place that said

22  that the company would prohibit any retaliation

23  against somebody who made a complaint of

24  harassment?

25      A.    Stating that no one can retaliate if

82

C. BEHM

1    I were to say something?

2    Q.    Correct.

3    A.    Yes.

4           (Attendance Policy is received

5           and marked as Exhibit 8 for

6           identification, as of this date.)

7    Q.    I hand you what's been marked as

8    Exhibit 8.  Again, if you'd take a moment and

9    look at that, and let me know when you're ready

10   to answer questions.

11   A.    Okay.

12   Q.    All right.  So, Ms. Behm, what is

13   Exhibit Number 8?

14   A.    It is the attendance policy that

15   they put in place, May 21st of 2018, five months

16   after I started.

17   Q.    And as you indicated earlier, when

18   you started at Mack, there wasn't a point

19   system, correct?

20   A.    Correct.

21   Q.    And this is a points-based

22   attendance policy that was put in place in May

23   of 2018?

24   A.    Yes.  Yes, it wasn't a part of the

83

C. BEHM

1
2    union until the new book.

3        Q.    The new contract?

4        A.    So this was just the company saying,

5    Hey, you're going to follow this, even though it

6    wasn't negotiated.

7        Q.    And did it apply to all of the

8    employees that were in the bargaining union?

9        A.    They enforce it.  Yes.

10       Q.    And did you have -- how did you

11   receive a copy of this policy?

12       A.    The same way you just handed it to

13   me.

14       Q.    Did anybody -- did you have a

15   meeting to discuss it?

16       A.    I had a startup meeting, which is

17   maybe five minutes long.  Just, hey, sign this

18   that you received -- I think we had to put our

19   initials that they handed it to us, and that was

20   that.

21       Q.    Do you recall who handed it to you

22   in that meetings?

23       A.    I was on the C line at the time, so

24   the supervisor on the C line.  There were two

25   supervisors.  I don't remember which one.

84

C. BEHM

1

2     Q.    Now, pursuant to this policy, there

3  was a specific, you know, type of corrective

4  action that would happen when you got to certain

5  point levels.

6     A.    Yes.

7     Q.    And did you understand that if you

8  got to certain point levels that, under this

9  policy, you would be disciplined?

10     A.    Yes.

11     Q.    Now, I think you may have answered

12  this question already, but did you receive any

13  job-specific training before you started work at

14  Mack?

15     A.    Clarify?

16     Q.    So did you receive any, like, you

17  know, any job-specific -- so you went through an

18  orientation, but did you spend some time

19  learning how to do your particular job --

20     A.    No.

21     Q.    -- before you went on the line?

22     A.    No.

23          MR. BAIRD:  Just wait --

24          MR. MC COY:  We have got to be

25          careful -- it's not a problem.  I do

C. BEHM

1

2            it, too -- not to talk over each

3            other because that makes it hard for

4            the court reporter.

5                THE WITNESS:  Okay.  I'm sorry.

6                MR. MC COY:  Sometimes I seem

7            like I'm done, and I've got more

8            that comes out.

9                THE WITNESS:  My fault, I'm

10            sorry.

11        Q.    So, go ahead.

12        A.    But to answer your question, no,

13    there is -- with production technician, you get,

14    I believe, four days of training per the book,

15    the UAW.  With production tech flex, which was

16    my job, you get maybe four hours.  And that's

17    also in the book.  Did I receive four hours?

18    No.  Most of the time it was -- this is the

19    manning (phonetic).  This is -- it has the parts

20    and what you're supposed to do.  Do it.

21        I remember I was still on probation, and

22    they had me build a treadle, and there was no

23    model or anything for me to go off of.  Do I

24    know if that truck made it off the line?

25    Probably.  Was it fixed?  I don't know.  Did

86

C. BEHM

1
2  that truck crash?  I would believe probably,
3  because I didn't know what I was doing.
4       Q.   When you say -- you said "a
5  treadle"?  Is that what you were --
6       A.   For gas brakes.
7       Q.   So your training was on the job.
8  You did it as you were working.  You learned how
9  to do the different aspects of your job?
10      A.   Yes.
11      Q.   Were you working -- were you
12 assigned to work with any particular employee to
13 learn how to do aspects of the job?
14      A.   No.  My job was flex.  It was -- you
15 did not know what you were doing when you walked
16 in the door.  It was that day, This is what
17 you're going to be doing.  I was in the same
18 line.  I was tied to a line.  So there's C line.
19 There is L line.  There is sleeper line.
20 There's H line.  There's G line.  It was, Go to
21 this line, report to the supervisor.
22      Q.   So -- well, let's talk about that.
23 So when you first started, you were assigned to
24 the C line, you indicated?
25      A.   Yes.

C. BEHM

1

2      Q.    And what type of trucks were made on

3  the C line?

4      A.    A lot of trash trucks, waste

5  management.

6      Q.    And those would be trucks without

7  sleeper cabs or --

8      A.    Yes.  LRs.

9      Q.    Who was your supervisor when you

10  started?

11      A.    I don't remember his name.  I called

12  him Waldo because he always had a beanie on.

13  Bryan.  Maybe Bryan.

14      Q.    And what shift were you working?

15      A.    First.  6:45 to 2:45.

16      Q.    Do you know how many employees

17  worked on the C line on first shift?

18      A.    At least a hundred, I would say.

19      Q.    Who was your union representative

20  when you started?

21      A.    Carl.

22      Q.    Is that Carl Kerchner?

23      A.    Yes.

24      Q.    At any point in time when you worked

25  at Mack, were you ever a supervisor?

88

1                          C. BEHM

2          A.    No.  Supervisors aren't union.  You

3    have to go through the company for that.

4          Q.    And during the time period that you

5    worked at Mack, did your job assignment ever

6    change?

7          A.    Every day.

8          Q.    Well, obviously, in the flex

9    position it changed every day, correct?

10         A.    Yes.

11         Q.    But in terms -- did you ever move

12   out of the flex position?

13         A.    For two weeks.

14         Q.    So only at the end of your

15   employment, is that what you're saying?

16         A.    Yes.

17         Q.    Now, did you ever change lines?

18         A.    All the time.

19         Q.    So what --

20         A.    I was on C line and L line and

21   sleeper line.

22         Q.    What did you make on the L line?

23         A.    You have to be more specific because

24   I worked on all of L line.

25         Q.    Well, just to -- explain to me.  You

1                        C. BEHM

2    said C line was mainly garbage trucks.  So what

3    is L line?

4         A.    L line had sleeper cabs on it,

5    regular cabs.  I didn't work on, like,

6    transmissions or engines.  I worked mainly on

7    cabs.

8         Q.    All right.  And so what's the

9    difference -- you said L line had sleepers on

10   it.  So when you say "sleeper line," what's the

11   difference in the two?

12        A.    Sleeper line pretty much is in the

13   beginning of L line.  So they -- they are a make

14   of their own in terms of sleepers.  They have

15   mattresses in them.  They have different things

16   that you need to put in them than a standard

17   cab.  So they would come on, and then the other

18   cabs would make their way side by side and then

19   come onto the line.  So every couple of regular

20   trucks, you get a sleeper cab because they took

21   more time.

22        Does that answer your question?

23        Q.    It does.  Thank you.

24        Again, I'm not going to mark these as an

25   exhibit.  But I'm going to hand you -- if you

C. BEHM

1
2    could just take a look at these and confirm that
3    those are the CBAs that were put in place in
4    2019.  And take your time.  I'm not in a rush.
5    I just want to verify.
6           A.    Yes.
7                    MR. BAIRD:  Just for the -- do
8                 you want to name the --
9                    MR. MC COY:  I was going to do
10                 the Bates numbers, that sort of
11                 thing.  I mean, if we put this in as
12                 exhibits, it's unwieldy.
13                    MR. BAIRD:  Right.
14                    MR. MC COY:  So the first
15                 document is -- is the master
16                 agreement between Mack Trucks and
17                 the local UAW.  This was -- the
18                 effective dates are October 25th of
19                 2019 to October 1st of 2023.  And
20                 the Bates Numbers are UAW 228
21                 through UAW 353.
22                    And the second document is the
23                 supplemental agreement for the
24                 Macungie operations.  Again, same
25                 effective dates, October 25th, 2019,

91

                    C. BEHM

1
2           to October 1st, 2023.  And the Bates
3           numbers are UAW-354 through 496.
4               (Action Type document, one page
5           is received and marked as Exhibit 9
6           for identification, as of this
7           date.)
8       Q.    Ms. Behm, you've been handed what's
9   been marked as Exhibit Number 9.  Is this a
10  document you have ever seen before?
11      A.    No.
12      Q.    So I'm just going to represent to
13  you, this is a document out of the human
14  resources information system at Mack Trucks.  So
15  what I want to ask you is, I want to kind of
16  walk through your employment history with Mack
17  and the different positions you were in and
18  leaves of absence you took.  Okay?
19      A.    Okay.
20      Q.    So if you start at the bottom -- and
21  I'm just going to ask you, if something is
22  incorrect, let me know, please, okay?
23      A.    Okay.
24      Q.    So if you look at the bottom, the
25  very first entry, it says:  Start date of

92

C. BEHM

1

2      January 2nd of 2018 through January 7th of 2018

3      was when you were hired, on January 2nd of 2018,

4      correct?

5          A.    Yes.

6          Q.    And the first week you were in

7      orientation, you indicated?

8          A.    Yes.

9          Q.    All right.  So if you look at the

10     next line up, January 8th of 2018, was when you

11     were assigned to a position?

12         A.    Yes.

13         Q.    And at that point in time, you were

14     a flex tech on C line?

15         A.    Yes.

16         Q.    Now, it indicates, the next line up,

17     that on May the 21st of 2018, there was an

18     organizational reassignment.  Do you know where

19     you moved on May the 21st of 2018?

20         A.    L line.

21         Q.    And then the line above that

22     indicates August 13th of 2018 was a leave of

23     absence.  Did you go out on leave on August the

24     13th of 2018?

25         A.    Yes.

93

C. BEHM

1

2     Q.    Why did you go out on leave in

3  August of 2018?

4     A.    During a family vacation I took

5  during plant shutdown, I got injured.

6     Q.    What kind of injury did you have?

7     A.    I want to tell you the truth, but I

8  doubt you're going to believe me.  I was

9  swimming with sea lions, and one ran over me and

10  almost dislocated my shoulder, and I had --

11  because I previously had clavicle surgery.  So

12  the sea lion reinjured it.

13     Q.    And how long did you remain out on a

14  leave of absence that year?

15     A.    A couple of months, until November.

16     Q.    So if you look at the next line, it

17  looks like November 16th of 2018 was your return

18  to work?

19     A.    Yes.

20     Q.    What position were you in when you

21  returned to work in November of 2018?

22     A.    L line.

23     Q.    And were you still a flex tech at

24  that position?

25     A.    Yes.

C. BEHM

1

2          Q.    At that time, excuse me.

3          All right.  And then on -- looks like a

4     few days later, November 19th of 2018, there was

5     an organizational reassignment.  Do you know

6     where you went on November 19th?

7          A.    I was still on L line, but the

8     beginning.

9          Q.    All right.  Then on December 5th of

10    2018, you went out on another leave of absence?

11         A.    Yes.

12         Q.    And I neglected to ask you.  Let me

13    just go back real quick.

14         From August 13th of 2018, through

15    November 15th of 2018, you were on A&S.

16         A.    Can you --

17         Q.    Were you on A&S?  Excuse me, let me

18    ask another question.

19         A.    On what dates?

20         Q.    November -- August 13th, after you

21    hurt your shoulder, August 13th of 2018 --

22         A.    Yes.

23         Q.    -- through November 15th of 2018,

24    did you receive A&S benefits?

25         A.    Yes.

C. BEHM

1

2      Q.    Back to December 5th of 2018, you

3  went out on another leave of absence.  Did you

4  receive A&S benefits?

5      A.    Yes.

6      Q.    How long did you remain out at that

7  time?

8      A.    A month and a half.

9      Q.    Why were you out of work from

10  December 5th through January of 2019?

11      A.    I was threatened by my husband at

12  the time and had to relocate.

13      Q.    So you were threatened.  How did

14  that qualify for A&S benefits?

15      A.    I suffered from stress and anxiety

16  and had a mental breakdown pretty much.

17      Q.    Next line up, January 21st of 2019,

18  you returned to work on that date?

19      A.    Yes.

20      Q.    Then next line up, February 27th of

21  2019, there was an organizational reassignment.

22  Do you know where you went that date?

23      A.    I was still on L line.

24      Q.    And then the next one up is

25  March 11th of 2019.  Again, it looks like

96

1                          C. BEHM

2    another organizational reassignment.  Do you

3    know if you moved then?

4          A.    I was still on L line.

5          Q.    Do you know what those

6    organizational reassignments mean?

7          A.    Maybe different supervisor.

8          Q.    And then on the next line up, on

9    May the 13th of 2019, it looks like you went out

10   on another leave of absence.

11         A.    Yes.

12         Q.    Why did you go out on leave that

13   date?

14         A.    I received a concussion at work on

15   May 8th, and then received a second concussion

16   on May 11th, and took a leave of absence.

17         Q.    And did you receive a -- so your

18   first concussion was at work?

19         A.    Yes.

20         Q.    Was that covered by Workers'

21   Compensation?

22         A.    They denied me.

23         Q.    And the second concussion, how did

24   that occur?

25         A.    I was assaulted.

C. BEHM

1

2     Q.     Outside of work?

3     A.     Yes.

4     Q.     And did you receive A&S benefits for

5 that leave of absence?

6     A.     Yes.

7     Q.     When did you return to work?

8     A.     September 5th, 2019.

9     Q.     And when you returned to work in

10 September of 2019, were you still a flex tech?

11    A.     Yes.

12    Q.     Do you remember what line you were

13 on then?

14    A.     They put me in Mack in Motion.

15    Q.     What does that mean?

16    A.     My term and other employees' term is

17 where they put the misfits, and you sit there

18 all day long.  And they -- Kaitlyn and another

19 HR representative had me teaching people in

20 cafeteria how to fill out their Buck Week

21 (phonetic) papers and occasionally build a cart

22 in Mack in Motion for supplies, and help with

23 the new computer systems.  So I was pretty much

24 penalized when I went back to Mack, for months

25 on end.

98

C. BEHM

1

2          Q.    So did you -- did you ever go back

3     on the line?

4          A.    No, I did not go back onto the line

5     until December.

6          Q.    All right.  So then it looks like

7     next line, December 2nd of 2019, there was a

8     temporary layoff for a week?

9          A.    Yes.  It appears to.

10         Q.    Do you know what that was for, why

11    there was a temporary layoff in December of

12    2019?

13         A.    I don't recall.

14         Q.    And then on December 9th it looks

15    like there was an organizational reassignment?

16         A.    Yes.

17         Q.    Where were you working then?

18         A.    G line.

19         Q.    So what is G -- you didn't mention

20    G line earlier.  Tell me what that is.

21         A.    G line, I was helping with fuel

22    tanks in the kitting area. K-I-T-T-I-N-G.

23         Q.    Tell me what kitting is.

24         A.    You preassemble something and it

25    goes to the line.  And then they attach it to

C. BEHM

1

2     the truck.

3          Q.    And you were doing kitting for gas

4     tanks; is that what you said?

5          A.    For the fuel tanks, yes.  Mainly the

6     straps, fuel straps to hold the tank in place.

7          Q.    All right.  And then on February the

8     17th of 2020, it says there was an

9     organizational reassignment.  What was -- what

10    position did you move to then?

11         A.    They moved me to second shift,

12    beginning of L line, and demoted me from flex to

13    just a tech.

14         Q.    You said "demoted."  Is that a

15    lower-paying position?

16         A.    Yes.

17         Q.    Flex was a higher paying job than

18    just the regular position?

19         A.    Yes, sir.

20         Q.    How much did your pay decrease?

21         A.    About a dollar.

22         Q.    And why did that happen on

23    February 17th of 2020?

24         A.    They -- they were laying off, and

25    they needed to place people in different areas

100

1                        C. BEHM

2  to accommodate how many people they were laying

3  off.

4        Q.    And then the top line, March 4th of

5  2020, it looks like you went out on a leave of

6  absence?

7        A.    Yes, I did.

8        Q.    Why did you go out on a leave that

9  date?

10        A.    I was going through so much

11  emotional distress from Mack.

12        Q.    And did you receive accident and

13  sickness benefits, A&S benefits?

14        A.    Eventually I did.  At first they

15  denied me.

16        Q.    And did you receive them all the way

17  through the end of your employment?

18        A.    Yes, I did.

19        Q.    And your employment ended in

20  February of 2021; is that correct?

21        A.    That is correct.  I don't know why

22  it says 9999.  It says December 31st.

23        Q.    Right.

24        A.    Is that just -- oh, okay, I see.  I

25  see.

C. BEHM

1

2     Q.    It was just a search date, I think,

3  that was put in.

4              (Wage Type spreadsheets is

5              received and marked as Exhibit 10

6              for identification, as of this

7              date.)

8     Q.    Before I ask you about this exhibit,

9  Ms. Behm, you said when you got put in the

10 Mack-In-Motion position in September of 2019,

11 that you were penalized.  Did you -- did your

12 pay change when you got put in the Mack in

13 Motion position?

14    A.    No.

15    Q.    So the same pay you had before you

16 had gone on that leave of absence?

17    A.    Yes.  They put me in a position that

18 I was not in.  Basically, a mechanic was in Mack

19 in Motion.  I was not a mechanic.

20    Q.    And then did you work the same

21 hours --

22    A.    Yes.

23    Q.    -- in Mack in Motion?

24    All right.  I'm going to hand you what has

25 been marked as Exhibit 10.

                              C. BEHM

1

2                   MR. MC COY:  Graham, I'm going to

3              tell you, this is -- this is part of

4              a spreadsheet that is marked Mack

5              270 through 282.  I just cut it and

6              blew it up so we could see it --

7                   MR. BAIRD:  A little better.

8                   MR. MC COY:  -- because it's too

9              small.

10        Q.   So, Ms. Behm, I want to ask you a

11   few specific questions about this, but this is

12   part of a spreadsheet that is a Mack spreadsheet

13   that shows your positions and hours worked.

14   Okay?  So what I wanted to ask you, if you would

15   look, there's a column you will see that's the

16   next to last.  It's called Cost Center.  Do you

17   see that?  If you look across the top over to

18   the right.

19        A.   Yes.

20        Q.   Do you see that?  Okay.

21        And then the first section of time is, you

22   know, if -- there's also a wage type.  That's

23   holiday pay.  I want to go down below the yellow

24   lines in the middle and look below that.

25        So the first cost center, it looks like

103

C. BEHM

1

2 you were in cab assembly L.  You see that?

3         A.    Yes.

4         Q.    And you were shift 1F, which was

5 6:45 a.m. to 2:45 p.m., correct?

6         A.    Correct.

7         Q.    And then it looks like you moved

8 to -- what's the next one?  Engine -- is that

9 engine room?

10         A.    I have no idea what that is.

11 Engine -- I have no idea.

12         Q.    Based on this document, it looks

13 like you worked in that position from

14 January 8th, 2018 until May the 18th of 2018.

15         A.    It states that.

16         Q.    If you don't know what that is,

17 that's fine.  I'm just -- you don't know what

18 that abbreviation -- what that means?

19         A.    No, I don't know what that means.

20         Q.    That's the time period when you said

21 you were working as a flex tech on the C line;

22 is that correct?

23         A.    I was on L line.  I moved off of

24 C line in May.

25         Q.    In May of 2018?

104

C. BEHM

1

2        A.    Yes.

3        Q.    So from January of 2018 through May

4    of 2018, you were working as a flex tech on the

5    C line?

6        A.    Yes.

7        Q.    So if you flip over to the third

8    page of this document, and you look at the date

9    of May 21st, 2018, I see you moved to what's

10   known as cab assembly, C.

11       A.    It's saying I moved to cab -- to C

12   line?

13       Q.    Yes.

14       A.    I moved off of C line on that date,

15   not on it.

16       Q.    Okay.  And then on the next page

17   there's an indication that on November 16th of

18   2018, you moved to cab assembly L.

19       A.    What was the date?

20       Q.    November 16, 2018.

21       A.    Yes.  But I was on L line.

22       Q.    Correct.  Cab assembly L, as in

23   Larry?

24       A.    Yes.  I was not on C line in August.

25   It states that, but I was not.

C. BEHM

1

2      Q.    In August of which year?

3      A.    It says of 2018 that I was on C

4 line, and I was not.

5      Q.    I believe August of 2018 was when

6 you went out on leave, correct, after your

7 shoulder injury?

8      A.    Yes.

9      Q.    So you are saying, when you went out

10 for that -- because of that injury, you were not

11 on C line at that time?

12      A.    I don't recall.

13      Q.    How long did you remain on the L

14 line after you moved?

15      A.    I stayed on L line until I went out

16 on A&S in May.  When I came back in September, I

17 was in Mack in Motion.  Then briefly on G line

18 in December until -- until about January.  Then

19 I was back at Mack in Motion.  And then placed

20 on second shift, L line.

21      Q.    So if you'll flip over to the page

22 where, if you look for the date, December 9th of

23 2019, looks like you changed from cab assembly L

24 to a different position.

25      A.    I was probably assisting on that

106

C. BEHM

1
2  line.

3      Q.    Do you know what that C-O-N-V stands

4  for?

5      A.    Conventional, would be my guess.

6      Q.    And this document shows that you

7  remained in that role through March the 4th of

8  2020.

9      A.    It states that, but I was not on

10  sleeper.  I was on L line.

11      Q.    And if you look over on the next

12  page, if you look at the date of February the

13  17th of 2020.

14      A.    February 17, 2020?

15      Q.    Yes.  It looks like that date you

16  moved from shift 1F to shift 2E, if you look all

17  the way over to the right.

18      A.    Correct.

19      Q.    Was that the first date that you

20  worked on second shift?

21      A.    Yes.

22      Q.    And you worked on second shift from

23  February 17th through March the 4th?

24      A.    Yes.

25      Q.    And then you did not return to work

C. BEHM

1

2    after that?

3         A.    Yes.

4         Q.    If you would look over at the last

5    page of this document.

6         So, Ms. Behm, you were employed by Mack

7    Trucks from January of 2018 through March of

8    20 -- or, excuse me, February of 2021.  Is that

9    correct?

10        A.    Yes.

11        Q.    A little over three years?

12        A.    Yes.

13        Q.    According to the last page of this

14   document, during that time period, you worked

15   2,767.9 hours.  Does that sound correct to you?

16        A.    Without having a calculator in front

17   of me, I would say "yes."  Yes.

18        Q.    All right.  We talked about during

19   the time period of your employment at Mack that

20   you got some pay raises.  Correct?

21        A.    Yes.

22        Q.    And that was pursuant to the CBA?

23        A.    Yes.

24        Q.    Now, you've also just testified a

25   minute ago that you got a pay decrease when you

                          C. BEHM

1   moved to second shift.

2       A.    Yes.

3       Q.    At any other time when you worked at

4   Mack, did you get a pay decrease?

5       A.    No.

6       Q.    Did your benefits ever change during

7   the time you worked at Mack?

8       A.    No.

9       Q.    And I think you may have told me

10  this earlier.  Do you remember what your pay

11  rate was at the time you resigned in February of

12  2021?

13      A.    I want to say 21.12.

14      Q.    How much were you making before you

15  moved to second shift?

16      A.    I don't recall.  There was a shift

17  differential, also.  I don't remember what the

18  percentage was.

19      Q.    So when you move to second shift,

20  you get a shift differential?

21      A.    Yes.  My pay went from production

22  tech, or production tech flex to just production

23  tech, and then so it lowered.  And then the

24  shift differential went up a little.

C. BEHM

1

2     Q.    So with the shift differential, was

3  it more than you were making in the flex

4  position?

5     A.    I don't recall.  I think it stayed

6  around the same, just because it went -- it

7  decreased and then increased because of the

8  shift differential.  So it kind of averaged out.

9     Q.    Directing your attention to the time

10  period you worked at Mack, did you have Corey on

11  your benefits?

12     A.    I did.

13     Q.    Why was -- at some point in time,

14  wasn't Corey also employed by Mack?

15     A.    He was.

16     Q.    When did Corey start working at

17  Mack?

18     A.    Same date I did, January 2nd, 2018.

19     Q.    So why was he on your benefits?

20     A.    He did not go on my benefits until

21  we got married.

22     Q.    And then why was he on your

23  benefits?

24     A.    Family plan was cheaper than

25  individual plans.

110

C. BEHM

                    (Life Event Change Form 2018 is

                    received and marked as Exhibit 11

                    for identification, as of this

                    date.)

                    (Life Event Change Form 2019 is

                    received and marked as Exhibit 12

                    for identification, as of this

                    date.)

Q.    Ms. Behm, I'll hand you what has

been marked as Exhibit Number 11 and Exhibit

Number 12.  I just want to verify.

     Exhibit Number 11 appears to be a

Life Event Change Form that you submitted,

indicating that you had got married.

A.    Yes.

Q.    And that occurred on July 7th of

2018?

A.    Yes.

Q.    And then if you would look at

Exhibit Number 11 -- excuse me, Exhibit Number

12.  Exhibit Number 12 appears to be another

life event change form that you submitted?

A.    Yes, but this was denied.

Q.    Your life event change form was

111

                        C. BEHM

1
2    denied?

3        A.    Yes.

4        Q.    Why was it denied?

5        A.    Kaitlyn denied it because, even

6    though it says we were separated, she would not

7    let me remove him until she had a divorce

8    decree.

9        Q.    So you submitted -- when did you

10   submit this document?

11       A.    The date that he assaulted me.

12       Q.    So that's May 11th of 2019?

13       A.    Yes.

14       Q.    Let me ask you -- look over at the

15   second page, if you would.

16       A.    Yes.

17       Q.    Down at the bottom what is the date

18   on the document?

19       A.    October 8th, 2019.

20       Q.    So did you -- you indicated you

21   submitted it the day he assaulted you, so why is

22   it dated October?

23       A.    It says:  Effective date of life

24   event change.  That was the date that we -- that

25   he assaulted me.  So I took it as our

C. BEHM

1

2    relationship is over.  And on October 8, 2019 is

3    when I informed Mack.

4         Q.    So why did you wait until October 8

5    to inform Mack?

6         A.    I wasn't at the plant.

7         Q.    You returned to the plant in

8    September; is that correct?

9         A.    Yes.  But by the time I went through

10    a union rep and got to human resources, that was

11    the turnover rate.

12         Q.    So did you ever remove Corey from

13    your insurance?

14         A.    Eventually I was able to, yes.

15         Q.    When did you move him from the

16    insurance?

17         A.    I got my divorce decree in March of

18    2020.

19         Q.    And is that when -- did you resubmit

20    the form at that time?

21         A.    I believe I emailed it to someone

22    because I wasn't there.  Or I brought it in.

23         Q.    On the first page of this document

24    where it's marked -- you marked the box next to

25    "divorce," it indicates:  Divorce or legal

113

1                          C. BEHM

2      separation, provide divorce decree or court's

3      order of separation.

4           Do you see that?

5           A.    Yes.  I provided them a copy of my

6      PFA to show proof of separation.  Which was

7      denied.

8           Q.    What is a PFA?

9           A.    Protection from abuse.

10          Q.    But at that point in time, did you

11     have a court order of separation?

12          A.    Yes.

13          Q.    You had a court order of --

14          A.    There's no legal separation in the

15     State of Pennsylvania.  So I submitted my PFA to

16     show that we were no longer together, living

17     together, to show separation.  Which was denied.

18          Q.    Did you -- as a result, did you end

19     up paying for his insurance until you were

20     formally divorced?

21          A.    Absolutely.

22          Q.    Did he contribute to that, at all?

23          A.    No.

24          Q.    When did he leave work at Mack?

25          A.    I don't recall the exact date.

C. BEHM

1

2     Q.    When he assaulted you in May of

3     2019, was he still working at Mack?

4          A.    No.

5          Q.    Do you know -- why did he leave work

6     at Mack?

7          A.    To my recollection, I believe he was

8     taking care of me, after my shoulder injury.  I

9     believe that's why he left, but I don't know the

10    exact date.

11         Q.    So that would have been sometime

12    after August of 2018?

13         A.    Yes.

14              MR. MC COY:  Why don't we take

15              another short break.

16              (A lunch break was taken.)

17    FURTHER EXAMINATION

18    BY MR. MC COY:

19         Q.    We are back on the record, and I'll

20    remind you that you're still under oath.

21         How was your job performance when you

22    worked at Mack?

23         A.    No supervisors complained.

24         Q.    Did you feel like you were a good

25    employee?

1                          C. BEHM

2          A.      Absolutely.   I went in and gave it

3     my all.

4          Q.      Did you ever get any performance

5     evaluations when you worked at Mack?

6          A.      Probably behind the scenes.

7          Q.      Did you ever get formal, like

8     written performance evaluations of any sort?

9          A.      Not that I recall.

10         Q.      Did you have any performance

11    problems during your time at Mack?

12         A.      No.

13         Q.      Did you ever receive any

14    disciplinary actions while you worked at Mack?

15         A.      Yes.

16         Q.      What do you recall receiving

17    disciplinary actions for?

18         A.      I was told I left my working area

19    when I was flex, so I was tied to the line, not

20    a specific area.   So I was assisting another

21    team leader named Fallon in the area right

22    before the one that I was normally at, and I got

23    written up for that.   But I refused to sign the

24    disciplinary action.

25         Q.      Any other discipline besides that?

116

C. BEHM

1

2      A.     Another one, a team lead said that I

3  wasn't in the work area.  Again, I was tied to

4  the line, not an area.  And that also came from

5  the team lead that was spending seven hours out

6  of the eight-hour day smoking cigarettes out

7  back.

8      Q.     Who was that?

9      A.     I believe his name was Justin.

10     Q.     Any other discipline besides that?

11     A.     When I moved from C line to L line,

12  it stated that I was -- I was reassigned, but

13  there was an altercation with me and a team lead

14  named Sara.  And it was:  Either move Colleen or

15  I quit.

16     Q.     What kind of altercation did you

17  have?

18     A.     I was on one of the hardest jobs on

19  C line, building pass-through plates, chassis

20  blocks.  Numerous things.  And I was already two

21  in the hole when I came in the door to fill in

22  for someone, and I asked the team lead for help.

23         Four hours later, when lunch came around,

24  I still had no help.  And then she tried to yell

25  at me at the end of the shift when everyone was

C. BEHM

1

2   still lined up at the time clock, and I was

3   still working.  And I told her:  I asked for

4   help numerous times, and you stood over there

5   flirting with the other gentlemen on the line

6   instead of helping.

7        So since I told her how I saw it, I got

8   kicked off of the line and moved out to L line.

9        Q.    So in terms of altercation, you mean

10  just a verbal altercation, not a physical

11  altercation?

12       A.    Correct.

13       Q.    And so you made the comment that,

14  you know, Colleen needs to move.  Are you saying

15  that Sara said if you weren't moved that she was

16  going to quit?

17       A.    Absolutely.

18       Q.    Who did she say that to?

19       A.    Everybody at the clock-out line.

20  She was very beside herself about the ordeal.

21       Q.    Did she report it to a supervisor?

22       A.    Brian came over, the C line

23  supervisor, and I told him exactly what

24  happened, that I asked for help numerous times,

25  and it was her job as that area team lead to

C. BEHM

1
2  assist where it was needed.  And she failed to
3  do her job.
4      Q.    And so you said this was when you
5  moved from which job?
6      A.    From C line to L line.
7      Q.    And do you recall when that took
8  place?
9      A.    Can I look back at the --
10     Q.    Was that the May -- well, yeah, it's
11 fine.  Please.  Yeah, you're welcome to refresh
12 your mind.
13         Was that the May 2018?  Might be easier to
14 look at the document before that.
15     A.    Yes.
16     Q.    May of 2018?
17     A.    Yes.
18     Q.    Did you get written up for that?
19     A.    No.
20     Q.    Any other write-ups that you recall?
21     A.    No.
22              (Notice of Formal Documented
23              Discussion, Attendance Policy is
24              received and marked as Exhibit 13
25              for identification, as of this

119

C. BEHM

1

2              date.)

3       Q.    Ms. Behm, I'm going to hand you

4  what's been marked as Exhibit Number 13.  Take a

5  minute and look at that and let me know when

6  you're ready to answer questions.

7       A.    I'm ready.

8       Q.    Okay.  What is Exhibit 13?

9       A.    This is a Notice of Formal

10 Documented Discussion for the Attendance Policy.

11      Q.    So this is -- as we talked earlier

12 under the attendance policy, it was a

13 points-based system, and at certain -- when you

14 incurred a certain amount of points, you would

15 get a particular type of discipline; is that an

16 accurate statement?

17      A.    Yes.

18      Q.    Okay.  So did you receive a

19 documented discussion on July 24th of 2018,

20 under the attendance policy?

21      A.    Yes.

22      Q.    And did you dispute this write-up or

23 this documented discipline?

24      A.    Yes.

25      Q.    In what way did you dispute it?

C. BEHM

1

2      A.    Through Carl Kerchner.

3      Q.    What was your issue with it?

4      A.    Carl and I went to Brian, my

5  supervisor on C line, to request time off for me

6  for my wedding.  Brian declined.  So then we

7  went to the plant manager.  He said:  Go enjoy

8  your wedding.  Which I did.  And I got written

9  up for two days that I took off for my wedding.

10     Q.    Which of these two dates were those?

11     A.    7/6 and 7/9.

12     Q.    And there's a note out to the side

13 of I guess the 7/9 entry where it says, absent,

14 unexcused, no notice.  And it says:  Did give

15 notice.  Do you know whose handwriting that is?

16     A.    No.

17     Q.    Did you file a grievance over this

18 disciplinary action?

19     A.    I don't remember.

20     Q.    Do you know if this was removed from

21 your record?

22     A.    I'm sure it wasn't.  It's right here

23 that it wasn't excused.

24     Q.    And who issued this disciplinary

25 action to you?

121

                          C. BEHM

1

2        A.     Kaitlyn.

3        Q.     And did you and Carl meet with

4    Kaitlyn to discuss the discipline?

5        A.     Yes.

6                     (Notice of Disciplinary Action

7                     are received and marked as Exhibit

8                     14-15 for identification, as of this

9                     date.)

10       Q.     Ms. Behm, I'm going to hand you what

11   has been marked as Exhibit 14 and Exhibit 15.

12   Do you recognize both of those documents?

13       A.     Yes.

14       Q.     Now, you referenced a few minutes

15   ago that you were written up twice for leaving

16   your work area.  Are these the write-ups for

17   those violations?

18       A.     Yes.

19       Q.     So let me look at Exhibit 14 to

20   start with.  That one was issued July 24, 2018;

21   is that right?

22       A.     Yes.

23       Q.     And who issued that to you?

24       A.     The supervisor was Carolina O'Connor

25   at the time.

122

C. BEHM

1

2      Q.    Now, tell me what the problem was,

3   from your perspective, with this write-up.

4      A.    She put:  Leaving assigned work area

5   during work hours, without permission.  I'm not

6   assigned to an area.  I'm assigned to the line.

7      Q.    Do you know what happened on this

8   particular date on -- it looks like July 19,

9   2018?

10     A.    Yes.

11     Q.    What happened?

12     A.    I was right next to the area in

13  kitting, assisting with a dash.

14     Q.    And was that part of your job duty,

15  to work in kitting?

16     A.    Yes.

17     Q.    As a flex tech, you would work in

18  kitting, as well?

19     A.    All of L line.

20     Q.    So did Ms. O'Connor tell you why you

21  were written up for being off the line that day?

22     A.    Yes.

23     Q.    Why?

24     A.    Because she said I left my work

25  area.

123

C. BEHM

1

2      Q.    So did you formally dispute this

3  disciplinary action in any way?

4      A.    Yes, I refused to sign it.

5      Q.    Did you file a grievance?

6      A.    I don't remember.

7      Q.    Was there a union representative

8  with you when this was issued to you?

9      A.    I believe Carl was there.

10     Q.    If you look at the next document,

11  Exhibit 15, what's the date on this disciplinary

12  action?

13     A.    3/8/2019.

14     Q.    Who was the supervisor that issued

15  it to you?

16     A.    Zachary.

17     Q.    And, again, this was written up for

18  violation of Work Rule 2 for not being in your

19  area?

20     A.    Yes.

21     Q.    Do you remember what happened on

22  this occasion that caused you to be write up --

23     A.    Yes.

24     Q.    -- to be written up, excuse me.

25     A.    I was assisting in the kitting area

1              C. BEHM

2    for the steering columns.  And that team lead

3    was mad that I was helping another team lead

4    assist on installing brackets.

5         Q.    So was the other team lead -- were

6    you supposed to be assisting that team lead with

7    something?

8         A.    Like I said, I'm tied to the line,

9    not a team lead or a supervisor.

10        Q.    But I guess I'm asking, did you

11   have -- were there multiple duties you were

12   supposed to be doing that day?

13        A.    Wherever they needed me on L line, I

14   was to assist.  That was my job.

15        Q.    So if I understand, you're saying

16   the other team leader needed you for something,

17   but you were already assisting at the time?

18        A.    He didn't even need me.  He was just

19   mad that I wasn't in his area so he could play

20   solitaire and smoke cigarettes.

21        Q.    And who was that team lead?

22        A.    I believe his name was Justin.  I

23   could be wrong.  He was in the very first

24   section after the sleepers came on the line.

25        Q.    So would Justin -- Justin was a team

125

C. BEHM

1     lead.  Zachary was the supervisor?

2

3          A.    Yes.

4          Q.    So Justin would report to Zachary?

5          A.    Yes.

6          Q.    Did you meet with Zachary about this

7     disciplinary action?

8          A.    He came up to me the day after it

9     happened and handed me the disciplinary action.

10         Q.    Was there a union representative

11    there?

12         A.    I told him to go find Carl.  And

13    Fallon, who was the team leader I was assisting,

14    he went to -- Carl went to Fallon, and Fallon

15    said, Yeah, she was helping me with brackets.

16    And Zack said, Well, HR already has the

17    disciplinary action, so I can't retract it.  So

18    it was confirmed that I was doing my job.

19         Q.    Did you do anything to formally

20    dispute this disciplinary action?

21         A.    I thought me not signing it was

22    statement enough.

23         Q.    Did you file a grievance over this?

24         A.    I don't remember.

25                    (Letter dated 3/3/20 is received

126

C. BEHM

1

2              and marked as Exhibit 16 for

3              identification, as of this date.)

4        Q.    I'll hand you what has been marked

5   as Exhibit 16.  Again, if you would look at that

6   and let me know when you're ready to answer

7   questions.

8        A.    I am ready.

9        Q.    What is Exhibit 16?

10       A.    This is a list of days I was absent

11   and their corrective actions at Mack Trucks.

12       Q.    So on this particular occasion, it

13   looks likes you were being issued an informal

14   document of discussion.  Is that what this is?

15       A.    For this, yes.

16       Q.    And this was again for violation of

17   the attendance policy; is that right?

18       A.    Yes.

19       Q.    Who issued this to you?

20       A.    Kaitlyn.

21       Q.    Did you dispute this write-up?

22       A.    Yes.

23       Q.    Why did you dispute this one?

24       A.    Because every single absence on this

25   I had either a subpoena or a court order that I

127

1                           C. BEHM

2    had to be in court, and they wrote me up for not

3    being there at work.

4          Q.    So what did you have to be in court

5    for on these dates?

6          A.    I had to be in court for my

7    protection order.  I had to be in court for

8    hearings for his charges.  I had to be in

9    custody court, child support court.  All orders

10   by the judge.

11         Q.    Now, it looks like two of the dates

12   on here are marked through.  Do you know why

13   that is?

14         A.    No, I do not.

15         Q.    So you did not think you should have

16   been written up for any of these dates?

17         A.    I can't be at two places at once.

18         Q.    Again, so my question is, you don't

19   think you should have been written up for any of

20   these?

21         A.    Absolutely not.

22         Q.    Is attending a court hearing an

23   excused absence?

24         A.    Yes.

25         Q.    Under the attendance policy?

128

C. BEHM

1

2        A.      Under the State of Pennsylvania.

3        Q.      If you have a subpoena or any court

4    appearance?

5        A.      I believe any court appearance, if

6    you're ordered by the court, you have to be

7    there or a warrant for your arrest is issued.

8        Q.      Now, were all of these court

9    appearances, was your attendance required?

10        A.      Yes.

11        Q.      And did you miss the entire day for

12    all of these court appearances?

13        A.      Yes.

14        Q.      Even if your hearing was in the

15    morning you would miss the entire day of work?

16        A.      I believe there's actually a court

17    hearing I didn't even attend.

18        Q.      But if the hearing lasted for an

19    hour, would you miss the entire day of work?

20        A.      Yes, because I lived an hour away.

21        Q.      Where did the hearings take place?

22        A.      Berks County, and I worked in

23    Lehigh.

24        Q.      Where is the courthouse in Berks

25    County?

129

C. BEHM

1

2      A.     Reading, Pennsylvania.

3      Q.     Did you meet with Kaitlyn to discuss

4  this attendance write-up?

5      A.     Yes.

6      Q.     Was anybody else present when you

7  met with her?

8      A.     My second shift, new union rep,

9  Kevin -- I don't know his last name.  What is

10  that?  Meckes-Gibbons?  M-E-C-K-E-S, dash

11  Gibbons.  That was the first time I met with

12  Kevin.

13      Q.     And did you file a grievance over

14  that attendance violation?

15      A.     I don't recall if it was a

16  grievance, but we had a meeting with Kaitlyn.

17      Q.     Outside of the disciplinary actions

18  we just reviewed, do you recall any other

19  disciplinary actions that you received during

20  your time at Mack?

21      A.     No.  But I know this three -- I

22  think it's three -- no, I'm sorry.  One of these

23  dates I was out sick, and Kaitlyn asked me for a

24  doctor's note, so I supplied her with the

25  doctor's note.  And she went on to ask me about

130

C. BEHM

1
2    my health and why I had a doctor's note.  And I

3    told her that I thought that was a HIPAA

4    violation, that a doctor's note is sufficient

5    enough.  And she refused to take off that point,

6    also.

7         Q.    Under the attendance policy, is

8    having a doctor's note -- does having a doctor's

9    note create an excused absence?

10        A.    I don't remember.

11        Q.    All right.  I want to talk now about

12   your leave of absence in 2018.  I know we have

13   already talked about that briefly earlier.

14                (Benefits document is received

15                and marked as Exhibit 17 for

16                identification, as of this date.)

17        Q.    I'll hand you what has been marked

18   as Exhibit 17.  Let me know when you're ready to

19   talk about this.

20        A.    Okay.

21        Q.    All right.  So, this appears to be a

22   request for A&S leave benefits that you

23   completed in August of 2018; is that correct?

24        A.    Yes.

25        Q.    We discussed your leave of absence

C. BEHM

1

2     in August of 2018, earlier, and I believe this

3     was when you were injured when you were on

4     vacation.

5          A.    Yes.

6          Q.    And you hurt your shoulder?

7          A.    Yes.

8          Q.    Now, you indicated you had already

9     had a shoulder injury before.  When did the

10    prior shoulder injury occur?

11         A.    April of 2013, I broke my clavicle.

12         Q.    Before you came to Mack?

13         A.    Yes.

14         Q.    I'm just going to kind of flip

15    through these pages.  I may have a couple of

16    questions for you.

17         The second page of this document, is that

18    your signature about halfway down the page?

19         A.    Yes.

20         Q.    And if you look at the next page of

21    the document, which appears to be a medical

22    statement.  Was Craig O'Neill your physician at

23    that time?

24         A.    Yes.

25         Q.    What kind of doctor is he?

C. BEHM

1

2      A.     Orthopedic.

3      Q.     And over on the right-hand side of

4  the page, there's a notation that you were

5  injured, it looks like, on August 7th of 2018,

6  and it says:  Fell on cruise; is that correct?

7      A.     Uh-huh.

8      Q.     Yes?

9      A.     Yes.

10     Q.     I believe you told me you were

11 injured when you were swimming?

12     A.     Yeah.  I didn't fill this paper out.

13 He did.

14     Q.     Did you tell him you fell?

15     A.     I told him it happened on a cruise.

16 Maybe he filled this out afterwards.  I don't

17 know.

18     Q.     And he indicated that you were

19 disabled from August the 13th through August the

20 27th of 2018.  Down on the left-hand side.

21     A.     Correct.

22     Q.     If you'll flip over a couple of

23 pages, there's a document at the -- well, if we

24 look at the Bates Number down at the bottom,

25 it's Plaintiff's 330.  It starts with Part A,

133

                              C. BEHM

1

2    Medical Facts, at the top of it.

3          A.    Yes.

4          Q.    If you go down, in question 3, so

5    there's a line there that says:  Is the employee

6    unable to perform any of his or her job

7    functions due to the condition?

8          And he says:  Yes.

9          A.    Correct.

10         Q.    No lifting, pushing, or pulling.

11         So you were not able to perform your job

12   at this time?

13         A.    At that time, I was not.

14         Q.    Did you apply for FMLA leave at this

15   time?

16         A.    FMLA or A&S?

17         Q.    FMLA.  Did you apply for FMLA leave

18   for this absence?

19         A.    I don't remember.

20         Q.    At this point in time, you had not

21   been employed by Mack for a year, had you?

22         A.    It goes by hours, not time, like --

23   not like a year.  It's amount of hours in a year

24   time.

25         Q.    But, again, my question was, at this

134

C. BEHM

1

2    point in time, you had not been employed for a

3    year, correct?

4          A.    Correct.

5          Q.    All right.  So if you would flip

6    over to the page that, down at the bottom is

7    marked Plaintiff's 334.  It's a document called

8    Diagnosis Treatment Plan.

9          A.    Yes.

10         Q.    All right.  And at this point in

11   time, it looks like -- and, again, I take it,

12   was this completed by Dr. O'Neill?

13         A.    Yes.

14         Q.    And he says, the treatment plan is:

15   Rest, physical therapy, with a follow-up on

16   October the 9th.

17         A.    Correct.

18         Q.    So did you remain out of work

19   through that time period?

20         A.    Yes.

21         Q.    If you would flip over to

22   Plaintiff's 339, called the Physical

23   Capabilities Checklist.  Do you see that?

24               MR. BAIRD:  It's hard to see.

25               It's obscured.

135

C. BEHM

1

2       A.      Okay.  Yes.  The page?

3       Q.      It's dated September 19, 2018, looks

4    like?

5       A.      Yes.

6       Q.      And at this point in time, again, is

7    this Dr. O'Neill that filled out this document?

8       A.      Yes.

9       Q.      And it indicates "No workup" at the

10   top?

11      A.      Correct.

12      Q.      All right.  And if you go to the

13   next page, and over on the right-hand side,

14   again, we have a description of when the

15   accident occurred, August 7, 2018.  And this

16   time it says zip-lining.

17      A.      I see that.

18      Q.      Do you know where Dr. O'Neill got

19   that information from?

20      A.      I did go zip-lining.

21      Q.      Did you hurt your shoulder

22   zip-lining?

23      A.      I mean, zip-lining hurts every part

24   of the body.

25      Q.      What exactly did you tell

136

C. BEHM

1
2     Dr. O'Neill about how you got hurt?

3          A.    I told him about the sea lion, but

4     he did ask me everything I did on the cruise.

5     Maybe he was putting it through all of the

6     different aspects of the cruise.

7          Q.    All right.  And if you would look at

8     the next page.

9          A.    Okay.

10         Q.    What is this document?

11         A.    Physical Capabilities Checklist

12    from -- from Mack Trucks.

13         Q.    And so is this a-- is this a Return

14    to Work document?

15         A.    I don't know what this is.

16         Q.    If you look halfway down the

17    right-hand side of this document, it indicates

18    that you were able to return to work with

19    restrictions per physical capabilities from 11/6

20    of '18.

21         Do you see that?

22         A.    Yes.  That's from Helene who is a

23    Mack employee.

24         Q.    Okay.  And then over on the

25    left-hand side, down at the bottom:  May lift 30

137

C. BEHM

1

2      pounds, no more than 10 pounds above shoulder

3      level?

4           A.    Yes.

5           Q.    Did you have those restrictions when

6      you returned to work at Mack?

7           A.    It says that, but when I returned, I

8      was working on L line in the kitting area, with

9      very heavy steering columns.

10          Q.    All right.  So if you would look at

11     the next page, please.

12          A.    Yes.

13          Q.    Is this a document completed by

14     Dr. O'Neill?

15          A.    Yes.

16          Q.    And if you look down at the bottom,

17     did he release you to return on November 8th of

18     2018, with no restrictions?

19          A.    Yes.

20          Q.    And what date did you actually

21     return to work?

22          A.    That, I don't know the exact date.

23          Q.    If we go back and look at Exhibit

24     Number 9, it looks like, according to that

25     document, you returned to work on November 16th,

138

C. BEHM

1  I believe.

2

3       A.    Yes.

4       Q.    And did you return to a different

5  job when you came back in November of 2018?

6       A.    Yes.

7       Q.    So what job did you go into in

8  November of 2018?

9       A.    I was on L line.

10      Q.    Do you know why you got moved to a

11  different job in November of 2018?

12      A.    I was moved every day so I couldn't

13  tell you exactly what time of each day I was on

14  what job.  I can tell you around about.

15      Q.    Okay.  So let me go back because

16  maybe my question is bad.

17      Did you move to a different line when you

18  came back from this leave of absence?

19      A.    I don't remember.

20      Q.    Do you recall why it took a week

21  from your release until you went back to work?

22      A.    I believe it was something with

23  placement.

24      Q.    What do you mean by "placement"?

25      A.    Mack had to decide, I guess, which

139

1                          C. BEHM

2     line to put me on.  I was flex.  They could put

3     me wherever they wanted.

4          Q.    But you went back into the flex tech

5     position at that point in time?

6          A.    Yes.

7          Q.    Not a different -- you weren't just

8     a production tech at that time?

9          A.    Correct.

10                    (Email is received and marked as

11                    Exhibit 18 for identification, as of

12                    this date.)

13         Q.    I'm handing you what's been marked

14    as Exhibit 18.

15         A.    Okay.

16         Q.    Do you recognize that document?

17         A.    I've never seen this document.

18         Q.    Yeah.  I was going to say, it's

19    probably not something you've ever seen.

20         This is an email, obviously an internal

21    email from Mack that indicates that in --

22    you requested two weeks of emergency leave the

23    week of December 3rd, 2018 and December 10th of

24    2018.  Do you recall requesting emergency leave

25    then?

140

C. BEHM

1

2      A.      Yes.

3      Q.      Why did you request emergency leave?

4      A.      My husband pulled a gun out at me.

5      Q.      And do you know when that happened

6  exactly, the date?

7      A.      It was either the -- it was right

8  before December 3rd, so either the 1st or the

9  2nd.

10     Q.      And did you -- were you granted

11 emergency leave?

12     A.      They denied it.

13     Q.      Did they tell you why they denied

14 your leave request?

15     A.      I was on a group phone call with

16 Kaitlyn and I believe Kevin Fronheiser at the

17 time, and Kaitlyn asked me if there was a

18 college student that could watch my daughter for

19 me, because I had no child care at the time.

20          And I said:  My daughter just went through

21 a traumatic experience seeing her father pull a

22 gun out at me.  I don't think I can find

23 someone.

24     Q.      So were you requesting emergency

25 leave because you needed child care?

141

                              C. BEHM

1

2        A.    I needed to find a place to live.

3        Q.    So you moved out of your house --

4        A.    Yes.

5        Q.    -- as a result?

6        A.    Yes.

7        Q.    The house where you were living, was

8   it your house?

9        A.    We were renting it together.

10       Q.    Is that the same house you currently

11  live in?

12       A.    No.

13       Q.    What was the address of that?

14       A.    608 Main Street, Blandon,

15  Pennsylvania.

16       Q.    Is that a house that you moved into

17  after you got married?

18       A.    Yes.

19       Q.    So where did you move after this

20  incident happened?

21       A.    216 Halsey Avenue, where I currently

22  reside.

23       Q.    And how long did it take you to make

24  that move from one location to the other?

25       A.    I moved in right before Christmas.

142

C. BEHM

1

2      Q.     So where did you live between the

3   incident and moving into the -- your current

4   address?

5      A.     My sister's couch.

6      Q.     Where does your -- and I know you

7   told me where your sister lives.

8      A.     She was living in Mohnton at that

9   time.

10     Q.     And I'm not sure -- circling back to

11   the question I asked you a minute ago, did they

12   tell you why they denied your request for

13   emergency leave?

14     A.     Because they needed me at work.

15     Q.     There's a reference in here to a

16   Drew, is it Kuhn?  Kuhn?  Do you know who that

17   is?

18     A.     I don't know who that is.

19     Q.     Was that your supervisor at the

20   time?

21     A.     That, I don't know.  I think Drew

22   was -- yes, Drew was the supervisor for the

23   whole L line.  I never really spoke to him.  But

24   I believe he was the L line supervisor.

25     Q.     Okay.

143

C. BEHM

1              C. BEHM

2              (Short Term Disability Benefit

3              Claim Form is received and marked as

4              Exhibit 19 for identification, as of

5              this date.)

6      Q.    I hand you what has been marked as

7   Exhibit 19.  I apologize.  This is not the

8   greatest copy in the world so I apologize for

9   that.  I think it's one of those documents

10  that's been scanned too many times and got

11  blurry, so --

12     A.    It's okay.

13     Okay.

14     Q.    All right.  So after the request for

15  emergency leave was denied, did you apply for

16  accident -- A&S benefits?

17     A.    Yes.

18     Q.    And is this the paperwork that you

19  submitted to apply for A&S benefits in December

20  of 2018?

21     A.    Yes.

22     Q.    It looks like you applied on

23  December the 5th?

24     A.    Yes.

25     Q.    All right.  And if you look at the

C. BEHM

1

2     second page of this document, looks like there's

3     a different physician or maybe physician's

4     assistant who filled this out, Brent -- Brent

5     Calhoon?

6          A.    Yes.

7          Q.    Where is Brent -- what practice is

8     he with?

9          A.    Green Hills Family Medicine.

10         Q.    That's in Reading?

11         A.    Flying Hills.

12         Q.    And what was the reason you took A&S

13    leave in December of 2018?

14         A.    Well, I initially requested just a

15    leave of absence to get my things in order.  And

16    with Mack being very un -- having no compassion,

17    my anxiety skyrocketed.  And I was concerned for

18    my well-being and my family's well-being.  So I

19    took off.

20         Q.    And if you look over a couple more

21    pages to the page that's Bates labeled Plaintiff

22    350.

23         A.    Yes.

24         Q.    Is that a form that was filled out

25    by Brent Calhoon, and there's -- do you know who

145

                            C. BEHM

1

2    the other name is?

3         A.    Yes.  Kimberly Rauenzahn.

4         Q.    Who is Kimberly?  Is she the doctor?

5         A.    She -- Brent is a PAC.  Kaitlyn felt

6    like he wasn't able to diagnose and wanted a DO,

7    so she sent this back and made a DO sign it,

8    also.

9         Q.    She's in the same practice with

10   Brent?

11        A.    Yes.

12        Q.    And according to this document, the

13   diagnosis was:  Major depression, recurrent and

14   generalized anxiety.

15        A.    Yes.

16        Q.    All right.  And if you look at the

17   next page, again, is this a document that was

18   filled out by Mr. Calhoon?

19        A.    Yes.

20        Q.    It indicates your estimated length

21   of disability is one to three months?

22        A.    Yes.

23        Q.    And were you able to work at this

24   point in time?

25        A.    No.

1                    C. BEHM

2         Q.    If you flip over to the next page,

3    when were you released to return back to work?

4         A.    I saw him on a -- I believe it was a

5    Tuesday or Wednesday before the 21st.  And he

6    told me to have a fresh start that coming

7    Monday.

8         Q.    So when you returned to work on

9    January 21st of 2019, what position did you work

10   in?

11        A.    L line, where I was when I left.

12        Q.    Still in a production flex position?

13        A.    Yes.  I was back at the steering

14   columns.

15        Q.    Explain that to me, because you said

16   you were back at the steering columns.  I

17   thought in a flex position you did whatever.

18        A.    Yeah.

19        Q.    So when you say that you're at the

20   steering columns, would you just work in the

21   steering columns, or would you work up and down

22   the line?

23        A.    Mainly that area, whether it be the

24   area before, area after it, sometimes the area

25   up a little bit.  I specialized pretty much in

C. BEHM

1

2  dash and all the way back.  So that was the area

3  I mainly stayed in.

4      Q.    So when you would come into work

5  each day, would you be told -- would somebody

6  say:  Here's where you need to go work today?

7      A.    I would apply -- apply -- I would go

8  to the same area I was at the day before, and if

9  nothing changed, they didn't need me somewhere

10  else, I would float around that area and assist

11  where I was needed.

12      Q.    Who was responsible for telling

13  you -- like if you needed to move from one area

14  to another, who would tell you that?

15      A.    Normally, a supervisor on L line

16  would come up to me and say:  Hey, we need you

17  in this area or that area.  But I would stay on

18  L line.

19      Q.    You didn't have a particular

20  supervisor that would come, say, All right,

21  today you need to be in this area?  Any of the

22  supervisors on L line can move you around?

23      A.    Pretty much, but Drew would conduct

24  it.

25                  (Corrective Action Request

148

1                          C. BEHM

2              Application is received and marked

3              as Exhibit 20 for identification, as

4              of this date.)

5        Q.    I hand you what has been marked as

6    Exhibit 20.

7        A.    Okay.

8        Q.    Is this a document you have ever

9    seen before?

10       A.    No.

11       Q.    I want to ask you -- so, again, we

12   talked earlier that in May of 2019, you -- you

13   had an injury at work?

14       A.    Yes.

15       Q.    Tell me what happened on that date.

16       A.    I stepped into a sleeper cab and

17   there was a bracket that I smashed my head on.

18       Q.    And did you cut yourself?

19       A.    I had like an indent on the top of

20   my forehead right here, but it wasn't like a

21   laceration.  I wasn't bleeding.

22       Q.    What were the other symptoms after

23   that happened?

24       A.    I started seeing dots right after it

25   happened, and I sat down.  And the person I was

C. BEHM

1
2  working with -- I don't recall their name --
3  said, Are you okay?  I said, Get the supervisor.
4  And I believe Don came over.  And I said, I hit
5  my head.  And he asked if I was okay.  I said,
6  Yeah, just let me get a drink of water.  I'll be
7  okay.
8       And throughout the day I noticed that my
9  ears started ringing.  My eyesight got really
10 sensitive to light, and didn't really have an
11 appetite.  Just started feeling sick.  So by the
12 end of the day, I said, you know, I'm not
13 feeling good.  I need to report this to Medical.
14 And I did.
15      Q.   So how did you report it to Medical?
16      A.    I went to Medical, to the medical
17 unit, and told them what happened.
18      Q.    So according to, you know, this
19 document, it indicates up at the top that the
20 incident was reported on May the 8th of 2019,
21 and it says the day of the incident was
22 approximately -- I think that says 8:30 am.  Do
23 you know if that's correct?  Maybe it's 9:30.  I
24 can't tell for sure.
25      A.    Where do you see that?

C. BEHM

1

2     Q.    The second entry says:  Date of

3   incident, and it has May 8th of 2019, and has a

4   time right next to it.

5     A.    It's probably 8:30 because I

6   remember it was before first break.  And first

7   break was at 9:10.  Or, I'm sorry.  9:20.

8     Q.    But if I understand you correctly,

9   you worked most of the shift before you went to

10  Medical?

11    A.    Yes.

12    Q.    Now, what happened when you went to

13  the medical department that day?

14    A.    I told them I hit my head.  And I

15  was harassed to go in an ambulance to the

16  hospital.  And it was the end of the day.  I

17  said, I can't.  I live an hour away.  I have to

18  get my kids.  There's no way I can leave right

19  now and go to the hospital.

20      Instead of them signing a paper waiving

21  that right, they continued to have HR and other

22  representatives from the plant come up to me and

23  harass me about going to the hospital.

24      I said, No, give me the paper.  I'll waive

25  my rights.  I'll go to the hospital when I get

151

C. BEHM

1

2    home and I find care for my kids.  And that's

3    what happened.

4         Q.    So did you go to the hospital after

5    you got home?

6         A.    Absolutely.

7         Q.    What did they tell you at the

8    hospital?

9         A.    I had a concussion.

10        Q.    What did they tell you to do because

11   of that?

12        A.    A minimum of 48 hours of brain rest,

13   meaning, go home, sit in a darkened room, keep

14   all the blinds shut, no sounds, just let your

15   brain recuperate.

16        Q.    So did you work the day after that?

17        A.    Mack called me, harassing me,

18   telling me I needed to get back into work.

19        Q.    When did you go back to work?

20        A.    That day.

21        Q.    So the injury occurred on May the

22   8th.

23        A.    Yes.

24        Q.    Did you work May the 9th?

25        A.    That's when they called me and told

152

1                          C. BEHM

2      me I had to come in.  I came in the next day,

3      the 10th.

4             Q.    When you came in on the 10th, did

5      you have a meeting in -- in the dispensary?

6             A.    Yes.  For four hours.

7             Q.    What happened in that meeting?

8             A.    I told them that I was not supposed

9      to be there.  I gave them my medical paperwork

10     from the hospital, stating I was still supposed

11     to be having brain rest.  And they told me that

12     they could supply me with tinted glasses for

13     light sensitivity.  They would provide me with,

14     not earmuffs, but something to help with the

15     sound, and asked if I would go on the floor,

16     wiping down carts.

17            I said, You guys are going against what

18     the hospital told me, with a minimum of 48 hours

19     of brain rest.  It hasn't even been 48 hours.

20            They told me -- or I told them I shouldn't

21     even be there.  That I shouldn't have even drove

22     in.

23            And they said that they would have sent a

24     shuttle to pick me up to come in.

25            And I flat out told them, If I have to --

153

C. BEHM

1   if you have to send a shuttle to pick me up, I

2   should not be in a manufacturing plant, putting

3   other people's lives at risk.

4       And after four hours -- Carl Kerchner was

5   sitting right next to me the whole four hours --

6   Mack finally said, Okay, go home.

7                   (Physical Capabilities Checklist

8                   is received and marked as Exhibit 21

9                   for identification, as of this

10                  date.)

11      Q.    I hand you what has been marked as

12  Exhibit 21.

13      A.    Okay.

14      Q.    So have you seen this document

15  before?

16      A.    No.

17      Q.    So this appears to be a medical

18  evaluation on May 10th of 2019.  Is that the day

19  you returned to the plant?

20      A.    On the 10th?

21      Q.    Yes.

22      A.    Yes.

23      Q.    And when you came back to the plant

24  that day, who did you see in the dispensary?

154

C. BEHM

1

2      A.    Dr. Muto.

3      Q.    And did Dr. Muto release you to

4  return to the light-duty job that day?

5      A.    He tried to.

6      Q.    And over on the left-hand side, it

7  says:  No exposure to bright light.  So bottom

8  of the left.

9      A.    Yes.

10     Q.    Did you have any other restrictions

11 besides limited exposure to bright light?

12     A.    He was not my physician.

13     Q.    That's what I mean.  From the

14 emergency room, did you have other restrictions?

15     A.    Yes.

16     Q.    What were they?

17     A.    No sounds.

18     Q.    What else?

19     A.    Pretty much what I stated before;

20 brain rest, sit in a darkened room, no sounds.

21 I didn't even have my kids.

22     Q.    And you said 48 hours of rest,

23 correct?

24     A.    Minimum, 48 hours.

25     Q.    All right.  And on the second page

C. BEHM

1

2    of this document, was there a -- did you -- was

3    there a Workers' Comp claim filed as a result of

4    this accident?

5         A.    Yes.

6         Q.    And was that claim denied?

7         A.    Yes.

8         Q.    Were you told why it was denied?

9         A.    Because I did not go to the hospital

10   that they wanted me to go to.  It wasn't in

11   network.

12             (Three-page doctor notes is

13             received and marked as Exhibit 22

14             for identification, as of this

15             date.)

16        Q.    I've handed you what has been marked

17   as Exhibit 22.

18        A.    Okay.

19        Q.    Have you ever seen this document

20   before?

21        A.    Not that I recall.

22        Q.    All right.  These are -- this is a

23   document from your medical records at Mack.  And

24   it appears to reference the incident that

25   occurred on May 10th, 2019; is that correct --

156

C. BEHM

1

2  or excuse me, not the incident.  Your meeting in

3  the dispensary on May 10th of 2019.

4       A.    Yes.

5       Q.    So down at the bottom of the page it

6  indicates -- there's a -- it says Workers' Comp

7  number.

8       Do you see that at the very bottom?

9       A.    Yes.

10      Q.    It says, Addendum:  Patient

11 indicates she is unwilling to perform light

12 duty.

13      Did you refuse to perform light duty?

14      A.    I refused to perform any duty during

15 the time that the hospital told me to be on

16 brain rest.  So that was the day they were

17 trying to make me return to work, against

18 hospital wishes.

19      Q.    And Dr. Muto sent you home that day?

20      A.    Yes.

21      Q.    And when did he tell you to come

22 back?

23      A.    I believe Monday.

24      Q.    All right.  If you would look over

25 at the next page of the document.

157

1                      C. BEHM

2          A.    The 243?

3          Q.    Yes.   243.

4          Down at the very bottom -- very bottom

5    line, starts on the end of the second-to-last

6    line, did you refer to Dr. Muto as a

7    veterinarian?

8          A.    Absolutely.

9          Q.    Why did you do that?

10         A.    Because he's crooked.

11         Q.    Why do you say that?

12         A.    He's going against all other

13   doctors.  He thinks he's the doctor.  He's not.

14         Q.    All right.  And then if you look at

15   the next page, on 244.

16         A.    Yes.

17         Q.    The bottom of that first paragraph,

18   did you tell the nurse in the dispensary that if

19   you go out there and get sick, you're f'ing

20   suing?

21         A.    Where do you see that?

22         Q.    Very last line of the first

23   paragraph.

24         A.    What page?

25         Q.    244.

158

1                           C. BEHM

2        A.     Yes, and I stood by that.

3                    (Workers' Comp Denial Notice is

4                    received and marked as Exhibit 23

5                    for identification, as of this

6                    date.)

7        Q.     Let me hand you real quick what's

8   been marked as Exhibit 23.

9        A.     Yes.

10        Q.     Did you receive a copy of this

11   document?

12        A.     Yes.

13        Q.     And this just confirms that your

14   Workers' Comp claim was denied?

15        A.     Yes.

16        Q.     And the date of the denial is

17   May the 23rd of 2019; is that correct?

18        A.     Yes.

19        Q.     So Dr. Muto sent you home on the

20   10th, told you to come back the next week.  Did

21   you come back to work the next week?

22        A.     No.

23        Q.     Why not?

24        A.     I got assaulted on the 11th, which

25   was a Saturday.

C. BEHM

1

2      Q.    Tell me what happened that day?

3      A.    That day my daughter had a medical

4  bill.  And I asked her father for money to pay

5  that medical bill, and he said, Okay.  So I went

6  to retrieve the money, and we got into an

7  altercation, and he punched me.

8      Q.    And this is Corey that you're

9  referring to, correct?

10      A.    Yes.

11      Q.    And did you end up having to seek

12  medical treatment because of that assault?

13      A.    Yes.

14      Q.    Did go over to the hospital that

15  day?

16      A.    Yes.

17      Q.    And do you recall what the diagnosis

18  was?

19      A.    Another concussion.

20      Q.    Did you go to the same -- same

21  hospital?

22      A.    Yes.

23      Q.    Did you see the same doctor?

24      A.    I was in the emergency room for both

25  incidents.

160

C. BEHM

1

2      Q.     And did you subsequently apply for

3  A&S benefits?

4      A.     Yes.

5             (A&S letter is received and

6             marked as Exhibit 24 for

7             identification, as of this date.)

8      Q.     I hand you what has been marked as

9  Exhibit 24.  Take a look at that and let me know

10  when you're ready.

11      A.     Okay.

12      Q.     Is this your application for A&S

13  benefits, effective May 13th, 2019?

14      A.     Yes.

15      Q.     If you look at the second page,

16  which is 203, Mack 203, is that your signature

17  halfway down the page?

18      A.     Yes.

19      Q.     And then go to the next page, which

20  is 204.  Over on the right-hand side it

21  indicates that the -- says the incident occurred

22  May the 12th of 2019; is that correct?

23      A.     It happened on the 11th.  So maybe

24  she filled this out the day after.  I don't

25  know.

1                        C. BEHM

2         Q.    And then it says:  Assault, injury

3    to face and head.

4         A.    Yes.

5         Q.    Do you know who the doctor was that

6    completed this?

7         A.    It was originally Brent Calhoon, but

8    again, Kaitlyn wanted a DO.  So Diane Bonaccorsi

9    resubmitted.

10         Q.    All right.  And if you flip over a

11    couple more pages to 206, this document down at

12    the bottom indicates that you -- they estimate a

13    length of disability is two to three weeks with

14    a return to work of June the 3rd.

15         A.    Correct.

16         Q.    And were you able to work at all at

17    that time?

18         A.    No.

19         Q.    Did you apply for FMLA leave at this

20    time?

21         A.    I don't remember.  If I did, it was

22    denied, because I didn't have hours.

23                    (Mack letter dated 5/21/19 is

24                    received and marked as Exhibit 25

25                    for identification, as of this

162

                          C. BEHM

1

2          date.)

3     Q.     I'm going to hand you what has been

4  marked as Exhibit 25.

5     A.     Okay.

6     Q.     All right.  Was your request for A&S

7  benefits approved by Mack?

8     A.     Yes.

9     Q.     And looks like it was approved

10  through June the 3rd of 2019?

11     A.     Yes.

12                 (Physical Capabilities Checklist

13                 is received and marked as *Exhibit

14                 25 for identification, as of this

15                 date.) (*should be 26)

16     Q.     This is Exhibit 26.  I really am

17  just using these because I know your leave of

18  absence ended up lasting until September,

19  correct?

20     A.     Yes.  After each follow-up

21  appointment I had to resubmit pretty much the

22  same A&S paperwork, just --

23     Q.     With a new date on it, right?

24     A.     Yeah, updating, yeah.

25     Q.     And so is that the normal procedure

163

                              C. BEHM

1

2    when you're out and you extend your leave at

3    Mack?

4         A.    I would assume so, yes.

5         Q.    Did you do that in your other leaves

6    when you were out and needed to extend the

7    leave?

8         A.    I believe this was the only one that

9    kept getting extended.

10        Q.    So, in this document, if you look at

11   the very first page of Exhibit 26, do you know

12   whose signature that is down at the bottom?

13        A.    Probably Bonaccorsi, it looks like.

14        Q.    And down on the right-hand side near

15   the bottom, it looks like it says July 1st,

16   2019, new date.

17        A.    Yes.

18        Q.    So this extended your -- was this

19   extending your leave another month?

20        A.    Yes.

21               (Letter dated 6/14/19 is received

22               and marked as Exhibit 27 for

23               identification, as of this date.)

24        Q.    Number 27.  Take a look at that and

25   let me know when you're ready.

164

                              C. BEHM

1

2        A.    Okay.

3        Q.    I asked you a few minutes ago if you

4   recall whether you had applied for FMLA leave on

5   this absence.  Does this refresh your

6   recollection?

7        A.    Yes, it does.

8        Q.    And what happened with your request

9   for FMLA leave?

10       A.    I was denied.

11       Q.    And, again, were you denied because

12   you didn't meet the hours requirement?

13       A.    Correct.

14                  (Letter dated 5/13/19 is received

15                  and marked as Exhibit 28 for

16                  identification, as of this date.)

17       Q.    Exhibit 28.  Is this another

18   extension of the same leave of absence?

19       A.    Yes.  Dr. Bonaccorsi referred me to

20   see a neurologist.

21       Q.    And looks like you had an

22   appointment with the neurologist on August 22nd.

23       A.    Yes.

24       Q.    And so did this extend your leave

25   through August the 22nd?

C. BEHM

1

2      A.      Yes.

3      Q.      And was your extension of leave

4  approved by Mack?

5      A.      To an extent.

6      Q.      Why do you say "to an extent"?

7      A.      Because Kaitlyn called me asking me

8  to see one of their neurologists for a second

9  opinion.

10     Q.      But did you get accident and

11 sickness benefits through August 22nd of 2019?

12     A.      Yes.

13             (Letter dated 8/22/19 is received

14             and marked as Exhibit 29 for

15             identification, as of this date.)

16     Q.      I hand you that one.  It's marked

17 Exhibit 29.

18     A.      Yes.

19     Q.      So you indicated that -- tell me the

20 name of the doctor you are saying?  Bona -- what

21 was her name?

22     A.      Bonaccorsi.

23     Q.      Bonaccorsi, excuse me.

24     So, Dr. Bonaccorsi referred you to a

25 neurologist?

C. BEHM

1

2      A.    Well, Brent Calhoon referred me.

3  But like I stated before, Kaitlyn always wanted

4  a DO.

5      Q.    She was signing the paperwork on

6  behalf of --

7      A.    Yes.

8      Q.    Got you.

9      And it looks like the neurologist that you

10 were referred to is a Dr. Brzozowski?

11     A.    Brzozowski, yes.

12     Q.    So when did you see Dr. Brzozowski?

13     A.    Looks like August 22nd.

14     Q.    All right.  And did Dr. Brzozowski

15 extend your leave?

16     A.    He wanted me to return back to him

17 on November 7th, but Mack did not like that.  So

18 they sent me to their neurologist, and I was

19 back at work in September without any

20 clearances.

21     Q.    So let me ask you, if you would look

22 over at the page that's marked -- let's see --

23 Mack 178.

24     A.    Yes.

25     Q.    Did Dr. Brzozowski complete the

167

C. BEHM

1
2    physical capabilities checklist for you?

3        A.    No.

4        Q.    Why not?

5        A.    Because he's not trained to do

6    physical capabilities.  He's a neurologist.

7        Q.    And if you'd look over at the next

8    page, down in the middle of the page, if you

9    would look at question Number 12 -- you can see

10   that on the left-hand side?

11       A.    Yes.

12       Q.    Did he determine that you were

13   totally disabled and unable to work?

14       A.    Yes.

15       Q.    And that looks like from August 22nd

16   to the present?

17       A.    Yes.

18       Q.    And right below that he indicates

19   that your expected return-to-work date is

20   December 1st of 2019?

21       A.    Yes.

22       Q.    All right.  So after you -- you just

23   indicated that Dr. -- after you saw

24   Dr. Brzozowski, that Mack instructed you to go

25   see a company doctor?

C. BEHM

1

2      A.    Yes.

3      Q.    How did you find out that they

4  wanted you to go see a company doctor?

5      A.    Kaitlyn called me, and I remember it

6  clear as day because I was standing in the

7  store, and the conversation didn't start that

8  way.  It started off as the modeling photos.

9  She asked me if I was modeling, if I was getting

10  paid, if my neurologist knew.  I told her her

11  job is in human resources and not my physician.

12      And she then instructed me to see a

13  company doctor.  And I stated that that wasn't

14  my physician, either.

15      And she said that I would be terminated

16  because, per all the documents at Mack, that if

17  they ask for a second opinion, I had to comply.

18      So I complied, and I went to their

19  neurologist.  She said that they would pay me

20  for my time and expense.  To this day I have not

21  been paid for my time and expense.  And I went

22  and saw Dr. Shipkin, I believe his name was.

23                  (Letter dated 8/29/19 is received

24              and marked as Exhibit 30 for

25              identification, as of this date.)

169

1          C. BEHM

2          Q.    I'm handing you what's been marked

3      as Exhibit Number 30.

4          A.    Yes.

5          Q.    Take a look at that and let me know

6      when you're ready to answer questions.

7          A.    Yes.

8          Q.    Tell me what Exhibit 30 is.

9          A.    It's a letter from Kaitlyn stating

10     that the company wants me to seek a second

11     professional opinion with Dr. Shipkin.

12         Q.    And you indicated that on -- and the

13     date is August 29th of 2019; is that right?

14         A.    Yes.

15         Q.    And the appointment with Dr. Shipkin

16     was set up for September 5th of 2019?

17         A.    Yes.

18         Q.    Now, you indicated a minute ago that

19     she told you that if you didn't go to the

20     appointment, that your -- your benefits could be

21     terminated?

22         A.    Yes.

23         Q.    And if you look down at the bottom

24     of the first page, does she reference the

25     portion of the CBA that states that?  Says:

1                        C. BEHM

2   Please see Mack Benefit Agreement, Article 3,

3   section 3?

4        A.    Yes.

5        Q.    And so you did go to the appointment

6   with Dr. Shipkin?

7        A.    Absolutely.

8        Q.    What happened during that

9   appointment?

10        A.    He looked in my eyes, checked my

11   reflexes, and it was a very brief examination.

12        Q.    How long did the appointment last?

13        A.    I don't recall.

14        Q.    Did he give you any sort of opinion

15   or diagnosis at the end of that appointment?

16        A.    He asked me how I was feeling that

17   day.  And I said I was feeling okay.  And he

18   said, Do you want to return to work?  And I

19   remember telling him that I love my job, I

20   wanted to go back.  And he was like, Okay.

21   Tomorrow.

22        Q.    Did you dispute that with him?

23        A.    I felt very uncomfortable, but what

24   was I going to say?  I was scared I was going to

25   lose my job.

C. BEHM

1

2     Q.    After your appointment with

3  Dr. Shipkin, did you communicate with anybody at

4  Mack?

5     A.    I don't recall.

6     Q.    Did you call Kaitlyn after the

7  appointment with Dr. Shipkin?

8     A.    I believe I spoke to medical.

9     Q.    What did you call Medical for?

10     A.    They were the ones that you have to

11  have your clearances for.  And they said that

12  they are waiting on my -- if I were to have

13  clearances, and that they would call me.

14     Q.    So Dr. Shipkin said you could go

15  back tomorrow, which would be September the 6th;

16  is that right?

17     A.    I don't remember.

18     Q.    Well, your appointment was on the

19  5th.  We just looked at that.

20     A.    Yes.

21     Q.    So he said, in that appointment, you

22  could go back tomorrow?

23     A.    Yes.

24     Q.    Whatever the next workday was,

25  right?

C. BEHM

1

2      A.     Yes.

3      Q.     Okay.  Gotcha.  If it was a Friday,

4   maybe it was Monday?

5      A.     Yeah.

6      Q.     Did you go back the next workday?

7      A.     I don't think I did.  I think they

8   were still waiting on clearances.  It was either

9   the next day or the following day.  But I

10   remember sitting in one of the cafeterias for,

11   like, two or three hours because it was -- who

12   was it? -- Rick Schmidt, he places everyone, was

13   waiting for my clearances.

14              (Dr. Shipkin letter is received

15              and marked as Exhibit 31 for

16              identification, as of this date.)

17      Q.     I've handed you what has been marked

18   as Exhibit 31.

19      A.     Okay.

20      Q.     Have you seen these letters from

21   Dr. Shipkin before?

22      A.     Once I requested my medical records

23   from Mack, I saw them.  But I wasn't handed them

24   after my appointment.

25      Q.     He did not send you a copy of these?

C. BEHM

1

2      A.    I don't remember.  I do remember

3  seeing it when I requested my medical records,

4  though.

5      Q.    And according to the letter,

6  Dr. Shipkin determined that you were capable of

7  performing your job as a production tech at

8  Mack; is that correct?

9      A.    Yes.

10              (A break was taken.)

11      Q.    All right.  Did Mack have a layoff

12  in early 2020?

13      A.    Yes.

14      Q.    How did you find out about that

15  layoff?

16      A.    At first it was word of mouth, just

17  talk around the plant.  Then it was confirmed.

18      Q.    At some point in time, was there

19  like a public announcement of a layoff?

20      A.    I don't remember.

21      Q.    Now, at the time that the layoff

22  took place, you were working, correct?  You were

23  not out on leave?

24      A.    No.  I was working.

25      Q.    Were you told -- did Mack ever tell

174

                                C. BEHM

1   you why the layoff was taking place?

3        A.    To my recollection, things were just

4   slowing down.  They had too many employees.

5        Q.    Did you receive any information from

6   Mack about how the layoff was going to take

7   place?

8        A.    I don't remember.

9               (Mack Trucks FAQS is received and

10              marked as Exhibit 32 for

11              identification, as of this date.)

12       Q.    I'll hand you what has been marked

13  as Exhibit 32, if you would look at that and let

14  me know when you're ready to discuss it.

15       A.    Okay.

16       Q.    You recognize these documents?

17       A.    I don't remember them, but I

18  remember hearing about it, and I know this

19  special announcement.

20       Q.    All right.  Well, let's look at

21  that, first of all.

22       So the special announcement, which is page

23  Mack 363, is dated January 28 of 2020; is that

24  correct?

25       A.    Yes.

C. BEHM

1

2     Q.    Okay.  And did you receive a copy of

3  this?

4     A.    Yes.

5     Q.    Now, in this document right at the

6  beginning, as it says:  In our message about

7  Lehigh Valley operations upcoming rate reduction

8  and layoffs shared with you on Wednesday,

9  January 8th.

10    Do you recall the layoff information being

11  shared on January the 8th of 2020

12    A.    I remember we had a meeting in the

13  one cafeteria, but I don't remember what it was

14  about.

15    Q.    And then it indicated that in that

16  meeting they said the last working day for those

17  affected by the layoff would be February the

18  28th.  Do you remember that?

19    A.    Yes.

20    Q.    And then I believe in this

21  announcement, were they changing the date of the

22  last day of work for people being laid off?

23    A.    I don't remember.

24    Q.    Looks like to me it changed to

25  February 21st, if you look in the third

176

                              C. BEHM

1

2     paragraph.

3         A.    Okay.

4         Q.    Do you recall that?

5         A.    I don't remember what the actual

6     dates were for the layoff.

7         Q.    All right.  So if you would go back

8     to the first page of this document, page 360.

9     Question number 4 on the first page there says:

10    If I'm not laid off and I'm currently on first

11    shift, what is the chance I would be assigned to

12    the second shift?

13        Do you see that?

14        A.    Yes.

15        Q.    And what's the response?

16        A.    During a rate change there will be

17    reduction, and based on seniority, employees may

18    be moved to other shifts.

19        Q.    Did you understand that individuals

20    who remained with the company after the layoff

21    could potentially have to change shifts?

22        A.    Yes.

23        Q.    And is that, in fact, what happened

24    to you as a result of the layoff?

25        A.    After being told I was not switching

177

C. BEHM

1

2  shifts, I did switch shifts.

3      Q.    So who told you you were not

4  switching shifts?

5      A.    Cruz.

6      Q.    Who was Cruz?

7      A.    My union rep.

8      Q.    Did anybody from Mack tell you you

9  were not switching shifts?

10      A.    Cruz told me he had a meeting with

11  Rick Schmidt who was in charge of assigning

12  everyone, and he said, Schmidtty said you're

13  staying on first.

14      Q.    And did you ever have a discussion

15  with Rick Schmidt?

16      A.    I tried to chase him down in the

17  plant, and he said that, Cruz already told me,

18  and that he had somewhere to be.  It was a very

19  brief conversation.

20      Q.    And was that after you had been

21  notified you were moving?

22      A.    No, that was before.  I was told up

23  until -- I was told for weeks I was staying on

24  first.  And then it was a Thursday, they told

25  me -- they called me into a meeting and said,

178

C. BEHM

1

2       You're being placed on second.  What line would

3       you want to go to?

4              Q.    Who called you into a meeting?

5              A.    It was Schmidt and someone else.  I

6       don't remember who.

7              Q.    Where did that meeting take place?

8              A.    In a cafeteria.

9              Q.    Just you with the two of them?

10             A.    Yes.

11             Q.    And in that meeting did you tell him

12      which line you wanted to be on?

13             A.    I told them that I couldn't -- I

14      told them before that I couldn't work on second

15      shift.  And he said, Well, you have to pick a

16      line.  I said, L line.

17             Q.    So why were you unable to work

18      second shift?

19             A.    Due to my daycare situation with my

20      daughter.

21             Q.    And what was -- how were you

22      handling daycare at that point in time?

23             A.    She was in daycare.

24             Q.    And so you were unable to work

25      second shift because of the daycare schedule?

C. BEHM

1

2      A.     Yes.

3      Q.     So you didn't have anybody to care

4  for your daughter during the night, I take it?

5      A.     Correct.

6      Q.     Are you aware of anybody who has

7  changed -- been able to change shift because of

8  daycare issues?

9      A.     In a plant that has majority of men,

10  they don't really have the same issues as women.

11      Q.     But, again, are you aware of anybody

12  who has changed shifts because of a daycare

13  issue?

14      A.     Can you rephrase that?

15      Q.     Are you aware of anybody -- when you

16  worked at Mack, were you aware of anybody who

17  needed to change shifts because of a day care

18  schedule, and was allowed to bump because of

19  that?

20      A.     There was a girl that was in flex --

21  I can't remember her name -- I can't remember

22  her name.  She was on second shift.  And she was

23  going through a separation and went to first.

24      Q.     Do you know what kind of -- do you

25  know what her seniority level was?

180

C. BEHM

1
2      A.    She was hired the same date I was.

3      Q.    Do you know if she bumped somebody
4  on first shift?

5      A.    I don't recall.

6      Q.    That was not at the time of the
7  layoff?

8      A.    No.  She stayed on first shift with
9  the layoff, so...

10     Q.    How -- when individuals are hired on
11  the same date, how is seniority determined?

12     A.    It's a really horrible way.  They go
13  by the last four of your Social.  So if someone
14  got a lucky Social 0001, they had higher
15  seniority than anyone.  It just went by the last
16  four of your Social.

17     Q.    All right.  So you indicated that
18  you had the meeting on Thursday.  Was that the
19  first time you learned that you were going to
20  move to second shift?

21     A.    Yes.  Up until that day I thought I
22  was safe on first.

23     Q.    And so when did you start the
24  second-shift job?

25     A.    Monday.

181

C. BEHM

1

2      Q.     Now, after you learned you were

3  moving to second shift, did you do anything in

4  response to that change of schedule?

5      A.     I went to the bathroom.  I cried.

6  And when I was coming down, I saw Cruz walking

7  up to the union office.  I said, Hey, what's

8  going on?  I was just told I was moving to

9  second shift.  He said, Well, talk to your

10  second-shift union rep.

11      Q.     So this was in February of 2020?

12      A.     Yes.

13      Q.     Do you recall the date of that

14  meeting?

15      A.     No.

16      Q.     In February of 2020, did you also

17  apply for FMLA leave?

18      A.     I believe I did.

19      Q.     Why did you apply for FMLA leave in

20  February of 2020?

21      A.     My migraines.

22             (Email dated 2/4/20 is received

23             and marked as Exhibit 33 for

24             identification, as of this date.)

25      Q.     Exhibit 33.

182

C. BEHM

1

2      A.     Okay.

3      Q.     All right.  If you would look over

4  the last two pages of this document, which is

5  Mack 103 and 104.

6      A.     Yes.

7      Q.     It indicates that you were applying

8  for leave because of your serious health

9  condition?

10      A.     Yes.

11      Q.     And you applied on February 4th of

12  2020?

13      A.     Yes.

14      Q.     So what exactly was going on with

15  you physically at that point in time that led

16  you to apply for FMLA?

17      A.     For my migraines, and if I needed a

18  day off, I wouldn't get penalized.

19      Q.     So what kind of FMLA leave were you

20  applying for?  Let me rephrase that.

21      Were you applying for like an intermittent

22  FMLA, or did you need to be out continuous?

23      A.     Not continuous, just in case one day

24  if I had a migraines flare-up, I was able to

25  call off without any repercussions.

183

C. BEHM

1

2    Q.    And what was the result of your
3    request for leave?

4    A.    I got denied.

5    Q.    Why did you get denied?

6    A.    Not enough hours in a 12-month
7    period.

8    Q.    Did you also submit a shift-change
9    request in February 2020?

10    A.    The shift-change request was when I
11    was switched to second shift.

12    Q.    Right.  Did you submit a shift
13    change requesting that you be moved back to
14    first shift?

15    A.    Yes.

16            (Shift Change Request is received
17            and marked as Exhibit 34 for
18            identification, as of this date.)

19    Q.    Look at Exhibit 34.  Is that a copy
20    of the shift change that you submitted in
21    February of 2020?

22    A.    Yes.

23    Q.    Why did you submit a shift change
24    request?

25    A.    I was unable to work second shift.

C. BEHM

1

2      Q.    And what was the result of

3  this request?

4      A.    It got denied.

5      Q.    Who does this request go to?

6      A.    HR.

7      Q.    And did you communicate with anybody

8  in HR about this request?

9      A.    No, I was unable to.

10     Q.    Were you informed why your request

11  was denied?

12     A.    To a certain extent.  They didn't

13  show me any proof or anything.  They said, We

14  looked into the last seniority number on first

15  shift, and they said that mine wouldn't be able

16  to bump any of them.

17         And I spoke with Kevin Fronheiser, and I

18  said, I know there's people on first shift that

19  have lower seniority than me.  And he said, Give

20  me the names.  And I said I didn't know their

21  exact names.  I just remember working with them

22  and -- I mean, we all have an SAP number.  And I

23  know people had SAP numbers higher than mine.

24     Q.    Who had less seniority than you and

25  was working on first shift?

C. BEHM

1

2      A.    There was that flex girl that went

3  from second shift to first shift.  I can't

4  remember her name.  But she didn't lose her flex

5  title or first shift.

6      And I remember a couple of weeks before I

7  got switched to second shift, I was up in the

8  union office, and they showed me the seniority

9  paper, and they said this is about where the

10  cutoff is for a layoff, and my name was right up

11  here.

12      Within a couple weeks of me stating I was

13  unable to go to second shift, that bumped up to

14  right above my name.  So I feel like they almost

15  did that intentionally because they wanted me

16  gone.

17      Q.    So, again, going back to the

18  individual who had moved from second shift to

19  first shift, do you know her name?

20      A.    I don't recall her name.

21      Q.    Do you know what her seniority

22  number was?

23      A.    Not offhand, anymore.  I know mine

24  because I just saw it on the paper, but...

25      Q.    But I believe you indicated a few

186

                          C. BEHM

1

2     minutes ago that she was hired the same day as

3     you?

4          A.    She was, yes.

5          Q.    So it's possible she had higher

6     seniority than you?

7          A.    If her Social was better, yeah.

8          Q.    Do you know of anybody else who was

9     with less seniority than you, that was on first

10    shift after the layoff?

11         A.    I didn't speak to many people.

12         Q.    So did you work the second-shift

13    job?

14         A.    Some days.  I wasn't there long.  I

15    got sick.  My daughter got sick.  And that's

16    when Kaitlyn and I had a meeting.  They tried to

17    tell me if I missed any more days, I was going

18    to get fired.

19         Q.    And when you say you had a meeting,

20    are you referring to the attendance policy

21    violation?

22         A.    Yes.

23         Q.    So you received that attendance

24    warning, I believe, on March the 3rd of 2020?

25         A.    Yes, I did.

C. BEHM

1

2    Q.    I'm going to refer back to Exhibit

3    Number 9, which you're welcome to look at if you

4    want to.  But it appears to me that you started

5    the job, the second-shift job on February the

6    17th of 2020.

7    A.    What did you say, February the 17th?

8    Q.    February the 17th of 2020, according

9    to the -- Mack's records --

10   A.    Yes.

11   Q.    -- does that look correct?

12   So on March the 3rd, which would have been

13   approximately two weeks later, you received an

14   attendance violation?

15   A.    Yes.

16   Q.    Or an attendance warning, excuse me.

17   What did you do after you got that --

18   well, I'm sorry, let me back up for a second.

19   You indicated that at that meeting they

20   told you you couldn't miss any more days?

21   A.    Yes.

22   Q.    What did you do after that meeting?

23   A.    I got all of my paperwork together

24   and gave it to my second-shift union rep,

25   stating all of my subpoenas and court orders and

188

C. BEHM

1

2    doctor's notes.

3        Q.    Now, you indicated that you missed

4    some days because you were sick and your

5    daughter was sick.

6        A.    Yes.

7        Q.    But you also -- that was when you

8    indicated that you missed some days because of

9    court appointments?

10       A.    Yes.

11       Q.    So you discussed that with your

12   second-shift union rep.  Did you discuss that

13   with Kaitlyn?

14       A.    Yes.

15       Q.    What was Kaitlyn's response when you

16   discussed that?

17       A.    She was asking me about my medical

18   health, and I told her that I thought that was a

19   HIPAA violation; that she had a doctor's note,

20   she didn't need to know anything beyond that.

21   And she went on to say, Well, did you have the

22   flu?  And I said again, there's my doctor's

23   note.  You don't have to ask me any more

24   questions.

25       Q.    Did you then apply for A&S benefits?

189

C. BEHM

1
2    A.    Afterwards, yes.

3    Q.    Why did you apply for A&S benefits?

4    A.    I felt targeted.  My anxiety, PTSD,

5    my migraines, everything just spiraled out of

6    control.  I was trying so hard to do my job and

7    come into second shift.  I mean, I was losing

8    daycare and begging friends and family every

9    night to watch my daughter the next day, and

10   life just got the best of me.

11                   (Benefit Claim Form is received

12                   and marked as Exhibit 35 for

13                   identification, as of this date.)

14   Q.    Exhibit 35.  If you would take a

15   moment and look that over.

16   A.    I remember this.

17   Q.    What is this document?

18   A.    Me requesting for A&S.

19   Q.    And, again, if you look at that

20   first page halfway down, is that your signature?

21   A.    Yes.

22   Q.    And this is dated March 5th of 2020.

23   A.    Yes.

24   Q.    Now, right above that, it appears to

25   say that on March the 4th, you left work early.

C. BEHM

1    Is that what that indicates?

2          A.     Yes.

3          Q.     Why did you leave early on the 4th?

4          A.     I had a panic attack.

5          Q.     Did something that happened at work

6    trigger the panic attack?

7          A.     Yes.  Kaitlyn told me I was going to

8    lose my job if I missed any more days.

9          Q.     Down at the bottom of the page you

10   wrote in some, I guess, additional comments.

11         A.     Yes.

12         Q.     So correct me if I'm wrong, this

13   says:  Never cleared to return to work.  Hostile

14   work environment, harassment, discrimination,

15   sexism, targeting, HIPAA violations,

16   victimization, unfair treatment, emotional

17   distress -- and emotional distress causing

18   increase in anxiety and migraines.  Correct?

19         A.     Yes.

20         Q.     Okay.  Tell me about that.  Tell me

21   what was going on that caused all of those

22   issues.

23         A.     It's funny that you bring this paper

24   up because Kaitlyn denied this paper.  This was

C. BEHM

1

2    the one that was denied because I wrote that.

3         Q.    Well, tell me what you meant by

4    that.

5         A.    Every single word that it said.  I

6    was never cleared to work.  Dr. Shipkin was not

7    my attending physician, so what gave him

8    priority over my actual neurologist that was

9    monitoring me?  Instead of me just going to any

10   doctor like Dr. Shipkin.  I don't know him.  He

11   didn't know any of my history, background,

12   nothing.  And I felt like I was being targeted

13   from mainly Kaitlyn, and like I said with your

14   last question, my life got the best of me with

15   the emotional distress, and me trying so hard to

16   do my job right, and be able to do the second

17   shift like they wanted me to do.  When I signed

18   onto Mack, I was able to do both shifts.  Life

19   happens to everyone.  And when I got moved to

20   second shift, I just wasn't able.  And it became

21   a very hostile work environment.

22        Q.    When was your daughter born?

23        A.    She was born May 2nd of 2017.

24        Q.    So the year -- she was less than a

25   year old what you started work at Mack?

192

C. BEHM

1

2      A.    Yes.

3      Q.    How were you taking care of -- how

4  did you have the ability to work second shift

5  then?

6      A.    Because I had my husband --

7  soon-to-be husband at the time.

8      Q.    He was not working at Mack at that

9  time?

10     A.    No, he was, but I was working first

11  shift, he was working second shift, so we would

12  swap her in the parking lot.

13     Q.    So you said that Kaitlyn denied

14  this request.  Did she tell you why this request

15  got denied?

16     A.    Yes.

17     Q.    Why?

18     A.    She said it was denied because it

19  was -- I can't claim migraines from a previous

20  A&S.  So since I was already cleared to return

21  back to work in September, supposedly, that I

22  couldn't claim the same thing.  So I went

23  back -- she actually told me -- because layoff

24  was happening, because of COVID, she told me

25  that everyone was applying for unemployment

193

1                          C. BEHM
2    compensation and -- because since I was denied
3    for A&S, she said, apply for unemployment.  And
4    I said that would be me lying on government
5    forms, because in the questions it states, Are
6    you available and able to work?  That would be
7    me lying, applying for unemployment compensation
8    because I wasn't able to work.  My migraines, my
9    anxiety, everything.  So I resubmitted the
10   paperwork and, surely enough, she finally
11   approved it.
12                   (Mack letter dated 3/19/20 is
13                   received and marked as Exhibit 36
14                   for identification, as of this
15                   date.)
16        Q.    Take a look at what has been marked
17   as Exhibit 36.  Is that the denial letter that
18   you got --
19        A.    Yes.
20        Q.    -- regarding your A&S benefit
21   application in March of 2020?
22        A.    Yes.
23                   (One-page document is received
24                   and marked as Plaintiff Exhibit 37
25                   for identification, as of this

194

1                        C. BEHM

2            date.)

3        Q.    Thirty-seven.  So you indicated a

4    minute ago that you resubmitted your application

5    for A&S benefits.

6        A.    Yes.

7        Q.    Is this the document that you

8    resubmitted to Mack to receive A&S benefits?

9        A.    Yes.

10       Q.    And once you resubmitted this

11   information, your request got approved?

12       A.    Yes.

13                 (Email dated 4/7/20 is received

14                 and marked as Exhibit 38 for

15                 identification, as of this date.)

16       Q.    Look at Exhibit 38.

17       A.    Okay.

18       Q.    Is that an email that you received

19   from Kaitlyn O'Neill?

20       A.    Yes.

21       Q.    In that email does she confirm that

22   you were going to receive A&S benefits?

23       A.    Yes.

24       Q.    Now, when you got the A&S

25   benefits -- and what's the date of that email?

C. BEHM

1

2        A.    There's a couple of dates.

3        Q.    What's the date that Kaitlyn told

4    you you were being approved for A&S?

5        A.    April 7th.

6        Q.    When you received the A&S benefits,

7    did they -- were they retroactive to the start

8    of the leave?

9        A.    I believe so, yes.

10        Q.    Is there a waiting period that you

11    have to go through before the benefits kick in?

12        A.    I believe it's eight working days.

13        Q.    And is that pursuant to the terms of

14    the CBA?

15        A.    Yes.

16                (A&S letter is received and

17                marked as Exhibit 39 for

18                identification, as of this date.)

19        Q.    If you look at Exhibit 39.  And,

20    again, just like previous, did you end up

21    extending this A&S leave?

22        A.    Yes.  Yes.

23        Q.    So did you go back to see

24    Dr. Brzozowski in 2020?

25        A.    Yes.

196

                            C. BEHM

1

2        Q.    If you look at the page that's

3   marked 144 --

4        A.    Yes.

5        Q.    -- down in the middle of the page,

6   he indicates that your expected return-to-work

7   date is January 2nd of 2021; is that correct?

8        A.    Where do you see that?

9        Q.    I think it's question 14.  It's hard

10  to see.

11       A.    Yes.

12       Q.    It's right above 15.

13       A.    Yes.

14       Q.    And then if you flip over to 147,

15  were you able to work, at all, at this time?

16       A.    No.

17       Q.    And how long did he indicate you

18  were going to be out of work?

19       A.    Says:  Estimated length of

20  disability, three to six months or longer.

21       Q.    And he indicates:  Patient not able

22  to perform any of activities without

23  exacerbating her condition.

24       A.    Correct.

25                  (Tower Health Medical Group

C. BEHM

1
2          letter is received and marked as

3          Exhibit 40 for identification, as of

4          this date.)

5               (Tower Health Medical Group

6          letter is received and marked as

7          Exhibit 41 for identification, as of

8          this date.)

9     Q.    Let's look at Exhibit 41 first.

10    A.    Okay.

11    Q.    So, again, I just want to look at

12  the dates.  The first -- if you look at the

13  first page, Mack 141, it looks like

14  Dr. Brzozowski extended your leave through

15  October 19th of 2020.

16    A.    Yes.

17    Q.    And if you look at 140, the next

18  page, he extends it through 11/17 of 2020.

19    A.    Yes.

20    Q.    And then the next page he extends it

21  through 2/1 of '21.

22    A.    Yes.

23    Q.    And then if you look at Exhibit 40,

24  because I did them out of order, after you saw

25  Dr. Brzozowski in the beginning of February of

198

1                       C. BEHM

2    2021, did he release you to return to work?

3          A.    In 2021?

4          Q.    Yes.

5          A.    Yes.

6          Q.    All right.  And he released you to

7    return to work February 16th of '21?

8          A.    Yes.

9          Q.    Did you return to work?

10         A.    No.

11         Q.    Why not?

12         A.    I quit.

13         Q.    Why did you quit?

14         A.    I was fearful for retaliation.

15         Q.    Why were you fearful for

16   retaliation?

17         A.    Because that was happening the whole

18   time of my employment, so I wanted to leave and

19   work for a different company.  And that's when I

20   sought employment at Amcor.

21         Q.    Did you apply for the Amcor job

22   before February 16th?

23         A.    It was about the same time.  I knew

24   I was returning back to work, and I started

25   getting anxious and knew that that wouldn't be

1                          C. BEHM

2    beneficial to my health.

3          Q.    Did you have a job offer from Amcor

4    before you resigned from Mack?

5          A.    I believe I did.

6          Q.    All right.  So you said you had been

7    subject to retaliation throughout your

8    employment.  Tell me what kind of retaliation

9    you had suffered.

10         A.    As far as my migraines, being a

11   woman.  I would also have to say, with my court

12   hearings, I know Kaitlyn wasn't fond of me, and

13   they knew I had a shoulder injury, and placed me

14   on fuel tanks with someone who was going out

15   because he had a shoulder injury in that same

16   area.  When they placed me on second shift, they

17   again knew about my shoulder injury and still

18   had me hauling, pulling cabs onto the line

19   where, normally, a full-grown man was.  And they

20   had me really pushing my health to the limits,

21   and they knew exactly what they were doing.

22         Q.    All right.  So let's talk about your

23   shoulder injury.  Your shoulder injury was in

24   2018, right?

25         A.    My shoulder injury was initially in

200

C. BEHM

1

2    2013.

3         Q.    And you started work at Mack in

4    January of 2018?

5         A.    Yes.

6         Q.    And then in August of 2018, you

7    reinjured your shoulder?

8         A.    Yes.

9         Q.    And you remained out of work, I

10   believe, through November of 2018?

11        A.    Yes.

12        Q.    And at that point in time, were you

13   cleared to return to work without restrictions?

14        A.    Yes.

15        Q.    Did you ever injure your shoulder

16   again?

17        A.    Yes.  I just had surgery on it in

18   November.

19        Q.    Did that happen while you were at

20   Mack?

21        A.    My shoulder?

22        Q.    Yeah, you just said you reinjured

23   your shoulder.  You just had surgery.  Did that

24   happen at Mack?

25        A.    No.

C. BEHM

1

2      Q.     So during the rest of your

3  employment at Mack, from November of '18, when

4  you returned to work, through your resignation,

5  did you have any shoulder issues?

6      A.     It would hurt here and there.

7      Q.     Did you ever go to the medical

8  department?

9      A.     No, I thought Dr. Muto was a

10  veterinarian.

11      Q.     Did you ever file a Workers' Comp

12  claim?

13      A.     No.  It would always get denied.

14      Q.     Did you ever file a Workers' Comp

15  claim for your shoulder?

16      A.     Not for my shoulder, no.

17      Q.     You said you were retaliated against

18  because of your court hearing; is that what you

19  said?

20      A.     Yes.

21      Q.     How exactly were you retaliated

22  against because of court hearings?

23      A.     Kaitlyn would tell me that I was

24  going to lose my job if I missed any more days.

25  So it was, do I lose my job or get arrested for

1                    C. BEHM

2     not appearing by court order?

3          Q.    And you were going to -- when you

4     had that discussion with Kaitlyn, you were

5     talking about your violation of the attendance

6     policy, right?

7          A.    Yes.

8          Q.    And that was on March the 3rd, I

9     believe, of 2020?

10         A.    I believe so.

11         Q.    I believe it's Exhibit 16.

12         A.    Yes.

13         Q.    Is there any other reason you

14    decided to resign from employment at Mack?

15         A.    I thought that I was going to get a

16    lot of backlash for reporting one of my union

17    brothers for harassment.

18         Q.    Who did you report for harassment?

19         A.    I reported Cruz for sexually

20    harassing me.

21         Q.    What is Cruz's last name?

22         A.    Rivera.

23         Q.    And you mentioned Cruz earlier.

24    When was Cruz your union rep?

25         A.    He was my union rep from

C. BEHM

1

2    December 2019 to the date that I went to second

3    shift.

4          Q.    So that would be February 17th, I

5    believe we looked at, of 2020?

6          A.    Yes.

7          Q.    So for approximately three months?

8          A.    That sounds about right.

9          Q.    And tell me what happened with Cruz.

10         A.    I was moved from Mack in Motion to

11   fuel tanks.  And I knew I had upcoming court

12   hearings.  So I went to -- I believe the

13   supervisor of fuel tanks was Mackenzie.  And I

14   said, Hey, I have some court hearings coming up.

15   Who is the union rep over here?  I need to talk

16   to him.

17         He told me it was Cruz.  I said, Okay, can

18   you let him know I need to talk to him and give

19   him the subpoenas?

20         And within a couple of hours he came back.

21   He gave me a piece of paper, a Post-it with

22   Cruz's number.  He said, Cruz said he's in

23   meetings all day.  Just contact him.  And that's

24   how Cruz got my phone number.

25         I texted him along the lines, Hey, my name

1      C. BEHM

2      is Colleen Behm.  I work fuel tanks.  I need to

3      talk to you about some court hearings I have.

4          And he said, Okay, I'll come talk to you

5      tomorrow.

6          And after that, it was texting me

7      constantly about, Oh, you look nice today.  It's

8      not every day we see a pretty woman walking

9      around Mack.  Next day, walk by me, Oh, you

10     smell good today.  It even came to a point, he

11     was at a bar and said -- texted me saying, Oh,

12     I'm at the bar with some Mack old-timers, and

13     you should really be here.  You would get a kick

14     out of it.

15         And I would tell him, Listen, I'm with my

16     kids.  Stop texting me.

17         At one point it was a Friday evening, my

18     mom and my sister were over, and we were talking

19     about him, and I remember saying, Speak of the

20     devil.  And he was messaging me again.

21         I kept telling him, Keep it professional.

22         He would text me, Are you sure?

23         Yes.  Please keep it professional.

24         It was just nonstop, no matter how many

25     times I told him just keep it at this, I have

C. BEHM

1
2  enough going on in my life with the court
3  hearings, trying to raise my kids.  I don't need
4  this extra stress.  Please stop.
5      At one point he actually called me on my
6  way to work, and he was, like, Oh, I was drunk,
7  I'm sorry.  Do you forgive me?
8      I was like, Listen, just drop it, let it
9  go.  Not even an hour later, walking past me and
10  there was a text message, Oh, you look nice
11  today.
12      I just told you two hours ago, keep it
13  professional.  He didn't ever get the hint.
14  Just leave me alone.
15      Q.    So he made comments to you --
16      A.    All the time.
17      Q.    -- about your appearance.  He sent
18  you text messages.
19      A.    Uh-huh.
20      Q.    How many times did you get text
21  messages from him?
22      A.    How often or how many?
23      Q.    How many times did you get text
24  messages?
25      A.    Over a course of three months, at

206

C. BEHM

1

2     least 10 a week.

3          Q.    And were all of those text messages

4     related to your appearance, or were all of those

5     text messages, from your perspective, harassing?

6          A.    Absolutely.  I would ask him about

7     me going to -- being concerned about having to

8     go to second shift.  And, Don't worry about it,

9     honey, I'm taking care of it.  Always along the

10    lines of flirtatious.

11         Q.    Do you still have those text

12    messages?

13         A.    No, I got a new phone.

14         Q.    Did you keep any of those text

15    messages?

16         A.    No, I gave them my phone.  I didn't

17    ask for, like, photos or anything to be switched

18    over.

19         Q.    When did you get a new phone?

20         A.    I got a new phone, I would say,

21    April or -- April, May of 2020.

22         Q.    So while you were still employed

23    with Mack?

24         A.    Yes.

25         Q.    That would have been while you were

C. BEHM

1

2    out on A&S?

3         A.    Yes.

4         Q.    All right.  So you had all of these

5    messages from Cruz.  Did you make a complaint

6    about Cruz?

7         A.    I spoke to an employee, Derrick

8    Jones.  I said -- we would talk on the phone.

9    He lives in the same area that I do.  And I

10   confided in him, and I told him Cruz was coming

11   on to me, and I said, You know he's married.  I

12   really don't want to stir up drama for him.  I

13   just want him to stop.

14        And he said, Well, just tell him to stop.

15        I would tell Cruz to stop all the time.

16   And, eventually, it just got out of hand, and I

17   just couldn't deal with it anymore.

18        And I told Kevin Fronheiser about it.  I

19   still have those text messages.  That was about

20   the time that I decided I was going to report

21   it, and -- because I didn't -- I felt like since

22   I didn't -- what's the word -- give in to his

23   advancements, that I was penalized, and he

24   didn't fight for me to stay on first shift like

25   he promised.

1                       C. BEHM
2          Q.     You mentioned Derrick Jones.  What
3     position was he in?
4          A.     He was also a flex.
5          Q.     Was he a union rep?
6          A.     No.  Just a worker.
7          Q.     When did you go to Kevin Fronheiser
8     and complain about Cruz?
9          A.     I believe it was the day that I was
10     told I was going to second shift, and Cruz told
11     me to talk to my second-shift union rep.  And I
12     reached out to Kevin, and I said, I feel like
13     I'm being punished because I didn't give into
14     his advancements, and he didn't fight for me.
15          Q.     And did you have any further
16     discussion with Kevin about that?
17          A.     Yeah.  He said, Why didn't you come
18     to me sooner?  And I told him, I didn't -- along
19     the lines I didn't want to deal with the drama.
20     I thought Cruz was taking care of me as a union
21     rep, and I didn't really have any concerns.  It
22     just kind of spiraled.
23          Q.     Outside of reporting it to Kevin,
24     did you report it to anybody else at the
25     company?

1                       C. BEHM

2          A.    I spoke about it to other employees,

3    Derrick and Kenny Virgil.  I don't know if Kenny

4    is still there.

5          Q.    Did you ever go to human resources?

6          A.    I was unable to.

7          Q.    Did you ever go to a member of

8    management?

9          A.    I went to Kevin who was the chairman

10   of the union.

11         Q.    Did you ever go to a member of Mack

12   management?

13         A.    There was no point.  You have to go

14   through your union to get to human resources.

15   Even a manager or supervisor would tell you,

16   Contact your union rep.  How do I go through my

17   union rep if he's the one.

18         Q.    Did Kevin ever call you into any

19   meeting with human resources?

20         A.    No.

21         Q.    Do you have any idea if Kevin ever

22   went to human resources?

23         A.    I have no idea.

24                     (Email dated 4/8/21 is received

25                     and marked as Exhibit 42 for

210

C. BEHM

1

2              identification, as of this date.)

3        Q.    I'm going to hand you what's been

4   marked as Exhibit 42.  That appears to be your

5   email to Kaitlyn, resigning from employment; is

6   that correct?

7        A.    Yes.

8        Q.    What was the date of your

9   resignation?

10       A.    February 8, 2021.

11       Q.    And you said your last day of

12   employment will be the 15th, correct,

13   February 15th?

14       A.    Yes.

15       Q.    I want to go back for just a second.

16   You mentioned the retaliation.  You mentioned

17   the issue with Cruz that -- and I believe --

18   correct me if I'm wrong -- but I believe what

19   you said was you were concerned that there would

20   be retaliation against you because you had gone

21   to Kevin about Cruz?

22       A.    Correct.

23       Q.    Any other reason that you resigned

24   from employment?

25       A.    I was scared of Kaitlyn.

211

C. BEHM

1

2      Q.     Why were you scared of Kaitlyn?

3      A.     She had a lot of leverage on my job

4  at Mack.  Where I would go, what shift I would

5  be on, disciplinary action, everything.  All of

6  my paperwork went through Kaitlyn.

7      Q.     Are there any other reasons that you

8  resigned?

9      A.     I love my job.  Kaitlyn and Cruz

10  were the reason I resigned.

11      Q.     Other than that -- those are the

12  reasons you resigned -- there are no other

13  reasons?

14      A.     I love my job.

15      Q.     Did you ever have a discussion --

16  back up.  Let me rephrase that.

17      When you were released to return to work

18  in February of 2021, if you had returned to

19  work, do you know what shift you would have been

20  on?

21      A.     I don't know.

22      Q.     Did you still have the same

23  child-care issues that you had in 2020?

24      A.     Yes.

25      Q.     Did you ever ask what shift you

212

1                     C. BEHM

2    would get back on?

3         A.    No.

4         Q.    Did you ever ask what position you

5    would get back into?

6         A.    No.

7         Q.    Did you resign from employment

8    because you didn't want to go back to a

9    second-shift job?

10        A.    No.  I went to Amcor.  That was

11   7 p.m. to 7 a.m.  I resigned specifically

12   because of Cruz and Kaitlyn.  Like I stated, I

13   loved my job.

14        Q.    Because you were scared of Kaitlyn?

15        A.    Yes, wholeheartedly.

16        Q.    Kaitlyn wrote you up for

17   disciplinary reasons?

18        A.    Yes.

19        Q.    Did Kaitlyn ever do anything else to

20   you besides write you up for disciplinary

21   reasons?

22        A.    I take that as, in other words, my

23   manhood -- my womanhood.  She dangled that on a

24   string.

25        Q.    What do you mean by that?

C. BEHM

1

2      A.    My subpoenas, everything.  She --

3   she held my job in front of my face and said, If

4   you miss any more days, that's it, you're gone.

5      Q.    And, again, was she enforcing the

6   attendance policy when she did that?

7      A.    Absolutely.

8      Q.    And she is in human resources,

9   correct?

10      A.    Yes.

11             (Screenshots is received and

12             marked as Exhibit 43 for

13             identification, as of this date.)

14      Q.    I wanted to talk about Exhibit

15   Number 43.  You mentioned a few minutes ago your

16   text messages with Kevin Fronheiser?

17      A.    Yes.

18      Q.    Is that what these are?

19      A.    Yes.

20      Q.    These were produced to us in

21   discovery.  You'll see down at the bottom they

22   are Bates labeled Plaintiff 424 through, I

23   believe, 436 is the last page.

24      A.    Okay.

25      Q.    So these -- these are text messages.

214

1                          C. BEHM

Did these come off of your phone?

3         A.    Yes.

4         Q.    And you said you saved these text

messages on your phone.  Do you have them saved

on your new phone?

7         A.    No.

8         Q.    So when did you print these off of

your phone?

10        A.    I was on second shift, and I

remember screenshotting them while sitting in a

sleeper cab.

13        Q.    Why did you save copies of these

text messages?

15        A.    Because I knew it was -- everything

was spiraling out of control, and this was the

last thing that I had.  Because once Cruz told

me he was no longer my union rep, I mean, I

didn't save his phone number or anything.  I was

kind of, like, well, that's that.

21        Q.    So you took screenshots of these

text messages --

23        A.    Uh-huh.

24        Q.    -- in February of 2020?

25        A.    Uh-huh.

215

C. BEHM

1
2      Q.    Is that right?

3      A.    Uh-huh.

4      Q.    At that point in time, did you still

5  have the old phone?

6      A.    I did.

7      Q.    So why didn't you take screenshots

8  of the messages from Cruz?

9      A.    Because when he told me he was no

10 longer my union rep, I discarded our

11 conversation.  I was done with him.  I wasn't

12 going to have to deal with him anymore.

13     Q.    If you flip over to the second page

14 of this -- well, let me ask you, first of all.

15 On the first page, that last text --

16          MR. MC COY:  Graham, I assume

17          these are the only copies.  These

18          are cut off, it looks like, at the

19          bottom of the page.  I'm assuming

20          this is all you got.

21          MR. BAIRD:  This is all we have.

22          MR. MC COY:  All right.  I got

23          you.

24     Q.    So, Ms. Behm, you don't have another

25 copy of these at home, do you?

216

C. BEHM

1

2      A.     No, I don't.

3      Q.     At the bottom of the first page, and

4  that last text, you say:  I know people

5  have less seniority than me on first, and I

6  cannot do second shift.

7      A.     Correct.

8      Q.     I've asked you earlier whether you

9  can specifically name anybody on first shift who

10  had less seniority than you, and you indicated

11  you didn't know the names.

12      A.     Correct.

13      Q.     Have you thought of anybody since I

14  asked you that question earlier?

15      A.     No.  These text messages are from

16  two, 2 1/2 years ago.

17      Q.     And you did not identify anybody

18  specifically in this text message, did you?

19      A.     No.

20      Q.     Moving on to the second page.

21  Again, down at the very bottom, it looks like

22  Kevin is asking you:  Why haven't you reached

23  out to me?

24      You said:  I have been in contact with

25  Cruz, but all he says is to be patient.

C. BEHM

1

2      So are you mad at me?  Kevin asks.

3      And what was your response to him?

4      A.    I have text messages from him making

5  heavy moves towards me a couple of months ago,

6  that I feel since I didn't entertain his

7  advances, that he didn't -- and it's cut off.

8      Q.    I believe it says:  He didn't want

9  to do shit to help me; is that right?  I believe

10  that's what that says.

11      A.    Probably.  Yes.

12      Q.    So you indicated a few minutes ago

13  that you reported Cruz to Kevin Fronheiser for

14  harassing you.

15      A.    Yes.

16      Q.    Is this your report of harassment to

17  Kevin Fronheiser?

18      A.    Yes.

19      Q.    Outside of that text message, did

20  you make any other report to Kevin Fronheiser?

21      A.    No.

22      Q.    All right.  If you would flip over

23  to the page that says Plaintiff's 428 on the

24  bottom.  The first text at the top is:  Yes,

25  1250?

C. BEHM

1

2      A.     Yes.

3      Q.     It appears to me that in this series

4   of text messages, you're talking about the

5   points that we talked about a few minutes ago,

6   where Kaitlyn had written you up for an

7   attendance violation.

8      A.     Yes.

9      Q.     So does that -- you know, you say:

10  HR wants to have a meeting with me on Monday.

11  At the very top.  You see that?

12     A.     Yes.

13     Q.     And that meeting we have already

14  established that took place on March the 3rd of

15  2020.

16     A.     Yes.

17     Q.     And you say in here:  They are

18  saying I have seven when I have five because of

19  court, me being sick, and then Jana being sick.

20     A.     Yes.

21     Q.     Only once I called off because I had

22  to figure out daycare because I was going to

23  second.

24     A.     Yes.

25     Q.     And then you say:  So fuck HR.

219

C. BEHM

1

2     A.     Yes.

3     Q.     Is that right?

4     A.     Yes.

5     Q.     And then if you flip on over, the

6  last few pages of this document appear to be

7  copies of your court records?

8     A.     Yes.

9     Q.     And why were you sending these to

10 Kevin?

11    A.     So he had them, also.

12    Q.     And these were for prior court

13 proceedings?

14    A.     Yes, that I had points for.

15    Q.     And do you know if Kaitlyn ended up

16 removing points from your record because of the

17 documents you produced?

18    A.     She didn't remove them.

19    Q.     Ms. Behm, did you file a charge of

20 discrimination against Mack Trucks?

21    A.     You'd have to ask Graham.  He

22 handles the legal stuff.

23    Q.     Okay.  Well, unfortunately, I don't

24 get to question Graham.  So...

25                 (Charge of Discrimination is

220

C. BEHM

1

2                received and marked as Exhibit 44

3                for identification, as of this

4                date.)

5        Q.     Ms. Behm, does this refresh your

6   recollection as to whether you filed a charge of

7   discrimination against Mack?

8        A.     Yes.

9        Q.     And if you look over -- or I guess

10  look at the bottom of the first page, what date

11  did you file this?

12       A.     July 22nd, 2020.

13       Q.     And on that date, you were still

14  employed by Mack, weren't you?

15       A.     Yes.

16       Q.     Why did you file a charge while you

17  were still employed?

18       A.     Can you rephrase that?

19       Q.     You testified you were still

20  employed by Mack on July 22nd of 2020.

21       A.     Yes.

22       Q.     So why, while you were still

23  employed by my client, did you file a charge of

24  discrimination?

25       A.     Yes.

221

C. BEHM

1

2      Q.      Why?

3      A.      Because it was what I needed to do.

4      Q.      What, at that point in time -- okay,

5  so in July of 2020, you were out on A&S?

6      A.      Yes.

7      Q.      What, at that point in time, caused

8  you to file a charge?

9      A.      Well, Kaitlyn denied my A&S because

10  she didn't like what I put at the bottom.  So I

11  had to resubmit the paperwork.  She tried

12  getting me to lie on unemployment paperwork, and

13  it took me some time to find Graham, and that

14  was the date that I was able to file.

15      Q.      Let me ask you a couple of things in

16  the charge.  On the first page, if you look down

17  in kind of in the text section, the third

18  sentence says:  When she returned to work in

19  January of 2019, Ms. Behm started being targeted

20  by superiors that began writing her up

21  for unwarranted reasons.

22      A.      Yes.

23      Q.      What are you referring to there?

24      A.      Them stating I was leaving my work

25  area when I'm not tied to a work area, I'm tied

222

                         C. BEHM

1

2   to a line.  And I stayed on the line.

3        Q.    Anything else that you were written

4   up for that you felt was unwarranted?

5        A.    Other than those two write-ups?

6        Q.    Yes.

7        A.    Not that I recall.

8        Q.    If you would look over at the next

9   page.

10       A.    Yes.

11       Q.    The second paragraph, down towards

12   the bottom of that second paragraph, there's a

13   sentence that states:  After her return from

14   medical leave, Ms. Behm was placed on second

15   shift with only one-day's notice?

16       A.    Correct.

17       Q.    You see that?  Is that accurate?

18       A.    Yes, they told me on a Thursday.  I

19   called off Friday.  And Monday I was on second

20   shift.

21                  (Dismissal Notice is received and

22                  marked as Exhibit 45 for

23                  identification, as of this date.)

24       Q.    Ms. Behm, you've been handed what

25   has been marked as 45, which is the dismissal

223

C. BEHM

1

2     notice.  Did you receive this from the Equal

3     Employment Opportunity Commission?

4          A.    Yes.

5          Q.    Do you know when you received this

6     document from the EEOC?

7          A.    Shortly after the date issued.

8          Q.    It was issued March 11th of 2021; is

9     that right?

10         A.    Yes.

11               (Civil Action Complaint is

12               received and marked as Exhibit 46

13               for identification, as of this

14               date.)

15         Q.    All right.  Ms. Behm, I've handed

16    what has been marked as Exhibit 46, which is a

17    copy of the amended complaint that was filed in

18    the lawsuit that you filed against Mack and the

19    local UAW.  And I realize this is a document

20    that was drafted by your lawyer, okay, so,

21    again, I don't get to ask him questions today,

22    unfortunately.

23         All right, so I have a few -- just a

24    couple of questions related to the factual

25    allegations in your lawsuit.  I'm going to ask

C. BEHM

1

2       you to flip over -- if you look at the top of

3       the page, it's page 5 of 12.

4           A.    Okay.

5           Q.    If you look to paragraph number 38.

6       Do you see that?  Says:  As a result of defendant's

7       retaliatory behavior and unwillingness to engage in

8       accommodating plaintiff's disability, she resigned

9       on or about February 15th of 2021.  Correct?

10          A.    Yes.

11          Q.    So how did Mack fail to accommodate

12      your disability?

13          A.    When I was seeing Dr. Brzozowski, my

14      neurologist, he said it's extremely unhealthy

15      for people with concussions, multiple

16      concussions, post-concussions disorder, which I

17      had, all along.  That it's healthy to have a

18      first shift because normal bodies wake up at the

19      same time every day, have the same schedule, and

20      for my brain health, first shift is ideal, not

21      second shift, not third -- especially not third

22      shift.  And that was his medical recommendation.

23          Q.    Okay.  What is the policy at Mack

24      for accommodating disabilities?

25          A.    That, I don't know.  Normally, as

C. BEHM

1

far as placement goes for medical, they try to

2

place you where you're able to work.  They do

3

try to accommodate that.  When I came back from

4

my shoulder injury, they accommodated and put me

5

on something that was light work.  When you have

6

a medical diagnosis, they try.

7

Q.    So when you are referencing working

8

first shift, are you referencing in the

9

February 2020 time frame when you were moved

10

from first shift to second shift?

11

A.    Narrow that a little bit.

12

Q.    I'm sorry.  Let me try again.

13

You said that Dr. Brzozowski indicated

14

moving shifts was problematic.

15

A.    Yes.

16

Q.    And so in February of 2020 is was

17

when you were required to move shifts as a part

18

of the layoff?

19

A.    Yes.

20

Q.    So is that the time frame you're

21

talking about where you needed an accommodation?

22

A.    I would say "yes."

23

Q.    All right.  How did you notify Mack

24

that you needed an accommodation then?

25

C. BEHM

1

2      A.      Cruz knew.

3      Q.      All right.  Let me ask again.  Did

4  you notify anybody in HR at Mack that you needed

5  an accommodation?

6      A.      I wasn't able to, unless I went

7  through my union rep.

8      Q.      Did you notify anybody in the

9  dispensary in February of 2020, that you needed

10  an accommodation?

11      A.      I wasn't able to go through anything

12  without my union rep to have a witness.

13      Q.      Did you notify anybody other than

14  Cruz that you needed an accommodation in

15  February of 2020?

16      A.      Kevin Fronheiser knew that in

17  regards to everything as a whole.

18      Q.      Did you present them with any

19  medical documentation from Dr. Brzozowski?

20      A.      They never asked.

21      Q.      Did you have -- do you have any

22  medical documentation from Dr. Brzozowski saying

23  you needed to be on first shift?

24      A.      No.

25      Q.      So you told Cruz and you told Kevin

C. BEHM

1

2    Fronheiser that you needed to be on first shift

3    for medical reasons?

4        A.    It was a couple of reasons, not just

5    medical.

6        Q.    And how did you tell Kevin that?

7        A.    I would see Kevin all the time on

8    the floor.

9        Q.    Did you say that in any of those

10   text messages to Kevin?

11       A.    Not in the text messages.

12       Q.    And how did you tell Cruz that?

13       A.    Probably person-to-person.

14       Q.    Did you tell anybody in management

15   at Mack that you needed an accommodation for

16   medical -- that you needed to be on first shift

17   for medical reasons?

18       A.    Anytime you go to a supervisor

19   there, they say, Go to your union rep.

20       Q.    Did you go to a supervisor to tell

21   them that at any point in time?

22       A.    There's no point.

23       Q.    So that's a no?

24       A.    That's a no.

25       Q.    All right.  So down at the bottom of

228

                            C. BEHM

1

2      page 5, there are -- you assert several claims

3      against my client.  The first one is a claim

4      under the Americans with Disabilities Act.  I

5      just talked to you about your need for

6      accommodation.

7             At any other point during your employment at

8      Mack, did you request an accommodation from my

9      client?

10            A.     No.

11            Q.     So you alleged that my client has

12     discriminated against you because you have a

13     disability.  What is your disability?

14            A.     My migraines.

15            Q.     Anything else other than migraines?

16            A.     PTSD, anxiety, depression.

17            Q.     When were you diagnosed with those

18     conditions?

19            A.     Ultimately, or like first diagnosis?

20            Q.     Yes.

21            A.     I was first placed on depression

22     medication a month before my daughter was born.

23            Q.     So that would have been sometime in

24     2017?

25            A.     Yes.

C. BEHM

1

2     Q.     Early 2017?

3     A.     I believe it was March of 2017,

4  about a month and a half.

5     Q.     Now, did you make Mack aware of that

6  condition at any point in time?

7     A.     I don't think.

8     Q.     So did Mack have any knowledge that

9  you had depression?

10    A.     We had to give them a list of our

11 prescriptions when we were hired, so if they

12 have that, then that would be in my medical

13 records.

14    Q.     Did you ever ask Mack to accommodate

15 your depression in any way?

16    A.     No, I didn't want to be

17 discriminated against.

18    Q.     So you just -- you didn't want to

19 tell them because you thought you would be

20 discriminated against if you did?

21    A.     Yes.  I was scared of Kaitlyn.

22    Q.     I believe you first were diagnosed

23 with a concussion in May of 2019?

24    A.     Yes.

25    Q.     And when you were diagnosed with

1                         C. BEHM

2    that concussion, you requested A&S?

3         A.    Workmen's Comp at first.  And then I

4    got my second concussion, and Mack thought that

5    they couldn't distribute [sic] which concussion

6    was worse, so they blamed it just on the

7    assault.  So that's why Workmen's Comp and

8    everything -- with me getting denied from not

9    going to their hospital and then not knowing

10   which concussion was worse.

11        Q.    So my question was, you applied for

12   A&S?

13        A.    Yes.

14        Q.    And you were granted A&S?

15        A.    Yes.

16        Q.    Was there any point in time when you

17   were at Mack that you applied for A&S and it was

18   denied?

19        A.    Yes.

20        Q.    When was that?

21        A.    In March.

22        Q.    Of which year?

23        A.    2020.

24        Q.    And that was subsequently approved a

25   few weeks later?

C. BEHM

1

2      A.    When I changed my wording.

3      Q.    And it was approved retroactively

4  back to the date you went out of work?

5      A.    Yes.

6      Q.    Do you have any other disabilities?

7      A.    I was diagnosed with sarcoidosis.

8      Q.    When did that happen?

9      A.    At first they thought I had cancer.

10  That was a couple of months after I left on A&S.

11  I had a big bump on my arm, and I saw a couple

12  of doctors for that.  I saw an oncologist.  And

13  eventually I was diagnosed with sarcoidosis.

14      Q.    So do you recall when you received

15  that diagnosis?

16      A.    I would say maybe -- I don't recall

17  the exact day.

18      Q.    Was it while you were still employed

19  by Mack?

20      A.    Yes.

21      Q.    Did you ever tell anybody at Mack

22  that you had sarcoidosis?

23      A.    I was out on A&S.

24      Q.    So is that a "no"?

25      A.    That's a "no."

232

C. BEHM

1

2     Q.    Do you have any other disability?

3     A.    That happened during Mack, or as a

4   whole?

5     Q.    Well, on the whole.

6     A.    I don't have a spleen.

7     Q.    Is that something Mack was aware of?

8     A.    I think it's in my paperwork on my

9   chart.  You have to give a whole medical

10  history.

11    Q.    You believe you are discriminated

12  against because you don't have a spleen?

13    A.    I don't believe I was discriminated

14  against because of that.  I was discriminated

15  against my migraines and what happened at Mack.

16    Q.    So tell me what Mack did to

17  discriminate against you because you had

18  migraines.

19    A.    Well, they denied my A&S.

20    Q.    What else?

21    A.    They put me in Mack in Motion when I

22  came back, and I didn't even have clearances.  I

23  had a clearance from Dr. Shipkin, but not my

24  actual neurologist.  They placed me on Mack in

25  Motion to sit there eight hours a day, doing

C. BEHM

1
2     nothing.  Occasionally, they would have me doing
3     things that weren't even relative to my job,
4     showing people how to use the computer system,
5     for putting in requests for Buck Week and FMLA
6     and everything, because they didn't want to deal
7     with us, pretty much.  They wanted us to be able
8     to go to the computer, put in requests for
9     paperwork, and not go to HR, at all.
10         Q.    When you say "deal with us," who are
11    you referring to?
12         A.    Anyone in the union.  They separated
13    company from union.  So if you didn't have a
14    company pass, you weren't going in HR.
15         Q.    But you said "deal with us."  You
16    said, They didn't want to deal with us.
17         A.    Yes.  Anyone in the union.
18         Q.    The company didn't want to deal with
19    anybody in the union?
20         A.    No.
21         Q.    What else did they do to
22    discriminate against you because of your
23    disability?
24         A.    Because of my disability?
25         Q.    Yes.

234

C. BEHM

1

2      A.    They would put me on tasks, knowing

3  I couldn't perform them.  As far as being on the

4  beginning of L line, pulling the cabs on, it was

5  in my medical chart about my shoulder and

6  repetitiveness.  They had me doing extremely

7  hard labor.

8      Q.    What about with regards to your

9  migraines?  Did they do anything else to

10  discriminate against you because you had

11  migraines?

12      A.    That's a tough one.  I mean,

13  migraines are triggered by anything.  Loud

14  noises, stress, repetitiveness.

15      Q.    Describe the interior of the

16  Macungie Mack plant to me.  Is it loud?

17      A.    In some areas.  Some areas it's

18  louder than others.

19      Q.    Does it require some heavy labor?

20      A.    In some areas.  Some jobs are easy.

21  Some jobs are extremely difficult.

22      Q.    Do they require repetitive motion?

23      A.    Not all of them.

24      Q.    Did you ever ask anybody in human

25  resources at Mack for a job that did not require

                              C. BEHM

1

2    those things?

3         A.    I spoke to my union rep about being

4    in kitting.

5         Q.    Let me ask it again.  Did you ever

6    talk to anybody in human resources at Mack about

7    being in a position that did not require --

8         A.    I was unable to.

9         Q.    And that's because you couldn't go

10   to human resources without going to the union

11   first?

12        A.    Correct.

13        Q.    Is there anything else they did to

14   discriminate against you because you had a --

15   because of your migraines?

16        A.    I have to think about that a little

17   bit more.

18        Q.    Now, you also have alleged a hostile

19   work environment, harassment claim against Mack.

20   What is that based on?

21        A.    Kaitlyn.

22        Q.    How did Kaitlyn harass you?

23        A.    Threatening my job.

24        Q.    And do you believe that's based upon

25   your sex?

236

C. BEHM

1

2       A.    I would say as a whole.  I mean,

3   that plant is mainly men.  And females are the

4   ones who pretty much care for children.  Kaitlyn

5   knew I couldn't go to second shift.

6       Q.    All right.  Anything else that

7   Kaitlyn did to discriminate against you based

8   upon your sex?

9       A.    Not about my sex, no.

10      Q.    Now, you also specifically allege in

11  the complaint, if you look at the top of page 7,

12  paragraph 53, very top, you were subjected to

13  unwelcome sexual advances, language, innuendo

14  statement, and other conduct by a coworker/union

15  representative.  Is that referring to Cruz?

16      A.    Yes.  And Kaitlyn would refer to me

17  as "the one with the nude photos," instead of by

18  my name.

19      Q.    When did she do that?

20      A.    When she wanted me to see a second

21  neurologist to get a second opinion,

22  Dr. Shipkin.

23      Q.    Who did she make that comment to?

24      A.    She made those comments, I believe,

25  to Kevin.

C. BEHM

1

2     Q.    Do you have any idea why she made

3  those comments to Kevin?

4     A.    Because she's rude and

5  unprofessional.

6     Q.    What was she referring to, "the one

7  with the nude photos"?

8     A.    Me.

9     Q.    But what?

10     A.    Instead of saying "Colleen Behm,"

11  "the one with the nude photos."

12     Q.    Were there nude photos?

13     A.    Yes.

14     Q.    All right.  So with regard to

15  Kaitlyn's conduct that you allege was harassing,

16  did you ever report that to anybody?

17     A.    How am I supposed to report my Human

18  Resource person to my human resources?

19     Q.    Again, did you ever report that to

20  anybody?

21     A.    Kevin knew about it.

22     Q.    How did Kevin know about it?

23     A.    Because he's the one who told me

24  that she was referring to me as the one with the

25  nude photos.

238

C. BEHM

1

2       Q.    Did you make a complaint to Kevin

3   about it?

4       A.    I said, Well, that's rude.

5       Q.    Did you make a complaint to anybody

6   at Mack in management about it?

7       A.    Kaitlyn is the one who handled all

8   of that.

9       Q.    Did you make a complaint to Kaitlyn

10  about it?

11      A.    How am I supposed to tell Kaitlyn

12  that she's being a jerk?

13      Q.    Again, I'm asking you the question.

14  So don't ask me a question back, please.

15      A.    No.

16      Q.    Thank you.

17      Did you ever make a complaint to anybody

18  in management at Mack about Kaitlyn?

19      A.    No.

20      Q.    All right.  Now, you also alleged my

21  client retaliated against you.  What did my

22  client do to retaliate against you?

23      A.    In what instance?

24      Q.    Well, anytime.  I mean, you

25  mentioned earlier there were several instances

C. BEHM

1

2    of conduct you thought was retaliatory.  So I'm

3    wondering what they did to you that you thought

4    was in retaliation for any, you know, protected

5    activity that you engaged in, either under the

6    Americans with Disabilities Act or Title VII.

7          A.    Well, I believe that they -- when

8    they put me in Mack in Motion, like I stated

9    before, that's pretty much where they put the

10   misfits.  They don't want to deal with you.  And

11   I believe they knew that I didn't have

12   clearances, so they didn't want me on the actual

13   floor, because I would be a liability.

14         Q.    I believe you testified earlier,

15   when you went to Mack in Motion, you were paid

16   the same pay rate you had before you went on

17   that leave?

18         A.    Yes.

19         Q.    And you subsequently moved back to a

20   production flex position, after Mack in Motion?

21         A.    Yes.

22         Q.    What else did Mack do to you that

23   you believe was in retaliation for you engaging

24   in protected activity?

25         A.    I believe they wanted me out the

C. BEHM

1    door, and they knew my weak points, and they

2    used that to their advantage.  They knew I

3    couldn't go to second shift.  They knew I would

4    have migraines.  They knew certain situations

5    would be unbearable for me, and ultimately, I

6    would leave.  And that's exactly what happened.

7          Q.    Why did you believe Mack wanted to

8    get rid of you?

9          A.    Because of the time that I was

10   taking off for my health.

11         Q.    And that time was all covered by A&S

12   benefits?

13         A.    Yes.

14         Q.    Is there anything else that Mack did

15   that you believe was retaliatory?

16         A.    With denying A&S and trying to get

17   me in trouble with filing false reports with

18   unemployment, yes.

19         Q.    Is there anything else Mack did that

20   you believe was retaliatory?

21         A.    Not that I can recall at this time.

22         Q.    All right.  If you look over to

23   page 9 of the complaint.

24         A.    Yes.

C. BEHM

1

2      Q.    Count 5 of the complaint is a claim

3   called "breach of duty of fair representation."

4   It says:  Plaintiff versus defendant, UAW.  You

5   are not bringing a claim of breach of duty of

6   fair representation against Mack, are you?

7      A.    That's his department.

8            MR. BAIRD:  No, we are not.

9      A.    No.

10     Q.    Just confirming.  Thank you.

11           MR. MC COY:  I've probably got 15

12           or 20 more minutes.  You want to

13           just keep going?  Are you okay?

14           THE WITNESS:  Yes.

15     Q.    All right.  Ms. Behm, in the

16   complaint, you are alleging that you're entitled

17   to certain damages from my client as a result of

18   its conduct in this case.  The first one of

19   those is lost wages.  What wages have you lost

20   as a result of my client's conduct?

21     A.    I wanted to retire there.  I dropped

22   out of school from mortuary science to take my

23   job at Mack.  I thought that was going to be --

24   to be where I finished everything.

25     Q.    And on February the 8th of 2021,

C. BEHM

1

2  when you resigned from employment at Mack, could

3  you have gone back to Mack?

4        A.    Yes.

5                  (2018 W-2 is received and marked

6                  as Exhibit 47 for identification, as

7                  of this date.)

8        Q.    Ms. Behm, if you look at Exhibit 47

9  for me first, would you just confirm these

10 appear to be your W-2s from 2018, 2019, and 2020

11 from Mack; is that correct?

12       A.    Yes.

13       Q.    In 2018, it looks like you earned

14 $32,881.44.

15       A.    Yes.

16       Q.    In 2019, you earned $34,233.87?

17       A.    Yes.

18       Q.    And in 2020, you earned 29,879.24?

19       A.    Yes.

20                 (Earning Statement is received

21                 and marked as Exhibit 48 for

22                 identification, as of this date.)

23       Q.    And then if you would look at

24 Exhibit 48, which I believe are your earning

25 statements from Mack for the couple of months in

243

C. BEHM

1

2    2021 when you were employed, if you would just

3    confirm that those are accurate, for me, please.

4         A.    Yes.

5         Q.    If you look at the first page, it

6    indicates ASN and says:  $489.10.  Is that how

7    much you earned per week when you were on A&S?

8         A.    Yes.

9         Q.    All right.  And if you would look

10   over at the page -- it's the second-from-last

11   page.  It's got a Bates label of Mack 390 on it.

12        A.    Second-to-last page?

13        Q.    Second-to-last page, yes.

14        A.    Page 390?

15        Q.    390, yes.

16        A.    Okay.

17        Q.    Did you receive a vacation payout of

18   about a little over $2500 on your final

19   paycheck?

20        A.    Yes.

21        Q.    And then on the next page, the very

22   last page, which is 391, looks like you got a

23   profit-sharing payment in April of 2021; is that

24   correct?

25        A.    Yes.

244

```
 1                        C. BEHM

 2              (Earning Statement is received

 3               and marked as Plaintiff Exhibit 49

 4               for identification, as of this

 5               date.)

 6       Q.    All right.  In Exhibit 49, you made

 7   reference a couple of hours ago to this, I

 8   believe.  Are these -- what is this document,

 9   Exhibit 49?

10       A.    This is my earnings from OnlyFans.

11       Q.    Okay.  And that's from September 1st

12   of 2021 to November 7th of 2021?

13       A.    Yes.

14       Q.    I believe you indicated that you

15   continued to have the OnlyFans site until

16   approximately one month ago?

17       A.    Yes.

18       Q.    Do you know how much total you

19   earned from OnlyFans?

20       A.    Just under 2,000, as a whole, from

21   when I started it until I turned it off.

22       Q.    You're also alleging that you lost

23   benefits.  What benefits did you lose as a

24   result of --

25       A.    Health benefits.
```

245

C. BEHM

1

2      Q.    Do you currently have any health

3  benefits?

4      A.    Through the state.

5      Q.    Do you have to pay anything for

6  those benefits?

7      A.    No.

8      Q.    The house where you currently live,

9  do you own it?

10     A.    No.  I rent it.

11     Q.    Have you ever -- have you rented it

12  the entire time you've been there?

13     A.    Yes.

14     Q.    During -- I guess between

15  February of 2021 and the present, did you ever

16  receive any government COVID benefits?

17     A.    Yes.  From -- I'm sorry.  From what

18  dates?

19     Q.    Between February of 20 -- between

20  the time you resigned from employment and the

21  present.

22     A.    Yes.

23     Q.    Do you know how much you received in

24  COVID benefits during that time period?

25     A.    I don't know.

246

                              C. BEHM

1

2          Q.     Did you also receive COVID benefits

3     in 2020 when you were out of work?

4          A.     Yes.

5          Q.     Do you recall how much you received

6     in COVID benefits in 2020?

7          A.     I do not.

8          Q.     Have you been unable to see any of

9     your doctors because of your -- because of the

10    fact you lost your health benefits last year?

11         A.     Yes.

12         Q.     Which doctors can you not see any

13    longer?

14         A.     I can't see my family physician

15    anymore.  So Brent Calhoon, Dr. Bonaccorsi,

16    Kimberly Rauenzahn.  My clavicle doctor.  I had

17    to get an out-of-network authorization to see

18    him, but that's limited.  And my -- I can't see

19    my normal gynecologist.  I have to see one

20    through the state, and I'm still on a waiting

21    list to get an appointment with her.

22         Q.     Have you been denied any medical

23    coverage in the past year?

24         A.     As far as health insurance or --

25         Q.     As far as any -- have you been

247

                          C. BEHM

1

2    denied any coverage for any medical issue that

3    you've had because you didn't have insurance?

4         A.    Yes.

5         Q.    What sort of issue have you had that

6    has not been covered by your health?

7         A.    I don't have a family doctor

8    anymore.

9         Q.    So when you have a medical issue,

10   where do you get treatment?

11        A.    I have to go to an Urgent Care.

12        Q.    So have you had any serious medical

13   issues in the past year?

14        A.    Migraines.

15        Q.    Do you continue to take the same

16   medication you took prior to February of 2021?

17        A.    I take Tylenol.

18        Q.    Do you have any prescription

19   medication that you take for migraines?

20        A.    No, because I can't see a

21   specialist.

22        Q.    So since you left Mack, you no

23   longer take your prescription medication?

24        A.    Correct.

25        Q.    You allege you have injury to

248

C. BEHM

1                    

reputation.  What do you mean by that?

3        A.    I don't see self-expression as being

harmful, but when someone degrades you for it

and calls you "the one with the nude photos,"

and puts you out there even more as in a

degrading way, it hurts.

8        Q.    Do you have any knowledge that -- I

assume you're referring to Kaitlyn's comments

about you?

11       A.    Yes.

12       Q.    Do you have any knowledge that

Kaitlyn made those comments outside of Mack?

14       A.    I don't know if she did.

15       Q.    You also allege you're seeking to

recover attorney's fees.  Have you had to pay

anything to your attorney so far in this case?

18       A.    No.

19       Q.    Have you had to pay any costs to

your attorney in this case?

21       A.    Not yet.

22       Q.    All right.  You're also alleging

that you suffered mental and emotional distress

because of my client's conduct.  Tell me about

your mental and emotional issues.

249

C. BEHM

1
2     A.    I don't know what my life is going
3     to hold anymore.  I enjoyed going to Mack.  Life
4     happens, and I had no control over that.  But my
5     womanhood was taken from me.  I couldn't walk in
6     Mack and not feel like I was being judged.
7     That's why I couldn't go back.
8         Q.    And that's based on the conduct of
9     Cruz and Kaitlyn?
10        A.    Yes.
11        Q.    When did Kaitlyn make the comment
12    about the nude photos?
13        A.    When she scheduled for second
14    opinion with Dr. Shipkin.
15        Q.    So that would have been August of
16    2019?
17        A.    Yes.
18        Q.    Have you received any treatment for
19    emotional distress?
20        A.    Yes.
21        Q.    Who have you seeked [sic] treatment
22    from.
23        A.    I saw Jill Snively.  She was a
24    counselor.  I was seeing her weekly.  And then I
25    went to biweekly, and then monthly.  So it was

250

C. BEHM

1

2   weekly when I was dealing with Mack.  And then

3   my stress levels started to improve when I

4   wasn't dealing with Kaitlyn or Cruz.

5           Q.    When did you start seeing Jill

6   Snively?

7           A.    After my concussion.

8           Q.    So after May of 2019?

9           A.    About June, July, yes.

10          Q.    Are you still seeing her?

11          A.    No.

12          Q.    When did you stop seeing her?

13          A.    After I resigned from Mack.

14          Q.    Besides Jill Snively, have you seen

15  anybody else for emotional distress?

16          A.    No.

17          Q.    What are you looking to recover from

18  Mack in this case?

19          A.    I'd have to discuss that with

20  Graham.  I don't know a roundabout figure.

21          Q.    Some money?

22          A.    As much as I would love to go back

23  to Mack, and I would in a heartbeat, I just know

24  it wouldn't be the same.

25          Q.    Why do you say that?

251

C. BEHM

1

2     A.    Because of Kaitlyn and, to my

3  knowledge, Cruz is still employed there, even

4  under my accusations.

5              (Rule 26 Disclosures is received

6              and marked as Exhibit 50 for

7              identification, as of this date.)

8              (Answers is received and marked

9              as Exhibit 51 for identification, as

10             of this date.)

11             (Responses is received and marked

12             as Exhibit 52 for identification, as

13             of this date.)

14     Q.    All right.  So, Ms. Behm, I'm going

15  to ask you just a couple of questions about each

16  of these.  So Exhibit 50, if you'll start with

17  that one, those are the initial disclosures that

18  you sent to us in this lawsuit.  And just a

19  couple of questions for you.

20        In the first page there's a section, if

21  you look down towards the bottom, says: Persons

22  with knowledge.

23        Do you see that?

24     A.    Yes.

25     Q.    And you got a list of several

252

1                        C. BEHM

2    people.  I know who most of these are.  Cruz

3    Rivera.  That should be Kevin Fronheiser; is

4    that right?

5         A.    Yes.

6         Q.    Joshua Knappenberger, who is that?

7         A.    That was a guy I dated at Mack.

8         Q.    What does he know -- what

9    information does he have related to your

10   lawsuit?

11        A.    I told him what was happening with

12   Cruz.

13        Q.    So that was in the same time frame

14   with the issues with Cruz over December of 2019

15   to February of 2020, that time frame?

16        A.    Yes.

17        Q.    Kenneth Virgil, who is he?

18        A.    He worked with me.

19        Q.    And Joshua was a coworker, as well?

20        A.    Yes.

21        Q.    He was not a supervisor, was he?

22        A.    No.

23        Q.    Is Kenneth a supervisor?

24        A.    No.

25        Q.    I believe you referenced you talked

C. BEHM

1   to Kenneth, you told Kenneth about Cruz, as

2   well?

3   A.   Yes.

4   Q.   If you look over on page 2.

5   A.   Same exhibit?

6   Q.   Yes, same exhibit.  In C, the very

7   bottom of C, and I realize these were submitted

8   to us August 31st of last year, it says:  Today

9   Plaintiff has sustained approximately $21,964 in

10  lost wages and economic loss.

11  Do you see that?

12  A.   Yes.

13  Q.   How did you come up with that

14  number?

15  A.   You'd have to talk to Graham.

16  Q.   So that's not your calculation?

17  A.   No.

18  Q.   All right.  If you'll go to 51,

19  please.  First section is the interrogatories

20  that you provide in response to -- or the

21  responses that you provided in -- to the

22  interrogatories that we submitted to you.

23  If you go over to page 4, at the top --

24  A.   Yes.

254

C. BEHM

1

2     Q.    -- there's a statement about Stanley

3  Black & Decker says:  Plaintiff currently in the

4  hiring process.

5          What does that mean?

6     A.    Yes.  They -- I had interviews with

7  them.  She wanted me to do a tour of the

8  facility and then, shortly after, I got a call

9  stating that I had to have two back-to-back

10 surgeries because I had a bone infection in my

11 clavicle.  So I told Stanley Black & Decker

12 that.  She said, Give me a call after surgery.

13 And I sent her an email, but all the positions

14 were filled.

15     Q.    So when was that that you were in

16 the hiring process with them?

17     A.    Around October.

18     Q.    When did you have surgery?

19     A.    October.

20     Q.    And so what -- you had an infection;

21 is that what you said?

22     A.    A bone infection.

23     Q.    And was this the same shoulder that

24 had been injured previously?

25     A.    Yes.

C. BEHM

1

2     Q.    Did you reinjure the shoulder?

3     A.    No.

4     Q.    And so what kind of surgery did you

5  have?

6     A.    They put an antibiotic cement in

7  there.  They took my hardware out, put an

8  antibiotic cement between the non-union

9  fracture, and then I was supposed to have

10  surgery four weeks later, but I got COVID, so

11  six weeks later I had my second surgery, and

12  they took bone from my hip and put it in there

13  with new hardware.

14     Q.    So, again, just to make sure my time

15  frame is correct, this was October of last year,

16  so 2021?

17     A.    Yes.

18     Q.    And how long were you unable to work

19  because of that?

20     A.    I still haven't been cleared to do

21  anything.

22     Q.    So have you reached back out to

23  Stanley Black & Decker?

24     A.    I did.  I told them that surgery

25  went good.  And I asked them if they had any

256

C. BEHM

1
2   openings coming up.

3       Q.    When did you reach back out to them?

4       A.    Within the past month.

5       Q.    So I know you said you did a

6   cleaning job, or worked for a cleaning company

7   last week.  How were you able to do that with

8   your shoulder?

9       A.    It's very light work.  Just wiping

10  windows and tabletops.

11      Q.    Who did your surgery on your

12  shoulder?

13      A.    Craig O'Neill.

14      Q.    Same doctor?

15      A.    Yes.

16      Q.    Go to page 6, please.  In the middle

17  of the page, you see there's a section that says

18  Answer to Interrogatory Number 13?  You see

19  that?

20      A.    Yes.

21      Q.    And, again, there are several

22  witnesses listed.  There are a couple of new

23  ones, I believe.  One is a Desiree Williams?

24      A.    Yes.

25      Q.    That's your friend you mentioned

257

                    C. BEHM

1    earlier, correct?

2

3          A.    Yes.

4          Q.    So you've discussed your lawsuit

5    with Desiree?

6          A.    Yes.

7          Q.    Derrick Jones, I believe you

8    mentioned him.  He was the one you talked to

9    when Cruz was making comments to you --

10         A.    Yes.

11         Q.    -- texting you?

12         Jill Snively, we -- and who is Joanna

13   Weaver?

14         A.    My mom.

15         Q.    That's your relative.

16         What did you talk to your mother about?

17         A.    She was there when Cruz messaged me.

18         Q.    All right.  If you would go to

19   Document 52, please.  These are your responses

20   to our request for production.  My only question

21   is:  Have you provided all documents that you

22   have in your possession related to your

23   employment at Mack, or related to any of the

24   claims in this case, to your attorney?

25         A.    Yes.

258

C. BEHM

1

2              (Screenshots are received and

3              marked as Exhibit 53 for

4              identification, as of this date.)

5        Q.    Ms. Behm, you've been handed what

6    has been marked as Exhibit 53.  Do you recognize

7    these pages?

8        A.    Yes.  That's my Instagram.

9        Q.    And you made reference earlier to

10   the nude photos.  Are these the photos that you

11   were referring to?

12       A.    Yes.

13       Q.    Are these part of -- were these some

14   of your modeling photos that were taken?

15       A.    Yes, but these weren't the photos

16   that were taken while at Mack.

17       Q.    When were the -- you're referring to

18   page 1?

19       A.    Yes.

20       Q.    When were those photos taken?

21       A.    These are more recent photos.  So

22   within the past two years.  So when Kaitlyn made

23   the comment of "the one with the nude photos,"

24   it was me with orange and blue hair.

25       Q.    I want to make sure I'm following

259

1                    C. BEHM

2      you.  So you said these photos were taken within

3      the last two years?

4           A.    Yes.

5           Q.    But were not taken while you were at

6      Mack.

7           A.    Meaning, they weren't taken when

8      Kaitlyn made that reference.

9           Q.    They were taken after that?

10          A.    Yes.

11          Q.    But you were -- were you working at

12     Mack when these pictures were taken?

13          A.    I think so, yes.

14          Q.    And then page 2, I'm assuming

15     that -- is that you with Corey?

16          A.    That's Corey.

17          Q.    Same on page 3, you and Corey?

18          A.    That's Corey.

19          Q.    Let me -- I'm sorry, go back to

20     page 2 just a minute.  There's a reference under

21     that photo, the date, August 15th.  Do you know

22     what year that picture -- that post was?

23          A.    Which page?

24          Q.    Page 2.

25          A.    This past year.

260

1                          C. BEHM

2          Q.    August.  That would have been

3     August 15th of 2021?

4          A.    Yes.  That was about the time that

5     we started talking.

6          Q.    And then the next page, there's

7     another picture of you and Corey.  Do you know

8     when that picture was from?

9          A.    Around the same time as the other

10    one.

11         Q.    And then down at the bottom there's

12    a picture that's cut off.  Do you know who that

13    is with you in the bottom picture?

14         A.    The one with the page --

15         Q.    Yeah, there, that one that's cut

16    off?

17         A.    That's me and Desiree.

18         Q.    All right.  And then the next post,

19    I believe, it's two pages.  There's a picture --

20    there's the text, and then the next page is the

21    picture; is that right?

22         A.    Yes.

23         Q.    All right.  And this is a post from

24    February 25th.  Do you know what year this was

25    done?

C. BEHM

1

2     A.     I don't.  I had blue hair.  So it

3     was sometime in 2019.

4     Q.     All right.  So in February of 2019,

5     were you still married to Corey?

6     A.     Legally.

7     Q.     You said in this post:  My marriage

8     made me extremely insecure with the cheating and

9     abuse.

10     So was this taken after -- was this posted

11     after you were divorced?

12     A.     I can't confirm or deny.

13     Q.     Now, in this post you indicate

14     you're going to have a Brazilian butt lift?

15     A.     Yes.  I wanted one.

16     Q.     When did you have that done?

17     A.     I went to Florida to talk to a

18     surgeon, in March.

19     Q.     Of what year?

20     A.     Not this year.  Last year.

21     Q.     March of 2021?

22     A.     Yes.  A year ago.

23     Q.     Did you have the procedure done?

24     A.     To an extent.

25     Q.     What do you mean by that?

262

C. BEHM

1
2          A.     My blood levels weren't sufficient.

3          Q.     So what kind of procedure did you

4     actually have done?

5          A.     They took a little bit of fat out of

6     my belly.

7          Q.     But not as much as you wanted?

8          A.     Correct.

9          Q.     And where did you have this done?

10         A.     CG Cosmetics.

11         Q.     Where is that located?

12         A.     Miami.

13         Q.     Do you have any records related to

14    that procedure?

15         A.     No.

16         Q.     How did you pay for that procedure?

17         A.     A guy that I was dating paid for it.

18         Q.     Who was that?

19         A.     That was Joshua Framptom.

20         Q.     Did he work at Mack?

21         A.     No.

22         Q.     So this was before you got back with

23    Corey?

24         A.     Yes.

25         Q.     When did you and Corey get back

263

C. BEHM

1

2     together?

3          A.    I would say, summer of last year.

4          Q.    And then the next page, there's a

5     post from February 23rd.  Do you know what year

6     that was?

7          A.    I don't.

8          Q.    And then the next page.  Tell me

9     what that picture is.

10         A.    That was the very first photo shoot

11    I did after my concussion.

12         Q.    And are you underwater in that

13    picture?

14         A.    I am.

15         Q.    And that was June 8th of 2019?

16         A.    That's when the photo was posted.

17         Q.    So when was the picture taken?

18         A.    Probably a week before.

19         Q.    Are those Corey's arms in that

20    picture?

21         A.    No.  Those hands would be Brandon

22    Lesagonicz.

23         Q.    Who is that?

24         A.    A male model.

25         Q.    And then the next picture,

264

C. BEHM

1   July 21st, do you know what year that was?

3        A.    That was two years ago.

4        Q.    2020?

5        A.    Yes.

6        Q.    It wasn't the same year as the

7   underwater photo?

8        A.    No.

9        Q.    Okay.  And then the last one, that's

10  you and Desiree again?

11       A.    Yes.

12       Q.    And then that's July 25th.  Do you

13  know what year that is?

14       A.    Well, the photo on the last two

15  pages, those were taken the same day, so you

16  can't really go by the dates in the photos.

17       Q.    I'm sorry, the photos were taken the

18  same -- I'm just -- I'm wondering what year --

19  so that's the post -- July 25th is when you

20  posted that, correct?

21       A.    Yes.

22       Q.    All right.  Do you know when those

23  pictures were taken two years ago on the same

24  day, you said?

25       A.    I don't.  I would store photos in my

C. BEHM

1
2  phone and post them periodically.

3       Q.     These were posted to Instagram?

4       A.     My modeling account, yes.

5       Q.     And do you still have that account?

6       A.     I actually just opened it back

7  yesterday.

8       Q.     When did you close it?

9       A.     The same time I closed OnlyFans.

10      Q.     So you closed it about a month ago

11 and then just reopened it again?

12      A.     Yes.

13                  (A break was taken.)

14      Q.     Have you ever applied for Social

15 Security Disability?

16      A.     Yes.

17      Q.     When did you apply for Social

18 Security Disability?

19      A.     I don't recall the exact date.  I

20 got a letter from Mack Trucks saying that I had

21 to apply for long-term disability.

22      Q.     You don't recall when that was?

23      A.     No.

24      Q.     But you did submit an application to

25 the Social Security Administration?

1                        C. BEHM

2        A.    I had to go and do a physical.

3        Q.    What was the result of that?

4        A.    I got denied.  They said I could be

5   a secretary.

6        Q.    Do you know if that happened during

7   the time period that you were out from 2020

8   until 2021?

9        A.    Yes.  I was still employed by Mack.

10       Q.    You were out on several A&S leaves

11   during your employment?

12       A.    Yes.  My last one.

13       Q.    You indicated earlier that you had

14   applied for an LLC to start your own business.

15   What was the name of the business?

16       A.    Evergreen Cleaning Services.

17       Q.    Have you submitted the paperwork for

18   that already?

19       A.    Yes.

20       Q.    Are you planning on -- when are you

21   planning on starting the business?

22       A.    Hopefully, soon.

23       Q.    What kind of cleaning are you going

24   to do?

25       A.    Residential, eventually commercial.

1                         C. BEHM

2    I have a lot of family that has been in that

3    industry, so they are giving me tips.

4          Q.    Your Instagram account, what is your

5    name on Instagram?

6          A.    Right now?

7          Q.    Yes.

8          A.    Creature, spelled just like

9    creature, and Collz, C-O-L-L-Z.

10         Q.    Is that all one word?

11         A.    I believe there's an underscore

12    between "Creature" and "Collz."

13         Q.    What other names have you used on

14    Instagram?

15         A.    The Goat one.

16         Q.    Is that the Goat XX?

17         A.    Yes.

18         Q.    What else?

19         A.    Wild_flower.

20         Q.    Does that have an underscore in it,

21    as well?

22         A.    Yes.

23         Q.    Any others?

24         A.    Not that I can recall.

25         Q.    Do you still use the Goat or the

268

                            C. BEHM

1

2    Wild_flower?

3         A.    Wild_flower got hacked.  So I can't

4    even access that one.  And the Goat one is the

5    Creature_Collz one.

6         Q.    When did you close down the one that

7    was Goat XX?

8         A.    It's not closed.  It's the

9    Creature_Collz.

10        Q.    I understand.  Well, I guess, when

11   did you change it to Creature_Collz?

12        A.    I don't know an exact date.

13        Q.    You testified earlier that you

14   worked at several gentlemen's clubs;

15   Cheerleaders, Utopia, and one more.

16        A.    Scores?

17        Q.    Scores.  At those clubs, are those

18   completely nude dancing?

19        A.    No.

20        Q.    What, topless, what is it?

21        A.    Scores, you couldn't be showing

22   anything.  You had to wear pasties and bottoms.

23   Pasties cover your nipples.

24        Q.    I understand.

25        A.    Okay.  At Cheerleaders in New

C. BEHM

1
2  Jersey, you had to stay fully clothed.  You

3  couldn't expose anything.

4          And at Diva/Utopia/BabyDoll, you could go

5  topless.  But that was a personal choice.

6          Q.     And then on your OnlyFans account,

7  you testified that you mowed the lawn topless.

8  Have you ever done anything on OnlyFans

9  completely nude?

10         A.     Yes.

11         Q.     What sort of things have you done on

12  OnlyFans completely nude?

13         A.     I have had sex on OnlyFans.

14         Q.     Was Corey involved in that?

15         A.     Yes.

16         Q.     Why did you get back together with

17  Corey?

18         A.     A mixture of things.  He stopped

19  drinking.  That was the root of all of his evil.

20  That's why he was angry, that's why he assaulted

21  me.  And he got his act together.  I had to

22  divorce him, but he got his act together.

23         Q.     Do you plan to get remarried?

24         A.     No.

25         Q.     All right.  I know we have covered a

270

C. BEHM

1

2     lot of ground today.  Is there anything that you

3     have forgotten that you now remember that you

4     would like to tell me?

5          A.     Before I went out on A&S, the last

6     time I had all my paperwork submitted for what

7     type of taxes to be taken out of my checks.  And

8     when I went out on A&S, something miraculously

9     happened and PA tax stopped being taken out, and

10    I had to pay in over $500.  So I don't know if

11    that was something that HR did, but I certainly

12    didn't make that adjustment.

13         Q.    Anything else that you may have

14    forgotten that you want to add to the record

15    now?

16         A.     I found it very disheartening that

17    after the accusations with Cruz, he is still

18    employed there.  That just shows the length of

19    Mack not having any type of heart towards

20    situations like that.

21         Q.    Anything else?

22         A.    No.

23         Q.    Is there anything that you may have

24    misstated that you need to correct before we

25    close your deposition?

271

1

2       A.     No.

3       Q.     Is there anything else you would

4  like to tell me about your lawsuit against Mack

5  Trucks?

6       A.     No.

7               MR. MC COY:  All right.  That's

8          all of the questions I have.

9               MR. BAIRD:  No questions.

10

11          (Time noted: 4:47 p.m.)

12

13

14          _____

                   COLLEEN BEHM

15

16  Sworn and subscribed to

17  before me this _____ day of

18  _____, _____.

19


         _____

20       Notary Public

21

22

23

24

25

272

**I N D E X**

WITNESS                              PAGE

  COLLEEN BEHM


By MR. MC COY                           4



**E X H I B I T S**


FOR IDENT.          DESCRIPTION          PAGE

Exhibit 1  Employment Application      28

Exhibit 2  Macungie Shop HBU Interview  58
           Guide

Exhibit 3  Job offer letter            61

Exhibit 4  Production Tech job         63
           description

Exhibit 5  UAW application             68

Exhibit 6  Acknowledgment              76

Exhibit 7  Volvo human resources       78
           Policies and Procedures

Exhibit 8  Attendance Policy           82

Exhibit 9  Action Type document, one   91
           page

Exhibit 10 Wage Type spreadsheets      101

Exhibit 11 Life Event Change Form 2018 110

Exhibit 12 Life Event Change Form 2019 110

Exhibit 13 Notice of Formal Documented 118
           Discussion, Attendance
           Policy

Exhibit 14-15 Notice of Disciplinary    121
              Action

Exhibit 16 Letter dated 3/3/20          125

Exhibit 17 Benefits document            130

Exhibit 18 Email                        139

Exhibit 19 Short Term Disability        143
              Benefit Claim Form

Exhibit 20 Corrective Action Request    147
              Application

Exhibit 21 Physical Capabilities        153
              Checklist

Exhibit 22 Three-page doctor notes      155
Exhibit 23 Workers' Comp Denial Notice  158
Exhibit 24 A&S letter                   160
Exhibit 25 Mack letter dated 5/21/19    161
Exhibit 26 Physical Capabilities        162
              Checklist

Exhibit 27 Letter dated 6/14/19         163

Exhibit 28 Letter dated 5/13/19         164

Exhibit 29 Letter dated 8/22/19         165

Exhibit 30 Letter dated 8/29/19         168

Exhibit 31 Dr. Shipkin letter           172

Exhibit 32 Mack Trucks FAQS             174

Exhibit 33 Email dated 2/4/20           181

Exhibit 34 Shift Change Request         183

Exhibit 35 Benefit Claim Form           189

274

1
2

Exhibit 37 One-page document          193
3
Exhibit 38 Email dated 4/7/20         194
4
Exhibit 39 A&S letter                 195
5
Exhibit 40 Tower Health Medical Group  196
           letter
6
7
Exhibit 41 Tower Health Medical Group  197
           letter
8
Exhibit 42 Email dated 4/8/21         209
9
Exhibit 43 Screenshots                213
10
Exhibit 44 Charge of Discrimination   219
11
Exhibit 45 Dismissal Notice           222
12
Exhibit 46 Civil Action Complaint     223
13
Exhibit 47 2018 W-2                   242
14
Exhibit 48 Earning Statement          242
15
Exhibit 49 Earning Statement          244
16
Exhibit 50 Rule 26 Disclosures        251
17
Exhibit 51 Answers                    251
18
Exhibit 52 Responses                  251
19
Exhibit 53 Screenshots                258
20
21
22
23
24
25

275

1

2              C E R T I F I C A T I O N

3              I, CAROLYN C. CRESCIO, a Notary

4     Public, within and for the State of

5     Pennsylvania, do hereby certify that the

6     foregoing witness, COLLEEN BEHM, was duly sworn

7     on the date indicated, and that the foregoing is

8     a true and accurate transcription of my

9     stenographic notes.

10             I further certify that I am not

11    related to any of the parties to this action by

12    blood or marriage; and that I am in no way

13    interested in the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto

15    set my hand this 8th day of March, 2022.

16

17

18    _____

         CAROLYN C. CRESCIO

19

20

21

22

23

24

25

276

1

2                        ERRATA SHEET

3     CASE NAME:  Collen Behm vs. Mack Truck, Inc., et al

      DATE OF DEPOSITION:March 8th, 2022

4     WITNESS' NAME:  COLLEEN BEHM

5     PAGE LINE   CHANGE                      REASON

6     -----------------------------------------------------

7     -----------------------------------------------------

8     -----------------------------------------------------

9     -----------------------------------------------------

10    -----------------------------------------------------

11    -----------------------------------------------------

12    -----------------------------------------------------

13    -----------------------------------------------------

14    -----------------------------------------------------

15    -----------------------------------------------------

16    -----------------------------------------------------

17    -----------------------------------------------------

18                    _____

                              COLLEEN BEHM

19

20    Sworn and subscribed to

      before me this _____ day of

21    _____, _____.

22    _____

              Notary Public

23

24

25

**A**

**a--** 136:13
**A-I-D-E-N** 22:20
**A&S** 68:4,5,13 94:15
  94:17,24 95:4,14
  97:4 100:13 105:16
  130:22 133:16
  143:16,19 144:12
  160:3,5,12 162:6,22
  188:25 189:3,18
  192:20 193:3,20
  194:5,8,22,24 195:4
  195:6,16,21 207:2
  221:5,9 230:2,12,14
  230:17 231:10,23
  232:19 240:12,17
  243:7 266:10 270:5
  270:8 273:13 274:4
**a.m** 1:13 52:4,5 103:5
  212:11
**abbreviation** 103:18
**ability** 8:9,16 192:4
**able** 60:16 80:8
  112:14 133:11
  136:18 145:6,23
  161:16 179:7
  182:24 184:15
  191:16,18,20 193:6
  193:8 196:15,21
  221:14 225:3 226:6
  226:11 233:7 256:7
**above-entitled** 1:16
**absence** 91:18 92:23
  93:14 94:10 95:3
  96:10,16 97:5 100:6
  101:16 126:24
  127:23 130:9,12,25
  133:18 138:18
  144:15 162:18
  164:5,18
**absent** 120:13 126:10
**absolutely** 7:9 73:17
  73:21 81:3 113:21
  115:2 117:17
  127:21 151:6 157:8
  170:7 206:6 213:7
**abuse** 113:9 261:9
**accent** 6:9,14
**access** 268:4

**accident** 46:10 47:8
  68:2 100:12 135:15
  143:16 155:4
  165:10
**accommodate** 100:2
  224:11 225:4
  229:14
**accommodated** 225:5
**accommodating**
  224:8,24
**accommodation**
  225:22,25 226:5,10
  226:14 227:15
  228:6,8
**account** 42:16,24
  55:18,20 265:4,5
  267:4 269:6
**accurate** 65:6,22
  119:16 222:17
  243:3 275:8
**accusations** 251:4
  270:17
**acknowledge** 3:4,8
**Acknowledgment**
  76:14 272:16
**act** 228:4 239:6
  269:21,22
**action** 1:3 34:9 84:4
  91:4 115:24 120:18
  120:25 121:6 123:3
  123:12 125:7,9,17
  125:20 147:25
  211:5 223:11
  272:19 273:2,8
  274:12 275:11
**actions** 30:8 115:14
  115:17 126:11
  129:17,19
**activities** 196:22
**activity** 239:5,24
**actual** 176:5 191:8
  232:24 239:12
**Adamstown** 38:11
**add** 270:14
**Addendum** 156:10
**additional** 190:11
**address** 7:14 9:19,23
  141:13 142:4
**addressed** 78:4

**adjustment** 270:12
**administer** 3:10
**administered** 3:9
**Administration**
  265:25
**adopted** 17:12
**advancements**
  207:23 208:14
**advances** 217:7
  236:13
**advantage** 240:3
**affect** 13:10
**agency** 44:7
**ago** 44:3 45:19 52:18
  54:8 107:25 121:15
  142:11 164:3
  169:18 186:2 194:4
  205:12 213:15
  216:16 217:5,12
  218:5 244:7,16
  261:22 264:3,23
  265:10
**agree** 3:12
**agreed** 25:7
**agreement** 66:16
  70:15,21 71:10
  90:16,23 170:2
**ahead** 47:16 85:11
**Aiden** 22:20
**air** 46:2
**airports** 19:18
**al** 276:3
**alcoholic** 8:12
**alive** 15:24
**allegations** 223:25
**allege** 81:8 236:10
  237:15 247:25
  248:15
**alleged** 228:11
  235:18 238:20
**alleging** 81:14 241:16
  244:22 248:22
**allowed** 73:4 80:13
  80:22 179:18
**altercation** 116:13,16
  117:9,10,11 159:7
**ambulance** 150:15
**Amcor** 39:14,15,19
  39:19 45:11,12 48:6

48:7,18,20 49:4,8
  50:8,16 51:21 52:14
  52:20,24 53:4,19
  198:20,21 199:3
  212:10
**amended** 223:17
**Americans** 228:4
  239:6
**amount** 119:14
  133:23
**and-** 2:11
**and/or** 60:16
**Andrew** 22:6 24:6
  26:19
**angry** 269:20
**animals** 29:22
**Anita** 17:13
**announcement**
  173:19 174:19,22
  175:21
**answer** 6:18,21 7:22
  8:9,17 28:25 57:16
  59:11 60:11,20 61:2
  69:5 78:24 82:11
  85:12 89:22 119:6
  126:6 169:6 256:18
**answered** 84:11
**answers** 6:25 251:8
  274:17
**antibiotic** 255:6,8
**anticipated** 62:6
**anxiety** 95:15 144:17
  145:14 189:4
  190:19 193:9
  228:16
**anxious** 198:25
**anybody** 17:14 23:17
  23:23 24:3 25:10
  50:8,16 83:14 129:6
  171:3 177:8 179:3,6
  179:11,15,16 184:7
  186:8 208:24 216:9
  216:13,17 226:4,8
  226:13 227:14
  231:21 233:19
  234:24 235:6
  237:16,20 238:5,17
  250:15
**anymore** 42:19

185:23 207:17
215:12 246:15
247:8 249:3
**anytime** 227:18
238:24
**apartment** 20:3
**apologize** 4:16,21
16:8 56:25 143:7,8
**appear** 219:6 242:10
**appearance** 128:4,5
205:17 206:4
**appearances** 128:9
128:12
**appearing** 202:2
**appears** 29:9 61:25
64:12 98:9 110:13
110:22 130:21
131:21 153:18
155:24 187:4
189:24 210:4 218:3
**appetite** 149:11
**application** 28:13
29:6 30:17 36:2
40:24 41:2 56:17,18
56:24 57:11 58:12
61:5 68:23 69:8
148:2 160:12
193:21 194:4
265:24 272:10,15
273:8
**applied** 40:2,7,16
45:8,14 46:8 47:23
48:11 143:22 164:4
182:11 230:11,17
265:14 266:14
**apply** 33:5 39:21,23
40:10,13,23 41:9
45:18 47:25 57:12
83:7 133:14,17
143:15,19 147:7,7
160:2 161:19
181:17,19 182:16
188:25 189:3 193:3
198:21 265:17,21
**applying** 56:20 182:7
182:20,21 192:25
193:7
**appointment** 80:12
162:21 164:22

169:15,20 170:5,9
170:12,15 171:2,7
171:18,21 172:24
246:21
**appointments** 188:9
**appraisers** 34:17
35:2,8 36:21 37:18
**approved** 162:7,9
165:4 193:11
194:11 195:4
230:24 231:3
**approximately**
149:22 187:13
203:7 244:16
253:10
**April** 131:11 195:5
206:21,21 243:23
**ARD** 25:21,22
**area** 18:18 33:19,22
37:22 38:11 48:10
63:5,6 65:11 73:24
73:25 98:22 115:18
115:20,21 116:3,4
117:25 121:16
122:4,6,12,25
123:19,25 124:19
137:8 146:23,24,24
146:24 147:2,8,10
147:13,17,17,21
199:16 207:9
221:25,25
**areas** 99:25 234:17
234:17,20
**arm** 231:11
**arms** 263:19
**arrest** 128:7
**arrested** 26:14,16,18
26:24,25 27:2,5
201:25
**arrests** 27:7
**Article** 170:2
**aside** 56:23 57:10
**asked** 35:21 43:18
116:22 117:3,24
129:23 140:17
142:11 149:5
152:15 159:4 164:3
168:9 170:16 216:8
216:14 226:20

255:25
**asking** 6:6 9:13 51:7
72:21 124:10 165:7
188:17 216:22
238:13
**asks** 217:2
**ASN** 243:6
**aspects** 86:9,13 136:6
**assault** 159:12 161:2
230:7
**assaulted** 96:25
111:11,21,25 114:2
158:24 269:20
**assembly** 103:2
104:10,18,22
105:23
**assert** 228:2
**assessment** 57:14
58:3,12 61:5
**assigned** 62:19 75:16
86:12,23 92:11
122:4,6,6 176:11
**assigning** 177:11
**assignment** 88:5
**assist** 118:2 124:4,14
147:10
**assistant** 144:4
**assisting** 58:9 105:25
115:20 122:13
123:25 124:6,17
125:13
**associations** 15:5
**assume** 6:19 24:6
52:4 163:4 215:16
248:9
**assuming** 61:10
66:11 215:19
259:14
**Atlantic** 32:19
**attach** 98:25
**attached** 70:2
**attack** 190:5,7
**attend** 11:2 15:8
128:17
**attendance** 60:7,10
77:18 82:5,15,23
118:23 119:10,12
119:20 126:17
127:25 128:9 129:4

129:14 130:7
186:20,23 187:14
187:16 202:5 213:6
218:7 272:18,24
**attending** 127:22
191:7
**attention** 27:22 109:9
**attorney** 4:23 5:9,16
7:13 248:17,20
257:24
**attorney's** 248:16
**attorneys** 2:4,9,15
3:3
**August** 30:16,21 54:7
54:9 92:22,23 93:3
94:14,20,21 104:24
105:2,5 114:12
130:23 131:2 132:5
132:19,19 135:15
164:22,25 165:11
166:13 167:15
169:13 200:6
249:15 253:9
259:21 260:2,3
**aunt** 23:19
**authorization** 246:17
**Auto** 1:8 2:15
**automobile** 38:17
**available** 193:6
**Avenue** 9:20 141:21
**averaged** 109:8
**aware** 46:13 179:6,11
179:15,16 229:5
232:7

---

**B**
**B** 3:24 75:17 272:7
**B-R-O-D-E-E** 10:9
**Babydolls** 31:7
**back** 14:19 29:8 36:7
38:23 47:22 56:8,10
56:14 65:11 94:13
95:2 97:24 98:2,4
105:16,19 114:19
116:7 118:9 137:23
138:5,15,18,21
139:4 142:10 145:7
146:3,13,16 147:2
151:18,19 153:24
156:22 158:20,21

166:16,19 170:20
171:15,22 172:6
176:7 183:13
185:17 187:2,18
192:21,23 195:23
198:24 203:20
210:15 211:16
212:2,5,8 225:4
231:4 232:22
238:14 239:19
242:3 249:7 250:22
255:22 256:3
259:19 262:22,25
265:6 269:16
**back-to-back** 254:9
**background** 5:16
14:18 21:21 191:11
**backlash** 202:16
**bad** 138:16
**BAIRD** 2:6 26:4
84:23 90:7,13 102:7
134:24 215:21
241:8 271:9
**Bakeries** 22:15
**bankruptcy** 28:6,8
**bar** 204:11,12
**bargaining** 66:16
70:14,21 71:10 83:8
**barriers** 60:18,21
**bartender** 36:17
**based** 13:18 103:12
176:17 235:20,24
236:7 249:8
**Basically** 101:18
**Bates** 36:4 90:10,20
91:2 132:24 144:21
213:22 243:11
**bathroom** 181:5
**beanie** 87:12
**becoming** 54:21,22
**began** 53:6 221:20
**begging** 189:8
**beginning** 31:13,18
38:7 41:25 74:3
89:13 94:8 99:12
175:6 197:25 234:4
**behalf** 28:9 166:6
**behavior** 224:7
**Behm** 1:4,15 4:1,7,13

4:13,15,16,19,19
5:1 6:1 7:1 8:1 9:1,6
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1,24 19:1,3 20:1
20:7,7 21:1,13 22:1
22:16 23:1 24:1
25:1 26:1 27:1 28:1
28:16 29:1,3 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1,8 57:1
58:1 59:1 60:1 61:1
61:17 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1,2,7 70:1
71:1 72:1 73:1 74:1
75:1 76:1,17 77:1
78:1,21 79:1,2 80:1
81:1 82:1,13 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
91:8 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1,9
102:1,10 103:1
104:1 105:1 106:1
107:1,6 108:1 109:1
110:1,10 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1,3 120:1
121:1,10 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1

159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1,2 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
215:24 216:1 217:1
218:1 219:1,19
220:1,5 221:1,19
222:1,14,24 223:1
223:15 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
237:10 238:1 239:1
240:1 241:1,15
242:1,8 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1,14 252:1
253:1 254:1 255:1
256:1 257:1 258:1,5
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:14 272:4 275:6
276:3,4,18
**believe** 5:4 30:15,18
38:7 48:11,17 57:14
57:21 58:11 62:14
66:9,17,19 68:14
75:17,20 79:8,19,25
85:14 86:2 93:8
105:5 112:21 114:7

114:9 116:9 123:9
124:22 128:5,16
131:2 132:10 138:2
138:22 140:16
142:24 146:4 149:4
156:23 163:8
168:22 171:8
175:20 181:18
185:25 186:24
195:9,12 199:5
200:10 202:9,10,11
203:5,12 208:9
210:17,18 213:23
217:8,9 229:3,22
232:11,13 235:24
236:24 239:7,11,14
239:23,25 240:8,16
240:21 242:24
244:8,14 252:25
256:23 257:7
260:19 267:11
**belly** 262:6
**belong** 15:4
**beneficial** 199:2
**benefit** 68:2,10 143:2
170:2 189:11
193:20 273:7,24
**benefits** 49:10,14
66:20 68:13,18
94:24 95:4,14 97:4
100:13,13 108:7
109:11,19,20,23
130:14,22 143:16
143:19 160:3,13
162:7 165:11
169:20 188:25
189:3 194:5,8,22,25
195:6,11 240:13
244:23,23,25 245:3
245:6,16,24 246:2,6
246:10 273:4
**berks** 11:18,19,22,23
12:13 13:11,12
128:22,24
**best** 52:6 189:10
191:14
**better** 30:12 33:7
51:11 102:7 186:7
**beverages** 8:13

**beyond** 188:20
**big** 231:11
**bill** 159:4,5
**Bimbo** 22:15
**biological** 17:11
**birth** 10:20
**bit** 5:15 6:8 29:13
  35:22 146:25
  225:12 235:17
  262:5
**biweekly** 249:25
**Black** 39:13,22 45:10
  48:5 254:3,11
  255:23
**blamed** 230:6
**Blandon** 21:10
  141:14
**bleeding** 148:21
**blew** 102:6
**blinds** 151:14
**blocks** 116:20
**blood** 262:2 275:12
**blow-mold** 48:22
**blue** 258:24 261:2
**blurry** 143:11
**bodies** 224:18
**body** 135:24
**bolts** 57:16
**Bona** 165:20
**Bonaccorsi** 161:8
  163:13 164:19
  165:22,23,24
  246:15
**bone** 254:10,22
  255:12
**book** 70:16 71:11
  72:16 73:13 78:16
  83:2 85:14,17
**born** 10:22 191:22,23
  228:22
**bottles** 49:2
**bottom** 36:3 69:12
  91:20,24 111:17
  132:24 134:6
  136:25 137:16
  154:7 156:8 157:4
  157:4,17 161:12
  163:12,15 169:23
  190:10 213:21

215:19 216:3,21
  217:24 220:10
  221:10 222:12
  227:25 251:21
  253:8 260:11,13
**bottoms** 268:22
**Boulevard** 2:4
**box** 112:24
**boyfriend** 9:25 10:13
**bracket** 148:17
**brackets** 124:4
  125:15
**brain** 151:12,15
  152:11,19 154:20
  156:16 224:20
**brakes** 86:6
**Brandon** 263:21
**Brazilian** 261:14
**breach** 241:3,5
**break** 7:17,23 56:6,7
  63:11 114:15,16
  150:6,7 173:10
  265:13
**breakage** 72:11
**breakdown** 95:16
**breaks** 7:19 63:13
**Brent** 144:4,4,7,25
  145:5,10 161:7
  166:2 246:15
**Brian** 117:22 120:4,6
**Bridget** 17:21 18:3
**brief** 170:11 177:19
**briefly** 39:14 45:12
  48:7 105:17 130:13
**bright** 154:7,11
**bring** 190:24
**bringing** 241:5
**Brodee** 10:9
**broke** 131:11
**brother** 17:23
**brothers** 202:17
**brought** 27:21
  112:22
**Bryan** 16:17,23 18:15
  87:13,13
**Brzozowski** 166:10
  166:11,12,14,25
  167:24 195:24
  197:14,25 224:13

225:14 226:19,22
**Buck** 97:20 233:5
**build** 85:22 97:21
**building** 116:19
**bump** 72:24 73:8
  179:18 184:16
  231:11
**bumped** 180:3
  185:13
**bunch** 62:9
**business** 5:5 28:9
  34:21 48:20 266:14
  266:15,21
**butt** 261:14

---
C
---

**C** 2:2 3:24 4:1 5:1 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1 14:1
  15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1
  63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1
  71:1 72:1 73:1,22
  74:1 75:1,17 76:1
  77:1 78:1 79:1 80:1
  81:1 82:1 83:1,23
  83:24 84:1 85:1
  86:1,18,24 87:1,3
  87:17 88:1,20 89:1
  89:2 90:1 91:1 92:1
  92:14 93:1 94:1
  95:1 96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1,21,24
  104:1,5,10,11,14,24
  105:1,3,11 106:1
  107:1 108:1 109:1
  110:1 111:1 112:1
  113:1 114:1 115:1

116:1,11,19 117:1
  117:22 118:1,6
  119:1 120:1,5 121:1
  122:1 123:1 124:1
  125:1 126:1 127:1
  128:1 129:1 130:1
  131:1 132:1 133:1
  134:1 135:1 136:1
  137:1 138:1 139:1
  140:1 141:1 142:1
  143:1 144:1 145:1
  146:1 147:1 148:1
  149:1 150:1 151:1
  152:1 153:1 154:1
  155:1 156:1 157:1
  158:1 159:1 160:1
  161:1 162:1 163:1
  164:1 165:1 166:1
  167:1 168:1 169:1
  170:1 171:1 172:1
  173:1 174:1 175:1
  176:1 177:1 178:1
  179:1 180:1 181:1
  182:1 183:1 184:1
  185:1 186:1 187:1
  188:1 189:1 190:1
  191:1 192:1 193:1
  194:1 195:1 196:1
  197:1 198:1 199:1
  200:1 201:1 202:1
  203:1 204:1 205:1
  206:1 207:1 208:1
  209:1 210:1 211:1
  212:1 213:1 214:1
  215:1 216:1 217:1
  218:1 219:1 220:1
  221:1 222:1 223:1
  224:1 225:1 226:1
  227:1 228:1 229:1
  230:1 231:1 232:1
  233:1 234:1 235:1
  236:1 237:1 238:1
  239:1 240:1 241:1
  242:1 243:1 244:1
  245:1 246:1 247:1
  248:1 249:1 250:1
  251:1 252:1 253:1,7
  253:8 254:1 255:1
  256:1 257:1 258:1

259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
275:2,2,3,18
**C-A-N-N-O-N** 10:10
**C-O-C-O-P-U-F-F-S**
55:22
**C-O-L-L-Z** 267:9
**C-O-N-V** 106:3
**cab** 89:17,20 103:2
104:10,11,18,22
105:23 148:16
214:12
**cabs** 87:7 89:4,5,7,18
199:18 234:4
**cafeteria** 97:20
175:13 178:8
**cafeterias** 172:10
**calculation** 253:17
**calculator** 107:16
**Calhoon** 144:5,25
145:18 161:7 166:2
246:15
**call** 5:18 36:4 140:15
171:6,9,13 182:25
209:18 254:8,12
**called** 32:20 34:16
37:5 57:14 63:7
72:21 87:11 102:16
134:7,22 151:17,25
165:7 168:5 177:25
178:4 205:5 218:21
222:19 241:3
**calls** 248:5
**cancer** 231:9
**Cannon** 22:6,8,10
24:6 25:4
**capabilities** 134:23
136:11,19 153:8
162:12 167:2,6
273:9,15
**capable** 173:6
**car** 40:9 46:5,7,24
47:8
**card** 24:4,9,10
**care** 29:21 41:7 114:8
140:19,25 151:2
179:3,17 192:3

206:9 208:20 236:4
247:11
**career** 11:18,22,23
13:10,11
**careful** 84:25
**Carl** 87:21,22 120:2
120:4 121:3 123:9
125:12,14 153:5
**Carmen** 59:19
**Carolina** 2:10 4:25
5:3 6:10 15:11,14
15:17,20 17:24
121:24
**Carolyn** 1:17 275:3
275:18
**Carpenter** 40:9 41:8
41:13
**cart** 97:21
**carts** 152:16
**case** 5:9 9:15 21:19
21:19 23:2,3 27:10
27:24 28:17 67:7
81:9,14 182:23
241:18 248:17,20
250:18 257:24
276:3
**cash** 29:22
**Cassie** 2:17 5:8
**caused** 123:22 190:22
221:7
**causing** 190:18
**caveat** 7:21
**CBA** 71:11,17,24
72:4,7 73:11 75:5
76:10 77:14,14 78:2
78:5,5,14,15 107:22
169:25 195:14
**CBAs** 90:3
**cement** 255:6,8
**center** 11:18,23 13:12
75:21 102:16,25
**Central** 19:19
**certain** 84:4,8 119:13
119:14 184:12
240:5 241:17
**certainly** 270:11
**certificate** 13:25
**certifications** 15:2
**certify** 275:5,10

**CG** 262:10
**chairman** 209:9
**chance** 176:11
**change** 70:21 77:18
78:7 88:6,17 101:12
108:7 110:2,6,14,23
110:25 111:24
176:16,21 179:7,17
181:4 183:13,16,20
183:23 268:11
272:22,23 273:23
276:5
**changed** 77:9,14,23
77:24 78:10 88:9
105:23 147:9
175:24 179:7,12
231:2
**changing** 175:21
**charge** 26:21 27:11
177:11 219:19,25
220:6,16,23 221:8
221:16 274:10
**charged** 27:3
**charges** 26:22 127:8
**Charles** 23:9,9
**Charlie** 23:22
**chart** 232:9 234:5
**chase** 177:16
**chassis** 116:19
**cheaper** 109:24
**cheating** 261:8
**checked** 170:10
**checklist** 134:23
136:11 153:8
162:12 167:2
273:10,15
**checks** 270:7
**cheerleader** 33:16
**Cheerleaders** 32:6
44:22 268:15,25
**Cherry** 1:11
**Chestnut** 2:16
**child** 22:5 127:9
140:19,25
**child-care** 211:23
**children** 22:2 67:10
236:4
**Children's** 16:22
18:6

**choice** 269:5
**Christmas** 141:25
**Chuck** 23:9
**church** 15:7
**cigarettes** 116:6
124:20
**circle** 66:4
**circling** 142:10
**City** 19:15 32:19
**Civil** 1:3 223:11
274:12
**claim** 27:14 28:3
143:3 155:3,6
158:14 189:11
192:19,22 201:12
201:15 228:3
235:19 241:2,5
273:7,24
**claims** 25:7 228:2
257:24
**clarify** 81:11 84:15
**classes** 11:15,17,25
12:3,7,21,22,24
13:7,8,14,17 14:3,9
14:20 26:2 54:13
**clavicle** 93:11 131:11
246:16 254:11
**cleaning** 45:17 46:9
47:3,17 48:15 256:6
256:6 266:16,23
**clear** 6:5 7:8 8:7
39:17 168:6
**clearance** 232:23
**clearances** 166:20
171:11,13 172:8,13
232:22 239:12
**cleared** 190:14 191:6
192:20 200:13
255:20
**CLEARY** 2:14
**client** 5:19 220:23
228:3,9,11 238:21
238:22 241:17
**client's** 241:20
248:24
**Clinic** 16:22 18:6
**clinical** 16:21
**clock** 117:2
**clock-out** 117:19

close 265:8 268:6
  270:25
closed 36:22 72:16
  265:9,10 268:8
clothed 269:2
clothes 42:6
club 31:8,9,17 32:5
clubs 32:18,21 53:10
  53:11,18 268:14,17
Coca-Cola 39:14,23
  45:11 48:4 49:2
cocopuffs 55:21
coffee 7:19
colleague 5:2
collective 66:16
  70:14,20 71:9
Colleen 1:15 4:7 9:6
  57:6 116:14 117:14
  204:2 237:10
  271:14 272:4 275:6
  276:4,18
college 11:14,16
  12:15 13:13 140:18
college-level 14:22
Collen 1:4 276:3
Collz 267:9,12
column 102:15
columns 124:2 137:9
  146:14,16,20,21
come 38:23 63:6,15
  89:17,19 147:4,16
  147:20 150:22
  152:2,24 156:21
  158:20,21 189:7
  204:4 208:17 214:2
  253:14
comes 85:8
coming 38:2 146:6
  181:6 203:14
  207:10 256:2
comment 117:13
  236:23 249:11
  258:23
comments 190:11
  205:15 236:24
  237:3 248:9,13
  257:9
commercial 266:25
Commission 223:3

communicate 81:9,12
  171:3 184:7
Comp 28:3 155:3
  156:6 158:3,14
  201:11,14 230:3,7
  273:12
companies 19:15
company 17:3 19:16
  35:22 45:17 46:9
  47:18 48:13,15
  51:19 68:11 76:2,12
  77:13 79:19 81:22
  83:4 88:3 167:25
  168:4,13 169:10
  176:20 198:19
  208:25 233:13,14
  233:18 256:6
compassion 144:16
compensation 96:21
  193:2,7
complain 50:7,11,16
  208:8
complained 114:23
complaint 81:23
  207:5 223:11,17
  236:11 238:2,5,9,17
  240:24 241:2,16
  274:12
complete 6:21 63:3,4
  63:16,16 166:25
completed 59:25 61:5
  130:23 134:12
  137:13 161:6
completely 8:10,17
  268:18 269:9,12
completing 56:23
complied 168:18
comply 168:17
computer 57:16
  97:23 233:4,8
concerned 144:17
  206:7 210:19
concerns 7:15 50:19
  208:21
Concessions 38:13
concussion 96:14,15
  96:18,23 151:9
  159:19 229:23
  230:2,4,5,10 250:7

263:11
concussions 224:15
  224:16
condition 8:16 133:7
  182:9 196:23 229:6
conditions 228:18
conduct 147:23
  236:14 237:15
  239:2 241:18,20
  248:24 249:8
confided 207:10
confirm 90:2 194:21
  242:9 243:3 261:12
confirmed 125:18
  173:17
confirming 241:10
confirms 158:13
confused 6:2
considered 51:14
constantly 204:7
consumed 8:12
contact 203:23
  209:16 216:24
contacting 35:3
contain 71:24
continue 36:19,25
  247:15
continued 150:21
  244:15
continuous 182:22,23
contract 77:12,12,24
  78:10 83:3
contribute 67:17
  113:22
control 189:6 214:16
  249:4
Conventional 106:5
conversation 168:7
  177:19 215:11
convicted 25:20
Cooking 54:13
copies 76:22 77:6,23
  214:13 215:17
  219:7
copy 29:9 70:14 78:2
  78:5,13,14 79:3,4
  79:14 83:11 113:5
  143:8 158:10
  172:25 175:2

183:19 215:25
  223:17
Corey 10:14 19:9,11
  19:21 20:23 22:16
  109:10,14,16
  112:12 159:8
  259:15,16,17,18
  260:7 261:5 262:23
  262:25 269:14,17
Corey's 20:6 263:19
corner 69:21
correct 20:9 22:3
  25:8 27:4 29:18
  33:2 36:14 40:19
  45:11 57:6 62:3,4
  63:17,20 66:16
  67:16 70:5,6 71:22
  78:8 79:15 80:24
  81:19 82:3,20,21
  88:9 92:4 100:20,21
  103:5,6,22 104:22
  105:6 106:18 107:9
  107:15,20 112:8
  117:12 130:23
  132:6,21 133:9
  134:3,4,17 135:11
  139:9 149:23
  154:23 155:25
  158:17 159:9
  160:22 161:15
  162:19 164:13
  173:8,22 174:24
  179:5 187:11
  190:13,19 196:7,24
  210:6,12,18,22
  213:9 216:7,12
  222:16 224:9
  235:12 242:11
  243:24 247:24
  255:15 257:2 262:8
  264:20 270:24
corrective 84:3
  126:11 147:25
  273:8
correctly 45:20 63:9
  80:21 150:8
Cosmetics 262:10
cosmetology 11:19,24
  12:10 14:17

cost 102:16,25
costs 248:19
couch 142:5
counselor 249:24
count 18:9 241:2
County 128:22,25
couple 7:19 8:5 52:15
52:17 53:10,19
66:14 74:12 89:19
93:15 131:15
132:22 144:20
161:11 185:6,12
195:2 203:20 217:5
221:15 223:24
227:4 231:10,11
242:25 244:7
251:15,19 256:22
course 70:19 205:25
courses 13:19,22,23
14:23
court 1:2 3:2,21 4:4
5:20 8:25 28:21
85:4 113:11,13
126:25 127:2,4,6,7
127:9,9,22 128:3,5
128:6,8,12,16
187:25 188:9
199:11 201:18,22
202:2 203:11,14
204:3 205:2 218:19
219:7,12
court's 113:2
courtesy 72:21,23
73:4,5
courthouse 128:24
cousin 23:22
cousins 23:10
cover 76:7 268:23
coverage 246:23
247:2
covered 23:5 96:20
240:12 247:6
269:25
COVID 51:5 192:24
245:16,24 246:2,6
255:10
COVID-19 49:22
50:2
coworker 252:19

coworker/union
236:14
COY 2:11 4:9 28:11
56:5 84:24 85:6
90:9,14 102:2,8
114:14,18 215:16
215:22 241:11
271:7 272:5
Craig 131:22 256:13
crash 86:2
crawl 60:15
create 130:9
creature 267:8,9,12
Creature_Collz
268:5,9,11
credit 24:4,9,10
Crescio 1:17 275:3
275:18
cried 181:5
criminal 11:20 12:18
13:4 14:14
criminology 14:14
crooked 157:10
crouch 60:15
cruise 132:6,15 136:4
136:6
Cruz 177:5,6,10,17
181:6 202:19,23,24
203:9,17,22,24
207:5,6,10,15 208:8
208:10,20 210:17
210:21 211:9
212:12 214:17
215:8 216:25
217:13 226:2,14,25
227:12 236:15
249:9 250:4 251:3
252:2,12,14 253:2
257:9,17 270:17
Cruz's 202:21 203:22
cups 7:19
curious 14:5
current 142:3
currently 9:17,22
14:25 15:4,11,15
16:18 18:3,24 19:11
141:10,21 176:10
245:2,8 254:3
custody 127:9

customer 48:11 55:7
customers 35:4 55:10
cut 102:5 148:18
215:18 217:7
260:12,15
cutoff 185:10

---

## D

D 2:12 75:17 272:2
dad 15:13,19,21
dad's 16:9 23:8
daily 60:24
Damage 34:16 35:8
36:20 37:18
damages 241:17
dancer 31:5
dancing 268:18
dangled 212:23
darkened 151:13
154:20
dash 122:13 129:10
147:2
date 10:20 28:15 49:5
58:13,19 61:14 62:5
64:4 68:25 69:24
76:16,25 78:20 82:7
91:7,25 95:18,22
96:13 100:9 101:2,7
104:8,14,19 105:22
106:12,15,19
109:18 110:5,9
111:11,17,23,24
113:25 114:10
119:2 121:9 122:8
123:11 126:3
130:16 137:20,22
139:12 140:6 143:5
148:4,15 150:2
153:11 155:15
158:6,16 160:7
162:2,15,23 163:16
163:23 164:16
165:15 167:19
168:25 169:13
172:16 174:11
175:21 180:2,11
181:13,24 183:18
189:13 193:15
194:2,15,25 195:3
195:18 196:7 197:4

197:8 203:2 210:2,8
213:13 220:4,10,13
221:14 222:23
223:7,14 231:4
242:7,22 244:5
251:7,10,13 258:4
259:21 265:19
268:12 275:7 276:3
dated 111:22 125:25
135:3 161:23
163:21 164:14
165:13 168:23
174:23 181:22
189:22 193:12
194:13 209:24
252:7 273:3,14,16
273:17,18,19,22
274:3,8
dates 90:18,25 94:19
120:10 127:5,11,16
129:23 176:6 195:2
197:12 245:18
264:16
dating 262:17
daughter 9:24 22:17
41:7 42:6 140:18,20
159:3 178:20 179:4
186:15 188:5 189:9
191:22 228:22
daughter's 10:2
day 31:2 41:7 47:6
63:19 69:16 73:6
86:16 88:7,9 97:18
111:21 116:6
122:21 124:12
125:8 128:11,15,19
138:12,13 147:5,8
149:8,12,21 150:13
150:16 151:16,20
152:2 153:19,25
154:4 156:16,19
159:2,3,15 160:24
168:6,20 170:17
172:9,9 175:16,22
179:17 180:21
182:18,23 186:2
189:9 203:23 204:8
204:9 208:9 210:11
224:19 231:17

232:25 264:15,24
271:17 275:15
276:20
**daycare** 178:19,22,23
178:25 179:8,12
189:8 218:22
**days** 26:9 38:14
47:11 49:13 51:22
51:22,23,23,24,24
51:24 53:19 75:21
77:19 85:14 94:4
120:9 126:10
186:14,17 187:20
188:4,8 190:9
195:12 201:24
213:4
**deal** 74:7,15 207:17
208:19 215:12
233:6,10,15,16,18
239:10
**dealing** 250:2,4
**decade** 44:15
**December** 33:5 56:19
59:5 62:3 94:9 95:2
95:10 98:5,7,11,14
100:22 105:18,22
139:23,23 140:8
143:19,23 144:13
167:20 203:2
252:14
**decide** 138:25
**decided** 202:14
207:20
**decisions** 75:6
**Decker** 39:13,22
45:10 48:5 254:3,11
255:23
**declined** 51:18 120:6
**decrease** 99:20
107:25 108:5
**decreased** 109:7
**decree** 111:8 112:17
113:2
**defendant** 2:9,15
241:4
**defendant's** 224:6
**Defendants** 1:9
**definition** 62:23,23
62:25 63:2,21

**degrades** 248:4
**degrading** 248:7
**degree** 13:6 14:2,6
**demanding** 54:21,23
**demoted** 99:12,14
**denial** 158:3,16
193:17 273:12
**denied** 96:22 100:15
110:24 111:2,4,5
113:7,17 140:12,13
142:12 143:15
155:6,8 158:14
161:12 164:10,11
183:4,5 184:4,11
190:25 191:2
192:13,15,18 193:2
201:13 221:9 230:8
230:18 232:19
246:22 247:2 266:4
**dental** 49:16 66:23
**deny** 261:12
**denying** 240:17
**department** 150:13
201:8 241:7
**dependents** 67:6
**depending** 75:18
**deposition** 1:15 3:4,5
3:7 5:11,13,25 7:10
8:22 270:25
**DEPOSITION:Ma...**
276:3
**depression** 145:13
228:16,21 229:9,15
**Derrick** 207:7 208:2
209:3 257:7
**Des** 43:18 44:14,16
**Describe** 234:15
**description** 63:25
64:13 65:6,22
135:14 272:9,14
**Desiree** 256:23 257:5
260:17 264:10
**determine** 167:12
**determined** 173:6
180:11
**devil** 204:20
**diagnose** 145:6
**diagnosed** 49:20
228:17 229:22,25

231:7,13
**diagnosis** 134:8
145:13 159:17
170:15 225:7
228:19 231:15
**Diane** 161:8
**differ** 63:21
**difference** 89:9,11
**different** 22:3 42:13
81:17 86:9 89:15
91:17 96:7 99:25
105:24 136:6 138:4
138:11,17 139:7
144:3 198:19
**differential** 66:19
108:18,21,25 109:2
109:8
**difficult** 234:21
**direct** 7:11
**directing** 13:21 14:7
14:12 109:9
**directly** 80:22
**director** 16:21
**disabilities** 224:24
228:4 231:6 239:6
**disability** 68:10,16
68:18 143:2 145:21
161:13 196:20
224:8,12 228:13,13
232:2 233:23,24
265:15,18,21 273:6
**disabled** 132:19
167:13
**discarded** 215:10
**disciplinary** 30:8
34:9 115:14,17,24
120:18,24 121:6
123:3,11 125:7,9,17
125:20 129:17,19
211:5 212:17,20
273:2
**discipline** 115:25
116:10 119:15,23
121:4
**disciplined** 84:9
**disclosures** 251:5,17
274:16
**discovery** 42:15
213:21

**discriminate** 232:17
233:22 234:10
235:14 236:7
**discriminated** 228:12
229:17,20 232:11
232:13,14
**discrimination** 27:11
27:15 190:15
219:20,25 220:7,24
274:10
**discuss** 7:12 83:15
121:4 129:3 174:14
188:12 250:19
**discussed** 130:25
188:11,16 257:4
**discussion** 46:20
118:23 119:10,19
126:14 177:14
202:4 208:16
211:15 272:24
**disheartening** 270:16
**dislocated** 93:10
**dismissal** 222:21,25
274:11
**disorder** 224:16
**dispensary** 152:5
153:25 156:3
157:18 226:9
**dispute** 119:22,25
123:2 125:20
126:21,23 170:22
**distancing** 50:4
**distress** 100:11
190:18,18 191:15
248:23 249:19
250:15
**distribute** 230:5
**DISTRICT** 1:2,2
**Diva/Utopia/Baby...**
269:4
**Divas** 31:6,18 32:5
**divorce** 19:7 111:7
112:17,25,25 113:2
269:22
**divorced** 18:25 19:5
113:20 261:11
**dock** 65:11
**doctor** 131:25 145:4
155:12 157:13

159:23 161:5
165:20 167:25
168:4,13 191:10
246:16 247:7
256:14 273:11
**doctor's** 129:24,25
130:2,4,8,8 188:2
188:19,22
**doctors** 157:13
231:12 246:9,12
**document** 29:5 57:3
58:21,24 59:3,18,24
61:16 69:20 76:19
77:2,7 90:15,22
91:4,10,13 103:12
104:8 106:6 107:5
107:14 111:10,18
112:23 118:14
123:10 126:14
130:14 131:17,21
132:23 134:7 135:7
136:10,14,17
137:13,25 139:16
139:17 144:2
145:12,17 148:8
149:19 153:15
155:2,19,23 156:25
158:11 161:11
163:10 175:5 176:8
182:4 189:17
193:23 194:7 219:6
223:6,19 244:8
257:19 272:19
273:4 274:2
**documentation**
226:19,22
**documented** 118:22
119:10,19,23
272:24
**documents** 28:17
121:12 143:9
168:16 174:16
219:17 257:21
**doing** 19:14 33:20
38:12 43:14,23
44:14 48:22 54:19
65:25 86:3,15,17
99:3 124:12 125:18
199:21 232:25

233:2 234:6
**dollar** 99:21
**dollars** 66:14
**domestic** 26:20
**Don** 149:4
**door** 86:16 116:21
240:2
**doors** 72:17
**dots** 148:24
**doubt** 93:8
**Douglassville** 31:11
**dozen** 43:22
**Dr** 134:12 135:7,18
136:2 137:14 154:2
154:3 156:19 157:6
158:19 164:19
165:24 166:10,12
166:14,25 167:23
167:24 168:22
169:11,15 170:6
171:3,7,14 172:14
172:21 173:6 191:6
191:10 195:24
197:14,25 201:9
224:13 225:14
226:19,22 232:23
236:22 246:15
249:14 273:20
**drafted** 223:20
**drag** 38:18
**drama** 207:12 208:19
**Drew** 142:16,21,22
147:23
**drink** 149:6
**drinking** 269:19
**drop** 205:8
**dropped** 241:21
**drove** 46:5 152:21
**drug** 57:20 58:12
**drunk** 205:6
**due** 133:7 178:19
**dues** 70:3
**DUI** 13:9 25:17,20
26:13
**duly** 3:25 275:6
**duties** 124:11
**duty** 122:14 156:12
156:13,14 241:3,5

**E**

**E** 2:2,2 3:24,24,24
272:2,7 275:2
**E-Y** 10:14
**earlier** 25:16 82:18
98:20 108:11
119:11 130:13
131:2 148:12
202:23 216:8,14
238:25 239:14
257:2 258:9 266:13
268:13
**early** 53:7 173:12
189:25 190:4 229:2
**earmuffs** 152:14
**earn** 13:6,25 42:2
47:2
**earned** 14:6 45:2
53:8,9 54:4 242:13
242:16,18 243:7
244:19
**earning** 242:20,24
244:2 274:14,15
**earnings** 244:10
**ears** 149:9
**easier** 118:13
**Eastern** 1:2 23:5
**easy** 234:20
**eBay** 42:5,12
**economic** 253:11
**EEOC** 223:6
**effect** 71:17 77:15
**effective** 90:18,25
111:23 160:13
**Ehrenberg** 2:17 5:8
**eight** 8:13 195:12
232:25
**eight-hour** 116:6
**either** 26:17 63:14
73:24 116:14
126:25 140:7,8
168:14 172:8 239:5
**Elite** 33:13,15,20
34:10,13 37:11
**Elizabeth** 23:18
**Ellison** 2:11 4:22
**else's** 63:3
**email** 139:10,20,21
181:22 194:13,18
194:21,25 209:24

210:5 254:13 273:5
273:22 274:3,8
**emailed** 112:21
**emergency** 139:22,24
140:3,11,24 142:13
143:15 154:14
159:24
**emotional** 100:11
190:17,18 191:15
248:23,25 249:19
250:15
**employed** 16:18,24
17:16 18:3,19 19:11
20:10,14 21:6,11
22:12 29:17 39:17
42:21 107:6 109:14
133:21 134:2
206:22 220:14,17
220:20,23 231:18
243:2 251:3 266:9
270:18
**employee** 47:20
60:16 86:12 114:25
133:5 136:23 207:7
**employees** 60:10
62:10,12 83:8 87:16
174:4 176:17 209:2
**employees'** 97:16
**employer** 27:12,15
27:19
**employment** 28:2,13
29:6,13 30:12 33:7
38:23 39:4 52:21
56:16,18 58:7 61:19
69:16 70:4,20 88:15
91:16 100:17,19
107:19 198:18,20
199:8 201:3 202:14
210:5,12,24 212:7
223:3 228:7 242:2
245:20 257:23
266:11 272:10
**ended** 100:19 162:18
219:15
**enforce** 83:9
**enforcing** 213:5
**engage** 224:7
**engaged** 239:5
**engaging** 239:23

engine 103:8,9,11
engines 89:6
enjoy 120:7
enjoyed 249:3
entered 71:21
entertain 217:6
entire 128:11,15,19
    245:12
entitled 241:16
entry 91:25 120:13
    150:2
environment 190:15
    191:21 235:19
Equal 223:2
equipment 34:23
ERIC 2:3
ERRATA 276:2
especially 224:21
ESQ 2:6,11,12,17
established 218:14
estimate 161:12
estimated 145:20
    196:19
estimates 34:22
et 276:3
evaluation 153:19
evaluations 115:5,8
evening 204:17
event 110:2,6,14,23
    110:25 111:24
    272:22,23
eventually 71:12
    100:14 112:14
    207:16 231:13
    266:25
Evergreen 266:16
Everybody 117:19
evil 269:19
ex-husband 10:18,19
exacerbating 196:23
exact 33:24 49:5
    113:25 114:10
    137:22 184:21
    231:17 265:19
    268:12
exactly 117:23
    135:25 138:13
    140:6 182:14
    199:21 201:21

240:7
examination 4:8
    114:17 170:11
examined 4:2
exception 73:18
exceptions 72:15,19
    73:15,20
excuse 30:4 46:24
    51:11 94:2,17 107:8
    110:21 123:24
    156:2 165:23
    187:16
excused 120:23
    127:23 130:9
Exeter 17:13
exhibit 28:12,14 29:4
    56:15 58:15,18
    61:13,16,17 64:2,6
    64:12 68:24 69:3
    71:14 74:7 76:15,18
    78:19,22 79:3,13
    82:6,9,14 89:25
    91:5,9 101:5,8,25
    110:3,7,11,11,13,21
    110:21,22 118:24
    119:4,8 121:7,11,11
    121:19 123:11
    126:2,5,9 130:15,18
    137:23 139:11,14
    143:4,7 148:3,6
    153:9,13 155:13,17
    158:4,8 160:6,9
    161:24 162:4,13,16
    163:11,22 164:15
    164:17 165:14,17
    168:24 169:3,8
    172:15,18 174:10
    174:13 181:23,25
    183:17,19 187:2
    189:12,14 193:13
    193:17,24 194:14
    194:16 195:17,19
    197:3,7,9,23 202:11
    209:25 210:4
    213:12,14 220:2
    222:22 223:12,16
    242:6,8,21,24 244:3
    244:6,9 251:6,9,12
    251:16 253:6,7

258:3,6 272:10,11
    272:12,13,15,16,17
    272:18,19,21,22,23
    272:24 273:2,3,4,5
    273:6,8,9,11,12,13
    273:14,15,16,17,18
    273:19,20,21,22,23
    273:24 274:2,3,4,5
    274:7,8,9,10,11,12
    274:13,14,15,16,17
    274:18,19
exhibits 90:12
existing 23:25
expect 60:9
expected 167:19
    196:6
expense 168:20,21
expenses 67:9
experience 140:21
explain 88:25 146:15
explained 5:16
expose 269:3
exposure 154:7,11
extend 163:2,6
    164:24 166:15
extended 163:9,18
    197:14
extending 163:19
    195:21
extends 197:18,20
extension 164:18
    165:3
extent 49:21 72:8,10
    78:4 165:5,6 184:12
    261:24
extra 205:4
extremely 224:14
    234:6,21 261:8
eyes 170:10
eyesight 149:9

                F

F 2:6,11 275:2
f'ing 157:19
face 26:19 50:25 51:8
    161:3 213:3
faces 50:5
facility 33:18 75:20
    254:8
fact 46:21 176:23

246:10
Facts 133:2
factual 223:24
fail 9:2 224:11
failed 118:2
fair 6:22 66:3 241:3,6
Fallon 115:21 125:13
    125:14,14
false 240:18
family 21:17 22:24
    35:15,17,18 93:4
    109:24 144:9 189:8
    246:14 247:7 267:2
family's 144:18
family-owned 35:11
FAQS 174:9 273:21
far 13:3 23:5 47:24
    199:10 225:2 234:3
    246:24,25 248:17
fat 262:5
father 21:12 22:5,17
    24:4 140:21 159:4
father's 17:11
fault 85:9
favoritism 72:13
fearful 198:14,15
February 31:23,24
    32:8 39:5,9 40:5,8
    40:12,14 41:25 45:6
    45:14 48:3 65:3
    95:20 99:7,23
    100:20 106:12,14
    106:23 107:8
    108:12 175:17,25
    181:11,16,20
    182:11 183:9,21
    187:5,7,8 197:25
    198:7,22 203:4
    210:10,13 211:18
    214:24 224:9
    225:10,17 226:9,15
    241:25 245:15,19
    247:16 252:15
    260:24 261:4 263:5
feedback 40:25 41:4
    41:11
feel 114:24 185:14
    208:12 217:6 249:6
feeling 149:11,13

170:16,17
**fees** 248:16
**fell** 132:6,14
**felt** 145:5 170:23
    189:4 191:12
    207:21 222:4
**females** 236:3
**field** 12:10
**fight** 207:24 208:14
**figure** 218:22 250:20
**file** 9:15 24:21 120:17
    123:5 125:23
    129:13 201:11,14
    219:19 220:11,16
    220:23 221:8,14
**filed** 5:12 25:4 27:11
    27:18,21 28:3,5,8
    155:3 220:6 223:17
    223:18
**filing** 35:3 240:18
**fill** 59:14,20 63:19
    97:20 116:21
    132:12
**filled** 61:21,23
    132:16 135:7 144:4
    144:24 145:18
    160:24 254:14
**filling** 57:10
**final** 243:18
**finalized** 19:7
**finally** 153:7 193:10
**find** 5:23 44:10
    125:12 140:22
    141:2 151:2 168:3
    173:14 221:13
**fine** 21:22 43:4
    103:17 118:11
**finish** 63:6
**finished** 11:13 241:24
**fired** 186:18
**first** 3:25 11:21 30:25
    39:7 52:11 59:23
    64:8 69:13,16 73:6
    79:8 86:23 87:15,17
    90:14 91:25 92:6
    96:18 100:14
    102:21,25 106:19
    112:23 124:23
    129:11 150:6,6

157:17,22 163:11
169:24 173:16
174:21 176:8,9,10
177:13,24 179:23
180:4,8,19,22
183:14 184:14,18
184:25 185:3,5,19
186:9 189:20
192:10 197:9,12,13
207:24 215:14,15
216:3,5,9 217:24
220:10 221:16
224:18,20 225:9,11
226:23 227:2,16
228:3,19,21 229:22
230:3 231:9 235:11
241:18 242:9 243:5
251:20 253:20
263:10
**First-time** 25:23
**five** 82:16 83:17
    218:18
**five-minute** 56:6
**fixed** 85:25
**flare-up** 182:24
**flat** 152:25
**Fleetwood** 21:5
**flex** 62:20,21 63:2,6
    63:12 64:9 66:8
    74:5 85:15 86:14
    88:8,12 92:14 93:23
    97:10 99:12,17
    103:21 104:4
    108:23 109:3
    115:19 122:17
    139:2,4 146:12,17
    179:20 185:2,4
    208:4 239:20
**flip** 36:7 104:7
    105:21 131:14
    132:22 134:5,21
    146:2 161:10
    196:14 215:13
    217:22 219:5 224:2
**flirtatious** 206:10
**flirting** 117:5
**float** 147:10
**floor** 152:15 227:8
    239:13

**flooring** 19:18,20
**Florida** 261:17
**flu** 188:22
**Flying** 144:11
**FMLA** 133:14,16,17
    133:17 161:19
    164:4,9 181:17,19
    182:16,19,22 233:5
**follicle** 57:20
**follow** 83:5
**follow-up** 40:20
    134:15 162:20
**following** 49:22,25
    172:9 258:25
**follows** 4:3
**fond** 199:12
**foregoing** 275:6,7
**forehead** 148:20
**forgive** 205:7
**forgotten** 270:3,14
**form** 59:15 110:2,6
    110:14,23,25
    112:20 143:3
    144:24 189:11
    272:22,23 273:7,24
**formal** 5:20 115:7
    118:22 119:9
    272:24
**formally** 113:20
    123:2 125:19
**formerly** 31:6,6
**forms** 193:5
**found** 270:16
**four** 10:7 45:14 47:6
    85:14,16,17 116:23
    152:6 153:5,6
    180:13,16 255:10
**four-day** 76:3
**fracture** 255:9
**frame** 35:4 225:10,21
    252:13,15 255:15
**Framptom** 262:19
**French** 46:24 51:11
**fresh** 146:6
**Friday** 46:4 47:7
    172:3 204:17
    222:19
**friend** 38:14 43:18
    44:14,16 256:25

**friendly** 51:17
**friends** 43:15 189:8
**Fronheiser** 140:16
    184:17 207:18
    208:7 213:16
    217:13,17,20
    226:16 227:2 252:3
**front** 4:21 56:15,24
    107:16 213:3
**fuck** 218:25
**fucking** 46:24 51:11
**fuel** 98:21 99:5,6
    199:14 203:11,13
    204:2
**full** 9:5
**full-grown** 199:19
**fully** 269:2
**functions** 133:7
**funeral** 13:21 14:7,12
    67:9
**funny** 190:24
**further** 3:8,12 114:17
    208:15 275:10

————————

**G**

**G** 86:20 98:18,19,20
    98:21 105:17
**garbage** 89:2
**gas** 86:6 99:3
**gem** 33:24
**general** 22:25
**generalized** 145:14
**gentlemen** 117:5
**gentlemen's** 31:9
    32:5,18,21 268:14
**geographically** 24:22
**getting** 66:18 163:9
    168:9 198:25
    221:12 230:8
**Gibbons** 129:11
**giggled** 46:23
**girl** 46:4 179:20
    185:2
**girlfriend** 32:16
**give** 5:15 6:25 9:5
    23:6 28:22 72:23
    120:14 150:24
    170:14 184:19
    203:18 207:22
    208:13 229:10

232:9 254:12
**given** 8:2
**giving** 6:20 267:3
**glad** 6:3 7:13
**glammed** 43:20
**glasses** 152:12
**Glenn** 16:10
**gluing** 33:22
**go** 11:4,14 24:15
  25:25 47:22 53:12
  56:10,14,25 57:13
  57:19 58:12,13 63:5
  63:7,22 66:14 68:15
  70:25 75:12 80:8,11
  80:16,18,22,24 81:2
  81:5 85:11,23 86:20
  88:3 92:23 93:2
  94:13 96:12 98:2,4
  100:8 102:23
  109:20 120:7
  125:12 133:4
  135:12,20 137:23
  138:7,15 147:6,7
  150:15,19,25 151:4
  151:13,19 152:15
  153:7 155:9,10
  157:19 159:14,20
  160:19 167:24
  168:4 169:19 170:5
  170:20 171:14,22
  172:6 176:7 178:3
  180:12 184:5
  185:13 195:11,23
  201:7 205:9 206:8
  208:7 209:5,7,11,13
  209:16 210:15
  211:4 212:8 226:11
  227:18,19,20 233:8
  233:9 235:9 236:5
  240:4 247:11 249:7
  250:22 253:19,24
  256:16 257:18
  259:19 264:16
  266:2 269:4
**Goat** 267:15,16,25
  268:4,7
**goes** 21:19 72:12
  98:25 133:22 225:2
**going** 6:18 8:4 22:24

23:15 28:17 38:22
  49:19 63:5 66:14
  71:13,15 83:5 86:17
  89:24,25 90:9 91:12
  91:21 93:8 100:10
  101:24 102:2
  117:16 119:3
  121:10 131:14
  139:18 150:23
  152:17 157:12
  162:3 170:24,24
  174:6 179:23
  180:19 181:8
  182:14 185:17
  186:17 187:2 190:8
  190:22 191:9
  194:22 196:18
  199:14 201:24
  202:3,15 205:2
  206:7 207:20
  208:10 210:3
  215:12 218:22
  223:25 230:9
  233:14 235:10
  241:13,23 249:2,3
  251:14 261:14
  266:23
**good** 4:10,11,22
  14:18 34:8 114:24
  149:13 204:10
  255:25
**Gotcha** 172:3
**government** 193:4
  245:16
**Governor** 11:5,8
**grade** 12:4
**graduate** 11:8
**graduated** 11:16 12:5
  14:23
**Graham** 2:6 42:25
  102:2 215:16
  219:21,24 221:13
  250:20 253:16
**Grand** 19:19
**grandmother** 17:13
**grandparents** 17:5
**granted** 140:10
  230:14
**greatest** 143:8

**Green** 144:9
**Greenville** 2:10
**grew** 42:6
**grievance** 27:18,20
  120:17 123:5
  125:23 129:13,16
**ground** 270:2
**group** 140:15 196:25
  197:5 274:5,7
**Grove** 38:8
**guess** 20:15 23:8
  51:12 55:5 106:5
  120:13 124:10
  138:25 190:11
  220:9 245:14
  268:10
**Guide** 58:17 59:9
  272:11
**guidelines** 49:23 50:2
**gun** 140:4,22
**guy** 50:20 51:10
  252:7 262:17
**guys** 152:17
**gymnastics** 33:17
**gynecologist** 246:19

## H

**H** 3:24 86:20 272:7
**H-A-L-S-E-Y** 9:20
**hacked** 268:3
**hair** 57:20 258:24
  261:2
**half** 17:23 95:8 229:4
**halfway** 131:18
  136:16 160:17
  189:20
**Halsey** 9:20 141:21
**hand** 25:24 28:20
  49:2 58:14 71:15
  77:16 82:8 89:25
  101:24 110:10
  119:3 121:10 126:4
  130:17 143:6 148:5
  153:12 158:7 160:8
  162:3 165:16
  174:12 207:16
  210:3 275:15
**handed** 29:3 61:21
  64:11 69:2 76:17
  77:20 79:2 83:12,19

83:21 91:8 125:9
  155:16 172:17,23
  222:24 223:15
  258:5
**handing** 64:5 78:21
  139:13 169:2
**handled** 238:7
**handles** 219:22
**handling** 178:22
**hands** 263:21
**handwriting** 120:15
**happen** 84:4 99:22
  200:19,24 231:8
**happened** 61:6 67:9
  73:10 74:9 117:24
  122:7,11 123:21
  125:9 132:15 140:5
  141:20 148:15,23
  148:25 149:17
  150:12 151:3 152:7
  159:2 160:23 164:8
  170:8 176:23 190:6
  203:9 232:3,15
  240:7 266:6 270:9
**happening** 192:24
  198:17 252:11
**happens** 73:14
  191:19 249:4
**happy** 46:12
**harass** 150:23 235:22
**harassed** 80:17
  150:15
**harassing** 151:17
  202:20 206:5
  217:14 237:15
**harassment** 27:15
  79:3,14,17 80:5
  81:8,13,24 190:15
  202:17,18 217:16
  235:19
**hard** 85:3 134:24
  189:6 191:15 196:9
  234:7
**hardest** 116:18
**hardware** 255:7,13
**harmful** 248:4
**hauling** 199:18
**HBU** 58:16 272:11
**head** 7:5,6 75:25

148:17 149:5
150:14 161:3
**heads** 7:2
**health** 49:16,20 54:20
66:22 130:2 182:8
188:18 196:25
197:5 199:2,20
224:20 240:11
244:25 245:2
246:10,24 247:6
274:5,7
**healthy** 224:17
**hear** 6:7 45:20 50:5
**heard** 6:19
**hearing** 3:21 127:22
128:14,17,18
174:18 201:18
**hearings** 127:8
128:21 199:12
201:22 203:12,14
204:3 205:3
**heart** 270:19
**heartbeat** 250:23
**heat** 33:23
**heavy** 137:9 217:5
234:19
**held** 1:16 46:20 213:3
**Helene** 136:22
**help** 35:21 38:8 67:8
97:22 116:22,24
117:4,24 152:14
217:9
**helping** 35:12,18
38:14 98:21 117:6
124:3 125:15
**hereunto** 275:14
**hey** 83:5,17 147:16
181:7 203:14,25
**high** 11:2,4,9,13 12:5
14:23 38:4 51:12
52:13 65:14
**higher** 99:17 180:14
184:23 186:5
**Hills** 144:9,11
**hint** 205:13
**hip** 255:12
**HIPAA** 130:3 188:19
190:16
**hire** 52:9

**hired** 40:17 47:17
48:14 50:20 62:12
64:16 77:8,19 92:3
180:2,10 186:2
229:11
**hiring** 58:9 59:11,12
62:9 254:4,16
**history** 91:16 191:11
232:10
**hit** 149:4 150:14
**hold** 70:7 99:6 249:3
**hole** 116:21
**holiday** 102:23
**home** 151:2,5,13
153:7 156:19
158:19 215:25
**homicide** 14:16
**honey** 206:9
**hopefully** 6:16
266:22
**horrible** 180:12
**hospital** 150:16,19,23
150:25 151:4,8
152:10,18 155:9
156:15,18 159:14
159:21 230:9
**hostess** 36:17
**hostile** 190:14 191:21
235:18
**hour** 47:5 128:19,20
150:17 205:9
**hours** 8:13 47:6,8
52:2 85:16,17
101:21 102:13
107:15 116:5,23
122:5 133:22,23
151:12 152:6,18,19
153:5,6 154:22,24
161:22 164:12
172:11 183:6
203:20 205:12
232:25 244:7
**house** 19:22 20:2
48:13 141:3,7,8,10
141:16 245:8
**HR** 75:25 80:7 97:19
125:16 150:21
184:6,8 218:10,25
226:4 233:9,14

270:11
**human** 5:5 78:17
80:8,11,12,17,18,21
80:23 81:10,13,15
81:17 91:13 112:10
168:11 209:5,14,19
209:22 213:8
234:24 235:6,10
237:17,18 272:17
**hundred** 60:12 87:18
**hurt** 68:6 94:21 131:6
135:21 136:2 201:6
**hurts** 135:23 248:7
**husband** 95:11 140:4
192:6,7
**husband's** 16:16

---

**I**

**Ian** 23:12
**idea** 103:10,11
209:21,23 237:2
**ideal** 224:20
**IDENT** 272:9
**identification** 28:15
58:18 61:14 64:3
68:25 76:16 78:20
82:7 91:6 101:6
110:4,8 118:25
121:8 126:3 130:16
139:11 143:4 148:3
153:10 155:14
158:5 160:7 161:25
162:14 163:23
164:16 165:15
168:25 172:16
174:11 181:24
183:18 189:13
193:14,25 194:15
195:18 197:3,7
210:2 213:13 220:3
222:23 223:13
242:6,22 244:4
251:7,9,12 258:4
**identify** 216:17
**II** 2:12
**immediate** 22:23
**impair** 8:9,16
**important** 72:3,6,9
**impose** 8:25
**impossible** 80:18

**improve** 250:3
**incidences** 73:22
**incident** 141:20
142:3 149:20,21
150:3 155:24 156:2
160:21
**incidents** 159:25
**including** 60:25
**income** 42:3 52:23
53:8,9,23 54:4 56:3
**incorrect** 65:9,12
91:22
**increase** 190:19
**increased** 109:7
**increases** 66:12
**incurred** 119:14
**indent** 148:19
**indicate** 76:21 196:17
261:13
**indicated** 19:21
32:25 42:16 64:8
82:18 86:24 92:7
111:20 131:8
132:18 165:19
167:23 169:12,18
175:15 180:17
185:25 187:19
188:3,8 194:3
216:10 217:12
225:14 244:14
266:13 275:7
**indicates** 30:17 92:16
92:22 112:25 135:9
136:17 139:21
145:20 149:19
156:6,11 160:21
161:12 167:18
182:7 190:2 196:6
196:21 243:6
**indicating** 110:15
**indication** 46:15
104:17
**individual** 74:15
109:25 185:18
**individuals** 73:20
74:11 176:19
180:10
**industry** 267:3
**infection** 254:10,20

254:22
**inform** 112:5
**informal** 126:13
**information** 5:23
21:21 91:14 135:19
174:5 175:10
194:11 252:9
**informed** 35:5 112:3
184:10
**initial** 251:17
**initially** 144:14
199:25
**initials** 83:19
**injections** 48:22
**injure** 200:15
**injured** 46:10 93:5
131:3 132:5,11
254:24
**injury** 93:6 105:7,10
114:8 131:9,10
148:13 151:21
161:2 199:13,15,17
199:23,23,25 225:5
247:25
**innuendo** 236:13
**insecure** 261:8
**Instagram** 44:11
55:17 258:8 265:3
267:4,5,14
**installing** 124:4
**instance** 238:23
**instances** 238:25
**Institute** 11:19 12:14
12:16 13:13,15
**instructed** 167:24
168:12
**instructions** 7:25
**insurance** 46:25
49:16 66:23,24 67:2
68:18 112:13,16
113:19 246:24
247:3
**intentionally** 185:15
**interested** 12:8 14:11
14:13 275:13
**interior** 234:15
**intermittent** 182:21
**internal** 139:20
**interrogatories**

253:20,23
**Interrogatory** 256:18
**interview** 58:16 59:7
59:9,10 272:11
**interviewed** 58:10
**interviews** 40:21
254:6
**involved** 269:14
**involves** 60:14
**issue** 6:17 80:4 81:8
81:10,14 120:3
179:13 210:17
247:2,5,9
**issued** 120:24 121:20
121:23 123:8,14
126:13,19 128:7
223:7,8
**issues** 49:20 179:8,10
190:23 201:5
211:23 247:13
248:25 252:14
**items** 53:22

**J**

**J-A-N-A** 10:5
**J-E-S-S-E** 21:10
**J-O-H-N** 16:10
**Jackson** 2:8 4:23
**jail** 26:10
**Jana** 10:3 218:19
**January** 30:25 32:10
40:5,11 41:18,18
53:23 56:3 62:7,16
69:18,25 77:3 79:5
92:2,2,3,10 95:10
95:17 103:14 104:3
105:18 107:7
109:18 146:9
174:23 175:9,11
196:7 200:4 221:19
**jerk** 238:12
**Jersey** 32:7,14 44:22
44:24 269:2
**Jesse** 21:2,8,8,11
**JFK** 2:4
**Jill** 249:23 250:5,14
257:12
**Joanna** 16:5 257:12
**job** 14:10 33:10 34:7
34:12,19 35:10,23

39:10,12 40:3,10
41:9,13 45:18 47:14
49:11,18 50:11
52:14 53:3 57:12
58:10 61:9,11,12,23
62:2 63:3,6,8,23,25
64:8,13,15,17 65:6
65:22,24 72:22,24
73:8 84:19 85:16
86:7,9,13,14 88:5
99:17 114:21
117:25 118:3,5
122:14 124:14
125:18 133:6,11
138:5,7,11,14 154:4
168:11 170:19,25
173:7 180:24
186:13 187:5,5
189:6 190:9 191:16
198:21 199:3
201:24,25 211:3,9
211:14 212:9,13
213:3 233:3 234:25
235:23 241:23
256:6 272:12,13
**job-specific** 84:13,17
**jobs** 38:2 39:21,24
40:6,13 41:19,22
45:8,9 47:23,25
116:18 234:20,21
**John** 16:10 17:22,25
57:6
**Johnstown** 17:22
**join** 68:21
**joint** 24:10
**Jones** 207:8 208:2
257:7
**JOSEM** 2:14
**Joshua** 252:6,19
262:19
**judge** 24:18 127:10
**judged** 249:6
**July** 19:4 110:17
119:19 121:20
122:8 163:15
220:12,20 221:5
250:9 264:2,12,19
**jumped** 47:16
**June** 30:14,18,20

43:25 161:14
162:10 250:9
263:15
**jury** 21:19,24 23:2
**justice** 11:20 12:18
13:4 14:14
**Justin** 116:9 124:22
124:25,25 125:4

**K**

**K-I-T-T-I-N-G** 98:22
**Kaitlyn** 2:20 5:4
97:18 111:5 121:2,4
126:20 129:3,16,23
140:16,17 145:5
161:8 165:7 166:3
168:5 169:9 171:6
186:16 188:13
190:8,25 191:13
192:13 194:19
195:3 199:12
201:23 202:4 210:5
210:25 211:2,6,9
212:12,14,16,19
218:6 219:15 221:9
229:21 235:21,22
236:4,7,16 238:7,9
238:11,18 248:13
249:9,11 250:4
251:2 258:22 259:8
**Kaitlyn's** 188:15
237:15 248:9
**keep** 35:5 73:23
151:13 204:21,23
204:25 205:12
206:14 241:13
**Kenneth** 252:17,23
253:2,2
**Kenny** 209:3,3
**kept** 163:9 204:21
**Kerchner** 87:22
120:2 153:5
**Kevin** 129:9,12
140:16 184:17
207:18 208:7,12,16
208:23 209:9,18,21
210:21 213:16
216:22 217:2,13,17
217:20 219:10
226:16,25 227:6,7

227:10 236:25
237:3,21,22 238:2
252:3
**kick** 195:11 204:13
**kicked** 117:8
**kids** 67:7 150:18
151:2 154:21
204:16 205:3
**Kimberly** 145:3,4
246:16
**kind** 13:19 34:19,21
41:13 47:16 48:20
91:15 93:6 109:8
116:16 131:14,25
179:24 182:19
199:8 208:22
214:20 221:17
255:4 262:3 266:23
**kitting** 73:24,25,25
98:22,23 99:3
122:13,15,18
123:25 137:8 235:4
**Knappenberger**
252:6
**kneeling** 60:15
**knew** 35:17,19 50:17
168:10 198:23,25
199:13,17,21
203:11 214:15
226:2,16 236:5
237:21 239:11
240:2,3,4,5
**know** 4:19 5:4 6:3,7,8
6:9,17,25 7:18,21
17:3,11 18:14,18,19
19:16,21 20:8,21
21:6,7,11,18,20
22:10,12,24 23:2,11
23:15 24:19 27:20
28:25 32:15 33:23
41:20 42:15,25 47:4
55:17 63:14 65:21
68:9 69:4 74:14,16
74:19 78:23 82:10
84:3,17 85:24,25
86:3,15 87:16 91:22
92:18 94:5 95:22
96:3,5 98:10 100:21
102:22 103:16,17

103:19 106:3 114:5
114:9 117:14 119:5
120:15,20 122:7
126:6 127:12 129:9
129:21 130:12,18
132:17 135:18
136:15 137:22
138:10 140:5 142:6
142:16,18,21
144:25 149:12,18
149:23 160:9,25
161:5 162:17
163:11,25 169:5
174:14,18 179:24
179:25 180:3
184:18,20,23
185:19,21,23 186:8
188:20 191:10,11
199:12 203:18
207:11 209:3
211:19,21 216:4,11
218:9 219:15 223:5
224:25 237:22
239:4 244:18
245:23,25 248:14
249:2 250:20,23
252:2,8 256:5
259:21 260:7,12,24
263:5 264:2,13,22
266:6 268:12
269:25 270:10
**knowing** 230:9 234:2
**knowledge** 32:2
229:8 248:8,12
251:3,22
**known** 31:6,6 104:10
**Kuhn** 142:16,16

——————

**L**

**L** 3:24,24 74:4 86:19
88:20,22,24 89:3,4
89:9,13 92:20 93:22
94:7 95:23 96:4
99:12 103:2,23
104:18,21,22
105:13,15,20,23
106:10 116:11
117:8 118:6 122:19
124:13 137:8 138:9
142:23,24 146:11

147:15,18,22
178:16 234:4
**label** 243:11
**labeled** 144:21
213:22
**labor** 234:7,19
**laceration** 148:21
**Ladson** 6:12 15:16
**laid** 175:22 176:10
**language** 236:13
**Larry** 104:23
**lasted** 36:23 128:18
**lasting** 162:18
**LAW** 2:3
**lawn** 9:18,21 22:11
24:25 37:19,21
54:17 269:7
**lawsuit** 5:11,22 23:25
24:8,13,21 25:3,8
25:14 223:18,25
251:18 252:10
257:4 271:4
**lawsuits** 25:4
**lawyer** 223:20
**laying** 99:24 100:2
**layoff** 40:4 98:8,11
173:11,15,19,21
174:2,6 175:10,17
176:6,20,24 180:7,9
185:10 186:10
192:23 225:19
**layoffs** 75:8,9 175:8
**lead** 33:22 116:2,5,13
116:22 117:25
124:2,3,5,6,9,21
125:2
**leader** 115:21 124:16
125:13
**learn** 46:21 51:12
86:13
**learned** 86:8 180:19
181:2
**learning** 84:19
**leave** 30:11 34:7
35:10 49:18 92:22
92:23 93:2,14 94:10
95:3 96:10,12,16
97:5 100:5,8 101:16
105:6 113:24 114:5

130:12,22,25
133:14,17 138:18
139:22,24 140:3,11
140:14,25 142:13
143:15 144:13,15
150:18 161:19
162:17 163:2,7,19
164:4,9,18,24 165:3
166:15 173:23
181:17,19 182:8,19
183:3 190:4 195:8
195:21 197:14
198:18 205:14
222:14 239:17
240:7
**leaves** 91:18 163:5
266:10
**leaving** 35:13 121:15
122:4 221:24
**Lebanon** 18:18
**led** 49:23 182:15
**left** 30:13,21 32:24,25
39:3 45:5 49:19
50:9 52:15 66:17
114:9 115:18
122:24 146:11
154:8 189:25
231:10 247:22
**left-hand** 132:20
136:25 154:6
167:10
**legal** 112:25 113:14
219:22
**Legally** 261:6
**Lehigh** 128:23 175:7
**length** 145:20 161:13
196:19 270:18
**Lesagonicz** 263:22
**let's** 38:5 56:6,11
62:24 86:22 166:22
174:20 197:9
199:22
**letter** 61:12 75:17,18
125:25 160:5
161:23 163:21
164:14 165:13
168:23 169:9
172:14 173:5
193:12,17 195:16

197:2,6 265:20
272:12 273:3,13,14
273:16,17,18,19,20
274:4,6,7
**letters** 172:20
**level** 137:3 179:25
**levels** 84:5,8 250:3
262:2
**leverage** 211:3
**Lewis** 2:8 4:23
**liability** 239:13
**license** 26:7
**licenses** 15:2
**lie** 221:12
**lieu** 3:9
**life** 66:24 67:2 110:2
110:6,14,23,25
111:23 189:10
191:14,18 205:2
249:2,3 272:22,23
**lift** 60:16 65:14
136:25 261:14
**lifting** 133:10
**light** 149:10 152:13
154:7,11 156:11,13
225:6 256:9
**light-duty** 154:4
**likes** 126:13
**limitation** 60:23
**limitations** 61:3
**limited** 154:11
246:18
**limits** 199:20
**line** 63:15 73:22,24
74:2,4 83:23,24
84:21 85:24 86:18
86:18,18,19,19,20
86:20,21,24 87:3,17
88:20,20,21,22,24
89:2,3,4,9,10,12,13
89:19 92:10,14,16
92:20,21 93:16,22
94:7 95:17,20,23
96:4,8 97:12 98:3,4
98:7,18,20,21,25
99:12 100:4 103:21
103:23,24 104:5,12
104:14,21,24 105:4
105:11,14,15,17,20

106:2,10 115:19
116:4,11,11,19
117:5,8,8,19,22
118:6,6 120:5 122:6
122:19,21 124:8,13
124:24 133:5 137:8
138:9,17 139:2
142:23,24 146:11
146:22 147:15,18
147:22 157:5,6,22
178:2,12,16,16
199:18 222:2,2
234:4 276:5
**lined** 117:2
**lines** 88:17 102:24
203:25 206:10
208:19
**lion** 93:12 136:3
**lions** 93:9
**list** 126:10 229:10
246:21 251:25
**listed** 39:22 40:7
47:24 77:7 256:22
**Listen** 204:15 205:8
**little** 5:15 6:8 29:13
35:22 57:13 102:7
107:11 108:25
146:25 225:12
235:16 243:18
262:5
**live** 9:17 15:11,15
16:2 17:6,8 18:10
18:17 20:20 21:4
23:5 141:2,11 142:2
150:17 245:8
**lived** 128:20
**lives** 9:22 22:10 142:7
153:4 207:9
**living** 113:16 141:7
142:8
**LLC** 46:9 266:14
**LLP** 2:14
**loading** 65:10
**local** 1:8 2:15 5:9
24:2 69:8 70:8,11
90:17 223:19
**located** 11:6 13:16
30:4 31:10 37:18
38:10 262:11

**location** 141:24
**long** 35:7 37:7 68:12
71:4,5,15 72:25
83:17 93:13 95:6
97:18 105:13
141:23 170:12
186:14 196:17
255:18
**long-term** 68:16,17
265:21
**longer** 113:16 196:20
214:18 215:10
246:13 247:23
**look** 28:24 35:25 39:9
39:12 45:7 58:20
60:3 69:4,19 78:23
82:10 90:2 91:24
92:9 93:16 102:15
102:17,24 104:8
105:22 106:11,12
106:16 107:4
110:20 111:14
118:9,14 119:5
121:19 123:10
126:5 131:20
132:24 136:7,16
137:10,16,23
143:25 144:20
145:16 156:24
157:14 160:9,15
163:10,24 166:21
167:7,9 169:5,23
174:13,20 175:25
182:3 183:19 187:3
187:11 189:15,19
193:16 194:16
195:19 196:2 197:9
197:11,12,17,23
204:7 205:10 220:9
220:10 221:16
222:8 224:2,5
236:11 240:23
242:8,23 243:5,9
251:21 253:5
**looked** 170:10 171:19
184:14 203:5
**looking** 33:7 250:17
**looks** 30:13 33:13
34:4,15 36:10,13

59:18 62:2 69:15
93:17 94:3 95:25
96:9 98:6,14 100:5
102:25 103:7,12
105:23 106:15
122:8 126:13
127:11 132:5
134:11 135:3
137:24 143:22
144:2 162:9 163:13
163:15 164:21
166:9,13 167:15
175:24 197:13
215:18 216:21
242:13 243:22
**lose** 26:7 170:25
185:4 190:9 201:24
201:25 244:23
**losing** 189:7
**loss** 253:11
**lost** 241:19,19 244:22
246:10 253:11
**lot** 21:20 72:11 78:12
87:4 192:12 202:16
211:3 267:2 270:2
**loud** 234:13,16
**louder** 234:18
**love** 170:19 211:9,14
250:22
**loved** 212:13
**lower** 184:19
**lower-paying** 99:15
**lowered** 108:24
**LPN** 18:7
**LRs** 87:8
**lucky** 180:14
**lunch** 114:16 116:23
**lungs** 49:24
**lying** 193:4,7
**lymph** 49:24

**M**

**M** 3:24
**M-E-C-K-E-S**
129:10
**M-O-H-N-T-O-N**
25:2
**machine** 33:24
**machinery** 50:6
**Mack** 1:7 2:9 5:5,12

14:10 20:9 24:2
27:10,16,19,21 28:2
29:7,14,16 30:12,24
31:4 32:25 33:4,5
36:5,8 38:3,6,23
39:3,4,8,20,24 41:6
41:17,22 42:2,21
43:6 44:16,19 45:5
49:6 52:15 53:6,8
53:12,13,18 56:12
56:18,21 57:2,12
58:4,10 59:7,18,24
59:24 60:4,8 61:20
62:9,18 64:14,21
66:5,12,17,21 67:12
67:17 68:3,18,20
69:9 70:8,11,13,20
71:18 72:12 75:11
75:22 76:23 77:22
79:24 80:3 81:10,13
81:21 82:19 84:14
87:25 88:5 90:16
91:14,16 97:14,22
97:24 100:11
101:12,18,23 102:4
102:12 105:17,19
107:6,19 108:5,8
109:10,14,17 112:3
112:5 113:24 114:3
114:6,22 115:5,11
115:14 126:11
129:20 131:12
133:21 136:12,23
137:6 138:25
139:21 144:16
151:17 153:7
155:23 160:16
161:23 162:7 163:3
165:4 166:17,23
167:24 168:16
170:2 171:4 172:23
173:8,11,25 174:6,9
174:23 177:8
179:16 182:5
191:18,25 192:8
193:12 194:8
197:13 199:4 200:3
200:20,24 201:3
202:14 203:10

204:9,12 206:23
209:11 211:4
219:20 220:7,14,20
223:18 224:11,23
225:24 226:4
227:15 228:8 229:5
229:8,14 230:4,17
231:19,21 232:3,7
232:15,16,21,24
234:16,25 235:6,19
238:6,18 239:8,15
239:20,22 240:8,15
240:20 241:6,23
242:2,3,11,25
243:11 247:22
248:13 249:3,6
250:2,13,18,23
252:7 257:23
258:16 259:6,12
262:20 265:20
266:9 270:19 271:4
273:14,21 276:3
**Mack's** 62:23,24 63:2
187:9
**Mack-In-Motion**
101:10
**Mack-related** 68:7
**Mackenzie** 203:13
**Macungie** 58:16
90:24 234:16
272:11
**mad** 124:3,19 217:2
**magisterial** 24:18
**Main** 2:9 141:14
**Major** 145:13
**majority** 179:9
**making** 35:2 75:6
108:15 109:3 217:4
257:9
**male** 263:24
**man** 199:19
**management** 20:11
87:5 209:8,12
227:14 238:6,18
**manager** 34:20,24
60:8 120:7 209:15
**manhood** 212:23
**manner** 3:18
**manning** 85:19

**Manpower** 57:14,22
57:23
**manufacturing** 33:18
41:15 48:13 153:3
**Maple** 38:8
**March** 1:13 19:8
95:25 100:4 106:7
106:23 107:7
112:17 186:24
187:12 189:22,25
193:21 202:8
218:14 223:8 229:3
230:21 261:18,21
275:15
**marijuana** 46:16,18
**mark** 28:11,21 71:13
89:24
**marked** 28:14 29:4
30:15 57:2 58:14,17
61:13,15 64:2,5,12
68:24 69:3,20 76:15
76:18 78:19,22 82:6
82:8 91:5,9 101:5
101:25 102:4 110:3
110:7,11 112:24,24
118:24 119:4 121:7
121:11 126:2,4
127:12 130:15,17
134:7 139:10,13
143:3,6 148:2,5
153:9,12 155:13,16
158:4,8 160:6,8
161:24 162:4,13
163:22 164:15
165:14,16 166:22
168:24 169:2
172:15,17 174:10
174:12 181:23
183:17 189:12
193:13,16,24
194:14 195:17
196:3 197:2,6
209:25 210:4
213:12 220:2
222:22,25 223:12
223:16 242:5,21
244:3 251:6,8,11
258:3,6
**marriage** 21:13 57:8

261:7 275:12
**married** 16:14 18:24
19:2 21:14 22:7
109:21 110:15
141:17 207:11
261:5
**mask** 51:9
**masks** 50:4
**master** 90:15
**matching** 67:22
**matter** 72:25 204:24
275:13
**mattresses** 89:15
**MC** 2:11 4:9 28:11
56:5 84:24 85:6
90:9,14 102:2,8
114:14,18 215:16
215:22 241:11
271:7 272:5
**McAllister** 13:15
**McCoy** 4:22
**mean** 14:5 46:16 50:2
50:24 51:4 62:21
64:25 77:11 78:6
90:11 96:6 97:15
117:9 135:23
138:24 154:13
184:22 189:7
212:25 214:18
234:12 236:2
238:24 248:2 254:5
261:25
**meaning** 151:13
259:7
**means** 62:22 103:18
103:19
**meant** 191:3
**mechanic** 101:18,19
**Meckes-Gibbons**
129:10
**MED-ED** 48:11
**media** 77:22
**medical** 74:16,20,21
131:21 133:2
149:13,15,16,16
150:10,13 152:9
153:18 155:23
159:3,5,12 171:8,9
172:22 173:3

188:17 196:25
197:5 201:7 222:14
224:22 225:2,7
226:19,22 227:3,5
227:16,17 229:12
232:9 234:5 246:22
247:2,9,12 274:5,7
**medication** 8:8
228:22 247:16,19
247:23
**Medicine** 144:9
**meet** 44:13 121:3
125:6 129:3 164:12
**meeting** 60:18 83:15
83:16 129:16 152:5
152:7 156:2 175:12
175:16 177:10,25
178:4,7,11 180:18
181:14 186:16,19
187:19,22 209:19
218:10,13
**meetings** 83:22
203:23
**member** 209:7,11
**members** 21:17 22:24
**membership** 69:8
**memory** 59:6
**men** 179:9 236:3
**mental** 8:15 54:20
95:16 248:23,25
**mention** 98:19
**mentioned** 15:10
25:16 45:9 53:10
62:8 202:23 208:2
210:16,16 213:15
238:25 256:25
257:8
**Mercari** 20:15 42:5,8
42:9 52:25
**message** 175:6
205:10 216:18
217:19
**messaged** 257:17
**messages** 205:18,21
205:24 206:3,5,12
206:15 207:5,19
213:16,25 214:5,14
214:22 215:8
216:15 217:4 218:4

227:10,11
**messaging** 204:20
**met** 15:22 35:20
129:7,11
**Miami** 262:12
**middle** 24:14 69:23
102:24 167:8 196:5
256:16
**Mifflin** 11:5,9
**migraines** 181:21
182:17,24 189:5
190:19 192:19
193:8 199:10
228:14,15 232:15
232:18 234:9,11,13
235:15 240:5
247:14,19
**mind** 43:16 118:12
**mine** 10:16 184:15,23
185:23
**minimum** 151:12
152:18 154:24
**minute** 28:23 38:23
58:20 66:6 107:25
119:5 142:11
169:18 194:4
259:20
**minutes** 83:17 121:14
164:3 186:2 213:15
217:12 218:5
241:12
**miraculously** 270:8
**misfits** 97:17 239:10
**mispronounce** 4:18
**missed** 186:17 188:3
188:8 190:9 201:24
**misstated** 270:24
**mixture** 269:18
**mobile** 65:13
**model** 85:23 263:24
**modeling** 43:9,11,13
43:19,24 44:6 45:3
168:8,9 258:14
265:4
**Mohnton** 25:2 38:11
142:8
**mom** 204:18 257:14
**moment** 69:4 78:23
82:9 189:15

**Monday** 47:6 146:7
156:23 172:4
180:25 218:10
222:19
**money** 45:2 47:2
55:11 159:4,6
250:21
**monitoring** 191:9
**month** 32:7 52:11
54:8 71:5 95:8
163:19 228:22
229:4 244:16 256:4
265:10
**monthly** 249:25
**months** 36:24 44:3
82:16 93:15 97:24
145:21 196:20
203:7 205:25 217:5
231:10 242:25
**Moody** 2:12 5:3
**morning** 4:10,11,22
7:20 128:15
**mortuary** 241:22
**mother** 15:23 16:14
16:18 23:18 257:16
**mother's** 16:4
**motion** 97:14,22
101:13,19,23
105:17,19 203:10
232:21,25 234:22
239:8,15,20
**Mountains** 20:22
**mouth** 173:16
**move** 15:19 60:16
72:23 73:5,25 74:2
88:11 99:10 108:20
112:15 116:14
117:14 138:17
141:19,24 147:13
147:22 180:20
225:18
**moved** 15:21 20:4,17
73:23 74:8,17 80:21
92:19 96:3 99:11
103:7,23 104:9,11
104:14,18 105:14
106:16 108:2,16
116:11 117:8,15
118:5 138:10,12

141:3,16,25 176:18
183:13 185:18
191:19 203:10
225:10 239:19
**moves** 72:21 73:4
217:5
**moving** 142:3 177:21
181:3,8 216:20
225:15
**mowed** 54:17 269:7
**Muhlenberg** 33:19
37:13
**multiple** 124:11
224:15
**Muto** 154:2,3 156:19
157:6 158:19 201:9
**mutual** 35:13

---

### N

**N** 2:2 3:24 272:2
275:2
**name** 4:5,22 9:5 10:2
10:5,8,9,15 16:4,6,9
16:10,12,16 17:3,22
17:25 19:9,16 22:3
23:13,20,21 31:17
36:18,24 37:6 48:10
50:21 54:13 55:14
55:18,20 57:5 59:20
75:2 87:11 90:8
116:9 124:22 129:9
145:2 149:2 165:20
165:21 168:22
179:21,22 185:4,10
185:14,19,20
202:21 203:25
216:9 236:18
266:15 267:5 276:3
276:4
**named** 17:23 115:21
116:14
**names** 17:10,12 20:6
20:25 21:3 23:7,11
74:10 184:20,21
216:11 267:13
**Narrow** 225:12
**near** 163:14
**nearly** 80:18
**necessarily** 59:9
**need** 6:4 7:12,14,17

7:20 21:20 89:16
124:18 147:6,9,16
147:21 149:13
182:22 188:20
203:15,18 204:2
205:3 228:5 270:24
**needed** 99:25 118:2
124:13,16 140:25
141:2 142:14
147:11,13 151:18
163:6 179:17
182:17 221:3
225:22,25 226:4,9
226:14,23 227:2,15
227:16
**needs** 117:14
**neglected** 94:12
**negotiated** 83:6
**Nestle** 39:13,22,25
40:16
**network** 155:11
**neurologist** 164:20
164:22 165:25
166:9,18 167:6
168:10,19 191:8
224:14 232:24
236:21
**neurologists** 165:8
**never** 11:15 65:13,19
77:22 139:17
142:23 190:14
191:6 226:20
**new** 13:18 19:14 20:5
32:6,14 37:2 44:22
44:24 52:9 71:9,11
71:20 77:14,25
78:13,15 83:2,3
97:23 129:8 162:23
163:16 206:13,19
206:20 214:6
255:13 256:22
268:25
**nice** 51:18 204:7
205:10
**Nicholas** 17:24 21:2,4
**night** 9:25 31:22
32:10,19 50:14,14
52:10 179:4 189:9
**nights** 32:11

**nipples** 268:23
**nod** 7:2,5
**nodes** 49:24
**noises** 234:14
**non-union** 255:8
**nonstop** 204:24
**normal** 162:25
224:18 246:19
**normally** 115:22
147:15 199:19
224:25
**Notary** 1:18 3:14,16
3:25 271:20 275:3
276:22
**notation** 132:4
**note** 120:12 129:24
129:25 130:2,4,8,9
188:19,23
**noted** 271:11
**notes** 155:12 188:2
273:11 275:9
**notice** 118:22 119:9
120:14,15 121:6
158:3 222:15,21
223:2 272:24 273:2
273:12 274:11
**noticed** 22:2 149:8
**notified** 177:21
**notify** 225:24 226:4,8
226:13
**November** 93:15,17
93:21 94:4,6,15,20
94:23 104:17,20
137:17,25 138:5,8
138:11 166:17
200:10,18 201:3
244:12
**nude** 236:17 237:7,11
237:12,25 248:5
249:12 258:10,23
268:18 269:9,12
**number** 9:10 29:4
36:5 58:15 60:8
76:18 79:13 82:14
91:9 110:11,12,13
110:21,21,22 119:4
132:24 137:24
156:7 163:24 167:9
169:3 176:9 184:14

184:22 185:22
187:3 203:22,24
213:15 214:19
224:5 253:15
256:18
**numbers** 36:4 90:10
90:20 91:3 184:23
**numerous** 116:20
117:4,24
**nurse** 157:18

---

## O

**O** 3:24 275:2
**O'Connor** 121:24
122:20
**O'Neill** 2:20 5:4
131:22 134:12
135:7,18 136:2
137:14 194:19
256:13
**oath** 3:9,10 8:25 56:9
114:20
**objection** 3:17
**objects** 60:17
**obscured** 134:25
**obviously** 21:18
38:24 48:14 53:8
67:24 88:8 139:20
**occasion** 123:22
126:12
**occasionally** 9:25
60:17 97:21 233:2
**occur** 25:18 96:24
131:10
**occurred** 110:17
135:15 151:21
155:25 160:21
**Ocean** 39:14,23
45:10 48:5
**October** 31:14 44:3,4
90:18,19,25 91:2
111:19,22 112:2,4
134:16 197:15
254:17,19 255:15
**off-the-record** 46:19
**offense** 25:23
**offer** 61:9,11,12,19
61:24 62:2 199:3
272:12
**offered** 14:10 51:17

**offers** 53:4
**offhand** 185:23
**office** 4:25 5:3 34:20
34:24 58:3 181:7
185:8
**officers** 70:11
**offices** 2:3 4:24
**oh** 6:11,13 14:16
46:24 51:10 100:24
204:7,9,11 205:6,10
**okay** 4:16,17,21 6:16
7:4,16,24 12:16
14:8 18:13,15 20:17
27:2,7,23 28:19
29:8,15 30:7,23
35:5 36:6,9 37:8,16
38:25 48:14 56:14
58:22 59:6,17 60:3
64:7 65:17,20 69:6
70:2 71:20,23 78:25
80:15 82:12 85:5
91:18,19,22,23
100:24 102:14,20
104:16 119:8,18
130:20 135:2 136:9
136:24 138:15
139:15 142:25
143:12,13 148:7
149:3,5,7 153:7,14
155:18 159:5
160:11 162:5 164:2
170:17,20 172:3,19
174:15 175:2 176:3
182:2 190:21
194:17 197:10
203:17 204:4
213:24 219:23
221:4 223:20 224:4
224:23 241:13
243:16 244:11
264:9 268:25
**old** 10:6,11 22:21
191:25 215:5
**old-timers** 204:12
**older** 17:21 21:2
**once** 28:22,24 36:20
36:25 71:9 80:21
127:17 172:22
194:10 214:17

218:21
oncologist 231:12
one-day's 222:15
One-page 193:23
274:2
ones 17:8 171:10
236:4 256:23
online 13:17 40:24
41:2,10
OnlyFans 42:16,23
53:25 54:2,5,11,19
55:13,25 244:10,15
244:19 265:9 269:6
269:8,12,13
open 46:9
opened 265:6
openings 256:2
operated 65:13
operations 90:24
175:7
opinion 165:9 168:17
169:11 170:14
236:21 249:14
opportunity 5:21
223:3
orange 258:24
ordeal 117:20
order 113:3,11,13
126:25 127:7
144:15 197:24
202:2
ordered 128:6
orders 127:9 187:25
organ 75:21
organizational 92:18
94:5 95:21 96:2,6
98:15 99:9
organizations 15:5
orientation 58:13
75:12,15 76:3,5,8
76:11 84:18 92:7
originally 58:2 161:7
Orthopedic 132:2
other's 50:5
out-of-network
246:17
out-of-state 3:16
outcome 275:13
outside 21:13 23:25

27:9,23 28:2 80:9
97:2 129:17 208:23
217:19 248:13
overtime 60:24
owned 35:14
owner 35:21
owns 35:19

**P**

P 2:2,2
P.C 2:3
p.m 52:4,5 103:5
212:11 271:11
PA 270:9
PAC 145:5
page 36:4,7 55:18
57:2 59:18,18,21
60:4 69:13,19,23
91:4 104:8,16
105:21 106:12
107:5,13 111:15
112:23 131:17,18
131:20 132:4 134:6
135:2,13 136:8
137:11 144:2,21
145:17 146:2
154:25 156:5,25
157:15,24 160:15
160:17,19 163:11
166:22 167:8,8
169:24 174:22
176:8,8,9 189:20
190:10 196:2,5
197:13,18,20
213:23 215:13,15
215:19 216:3,20
217:23 220:10
221:16 222:9 224:3
224:3 228:2 236:11
240:24 243:5,10,11
243:12,13,14,21,22
251:20 253:5,24
256:16,17 258:18
259:14,17,20,23,24
260:6,14,20 263:4,8
272:3,9,20 276:5
pages 59:23,24 70:3
131:15 132:23
144:21 161:11
182:4 219:6 258:7

260:19 264:15
paid 43:11 66:18
70:3 71:6 76:4
168:10,21 239:15
262:17
Pam 16:13
Pamela 16:13
panic 190:5,7
paper 59:10 132:12
150:20,24 185:9,24
190:24,25 203:21
papers 77:21 78:12
97:21
paperwork 63:23
143:18 152:9
162:22 166:5
187:23 193:10
211:6 221:11,12
232:8 233:9 266:17
270:6
paragraph 157:17,23
176:2 222:11,12
224:5 236:12
parents 6:10 15:10
20:4
parents' 17:12 20:6
parking 192:12
part 63:11 82:25
102:3,12 122:14
132:25 135:23
225:18 258:13
part-runner 56:22
participating 3:3
particular 25:8 44:12
84:19 86:12 119:15
122:8 126:12
147:19
parties 3:12 275:11
partners 5:5
parts 85:19
party 3:17
pass 233:14
pass-through 116:19
pasties 268:22,23
patient 156:10
196:21 216:25
pay 34:8 54:12 66:8
66:11 68:8 81:4
99:20 101:12,15

102:23 107:20,25
108:5,11,22 159:4
168:19 239:16
245:5 248:16,19
262:16 270:10
paycheck 243:19
paying 54:15 99:17
113:19
payment 243:23
payments 24:12
payout 243:17
paystub 43:2 47:5
PC 2:8
peace 43:16
penalized 97:24
101:11 182:18
207:23
penalties 9:2
pending 7:22
Pennsylvania 1:2,12
1:19 2:5,17 4:2 9:18
9:21 10:24 15:12
16:3 17:6,9,23
18:11 22:11 23:6
24:23 30:6 113:15
128:2 129:2 141:15
275:5
penny 20:7,13 81:4
pension 67:12,13,15
people 50:21,23
54:12,24 55:15
59:12 72:20 73:17
73:21 74:2 75:13,19
97:19 99:25 100:2
175:22 184:18,23
186:11 216:4
224:15 233:4 252:2
people's 153:4
percent 60:12 68:8
percentage 67:22
108:19
perform 133:6,11
156:11,13,14
196:22 234:3
performance 114:21
115:4,8,10
performed 65:8
performing 173:7
perfume 74:23,25

**period** 31:13 38:20
39:8,10 41:16,20,24
42:2,4 43:9 66:12
66:13 88:4 103:20
107:14,19 109:10
134:19 183:7
195:10 245:24
266:7
**periodically** 265:2
**permission** 122:5
**person** 3:10 148:25
237:18
**person-to-person**
227:13
**personal** 8:5 269:5
**personally** 28:5
**Persons** 251:21
**perspective** 122:3
206:5
**PetSmart** 29:17,20
29:24 30:2,9,11,14
31:4 32:25 33:10,12
**PFA** 113:6,8,15
**Philadelphia** 1:12 2:5
2:17 4:24 46:17
**phone** 5:18 140:15
203:24 206:13,16
206:19,20 207:8
214:2,5,6,9,19
215:5 265:2
**phonetic** 85:19 97:21
**photo** 259:21 263:10
263:16 264:7,14
**Photographers** 44:10
**photos** 168:8 206:17
236:17 237:7,11,12
237:25 248:5
249:12 258:10,10
258:14,15,20,21,23
259:2 264:16,17,25
**physical** 8:15 117:10
134:15,22 136:11
136:19 153:8
162:12 167:2,6
266:2 273:9,15
**physically** 3:5 182:15
**physician** 131:22
144:3 154:12
168:11,14 191:7

246:14
**physician's** 144:3
**piano** 75:23
**pick** 5:17 23:2 152:24
153:2 178:15
**picture** 259:22 260:7
260:8,12,13,19,21
263:9,13,17,20,25
**pictures** 44:9 259:12
264:23
**piece** 59:10 203:21
**place** 1:17 24:19
34:16 71:10 79:20
81:21 82:16,23 90:3
99:6,25 118:8
128:21 141:2
173:22 174:2,7
178:7 218:14 225:3
**placed** 8:25 105:19
178:2 199:13,16
222:14 228:21
232:24
**placement** 138:23,24
225:2
**places** 45:13 127:17
172:12
**Plaintiff** 1:5,16 2:4
144:21 193:24
213:22 241:4 244:3
253:10 254:3
**plaintiff's** 132:25
134:7,22 217:23
224:8
**plan** 109:24 134:8,14
269:23
**planning** 266:20,21
**plans** 109:25
**plant** 57:18,20 61:6
64:14 77:17 93:5
112:6,7 120:7
150:22 153:3,20,24
173:17 177:17
179:9 234:16 236:3
**plastic** 48:25,25
**plates** 116:19
**platform** 42:13
**play** 124:19
**played** 75:22
**please** 3:18 4:5 6:24

9:5 10:4 17:9 18:13
23:7 28:11 69:4
91:22 118:11
137:11 170:2
204:23 205:4
238:14 243:3
253:20 256:16
257:19
**Poconos** 20:5,18,21
**point** 5:25 20:8 57:5
62:9 77:20 82:19
84:5,8 87:24 92:13
109:13 113:10
130:5 133:20 134:2
134:10 135:6 139:5
145:24 173:18
178:22 182:15
200:12 204:10,17
205:5 209:13 215:4
221:4,7 227:21,22
228:7 229:6 230:16
**points** 119:14 218:5
219:14,16 240:2
**points-based** 82:22
119:13
**Poland** 15:25
**policies** 76:7,22 77:7
77:8,14 78:4,17
272:17
**policy** 77:19 79:3,4
79:11,14,18,19,23
80:2,3,16 81:21
82:5,15,23 83:11
84:2,9 118:23
119:10,12,20
126:17 127:25
130:7 186:20 202:6
213:6 224:23
272:18,25
**porn** 54:13
**portion** 169:25
**position** 34:2 40:16
40:18 56:20 60:14
62:19 64:9,14,21
65:7 66:8 70:7 88:9
88:12 92:11 93:20
93:24 99:10,15,18
101:10,13,17
103:13 105:24

109:4 139:5 146:9
146:12,17 208:3
212:4 235:7 239:20
**positions** 66:5 91:17
102:13 254:13
**possession** 257:22
**possible** 186:5
**post** 259:22 260:18
260:23 261:7,13
263:5 264:19 265:2
**post-concussions**
224:16
**Post-it** 203:21
**post-Mack** 56:11
**posted** 261:10 263:16
264:20 265:3
**potentially** 14:6
49:23 63:18 176:21
**Pottstown** 10:23
**pounds** 60:17,18
137:2,2
**practice** 4:25 144:7
145:9
**pre-Mack** 56:11
**preassemble** 98:24
**prep** 36:17
**prepared** 8:21
**prescription** 247:18
247:23
**prescriptions** 229:11
**present** 2:20 3:5
27:10,24 53:15,17
129:6 167:16
226:18 245:15,21
**pretty** 14:18 41:5
52:25 75:25 89:12
95:16 97:23 146:25
147:23 154:19
162:21 204:8 233:7
236:4 239:9
**previous** 192:19
195:20
**previously** 21:14
25:17 59:4 93:11
254:24
**print** 214:8
**prior** 29:13 33:12
34:15 38:2 40:7,14
50:15 57:8 131:10

219:12 247:16
**priority** 191:8
**probably** 85:25 86:2
  105:25 115:6
  139:19 150:5
  163:13 217:11
  227:13 241:11
  263:18
**probation** 62:14
  85:21
**problem** 84:25 122:2
**problematic** 225:15
**problems** 115:11
**procedure** 162:25
  261:23 262:3,14,16
**Procedures** 78:18
  272:17
**proceed** 3:22 8:21
**proceedings** 219:13
**process** 35:6 59:12
  75:12,15 76:5,8,11
  254:4,16
**produced** 213:20
  219:17
**production** 33:25
  56:22 62:20,21 63:2
  63:25 64:9,13,20
  65:7,15,15 66:7
  74:5,6 85:13,15
  108:22,23,23 139:8
  146:12 173:7
  239:20 257:20
  272:13
**professional** 1:18
  15:2 169:11 204:21
  204:23 205:13
**profit-sharing**
  243:23
**program** 13:4
**prohibit** 81:22
**promised** 207:25
**proof** 113:6 184:13
**Property** 34:16 35:8
  36:20 37:17
**protected** 239:4,24
**protection** 113:9
  127:7
**provide** 113:2 152:13
  253:21

**provided** 113:5
  253:22 257:21
**provisions** 75:4
**PTSD** 189:4 228:16
**public** 1:19 3:25
  173:19 271:20
  275:4 276:22
**pull** 140:21
**pulled** 140:4
**pulling** 133:10
  199:18 234:4
**punched** 26:19 159:7
**punished** 208:13
**purpose** 5:10
**purposes** 9:16
**pursuant** 66:15 75:4
  84:2 107:22 195:13
**push** 59:11
**pushing** 133:10
  199:20
**put** 9:13 37:12 51:17
  82:16,23 83:18
  89:16 90:3,11 97:14
  97:17 101:3,9,12,17
  122:4 139:2,2
  221:10 225:5
  232:21 233:8 234:2
  239:8,9 255:6,7,12
**puts** 248:6
**putting** 136:5 153:3
  233:5

---

**Q**

**qualify** 95:14
**quarters** 80:14
**question** 6:2,3,18,19
  6:20,22 7:22,23
  22:25 60:6,7,13,22
  84:12 85:12 89:22
  94:18 127:18 133:4
  133:25 138:16
  142:11 167:9 176:9
  191:14 196:9
  216:14 219:24
  230:11 238:13,14
  257:20
**questions** 5:22 6:25
  7:11,15 8:5,6,10,17
  21:17 28:25 57:16
  59:11 69:5 78:24

82:11 102:11 119:6
  126:7 131:16 169:6
  188:24 193:5
  223:21,24 251:15
  251:19 271:8,9
**quick** 51:12 57:15
  94:13 158:7
**quit** 49:6 116:15
  117:16 198:12,13

---

**R**

**R** 2:2,17 275:2
**raceway** 38:9,16,17
**racing** 38:18
**raise** 205:3
**raises** 107:20
**ran** 34:22 93:9
**RANDLE** 2:12
**Randy** 5:2
**rate** 51:13 52:13 66:8
  108:12 112:11
  175:7 176:16
  239:16
**Rauenzahn** 145:3
  246:16
**reach** 256:3
**reached** 208:12
  216:22 255:22
**reading** 37:11,12,23
  79:9 129:2 144:10
**ready** 28:25 58:22,23
  69:5 78:24 82:10
  119:6,7 126:6,8
  130:18 160:10
  163:25 169:6
  174:14
**real** 94:13 158:7
**realize** 223:19 253:8
**really** 6:11 14:13
  142:23 149:9,10
  162:16 179:10
  180:12 199:20
  204:13 207:12
  208:21 264:16
**rear-ended** 46:5
**reason** 7:18 8:5,20
  74:17,20,22 81:2,3
  81:4 144:12 202:13
  210:23 211:10
  276:5

**reasons** 211:7,12,13
  212:17,21 221:21
  227:3,4,17
**reassigned** 116:12
**reassignment** 92:18
  94:5 95:21 96:2
  98:15 99:9
**reassignments** 96:6
**recall** 30:20 38:21
  40:2,15 58:11 67:4
  67:21,23 68:19
  73:19 77:6 79:7,10
  83:21 98:13 105:12
  108:17 109:5
  113:25 115:9,16
  118:7,20 129:15,18
  138:20 139:24
  149:2 155:21
  159:17 164:4
  170:13 171:5
  175:10 176:4 180:5
  181:13 185:20
  222:7 231:14,16
  240:22 246:5
  265:19,22 267:24
**receive** 28:22 30:7
  49:10,15 61:9,11
  66:20 68:13 70:14
  71:11 83:11 84:12
  84:16 85:17 94:24
  95:4 96:17 97:4
  100:12,16 115:13
  119:18 158:10
  174:5 175:2 194:8
  194:22 223:2
  243:17 245:16
  246:2
**received** 28:14 53:3
  58:17 61:12,20 64:2
  66:11 68:23 76:14
  76:21 77:22,25
  78:11,13,14,18 79:5
  79:14,18 82:5 83:18
  91:5 96:14,15 101:5
  110:3,7 118:24
  121:7 125:25
  129:19 130:14
  139:10 143:3 148:2
  153:9 155:13 158:4

160:5 161:24
162:13 163:21
164:14 165:13
168:23 172:14
174:9 181:22
183:16 186:23
187:13 189:11
193:13,23 194:13
194:18 195:6,16
197:2,6 209:24
213:11 220:2
222:21 223:5,12
231:14 242:5,20
244:2 245:23 246:5
249:18 251:5,8,11
258:2
**receiving** 77:6 79:7
79:10 115:16
**recognize** 61:16
65:20 76:19 121:12
139:16 174:16
258:6
**recollection** 114:7
164:6 174:3 220:6
**recommendation**
224:22
**record** 4:6 6:5 7:8,14
8:6 9:13,14 56:8
71:15 114:19
120:21 219:16
270:14
**records** 155:23
172:22 173:3 187:9
219:7 229:13
262:13
**recover** 248:16
250:17
**recuperate** 151:15
**recurrent** 145:13
**reduction** 175:7
176:17
**refer** 157:6 187:2
236:16
**reference** 42:8
142:15 155:24
169:24 244:7 258:9
259:8,20
**referenced** 121:14
252:25

**referencing** 225:8,9
**referred** 164:19
165:24 166:2,10
**referring** 159:9
186:20 221:23
233:11 236:15
237:6,24 248:9
258:11,17
**reflexes** 170:11
**refresh** 59:6 118:11
164:5 220:5
**refuse** 156:13
**refused** 78:12 115:23
123:4 130:5 156:14
**regard** 72:18 81:7
237:14
**regarding** 71:24
193:20
**regards** 60:23 226:17
234:8
**register** 29:22
**regular** 89:5,19 99:18
**regularly** 15:8
**reinjure** 255:2
**reinjured** 93:12
200:7,22
**related** 206:4 223:24
252:9 257:22,23
262:13 275:11
**relationship** 112:2
**relative** 21:23 233:3
257:15
**relatives** 23:4 70:10
**release** 137:17
138:21 154:3 198:2
**released** 146:3 198:6
211:17
**relocate** 95:12
**remain** 93:13 95:6
105:13 134:18
**remainder** 70:4
**remained** 106:7
176:20 200:9
**remarried** 269:23
**remember** 32:3 36:24
37:4,6 48:10,12
49:5 50:21 74:10
75:2 79:17,23 83:25
85:21 87:11 97:12

108:11,18 120:19
123:6,21 125:24
130:10 133:19
138:19 150:6
161:21 168:5
170:19 171:17
172:10 173:2,2,20
174:8,17,18 175:12
175:13,18,23 176:5
178:6 179:21,21
184:21 185:4,6
189:16 204:19
214:11 270:3
**remind** 56:9 114:20
**remotely** 3:7,11
**remove** 111:7 112:12
219:18
**removed** 120:20
**removing** 219:16
**renegotiated** 70:23
**renewal** 77:9,10
**rent** 245:10
**rented** 75:23 245:11
**renting** 141:9
**reopened** 265:11
**rep** 80:12,25 81:5
112:10 129:8 177:7
181:10 187:24
188:12 202:24,25
203:15 208:5,11,21
209:16,17 214:18
215:10 226:7,12
227:19 235:3
**repeat** 6:4
**repercussions** 182:25
**repetitive** 234:22
**repetitiveness** 234:6
234:14
**rephrase** 179:14
182:20 211:16
220:18
**report** 86:21 117:21
125:4 149:13,15
202:18 207:20
208:24 217:16,20
237:16,17,19
**reported** 149:20
202:19 217:13
**reporter** 1:18 3:2,21

4:4 5:20 28:21 85:4
**reporting** 3:6,18
202:16 208:23
**reports** 240:18
**represent** 91:12
**representation** 241:3
241:6
**representative** 87:19
97:19 123:7 125:10
236:15
**representatives**
150:22
**reps** 27:22
**reputation** 248:2
**request** 120:5 130:22
140:3,14 142:12
143:14 147:25
162:6 164:8 183:3,9
183:10,16,24 184:3
184:5,8,10 192:14
192:14 194:11
228:8 257:20 273:8
273:23
**requested** 21:18
139:22 144:14
172:22 173:3 230:2
**requesting** 139:24
140:24 183:13
189:18
**requests** 55:2 233:5,8
**require** 234:19,22,25
235:7
**required** 128:9
225:18
**requirement** 164:12
**requirements** 60:19
**reside** 19:23 141:22
**Residential** 266:25
**resign** 202:14 212:7
**resignation** 201:4
210:9
**resigned** 39:4,24
50:11,13,18 108:12
199:4 210:23 211:8
211:10,12 212:11
224:8 242:2 245:20
250:13
**resigning** 50:15
210:5

**Resource** 237:18
**resources** 5:5 78:17
  80:8,11,13,17,18,22
  80:23 81:10,13,15
  81:17 91:14 112:10
  168:11 209:5,14,19
  209:22 213:8
  234:25 235:6,10
  237:18 272:17
**response** 3:20 176:15
  181:4 188:15 217:3
  253:21
**responses** 42:15
  251:11 253:22
  257:19 274:18
**responsibilities** 34:25
**responsible** 29:21
  147:12
**rest** 134:15 151:12
  152:11,19 154:20
  154:22 156:16
  201:2
**restate** 6:4
**restaurant** 36:23
  37:2
**restrictions** 136:19
  137:5,18 154:10,14
  200:13
**resubmit** 112:19
  162:21 221:11
**resubmitted** 161:9
  193:9 194:4,8,10
**result** 24:13 26:8
  113:18 141:5 155:3
  176:24 183:2 184:2
  224:6 241:17,20
  244:24 266:3
**resume** 29:9 37:11
**retaliate** 81:25
  238:22
**retaliated** 201:17,21
  238:21
**retaliation** 81:22
  198:14,16 199:7,8
  210:16,20 239:4,23
**retaliatory** 224:7
  239:2 240:16,21
**retire** 241:21
**Retirement** 49:17

**retract** 125:17
**retrieve** 159:6
**retroactive** 195:7
**retroactively** 231:3
**return** 93:17 97:7
  106:25 136:13,18
  137:17,21 138:4
  146:3 154:4 156:17
  161:14 166:16
  170:18 190:14
  192:20 198:2,7,9
  200:13 211:17
  222:13
**return-to-work**
  167:19 196:6
**returned** 93:21 95:18
  97:9 112:7 137:6,7
  137:25 146:8
  153:20 201:4
  211:18 221:18
**returning** 198:24
**reviewed** 28:24
  129:18
**revised** 78:14
**Rick** 172:12 177:11
  177:15
**rid** 240:9
**riding** 46:14
**right** 4:13 8:4 9:4
  11:13 12:12 14:22
  18:23 27:9 29:10,12
  29:16 32:24 33:6,12
  34:5 35:25 37:14,24
  38:19 43:8 45:5
  46:2 47:10,22 52:14
  55:6,11,16 56:13
  59:20,21 63:23 66:3
  68:12 69:19 70:23
  75:21,24 81:18
  82:13 89:8 90:13
  92:9 94:3,9 98:6
  99:7 100:23 101:24
  102:18 106:17
  107:18 115:21
  120:22 121:21
  122:12 126:17
  130:11,21 134:5,10
  135:12 136:7
  137:10 140:7

141:25 143:14,25
145:16 147:20
148:20,24 150:4,18
150:21 153:6
154:25 155:22
156:24 157:14
161:10 162:6,23
166:14 167:18,22
169:13 171:16,25
173:11 174:20
175:5 176:7 180:17
182:3 183:12
185:10,14 189:24
191:16 196:12
198:6 199:6,22,24
202:6 203:8 207:4
215:2,22 217:9,22
219:3 223:9,15,23
225:24 226:3
227:25 236:6
237:14 238:20
240:23 241:15
243:9 244:6 248:22
251:14 252:4
253:19 257:18
260:18,21,23 261:4
264:22 267:6
269:25 271:7
**right-hand** 132:3
  135:13 136:17
  160:20 163:14
**rights** 150:25
**ringing** 149:9
**risk** 153:4
**Rivera** 59:19 202:22
  252:3
**Robert** 20:7,8
**role** 106:7
**room** 3:6 103:9
  151:13 154:14,20
  159:24
**root** 269:19
**rotating** 51:18
**roughly** 29:25 54:7
**roundabout** 250:20
**rude** 7:7 50:22,23
  51:3,9,15 237:4
  238:4
**rule** 72:11,15 123:18

251:5 274:16
**rules** 71:24
**run** 52:7
**rush** 90:4

---

**S**

**S** 2:2 272:7
**S-A-R-A** 9:8
**S-O-D-E-R-S-T-R-...**
  23:14
**safe** 65:10 180:22
**safely** 65:11
**salary** 65:9
**sales** 29:23
**sanitizers** 49:3
**SAP** 184:22,23
**Sara** 9:6,7 116:14
  117:15
**sarcoidosis** 49:21
  231:7,13,22
**sat** 148:25
**Saturday** 158:25
**save** 214:13,19
**saved** 214:4,5
**saw** 117:7 146:4
  167:23 168:22
  172:23 181:6
  185:24 197:24
  231:11,12 249:23
**saying** 4:12 6:8 27:3
  53:13 72:14 73:15
  77:13,21 83:4 88:15
  104:11 105:9
  117:14 124:15
  165:20 204:11,19
  218:18 226:22
  237:10 265:20
**says** 36:5 60:7,14
  72:12 79:16 80:16
  91:25 99:8 100:22
  100:22 105:3 111:6
  111:23 120:13,14
  132:6 133:5,8
  134:14 135:16
  137:7 149:21,22
  150:2 154:7 156:6
  156:10 160:21
  161:2 163:15
  169:25 175:6 176:9
  190:14 196:19

216:25 217:8,10,23
221:18 224:6 241:4
243:6 251:21 253:9
254:3 256:17
scanned 143:10
scared 170:24 210:25
211:2 212:14
229:21
scenes 115:6
schedule 41:5 51:20
178:25 179:18
181:4 224:19
scheduled 45:24
47:10 249:13
schedules 35:3
Schmidt 172:12
177:11,15 178:5
Schmidtty 177:12
school 11:2,4,9,14
12:5 14:23 38:4
241:22
science 241:22
Scores 32:20 268:16
268:17,21
screaming 50:4,25
51:8
screen 57:17
screenshots 213:11
214:21 215:7 258:2
274:9,19
screenshotting
214:11
screw 57:15
sea 93:9,12 136:3
search 101:2
second 60:4 69:19
90:22 96:15,23
99:11 105:20
106:20,22 108:2,16
108:20 111:15
129:8 131:17 144:2
150:2 154:25
160:15 165:8
168:17 169:10
176:12 178:2,14,18
178:25 179:22
180:20 181:3,9
183:11,25 185:3,7
185:13,18 187:18

189:7 191:16,20
192:4,11 199:16
203:2 206:8 208:10
210:15 214:10
215:13 216:6,20
218:23 222:11,12
222:14,19 224:21
225:11 230:4 236:5
236:20,21 240:4
249:13 255:11
second-from-last
243:10
second-shift 180:24
181:10 186:12
187:5,24 188:12
208:11 212:9
second-to-last 157:5
243:12,13
secretary 266:5
section 102:21
124:24 170:3
221:17 251:20
253:20 256:17
Security 9:9,14 68:15
265:15,18,25
see 36:5 54:12,16
57:15 69:23 100:24
100:25 102:6,15,17
102:20 103:2 104:9
113:4 134:23,24
135:17 136:21
149:25 153:25
156:8 157:21
159:23 164:20
165:8 166:12,22
167:9,25 168:4,12
170:2 176:13
195:23 196:8,10
204:8 213:21
218:11 222:17
224:6 227:7 236:20
246:8,12,14,17,18
246:19 247:20
248:3 251:23
253:12 256:17,18
seeing 14:15 140:21
148:24 173:3
224:13 249:24
250:5,10,12

seek 159:11 169:10
seeked 249:21
seeking 248:15
seen 58:24 59:3 65:19
91:10 139:17,19
148:9 153:15
155:19 172:20
250:14
self-employed 20:16
self-expression 248:3
sell 42:5
Selling 52:25
sells 20:15
send 153:2 172:25
sending 35:2 219:9
seniority 69:24 71:25
72:3,6,9,13,15 73:3
73:7 75:5,9 176:17
179:25 180:11,15
184:14,19,24 185:8
185:21 186:6,9
216:5,10
sensitive 149:10
sensitivity 152:13
sent 145:7 152:23
156:19 158:19
166:18 205:17
251:18 254:13
sentence 221:18
222:13
separate 80:7
separated 24:11
80:10,19 111:6
233:12
separation 113:2,3,6
113:11,14,17
179:23
September 54:7,9
97:8,10 101:10
105:16 112:8 135:3
162:18 166:19
169:16 171:15
192:21 244:11
series 218:3
serious 182:8 247:12
service 48:12 57:24
Services 266:16
set 55:14 169:16
275:15

setting 5:20
settle 24:15 25:7
settled 24:17
seven 52:3,3 116:5
218:18
sex 235:25 236:8,9
269:13
sexism 190:16
sexual 236:13
sexually 202:19
shake 7:2,5
shared 175:8,11
SHEET 276:2
shift 51:18 66:19
87:14,17 99:11
103:4 105:20
106:16,16,20,22
108:2,16,17,20,21
108:25 109:2,8
116:25 129:8 150:9
176:11,12 178:15
178:18,25 179:7,22
180:4,8,20 181:3,9
183:11,12,14,16,20
183:23,25 184:15
184:18,25 185:3,3,5
185:7,13,18,19
186:10 189:7
191:17,20 192:4,11
192:11 199:16
203:3 206:8 207:24
208:10 211:4,19,25
214:10 216:6,9
222:15,20 224:18
224:20,21,22 225:9
225:11,11 226:23
227:2,16 236:5
240:4 273:23
shift-change 183:8
183:10
shifts 41:6 51:25 52:7
52:8 60:24 176:18
176:21 177:2,2,4,9
179:12,17 191:18
225:15,18
Shillington 11:7 16:3
Shipkin 168:22
169:11,15 170:6
171:3,7,14 172:14

172:21 173:6 191:6
191:10 232:23
236:22 249:14
273:20
**shit** 217:9
**shoot** 43:19 263:10
**Shop** 58:16 272:11
**SHORE** 2:3
**short** 114:15 143:2
273:6
**short-term** 68:9
**Shorthand** 1:18
**shortly** 80:10 223:7
254:8
**shoulder** 93:10 94:21
105:7 114:8 131:6,9
131:10 135:21
137:2 199:13,15,17
199:23,23,25 200:7
200:15,21,23 201:5
201:15,16 225:5
234:5 254:23 255:2
256:8,12
**show** 7:3 28:17 55:8
113:6,16,17 184:13
**showed** 70:3 185:8
**showing** 61:15 233:4
268:21
**shows** 102:13 106:6
270:18
**shut** 151:14
**shutdown** 93:5
**shuttle** 152:24 153:2
**siblings** 17:18 18:8
20:23
**sic** 230:5 249:21
**sick** 129:23 149:11
157:19 186:15,15
188:4,5 218:19,19
**sickness** 68:2 100:13
165:11
**side** 89:18,18 120:12
132:3,20 135:13
136:17,25 154:6
160:20 163:14
167:10
**sign** 78:9,12 83:17
115:23 123:4 145:7
**signature** 57:3 59:17

65:18,21 69:11,12
77:4 131:18 160:16
163:12 189:20
**signed** 191:17
**signing** 125:21
150:20 166:5
**single** 126:24 191:5
**Sinking** 37:20,21
**sir** 99:19
**sister** 17:21 142:7
204:18
**sister's** 142:5
**sit** 97:17 151:13
154:20 232:25
**site** 55:3,23 244:15
**sitting** 153:6 172:10
214:11
**situation** 178:19
**situations** 14:15
240:5 270:20
**six** 36:23 47:6 196:20
255:11
**six-year** 66:13
**skip** 38:22
**skyrocketed** 144:17
**slap** 25:23
**sleeper** 86:19 87:7
88:21 89:4,10,12,20
106:10 148:16
214:12
**sleepers** 89:9,14
124:24
**slowing** 174:4
**small** 102:9
**smashed** 148:17
**smell** 46:16,17
204:10
**smoke** 124:20
**smoking** 116:6
**Snively** 249:23 250:6
250:14 257:12
**social** 9:9,14 68:15
77:22 180:13,14,16
186:7 265:14,17,25
**Soderstrom** 23:12
**solitaire** 124:20
**somebody** 63:11,19
73:8 81:23 147:5
180:3

**somewhat** 5:19
**son** 9:24 10:8 22:20
**son's** 24:4
**soon** 266:22
**soon-to-be** 192:7
**sooner** 208:18
**sorry** 4:12 19:8 30:4
37:15 72:5 85:5,10
129:22 150:7
187:18 205:7
225:13 245:17
259:19 264:17
**sort** 8:8 90:10 115:8
170:14 247:5
269:11
**sought** 198:20
**sound** 107:15 152:15
**sounds** 151:14
154:17,20 203:8
**source** 42:3 53:23
56:3
**South** 2:9,10 4:25 5:3
6:10 15:11,13,17,20
17:24
**speak** 76:12,13
186:11 204:19
**special** 174:19,22
**specialist** 247:21
**specialized** 146:25
**specific** 60:24 84:3
88:23 102:11
115:20
**specifically** 72:18
73:19 212:11 216:9
216:18 236:10
**spell** 9:7 10:4 23:13
**spelled** 267:8
**spelling** 23:16
**spend** 84:18
**spending** 116:5
**spends** 9:25
**spiraled** 189:5
208:22
**spiraling** 214:16
**spleen** 232:6,12
**split** 24:14
**spoke** 142:23 171:8
184:17 207:7 209:2
235:3

**Sportswear** 33:13,15
33:21 34:10,13
37:11
**Spray** 39:14,23 45:10
48:5
**spreadsheet** 102:4,12
102:12
**spreadsheets** 101:4
272:21
**Springs** 37:20,21
**stacker** 65:14
**standard** 89:16
**standing** 60:14 168:6
**stands** 106:3
**Stanley** 39:13,22
45:10 48:5 254:2,11
255:23
**start** 30:24 33:4 38:5
42:23 43:23 49:4
58:13 62:5,15,24
91:20,25 109:16
121:20 146:6 168:7
180:23 195:7 250:5
251:16 266:14
**started** 37:25 38:6
62:18 64:17 66:4,7
66:9 67:14 70:13
71:18 75:11 76:22
79:5,15,18,24 80:3
80:6,10 81:20 82:17
82:19 84:13 86:23
87:10,20 148:24
149:9,11 168:8
187:4 191:25
198:24 200:3
221:19 244:21
250:3 260:5
**starting** 31:4 266:21
**starts** 132:25 157:5
**startup** 83:16
**state** 1:19 3:14,19 4:2
4:5 113:15 128:2
245:4 246:20 275:4
**stated** 116:12 154:19
166:3 168:13
212:12 239:8
**statement** 119:16
125:22 131:22
236:14 242:20

244:2 254:2 274:14
274:15
**statements** 242:25
**states** 1:2 103:15
104:25 106:9
169:25 193:5
222:13
**stating** 79:20 81:25
152:10 169:9
185:12 187:25
221:24 254:9
**Station** 19:19
**stay** 38:15 147:17
207:24 269:2
**stay-at-home** 21:12
**stayed** 105:15 109:5
147:3 180:8 222:2
**staying** 177:13,23
**steering** 124:2 137:9
146:13,16,20,21
**stenographic** 275:9
**step** 63:10,16
**step-siblings** 18:9,21
**stepbrother** 18:16
23:8
**stepchildren** 22:19
**stepmom** 15:13,19,22
**stepmother** 16:11
**stepped** 148:16
**steps** 35:6
**stir** 207:12
**stoned** 46:5,13,22
**stood** 117:4 158:2
**stooping** 60:15
**stop** 11:21 12:6 13:8
14:8 54:19 204:16
205:4 207:13,14,15
250:12
**stopped** 12:23 13:7
14:3 269:18 270:9
**store** 168:7 264:25
**straight** 74:5
**straps** 99:6,6
**street** 1:11 2:9,16
9:19 75:22 141:14
**streets** 46:17
**stress** 95:15 205:4
234:14 250:3
**strike** 70:25 71:7

**string** 212:24
**strip** 31:8
**student** 140:18
**studied** 12:18
**stuff** 34:23 49:2
54:17 219:22
**subject** 199:7
**subjected** 236:12
**submit** 56:17 57:20
111:10 183:8,12,23
265:24
**submitted** 41:2 61:4
69:15 110:14,23
111:9,21 113:15
143:19 183:20
253:8,23 266:17
270:6
**subpoena** 126:25
128:3
**subpoenas** 187:25
203:19 213:2
**subscribed** 271:16
276:20
**subsequently** 160:2
230:24 239:19
**subway** 19:19
**sued** 24:3,12 25:10
**suffered** 95:15 199:9
248:23
**sufficient** 130:4
262:2
**suing** 5:18 157:20
**Suite** 2:5,10,16
**summer** 263:3
**superiors** 221:20
**supervisor** 22:15
51:16 74:24 83:24
86:21 87:9,25 96:7
117:21,23 120:5
121:24 123:14
124:9 125:2 142:19
142:22,24 147:15
147:20 149:3
203:13 209:15
227:18,20 252:21
252:23
**supervisors** 83:25
88:2 114:23 147:22
**supplemental** 90:23

**supplements** 35:3
**supplied** 129:24
**supplies** 97:22
**supply** 152:12
**support** 127:9
**supposed** 49:12,14
75:5,7,9,10 80:4
85:20 124:6,12
152:8,10 237:17
238:11 255:9
**supposedly** 192:21
**sure** 4:14 6:5 7:8 8:6
13:10 21:21 35:4
39:16 47:9 49:21
55:6 59:19 80:20
120:22 142:10
149:24 204:22
255:14 258:25
**surely** 193:10
**surgeon** 261:18
**surgeries** 254:10
**surgery** 93:11 200:17
200:23 254:12,18
255:4,10,11,24
256:11
**sustained** 253:10
**swap** 192:12
**swelling** 49:24
**swimming** 93:9
132:11
**switch** 52:11 177:2
**switched** 36:22,25
183:11 185:7
206:17
**switching** 19:15
176:25 177:4,9
**sworn** 3:15,25 271:16
275:6 276:20
**symptoms** 148:22
**system** 14:14 77:20
82:20 91:14 119:13
233:4
**systems** 97:23

**T**

T 272:7 275:2,2
**tabletops** 256:10
**take** 7:17,18,23 11:17
12:3,21 13:22 18:23
22:16 28:23,23

40:17 50:13 55:5
56:6 57:13 58:20
59:21 69:3 73:9
78:22 82:9 90:2,4
114:14 119:4
128:21 130:5
134:11 141:23
160:9 163:24 169:5
174:6 178:7 179:4
189:14 193:16
212:22 215:7
241:22 247:15,17
247:19,23
**taken** 1:17 5:13 13:13
14:19 55:23 56:7
114:16 173:10
249:5 258:14,16,20
259:2,5,7,9,12
261:10 263:17
264:15,17,23
265:13 270:7,9
**takes** 44:9
**talk** 29:13 39:2 40:4
43:3 56:12 67:25
76:10 81:6 85:2
86:22 130:11,19
173:17 181:9
199:22 203:15,18
204:3,4 207:8
208:11 213:14
235:6 253:16
257:16 261:17
**talked** 41:20 53:7
56:2,10,16 107:18
119:11 130:13
148:12 218:5 228:5
252:25 257:8
**talking** 4:20 30:5
41:17 55:16 57:23
202:5 204:18 218:4
225:22 260:5
**tank** 99:6
**tanks** 98:22 99:4,5
199:14 203:11,13
204:2
**targeted** 189:4
191:12 221:19
**targeting** 190:16
**tasks** 234:2

tax 270:9
taxes 270:7
TaylorMade 45:16
  47:3,17 48:8,9,15
  52:17,20,24 53:4,20
teaching 97:19
team 115:21 116:2,5
  116:13,22 117:25
  124:2,3,5,6,9,16,21
  124:25 125:13
tech 40:9 41:8,13
  63:25 64:13,21 65:7
  65:15,16 85:15
  92:14 93:23 97:10
  99:13 103:21 104:4
  108:23,23,24
  122:17 139:4,8
  173:7 272:13
Technical 11:19
  12:14,15,15 13:12
technician 74:6 85:13
Technology 11:18,23
  13:12 40:9
tell 9:2,12 17:8,9 24:8
  25:22 29:4,20 31:8
  34:19 36:3 42:10
  43:13 48:20 50:2,19
  68:5 75:14 80:3
  93:7 98:20,23 102:3
  122:2,20 132:14
  135:25 138:13,14
  140:13 142:12
  147:14 148:15
  149:24 151:7,10
  156:21 157:18
  159:2 165:19 169:8
  173:25 177:8
  178:11 186:17
  190:21,21 191:3
  192:14 199:8
  201:23 203:9
  204:15 207:14,15
  209:15 227:6,12,14
  227:20 229:19
  231:21 232:16
  238:11 248:24
  263:8 270:4 271:4
telling 147:12 151:18
  170:19 204:21

temporary 35:12
  57:23 58:7 98:8,11
term 33:24 97:16,16
  143:2 273:6
terminated 33:9
  34:12 35:23 47:13
  168:15 169:21
terms 60:10 88:11
  89:14 117:9 195:13
terrazzo 19:14,17
test 23:16 57:20
  58:13
testified 4:3 107:24
  220:19 239:14
  268:13 269:7
testify 25:14
testifying 3:13
tests 61:6
text 204:22 205:10,18
  205:20,23 206:3,5
  206:11,14 207:19
  213:16,25 214:4,14
  214:22 215:15
  216:4,15,18 217:4
  217:19,24 218:4
  221:17 227:10,11
  260:20
texted 203:25 204:11
texting 204:6,16
  257:11
Thank 9:4 89:23
  238:16 241:10
therapy 134:15
thing 43:2 90:11
  192:22 214:17
things 56:2 67:24
  77:16 89:15 116:20
  144:15 174:3
  221:15 233:3 235:2
  269:11,18
think 38:13 55:21
  62:8 66:13 67:7,8
  83:18 84:11 101:2
  108:10 109:5
  127:15,19 129:22
  140:22 142:21
  143:9 149:22 172:7
  172:7 196:9 229:7
  232:8 235:16

  259:13
thinks 157:13
third 104:7 175:25
  221:17 224:21,21
Thirteen 22:22
Thirty-seven 194:3
thought 14:16 125:21
  130:3 146:17
  180:21 188:18
  201:9 202:15
  208:20 216:13
  229:19 230:4 231:9
  239:2,3 241:23
threatened 95:11,13
Threatening 235:23
three 44:3 51:24
  107:11 129:21,22
  145:21 161:13
  172:11 196:20
  203:7 205:25
Three-page 155:12
  273:11
Thursday 47:7
  177:24 180:18
  222:18
tied 86:18 115:19
  116:3 124:8 221:25
  221:25
time 1:16 5:25 8:22
  24:20 26:10 28:16
  28:16 29:14 31:20
  35:4 36:2,3 38:20
  39:8,10 40:11 41:16
  41:19,24 42:3 43:9
  44:2 57:4,5,15
  59:13 62:9 63:4,13
  66:12 67:14 68:7
  69:12 74:9 79:8
  83:23 84:18 85:18
  87:24 88:4,18 89:21
  90:4 92:13 94:2
  95:7,12 102:21
  103:20 105:11
  107:14,19 108:4,8
  108:12 109:9,13
  112:9,20 113:10
  115:11 117:2 120:5
  121:25 124:17
  129:11,20 131:23

  133:12,13,15,20,22
  133:24 134:2,11,19
  135:6,16 138:13
  139:5,8 140:17,19
  142:9,20 145:24
  150:4 156:15
  161:17,20 168:20
  168:21 173:18,21
  178:22 180:6,19
  182:15 192:7,9
  196:15 198:18,23
  200:12 205:16
  207:15,20 215:4
  221:4,7,13 224:19
  225:10,21 227:7,21
  229:6 230:16
  240:10,12,22
  245:12,20,24
  252:13,15 255:14
  260:4,9 265:9 266:7
  270:6 271:11
times 26:14 43:21,22
  117:4,24 143:10
  204:25 205:20,23
tinted 152:12
tips 267:3
title 185:5 239:6
today 5:2,10 8:7,8,18
  147:6,21 204:7,10
  205:11 223:21
  253:9 270:2
told 50:21 51:10
  74:22,23 75:25
  108:10 115:18
  117:3,7,23 125:12
  130:3 132:10,15
  136:3 142:7 146:6
  147:5 149:17
  150:14 151:25
  152:8,11,18,20,20
  152:25 155:8
  156:15 158:20
  168:10 169:19
  173:25 176:25
  177:3,10,17,22,23
  177:24 178:13,14
  181:8 187:20
  188:18 190:8
  192:23,24 195:3

203:17 204:25
205:12 207:10,18
208:10,10,18
214:17 215:9
222:18 226:25,25
237:23 252:11
253:2 254:11
255:24
**tolerated** 79:20
**tomorrow** 170:21
171:15,22 204:5
**top** 100:4 102:17
133:2 135:10
148:19 149:19
217:24 218:11
224:2 236:11,12
253:24
**topless** 54:17 268:20
269:5,7
**total** 32:12 244:18
**totally** 167:13
**tough** 234:12
**tour** 75:20 254:7
**Tower** 196:25 197:5
274:5,7
**town** 11:6 20:20
32:14
**tractor-trailers** 34:23
**trailer** 80:9
**trailers** 65:10,11
**trained** 167:5
**trainer** 36:18
**training** 63:24 84:13
85:14 86:7
**transcript** 7:3
**transcription** 275:8
**transfer** 33:23 75:6
**transmissions** 89:6
**transport** 65:13
**trash** 87:4
**traumatic** 140:21
**travels** 19:24
**treadle** 85:22 86:5
**treatment** 134:8,14
159:12 190:17
247:10 249:18,21
**trial** 21:19,20 24:16
25:14
**trick** 5:24

**tried** 116:24 154:5
177:16 186:16
221:11
**TRIGANI** 2:14
**trigger** 190:7
**triggered** 234:13
**trouble** 240:18
**truck** 63:4,15 65:14
85:24 86:2 99:2
276:3
**trucks** 1:7 2:9 5:6,12
29:7,14,17 30:12,24
31:4 33:2,5 38:3,6
39:24 41:17 42:21
43:6 44:17,19 45:6
53:7,18 56:11,11,12
57:12 59:7 60:9
61:20 64:14,21
67:12,17 87:2,4,6
89:2,20 90:16 91:14
107:7 126:11
136:12 174:9
219:20 265:20
271:5 273:21
**true** 275:8
**truth** 9:2 93:7
**truthful** 6:21
**truthfully** 8:10,17
**try** 6:24 225:2,4,7,13
**trying** 5:23 7:8
156:17 189:6
191:15 205:3
240:17
**Tuesday** 47:7 146:5
**turned** 244:21
**Turner** 17:13 23:9,22
**turnover** 51:12 52:13
112:11
**Twelve** 10:12
**Twenty-two** 49:9
**twice** 121:15
**Twitter** 55:17
**two** 9:21 13:5 15:21
32:11 38:14 45:19
47:8 49:7,13 51:22
51:22,23,23,24,24
52:7,8 53:10,11
59:23 64:22 75:21
83:24 88:13 89:11

116:20 120:9,10
127:11,17 139:22
161:13 172:11
178:9 182:4 187:13
205:12 216:16
222:5 254:9 258:22
259:3 260:19 264:3
264:14,23
**Tylenol** 247:17
**type** 75:22 84:3 87:2
91:4 101:4 102:22
119:15 270:7,19
272:19,21
**types** 34:22

**U**

**UAW** 5:9 24:2 25:7
27:10,19 68:21,23
69:8 70:4 85:15
90:17,20,21 223:19
241:4 272:15
**UAW-10** 69:20
**UAW-354** 91:3
**Uh-huh** 12:17 21:25
26:3 33:3 34:6 39:6
52:19 132:7 205:19
214:23,25 215:3
**Uh-uh** 17:15
**ultimately** 228:19
240:6
**un** 144:16
**unable** 133:6 167:13
178:17,24 183:25
184:9 185:13 209:6
235:8 246:8 255:18
**unbearable** 240:6
**uncomfortable** 14:15
170:23
**underscore** 267:11
267:20
**understand** 6:2,6,20
7:25 8:24 47:9 51:5
63:9 78:11 80:21
84:7 124:15 150:8
176:19 268:10,24
**understanding** 25:6
39:3
**underwater** 263:12
264:7
**unemployment**

192:25 193:3,7
221:12 240:19
**unexcused** 120:14
**unfair** 190:17
**unfortunately** 219:23
223:22
**unhealthy** 224:14
**uniforms** 33:17
**union** 27:22 70:8,11
71:8 76:13 77:12,24
80:7,12,25 81:5,16
81:18 83:2,8 87:19
88:2 112:10 123:7
125:10 129:8 177:7
181:7,10 185:8
187:24 188:12
202:16,24,25
203:15 208:5,11,20
209:10,14,16,17
214:18 215:10
226:7,12 227:19
233:12,13,17,19
235:3,10
**unit** 149:17
**United** 1:8 2:15
**UNITES** 1:2
**unloading** 65:10
**Uno** 37:8
**Unos** 36:11,16,22
37:25
**unprofessional** 237:5
**unwarranted** 221:21
222:4
**unwelcome** 236:13
**unwieldy** 90:12
**unwilling** 156:11
**unwillingness** 224:7
**upcoming** 175:7
203:11
**updating** 162:24
**Urgent** 247:11
**use** 233:4 267:25
**Utopia** 31:5,19,21,22
32:5 41:20 53:9
268:15

**V**

**v** 1:6
**vacation** 93:4 131:4
243:17

**Valley** 175:7
**verbal** 6:25 117:10
**verification** 9:15
**verify** 90:5 110:12
**versus** 241:4
**veterinarian** 157:7
201:10
**vibration** 74:4
**vibrations** 74:16
**victimization** 190:17
**VII** 239:6
**violation** 123:18
126:16 129:14
130:4 186:21
187:14 188:19
202:5 218:7
**violations** 121:17
190:16
**violence** 26:21
**Virgil** 209:3 252:17
**vision** 66:23
**visits** 19:22
**Volvo** 78:17 79:4
272:17
**vs** 276:3

**W**

**W-2** 242:5 274:13
**W-2s** 242:10
**wage** 101:4 102:22
272:21
**wages** 241:19,19
253:11
**wait** 84:23 112:4
**waiting** 171:12 172:8
172:13 195:10
246:20
**waitress** 35:20 36:16
36:17
**waive** 150:24
**waiving** 150:20
**wake** 224:18
**Waldo** 87:12
**walk** 46:16 91:16
204:9 249:5
**walked** 86:15
**walking** 60:15 181:6
204:8 205:9
**want** 4:14 24:11
29:12,12 39:2 47:22

54:24 55:9 56:10,14
62:22 65:21 71:14
80:20 90:5,8 91:15
91:15 93:7 102:10
102:23 108:14
110:12 130:11
148:11 170:18
178:3 187:4 197:11
207:12,13 208:19
210:15 212:8 217:8
229:16,18 233:6,16
233:18 239:10,12
241:12 258:25
270:14
**wanted** 77:17 102:14
139:3 145:6 155:10
161:8 166:3,16
168:4 170:20
178:12 185:15
191:17 198:18
213:14 233:7
236:20 239:25
240:8 241:21 254:7
261:15 262:7
**wants** 169:10 218:10
**warning** 186:24
187:16
**warrant** 128:7
**wasn't** 12:8 13:10
46:12 50:17 58:7
63:15,19 67:23 68:6
71:5 74:23 82:19,25
83:6 109:14 112:6
112:22 116:3
120:22,23 124:19
145:6 148:20,21
155:10 168:13
172:23 186:14
191:20 193:8
199:12 215:11
226:6,11 250:4
264:6
**waste** 87:4
**watch** 140:18 189:9
**water** 48:25 149:6
**way** 83:12 89:18
100:16 106:17
119:25 123:3 147:2
150:18 168:8

180:12 205:6
229:15 248:7
275:12
**We'll** 38:23 71:23
**we've** 47:24 56:10
**weak** 240:2
**wear** 74:22,24 268:22
**Weaver** 16:7,17
18:15 257:13
**wedding** 120:6,8,9
**Wednesday** 47:7
146:5 175:8
**week** 45:22,23 47:3
49:6,6 53:20 92:6
97:20 98:8 138:20
139:23 158:20,21
206:2 233:5 243:7
256:7 263:18
**weekend** 51:23
**weekends** 60:25
**weekly** 249:24 250:2
**weeks** 45:19 52:15,18
64:22 88:13 139:22
161:13 177:23
185:6,12 187:13
230:25 255:10,11
**welcome** 118:11
187:3
**welder** 17:4
**well-being** 144:18,18
**went** 31:19 32:15
36:20 44:23 55:21
58:2 61:5 64:23
68:20 71:10 75:18
84:17,21 94:6,10
95:3,22 96:9 97:24
100:5 105:6,9,15
108:22,25 109:6
112:9 115:2 120:4,7
125:14,14 129:25
138:21 139:4
140:20 149:16
150:9,12 159:5
168:18,21 179:23
180:15 181:5 185:2
188:21 192:22
203:2,12 209:9,22
211:6 212:10 226:6
231:4 239:15,16

249:25 255:25
261:17 270:5,8
**weren't** 49:21,22,25
80:13 117:15 139:7
220:14 233:3,14
258:15 259:7 262:2
**West** 9:18,21 22:11
24:24 37:19,21
**WHEREOF** 275:14
**wholeheartedly**
212:15
**Wild_flower** 267:19
268:2,3
**Williams** 256:23
**windows** 256:10
**wiping** 152:16 256:9
**wishes** 156:18
**witness** 3:13,15,24
25:13 85:5,9 226:12
241:14 272:3 275:6
275:14
**WITNESS'** 276:4
**witnesses** 9:12
256:22
**woman** 74:3 199:11
204:8
**womanhood** 212:23
249:5
**women** 179:10
**wondering** 239:3
264:18
**word** 55:6 173:16
191:5 207:22
267:10
**wording** 231:2
**words** 9:21 212:22
**work** 16:20 17:2 18:5
19:13,24 22:14
29:14,24 30:24 31:4
35:7 36:20 37:25
38:2 41:7,19,21
44:16,21 45:7,24
47:10 51:20 53:6
62:15,18 64:20
68:20 70:13 71:18
73:22 75:11 76:22
79:5,24 81:20 84:13
86:12 89:5 93:18,21
95:9,18 96:14,18

97:2,7,9 101:20
106:25 113:24
114:5 116:3 121:16
122:4,5,15,17,24
123:18 127:3
128:15,19 134:18
136:14,18 137:6,21
137:25 138:21
142:14 145:23
146:3,8,9,20,21
147:4,6 148:13
151:16,18,19,24
156:17 158:21
161:14,16 166:19
167:13 170:18
175:22 178:14,17
178:24 183:25
186:12 189:25
190:6,14,15 191:6
191:21,25 192:4,21
193:6,8 196:15,18
198:2,7,9,19,24
200:3,9,13 201:4
204:2 205:6 211:17
211:19 221:18,24
221:25 225:3,6
231:4 235:19 246:3
255:18 256:9
262:20
**workday** 171:24
172:6
**worked** 12:9 20:8
29:16 30:8 31:20,22
31:25 32:4,6,11,18
32:19,22 33:13 34:4
34:10,16 36:10,13
38:20 39:8,15,19
42:2 44:6,19 45:12
45:16,21,22 47:5
48:7,18 53:17,18,19
53:19 61:8 66:5,21
73:17 87:17,24 88:5
88:24 89:6 102:13
103:13 106:20,22
107:14 108:4,8
109:10 114:22
115:5,14 128:22
150:9 179:16
252:18 256:6

268:14
**worker** 208:6
**workers** 1:8 2:15
80:7
**Workers'** 28:3 96:20
155:3 156:6 158:3
158:14 201:11,14
273:12
**working** 12:25 19:19
31:12,16 36:19 37:2
41:17 46:5 49:4
52:24,24 53:9 60:23
60:24 73:24 86:8,11
87:14 98:17 103:21
104:4 109:16 114:3
115:18 117:3 137:8
149:2 173:22,24
175:16 184:21,25
192:8,10,11 195:12
225:8 259:11
**Workmen's** 230:3,7
**workout** 54:13
**workplace** 80:5
**works** 32:16
**workup** 135:9
**world** 143:8
**worry** 206:8
**worse** 230:6,10
**wouldn't** 59:8,9
182:18 184:15
198:25 250:24
**wow** 6:13
**write** 123:22 212:20
**write-up** 119:22
122:3 126:21 129:4
**write-ups** 118:20
121:16 222:5
**writing** 221:20
**written** 115:8,23
118:18 120:8
121:15 122:21
123:17,24 127:16
127:19 218:6 222:3
**wrong** 124:23 190:13
210:18
**wrote** 127:2 190:11
191:2 212:16
**Wyomissing** 16:22
18:6 30:3,6 37:8

**X**
x 1:3,10 272:2,7
**XX** 267:16 268:7

**Y**
**yeah** 24:10 30:22
37:3,3,12,23 38:18
38:18 42:9 45:22
46:23,25 50:9 51:6
52:10 55:4 118:10
118:11 125:15
132:12 139:18
146:18 149:6
162:24,24 172:5
186:7 200:22
208:17 260:15
**year** 11:11 12:5 35:9
48:2 54:9 68:14
93:14 105:2 133:21
133:23,23 134:3
191:24,25 230:22
246:10,23 247:13
253:9 255:15
259:22,25 260:24
261:19,20,20,22
263:3,5 264:2,6,13
264:18
**years** 13:5 29:24
74:13 107:11
216:16 258:22
259:3 264:3,23
**yell** 116:24
**yellow** 102:23
**yesterday** 265:7
**York** 13:18 19:15
20:5
**you-all** 70:25

**Z**
**Zachary** 123:16
125:2,4,6
**Zack** 125:16
**zip-lining** 135:16,20
135:22,23

**0**
**0001** 180:14

**1**
**1** 28:12,14 29:4 56:15

258:18 272:10
**1/2** 216:16
**10** 60:13,17 101:5,25
137:2 206:2 272:21
**10,000** 67:8
**10:10** 1:13
**101** 272:21
**103** 182:5
**104** 182:5
**10th** 139:23 152:3,4
153:19,21 155:25
156:3 158:20
**11** 60:22 110:3,11,13
110:21 272:22
**11/17** 197:18
**11/6** 136:19
**110** 272:22,23
**11574,Signature**
275:17
**118** 272:24
**11th** 12:4 95:25 96:16
111:12 158:24
160:23 223:8
**12** 52:2 56:19 59:5
110:7,12,22,22
167:9 224:3 272:23
**12-hour** 41:6 51:25
**12-month** 183:6
**121** 273:2
**1240** 2:5
**125** 273:3
**1250** 217:25
**12th** 12:4 160:22
**13** 118:24 119:4,8
256:18 272:24
**130** 273:4
**139** 273:5
**13th** 92:22,24 94:14
94:20,21 96:9
132:19 160:13
**14** 36:8 47:5 121:11
121:19 196:9
**14-15** 121:8 273:2
**140** 197:17
**141** 197:13
**143** 273:6
**144** 196:3
**147** 196:14 273:8
**15** 2:9 121:11 123:11

196:12 241:11
**1500** 2:4
**153** 273:9
**155** 273:11
**158** 273:12
**15th** 94:15,23 210:12
210:13 224:9
259:21 260:3
**16** 57:2 104:20 126:2
126:5,9 202:11
273:3
**160** 273:13
**1601** 1:11
**161** 273:14
**162** 273:15
**163** 273:16
**164** 273:17
**165** 273:18
**168** 273:19
**16th** 93:17 104:17
137:25 198:7,22
**17** 106:14 130:15,18
273:4
**172** 273:20
**174** 273:21
**178** 166:23
**17th** 99:8,23 106:13
106:23 187:6,7,8
203:4
**18** 38:7 136:20
139:11,14 201:3
273:5
**1800** 54:6
**181** 273:22
**183** 273:23
**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** 9:11
**189** 273:24
**18th** 103:14
**19** 59:24 62:3 122:8
135:3 143:4,7 273:6
**19.72** 66:10
**19106** 2:17
**19110** 2:5
**193** 274:2
**194** 274:3
**195** 274:4
**196** 274:5
**19609** 9:21
**197** 274:7

**1989** 10:21
**19th** 94:4,6 197:15
**1F** 103:4 106:16
**1st** 90:19 91:2 140:8
163:15 167:20
244:11

_____

**2**

**2** 58:15,18 123:18
216:16 253:5
259:14,20,24
272:11
**2,000** 244:20
**2,767.9** 107:15
**2/1** 197:21
**2/4/20** 181:22 273:22
**2:45** 87:15 103:5
**20** 13:23 59:24 60:4
107:8 148:3,6
241:12 245:19
273:8
**200** 2:16 62:13
**2007** 11:12 36:14
37:24 38:5
**2007-2018** 38:20
**2011** 12:23 24:20
26:17
**2012** 26:17 31:15
34:5 36:14
**2013** 12:23 13:9
25:19 32:20 131:11
200:2
**2014** 34:5
**2015** 29:25
**2016** 13:24
**2017** 13:24 29:25
30:14 31:13,15
56:19 59:5 62:3
191:23 228:24
229:2,3
**2018** 19:4 29:25
30:25 39:9 41:18,25
53:7,17,24 56:3
62:7,16 69:18,25
77:3 79:6 82:16,24
92:2,2,3,10,17,19
92:22,24 93:3,17,21
94:4,10,14,15,21,23
95:2 103:14,14,25
104:3,4,9,18,20

105:3,5 107:7
109:18 110:2,18
114:12 118:13,16
119:19 121:20
122:9 130:12,23
131:2 132:5,20
135:3,15 137:18
138:5,8,11 139:23
139:24 143:20
144:13 199:24
200:4,6,10 242:5,10
242:13 272:22
274:13
**2019** 19:8 31:23,24
43:25 71:21 78:14
90:4,19,25 95:10,17
95:21,25 96:9 97:8
97:10 98:7,12
101:10 105:23
110:6 111:12,19
112:2 114:3 146:9
148:12 149:20
150:3 153:19
155:25 156:3
158:17 160:13,22
162:10 163:16
165:11 167:20
169:13,16 203:2
221:19 229:23
242:10,16 249:16
250:8 252:14 261:3
261:4 263:15
272:23
**2020** 19:8 40:5,12
64:25 65:4,8 99:8
99:23 100:5 106:8
106:13,14 112:18
173:12 174:23
175:11 181:11,16
181:20 182:12
183:9,21 186:24
187:6,8 189:22
193:21 195:24
197:15,18 202:9
203:5 206:21
211:23 214:24
218:15 220:12,20
221:5 225:10,17
226:9,15 230:23

242:10,18 246:3,6
252:15 264:4 266:7
**2021** 39:5,9 40:8,14
41:18,25 45:6,15
48:3 100:20 107:8
108:13 196:7 198:2
198:3 210:10
211:18 223:8 224:9
241:25 243:2,23
244:12,12 245:15
247:16 255:16
260:3 261:21 266:8
**2022** 1:13 275:15
276:3
**2023** 90:19 91:2
**203** 160:16,16
**204** 160:20
**206** 161:11
**209** 274:8
**21** 44:4 59:18 153:9
153:13 197:21
198:7 273:9
**21-02500** 1:3
**21,964** 253:10
**21.12** 66:18 108:14
**213** 274:9
**216** 9:20 141:21
**219** 274:10
**21st** 82:16 92:17,19
95:17 104:9 146:5,9
175:25 264:2
**22** 32:9 49:9 155:13
155:17 273:11
**222** 274:11
**223** 274:12
**228** 90:20
**22nd** 10:21 164:22,25
165:11 166:13
167:15 220:12,20
**23** 49:9 158:4,8
273:12
**23rd** 158:17 263:5
**24** 121:20 160:6,9
273:13
**242** 274:13,14
**243** 157:2,3
**244** 157:15,25 274:15
**24th** 119:19
**25** 161:24 162:4,14

273:14
**2500** 243:18
**251** 274:16,17,18
**258** 274:19
**25th** 90:18,25 260:24
 264:12,19
**26** 162:15,16 163:11
 251:5 273:15
 274:16
**27** 163:22,24 273:16
**270** 102:5
**27th** 95:20 132:20
**28** 164:15,17 174:23
 272:10 273:17
**282** 102:5
**28th** 175:18
**29** 165:14,17 273:18
**29,879.24** 242:18
**29601** 2:10
**29th** 169:13
**2E** 106:16
**2nd** 30:25 62:7,16
 69:18,25 77:3 92:2
 92:3 98:7 109:18
 140:9 191:23 196:7

---
**3**

**3** 61:13,16,17 133:4
 170:2,3 259:17
 272:12
**3/19/20** 193:12
**3/3/20** 125:25 273:3
**3/8/2019** 123:13
**30** 77:19 136:25
 168:24 169:3,8
 273:19
**31** 172:15,18 273:20
**31st** 100:22 253:9
**32** 174:10,13 273:21
**32,881.44** 242:14
**325** 2:16
**33** 181:23,25 273:22
**330** 132:25
**334** 134:7
**339** 134:22
**34** 183:17,19 273:23
**34,233.87** 242:16
**35** 189:12,14 273:24
**350** 144:22
**353** 90:21

**36** 193:13,17
**360** 176:8
**363** 174:23
**37** 193:24 274:2
**38** 194:14,16 224:5
 274:3
**39** 195:17,19 274:4
**390** 243:11,14,15
**391** 243:22
**3rd** 139:23 140:8
 161:14 162:10
 186:24 187:12
 202:8 218:14

---
**4**

**4** 64:2,6,12 74:7
 176:9 253:24 272:5
 272:13
**4/7/20** 194:13 274:3
**4/8/21** 209:24 274:8
**4:47** 271:11
**40** 197:3,23 274:5
**400** 59:12 62:13
 75:13
**401(k)** 66:22 67:11
 67:18
**41** 197:7,9 274:7
**42** 209:25 210:4
 274:8
**424** 213:22
**428** 217:23
**43** 213:12,15 274:9
**436** 213:23
**44** 220:2 274:10
**45** 222:22,25 274:11
**46** 223:12,16 274:12
**47** 242:6,8 274:13
**48** 151:12 152:18,19
 154:22,24 242:21
 242:24 274:14
**489.10** 243:6
**49** 244:3,6,9 274:15
**496** 91:3
**4th** 100:4 106:7,23
 182:11 189:25
 190:4

---
**5**

**5** 68:24 69:3 224:3
 228:2 241:2 272:15

**5/13/19** 164:14
 273:17
**5/21/19** 161:23
 273:14
**50** 60:18 251:6,16
 274:16
**500** 270:10
**51** 251:9 253:19
 274:17
**52** 251:12 257:19
 274:18
**53** 236:12 258:3,6
 274:19
**58** 272:11
**5th** 94:9 95:2,10 97:8
 143:23 169:16
 171:19 189:22

---
**6**

**6** 76:15,18 79:13
 256:16 272:16
**6/14/19** 163:21
 273:16
**6:45** 87:15 103:5
**60** 26:9 68:8
**608** 141:14
**61** 272:12
**63** 272:13
**67** 2:15
**677** 1:8 69:8
**68** 272:15
**6th** 171:15

---
**7**

**7** 52:4,4,5,5 78:19,22
 79:3 135:15 212:11
 212:11 236:11
 272:17
**7/6** 120:11
**7/9** 120:11,13
**700** 2:10
**76** 272:16
**78** 272:17
**7th** 19:4 92:2 110:17
 132:5 166:17 195:5
 244:12

---
**8**

**8** 1:13 82:6,9,14
 112:2,4 210:10

272:18
**8/22/19** 165:13
 273:18
**8/29/19** 168:23
 273:19
**8:30** 149:22 150:5
**82** 272:18
**8th** 92:10 96:15
 103:14 111:19
 137:17 149:20
 150:3 151:22 175:9
 175:11 241:25
 263:15 275:15
 276:3

---
**9**

**9** 91:5,9 137:24 187:3
 240:24 272:19
**9:10** 150:7
**9:20** 150:7
**9:30** 149:23
**90-day** 62:14
**91** 272:19
**9999** 100:22
**9A** 60:8
**9th** 98:14 105:22
 134:16 151:24

## Employment Application

Date of Application: Dec. 12, 2017

Name: John                    Colleen
      Last                    First



**EXHIBIT**

1

## Employment Application

**Personal**

Last Name: _John_    First Name: _Colleen_

Social Security No. _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_    Date of Application: _12/12/17_

Address: _1904 Van Read Rd Apt C4_

City: _Wyomissing_    State: _PA_    Zip / postal code: _19610_

Home phone: _n/a_    Work phone: _n/a_

Mobile phone: _610-858-0522_    Email address: _cbarab8@gmail.com_

Have you ever filled out an application for Mack Trucks before?    ☐ Yes    ☒ No

If Yes, give most recent date and position _n/a_

Have you ever been employed by Mack before?    ☐ Yes    ☒ No

If Yes, give most recent date and position _n/a_

Are you employed now?    ☐ Yes    ☒ No    If so, may we contact your present employer    ☐ Yes    ☒ No

Are you over the age of 18 years old? (If no, you will be required to provide authorization to work)    ☒ Yes    ☐ No

Are you legally eligible for employment in the United States    ☒ Yes    ☐ No

(Proof of identity and eligibility will be required)

**Employment Preference**

Position Applying for: _Production or "pack runner"_

Type of employment:    ☒ Full Time    ☐ Part Time    ☐ Shift Work    ☐ Temporary    ☐ Co-op    ☐ Intern

On what date you would be available for work? _12/12/17_

Are you on lay-off and subject to recall?    ☐ Yes    ☒ No

Can you travel if the job requires it?    ☒ Yes    ☐ No

Have you been convicted of a felony within the last 7 years?    ☐ Yes    ☒ No
(Conviction will not necessarily disqualify applicant from employment)

If Yes, explain: _n/a_

1

JA000311

2007

## Education

High School: _Gov. Mifflin_____ Address(City & State): _Shillington, PA_

Phone number: _____ Did you graduate? ☑ Yes ☐ No ☐ GED

College/ University (Most Recent): _____ Phone number: _____

Address (City and State): _____ GPA: _____

Did you graduate: ☐ Yes ☐ No ☐ Current Student  Type of Degree: _____

Degree received date: ___/___/___  Major and Minor: _____

Graduate School (or additional colleges): _____ Phone number: _____

Address (City & State): _____ GPA: _____

Did you graduate? : ☐ Yes ☐ No ☐ Current Student

Type of Degree: _____ Degree received date: ___/___/___

Major and Minor: _____

Business, Vocational or Junior College _____ Phone number: _____

Address (City and State): _____ GPA: _____

Did you graduate: ☐ Yes ☐ No ☐ Current Student

Type of Degree: _____ Degree received date: ___/___/___

Major and Minor: _____

## Special Skills & Qualifications:

Summarize or describe special skills, qualifications or certificates not otherwise listed in this application (E.g., Mechanical Aptitude, CDL, Welding, Spray Painting, Sheet Metal Finishing etc.)

_Mechanical, heat transfer, Clams_

_____

_____

## Language Proficiency

Indicate languages you speak, read and/or write

|       | Fluent  | Good | Fair |
|-------|---------|------|------|
| Speak | english |      |      |
| Read  | english |      |      |
| Write | english |      |      |

2

MACK0012

## Employment History

List work experience in chronological order (most recent position first)

Employer Name: _Petsmart_   Telephone with Area Code: _____

Address (City and State): _Wyomissing PA_

Date of Employment - Start Date: _01/15_   End Date (leave blank if still employed): _06/17_

Beginning Salary: _$8.50_   Ending Salary: _$8.50_   Bonus Earned: _n/a_

Position Held / Job Title: _Pet Care_   Description of Duties: _caring for such_
_& sick animals, customer service_

Reason for Leaving: _bad child_

Is this a current employer?   ☐ Yes   ☒ No

Do we have permission to contact this employer?   ☒ Yes   ☐ No

### Employment Experience #2

Employer Name: _Elite Sportswear_   Telephone with Area Code: _____

Address (City and State): _Reading PA_

Date of Employment - Start Date: _____   End Date (leave blank if still employed): _____

Beginning Salary: _$8.00_   Ending Salary: _$8.00_   Bonus Earned: _n/a_

Position Held / Job Title: _line leader_   Description of Duties: _iron, heat transfer,_
_handing out & checking work in giving_

Reason for Leaving: _not friendly wanted job closer for advancing_

Is this a current employer?   ☐ Yes   ☒ No

Do we have permission to contact this employer?   ☒ Yes   ☐ No

### Employment Experience #3

Employer Name: _VDR_   Telephone with Area Code: _____

Address (City and State): _Sinking Springs PA_

Date of Employment - Start Date: _____   End Date (leave blank if still employed): _____

Beginning Salary: _$10_   Ending Salary: _$11_   Bonus Earned: _n/a_

Position Held / Job Title: _Supervisor_   Description of Duties: _Supplements_
_appointments for customers, clients_

Reason for Leaving: _temporary_

Is this a current employer?   ☐ Yes   ☒ No

Do we have permission to contact this employer?   ☒ Yes   ☐ No

8

Behm v. Mack Trucks, et al.                    MACK0013

## Employment History

List work experience in chronological order (most recent position first)

Employer Name: _CINOS_ _____ Telephone with Area Code: _____

Address (City and State): _Wyomissing, PA_ _____

Date of Employment – Start Date: _10/07_ _____ End Date (leave blank if still employed): _06/12_

Beginning Salary: _$2.43_ _____ Ending Salary: _$2.43_ _____ Bonus Earned: _n/a_ _____

Position Held / Job Title: _Waitress_ _____ Description of Duties: _handling food_

_Customer service, hostess_

Reason for Leaving: _Moved_ _____

Is this a current employer?     ☐ Yes  ☐ No

Do we have permission to contact this employer?     ☐ Yes  ☐ No

Employment Experience #2

Employer Name: _____ Telephone with Area Code: _____

Address (City and State): _____

Date of Employment – Start Date: _____ End Date (leave blank if still employed): _____

Beginning Salary: _____ Ending Salary: _____ Bonus Earned: _____

Position Held / Job Title: _____ Description of Duties: _____

Reason for Leaving: _____

Is this a current employer?     ☐ Yes  ☐ No

Do we have permission to contact this employer?     ☐ Yes  ☐ No

Employment Experience #3

Employer Name: _____ Telephone with Area Code: _____

Address (City and State): _____

Date of Employment – Start Date: _____ End Date (leave blank if still employed): _____

Beginning Salary: _____ Ending Salary: _____ Bonus Earned: _____

Position Held / Job Title: _____ Description of Duties: _____

Reason for Leaving: _____

Is this a current employer?     ☐ Yes  ☐ No

Do we have permission to contact this employer?     ☐ Yes  ☐ No

8

References

List below three professional references:

Reference #1

First Name: Robert                    Last Name: Behm

Address: 127 W. Wiener Rd.            Phone number: 610-926-3842

Business: MACK                        Years Acquainted: 3

How do you know this person? boyfriends father

Reference #2

First Name: Heather                   Last Name: Ransom

Address: 1334 West Wyomissing Blvd    Phone number: 484-219-6230

Business: BCBS                        Years Acquainted: 17

How do you know this person? High school

Reference #3

First Name: Brittany                  Last Name: Smeer

Address: 8 N. Los Robles Ct           Phone number: 610-463-8509

Business: Elite                       Years Acquainted: 4

How do you know this person? Elite

4

Behm v. Mack Trucks, et al.                          MACK0015

I certify that the information on this application is true and complete. Mack Trucks, Inc has my permission to discuss, for employment purposes, the contents of this application with anyone except as follows:

_____

(Specify organizations or persons not to be contacted)

I understand that passing a pre-placement medical evaluation, including drug screening, by a company physician is required as a pre-condition of employment.

I understand and agree that any misrepresentation or deliberate omission of fact on my application will be justification for refusal to employ me or for termination of my employment by Mack Trucks, Inc. I further understand that the information is subject to verification by Mack Trucks, Inc. and I authorize any of the persons or organizations referenced in this application to give you any and all information they might have, personal or otherwise, with regard to any of the subjects covered by this application and release all such parties from liability for any damages that may result from furnishing such information. I authorize you to request and receive such information.

In consideration for my employment and my being considered for employment by Mack Trucks, Inc. I agree to conform to the rules, regulations and policies of Mack Trucks, Inc and acknowledge that these rule, regulations and policies may be changed interpreted withdrawn or added to by Mack Trucks, Inc. at any time with or without prior notice to me.

I further acknowledge that my employment may be terminated, any offer of employment, or any acceptance of any such offer, if such is to occur, may be withdrawn, with or without cause, and with or without prior notice, at any time, at the option of either Mack Trucks, Inc. or myself. I understand that no representatives of Mack Trucks, Inc. have an authority to enter into any agreement for any specified period of time or to assure any other personnel action, either prior to commencement of my employment or after I have become employed or to assure any benefits or terms and conditions of employment, or make any agreement contrary to the foregoing, except as set forth in writing by the Board of Directors of Mack Trucks, Inc.

| | 12/12/17 |
|---|---|
| Applicants signature | Date |



5



# Colleen S. John

1804 Van Reed Road Apartment G4 Wyomissing, PA 19610  |  610-587-0522  |  osarab89@gmail.com

## Professional Summary

I am very much interested in joining your team and applying my creativity, listening skills, courage, and my ability to inspire to an impressive company.

## Core Qualifications

- Quick Learner
- Client Focused
- Computer Proficient
- Multi-task Management
- Creative Problem Solving
- Customer/Client Satisfaction

## Work History

01/2015-08/2018    Pet Care Specialist at PetSmart-Wyomissing, PA

- Responsible for caring for all animals
- Assisted in treatment of well and sick pets
- Developed strong trustworthy relationships with customers
- Wrote, negotiated, and finalized sales contracts
- Prepared merchandise for sales floor

09/2012-11/2014    Lead at Elite Sportswear-Reading, PA

- Responsible for achieving production requirements
- Oversaw the production process and managed the production schedule
- Prepared and maintained production reports and personnel records
- Looked over other employees and assignments

08/2011-08/2012    Office Manager at Property Damage Appraisers-Sinking Springs, PA

- Oversaw daily office operations for staff of 10-12 employees
- Worked directly with insurance claims, adjusters, and appraisers to achieve the upmost satisfaction
- Researched and updated all required materials needed for firm and partners
- Analyzed department documents for appropriate distribution and filing

# Colleen S. John

1904 Van Read Road Apartment G4 Wyomissing, PA 19610   |   610-587-0522   |   csarab89@gmail.com

## Education

- American Academy McAllister Institute- Funeral Services
- Berks Technical Institute- Criminal Justice
- Berks Career and Technology Center- Cosmetology



**EXHIBIT**

2

# MACK

### Macungie Shop HBU
### Interview Guide

Candidate Name: Colleen John          Date: 12/12/19

1. What attracted you to Mack Trucks?
   Heard it was a very clean working enviorment and a great company.

2. Walk us through your resume. Tell us about the most important experiences you've had that will highlight your fit for the Production Tech position?
   I worked in a very fast pace production factory with deadlines that needed to be met.

**Job Specific Questions:**

3. Please tell me about your experience and comfort level using mechanical hand tools (Identify tools used and specific purpose)
   very comfortable, I have used heavy duty machinery that needs 1,000% of your attention to avoid injury.

4. Please tell me about your experiences and comfort level operating a forklift? How many years? What types of forklift equipment have you been trained on?
   I'm very comfortable, we used a class ??

**Quality Questions:**

5. What jobs have required you to work at a fast pace and still maintain quality standards?
   a. What is priority Quality or Quantity?
   Quality is absolute importance

6. Has there been a time where you have seen somebody on site doing something unsafe? What did you do about it?
   Confront a supervisor to prevent harm to themselves and other employers

1



**Judgment and Decision Making:**

7. What kinds of pressures do you feel in your job? Tell me about them and explain how do you deal with them? *When someone leaves a mess, I clean what I can to do my job properly*

**Job Motivation**

8. What about your job most inspires you? *The finished product*

**Attendance:**

9. (a.) If you were a Manager at Mack Trucks what would you expect from your employees in terms of attendance? *100%*

   (b.) How many days off would you allow one of your employees during a 90 day probationary period? *none*

**Other**

10. This position involves standing; walking; stooping; kneeling, crouch or crawl. Employee must be able to lift and/or move objects up to 10 pounds and occasionally up to 50 pounds. Are there any barriers to meeting these requirements? *no barriers*

11. Do you have limitation in regards to:
    Working specific shifts?
    Working overtime daily including weekends? *no limitations*

12. Are there questions about this Company or this opportunity that we can answer for you? *Health insurance*

2

**MACK.**

Interviewer's Evaluation of Applicant

| Skill Description | Exceeds Requirements | Meets Requirements | Below Requirements |
|---|---|---|---|
| Specific Job Knowledge: | | ✓ | |
| Quality Assurance: | | ✓ | |
| Judgment and Decision Making: | | ✓ | |
| Communication: | | ✓ | |
| Attendance: | | ✓ | |

Recommendation:

Recommend for Hire: _____✓_____     Not a Match: _____     No Decision Yet: _____

Provide your overall opinion of the applicant and make additional comments on any of the above areas.

Carmen M. Rivera                                    12|13|17

Interview Signature:              Title:                          Date:

3





Date: 12/19/17

*Via Hand Delivery*

Name: Colleen John

Dear Successful Candidate:

Congratulations! You have successfully completed our application and evaluation process. We are pleased to offer you a position as an hourly bargaining unit worker in our Macungie Cab and Vehicle Assembly contingent upon your passing of a drug screen. As a new hourly bargaining unit employee, your hourly wage rate and benefits will progress in accordance with the applicable collective bargaining agreement. Your exact position and wage will be communicated to you upon your acceptance and successful completion of the drug screen. In the event a position is not immediately available, you will be placed into our hiring pool of qualified candidates and contacted when a position becomes available. As required by law, your employment with Mack Truck's Inc. is also contingent upon your providing legal proof of your identity and authorization to work in the United States.

We look forward to having you join our team!

Mack Trucks, Inc.

_____
Candidate's Signature

Colleen John
Candidate's Printed Name

New Hire Orientation Start Date

✓  Tuesday, January 2, 2018

Mack Trucks, Inc. – Macungie Cab & Vehicle Assembly – 7000 Alburtis Road – Macungie, PA 18062

JA000322



**EXHIBIT**
4

# Production Tech

**Classification**
nonexempt

**Salary Grade/Level/Family/Range**
$26.78

**Reports to**

**Date**

## JOB DESCRIPTION

**Summary/Objective**
Operates mobile transport of equipment such as lift truck, hi-stacker, etc. in the movement of materials throughout the plant. Must satisfy company standards and requirements for operation of equipment. Place incoming production parts into proper bins and bulk floor storage locations to satisfy assembly requirements.

Also may include clerical type work functions associated with shop record keeping, Utilize working skills in the operation of data entry terminals and CRT's, computers, and other varied office equipment.

Safe loading and unloading of trailers from dock areas, back trailers safety into tight areas.

**Essential Functions**
Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

1. The ability to use a variety of mechanical hand tools, including air driven and torqueing tools
2. The ability to understand and carry out verbal and written instructions.
3. The Ability to use personal computers for diagnostic testing.
4. The ability to assemble/attach vehicle components or other sub-assembled parts without direct visualization.
5. The ability to read blueprints
6. The ability to use inspection tools.
7. The ability to effectively listen, responds, and communicates with supervisors and co-workers.

JA000323

Competencies
1. Communication Proficiency.
2. Organizational Skills.
3. Mathematical Skills.
4. Technical Capacity.
5. Thoroughness.
6. Time Management.

Work Environment
As a Production Technician you will be responsible for working on our assembly lines in the production of heavy-duty trucks. Positions require use of air and hand tools, torque equipment, reading of blueprints, truck specification sheets, and job instructions, as well as working as part of a team in the production of our vehicles.

Physical Demands
The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.

While performing the duties of this job, the employee is regularly required to use hands to finger, handle or feel; reach with hands and arms; and talk or hear. The employee frequently is required to stand; walk; and stoop, kneel, crouch or crawl. The employee is occasionally required to sit and climb or balance. The employee must regularly lift and/or move objects up to 10 pounds, frequently lift and/or move objects up to 50 pounds, and occasionally lift and/or move objects that weigh more than 100 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception and ability to adjust focus.

| FUNCTIONS | PERCENT OF TIME |
|---|---|
| Lift/reach floor to waist, waist to shoulder, shoulder height or higher | Constant<br>(67-100% of workday) |
| Use of vibratory tools | Frequently<br>(34-66% of workday) |
| Stand, Walk | Constant<br>(67%-100% of work day) |
| Stooping/Squatting | Occasional<br>(6%-33% of workday) |
| Bending/Twisting | Frequently<br>(34%-66% of workday) |
| Climbing | Frequently<br>(34%-66% of workday) |
| Bilateral grip/grasp/push/pull | Frequently<br>(34%-66% of workday) |
| Lifting/Carrying Medium Level(50 # max.; frequently up to 20#; constant 10# | Frequently<br>(34%-66% of workday) |

MACK0002

JA000324

☐   I am able to perform all the essential function of this position without accommodation.

☐   I may need an accommodation to perform one or more of the essential functions of this position. (Place a check mark beside one or more of the essential functions that you are unable to perform.

Signature:                                              Date:

MACK0003

JA000325

APPLICATION FOR MEMBERSHIP – UAW LOCAL 677 MACK UNIT

INTERNATION UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW)
DETROIT, MICHIGAN 48214

Name _Colleen Sara John_ DOB _05/22/89_ SS# ▬▬▬-4810 SAP# _450939_

Email _CSarab89 @gmail.com_ Phone ____ Cell _610-587-0522_

Address _1904 Van Reed Rd Apt G4_ City _Wyomissing_ State _PA_ Zip _19610_

Prior Union Affiliation: Name ____ Local Number ____

I herby designate, select an empower the International Union, United Automobile, Aerospace and Agricultural Implement Workers of American (UAW), it's agents or representatives, to act for me as my exclusive representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of my employment, and I hereby revoke every selection of designation which in any manner may heretofore have been made by me, or any other representative for any of such purposes.

   's my honor, while a UAW member, to faithfully observe the Constitution and laws of the Union and the Constitution of the United States (or the Dominion of Canada as the case my be); to comply with all the rules and regulations for the government thereof; not to divulge or make known any private proceedings of this Union; to faithfully perform all the duties assigned to me to the best of my ability and skill, to so conduct myself at all times as not to bring reproach up on my Union, and at all times to bear true and faithful allegiance to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW).

CONTRIBUTIONS OR GIFTS TO THE UAW ARE NOT DEDUCTIBLE AS CHARITABLE CONTRIUBTIONS FOR FEDERAL INCOME TAX PURPOSES.

Applicants Signature ____

Witness ____

Date _01/02/18_

~ UAW877 TD ~
01/2018



**EXHIBIT**

_5_

UAW – 000009

JA000326

/15/2021

‑ Member information ‑
UAW LOCAL 677

Personal

SS # ▓▓▓-4810             CLOCK : 450939             UAW ID : 03571237

Last Name : Behm             First Name Colleen             Middle :

Phone : (610)587-0522             Address : 216 Halsey Ave,

Birth Date : 05/22/1989             Address :

County : Berks             City : Reading             ST : PA

Marital Status             ZIP Code : 19609

Sex : FEMALE             No Label : false

Cell Phone : (610)587-0522             E-Mail : csarab89@gmail.com

T-shirt size :             Last4SSN : 4810

Job

Medical Coverage             Seniority Date 01/02/2018

Department :             Retire Date :

Shift : 1             Skill Level

Status : Inactive             Unit : Mack Truck

Classification : Macungie             Initiation Date

Committees :

Member Notes

✓as listed as Colleen John
Voluntary quit

UAW - 000010

JA000327

Member DUES Information

10/15/2021                                UAW LOCAL 677

Member Information

| SS #: ████-4810 | CLOCK: 450939 | UNIT: Mack Truck |
|---|---|---|

Last Name: Behm          First Name: Colleen          Middle:

Address:    216 Halsey Ave. Reading, PA 19609

Dues Record Information

Year: 2018                     Type of Dues: Regular Dues          UNIT:          Mack Truck

| Month | Dues | Refund |
|---|---|---|
| Jan | 0.00 | 0.00 |
| Feb | 49.55 | 0.00 |
| Mar | 69.55 | 0.00 |
| Apr | 49.55 | 0.00 |
| May | 49.55 | 0.00 |
| Jun | 49.55 | 0.00 |
| Jul | 49.55 | 0.00 |
|  | 49.55 | 0.00 |
| Sep | 49.55 | 0.00 |
| Oct | 0.00 | 0.00 |
| Nov | 0.00 | 0.00 |
| Dec | 0.00 | 0.00 |
| TOTAL | 416.40 | 0.00 |

UAW - 000011

Member DUES Information

10/15/2021                                    UAW LOCAL 677

Member Information

SS #: ████-4810              CLOCK:        450939              UNIT:        Mack Truck

Last Name: Behm             First Name:   Colleen             Middle:

Address:    216 Halsey Ave. Reading, PA 19609

Dues Record Information

Year: 2019                 Type of Dues: Regular Dues         UNIT:        Mack Truck

| Month | Dues | Refund |
|-------|------|--------|
| Jan | 50.53 | 0.00 |
| Feb | 50.53 | 0.00 |
| Mar | 50.53 | 0.00 |
| Apr | 50.53 | 0.00 |
| May | 50.53 | 0.00 |
| Jun | 51.25 | 0.00 |
| Jul | 0.00 | 0.00 |
|  | 51.25 | 0.00 |
| Sep | 51.25 | 0.00 |
| Oct | 51.25 | 0.00 |
| Nov | 51.25 | 0.00 |
| Dec | 103.55 | 0.00 |
| TOTAL | 612.45 | 0.00 |

UAW - 000012

JA000329

Member DUES Information

UAW LOCAL 677

10/15/2021

Member Information

SS #: ████-4810          CLOCK:      450939          UNIT:      Mack Truck

Last Name: Behm          First Name:    Colleen          Middle:

Address:    216 Halsey Ave. Reading, PA 19609

Dues Record Information

Year:  2020                    Type of Dues:  Regular Dues          UNIT:      Mack Truck

| Month | Dues | Refund |
|---|---|---|
| Jan | 52.80 | 0.00 |
| Feb | 52.80 | 0.00 |
| Mar | 50.95 | 0.00 |
| Apr | 20.38 | 0.00 |
| May | 37.69 | 0.00 |
| Jun | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 |
|  | 50.95 | 0.00 |
| Sep | 0.00 | 0.00 |
| Oct | 0.00 | 0.00 |
| Nov | 0.00 | 0.00 |
| Dec | 0.00 | 0.00 |
| TOTAL | 265.57 | 0.00 |

UAW - 000013

JA000330

Member DUES Information

10/15/2021                                         UAW LOCAL 677

~~Member Information~~

| SS #: ████4810 | CLOCK: | 450939 | UNIT: | Mack Truck |
|---|---|---|---|---|

| Last Name: Behm | First Name: | Colleen | Middle: |
|---|---|---|---|

Address:     216 Halsey Ave. Reading, PA 19609

Dues Record Information

Year:  2021                        Type of Dues:  Regular Dues          UNIT:      Mack Truck

| Month | Dues | Refund |
|---|---|---|
| Jan | 51.48 | 0.00 |
| Feb | 0.00 | 0.00 |
| Mar | 51.48 | 0.00 |
| Apr | 0.00 | 0.00 |
| May | 1.76 | 0.00 |
| Jun | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 |
|  | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 |
| Oct | 0.00 | 0.00 |
| Nov | 0.00 | 0.00 |
| Dec | 0.00 | 0.00 |
| TOTAL | 104.72 | 0.00 |

UAW - 000014

JA000331



### Acknowledgement of Receipt and Understanding of Company Policies

I acknowledge that I have received copies of the Company Policies enumerated on this document on the date listed below. I further acknowledge that I have read, understand and will comply with the principles, guidelines and procedures set forth in each policy.

1) The Company Rules of Conduct
2) The Company Substance Abuse Policy
3) The Company Workplace Violence Policy
4) The Company Harassment Policy
5) The Company Attendance Policy

Additionally, I will sign the two (2) copies of this document, retain one for myself, and return one copy to the Company. I understand that this document will be retained in my personnel file.

_____
Signature

Colleen S. John
Print Name

01/02/18
Date



EXHIBIT
6

Behm v. Mack Trucks, et al.

MACK0007

JA000332



**Volvo Human Resources**

United States Policies & Procedures

| HR Center of Expertise: | Employee & Labor Relations | ORIGINAL ISSUE: 1/1/2006 |
|---|---|---|
| SUBJECT: | Harassment | REVIEWED: |
| POLICY #: | WP-03 | REVISED: 12/9/2013 |

**PURPOSE**   To promote a common understanding and application of guidelines for prevention of harassment, and to establish guidelines for handling such concerns.

**SCOPE**   This policy applies to non-employees on Company premises and all business associates and employees of the Company at all locations within the United States. The term "Company" shall refer to all U.S. Divisions/Business Areas.

**POLICY**

The Company is committed to providing a work environment that is free from harassment at all locations. In support of this commitment and with the goal of fostering mutual respect among all employees, and other business associates, we offer these guidelines for conducting our business in a manner that allows each employee and business associate to be productive without the presence or threat of intimidation or harassment. Accordingly, harassment of any employee or business associate, by any individual because of the employee's race, color, sex, gender, creed, religion, national origin, age, affectional or sexual orientation, gender identity or expression, marital status, disability, veteran status, citizenship status, genetic information or for any other reason, will not be tolerated on the job, on Company property, or at any Company-sponsored activity.  Therefore, the Company expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice or harassment.

*Definitions*

Harassment is defined as any unwelcome or unsolicited verbal, non-verbal, physical, or sexual conduct that:

- is made a term or condition of employment;
- is used as the basis for employment decisions; or
- creates an intimidating, hostile, or offensive working environment.

*Verbal Harassment:*

Any comment of an intimidating, aggressive, or intentionally offensive nature directed towards an employee's race, color, sex, gender, creed, religion, national origin, age, affectional or sexual orientation, gender identity or expression, marital status, disability, veteran status, citizenship status, genetic information or for any other reason.  Examples of this form of harassment include remarks or offensive jokes that degrade and offend individuals.

*Non-Verbal Harassment:*

Any written, printed, published, posted, tangible or intangible record such as e-mail and inter- and intranet content of an intimidating, aggressive, or derogatory nature slanted towards an employee or associate of the Company regarding his/her race, color, sex, gender, creed, religion,

Behm v. Mack Trucks, et al.                                                    MACK0370

JA000333

## Volvo Human Resources

national origin, age, affectional or sexual orientation, gender identity or expression, marital status, disability, veteran status, citizenship status, genetic information or for any other reason. Examples of this form of harassment include the distribution or display of cartoons, nude calendars, or other materials that are racist or sexually explicit in nature.

*Physical Harassment:*
Physical contact or gestures of an aggressive nature which create an intimidating, hostile, or offensive working environment.  Examples of this form of harassment include inappropriate touching, hitting, pushing, or other unwelcome and/or aggressive physical contact or threats to take such actions.

*Sexual Harassment:*
Sexual harassment is defined as any unwelcome or unsolicited sexual advances, demands for sexual favors, or other verbal, non-verbal, or physical conduct such as uninvited touching of a sexual nature or sexually related comments, innuendoes, sexually suggestive comments, jokes of a sexual nature, sexual propositions, commentaries of a sexually graphic nature, or threats of a sexual nature, when:

- Submission to such conduct is an explicit or implicit condition of employment;
- Submission to or rejection of such conduct is used as the basis for employment decisions; or
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Examples of prohibited sexual conduct may include the following:
- **Verbal:** Unwelcome sexual advances, propositions or flirtation; offers of employment benefits in exchange for sexual favors; threatened or actual reprisals after a negative response to sexual advances; sexually explicit or graphic verbal comments about an individual's body, or sexually degrading words used to describe an individual.
- **Non-Verbal:** Leering or obscene gestures; display in the workplace of sexually suggestive objects, pictures or cartoons; making of suggestive or insulting sounds, writing of suggestive or obscene notes or letters.
- **Physical:** Unwanted physical contact including suggestive and offensive patting, pinching, or brushing against another.

*Retaliation is Prohibited*
The Company prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such allegations. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will subject the retaliating party to disciplinary action.

*Printed copies are uncontrolled and may not be the most current version of the document*
Behm v. Mack Trucks, et al.                                         MACK0371

JA000334

**Volvo Human Resources**

United States Policies & Procedures

Procedure for Reporting Harassment

*Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. An employee's failure to satisfy this obligation could affect his or her legal rights in pursuing subsequent legal action.*

Any employee or business associate who feels he/she has been harassed should immediately report such incident to his/her Human Resources Business Partner at the facility at which they are employed or to another senior manager/executive within the Company before the conduct becomes more severe and pervasive.

Employees should not feel hesitant or embarrassed about reporting harassment. The Company is dedicated to making sure that the work place is productive and free from harassing conduct. The Company can only achieve this goal if employees report and cooperate in the investigation of all possible violations of this policy.

Complaints may be made in writing or in person. In either case, the employee must be able to provide the name of the alleged offender(s); the date, location, and nature of the alleged violation, and the identity of any witnesses to the alleged violation.

The complaint file will be treated as highly private and confidential.

*Procedure for Supervisors/Managers*
Any member of management who receives a complaint of harassment should immediately contact Human Resources, who will then assume responsibility for handling the complaint. However, should a Human Resources representative not be available, or should the employee insist on an immediate discussion with the manager, the following procedure should be followed:

1. Listen carefully to the employee or third party making the complaint. Keep in mind it is not your role to judge whether the complaint is valid.
2. Ask the person making the complaint to document in writing and in their own words the incident and sign the document.
3. Assure the person making the complaint that the alleged incident will be reported immediately to the Human Resources Department and that the complaint will be handled in a timely and confidential manner.
4. Immediately report the incident to the Human Resources Department and turn over the documentation of the incident to Human Resources.
5. If violence is reported or threatened, report to security and/or contact appropriate authorities.
6. Maintain the confidentiality of the incident.
7. Cooperate and assist in any investigation as requested/directed by Human Resources and/or authorities.

3-5
*Printed copies are uncontrolled and may not be the most current version of the document*

MACK0372

JA000335

## Volvo Human Resources

*Investigations of Alleged Harassment*

*Validity of Allegations:*
The Company recognizes that whether a particular action or incident is harassment can only be determined upon a review of the facts of the incident. Therefore, it is the Company's policy to investigate all harassment complaints promptly and thoroughly. To the fullest extent practicable, the Company will maintain the confidentiality of those involved. The Company will try to limit access to confidential information relating to the charge and investigation to those employees with a "need to know".

*Good-Faith Allegations:*
No retaliatory measures will be tolerated against any employee or business associate who makes a complaint of harassment in good faith. Nor will the Company release to a third party, or anyone within the Company who is not involved with the investigation, the content of such complaints or investigations. The purpose of this provision is to protect the confidentiality of the report, to encourage employees to report behavior believed to be harassment, and to protect the reputation of any employee or business associate who may be wrongfully accused of harassment.

*False Allegations:*
The Company recognizes that false accusations of harassment can have a serious effect on innocent individuals. After an investigation is conducted, if the Company determines that an allegation has not been made in good faith, it will take appropriate action against the party proceeding in bad faith, including discipline up to and including termination of employment.

*Employee Appeal*
If the employee is not satisfied with the resolution of the initial complaint, the employee may appeal the resolution of the complaint to any other impartial senior executive official within the Company.

*Discipline*
If an investigation confirms that harassment has occurred, the Company will take corrective action. Corrective action may include discipline up to and including immediate termination of employment.

Additionally, any retaliation against the employee filing the charge (other than any discipline imposed for filing a charge in bad faith) will be considered a violation of this policy and appropriate corrective action will be taken against the offending party.

Behm v. Mack Trucks, et al.                                              MACK0373

JA000336

**Volvo Human Resources**

United States Policies & Procedures

NOTES:
1) This policy does not confer any contractual right, either express or implied, to remain in the Company's employ. Nor does it guarantee any fixed terms and conditions of your employment.

2) Although the term "Company" is used collectively for purposes of this policy, as defined in the scope, the employee's employment relationship remains exclusively with their Division/Business Area.

3) The provisions of this policy may be revised without prior notice. Revised policies will be posted as quickly as is practicable.

4) Any statement, whether written or oral, that conflicts with anything contained in this policy is not the policy of the Company and is not binding upon the Company.

*Printed copies are uncontrolled and may not be the most current version of the document*

Behm v. Mack Trucks, et al.

MACK0374

JA000337





| | |
|---|---|
| **Issuer:** Human Resources | **Policy:** Attendance |
| **Policy #:** LVO-2018-01 | **Effective Date:** May 21, 2018 |

**Purpose:**

The Company expects and depends upon regular and punctual attendance of its employees and for employees to work through the duration of their scheduled shift. Regular and predictable attendance by each employee is essential to the successful operation of the business. Absenteeism adversely affects employee morale, quality, costs and ultimately the product and our customers.

The Company does understand that occasionally employees may be required to miss work, be tardy or leave work early for valid reasons. In order to balance these interests, the Company has established the following occurrence-based Attendance Policy. The guidelines for the Policy are simple: an employee is either at work or not at work; an employee is either on time or not on time, and an employee either leaves early or does not leave early.

**Scope:**

This Policy will apply to all Macungie Shop Bargaining Unit employees who have acquired seniority pursuant to Article 6 of the 2016 Master Agreement.

**Call-Off Procedure:**

If an employee expects to be absent for their scheduled shift the employee is required to call into the designated call-off line (610-966-8873) as soon as practicable, but in no event later than one (1) hour prior to the employee's scheduled shift start time. If an employee cannot report to work punctually, and is going to be 30 minutes or more late for their scheduled shift ,the employee is required to call into the designated call-off line as soon as possible, but in no event later than the employees scheduled shift start time. The designated call-off line will be the only acceptable method of calling off. Messages left with a co-worker or Supervisor will not be accepted as a valid call-off under this Policy. When calling off, you will need to provide your first and last name, SAP number, work area and shift. Further, employees are required to call into the call-off line for each day they are absent unless the employee is on a Company-approved leave of absence. Failure to comply with this call-off procedure will result in the accumulation of a quarter (0.25) point, which will be assessed in addition to the points associated with the absence or tardy. The purpose of this procedure is to provide the Company with adequate time to develop an operating plan in reaction to the employees absence or tardy.

1

JA000338



**Definitions:**

Absence: An absence is defined as a failure to report to work for a scheduled shift.

Tardy: A tardy is defined as having clocked in one (1) minute or more after an employee's scheduled start time.

Early Quit: An early quit is defined as leaving work early with notification to the employee's supervisor, prior to the end of the employee's scheduled shift. An employee who leaves work early without notifying his/her supervisor may be subject to disciplinary action under the Mack Trucks Rules of Conduct in addition to the points associated with the occurrence.

**Exceptions:**

Absences, tardies and early quits that are scheduled and approved by an  appropriate member of Management within the employees Department do not fall within the scope of the Attendance Policy. In order to be approved, the planned time-off must be requested at least one (1) business day in advance. For example: An employee desiring to be off from work on a Friday must make his/her request no later than the end of the employee's scheduled shift on the preceding Thursday. However, a timely request for approved time-off does not guarantee that the request will be approved. Requests for time-off should be made as far in advance as possible. Furthermore, all legal and contractual absences including, but not limited to, vacations, holidays, union business leave, military leave, jury duty, bereavement leave, FMLA, disability leave, A&S, workers compensation leave, etc. are NOT subject to the Attendance Policy.

Please note, in accordance with the Company's FMLA and disability accommodation policies, employees who are absent, tardy, or who must leave work early (early quit) as a result of an approved FMLA leave or disability accommodation, will not receive occurrences so long as they comply with the notification procedures set forth  herein, and with  the approval process for such absences.

Behm v. Mack Trucks, et al.                                                                              MACK0376

JA000339



**Points:**

Points will be assessed based on the criteria outlined below:

| Occurrence | Points |
|---|---|
| Tardy < 2 Hrs | 0.5 |
| Early Quit < 2 Hrs | 0.5 |
| Tardy - 2 Hrs or more | 1 |
| Early Quit - 2 Hrs or more | 1 |
| Absence (Full-day) | 1 |

Employees who are absent, tardy or leave early (early quit) as a result of a medical condition, injury or illness may submit documentation from a medical provider, specifying the reason for the absence and the date(s) and/or time(s) on which the employee was unable to work. Such medical documentation may only be presented to the Human Resources Department. Upon review of the information provided, if the absence, tardiness, or early departure (early quit) is deemed to be covered by FMLA and/or the result of a reasonable accommodation provided to the employee, it shall not count as an occurrence and may be excused as provided in the "Exceptions" section above.

If you are out multiple days and you have doctor's note covering the days out, the employee will only receive one (1) point for the entire absence. If no doctor's note is provided a point will be initiated for each day out.

3

JA000340



**Corrective Action:**

The steps of corrective action for accumulation of points are as follows: ALTHOUGH THESE STEPS ARE INTENDED TO BE USED PROGRESSIVELY, ANY ONE OF THEM MAY BE SKIPPED AS CIRCUMSTANCES WARRANT WHEN AN EMPLOYEE IS ACCUMLATING POINTS.

| Progressive Level | Points Accumulated | Corrective Action |
|---|---|---|
| Step 1 | 5 | Informal documented discussion |
| Step 2 | 6 | Formal documented  discussion |
| Step 3 | 7 | 1-day unpaid suspension |
| Step 4 | 8 | Discharge |

Accumulated points will expire after aging for one (1) year and, therefore, will not be taken into consideration for disciplinary purposes.

Example: If an employee accumulates one (1) point on January 2, 2018, one (1) point on January 4, 2018 , one (1) point on January 8, 2018, one (1) point on January 10, 2018 and one (1) point on January 15, 2018 he will be subject to an informal documented discussion for having accumulated five (5) points..

**Perfect Attendance:**

6 months of perfect attendance results in the removal of 1 point. If you have 6-months of perfect attendance and used no points you can earn 1 additional point.  Employees cannot have more than 9 points in their allotment of points.

Perfect attendance will be calculated on a 6-month calendar year as listed below:

| 2018 | July 1 , 2018 through December 31, 2018 |
|---|---|
| 2019 forward | • January 1 through June 30<br>• July 1  through Dec 31 |

---

Behm v. Mack Trucks, et al.                                    MACK0378

JA000341



Perfect Attendance:  An employee will be considered to have Perfect Attendance if his only time away from work is due to Holidays, scheduled and approved daily and weekly vacation, periods of temporary layoff or vacation shutdown.

It is the employee's responsibility to keep informed of the points he/she has accumulated. If an employee has a question concerning the amount of points they accumulated, they must see their supervisor to obtain that info.

<u>Severe Weather:</u>

As long as the Lehigh Valley work sites are open and the employee is scheduled to work, s/he is expected to adhere to this Attendance Policy. A Lehigh Valley work site may be closed only when one of the following occurs:

- The State of Pennsylvania has declared a State of Emergency due to severe weather affecting Lehigh County.  Please refer to www.wfmz.com/weather in order to find the latest alerts issued by the Pennsylvania Emergency Management Agency.
- Upon notice from the Company to employees at the discretion of the Vice President and General Manager or his designee.

In addition, if an employee resides in a county that is experiencing a State of Emergency due to severe weather and the Lehigh Valley work sites are still open, the employee will have any absences or tardies for the day(s) in question excused.

<u>Supplemental:</u>

Employees must complete and submit a Request for Manual Time Entry Form to the Human Resources Department on any day that they are unable to record their actual entry and/or departure time due to an inoperable or lost badge/time card.

Behm v. Mack Trucks, et al.                                                    MACK0379

JA000342

| Pers. No. | 450939 | | Pers.Assgn | 450939 00450939 US45 1 | |
|---|---|---|---|---|---|
| Name | Colleen Behm | | | | |
| EE group | 1 Permanent | | Personnel ar | G911 | Macungie, PA LVO |
| EE subgroup | UR Hourly Union | | SSN | 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 | |
| Choose | 01/01/1800 | to | 12/31/9999 | | |

| Start Date | End Date | Act. | Action Type | ActR | Reason for action | C... | E |
|---|---|---|---|---|---|---|---|
| 03/04/2020 | 12/31/9999 | 31 | LOA – Active | U6 | STD/A&S | 3 | |
| 02/17/2020 | 03/03/2020 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 12/09/2019 | 02/16/2020 | 92 | Return from leave of abs...02 | | Return From Temp Lay-... | 3 | |
| 12/09/2019 | | 02 | Org. reassignment within...UA | | Manpower Movement | | |
| 12/02/2019 | 12/08/2019 | 31 | LOA – Active | UC | Temp Lay-off: Involuntar... | 3 | |
| 09/06/2019 | 12/01/2019 | 92 | Return from leave of abs...01 | | Return | 3 | |
| 05/13/2019 | 09/05/2019 | 31 | LOA – Active | U6 | STD/A&S | 3 | |
| 03/11/2019 | 05/12/2019 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 02/27/2019 | 03/10/2019 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 01/21/2019 | 02/26/2019 | 92 | Return from leave of abs...01 | | Return | 3 | |
| 12/05/2018 | 01/20/2019 | 31 | LOA – Active | U6 | STD/A&S | 3 | |
| 11/19/2018 | 12/04/2018 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 11/16/2018 | 11/18/2018 | 92 | Return from leave of abs...01 | | Return | 3 | |
| 08/13/2018 | 11/15/2018 | 31 | LOA – Active | U6 | STD/A&S | 3 | |
| 05/21/2018 | 08/12/2018 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 01/08/2018 | 05/20/2018 | 02 | Org. reassignment within...UA | | Manpower Movement | 3 | |
| 01/02/2018 | 01/07/2018 | 01 | Hiring | 01 | Expansion | 3 | |



EXHIBIT
9

Behm v. Mack Trucks, et al.

MACK0282

JA000343

EXHIBIT

10

| Name of Employee or Applicant | Current Date | Number of hours | Wage Type L | Cost Center (Techn.) | Cost Center | Work schedule rule text |
|---|---|---|---|---|---|---|
| Colleen Behm | 3/30/2018 | 8.00 | Holiday | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/28/2018 | 8.00 | Holiday | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/4/2018 | 8.00 | Holiday | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/3/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/22/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/23/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/24/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/25/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/26/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/27/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/28/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/31/2018 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/1/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/21/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/19/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/27/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/2/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/11/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/28/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/29/2019 | 8.00 | Holiday | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/24/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/25/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/26/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/27/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/30/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/31/2019 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/1/2020 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/20/2020 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/4/2020 | 8.00 | Holiday | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| | | 232.00 | Holiday | | | |
| | | 232.00 | | | | |
| Colleen Behm | 1/2/2018 | 8.00 | Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/3/2018 | 8.00 | Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/4/2018 | 8.00 | Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/5/2018 | 8.00 | Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/8/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/9/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/10/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/11/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/12/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/16/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/17/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/18/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/19/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/22/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/23/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/24/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/25/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/26/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/29/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/30/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |

| Colleen Behm | 1/31/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
|---|---|---|---|---|---|---|
| Colleen Behm | 2/1/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/2/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/5/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/6/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/7/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/8/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/9/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/12/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/13/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/14/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/15/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/16/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/19/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/20/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/21/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/22/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/23/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/26/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/28/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/1/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/2/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/5/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/6/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/8/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/9/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/12/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/13/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/14/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/15/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/16/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/19/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/20/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/21/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/22/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/23/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/26/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/27/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/28/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/29/2018 | 7.80 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/2/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/3/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/4/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/5/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/6/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/9/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/10/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/11/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/12/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/13/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/16/2018 | 8.00 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/17/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/18/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/19/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/20/2018 | 7.90 | Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |

| | | | | | |
|---|---|---|---|---|---|
| Colleen Behm | 4/23/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 4/24/2018 | 2.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 4/26/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 4/27/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 4/30/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/1/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/2/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/3/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/4/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/7/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/8/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/9/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/10/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/11/2018 | 8.00 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/14/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/15/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/16/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/17/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/18/2018 | 7.90 Regular | 41258 | Engn Grm Line EG 2nd | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/21/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/22/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/23/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/24/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/29/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/30/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 5/31/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/1/2018 | 8.00 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/4/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/5/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/6/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/7/2018 | 8.00 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/8/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/11/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/12/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/13/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/13/2018 | 1.20 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/14/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/15/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/18/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/19/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/20/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/21/2018 | 8.00 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/22/2018 | 8.00 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/25/2018 | 4.30 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/26/2018 | 8.00 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/27/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/28/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 6/29/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/2/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/3/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/5/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/10/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/11/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/12/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |
| Colleen Behm | 7/13/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F – 6:45 to 14:45 |

| Colleen Behm | 7/16/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
|---|---|---|---|---|---|
| Colleen Behm | 7/17/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/18/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/19/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/24/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/25/2018 | 7.90 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 7/26/2018 | 2.80 Regular | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/16/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/19/2018 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/20/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/21/2018 | 5.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/26/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/27/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/28/2018 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/29/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/30/2018 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/22/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/23/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/24/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/25/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/28/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/29/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/30/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/31/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/1/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/4/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/5/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/6/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/7/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/8/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/11/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/12/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/13/2019 | 3.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/13/2019 | 5.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/14/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/15/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/18/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/19/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/20/2019 | 3.50 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/20/2019 | 4.50 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/21/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/22/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/25/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/26/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/27/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/28/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/1/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/4/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/5/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/6/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/7/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/8/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/11/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/12/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/13/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Colleen Behm | 3/14/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/15/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/15/2019 | 1.30 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/18/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/19/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/20/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/21/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/22/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/25/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/26/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/27/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/28/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/29/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/1/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/2/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/3/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/4/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/5/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/8/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/9/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/10/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/11/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/12/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/15/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/16/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/17/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/18/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/22/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/23/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/24/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/25/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/26/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/29/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/30/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/1/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/2/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/3/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/6/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/7/2019 | 3.50 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/8/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/8/2019 | 4.50 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/10/2019 | 4.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/6/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/9/2019 | 8.00 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/10/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/11/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/12/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/13/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/16/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/17/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/18/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/19/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/20/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/23/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/24/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |

| | | | | | |
|---|---|---|---|---|---|
| Colleen Behm | 9/25/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/26/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/27/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 9/30/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/1/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/2/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/4/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/7/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/8/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/9/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/10/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/11/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 10/31/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/1/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/4/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/5/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/6/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/7/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/8/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/12/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/13/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/14/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/15/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/18/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/19/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/20/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/21/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/22/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/25/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/26/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 11/27/2019 | 7.90 Regular | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/9/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/10/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/11/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/12/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/13/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/16/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/17/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/18/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/19/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/20/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 12/23/2019 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/2/2020 | 8.00 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/3/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/6/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/7/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/8/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/9/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/10/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/13/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/14/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/15/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/17/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/21/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/22/2020 | 7.90 Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Colleen Behm | 1/23/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/24/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/27/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/29/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/30/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 1/31/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/3/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/4/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/5/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/6/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/7/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/10/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/11/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/12/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/13/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/17/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 2/18/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 2/19/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 2/24/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 2/28/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 3/3/2020 | 7.90 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| Colleen Behm | 3/4/2020 | 2.20 | Regular | 41222 | CONV. CAB1/Sleeper | Shift 2E - 15:15 to 23:15 |
| | | 2,453.60 | Regular | | | |
| | | 2,453.60 | | | | |
| Colleen Behm | 2/6/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/8/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/13/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/15/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/22/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 2/24/2018 | 5.30 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/1/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/6/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/8/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/12/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/13/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/14/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/15/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/20/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/22/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/7/2018 | 8.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/13/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/17/2018 | 1.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/24/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/3/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/10/2018 | 2.00 | Overtime | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 6/1/2018 | 2.00 | Overtime | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 6/5/2018 | 1.00 | Overtime | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 6/7/2018 | 1.00 | Overtime | 41252 | Cab Assembly -C  C01 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/5/2019 | 1.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/7/2019 | 1.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/12/2019 | 1.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/13/2019 | 1.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/14/2019 | 1.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/6/2019 | 4.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 5/6/2019 | 8.00 | Overtime | 41222 | Cab Assembly - L CB1 | Shift 1F - 6:45 to 14:45 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 71.30 | Overtime | | | |
| | | 71.30 | | | | |
| Colleen Behm | 3/5/2018 | 2.00 | Double Time | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 3/26/2018 | 2.00 | Double Time | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/9/2018 | 2.00 | Double Time | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| Colleen Behm | 4/15/2018 | 5.00 | Double Time | 41258 | Engn Grm Line EG 2nd | Shift 1F - 6:45 to 14:45 |
| | | 11.00 | Double Time | | | |
| | | 11.00 | | | | |
| | | 2,767.90 | | | | |

JA000351

# Life Event
## Change Form

This form must be completed and returned to the HRSC within 31 days of a qualified life event for your coverage elections to change.

First Name **Colleen**   MI **S**   Last Name **John**

SSN **188 70 4810**   Date of Birth **05/22/89**   Effective Date of Life Event Change **7/7/18**

New Name (name change only) _____   Reason for Name Change _____

I certify that I have had a Life Event Change as described below (check one). Please provide copies unless otherwise indicated:

☒ * Marriage (provide marriage certificate)

☐ * Divorce or Legal Separation (provide divorce decree or Court's order of separation)

☐ * Name Change (provide copy of social security card showing new name)

☐ * Birth or adoption of child (provide birth certificate or adoption decree)

☐ * Death of spouse and/or child (provide certified death certificate)

☐ * Spouse's employment/termination of employment (provide HIPAA notice or spouse's confirmation of benefit enrollment from employer.)

☐ * Employee or Spouse's transfer to a non-eligible employment classification (provide HIPAA document)

☐ * A child or children became ineligible for continued health care coverage due to a change in age

New address

☐ * Address change out of medical plan service area.

Other

☐ * Explanation _____

**NOTE:**

This form must be submitted within 31 days of your life event change even if you do not yet have the proof documents.

It is your responsibility to provide proof that your dependents are eligible for coverage.

Your changes remain pending until all required documentation is received.

HRSC will review documentation once received. Failure to provide support documentation will cancel your request.

**EXHIBIT**
**11**

Last update
20/09/2016

Dependent Information Next Page

Page 1 of 2

Behm v. Mack Trucks, et al.

MACK0029

If Life Change Event request is to add/drop a dependent, please complete the following items describing the details of your Life Event Change: (complete for each dependent – attach a separate sheet if necessary)

## Dependent(s) Information

First Name [                    ] MI [  ] Last Name [                    ]

SSN [          ] Date of Birth [          ] ☐ Male ☐ Female

Relationship ☐ Child ☐ Step-Child ☐ Spouse

Is Dependent Employed? ☐ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☐ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☐ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

First Name [                    ] MI [  ] Last Name [                    ]

SSN [          ] Date of Birth [          ] ☐ Male ☐ Female

Relationship ☐ Child ☐ Step-Child ☐ Spouse ☐ Sponsored Dependent

Is Dependent Employed? ☐ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☐ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☐ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

First Name [                    ] MI [  ] Last Name [                    ]

SSN [          ] Date of Birth [          ] ☐ Male ☐ Female

Relationship ☑ Child ☐ Step-Child ☐ Spouse ☐ Sponsored Dependent

Is Dependent Employed? ☐ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☐ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☐ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

## Enrollment Form:  Additional coverage options

☐ Please Add or Delete as indicated above

☐ Please Generate an enrollment form for additional coverage options (Supplemental Life or ADD coverages and/or Flexible Spending Account)

Signature of Employee _____   Date 7/10/18

Last update
20/09/2016

Behm v. Mack Trucks, et al.                    MACK0030

JA000353

# Life Event
*Change Form*

This form must be completed and returned to the HRSC within 31 days of a qualified life event for your coverage elections to change.

First Name __Colleen__   MI __S__   Last Name __Behm__

SSN __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__   Date of Birth __05/22/89__   Effective Date of Life Event Change __May 11, 2019__

New Name (name change only) _____   Reason for Name Change _____

I certify that I have had a Life Event Change as described below (check one). Please provide copies unless otherwise indicated:

[ ] * Marriage (provide marriage certificate)
     * Is your spouse a Volvo employee?  [ ] Yes  [ ] No
[✗] * Divorce or Legal Separation (provide divorce decree or Court's order of separation)
     * Is your spouse a Volvo employee?  [ ] Yes  [ ] No
[ ] * Name Change (provide copy of social security card showing new name)

[ ] * Birth or adoption of child (provide birth certificate or adoption decree)

[ ] * Death of spouse and/or child (provide certified death certificate)

[ ] * Spouse's employment/termination of employment (provide HIPAA notice or spouse's confirmation of benefit enrollment from employer.)

[ ] * Employee or Spouse's transfer to a non-eligible employment classification (provide HIPAA document)

[ ] * A child or children became ineligible for continued health care coverage due to a change in age

New address
[ ] * Address change out of medical plan service area.

Other
[ ] * Explanation _____

NOTE:

This form must be submitted within 31 days of your life event change **even if you do not yet have the proof documents.**

It is your responsibility to provide proof that your dependents are eligible for coverage.

Your changes remain pending until all required documentation is received.

HRSC will review documentation once received. Failure to provide support documentation will cancel your request.

**EXHIBIT**
tabbies
12

Last update
01/28/2019

Dependent Information Next Page

Page 1 of 2

Behm v. Mack Trucks, et al.                                    MACK0088

If Life Change Event request is to add/drop a dependent, please complete the following items describing the details of your Life Event Change: (complete for each dependent – attach a separate sheet if necessary)

## Dependent(s) Information

First Name: Corey    MI: L    Last Name: Behm

SSN: 188-70-783_    Date of Birth: 05/12/87    ☒ Male  ☐ Female

Relationship: ☐ Child   ☐ Step-Child   ☒ Spouse

Is Dependent Employed? ☒ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☒ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☒ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

First Name: [blank]    MI: [blank]    Last Name: [blank]

SSN: [blank]    Date of Birth: [blank]    ☐ Male  ☐ Female

Relationship: ☐ Child   ☐ Step-Child   ☐ Spouse   ☐ Sponsored Dependent

Is Dependent Employed? ☐ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☐ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☐ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

First Name: [blank]    MI: [blank]    Last Name: [blank]

SSN: [blank]    Date of Birth: [blank]    ☐ Male  ☐ Female

Relationship: ☑ Child   ☐ Step-Child   ☐ Spouse   ☐ Sponsored Dependent

Is Dependent Employed? ☐ Yes ☐ No   Is Dependent covered under another Medical, Dental and/or Vision plan? ☐ Yes ☐ No
Please check one:
☐ Add indicated dependent(s) to current health plan coverage (medical/prescription, dental or vision)
☐ Delete indicated dependent(s) from current health plan coverage (medical/prescription, dental or vision)

## Enrollment Form: Additional coverage options

☒ Please Add or Delete as indicated above

☐ Please Generate an Enrollment form for additional coverage options (Supplemental Life or ADD coverages and/or Flexible Spending Accou

Signature of Employee [signature]    Date: October 8, 2019

Return this form to the HRSC mailstop CC 2/38
Fax: 1-336-393-3607 Email: hrsc@volvo.com

Last update
01/28/2010
Page 2 of 2



## Notice of Formal Documented Discussion
### - Attendance Policy-

**Subject:** Meeting with Colleen John
**SAP#:** 450939
**Department:** Production
**Classification:** Cab Assembly
**Shift:** 1
**Regarding:** Step 2 Formal Documented Discussion – 2018 Attendance Policy
**Date:** July 24, 2018
**Time:** 1:30pm
**Location:** HR Office
**Meeting Participants:** Kaitlyn O'Neill, Carl Kerchner

On July 24, 2018 a meeting was held with Colleen John to notify her that she has accumulated 6.25 points and has reached the Formal Documented Discussion and Interventional level as contained in the Corrective Action section of the 2018 Attendance Policy. The following occurrences were reviewed with him/her:

| Absence Code | Date | Hours | Points | |
|---|---|---|---|---|
| Absent Unexcused Notice | 4/25/2018 | 8 | 1 | |
| Absent Unexcused Notice | 5/25/2018 | 8 | 1 | |
| Absent Unexcused Notice | 7/6/2018 | 8 | 1 | |
| Absent Unexcused No Notice | 7/9/2018 | 8 | 1.25 | *did give notice* |
| Early Quit Unexcused | 6/25/2018 | 3.7 | 1 | |
| Early Quit Unexcused | 4/24/2018 | 6 | 1 | |
| | | | 6.25 | |

Colleen John stated that she was still in her 90 days during the 4/25/18 absence. 5/25/18 stated it was child care issue. 7/6/2018- 7/9/2018 it was her wedding but during that time she had gotten moved to 2 different areas – gave notice to both Carolina and Jeff Townsend – Tim Newman was made aware as well.
April 24 – still on 90 day probation. 6/25 – child care emergency.

As a general reminder, the Company offers an Employee Assistance Program (EAP) that can be confidentially reached to assist you at 1-800-395-1616. Also, please keep in mind that if you encounter additional difficulties with matters which affect your attendance you are encouraged to contact me, your Union Rep or supervisor as quickly as possible so that we can work together to address them.

Regular attendance is essential to performing your position in a satisfactory manner and to the efficient operation of the business. We expect to see immediate and sustained improvement in your attendance.

_____     _____ 7/24/18
Name                Signature         Date

**EXHIBIT**
13

## Notice of Disciplinary Action

**Date of Notice:** 07/24/2018

| | |
|---|---|
| Employee Name: Colleen John | SAP/Badge #: 450939 |

| | | |
|---|---|---|
| Job Classification: Production Tech | Department: 10013536 | Shift: 1st |

Supervisor Name: Carolina O'Connor

Infraction: Conduct – Work Rule #2 - Leaving assigned work area during work hours without permission

### Progressive Discipline Step

- ☒ Verbal Reminder
- ☐ Written Reminder
- ☐ Written Warning
- ☐ Disciplinary Layoff (          Days)
- ☐ Discharge
- ☐ Other

If other, explain:

**Description of Misconduct:** The imposed disciplinary action will serve to confirm that you have been notified of your unacceptable behavior on 7/19/18 - Leaving assigned work area during work hours without permission.

The company requires and depends upon full accountability of its employees and for employees to remain on the production line to work through the duration of their scheduled shift. If any employee needs to leave the line during scheduled production time they need to report directly to a Supervisor. It is essential for the company to know your location in the event of an emergency and to maintain proper coverage on the line in your absence for safe and efficient operation of the business. Your choice to leave the line and not return before end of day without proper notice has resulted in this disciplinary action. Moving forward, I expect you to report to a Supervisor need leave the line for non-emergency related activity. Please be advised that further violations of inappropriate behavior will result in further discipline up to and including discharge.

| Effective: | 12:38PM | 7/24/18 | Return to Work: | 12:45PM | 7/24/18 |
|---|---|---|---|---|---|
| | Time | Date | | Time | Date |

Management Signature:

Employee Signature: *Decline to Sign*

*By signing, you acknowledge receipt of a copy of this notice.

*Place original in personnel file. Provide copy to: Employee, UAW Representative, Labor Relations, Supervisor*

CLP/LR-11.10.2010



EXHIBIT
14

**MACK**

## Notice of Disciplinary Action

Date of Notice: 3/8/19

| Employee Name: Colleen John Behm | SAP/Badge #: 450939 | |
|---|---|---|
| Job Classification: Production Flex | Department: 223 | Shift:1st |

Supervisor Name: Zachary Maurer

Infraction: Work Rule #2

### Progressive Discipline Step

☐ Verbal Reminder      ☒ Written Reminder      ☐ Written Warning

☐ Disciplinary Layoff (          Days)      ☐ Other

If other, explain:

**Description of Misconduct:** Colleen was not in her work area (Cab 1 VT 2) for the last hour of the day. Colleen has been disciplined for the same infraction on 7/24/18. Any further incidents of this nature can and will result in further disciplinary action up to and including termination.

| Effective: | | | Return to Work: | | |
|---|---|---|---|---|---|
| | Time | Date | | Time | Date |

Management Signature: _[signature]_          3/8/19

Employee Signature: *Employee refused to sign*   3/8/19      6:53 am

*By signing, you acknowledge receipt of a copy of this notice.

*Place original in personnel file. Provide copy to: Employee, UAW Representative, Labor Relations, Supervisor*

CLMLR-11.10.2010

**EXHIBIT**

bobbee

**15**

Behm v. Mack Trucks, et al.                    MACK0057

JA000358



MACK TRUCKS, INC.
LEHIGH VALLEY OPERATIONS

Date: 3/3/2020

SAP: 450939

Dear Colleen Behm,

Per *Policy #: LVO-2018-01, Attendance Policy*, the Company expects and depends upon regular and punctual attendance of its employees and for employees to work through the duration of their scheduled shift. Regular and predictable attendance by each employee is essential to the successful operation of the business.  Absenteeism adversely affects employee morale, quality, costs and ultimately the product and our customers.

The steps of corrective action for accumulation of points are as follows:

| Progressive Level | Points Accumulated | Corrective Action |
|---|---|---|
| Step 1 | 5 | Informal documented discussion |
| Step 2 | 6 | Formal documented discussion |
| Step 3 | 7 | 1-day unpaid suspension |
| Step 4 | 8 | Discharge |

*ALTHOUGH THESE STEPS ARE INTENDED TO BE USED PROGRESSIVELY, ANY ONE OF THEM MAY BE SKIPPED AS CIRCUMSTANCES WARRANT WHEN AN EMPLOYEE IS ACCUMULATING POINTS.*

At this time, you have accumulated ____ points, which shows a pattern of ongoing attendance issues.

Below is a list of your points by date:

| Absence Code | Date | Hours | Points |
|---|---|---|---|
| Absent Unexcused Notice | 10/3/2019 | 8 | 1 |
| Absent Unexcused Notice | 1/16/2020 | 8 | 1 |
| Absent Unexcused Notice | 1/28/2020 | 8 | 1 |
| Absent Unexcused Notice | 2/14/2020 | 8 | 1 |
| Absent Unexcused Notice | 2/20/2020 | 8 | 1 |
| Absent Unexcused Notice | 2/25/2020 | 8 | 1 |
| Absent Unexcused Notice | 3/2/2020 | 8 | 1 |



JA000359

| Total | | | 6 |
|---|---|---|---|

Check Corrective Action Step:

| Step 1 | 5 | Informal documented discussion |
|---|---|---|
| Step 2 | 6 | Formal documented discussion |
| Step 3 | 7 | 1-day unpaid suspension |
| Step 4 | 8 | Discharge |

Although, we do not doubt the legitimacy of your absences, it was explained in great detail the regular, predictable and punctual attendance is an essential element of your position and the employer-employee relationship.

The Company offers an Employee Assistance Program (EAP) that can be confidentially reached to assist you at 1-877-240-6863. This is strictly voluntary. A pamphlet regarding the EAP's services is also enclosed.

We expect immediate and sustained improvement in your attendance or it could result in further corrective action including termination of employment.

Sincerely,

Kaitlyn O'Neill – HRBP

Cc. Kevin Meekes- Gibbons

_____
Employee Signature

Behm v. Mack Trucks, et al.

MACK0077

JA000360

 

**Mack Trucks, Inc.**
Macungie Assembly Operations
7000 Alburtis Road
Macungie, PA 18062-9631
Phone: 610-966-8083

Name: _Colleen John_   SAP: _450939_   Date: _8/13/18_

We are sorry to hear that you are ill and want to wish you a speedy recovery. If there is anything we can do to help you medically, please do not hesitate to contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost time from work will only be processed if your absence is approved by an MD, DO, DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted, which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability Benefits Claim Form enclosed, must be filled out completely, signed by an M.D. and faxed to the Mack Macungie HR office, 610-966-8950, or it may cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to work release upon returning to work. If you do not have this release with you, we will NOT be able to return you to work until that release is obtained. The work release should state the effective date of return with or without restrictions. If there are any restrictions attached to your release, they need to be as specific and as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract, Article 1- Section 27( c)(3)), FMLA runs concurrent with six weeks (up to 240 hours) of accident and sickness benefits. An FMLA Certification of Health Care Provider for Employee's Serious Health Condition is enclosed. Your doctor should complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE: _8/28/18_
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions or concerns, please do not hesitate to call me at 610-966-8083.

Sincerely,

Angela Pursell
Macungie Human Resources

/attachments

**EXHIBIT**
17

# SHORT TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

**PART A**    **EMPLOYEE'S STATEMENT**
All Questions Must Be Completed by Employee—Claim Form Must Be Returned By: **8/28/18**

Full Name **Colleen Sara John**   Badge# **450939**   Social Security Number **1881 7016810**   Date of Birth **05/22/89**

Address
Street **608 Main St.**   City or Town **Blandon**   State **PA**   Zip **19510**

If accident occurred, give Date **08/07/18** 20 ___ A.M. P.M. & Describe In Space Provided Below   Is the sickness or injury due to your employment with the Company? Yes ___ No **X**   If "Yes", give full particulars in space provided below, or on separate sheet.

Is the sickness or injury due to your employment with another Employer?   Yes ___ No **X**   If "Yes", give full particulars below.

Were you employed by another Employer (full or part-time) when disability commenced?   Yes ___ No ___   If "Yes", give full particulars below and name of Employer.

First day you did not perform any portion any work for because of disability ___ 20 ___ A.M. P.M.   Date you were first treated by physician in present disability ___ 20 ___   If recovery has returned, give date ___ 20 ___ A.M. P.M.

## AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care facilities, care restrictions, and to insurers, prepaid or hospital service and prepaid health plans, employers and group policyholders, unions/labor or benefit plan administrators:

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided on the period, and any other employment related information regarding the patient. THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE REDISCLOSED TO AN INDEPENDENT CLAIM ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIERS FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the duration of this authorization is for the term of coverage of the policy or contract under which a claim for benefits has been submitted.
I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original.
If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any, or to recoup such overpayment by withholding monies from any Company compensation that would otherwise be due to me.

Date **Aug. 13, 2018**        Employee's Signature _____

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.**

**IMPORTANT** – Attending Physician must complete reverse side of this form.

** Procedure upon return from sick leave**
If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

**PART B**    **EMPLOYER'S STATEMENT**

Full Name of Employee: _____    Social Security Number _____

Employee Date of Hire: _____   Was coverage in force When disability began: Yes ___ No ___   Occupation _____

Was employee laid off/out, was lay off/out contemplated prior to beginning of this disability? Yes ___ No ___ If "Yes" give date ___ 20 ___   Did the sickness or injury arise out of the Employee's employment? Yes ___ No ___   If "Yes" state reason in space provided below: Why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement.

Are there any circumstances which would cause you to question the validity of the claim? Yes ___ No ___   If "Yes" give reason in space provided below   Hourly rate Or monthly salary _____   Amount of weekly A & B benefit _____

List Employee withholding allowance for federal taxes (e.g., M-1) _____   List Holidays paid during sick leave _____   List number of Occasional sick days used this year _____

Date Employee was first absent from work in present disability ___ 20 ___   Date work resumed normal ___ 20 ___

Date ___ 20 ___   Employer Representative _____

Additional Space For Employee/Employer Use (Attach additional sheets for more information)

Plaintiff 000327

"Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts."

**PART C        ATTENDING PHYSICIAN'S STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION**
*TO THE ATTENDING PHYSICIAN:* Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for additional information.

1. PATIENT'S FULL NAME   Colleen Sara John

2. DIAGNOSIS AND CONCURRENT CONDITIONS
M89.8x) Pain of left Clavicle

IF PREGNANCY, APPROXIMATE DATE COMMENCED:

DATE _____

CORRESPONDING ICD-9 CODE:
*ICD – International Classification of Disease*

3. a. Was surgery performed?   Yes  X  No        Not after reinjury 8/7/18

b. Type of Surgical Procedure: _____

c. Date of surgery: N/A

4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?
X  Yes  ___ No

5. DATE PATIENT WAS LAST EXAMINED BY YOU FOR THIS CURRENT CONDITION:
DATE  8/13/18

6. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
Sickness Appeared Date _____
X  Accident Happened Date  8/7/18

If Accident, Describe Nature of Accident:
Fell on Crutches

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL, AFTER FIRST DATE EXAMINED (If not applicable, state "NONE"):
DATE  N/A

7. WAS PATIENT HOSPITALIZED?   Yes  (No)
If Yes:  Date Admitted _____   Date Discharged _____
Name of Hospital _____

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:
DATE  9/6/18

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
___ Yes  X No        If "YES" describe condition and date:

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
X  Yes  ___ No        If "NO", Explain:

HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?
___ Yes  X No        If "YES":
Date of Referral _____
Name of Physician _____

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?   X Yes  ___ No
IF YES, FROM  8/13/18  TO  8/27/18

13. WAS PATIENT PARTIALLY DISABLED? (If you are completing this form, please list a specified restriction in the "Remarks", Section below along with the estimated duration of the restriction.)
IF YES, FROM _____   TO _____

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK: An approximate date must be specified.
Regular work – Date  8/27/18        Restricted work (see No. 15) –Date: _____

15. ATTENTION ATTENDING PHYSICIAN
If you are returning an employee to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work assignments, we request that you clearly identify on this Accident and Sickness form:
(a)   Any medical restrictions and/or specific limitations applicable to the employee.
(b)   Any type of work the employee is able to perform.
(c)   Any type of work the employee is unable to perform.
If you have any questions regarding this request or the scope of job function please contact the Human Resources Service Center.

Attending Physician Remarks: (Use additional sheet if necessary)

| | | | |
|---|---|---|---|
| 8/16/18 | Craig O'Neill | _signature_ | MD |
| DATE | PHYSICIAN'S NAME (Print) | SIGNATURE | DEGREE |
| 301 S 7th Ave Suite 3220 West | Reading | PA | 19601 |
| STREET ADDRESS | CITY OR TOWN | STATE | ZIP CODE |
| (610) 376-8671 | (610) 376-6387 | | |

If assistance is needed in completing this form, please contact
Angela Pursell
1-610-966-8083 or Fax 1-610-966-8950

RETURN THIS COMPLETED FORM TO:
Angela Pursell, Mack Trucks, Inc
7000 Alburtis Road
Macungie PA 18062

Plaintiff 000328

## REIMBURSEMENT AGREEMENT

### To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated 8/13/18 , provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

(1) Payments received from any or all of the benefits sources enumerated above, and

(2) Salary Continuation and/or Accident and Sickness benefit payments made by you

exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Disease Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

8/13/18
DATE

_Colleen John_
EMPLOYEE SIGNATURE

Colleen John
EMPLOYEE NAME (PRINTED/TYPED)

450989
BADGE NO.

Rev 10/13

Plaintiff 000329

PART A: MEDICAL FACTS
1. Approximate date condition commenced: _8/13/18_

   Probable duration of condition: _8/27/18_

   Mark below as applicable:
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   _X_ No ___ Yes. If so, dates of admission:

   Date(s) you treated the patient for condition:
   _8/13/18_

   Will the patient need to have treatment visits at least twice per year due to the condition? ___ No _X_ Yes.

   Was medication, other than over-the-counter medication, prescribed? ___ No _X_ Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g. physical therapist)?
   _X_ No ___ Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? _X_ No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to the condition: ___ No _X_ Yes.

   If so, identify the job functions the employee is unable to perform:

   No lifting, pushing + pulling

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave. (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

   M89.8X1 Pain of left clavicle.

   Patient reinjured clavicle 8/7/18.

JA000365

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?  ___ No  _X_ Yes

   If so, estimate the beginning and ending dates for the period of incapacity: 8/13 to 8/27/18

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition?  ___ No  _X_ Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   _X_ No ____ Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   Next follow up appointment   9/6/18

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions?  _X_ No ____ Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   _X_ No ____ Yes. If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency ____ times per ____ week(s) ____ month(s)

   Duration ____ hours or ____ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.**

_____

_____

_____

_____

Page 3                        CONTINUED ON NEXT PAGE               Form WH-380-E  Revised May 2015

Plaintiff 000331

_____     _____
Signature of Health Care Provider                    Date

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Page 4                                                                    Form WH-380-E Revised May 2015

Plaintiff 000332

Sep. 14. 2018  6:44AM                                                    No. 6340  P.  2/5

  

Mack Trucks, Inc.
Macungie Assembly Operations
7000 Alburtis Road
Macungie, PA 18062-9631
Phone: 610-966-8083

Name: _Colran John_   SAP: _450939_   Date: _9/12/18_

We are sorry to hear that you are ill and want to wish you a speedy recovery. If there is anything we can do to help you medically, please do not hesitate to contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost time from work will only be processed if your absence is approved by an MD, DO, DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted, which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability Benefits Claim Form enclosed, must be filled out completely, signed by an M.D. and faxed to the Mack Macungie HR office, 610-966-8950, or it may cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to work release upon returning to work. If you do not have this release with you, we will NOT be able to return you to work until that release is obtained. The work release should state the effective date of return with or without restrictions. If there are any restrictions attached to your release, they need to be as specific and as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract, Article 1 - Section 27(c)(3)), FMLA runs concurrent with six weeks (up to 240 hours) of accident and sickness benefits. An FMLA Certification of Health Care Provider for Employee's Serious Health Condition is enclosed. Your doctor should complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE: _10 / 9 / 18_
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions or concerns, please do not hesitate to call me at 610-966-8083.

Sincerely,

Angela Pursell
Macungie Human Resources

/attachments

Plaintiff 000333

Sep. 14, 2018  6:44AM                                    No. 6340   P. 4/5

**MACK**

Lehigh Valley Operations
7000 ALBURTIS ROAD
MACUNGIE, PA  18062-9631
PHONE# (610) 966-8878; FAX# (610) 966-8882

## DIAGNOSIS TREATMENT PLAN

PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU!

DATE: 9/13/18   PATIENT'S NAME (print): Colleen Sara John

DIAGNOSIS: Left clavicle pain. Non-union fracture

TREATMENT PLAN: Rest
Physical therapy
follow up 10/9/18

DIAGNOSTIC STUDIES: N/A

RETURN VISIT DATE: 10/9/18

PHYSICIAN SIGNATURE: _____ MD.
*Requires MD, DO, or DPM signature ONLY.

PRINT PHYSICIAN'S NAME: Craig O'neill

PHYSICIAN'S ADDRESS: 301 S 7th Ave. Suite 3220
West Reading PA, 19611

PHYSICIAN'S PHONE #: 610-370-8171

Diagnosis treatment plan: updated 7/15/10

Plaintiff 000334

Sep 14 2018 6:44AM No. 6340 P. 5/5

## SHORT TERM DISABILITY BENEFIT CLAIM FORM

ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT
IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION

PART A    EMPLOYEE'S STATEMENT
All Questions Must Be Completed by Employee – Claim Form Must Be Returned By: _____

| Full Name: Colleen John | Unit: 450939 | Social Security Number: 1881 D14810 | Date of Birth |
|---|---|---|---|

| Address Street | City or State | State | Zip |
|---|---|---|---|

| If accident occurred, Give Date _____ 20___ Describe in Space Provided Below | Is the sickness or injury due to your employment with the Company? ☐ Yes ☐ No | If "Yes", give full particulars in space provided below, or on separate sheet |
|---|---|---|

| Is the sickness or injury also to your employment with another employer? ☐ Yes ☐ No | If Yes, give full particulars below. |
|---|---|

| Were you employed by another employer (full or part-time) when disability commenced? ☐ Yes ☐ No | If Yes, give full particulars below and name of employer. |
|---|---|

| First day you did not perform any work because of disability 20___ | Date you were first treated by physician in present disability 20___ | If recovery has occurred, give date 20___ |
|---|---|---|

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care facilities, and to insurers, medical or hospital service and prepaid health plans, employers and their policyholders, contract holders or benefit plan administrators.

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment related information regarding the patient. THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE REDISCLOSED TO AN INDEPENDENT CLAIMS ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIERS FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the furnishing of any authorization is in the terms of coverage of the policy to conduct under which a claim for health benefits has been submitted.
I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original.
If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any, or to recoup such as requested by withholding monies from any Company compensation that would otherwise be due me.

_____    _____
Date                          Employee's Signature

ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE
SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.

IMPORTANT – Attending Physician must complete reverse side of this form.

** Procedure upon return from sick leave **

If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

PART B    EMPLOYER'S STATEMENT

| Full Name of Employee | Social Security Number |
|---|---|

| Employee Date of Hire | Was coverage in force when disability began? ☐ Yes ☐ No | Occupation |
|---|---|---|

| Was employee laid off or was lay off contemplated prior to beginning of this disability? ☐ Yes ☐ No If "Yes" give date 20___ | Did the sickness or injury arise out of the Employee's employment? ☐ Yes ☐ No | If "Yes" state reason in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement. |
|---|---|---|

| Are there any circumstances which should cause you to question the validity of this claim? ☐ Yes ☐ No | If "Yes" give reason in space provided below | Hourly rate Or monthly salary | Amount of Weekly A.S.S. benefit |
|---|---|---|---|

| List Employees scheduled absence for federal leave (e.g. M-F) | List Holidays paid during sick leave | List number of Occasional sick days used this year |
|---|---|---|

| Date Employee was first absent from work in | Date work was resumed 20___ |
|---|---|

_____    _____
Date                          Employer's Representative

Additional Space For Employer/Employee Use (Attach additional sheets for more information)

DEFENDANT 000333

John, Colleen Sara (MR # )0956951 DOB: 05/22/1989       Encounter Date: 08/29/2018

Letter by Krempasky, Courtney on 8/29/2018



Orthopaedic Associates of Reading, Ltd.
301 S. 7th Avenue Suite 3220
West Reading PA 19611-1493
Phone: 610-376-8671
Fax: 610-376-6367

Colleen Sara John
608 Main Street
Blandon PA 19510

August 29, 2018

| | |
|---|---|
| Patient: | Colleen Sara John |
| MR Number: | 1096695 |
| Date of Birth: | 5/22/1989 |

Correction for FMLA forms

The above named patient was under my care from 8/13/2018 until present.

Return Instructions: Patient is to be off work starting 8/13/2018 until she is re-evaluated on 9/7/2018.

If there are any questions, please call the office at Dept: 610-376-8671.

Sincerely,

Dr. Craig O'Neill MD
Orthopaedic Associates Of Reading, Ltd.

Plaintiff 000336

JA000371



**ORTHOPAEDIC ASSOCIATES OF READING, LTD.**
**O.A.R. READING SPORTS MEDICINE**

301 S. Seventh Avenue          4865 DeMoss Road          Telephone (610) 376-8671
Suite 322G                     Suite 102                 Fax (610) 376-6387
West Reading, PA 19611         Reading, PA 19606          www.oarmd.com

DAVID B. REES, JR., M.D.          JOHN O. CASEY, JR., M.D.          LEONARD L. D'ADDESI, M.D.          CRAIG A. O'NEILL, M.D.
ROBERT D. SUTHERLAND, M.D.        CHRISTOPHER J. MANCUSO, M.D.      ERIC M. SLOTKIN, D.O.             BRIAN C. STAPINSKI, M.D.

## FACSIMILE COVER SHEET

WE ARE TELECOPYING __2__ PAGES INCLUDING THIS COVER SHEET

COMPANY NAME:

ATTENTION: Angela

DATE: 8/29/18

PHONE NUMBER:

FAX NUMBER: 610-966-8950

IF YOU DO NOT RECEIVE ALL OF THE PAGES, OR IF OTHER PROBLEMS OCCUR, PLEASE CALL
US BACK AS SOON AS POSSIBLE @ (610) 376-8671, ext: 267

SENT BY: Courtney Kremposky

Can you please send over a new short-term
disability form so that it can be corrected.
I apologize for the inconvenience.

This transmission is intended for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, the employee or the agent responsible for delivering the message, you are hereby notified that any dissemination, distribution or copying of the communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone to arrange the return of these materials.

Phone (610) 376-8671
Fax (610) 376-6387



Plaintiff 000337

Sep. 19. 2018 12:06PM

No. 6422   P. 1/3
Sep. 19 2018 10:37am   P002/003

**PHYSICIAN OFFICE: AT COMPLETION OF VISIT, PLEASE FAX THESE COMPLETED FORMS TO 610-966-8950**

DATE: 9-10-18

PATIENT'S NAME (print): Colleen Sara John     DOB: 5/22/89

DIAGNOSIS: Pain of left clavicle - MS9.8X1

TREATMENT PLAN:
Continue physical therapy, rest,
Follow up on 10-9-18

DIAGNOSTIC STUDIES: none

RETURN VISIT DATE: 10-9-18

*PHYSICIAN SIGNATURE:

*Requires MD, DO or DPM Signature

PRINT PHYSICIAN'S NAME: Craig Obeill MD

PHYSICIAN ADDRESS: 301 S 7th Ae Suite 3220
West Reading PA 19611

PHYSICIAN TELEPHONE #: 610-376-8671

Plaintiff_000338

Form WH-380-E Revised May 2013

JA000373

## PHYSICAL CAPABILITIES CHECKLIST
## LEHIGH VALLEY OPERATIONS
## MEDICAL DEPARTMENT

Print Patient's Name: Colleen Seraphin   Date Completed: 9-19-18

Dominant Hand: Right _____ Left _____   **NO work**

|  | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** |  |  |  |  |  |  |
| Floor to Waist |  |  |  |  |  |  |
| Waist to Shoulder |  |  |  |  |  |  |
| Shoulder Height or Higher |  |  |  |  |  |  |
| **USE OF VIBRATORY TOOLS:** |  |  |  |  |  |  |
| **MISCELLANEOUS ACTIVITIES:** |  |  |  |  |  |  |
| Sitting |  |  |  |  |  |  |
| Standing |  |  |  |  |  |  |
| Walking |  |  |  |  |  |  |
| Bending |  |  |  |  |  |  |
| Twisting |  |  |  |  |  |  |
| Stooping / Squatting |  |  |  |  |  |  |
| Kneeling |  |  |  |  |  |  |
| Climbing |  |  |  |  |  |  |
| Crawling |  |  |  |  |  |  |
| Driving: Lift Truck / Tractor Trailer / Car |  |  |  |  |  |  |

PLEASE CIRCLE APPROPRIATE EXTREMITY:   RIGHT HAND   LEFT HAND   BOTH HANDS

| **REPETITIVE TASKS** | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| Grip / Grasp |  |  |  |  |  |
| Push / Pull |  |  |  |  |  |
| Fine Manipulation |  |  |  |  |  |
| Keyboard Operation |  |  |  |  |  |
| Foot Controls |  |  |  |  |  |

**LIFTING / CARRYING:**
- Sedentary   10 lbs. max. & occasionally carrying small objects; this does not mean seated work. Please address in sitting, standing, etc. in miscellaneous activities.
- Light   20 lbs. max; frequently up to 10 lbs.
- Medium   50 lbs. max; frequently up to 20 lbs.; constant 10 lbs.

Estimated Length of Disability: Approx 10/9/18   Date released to RTW: _____

Any medication that would prevent RTW activities?   Yes ___ No ___ Explain: _____

Comments / Explanations: _____

Sep. 14 2018  6.47AM                                      No. 6340   P. 1/5

"Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts."

PART C          ATTENDING PHYSICIANS STATEMENT—ONLY THE DOCTOR CAN COMPLETE THIS PORTION
TO THE ATTENDING PHYSICIAN: Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for additional information.

1. PATIENT'S FULL NAME: Colleen Sara John

2. DIAGNOSIS AND CONCURRENT CONDITIONS: Left clavicle non-union fracture    IF PREGNANCY, APPROX BIRTH DATE COMMENCED:
   CORRESPONDING ICD CODE: -2-87.81 — M89.8X1    DATE: N/A
   *ICDA = International Classification of Diseases

3. NATURE OF TREATMENT: clavicle fixation hardware   removal of    4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?
   IF OPERATION, GIVE DATE AND DESCRIBE: 11/8/17                            Yes  X No

5. DATE OF ONSET SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
   Sickness Appeared Date:
   Accident Happened Date: 8/7/18

6. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT CONDITION:
   DATE: 8/13/18

   If Accident, Describe Nature of Accident:
   ziplining

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL AFTER FIRST DATE EXAMINED (if not applicable, state "NONE"):
   DATE: 9/7/18

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:
   10/9/18

9. WAS PATIENT HOSPITALIZED?     Yes   (No)
   If Yes: Date Admitted:_____ Date Discharged:_____
   Name of Hospital:

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
    X Yes   No   If "YES" describe condition and date:
    Fx clavicle 12/2/15

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
    X Yes   No   If "NO", Explain:

    HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?
    X Yes   No   If "YES",
    Date of Referral: 8/7/18
    Name of Physician: physical therapy

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?
    IF YES, FROM: 8/13/18   approx   TO: 10/9/18

13. WAS PATIENT PARTIALLY DISABLED? (If you are completing this item, please list expected restrictions in the "Remarks" section below along with the estimated duration of the restriction.)
    IF YES, FROM:_____ TO:_____

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK: An approximate date must be specified.
    Regular work—Date: approx 10/9/18     Restricted work (see No. 15) — Date:

15. ATTENTION: ATTENDING PHYSICIAN
    If you are releasing an employee to return to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work. Assignments, we request that you identify on this Accident and Sickness form:
    (a)  Any medical restrictions and/or specific limitations applicable to the employee.
    (b)  Any type of work the employee is able to perform.
    (c)  Any type of work the employee is unable to perform.
    If you have any questions regarding this request or the scope of job functions please contact the Human Resources Service Center.

Attending Physician's SIGNATURE (Use blue ink if possible):

DATE: 9/13/18     PHYSICIAN'S NAME (Print): Craig O'Neill     SIGNATURE: [signature] O'Neill     DEGREE: MD
STREET ADDRESS: 301 S 7TH Ave.     CITY OR TOWN: West Reading     STATE: PA     ZIP CODE: 9[6]11
TELEPHONE NO.: (610) 376 8[6]71     FAX NO.: (610) 376 638[?]

If assistance is needed in completing this form, please contact
Angela Pursell
(PH) 1-610-966-8083

RETURN THIS COMPLETED FORM TO:
Mack Trucks, Inc
Angela Pursell
7000 Alburtis Road
Macungie, PA 18062

Plaintiff 000340

# MACK TRUCKS INC. / LEHIGH VALLEY OPERATIONS
## MEDICAL EVALUATION

Date: 11/6/18
Name: Colleen John
Department: verbl
Job: PT
Shift: DAY

DOH#: 11/21/18
SAP#: 45083 9

Date of Injury/Illness: _____
Injury/Illness: _____ COMPliance

Claim Status: ☐ Workers' Comp ☐ WC-Claim Pending ☑ Non-Work-Related
Claim #, if applicable: _____

Date of Injury/Illness: 8/1/18   Lost-Time Date, if applicable: 8/13/18
Dominant Hand: ☑ R ☐ L

Based on Medical Review, the employee is:
Effective Date: 11/6/18
☐ Able to Work   ☐ Not Able to Work
☑ Restrictions per Physical Capabilities Form

Medical Excuse Actions:
☑ Medical Evaluation was provided by the outside treating physician.
☐ Medical Evaluation was provided by the company physician.
☐ Surgery Date: _____

Recheck Date w/Outside Treating Physician: Dr. O'Neill 11/23/18
Recheck Date w/Company Physician: _____

Signed: Company Physician/Nurse: _____

## JOB PLACEMENT: PERSONNEL DEPARTMENT
The employee has been evaluated and:
☐ Placed on regular work, with no restrictions   ☐ Transitional
☐ Placed on regular work, with restrictions   ☑ Not Able to be Placed

Date: 11/6/18 Bahamo NCGuide-Skerp
Supervisor: _____

---

## PHYSICAL CAPABILITIES CHECKLIST
### Based on a 480-minute workday
### Mack Trucks, Inc. – Lehigh Valley Operations

MARK:

| LIFTING AND REACHING: | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |

| USE OF VIBRATORY TOOLS: | | | | | | |
|---|---|---|---|---|---|---|

| MISCELLANEOUS ACTIVITIES: | | | | | | |
|---|---|---|---|---|---|---|
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping/Squating | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Keyboard Operation | | | | | | |
| • Driving Car - LR | | | | | | |
| • Truck / Tractor / Trailer | | | | | | |

| PLEASE CIRCLE APPROPRIATE EXTREMITY: | | | | | | |
|---|---|---|---|---|---|---|
| REPETITIVE TASKS: | RIGHT HAND | | | LEFT HAND | | BOTH HANDS |
| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | Never |
| • Grip/Grasp | | | | | | |
| • Push/Pull | | | | | | |
| • Fine Manipulation | | | | | | |
| • Keyboard Operation | | | | | | |
| • Foot Controls | | | | | | |

### LIFTING/CARRYING:
☐ Sedentary - 10 lbs. max, & occasionally carrying small objects, this does not mean seated work
☐ Light - Please express in sitting, standing, etc., in miscellaneous activities
   20 lbs. max, frequently up to 10 lbs.
☐ Medium - 50 lbs. max, frequently up to 20 lbs, constant 10 lbs

Estimated Length of Disability: _____

Any medication that would prevent RTW activities? ☐ Yes   ☐ No   Explain: _____

Date released to RTW: _____

Comments/Explanations: Nomore than 10lbs above Shoulder level.

Sep 10 2014 02:14am    P002/002

## PHYSICAL CAPABILITIES CHECKLIST
## LEHIGH VALLEY OPERATIONS
## MEDICAL DEPARTMENT

Print Patient's Name: Colleen John          Date Completed: 11/6/18

Dominant Hand: Right _____ Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| Floor to Waist | ✓ | | | | | |
| Waist to Shoulder | ✓ | | | | | |
| Shoulder Height or Higher | ✓ | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| Sitting | ✓ | | | | | |
| Standing | ✓ | | | | | |
| Walking | ✓ | | | | | |
| Bending | ✓ | | | | | |
| Twisting | ✓ | | | | | |
| Stooping / Squatting | ✓ | | | | | |
| Kneeling | ✓ | | | | | |
| Climbing | ✓ | | | | | |
| Crawling | ✓ | | | | | |
| Driving: Lift Truck / Tractor Trailer / Car | ✓ | | | | | |

PLEASE CIRCLE APPROPRIATE EXTREMITY:   RIGHT HAND   LEFT HAND   BOTH HANDS

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| Grip / Grasp | ✓ | | | | |
| Push / Pull | ✓ | | | | |
| Fine Manipulation | ✓ | | | | |
| Keyboard Operation | ✓ | | | | |
| Foot Controls | ✓ | | | | |

**LIFTING / CARRYING:**

- Sedentary — 10 lbs. max. & occasionally carrying small objects; this does not mean seated work. Please address in sitting, standing, etc., in miscellaneous activities.
- Light — 20 lbs. max.; frequently up to 10 lbs.
- (Medium) — 50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs.

Estimated Length of Disability: 11/8/18          Date released to RTW: 11/8/18

Any medication that would prevent RTW activities?   Yes   ✓ No   Explain _____

Comments / Explanations: Return to work with no restrictions

Physician's Signature: _____

Plaintiff_000342

JA000377

Sep 19 2016 02:14am      P001/002

RECEIVED

NOV 0 6 2018

MACUNGIE MEDICAL

**Lehigh Valley Operations**
**7000 ALBURTIS ROAD**
**MACUNGIE, PA 18062-9631**
**PHONE# (610) 966-8878; FAX# (610) 966-8882**

DIAGNOSIS TREATMENT PLAN

PLEASE FAX COMPLETED FORM BELOW TO FAX# (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU!

DATE: 11/06/18   PATIENT'S NAME (print): _Colleen John_

DIAGNOSIS: S42.022K - Displaced fracture of shaft of LT Clavicle, subsequent encounter for fracture w/ nonunion

TREATMENT PLAN:

Follow-up in 6-7 weeks, Return to work with no restrictions, Start physical therapy for shoulder pain

DIAGNOSTIC STUDIES: XRay LT Clavicle 12/2/15, XRay LT Clavicle 8/13/18

RETURN VISIT DATE: 11/28/18

*PHYSICIAN SIGNATURE: _[signature]_
  *Requires MD, DO or DPM signature ONLY

PRINT PHYSICIAN'S NAME: Craig Oneill MD

PHYSICIAN'S ADDRESS: 301 S Seventh Avenue, Suite 3220
West Reading, PA 19611

PHYSICIAN'S PHONE #: 610.376.8171

diagnosis treatment plan: updated 7/18/18

Plaintiff 000343

## PHYSICAL CAPABILITIES CHECKLIST
### Based on a 480 minute workday
### Mack Trucks, Inc. – Lehigh Valley Operations

| | Constant 67 - 100% | Frequent 34 - 66% | Occasional 6 - 33% | Seldom 0 - 5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING AND REACHING:** | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping/Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Driving Car / Lift Truck? / Tractor Trailer | | | | | | |

### PLEASE CIRCLE APPROPRIATE EXTREMITY:

| REPETITIVE TASKS: | RIGHT HAND | LEFT HAND | BOTH HANDS |
|---|---|---|---|
| • Grip/Grasp | | | |
| • Push/Pull | | | |
| • Fine Manipulation | | | |
| • Keyboard Operation | | | |
| • Foot Controls | | | |

**LIFTING/CARRYING:**
- ☐ Sedentary   10 lbs. max. & occasionally carrying small objects, this does not mean seated work.
  Please address in sitting, standing, etc., in miscellaneous activities
- ☐ Light   20 lbs. max. frequently up to 10 lbs.
- ☐ Medium   50 lbs. max. frequently up to 20 lbs. constant 10 lbs.

Estimated length of Disability: _____ 11/8/18

Any medication that would prevent RTW activities? ☐ Yes  ☐ No  Explain:

Date released to RTW: _____ 11/8/18

Comments/Explanations: RTW E NO RESTRICTIONS

## MACK TRUCKS INC. / LEHIGH VALLEY OPERATIONS
### MEDICAL EVALUATION

Date: 11/3/18

Name: Coleman, John

Department: Vend [??]

Job: PT

Injury/Illness:

Date of Injury/Illness: 8/1/18  Lost Time Date, if applicable: 8/13

Claim Status: ☐ Workers Comp ☐ WC Claim Pending ☐ Non-Work Related

Claim #, if applicable: _____  Dominant Hand: ☐ R ☐ L

**Medical Excuse Actions:**
- ☐ Medical Evaluation was provided by the outside treating physician.
- ☐ Medical Evaluation was provided by the company physician.
- ☐ Surgery Date:

**Based on Medical Review, the employee is:**
- ☐ Effective Date:
- ☐ Able to Work     ☐ Not Able to Work
- ☐ Restrictions per Physical Capabilities Form

Recheck Date w/Outside Treating Physician: Dr. O'Neill 11/13/18

Recheck Date w/Company Physician:

Signed: Company Physician/Nurse:

## JOB PLACEMENT: PERSONNEL DEPARTMENT

The employee has been evaluated and is:
- ☐ Placed on regular work, with no restrictions     ☐ Transitional
- ☐ Placed on regular work, with restrictions     ☐ Not Able to be Placed

Date: 11/13/18   Signed: _____

Supervisor: _____

Plaintiff 000344

**Pursell Angela**

To:     Kuhn Drew; O'Neill Kaitlyn; Newman Timothy (d)
Subject:   Colleen John Behm LOA request

All,

Colleen John Behm is requesting 2 weeks of emergency leave for week so 12/3/18 and 12/10/18.

The reason for the request is due to a legal domestic situation. I have the supporting documentation.

Drew Kuhn – please advise if you are able to support having an additional person off in cab1 those weeks.

Please note Colleen had two points removed during her probation when she was on her honeymoon.
In addition she has been out on A&S from 8/13/18 RTW 11/16/18.

Colleen is currently at 7 points.

Once we hear back from Drew and what the staffing situation is we will take all this information and make a decision.

| 1AB1 | Absent Unexcused Notice | Colleen Behm | 450939 | 5/25/2018 | 8 | HBU-Macungie | 10013534 | 4125 |
|------|------------------------|--------------|--------|-----------|---|--------------|----------|------|
| 1EQ1 | Early Quit Unexcused | Colleen Behm | 450939 | 6/25/2018 | 3.7 | HBU-Macungie | 10013534 | 4125 |
| 1AB1 | Absent Unexcused Notice | Colleen Behm | 450939 | 7/6/2018 | 8 | HBU-Macungie | 10013534 | 4125 |
| 1AB1 | Absent Unexcused Notice | Colleen Behm | 450939 | 7/9/2018 | 8 | HBU-Macungie | 10013534 | 4125 |
| 1AB1 | Absent Unexcused Notice | Colleen Behm | 450939 | 7/20/2018 | 8 | HBU-Macungie | 10013534 | 4125 |
| 1AB1 | Absent Unexcused Notice | Colleen Behm | 450939 | 7/27/2018 | 8 | HBU-Macungie | 10013534 | 4125 |
| 1TU1 | Tardy Unexcused | Colleen Behm | 450939 | 11/5/2018 | 7.6 | HBU-Macungie | 50644853 | 4122 |
| | | | 450939 Total | | | | | |

1



Behm v. Mack Trucks, et al.

MACK0070

JA000380

RECEIVED
DEC 17 2018

11 32 58   12-12-2018   2 /10
:5:20:39   12-05-2018   2 /10

## SHORT-TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

**PART A**   **EMPLOYEE'S STATEMENT**
All Questions Must Be Completed by Employee – Claim Form Must Be Returned By: _____

| Full Name | Badge# | Social Security Number | Date of Birth |
|---|---|---|---|
| Colleen Sara John/Rehm | 450939 | 188 70 4810 | 05/22/1989 |

Address Street: 608 Main St.   City or Town: Blandon   State: PA   Zip: 19510

If accident occurred, give Date: December 1, 2018. Describe in Space Provided below: ☐

Is the sickness or injury due to your employment with the Company? ☐ Yes ☒ No   If "Yes", give full particulars in space provided below, or on separate sheet.

Is the sickness or injury due to your employment with another employer? ☐ Yes ☒ No   If, Yes, give full particulars below.

Were you employed by another employer (full or part-time) when disability commenced? ☐ Yes ☒ No   If Yes, give full particulars below and name of employer.

First day you did not perform any work (last day of disability): 12/3 2018
Date you were first treated by physician in present disability: _____ 20_____
If recovery has occurred, give date: _____ 20_____

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care institutions, and to insurers, medical or hospital service and prepaid health plans, employers and group policyholders, contract holders or benefit plan administrators,
You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment-related information regarding the patient. THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE REDISCLOSED TO AN INDEPENDENT CLAIMS ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIER FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.
I understand that the duration of this authorization is for the term of coverage of the policy or contract under which a claim for health benefits has been submitted.
I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original.
If I receive a disability benefit payment greater than that which I should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any, or to recoup such overpayment by withholding monies from any Company compensation that would otherwise be due me.

Date: 12/5 20 18   Employee's Signature: _____

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.**

*IMPORTANT — Attending Physician must complete reverse side of this form.*

**\*\* Procedure upon return from sick leave\*\***
If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

**PART B**   **EMPLOYER'S STATEMENT**

| Full Name of Employee | | Social Security Number |
|---|---|---|

| Employee | Was coverage in force | Occupation |
|---|---|---|
| Date of Hire | When disability began ☐ Yes ☐ No | |

Was employee laid off or was lay off contemplated prior to beginning of this disability? ☐ Yes ☐ No   If "Yes" give date _____ 20_____   Did the sickness or injury arise out of the Employee's employment? ☐ Yes ☐ No   If "Yes" state reason in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement.

Are there any circumstances which would cause you to question the validity of this claim? ☐ Yes ☐ No   If "Yes" give reason in space provided below   Hourly rate Or monthly salary   Amount of weekly A & S benefit

List Employee withholding election for federal taxes (e.g., M-1)   List Holidays paid during sick leave   List number of Occasional sick days used this year

Date Employee was first absent from work in present disability _____ 20_____   Date work was resumed _____ 20_____

Date _____ 70_____   Employer Representative _____

\*\*Additional Space For Employer/Employee Use (Attach additional sheets for more information)

RECEIVED DEC 05 2018


EXHIBIT
19

Plaintiff 000347

JA000381

**PART G    ATTENDING PHYSICIAN'S STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION**

TO THE ATTENDING PHYSICIAN: Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist in determining if these benefits are payable. Please answer ALL applicable items; otherwise the form will be returned to you for additional information.

1. PATIENT'S FULL NAME    Colleen John

2. DIAGNOSIS (INCLUDE COMPLICATIONS)    Major depression Nervous    3. PREGNANCY, APPROXIMATE DATE PREGNANCY

F 33.41    F 41.1    DATE

4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?    Yes ☒ No

5. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED    10-18-18

6. DATE PATIENT WAS FIRST UNABLE TO WORK DUE TO THIS CURRENT    7-6-18

7. DATES OF TREATMENT (PHYSICIAN'S OFFICE OR HOSPITAL) AFTER FIRST CALL/VISIT    7-23-18   9-20-18   10-4-18   11-2-18

8. WAS PATIENT HOSPITALIZED?    Yes ☒ No
If Yes: Date Admitted    Date Discharged
Name of Hospital

9. PATIENT'S NEXT SCHEDULED APPOINTMENT IS    1-8-19

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?    Yes ☒ No    IF YES describe condition and date
SA 2013 – anxiety

11. IS PRESENT TREATMENT FOR THIS CASE THIS CONDITION?    Yes ☒ No    IF NO, Explain:
HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?    Yes ☐ No    IF YES,
Name of Physician

12. WAS PATIENT PARTIALLY DISABLED?    Yes ☒ No    follow up
IF YES FROM    12-5-18    TO    no longer
IF YES FROM    TO

13. ATTENDING ATTENDING PHYSICIAN

12-5-18    Brett Colleen    [signature]    MS PA-C
DATE    PHYSICIAN'S NAME (Print)    SIGNATURE    DEGREE

1003 Vergatunn Rd    Reading    PA    19607
STREET ADDRESS    CITY or TOWN    STATE    ZIP CODE

( 610 ) 777-4640    ( 610 ) 777-5575
TELEPHONE    FAX NO.

If assistance is needed in completing this form, please contact
Angela Purcell
1-610-966-5083

RETURN THIS COMPLETED FORM TO:
Mack Trucks, Inc
Angela Purcell
7000 Alburtis Road
Macungie, PA 18062
Fax 1-610-966-6950

RECEIVED DEC 06 2018

JA000382

## REIMBURSEMENT AGREEMENT

### To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated _____, provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

    (1) Payments received from any or all of the benefits sources enumerated above, and

    (2) Salary Continuation and/or Accident and Sickness benefit payments made by you

Which exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree, that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Disease Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program, or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

12/5/18
DATE

EMPLOYEE SIGNATURE

*Colleen Sara John Behm*
EMPLOYEE NAME (PRINTED/TYPED)

450939
BADGE NO.

Rev 10/13

RECEIVED DEC 0 5 2018

6103768745
6103760745

11 33:56   12-12-2018   5 10
15:30;30   12-05-2018   5/10



**MACK.**

Lehigh Valley Operations
7000 ALBURTIS ROAD
MACUNGIE, PA 18062-9631
PHONE# (610) 966-8878; FAX# (610) 966-8882

DIAGNOSIS TREATMENT PLAN

PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU

DATE: 12-5-18   PATIENT'S NAME (print): Colleen John

DIAGNOSIS: Major depression recurrent F33.41 Generalized anxiety F41.1

TREATMENT PLAN: change medication and/or dosage to

control symptoms.

_____

_____

_____

_____

DIAGNOSTIC STUDIES: _____

RETURN VISIT DATE: Jan 8 2019

*PHYSICIAN SIGNATURE: _____
*Requires MD, DO, or DPM signature ONLY

PRINT PHYSICIAN'S NAME: _____

PHYSICIAN'S ADDRESS: _____

PHYSICIAN'S PHONE #: 610-777-4040

Diagnosis treatment plan  updated 7/18/16

RECEIVED DEC 05 2018

Plaintiff 000350

JA000384

03768745

11:34 OH   12-12-2018   6/10
15:30:44   12-05-2018   6/10

## PHYSICAL CAPABILITIES CHECKLIST
### LEHIGH VALLEY OPERATIONS
### MEDICAL DEPARTMENT

**MACK**

Print Patient's Name: Colleen Schin       Date Completed: 12-5-18

Dominant Hand: Right X   Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| Floor to Waist | | | | | | |
| Waist to Shoulder | | | | | | |
| Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| Sitting | | | | | | |
| Standing | | | | | | |
| Walking | | | | | | |
| Bending | | | | | | |
| Twisting | | | | | | |
| Stooping / Squatting | | | | | | |
| Kneeling | | | | | | |
| Climbing | | | | | | |
| Crawling | | | | | | |
| Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

**PLEASE CIRCLE EITHER RIGHT HAND / RIGHT HAND / LEFT HAND / BOTH HANDS**

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| Grip / Grasp | | | | | |
| Push / Pull | | | | | |
| Fine Manipulation | | | | | |
| Keyboard Operation | | | | | |
| Foot Controls | | | | | |

**LIFTING / CARRYING**
- O Sedentary    10 lbs. max. & occasionally carrying small objects; this does not mean seated work. Please address in sitting, standing, etc., in miscellaneous activities.
- O Light    20 lbs. max.; frequently up to 10 lbs.
- O Medium    50 lbs. max.; frequently up to 20 lbs. constant 10 lbs.

Estimated Length of Disability: 1-3 mths       Date released to RTW: _____

Any medication that would prevent RTW activities?   Yes X No   Explain: _____

Comments / Explanations: pr physical limitations Pt's emotional state

makes / causes her to be unable to perform tasks of work efficiently
and could make her emotional state worse

Physician's Signature: _____

RECEIVED DEC 0 5 2

Plaintiff 000351

JA000385

HR  1/9/19

**INTEGRATED MEDICAL GROUP, PC**
1903 Morgantown RD
Reading PA 19607-9620
610-777-4040

CALHOON, BRENT, P.A.
1903 Morgantown Road
Reading, PA 19607-9620

RECEIVED JAN 0 9 2019

SAP - 460939

WORK/SCHOOL EXCUSE

Date: 01/08/19

PATIENT NAME: Colleen S Behm

The patient may return to work/school on 01/21/2019 for full duty.

Due to current privacy laws, the medical reason for his/her absence will not be provided unless requested by the patient.

Sincerely,

Brent Calhoon
Brent Calhoon PA-C

Electronically signed by agent of provider: Karen Steiger on 01/08/2019 at 12:01 pm

INTEGRATED MEDICAL GROUP, P.C.
GREEN HILLS FAMILY PRACTICE ASSOCIATES, LLC
Diane T. Bonaccorsi, M.D.  Kimberly Ravenzahn, D.O.
B. Charles Muvdi, M.D.  Brent Calhoon, PA-C
Kristin Kimma, CRNP
1903 Morgantown Road
Reading, Pa 19607
610-777-4040

Plaintiff 000352

JA000386

# CORRECTIVE ACTION REQUEST APPLICATION
MACK TRUCKS, INC. - LEHIGH VALLEY OPERATIONS

**INJURY / ACCIDENT REPORT FORM (DISPENSARY COPY)**

## Colleen Behm

| | |
|---|---|
| Date Reported: | 05/08/2019 |
| Date of Incident: | 05/08/2019 0830am |
| Time Began Work: | 0845am |
| Department: | Production |
| Area: | Cab 1 |
| Section: | VT 5 |
| Supervisor: | Donald Craft |
| SAP: | 460039 |
| Name of Person(s) Involved: | Colleen Behm |
| Address: | 216 halsey avenue<br>Reading pa, 19609 |
| Date of Birth: | 05/22/1989 |
| Date of Hire: | 01/02/2018 |
| Gender: | F |
| Manning Title: | flex tech |
| Shift: | 1st |
| Length of Time in this Job: | < or equal to 1 month |
| Type of Injury / Illness: | Laceration / Abrasion / Contusion |
| Causes of Injury: | Struck By / Against |
| Body Parts: | Head |
| Body Part (R/L): | Right |

## Dispensary Information

| | |
|---|---|
| Injury Type | WC Denial |
| Employee's Description | I climbed into the sleeper and there was a bracket, that was attached to the roof and I hit my head on it. It stunned me; I had to sit down shortly afterwards I got a headache that has not gone away- I was nauseated and did not finish lunch, my ears are ringing, and my eyes are sensitive to the light. |
| Witnesses | noel |
| Employee Agrees | Yes |

EMPLOYEE SIGNATURE: _____

| | |
|---|---|
| What Object or Substance Directly Harmed Employee? | hit head on roof bracket |
| PPE Required | Safety Glasses, Safety Shoes |
| PPE Used | Safety Glasses, Safety Shoes |
| Was there a Fatality? | No |
| Date of Fatality | n/a |
| S | see above statement |
| O | no LOC PERRLA, VSS, minor erythema - right forehead. EE took own Ibuprofen 9am but no relief obtained |
| A | contusion right forehead |
| P | TO LVHC-ER for further evaluation - EE refused to go to LVHC-ER. Went to Reading Hospital on her own. |
| Healthcare Provider Name / Address | dispensary |
| Was an ER visit or Hospitalization Required? | Yes |
| Signing Nurse | Kathy Shiffert |

Behm v. Mack Trucks, et al.


EXHIBIT
26

MACK0248

**EXHIBIT 21**

Behm v. Mack Trucks, et al.

MACK0208

## MACK TRUCKS INC. / LEHIGH VALLEY OPERATIONS
### MEDICAL EVALUATION

Date: 5/10/19

Name: Eileen Behm                     SAP#: 450039

Department: CAB1 JTY    DOH#: 5-22-89   1-22-18

Job: Flex tech    Shift: 735

Injury/Illness: Head

Date of Injury/Illness: 2/8/19   Lost Time Date, if applicable: 5/9/19

Claim Status: ☐ Workers Comp ☐ WC Claim Pending ☐ Non-Work Related

Claim #, if applicable: WC5906E 11428  Dominant hand: ☐ R  ☐ L

• • • • • • • • • • • • • • • • • • • • • •

**Medical Excuse Actions:**
☐ Medical Evaluation was provided by the outside treating physician.
☑ Medical Evaluation was provided by the company physician.
☐ Surgery Date:

• • • • • • • • • • • • • • • • • • • • • •

**Based on Medical Review, the employee is:**

Effective Date: 5/10/19
☐ Able to Work   ☐ Not Able to Work
☑ Restrictions per Physical Capabilities Form

Recheck Date w/Outside Treating Physician:

Recheck Date w/Company Physician:  5/29/19  72m

Signed: Company Physician/Nurse:

### JOB PLACEMENT: PERSONNEL DEPARTMENT  K-18

The employee has been evaluated and is:
☐ Placed on regular work, with no restrictions  ☐ Terminated
☐ Placed on regular work, with restrictions  ☑ Not Able to be Placed,  5/10/19

Date: 5-10-19    Signed: Joseph Drew Kuhn

Supervisor: Joseph Drew Kuhn

This medical evaluation does not entitle an employee to any benefits under Our Company's Sick Leave Program. To receive benefits through the Workers' Compensation, Salary Continuation or Medical & Sickness Program, the employee must provide appropriate medical documentation in accordance with plan requirements.
If the employee is referred to a physician or any health care provider, any expenses incurred will be the employee's responsibility. Such expenses may or may not be covered under the applicable health benefits program and will be processed in accordance with the terms of the program.

** ≠ 33 W30 Wt + replaced today.

---

## PHYSICAL CAPABILITIES CHECKLIST
### Based on a 480 minute workday
Mack Trucks, Inc. – Lehigh Valley Operations

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING AND REACHING:** | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | ✓ |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | ✓ | | | | | |
| • Standing | | | ✓ | | | |
| • Walking | | ✓ | | | | |
| • Bending | | | | ✓ | | |
| • Twisting | | | | | ✓ | |
| • Stooping/Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | ✓ | |
| • Driving: Car / Lift Truck / Tractor / Trailer | | | | | | |

| PLEASE FORCE FOR APPROPRIATE EXTREMITY | RIGHT HAND | | | | LEFT HAND | | | | BOTH HANDS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | | | | | Never |
| **REPETITIVE TASKS:** | | | | | | | | | | |
| • Grip/Grasp | | ✓ | | | | | | | | |
| • Push/Pull | | ✓ | | | | | | | | |
| • Fine Manipulation | | | | | | | | | | |
| • Keyboard Operation | | | | | | | | | | |
| • Foot Controls | | | | | | | | | | |

**LIFTING/CARRYING:**
☑ Sedentary  10 lbs. max, & occasionally carrying small objects; this does not mean seated work.
Please address in sitting, standing, etc., in miscellaneous activities.
☐ Light    20 lbs. max; frequently up to 10 lbs.
☐ Medium   50 lbs. max; frequently up to 20 lbs; constant 10 lbs.

Estimated Length of Disability:

Any medication that would prevent RTW activities? ☐ Yes  ☐ No  Explain:

Date released to RTW:

Comments/Explanations: No exposure to bright light

Lost Time estimated 5-9-19

Behm v. Mack Trucks, et al.                                      MACK0211

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR AND INDUSTRY
BUREAU OF WORKERS' COMPENSATION
1171 S. CAMERON STREET, ROOM 103
HARRISBURG, PA 17104-2501
(TOLL FREE) 800-482-2383
(TTY 800-362-4228

## NOTICE OF ABILITY TO RETURN TO WORK

| Social Security Number | Serial Security Number | Date of Injury |
|---|---|---|
| 188 - 70 - 481D | | 5   8   19 |

PA BWC Claim Number: 08080E1142Y

**Employee**

Last Name: Colleen    First Name: Behm
Street: 3116 Halsey Ave
City: Reading   State: PA   Zip Code: 19606
Telephone: (610) 587-0822

**Employer**

Name: Volvo Group N.A./Mack Trucks, Inc.
Street: Route 100 and Geheman Road
City: Macungie   State: PA   Zip Code: 18062
Telephone: (610) 966-8878   FEIN

**Insurer or Third Party Administrator (if self-insured)**

Name: Liberty Mutual Insurance Co.
Street: 175 Kings Grant Drive
P. O. Box 3634
City: Bala Cynwyd   State: PA   Zip Code: 19004
Telephone: (800) 300-4472
County    Claim Number    FEIN

DATE OF THIS NOTICE:   5 / 10 / 19

Given to EE on   5/10/19

By _____
(Nurse's Signature)

(Date)

Section 306(b)(3) of the Pennsylvania Workers' Compensation Act requires insurers to notify the employee when they receive medical evidence indicating the ability to return to work in some capacity.

Receipt of medical evidence indicates your present physical condition or change of condition is:

You were cleared to RTW per Dr. MVP    on   5/10/19   (Date)

See attached documentation.

Attached are all documents supporting these allegations.

### YOU SHOULD ALSO KNOW

You have an obligation to look for available employment.

Proof of available employment may jeopardize your right to receive ongoing benefits.

You have the right to consult with an attorney in order to obtain evidence to challenge the insurer's contentions.

Any individual filing misleading or incomplete information knowingly and with intent to defraud is in violation of Section 1102 of the Pennsylvania Workers' Compensation Act and may also be subject to criminal and civil penalties through Pennsylvania Act 165 of 1994.

Auxiliary aids and services are available upon request to individuals with disabilities.

Equal Opportunity Employer/Program

LIBC-757 REV 6-04

Collen Behm          SAP # 450939          May 10, 2019

S:   Patient presents for follow-up regarding an injury to her forehead. She states she stood up in the cab of a truck striking her head on a bracket. She did not lose consciousness. However she did report that she had a headache and nausea. She was offered a visit at the emergency room but declined instead going on her own that evening to Reading Hospital. CAT scan was performed at that time and was negative/normal. Date of that visit was May 8, 2019. The patient indicates that although she still has a headache and some photophobia she is otherwise improved. The patient is using Tylenol at this time.

O:   Examination reveals patient to be alert and oriented in no acute distress. She does report that she is photophobic. Examination of her eyes reveal EOMI, PERRLA. Fundascopic examination shows normal cup-to-disc ratio. The patient's Romberg is solidly normal. She moves upper and lower extremities through a normal range of motion. With her only symptoms currently is headache and photophobia. Examination of the area of contusion shows no evidence of an abrasion, swelling, ecchymosis or palpatory tenderness. The patient will be allowed to return to work at a very modified position placed in an area of reduced light/tinted glasses, reduce noise and primarily seated work.

A:   Head contusion

P:   #1. Patient will be allowed to work at a restricted level of duty wearing tinted glasses or reduced light environment
2. Patient may use Tylenol at her discretion although over-the-counter dosing should not be exceeded SED
3. Patient will follow up with me on Monday, May 13, 2019

In attendance: Tara Houck, RN, Gloria Pesola, RN, HRBP Dee Markell, Karl Kerschner, UAW
Alan Muto, D.O.

WC #          WC 390 E 11428
Addendum: Patient indicates that she is unwilling to perform light duty. This light duty was specifically designed with low light, tinted glasses and sit down work. Patient states she still has a headache and is worried that she might become nauseous. As a result she will be sent home today under Workmen's Comp. and follow up on Monday, May 13, 2019. The patient was also offered a second opinion by a panel provider and she has a list of those providers with her. She was asked to notify us if she was to access a panel provider. Patient was offered transportation home but declined



Behm v. Mack Trucks, et al.                                              MACK0242

Muto. I also requested that HR be brought into the conversation since EE was giving us issues regarding her return to work today. We also provided EE with tinted safety glasses for her to work since she had c/o of photophobia. I left the room to notify HR of all of the above and request their presence as I explained the WC process with the EE and any repercussions that may occur if she chooses to go home today. I also notified Dr. Muto that she is requesting his presence in the exam room to ask him questions about her headaches/migraines etc. When I left the room, Tara Houck RN, advised me that she had complaints about what I said regarding Medical transportation to work (EE verbalized the following: can you believe her wanting to send Medicar for me to come to work. I should be home resting my brain. If I go out there and get sick I am "F...ing sueing!

Dee Markell & Marta Albalate from HR came into the exam room to discuss EE's reluctance to return to work and the repercussions that could occur if the employee chooses to go home even though we have light duty work available for her today. Once again, EE explained to HR & union rep. that she prefers to go home & rest today. Marta & I explained again that since we have light duty available for her today, that she would be returned to work with full pay on a light duty assignment. If she chooses to go home, rather than work in her light duty assignment, that she would be subject to the disciplinary process of receiving a point. I also discussed with EE that she would not be paid WC because there is a waiting period for WC when you are out of work. The EE then started talking to her union rep. and stating that she wants to see her FMD/PCP for treatment. I started to explain to the EE the WC law/rights & duties/physician panel for 90 days, etc. and that she also signed the forms during her injury report regarding this issue, when she completely looked in my direction and said, "stop talking to me"! She also stated that she did not sign these forms and I advised her that she did. She told me to go check the chart, which I did, and the signed forms were in the chart & were shown to her for review. She then started talking to her union rep. regarding that she would forget the WC part and see her FMD for treatment and work status. I then politely interjected and said to everyone present; "Colleen, with all due respect, we cannot stop you from seeing your FMD; however, I would like you to know that if you choose to go to your FMD for treatment for this alleged work injury, your bills will probably not be covered under WC by LM. Also your health insurance will not pick up the bill since you

have an open active WC claim and you may end up being stuck with the bills. I think it is important that you are aware & understand how the WC process works. I also advised EE that she can treat with any one of the physician panel providers on the list for the first 90 days if she wanted a 2nd opinion from Dr. Muto's opinion. She then asked for Dr. Muto to come into the room to discuss her work status. Dr. Muto did see her again, and advised he would place her out of work today under WC, but that he will see her again in f/u on Monday, 5/13/19 to determine her work status at that time. We also gave her another copy of the physician panel list, so that if she feels the need to get a 2nd opinion, she is more than welcome to seek care from any provider on that list. I asked EE if she wanted to be transported home by Medicar but she declined the offer. The conversations ended, and EE left the department with her union rep. at approx. 10:45 a.m. EE will be paid for the hours from 06:45 a.m. to 10:45 a.m. EE is to return on Monday, 5/13/19, for possible return to work with or without restrictions, per Dr. Muto's follow up exam.

Gloria Pesola RN

Distribution 5/29/19

 **pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
BUREAU OF WORKERS' COMPENSATION

# NOTICE OF WORKERS'
## COMPENSATION DENIAL

**EMPLOYEE**

DENIED

5/23/19

COLLEEN S BEHM
216 HALSEY AVE
READING PA 19609

**DATE OF NOTICE**
| 0 | 5 | 2 | 3 | 2 | 0 | 1 | 9 |
| MM | | DD | | YYYY | | | |

**DATE OF INJURY**
| 0 | 5 | 0 | 8 | 2 | 0 | 1 | 9 |
| MM | | DD | | YYYY | | | |

**SOCIAL SECURITY NUMBER**
| * | * | * | - | * | * | - | 4 | 6 | 1 | 0 |

Date of birth
| 0 | 6 | - | 2 | 2 | - | 1 | 9 | 6 | 9 |
| | MM | | DD | | | YYYY | | | |

**WC ID NUMBER**
| W | 1 | 0 | 1 | 6 | 8 | 0 | 1 | 8 |

County _____

**WCAIS CLAIM NUMBER**
| 0 | 3 | 0 | 8 | 0 | 1 | 3 |

Telephone 6106070622

**EMPLOYER**

Name  VOLVO GROUP NORTH AMERICA INC.

Address  7000 ALBURTIS RD

Address _____

City/Town  MACUNGIE _____ State  PA  ZIP  18062

County _____

Telephone  6109688070 ____ FEIN  562431186

**INSURER**

Name  LM INSURANCE CORPORATION

Address  111 PRESIDENTIAL BLVD STE 127

Address _____

City/Town  BALA CYNWYD ____ State  PA  ZIP  19004

County _____

Telephone _____ FEIN  043058504

NAIC code  33000 _____ Insurer code  2235

Insurer/Administrator claim #  390E11426

**TPA**

Name _____

Address _____

Address _____

City/Town _____ State _____ ZIP _____

County _____

Telephone _____ FEIN _____

Insurer/Administrator claim# _____

**INJURY INFORMATION**

Part of body injured
Multiple Head Injury

Nature of Injury
Contusion [Bruise - intact skin surface hematoma ]

Accident/injury description narrative
EE CLIMBED INTO SLEEPER AND STRUCK HEAD ON BRACKET
ATTACHED TO ROOF. C/O HEADACHE, NAUSEA, EARS RINGING,
LIGHT SENSITIV

County  LEHIGH

Check if occupational disease ☐

**NOTICE TO EMPLOYEE:** The employer/insurer has decided to deny
you workers' compensation benefits. You have the right to contest
this denial by timely filing a petition. Petitions may be either
electronically filed in WCAIS or sent to the Workers' Compensation
Office of Adjudication, 1010 N. Seventh St., Suite 202, Harrisburg, PA
17102-1400.

Do not use this form to accept a medical-only claim. This notice
shall be sent to the employee or dependent and filed with the Bureau
of Workers' Compensation via electronic format no later than 21 days
after notice or knowledge to the employer of the employee's disability
or death. A separate paper copy of this EDI-generated form should
not be uploaded or sent to the Bureau.

Specific information regarding this claim is on the reverse side of this form.

LIBC-496 REV 03-16 (Page 1)                     (OVER)


EXHIBIT
23
tabbies

Behm v. Mack Trucks, et al.

MACK0201

JA000393

May. 21. 2019 11:16AM     05/21/2019 07:49 No. 7547 P. 4

HR 5/21/19     **A&S**

RECEIVED **MACK.**

Mack Trucks, Inc.
Macungie Assembly Operations
7000 Alburtis Road
Macungie, PA 18062-9631
Phone: 610-966-8083

MAY 2 1 2019

MACUNGIE MEDICAL

Name: Colleen Sara Behm   Emp: 450939   Date: May 13, 2019

We are sorry to hear that you are ill and want to wish you a speedy recovery. If there is anything we can do to help you medically, please do not hesitate to contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost time from work will only be processed if your absence is approved by an MD, DO, DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted, which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability Benefits Claim Form enclosed, must be filled out completely, signed by an M.D. and faxed to the Mack Macungie HR office, 610-966-8950, or it may cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to work release upon returning to work. If you do not have this release with you, we will NOT be able to return you to work until that release is obtained. The work release should state the effective date of return with or without restrictions. If there are any restrictions attached to your release, they need to be as specific and as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract, Article 1- Section 27(c)(3)), FMLA runs concurrent with six weeks (up to 240 hours) of accident and sickness benefits. An FMLA Certification of Health Care Provider for Employee's Serious Health Condition is enclosed. Your doctor should complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE: _____/_____/_____
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions or concerns, please do not hesitate to call me at 610-966-8083.

Sincerely,

Angela Pursell
Macungie Human Resources

/attachments

**EXHIBIT**
24

May. 21. 2019 11:15AM                                    05/21/2019 07:40    No. 7547  P. 3/010
From:

## SHORT TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

PART A      EMPLOYEE'S STATEMENT
All Questions Must Be Completed by Employee → Claim Form Must Be Returned By: _____

| Full Name | Badge # | Social Security Number | Date of Birth |
|---|---|---|---|
| Colleen Sara Behm | 450939 | 188 170 4810 | 05/22/1989 |

| Address Street | City or Town | State | Zip |
|---|---|---|---|
| 216 Halsey Ave | Reading | PA | 19609 |

If accident occurred, give Date May 11, 20 19 Describe in Space Provided Below   |   Is the sickness of injury due to your employment with the Company?   Yes ___ No X   If "Yes", give full particulars in space provided below.

Is the sickness of injury due to your employment with another employer?   Yes ___ No X   If Yes, give full particulars below.

Were you employed by another employer (full or part-time) when disability commenced?   Yes ___ No X   If Yes, give full particulars below and name of employer.

| First day you did not perform any work because of disability | Date you were first treated by physician in present disability | If recovery has occurred, give date |
|---|---|---|
| May 18, 20 19 | May 11, 20 19 | 20 |

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical care institutions, and to insurance, medical or hospital service and prepaid health plans, employers and group policyholders, contract holders or benefit plan administrators.

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment related information regarding the patient, THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE DISCLOSED TO AN INDEPENDENT CLAIMS ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIER FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the duration of this authorization is for the term of coverage of the policy or contract under which a claim for benefits has been submitted. I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original. If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to correct such overpayment from, including the right to reduce future disability benefits, if any, or to recoup such overpayment by withholding it as in a future Supplementary Compensation that would otherwise be due me.

| May 13 | 20 19 |
|---|---|
| Date | Employee's Signature |

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE,**

**IMPORTANT – Attending Physician must complete reverse side of this form.**

**\*\*Procedure upon return from sick leave\*\***

If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

PART B      EMPLOYER'S STATEMENT

| Full Name of Employee | | Social Security Number |
|---|---|---|

| Employee Date of Hire | Was coverage in force | Yes ___ | Comparison |
|---|---|---|---|
| | When disability began | Yes ___ | |

Was employee laid off or was lay off contemplated prior to beginning of this disability?   Yes ___ No ___   If "Yes" give date ___ 20___   |   Did the sickness of injury arise out of the Employee's employment?   Yes ___ No ___   |   If "Yes" state reason in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement.

Are there any circumstances which would cause you to question the validity of the claim?   Yes ___ No ___   |   If "Yes" give reasons in space provided below   |   Hourly rate Or monthly salary   |   Amount of weekly A & S benefit

| List Employees withholding election for federal taxes (e.g., M-1) | Paid Holidays paid during sick leave | List number of Overtime and short days used this year |
|---|---|---|

Date Employee was first absent from work in present disability _____ 20___   |   Date work was resumed _____ 20___

| Date | 20___ | Employer Representative |
|---|---|---|

Additional Space For Employer/Employee Use (Attach additional sheets for more information)

Behm v. Mack Trucks, et al.                                          MACK0203

From May. 21. 2019 11:15AM                          06/21/2019 07:40  No. 7547   P... 03/010

Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts.

**PART C     ATTENDING PHYSICIAN'S STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION**
*TO THE ATTENDING PHYSICIAN:* Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for additional information.

1. PATIENT'S FULL NAME
Behm    Colleen

2. DIAGNOSIS AND CONCURRENT CONDITIONS                          IF PREGNANCY, APPROXIMATE DATE COMMENCED:

CORRESPONDING ICDA CODE: S06.0X0D  309.93x D    DATE _____
(ICDA - International Classification of Diseases)     F41.      F53.41

3. a. Was surgery performed?          ___ Yes   ___ No      4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF
   b. Type of Surgical Procedure: _____               PATIENT'S EMPLOYMENT?
   c. Date of Surgery: _____                           ___ Yes   X  No

5. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT    6. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED?
   CONDITION:                                                     Sickness Appeared Date: _____
   DATE:  5-13-19                                                 X  Accident Happened Date:  5-12-19
                                                                  If Accident, Describe Nature of Accident:
7. DATE OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL AFTER         assault - injury to face & head
   FIRST DATE EXAMINED (if not applicable, state "NONE"):
   DATE:  5-18-19

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:                    9. WAS PATIENT HOSPITALIZED?          ___ Yes   (No)
   DATE:  5-31-19                                                 If Yes  Date Admitted:_____  Date Discharged:_____
                                                                  Name of Hospital: _____

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?           11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
    ___ Yes   X  No     If "YES" describe condition and date      ___ Yes   ___ No      If "NO", Explain:
                                                                  WAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?
                                                                  ___ Yes   ___ No      If "YES",
                                                                  Date of Referral: _____
                                                                  Name of Physician: _____

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER       13. WAS PATIENT PARTIALLY DISABLED? (If you are completing this form,
    YOUR CARE?   X  Yes   ___ No                                  please list specific restrictions in the "Remarks" Section below along with the
                                                                  estimated duration of the restriction.)
    IF YES, FROM  5-12-19        TO  6-3-19                       IF YES, FROM _____  TO _____

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK? Approximate date must be specified.
    Regular work - Date: _____              Restricted work (see No. 13) - Date: _____

15. ATTENTION ATTENDING PHYSICIAN
    If you are releasing an employee to return to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work
    Assignments, we request that you clearly identify on this Accident and Sickness form:
        (a)  Any medical restrictions and/or specific limitations applicable to the employee.
        (b)  Any type of work the employee is able to perform.
        (c)  Any type of work the employee is unable to perform.
    If you have any questions regarding the receipt of the scope of job functions please contact the Human Resource Service Center.

Attending Physician's Remarks (Use additional sheet if necessary)

5-21-19          Diane Bonace, DO          [signature]
DATE             PHYSICIAN'S NAME (Print)             SIGNATURE

1803 Morgantown Rd          Pasadena          PA          1960?
STREET ADDRESS               CITY or TOWN       STATE       ZIP CODE

( 610 )  777  4040                ( 610 )  777  5575
TELEPHONE NO.                     FAX NO.

If assistance is needed in completing this form, please contact          RETURN THIS COMPLETED FORM TO:
Angela Purcell                                                           Mack Trucks, Inc
(PH) 1-610-966-8083                                                      Angela Purcell
                                                                        7000 Alburtis Road
                                                                        Macungie, PA 18062

## REIMBURSEMENT AGREEMENT

To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated _May 13, 2019_, provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

    (1)  Payments received from any or all of the benefits sources enumerated above, and

    (2)  Salary Continuation and/or Accident and Sickness benefit payments made by you

which exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree, that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Disease Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program, or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

_5/13/19_
DATE

EMPLOYEE SIGNATURE

_Colleen Sara Behm_
EMPLOYEE NAME (PRINTED/TYPED)

_450939_
BADGE NO.

Rev 10/13

Behm v. Mack Trucks, et al.                                    MACK0205

May. 21. 2019 11:16AM   From·
06/21/2019 07:50  No. 7547  P. 6/010

## PHYSICAL CAPABILITIES CHECKLIST
## LEHIGH VALLEY OPERATIONS
## MEDICAL DEPARTMENT



Print Patient's Name: **Colleen Sara Behm**   Date Completed: **May 13, 2019**

Dominant Hand: Right ___ Left ___

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| Floor to Waist | | | | ✓ | | |
| Waist to Shoulder | | | | ✓ | | |
| Shoulder Height or Higher | | | | ✓ | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| Sitting | | | | | | |
| Standing | | ✓ | | | | |
| Walking | | ✓ | | | | |
| Bending | | ✓ | | | | |
| Twisting | | ✓ | | | | |
| Stooping / Squatting | | | ✓ | | | |
| Kneeling | | | ✓ | | | |
| Climbing | | | ✓ | | | |
| Crawling | | | ✓ | | | |
| Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| Grip / Grasp | | ✓ | | | |
| Push / Pull | | ✓ | | | |
| Fine Manipulation | | ✓ | | | |
| Keyboard Operation | | ✓ | | | |
| Foot Controls | | | ✓ | | |

| LIFTING / CARRYING: | | |
|---|---|---|
| ○ Sedentary | 10 lbs. max. & occasionally carrying small objects; this does not mean seated work. Please address in sitting, standing, etc., in miscellaneous activities. | |
| ○ Light | 20 lbs. max.; frequently up to 10 lbs. | |
| ○ Medium | 50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs. | |

Estimated Length of Disability: **2-3 weeks**   Date released to RTW: **6-3-19**

Any medication that would prevent RTW activities? ___ Yes  ✗ No  Explain: ___

Comments / Explanations: ___

Physician's Signature: ___

Behm v. Mack Trucks, et al.                                    MACK0206

May. 21. 2019  11:16AM    From:                                    06/21/2019 07:50   No. 7547  P. 5   06/010



**Lehigh Valley Operations**
**7000 ALBURTIS ROAD**
**MACUNGIE, PA 18062-9631**
**PHONE# (610) 966-8878; FAX# (610) 966-8882**

### DIAGNOSIS TREATMENT PLAN

> **PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882**
> **ASAP AT COMPLETION OF VISIT. THANK YOU!**

DATE: 5/13/19      PATIENT'S NAME (print): Colleen Sara Behm

DIAGNOSIS: S06.0vx0 Concussion w/out Loc   S09.93x D Unspec Crush
                                                                injury to face

TREATMENT PLAN: _____

Concussion protocol and follow up May 31, 2019

_____

_____

_____

DIAGNOSTIC STUDIES: _____

RETURN VISIT DATE: 5-31-19

*PHYSICIAN SIGNATURE: _____
                        *Requires MD, DO or DPM signature ONLY

PRINT PHYSICIAN'S NAME: Diane Bonacci orSi

PHYSICIAN'S ADDRESS: 1903 Morgantown Rd  Reading PA 1860?

PHYSICIAN'S PHONE #: 6A 727 4040

Diagnosis treatment plan: updated 7/16/16

Behm v. Mack Trucks, et al.                                    MACK0207

From:                                              06/21/2019 07:50    #182 P.007/010

**Certification of Health Care Provider for**
**Employee's Serious Health Condition**
**(Family and Medical Leave Act)**

RECEIVED
WHD
JUN 2019
MACUNGIE MEDICAL

U.S. Department of Labor
Wage and Hour Division
U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 5/31/2018

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: ANGELA PURSELL; MACK TRUCKS INC. PH: 610-966-3083  FAX: 610-966-8950

Employee's job title: Production Flex   Regular work schedule: 1st  645-245

Employee's essential job functions: Flex

Check if job description is attached:

**SECTION II: For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections, 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Colleen  Sara  Behm
First              Middle           Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your response to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: 

INTEGRATED MEDICAL GROUP, P.C.
GREEN HILLS FAMILY PRACTICE ASSOCIATES, LLC
Diane T. Bonacoorsi, M.D.  Kimberly Hauenzahn, D.O.

Type of practice / Medical specialty: 

B. Charles Muvdi, M.D.; Brent Calhoon, PA-C
Kristin Kimms, CRNP

Telephone: (     )                         Fax:(     )    1903 Morgantown Road
Reading, Pa 19607
610-777-4040

Page 1                                            Form WH-380-E  Revised May 2015

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced:  5-12-19

Probable duration of condition:  2-3 weeks

Mark below as applicable:
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
X No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:
5-13-19

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No X Yes.

Was medication, other than over-the-counter medication, prescribed? X No ___ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___ Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No X Yes.

If so, identify the job functions the employee is unable to perform:
all

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

headache from concussion made worse with mental and
physical activity prolonging injury / debility

Page 2                           CONTINUED ON NEXT PAGE               Form WH-380-E Revised May 2015

From:                                           06/21/2019 07:51      #182 P.009/010

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?  ___ No  X Yes.

   If so, estimate the beginning and ending dates for the period of incapacity:  5-12-19    6-3-19

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition?  ___ No  X Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___ No  X Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   office visit every 2 weeks    next appt 3-31-19

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___ No ___ Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ____ No ____ Yes. If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency          : _____ times per _____ week(s) _____ month(s)

        Duration: _____ hours or ___ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER:**

   _____

   _____

   _____

   _____

   _____

   _____

Page 3                          CONTINUED ON NEXT PAGE          Form WH-380-E  Revised May 2015

From:                                    06/21/2019 07:51   #182 P.010/010

_____

Signature of Health Care Provider          Date  5/21/19

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29
C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB
control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this
collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining
the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden
estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the
Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC
20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

Page 4                                        Form WH-380-B Revised May 2015



Date: 5/21/19

Colleen Behm
216 Halsey Ave.
Reading, PA 19609

Dear Colleen Behm,

Based on the Mack/ UAW Benefit contract and the available medical information you provided, your medical leave of absence has been approved from 5/13/19 with a RTW date of 6/3/19. Please note benefits for an eligible employee shall begin on the eighth consecutive day of disability due to sickness.

If your doctor clears you for work at an earlier date, you must return to work on that date.

If your doctor plans to release you to work later, the enclosed Supplementary Medical form must be completed by your doctor and returned to our office before 6/3/19 to ensure uninterrupted benefits.

Your Accident & Sickness benefits will stop on the above date unless otherwise advised. You will be expected to report to work on the next business day since you will no longer be on an approved sick leave.

Please allow up to 2 weeks for processing.

If you have any questions pertaining to your claim please contact the Dispensary at 610-966-8878.

Sincerely,

Your Human Resource Department

Cc: HRBP

Mack Trucks Inc.
7000 Alburtis Road
Macungie, PA 18062



Behm v. Mack Trucks, et al.                                        MACK0054

JA000404

## PHYSICAL CAPABILITIES CHECKLIST
## LEHIGH VALLEY OPERATIONS
## MEDICAL DEPARTMENT

**Print Patient's Name:** Colleen Sara Behm    **Date Completed:** May 13, 2019

**Dominant Hand:** Right _____ Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| • Floor to Waist | | | | ✓ | | |
| • Waist to Shoulder | | | | ✓ | | |
| • Shoulder Height or Higher | | | | ✓ | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | ✓ | | | | | |
| • Standing | | | ✓ | | | |
| • Walking | | | ✓ | | | |
| • Bending | | | | ✓ | | |
| • Twisting | | | ✓ | | | |
| • Stooping / Squatting | | | | ✓ | | |
| • Kneeling | | | | ✓ | | |
| • Climbing | | | | ✓ | | |
| • Crawling | | | | ✓ | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | ✓ | | |

**PLEASE CIRCLE APPROPRIATE EXTREMITY:**   RIGHT HAND   LEFT HAND   BOTH HANDS

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | ✓ | | | |
| • Push / Pull | | ✓ | | | |
| • Fine Manipulation | | ✓ | | | |
| • Keyboard Operation | | ✓ | | | |
| • Foot Controls | | | ✓ | | |

**LIFTING / CARRYING:**

◊ Sedentary    10 lbs. max. & occasionally carrying small objects; this does not mean seated work.
     Please address in sitting, standing, etc, in miscellaneous activities.

◊ Light    20 lbs. max.; frequently up to 10 lbs.

◊ Medium    50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs.

**Estimated Length of Disability:** 2-3 weeks    **Date released to RTW:** 6-3-19   7-1-19

**Any medication that would prevent RTW activities?** Yes ___ No ✓ Explain _____

**Comments / Explanations:** _____

**Physician's Signature:** _____

Behm v. Mack Trucks, et al.


EXHIBIT
26

MACK0200

2019-May. 29. 2019 1:15PM   Updated   test 2 >>   No. 7571   P. 6/ 7/10

6-10-19 - OK continuous  5-12-19 to 7-1-19

---

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT

OMB Control Number 1235-0003
Expires: 5/31/2018

**SECTION I: For Completion by the EMPLOYER**

INSTRUCTIONS to the EMPLOYER: The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: ANGELA PURSELL: MACK TRUCKS INC. PH: 610-366-6003 FAX: 610-366-8250

Employee's Job title: Production Flex   Regular work schedule: 1st  6 HS. 2.4

Employee's essential job functions: Flex

RECEIVED
MAY 29 2019
MACK MEDICAL

Check if job description is attached

**SECTION II: For Completion by the EMPLOYEE**

INSTRUCTIONS to the EMPLOYEE: Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Colleen  Sara  Behm  450939
First     Middle     Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

INSTRUCTIONS to the HEALTH CARE PROVIDER: Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address:   INTEGRATED MEDICAL GROUP P.C.
GREEN HILLS FAMILY PRACTICE ASSOCIATES, LLC
Diane T. Bonaccorsi, M.D., Kimberly Havenstrite, D.O.
B. Charles Muvdi, M.D., Brent Calhoon, PA-C

Type of practice / Medical specialty:
Kristin Kimms, CRNP
Telephone: (_____)   Fax (   1908 Morgantown Road
Reading, Pa 19607
610-777-4040

Page 1

Form WH-380-E Revised May 2015

2019-May. 29. 2019 1:16PM          test 2 >>          No. 7571   P. 7  8/10

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: 5-12-19

   Probable duration of condition: 2-3 ~~weeks~~ 2-3 mths
   *error*

   Mark below as applicable:
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   X No ___ Yes. If so, dates of admission: _____

   Date(s) you treated the patient for condition:
   5-13-19    5-29-19

   Will the patient need to have treatment visits at least twice per year due to the condition? ___ No X Yes.

   Was medication, other than over-the-counter medication, prescribed? X No ___ Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   ~~X~~ No X Yes. If so, state the nature of such treatments and expected duration of treatment:
   *error*    Neurologist

2. Is the medical condition pregnancy? X No ___ Yes. If so, expected delivery date? _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to the condition? ___ No X Yes.

   If so, identify the job functions the employee is unable to perform:
   all

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):
   headaches from concussion made worse with mental and
   physical activity, balancing injury / debility

Page 2                    CONTINUED ON NEXT PAGE                Form WH-380-E Revised May 2015

Behm v. Mack Trucks, et al.                                        MACK0125

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___ No _X_ Yes,

If so, estimate the beginning and ending dates for the period of incapacity: 5-12-19   6-25-19  7-1-19 *error*

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___ No _X_ Yes,

If so, are the treatments or the reduced number of hours of work medically necessary?
___ No _X_ Yes,

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

office visit every 2 weeks   next appt 5-25-19   6-28-19 *error*

Estimate the part-time or reduced work schedule the employee needs, if any:

___ hour(s) per day; ___ days per week from ___ through ___

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? _X_ No ___ Yes,

Is it medically necessary for the employee to be absent from work during the flare-ups?
___ No ___ Yes. If so, explain

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ___ times per ___ week(s) ___ month(s)

Duration: ___ hours or ___ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER**

Page 5                    CONTINUED ON NEXT PAGE              Form WH-380-E Revised May 2015

Behm v. Mack Trucks, et al.                              MACK0126

JA000408

2019-May. 29. 2019 1:16PM          test 2 >>          No. 7571    P.  9▷ 10/10

Signature of Health Care Provider          Date  5/21/19

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 CFR. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

Page 4                                        Form WH-380-E Revised May 2015

Behm v. Mack Trucks, et al.                              MACK0127



MACK TRUCKS, INC,
LEHIGH VALLEY OPERATIONS
7000 ALBURTIS ROAD
MACUNGIE, PA 18062-9631

June 14, 2019

Colleen Behm
216 Halsey Ave.
West Lawn, Pa 19609

Dear Employee:

Enclosed, is the Notice of Eligibility and Designation Notice related to your request for a Family and Medical Leave. It identifies the status of your request. It also provides, information about other matters related to your leave, such as your leave schedule and any required Return to Work Certification. Please read the Notice carefully. Upon taking any leave, you must notify us of any requested time, by notice of the Mack Truck Inc. call off procedure. Failure to notify may be subject to the terms of the attendance policy.

If you have questions about this, please let me know.

Sincerely,

Ayesha White
HR Coordinator

Enclosure:   Designation Notice
             Notice of Eligibility



EXHIBIT
27
tabbies

Behm v. Mack Trucks, et al.                                    MACK0120

JA000410

**Notice of Eligibility and Rights &
Responsibilities
(Family and Medical Leave Act)**

**U.S. Department of Labor**
Wage and Hour Division

 **WHD**
U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 5/31/2018

In general, to be eligible an employee must have worked for an employer for at least 12 months, meet the hours of service requirement in the 12 months preceding the leave, and work at a site with at least 50 employees within 75 miles. While use of this form by employers is optional, a fully completed Form WH-381 provides employees with the information required by 29 C.F.R. § 825.300(b), which must be provided within five business days of the employee notifying the employer of the need for FMLA leave. Part B provides employees with information regarding their rights and responsibilities for taking FMLA leave, as required by 29 C.F.R. § 825.300(b), (c).

[Part A – NOTICE OF ELIGIBILITY]

TO:   Colleen Behm - 450939
      Employee

FROM:  Ayesha White
      Employer Representative

DATE:   6/13/2019

On  5/29/2019 , you informed us that you needed leave beginning on  5/12/2019  for

___ The birth of a child, or placement of a child with you for adoption or foster care;

_✓_ Your own serious health condition;

___ Because you are needed to care for your ____ spouse; ____ child; ____ parent due to his/her serious health condition.

___ Because of a qualifying exigency arising out of the fact that your ____ spouse; ____ son or daughter; ____ parent is on covered active duty or call to covered active duty status with the Armed Forces.

___ Because you are the ____ spouse; ____ son or daughter; ____ parent; ____ next of kin of a covered servicemember with a serious injury or illness.

This Notice is to inform you that you:

_✓_ Are eligible for FMLA leave (See Part B below for Rights and Responsibilities);

_✓_ Are ___ not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):

___ You have not met the FMLA's 12-month length of service requirement. As of the first date of requested leave, you will have worked approximately ___ months towards this requirement.

_✓_ You have not met the FMLA's hours of service requirement.

___ You do not work and/or report to a site with 50 or more employees within 75 miles.

If you have any questions, contact  Kaitlyn O'Neill – HRBP _____ or view the FMLA poster located in _____

[PART B-RIGHTS AND RESPONSIBILITIES FOR TAKING FMLA LEAVE]

As explained in Part A, you meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the applicable 12-month period. However, in order for us to determine whether your absence qualifies as FMLA leave, you must return the following information to us by _____, (If a certification is requested, employers must allow at least 15 calendar days from receipt of this notice; additional time may be required in some circumstances.) If sufficient information is not provided in a timely manner, your leave may be denied.

___ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request ___ is/ ___ is not enclosed.

___ Sufficient documentation to establish the required relationship between you and your family member.

___ Other information needed (such as documentation for military family leave): _____

_____

_____

___ No additional information requested

Page 1                              CONTINUED ON NEXT PAGE                   Form WH-381 Revised February 2013

Behm v. Mack Trucks, et al.                                              MACK0121

If your leave does qualify as FMLA leave you will have the following responsibilities while on FMLA leave (only checked blanks apply):

_____   Contact _____ at _____ to make arrangements to continue to make your share of the premium payments on your health insurance to maintain health benefits while you are on leave. You have a minimum 30-day (or, indicate longer period, if applicable) grace period in which to make premium payments. If payment is not made timely, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work.

_____   You will be required to use your available paid _____ sick, _____ vacation, and/or _____ other leave during your FMLA absence. This means that you will receive your paid leave and the leave will also be considered protected FMLA leave and counted against your FMLA leave entitlement.

_____   Due to your status within the company, you are considered a "key employee" as defined in the FMLA. As a "key employee," restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us. We _____ have/_____ have not determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us.

_____   While on leave you will be required to furnish us with periodic reports of your status and intent to return to work every _____. (Indicate interval of periodic reports, as appropriate for the particular leave situation).

If the circumstances of your leave change, and you are able to return to work earlier than the date indicated on the this form, you will be required to notify us at least two workdays prior to the date you intend to report for work.

If your leave does qualify as FMLA leave you will have the following rights while on FMLA leave:

- You have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period calculated as:

  _____   the calendar year (January—December),

  _____   a fixed leave year based on _____,

  ✓   the 12-month period measured forward from the date of your first FMLA leave usage,

  _____   a "rolling" 12-month period measured backward from the date of any FMLA leave usage.

- You have a right under the FMLA for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered servicemember with a serious injury or illness. This single 12-month period commenced on _____.
- Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work.
- You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)
- If you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered servicemember's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
- If you have not informed us above that you must use accrued paid leave while taking your unpaid FMLA leave entitlement, you have the right to have _____ sick, _____ vacation, and/or _____ other leave run concurrently with your unpaid leave entitlement, provided you meet any applicable requirements of the leave policy. Applicable conditions related to the substitution of paid leave are referenced or set forth below. If you do not meet the requirements for taking paid leave, you remain entitled to take unpaid FMLA leave.

  _____   For a copy of conditions applicable to sick/vacation/other leave usage please refer to _____ available at: _____

  _____   Applicable conditions for use of paid leave: _____

  _____

  _____

  _____

Once we obtain the information from you as specified above, we will inform you, within 5 business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please do not hesitate to contact:

Ayesha White _____ at   610.966.8906

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to provide employees with notice of their eligibility for FMLA protection and their rights and responsibilities. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(b), (c). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take on average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

Form WH-381 Revised February 2013

Behm v. Mack Trucks, et al.                                          MACK0122

JA000412

Designation Notice
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division



U.S. Wage and Hour Division
OMB Control Number: 1235-0003
Expires: 8/31/2021

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form by employers is optional, a fully completed Form WH-382 provides an easy method of providing employees with the written information required by 29 C.F.R. §§ 825.300(c), 825.301, and 825.305(c).

To:    Colleen Behm - 450939

Date:  06/14/2019

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided.
We received your most recent information on _____ 6/29/2019 _____ and decided:

_____  Your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave.

The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement.

_____  Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: _____

_____  Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised (check if applicable):
_____  You have requested to use paid leave during your FMLA leave. Any paid leave taken for this reason will count against your FMLA leave entitlement.

_____  We are requiring you to substitute or use paid leave during your FMLA leave.

_____  You will be required to present a fitness-for-duty certificate to be restored to employment. If such certification is not timely received, your return to work may be delayed until certification is provided. A list of the essential functions of your position ____ is ____ is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

_____  Additional information is needed to determine if your FMLA leave request can be approved:

_____  The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request. You must provide the following information no later than _____ unless it is not
(Provide at least seven calendar days)
practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

_____
(Specify information needed to make the certification complete and sufficient)

_____  We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later time.

__✓__  Your FMLA Leave request is Not Approved.
_____  The FMLA does not apply to your leave request.
_____  You have exhausted your FMLA leave entitlement in the applicable 12-month period.

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been designated as FMLA leave. 29 U.S.C. § 2617; 29 C.F.R. §§ 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10—30 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210.  DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

Form WH-382 January 2009

Behm v. Mack Trucks, et al.                                                                MACK0123

From:                                                    08/12/2019  15:35      #766 P.001/040

Colleen S Behm   DOB 05/22/1989   INTEGRATED MEDICAL GROUP, PC     ~FAX~#  610-966-8882

Page #1

MACK.

Mack Trucks, Inc.
Macungie Assembly Operations
7000 Alburtis Road
Macungie, PA 18062-9531
Phone: 610-966-8093

HR 8/13/19

Name: Colleen Sara Behm AP: 450939   Date: May 13, 2019

We are sorry to hear that you are ill and want to wish you a speedy recovery.
If there is anything we can do to help you medically, please do not hesitate to
contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost
time from work will only be processed if your absence is approved by an MD, DO,
DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted,
which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability
Benefits Claim Form enclosed, must be filled out completely, signed by an
M.D. and faxed to the Mack Macungie HR office, 610-966-8950, or it may
cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to
work release upon returning to work. If you do not have this release with you, we
will NOT be able to return you to work until that release is obtained. The work
release should state the effective date of return with or without restrictions.
If there are any restrictions attached to your release, they need to be as specific and
as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract, Article 1- Section 27(
c)(9)), FMLA runs concurrent with six weeks (up to 240 hours) of accident
and sickness benefits. An FMLA Certification of Health Care Provider for
Employee's Serious Health Condition is enclosed. Your doctor should
complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE:      /      /
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions
or concerns, please do not hesitate to call me at 610-966-8093.

Sincerely,

RECEIVED

AUG 1 2 2019

Angela Pursell
Macungie Human Resources

MACUNGIE MEDICAL

/attachments

**EXHIBIT**
28

Behm v. Mack Trucks, et al.                                      MACK0094

o'leen S Behm  DOB 05/22/1989  INTEGRATED MEDICAL GROUP, PC                                    Page #2

## BENEFIT CLAIM FORM

ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION

PART A     EMPLOYEE'S STATEMENT
All Questions Must Be Completed by Employee—Claim Form Must Be Returned By:

Full Name: Oileen Sara Behm     Badge#: 450939     Social Security Number: 188 178 48101     Date of Birth: 05/22/1989

Address: 2116 Halsey Ave     City or Town: Reading     State: PA     Zip: 19609

(Employee's signature / date fields)     Disability: May 11, 20 19

AUTHORIZATION TO RELEASE INFORMATION

May 13, 20 19     (Employee's Signature)

ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.

IMPORTANT—Attending Physician must complete reverse side of this form.

If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please present your work release to your Supervisor and the Human Resources Service Center.

PART B     EMPLOYER'S STATEMENT

(Employer statement section — mostly blank form fields)

Behm v. Mack Trucks, et al.                                    MACK0095

JA000415

Colleen S Behm  DOB 06/22/1989  INTEGRATED MEDICAL GROUP, PC                Page #3

*Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to conceal facts. Criminal and/or civil penalties can result from such acts.*

**PART C      ATTENDING PHYSICIAN'S STATEMENT -- ONLY THE DOCTOR CAN COMPLETE THIS PORTION**
*TO THE ATTENDING PHYSICIAN: Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise this form will be returned to you for additional information.*

1. PATIENT'S FULL NAME      Behm    Colleen

2. DIAGNOSIS AND CONCURRENT CONDITIONS                    IF PREGNANCY, APPROXIMATE DATE CONCEPTION?

CONDITION(S) ICD10 CODE: _____ S06.0x0D  S09.90xD        DATE _____

3. a. Was surgery performed?        ___ Yes  ___ No

   b. Type of Surgical Procedure

   c. Date of Surgery

4. a. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?        ___ Yes  _X_ No

5. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT CONDITION?    DATE:  5-13-19

6. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
   _X_ Accident Happened Date:  5-12-19
   Nature/Name of Accident:  assault - injury to face + head

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL AFTER FIRST DATE EXAMINED (if applicable, thru "TODAY")
   DATE:  5-13-19        7-13-19

8. PATIENT'S NEXT SCHEDULED APPOINTMENT?    DATE:  5-31-19

9. WAS PATIENT HOSPITALIZED?    ___ Yes  (No)
   If Yes: Date Admitted:          Date Discharged:
   Name of Hospital:

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?    ___ Yes  _X_ No

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?    _X_ Yes  ___ No
    HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?    ___ Yes  ___ No

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?    _X_ Yes  ___ No
    IF YES, FROM  5-12-19   THRU

13. WAS PATIENT PARTIALLY DISABLED (if you are permitting them back but specific restriction in the "Remarks" Section below along with estimated duration of this restriction)?    ___ Yes  ___ No

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK?    pt has appt with Neurology  *New Date

15. ATTENTION: ATTENDING PHYSICIAN

ATTENDING PHYSICIAN'S NAME (PRINT)    Diane Borace D.O.
DATE  5-13-19
STREET ADDRESS  1200 S Margaret___ Rd
CITY OR TOWN  Reading   STATE  PA   ZIP CODE  (1960)
TELEPHONE NO. (610) 777-4040    FAX NO. (610) 772-5575

If assistance is needed in completing this form, please contact
Angela Farrell
(888) 1-610-366-8083

From:                                    08/12/2019 15:38    #755 P.005/010

Colleen S Behm  DOB 05/22/1999 INTEGRATED MEDICAL GROUP, PC          —Page #5
                                                                     Page #5



Lehigh Valley Operations
7000 ALBURTIS ROAD
MACUNGIE, PA 18062-9631
PHONE# (610) 966-8878; FAX# (610) 966-8882

DIAGNOSIS TREATMENT PLAN

PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU!

DATE: 5/13/19      PATIENT'S NAME (print): Colleen Sara Behm

DIAGNOSIS: S06.0X0D  Concussion w/o/t  Loc    S09.93xD  Unspecified
                                             Injury to the

TREATMENT PLAN: _____

Concussion protocol and follow up May 31, 2019

addendum : concussion nurse Obs't neurocognit :

addendum      D/o  June 28, 2019

New appt date  Aug 22, 2019

DIAGNOSTIC STUDIES: _____

RETURN VISIT DATE:   5-31-19      6-28-19     7-18-19

*PHYSICIAN SIGNATURE: _____
                     *Requires MD, DO or DPM signature ONLY

PRINT PHYSICIAN'S NAME: Diane  Barracorsi

PHYSICIAN'S ADDRESS: 1703  Morgantown Rd  Reading PA  1967

PHYSICIAN'S PHONE #: 6A 777 4040

Diagnosis treatment plan, updated 7/18/18

Behm v. Mack Trucks, et al.                          MACK0098

From:                                              05/12/2019 15:36    #785 P.006/010

lleen S Behm  DOB 05/22/1989  INTEGRATED MEDICAL GROUP, PC                Page #6
Page #6

## PHYSICAL CAPABILITIES CHECKLIST
## LEHIGH VALLEY OPERATIONS
### MEDICAL DEPARTMENT

Print Patient's Name: Colleen Sara Behm          Date Completed: May 13, 2019

Dominant Hand: Right _____ Left _____

| LIFTING & REACHING: | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | ✓ | | |
| • Shoulder Height or Higher | | | | ✓ | | |
| USE OF VIBRATORY TOOLS: | | | | | | |
| MISCELLANEOUS ACTIVITIES: | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | ✓ | | |
| • Walking | | | ✓ | | | |
| • Bending | | | ✓ | | | |
| • Twisting | | | ✓ | | | |
| • Stooping / Squatting | | | ✓ | | | |
| • Kneeling | | | | ✓ | | |
| • Climbing | | | | ✓ | | |
| • Crawling | | | | ✓ | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

| PLEASE CIRCLE APPROPRIATE EXTREMITY: RIGHT HAND  LEFT HAND  BOTH HANDS REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | ✓ | | | |
| • Push / Pull | | ✓ | | | |
| • Fine Manipulation | | ✓ | | | |
| • Keyboard Operation | | ✓ | | | |
| • Foot Controls | | | | | |

### LIFTING / CARRYING:
◊ Sedentary     10 lbs. max. & occasionally carry/lay small objects; this does not mean seated work.
                Please address in sitting, standing, etc., in miscellaneous activities.
◊ Light         20 lbs. max.; frequently up to 10 lbs.
◊ Medium        50 lbs. max.; frequently up to 20 lbs; constant 10 lbs.

Estimated Length of Disability: 2-3 weeks     Date released to RTW: 7/19/19  7/19/19

Any medication that would prevent RTW activities?   Yes   ✗ No  Explain _____

Comments / Explanation: _____                    Aug 22 2019
                                                               new date

Physician's Signature: _____

Behm v. Mack Trucks, et al.                                    MACK0099

JA000418

From:                                          08/12/2019 16:37      #765 P.007/010

8/13/19 Ok extended leave

olleen S Behm  DOB 05/22/1989  INTEGRATED MEDICAL GROUP, PC

## Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division

**WHD**

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT

OMB Control Number 1215-0001
Expires: 5/31/2018

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: ANGELA PURSELL, MACK TRUCKS IND. PH: 610-966-8033 FAX: 610-969-8860

Employee's job title: Production Flex   Regular work schedule: 1st   6.45-2.45

Employee's essential job functions: Flex

Check if job description is attached:

**SECTION II: For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections, 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request, 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form, 29 C.F.R. § 825.305(b).

Your name: Colleen   Sara   Behm
First           Middle         Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: INTEGRATED MEDICAL GROUP, P.C.
GREEN HILLS FAMILY PRACTICE ASSOCIATES, LLC
Type of practice / Medical specialty: Dana I. Bonaccorsi, M.D., Kimberly Haberzahn, D.O.,
B. Charles Mundil, M.D., Brent Calhoon, PA-C
Telephone ( )                           Fax ( )   Kristin Kimms, CRNP
1203 Morgantown Road
Reading, Pa 19607
610-777-4040

Page 1                                          Form WH-380-E Revised May 2015

RECEIVED
AUG 12 2019
MACUNGIE MEDICAL

From:                                   08/12/2019 16:37   #765 P.008/010

olleen S. Behm  DOB 05/22/1989  INTEGRATED MEDICAL GROUP, PC        Page #8
                                                                    Page #8

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced:  5·12·19

Probable duration of condition:  2-3 weeks  2-3 weeks  3-6 mths
                                 error       error

Mark below as applicable:
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
X No  ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:
5-13-19   5-29-19

Will the patient need to have treatment visits at least twice per year due to the condition?  ___ No  X Yes.

Was medication, other than over-the-counter medication, prescribed?  X No  ___ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No  X Yes. If so, state the nature of such treatments and expected duration of treatment:
neurologist  new appt. date Aug 22 2019

2. Is the medical condition pregnancy?  X No  ___ Yes. If so, expected delivery date: ___

3. Use the information provided by the employee in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition:  ___ No  X Yes.

If so, identify the job functions the employee is unable to perform:
all

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):
headache from concussion made worse with mental and
physical activity  prolonging injury / disability

Page 2              CONTINUED ON NEXT PAGE        Form WH-380-E Revised May 2015

From:                                    08/12/2019 15:38   #755 P.009/010

Eileen S Behm  DOB 05/22/1989 INTEGRATED MEDICAL GROUP, PC ────── Page #9
                                                              Page #9

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___ No _X_ Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 5-12-19   6-25-19   7-19-19

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___ No _X_ Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary? ___ No _X_ Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:
   office visit every 2 weeks   next appt  5-31-19   6-28-19

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? _X_ No ___ Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ___ No ___ Yes. If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency _____ : _____ times per _____ week(s) _____ month(s)

   Duration _____ hours or ___ day(s) per episode

   ███████████████████████████████████████████████████████████

   _____

   _____

   _____

   _____

   _____

   _____

Page 3                    CONTINUED ON NEXT PAGE        Form WH-380-E Revised May 2015

Behm v. Mack Trucks, et al.                                    MACK0114

From:                                          08/12/2019 15:38     #766 P.010/010

o'lleen S Behm  DOB 05/22/1989  INTEGRATED MEDICAL GROUP, PC

Page #10
Page #10

Signature of Health Care Provider                    Date    5/21/19

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years, 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

Page 4                                          Form WH-380-E Revised May 2015

Sep. 10. 2019  2:30PM    NEUROLOGY DOB STE 210                        No. 7269   P.  6



Mack Trucks, Inc.
Lehigh Valley Ops,
7000 Alburtis Road
Macungie, PA 18062-9631
Phone: 610-966-8083

Name: Colleen Sara Behm   SAP: 450939   Date: Aug. 22, 2019

We are sorry to hear that you are ill and want to wish you a speedy recovery.
If there is anything we can do to help you medically, please do not hesitate to
contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost
time from work will only be processed if your absence is approved by an MD, DO,
DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted,
which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability
Benefits Claim Form enclosed, must be filled out completely, signed by an
M.D. and faxed to the Mack Macungie Medical office, 610-966-8882, or it may
cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to
work release upon returning to work. If you do not have this release with you, we
will NOT be able to return you to work until that release is obtained. The work
release should state the effective date of return with or without restrictions.
If there are any restrictions attached to your release, they need to be as specific and
as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract, Article I- Section 27
(o)(8)), FMLA runs concurrent with six weeks (up to 240 hours) of accident
and sickness benefits. An FMLA Certification of Health Care Provider for
Employee's Serious Health Condition is enclosed. Your doctor should
complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE: ____/____/____
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions or
concerns, please do not hesitate to call me at 610-966-8083.

Sincerely,

Macungie Human Resources

/attachments



EXHIBIT
29

Behm v. Mack Trucks, et al.                                          MACK0174

JA000423

Sep. 10. 2019  2:30PM    NEUROLOGY DOB STE 210              No. 7269    P. 7

## SHORT TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

PART A    **EMPLOYEE'S STATEMENT**
All Questions Must Be Completed by Employee – Claim Form Must Be Returned By:

| Full Name | Colleen Sara Behm | Social Security Number | 188 17614810 | Date of Birth | 05/22/1989 |
| Address Street # | 216 Halsey Ave | City or Town | West Lawn | State | PA | Zip | 19609 |

If accident occurred, give Date ___ May 11 __ 20 19 __
Describe in Space Provided Below ___ seizure victim

Is the sickness or injury due to your employment with this Company?  Yes  ☒ No
If "Yes", give full particulars in space provided below, or on separate sheet.

Is the sickness or injury due to your employment with another employer?  Yes  ☒ No
If Yes, give full particulars below.

Were you employed by another employer (full or part-time) when disability commenced?  Yes  ☒ No
If Yes, give full particulars below and name of employer.

First day you did not perform any work because of disability ___ May 13, 2019
Date you were first treated by physician in present disability ___ May 13, 20 19
If recovery has occurred, give date ___ 20 ___

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care institutions, and to insurers, medical or hospital service and prepaid health plans, employers and group policyholders, against holders or benefit plan administrators.

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment related information regarding the patient. THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE DISCLOSED TO AN INDEPENDENT CLAIM ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIER FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the duration of this authorization is for the term of coverage of the policy or contract under which a claim for health benefits has been submitted.
I understand that I have a right (as can be a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original.
If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any, or to recoup such overpayment by withholding monies from any Company compensation that would otherwise be due me.

___ Aug 22 ___ 20 19 ___                    X ___
Date                                         Employee's Signature

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.**

**IMPORTANT** – Attending Physician must complete reverse side of this form.

**** Procedure upon return from sick leave****
If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

PART B    **EMPLOYER'S STATEMENT**

| Full Name of Employee | | Social Security Number |

| Employee Date of Hire | | Was coverage in force When disability began  Yes  No | Occupation |

Was employee laid off or was lay off contemplated prior to beginning of sick disability?  Yes  No   If "Yes" give date ___ 20 ___
Did the sickness or injury arise out of the Employee's employment?  Yes  No   If "Yes" state reason in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement.

Are there any circumstances which would cause you to question the validity of the claim?  Yes  No   If "Yes" give reason in space provided below   Hourly rate Or monthly salary ___   Amount of weekly A & S benefit ___

| List Employee withholding election for Federal taxes (e.g., M-1) | List Holidays paid during sick leave | List number of Occasional sick days used this year |

| Date Employee was first absent from work in present disability ___ 20 ___ | Date work was resumed ___ 20 ___ |

Date ___ 20 ___    Employer Representative ___

Additional Space For Employee/Employer Use (Attach additional sheets for more information)

Sep. 10, 2019  2:31PM   NEUROLOGY DOB STE 210                    No. 7269   P. 8

# REIMBURSEMENT AGREEMENT

**To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf**

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated May 13, 2019, provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

    (1)  Payments received from any or all of the benefits sources enumerated above, and

    (2)  Salary Continuation and/or Accident and Sickness benefit payments made by you

which exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree, that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program, or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

Aug. 22, 2019
DATE

EMPLOYEE SIGNATURE

Colleen Sara Behm
EMPLOYEE NAME (PRINTED/TYPED)

450989
BADGE NO.

Behm v. Mack Trucks, et al.                                        MACK0176

JA000425

Sep. 10. 2019  2:28PM    NEUROLOGY DOB STE 210                    No. 7269   P. 3

**MACK TRUCKS, INC.**
**LEHIGH VALLEY OPERATIONS**
**7000 ALBURTIS ROAD**
**MACUNGIE, PA. 18062-9631**
**PHONE # (610) 966-8878**

*PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882 ASAP*
*AT COMPLETION OF VISIT OR BRING COMPLETED FORM DIRECTLY*
*TO MACK DISPENSARY*

DATE: ___8/22/19___

PRINT PATIENT'S NAME: ___COLLEEN  SARA  BEHM___

DIAGNOSIS: (1) MULTIPLE CONCUSSIONS (2) POST CONCUSSION SYNDROME
(3) POSTTRAUMATIC STRESS DISORDER (4) MEMORY LOSS
(5) POST TRAUMATIC MIGRAINE HEADACHES

TREATMENT PLAN: (1) IMITREX 100 mg + ANAPROX DS 550mg
at onset of Migraine + repeat 1 hr PRN
(2) THERAPY FOR POST TRAUMATIC STRESS
(3) GLOBAL NEUROTRAX TO EVALUATE MEMORY LOSS + COGNITION

DIAGNOSTIC STUDIES: ___GLOBAL NEUROTRAX___

RETURN VISIT DATE: ___11/7/19  3:15 PM___

PRINT PHYSICIAN'S NAME: ___L. BRZOZOWSKI MD___

PHYSICIAN'S ADDRESS/PHONE #: ___301  57th  Ave  Suite 210___

___484  628-4656___          ___West Reading PA 19611___

PHYSICIAN'S SIGNATURE: ___L Brzozowski MD___
**\*\*Requires MD, DO or DPM Signature Only**
Reviewed / Revised 08/27/2018

Behm v. Mack Trucks, et al.                              MACK0177

Sep. 10. 2019  2:29PM   NEUROLOGY DOB STE 210          No. 7269   P. 4



## PHYSICAL CAPABILITIES CHECKLIST
### LEHIGH VALLEY OPERATIONS
### MEDICAL DEPARTMENT

Print Patient's Name: _____   Date Completed: _____

Dominant Hand: Right _____   Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping / Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

**PLEASE CIRCLE APPROPRIATE EXTREMITY:   RIGHT HAND   LEFT HAND   BOTH HANDS**

| • REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | | | | |
| • Push / Pull | | | | | |
| • Fine Manipulation | | | | | |
| • Keyboard Operation | | | | | |
| • Foot Controls | | | | | |

| **LIFTING / CARRYING:** | | |
|---|---|---|
| O Sedentary | 10 lbs. max. & occasionally carrying small objects; this does not mean seated work. Please address in sitting, standing, etc., in miscellaneous activities. | |
| O Light | 20 lbs. max.; frequently up to 10 lbs. | |
| O Medium | 50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs. | |

Estimated Length of Disability: _____   Date released to RTW: _____

Any medication that would prevent RTW activities? ____ Yes ____ No   Explain: _____

Comments / Explanations: Dr Brzozowski is not trained to do physical capabilities arscrements — he filled out what he could.

Physician's Signature: _____

JA000427

Sep. 10, 2019 - 2:29PM   NEUROLOGY DOB STE 210                                   No. 7269   P. 2
"Notice to all parties completing this form—it is transmitted to fill out this form with information yes, now to be filed or to omit important facts. Criminal and/or civil pen...s can result from such acts."                    FR   9/10/19

PART C       ATTENDING PHYSICIANS STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION
TO THE ATTENDING PHYSICIAN: Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise this form will be returned to you for additional information.

1. PATIENT'S FULL NAME
COLLEEN SARA BEHM

2. DIAGNOSIS AND CONCURRENT CONDITIONS  MULTIPLE CONCUSSIONS     IF PREGNANCY, APPROXIMATE DATE CONFINEMENT:
POST CONCUSSION SYNDROME                                         DATE:
POST TRAUMATIC MIGRAINE HEADACHES
CORRESPONDING ICDA CODE:
"HDA—Hospitalized Classification Disease"

3. a. Was surgery performed? ____ Yes  X No
   b. Type of Surgical Procedure: _____
   c. Date of Surgery: _____

4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?
   X Yes  ____ No

5. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT CONDITION:
   DATE: 8/22/19

6. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
   Sickness Appeared Date: _____
   X Accident Happened Date: 5/8/19
   If Accident, Describe Nature of Accident:
   STOOD UP AT WORK IN PLACE WHERE
   SHE WAS SUBSTITUTING HIT(A) FRONTAL
   HEAD HARD - CONCUSSION NAUSEA WEAKNESS H...

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL AFTER FIRST DATE EXAMINED (if not applicable, state "NONE"):
   DATE: NONE

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:
   DATE: 11/7/19

9. WAS PATIENT HOSPITALIZED?   Yes  (No)
   If Yes, Date Admitted: _____  Date Discharged: _____
   Name of Hospital: _____

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
    X Yes  ____ No   If "YES", describe condition and date:
    2013  CAR ACCIDENT - CONCUSSION
    LOSS OF CONSCIOUSNESS LESS THAN 30 MIN
    5/4/13  CONCUSSION FROM ASSAULT

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
    X Yes  ____ No   If "NO", Hospital:
    HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?
    ____ Yes  X No   If "YES":
    Date of Referral: _____
    Name of Physician: _____

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?  X Yes  ____ No
    IF YES, FROM  8/22/19  TO  PRESENT

13. WAS PATIENT PARTIALLY DISABLED? (If you are completing this item, please list specific restrictions in the "Remarks" Section below along with the estimated duration of the restriction.)
    IF YES, FROM _____  TO _____

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK: An approximate date must be specified.
    Regular work—Date: 12/1/19          Restricted work (see No. 15)—Date: _____

15. ATTENTION: ATTENDING PHYSICIAN
    If you are releasing an employee to return to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work. Assignments, we request that you clearly identify on this Accident and Sickness form:
    (a) Any medical restrictions and/or limitations applicable to the employee.
    (b) Any type of work the employee is able to perform.
    (c) Any type of work the employee is unable to perform.
    If you have any questions regarding this request or the scope of job functions please contact the Human Resources Service Center.

    Attending Physician Remarks: (Use additional sheet if necessary)
    PATIENT AND RESTRICTIONS ARE RELATED TO MEMORY LOSS, COGNITIVE
    DYSFUNCTION, BEHAVIORAL CHANGES & POST TRAUMATIC MIGRAINE HEADACHES
    8/22/19          L BRZOZOWSKI MD          L Brzozowski          M D
    DATE             PHYSICIAN'S NAME (Print)     SIGNATURE            DEGREE
    301 57th Ave Suite 210     West Reading     PA     19611
    STREET ADDRESS             CITY/TOWN        STATE  ZIP CODE
    484. 628. 4656             484, 628. 4657
    TELEPHONE NO.              FAX NO.

    If assistance is needed in completing this form, please
    contact the Medical Department at
    Phone: 610.966.8878

    RETURN THIS COMPLETED FORM TO:
    Mack Trucks, Inc
    Lehigh Valley Operations
    7000 Alburtis Road
    Macungie, PA 18062
    Fax 1-610-966-8882

Behm v. Mack Trucks, et al.                                        MACK0179



MACK TRUCKS, INC.
MACUNGIE CAB & VEHICLE
ASSEMBLY

August 29, 2019

VIA FEDEX Delivery
Colleen Behm
216 Halsey Ave
West Lawn, PA 19609

Colleen,

The Company would like to seek a 2nd professional opinion on your current medical condition that has you placed out of work.  The Company will be paying for the appointment, it will be of no cost to you.  Please see the information below in regards to the appointment.

Date: September 5, 2019
Time: 11:00am
Location: 101 Greenwood Ave, Suite 450 Jenkintown, PA 19046
Neurologist: Dr.Shipkin

We realize this location is not close to your home,therefore if you would like transportation to the appointment please contact me as soon as possible. I will assist in coordinating transportation to and from the doctor's office for you.  My phone number is 610-966-8016.  If you do not want transportation and feel comfortable driving yourself there, that is fine as well.

The reason we are seeking this second opinion is we would like to see what additional resources can be provided to you to help with your recovery and return you back to work. Should you not go to the appointment, and not have a justifiable reason for not going to the appointment, we will have to stop you're A&S payments and will expect you to return to work immediately.  (Please see Mack Benefit Agreement, Article 3, Section 3)

We hope you have a speedy recovery and seek the professional medical help to return to you work as soon as possible.



EXHIBIT

30

Behm v. Mack Trucks, et al.

MACK0265

JA000429

2

Regards,

Kaitlyn O'Neill
Human Resources Business Partner
Mack Trucks, Inc.

JA000430

Paul M. Shipkin, M.D., P.C.
Neurology/ Neuro- Ophthalmology
101 Greenwood Ave., Ste. 450
Jenkintown, PA 19046

Pt 215-293-9140
Ft 215-293-9143

September 17, 2019

Cullyn O'Neill

RE: COLLEEN BEHM

Dear Ms. O'Neill:

I have reviewed my Independent Medical Examination report regarding Colleen Behm (date of evaluation 09/05/19). We spoke on the telephone earlier this morning, Friday, 09/13/2019.

It is my opinion, based on all available data and my examination, that Colleen Behm is fully capable of resuming her former work activities at Mack Truck full time without restrictions referable to both the 05/08/19 incident and the 05/11/19 incident.

Thank you, once again, for your interest in my opinion regarding the neurologic status of Colleen Behm. Should you have further questions, please feel free to contact me.

Sincerely,

Paul M. Shipkin, MD

PMS/jc

(0913-007, 0913-008)

**EXHIBIT**

31

*Paul M. Shipkin, M.D., P.C.*
*Neurology/Neuro- Ophthalmology*
*101 Greenwood Ave., Ste. 450*                          P: 215-293-9140
*Jenkintown, PA 19046*                                  F: 215-293-9143

September 7, 2019

Caitlyn O'Neill

RE: COLLEEN BEHM
Date of incident: 06/08/19

Dear Ms. O'Neill:

Colleen Behm is a 30-year-old right-handed former production Mack truck builder evaluated on 09/05/19 for a neurologic Independent Medical Examination.

Prior to evaluation, it was explained to Ms. Behm that this appointment is for purposes of evaluation only, not for care, treatment, or consultation and therefore, no doctor/patient relationship would result. She has also been advised that I am an independent doctor and have been requested to conduct this evaluation at your request. Barbara Gray was several feet away from the examination room during the entire evaluation lasting approximately one hour and ten plus minutes in my Jenkintown, Pennsylvania private practice office.

History of the present illness:
Colleen Behm describes "fine health" until 05/08/19. At that time, "I was working full time, 40 hours a week, production flex, I would fill in for people, did repairs, installed dashes, use machinery/drills, cranes, wiring, building manifolds for brakes (provided an extensive description of her work activities)." Ms. Behm has been in this particular occupation approximately two years.

On 05/08/19, "It was about 8:30 a.m., a Wednesday, I was working on the line, went into a sleeper cab, stood up and hit the top of my head on a metal bracket (pointing to high right forehead near hairline). Another worker was there, I had no loss of consciousness but I did rub it. I sat down and rested, felt nauseous and could not eat when lunch came around, had some migraines, light sensitivity and ringing in my ears that would come and go during the day, I had no bleeding, I continued working until 2:00 p.m. then I went to medical where I saw a nurse, did an incident report. Then I drove home, about a one-hour drive, then I drove to Reading Hospital emergency room."

At Reading emergency room Ms. Behm recalls being examined with a CT brain, "They just said I had a concussion and said to rest. I went back to work Friday morning (two days after the incident), but did not work, after four hours of arguing they sent me home. I drove home again on Friday."

Colleen Behm
September 7, 2019
Page 2

Thereafter, Ms. Behm has remained out of work to present describing, at least during the first week or two after 05/08/19, similar symptoms as noted above.

On 05/11/19 (Saturday, three days after the 05/08/19 incident), "My husband and I were separated, going through a divorce, he assaulted me, punched me more than 11 times in my head, left temple in the back of my head, my daughter age two witnessed it. He got pulled off by one of his friends, I called the police, they came and an ambulance came. My sister, who is a nurse, took me to Reading Hospital emergency room. I had another CAT scan that showed no bleeding (intracranial) but a lot of swelling (scalp), bleeding in the back of my head (scalp), my left side of my face was a balloon. I said no to the staples they wanted to put in the back of my head, I was driven home, I'm going through the court process and I already have a PFA (Protection From Abuse)."

Medical personnel seen along the way (during the past four months) are outlined above and include a family doctor, neurologist known as Dr. B., and a psychiatrist. Currently, she follows with all of these medical people.

Treatments have included medications and current treatment consists of medication: Naproxen sodium 500 mg p.r.n., Adderall, vitamins, iron, sumatriptan 100 mg, amitriptyline 25 mg at bedtime, "Zoloft for the assault and for PTSD, buspirone and Xanax from anxiety from the assault."

Prior to her evaluation today, she recalls ingesting Zoloft and buspirone.

Testing has included the above noted imaging studies.

During the past two or three weeks continuing issues, according to Colleen Behm, are said to include:

(1)   "Migraines, pain behind one eye or the other." Discomfort when present averages 8 on a 0-10 pain scale and is said to occur two or three times a week lasting "a couple of hours." Provocative/aggravating factors include "focusing on something too long, driving especially at night where there's lights." Benefit is achieved wearing a cold mask over eyes, resting in a dark room, and taking naproxen one or two pills as needed. Overall, these symptoms are "getting better, not lasting as long."

(2)   "Insomnia, sleep paralysis when I'm having a nightmare, it's like the nightmare continues and I can't move, night terrors when I'm having a bad night they are from the PTSD from the assault." These symptoms are said to occur approximately every other night, four or five times a week and "have gotten better." Medications and therapy are beneficial.

Colleen Behm denies all other pertinent neurologic symptomatology at present. When asked how she spends her days, she explained that she drives and, in fact, drove to this evaluation and will be driving home, cares for two young children, engages in various computer activities, etc.

Behm v. Mack Trucks, et al.                                            MACK0254

JA000433

Colleen Behm
September 7, 2019
Page 3

Past medical history includes "ADHD on Adderall since January 2019 from my family doctor, also Xanax and buspirone since January 2019, I already had a PFA in December of 2018 when my husband attempted to assault me at that time." "Motor vehicle accident 2013 when I was driving alone, I hurt all of me, I was ejected from the vehicle, unconscious, in a hospital at Reading for a week, had a splenectomy, left lung puncture (pneumothorax), fractured clavicle that was operated twice with the last surgery November 2017, multiple left rib fractures, concussion, lots of road rash, I did get a DUI." Status post cesarean section.

Colleen Behm denies any other accidents, injuries, surgical procedures, or medical problems during her entire lifetime. Medication allergies include amoxicillin.

Social history reveals she is currently going through a divorce and has two biological children, ages nine and two. She smoked cigarettes in the range of one pack per month, consumes occasional glasses of wine and denies illicit drug use. Following high school, she attended Berks Technical Institute where she studied criminal justice and business management but did not achieve a degree. She also trained as a funeral director but "dropped out."

Family history is said to be noncontributory.

Current medications are noted above. Prior to her evaluation today, she recalls ingesting Zoloft and buspirone.

No records were received prior to the IME being performed.

Physical Examination: Colleen Behm presents as a pleasant, articulate, well-groomed, relaxed, healthy appearing young woman with a large number of tattoos estimating her body weight at about 132 pounds, 5 feet 4 inches. She has a completely normal neurologic examination.

Examination of cranium reveals no abnormalities or tenderness. Neck is supple with full range of movement without discomfort. Nuchal, thoracic, and low back musculature is soft, supple, and nontender (normal by palpation and inspection).

Mental status is within normal limits, more specifically, she is fully oriented with intact recent and remote memory as well as immediate recall. Concentration, language function, abstract reasoning, and executive functioning are intact. She has a normal affect tending to smile and laugh appropriately at various times during her evaluation.

Cranial Nerves: Ocular movements, pupils, and visual fields to confrontation testing are normal. Fundi are suboptimally visualized in this setting although those portions seen appear to be intact. Facial sensation/symmetry and audition with finger rustling are normal.

Behm v. Mack Trucks, et al.                                          MACK0255

JA000434

Colleen Behm
September 7, 2019
Page 4

Motor examination reveals 5/5 muscle group strength testing in arms and legs bilaterally. Appendicular coordination, muscle tone, stance, gait, and posture are normal with normal heel and toe walking and no sway in the Romberg position. She has normal dexterity in both hands.

Sensory exam is intact to all modalities tested including light touch, thermal sensation, vibration, etc.

Reflexes are 2+ throughout with bilateral plantar flexor responses.   While sitting on the examination table, she fully extends either straight leg making a 90-degree angle with her abdomen and thorax and holds this position for approximately 10-15 seconds bilaterally with no obvious discomfort.

<u>COMMENT:</u>

If historical data from the patient is accurate, Colleen Behm recalls an incident on 05/08/19 as outlined above.   Ms. Behm's subsequent clinical course has been described including an assault on 05/11/19.   Continuing symptoms in recent weeks are said, by Colleen Behm, to include occasional "migraines" as noted above and cognitive issues that she attributes to "PTSD from the assault on 05/11/19."

Imaging studies and imaging study reports are not available for review.   She spends her days as outlined above driving a motor vehicle, computer activities, caring for two young children, etc.

Past medical history includes "attention deficit hyperactivity disorder" on Adderall, Xanax, and buspirone, emotional stress with a PFA since December 2018, motor vehicle accident 2013 with profound multiple injuries and surgical procedures noted above, cesarean section.

On examination, Colleen Behm presents as a pleasant, articulate, well-groomed, generally healthy appearing young woman estimating her current body weight at about 132 pounds, 5 feet 4 inches.   She has a large number of tattoos and has a completely normal neurologic examination.

In reviewing available very limited medical records, this examiner has been provided with a job description as "Production Tech." No other medical records are available for review today.

The working neurologic diagnosis is scalp contusion on 05/08/19.   Some of the symptoms Ms. Behm describes may be seen with a very minor concussion although this diagnosis is unlikely given all available data.

Colleen Behm's clinical presentation is further complicated by an assault by her husband approximately three days after 05/08/19 (on 05/11/19) with fairly significant cranial trauma, "PTSD", etc.

Colleen Behm
September 7, 2019
Page 5

Most patient resolve from the 05/08/19 incident as described above over several weeks, approximately three to four weeks on average, with or without conservative care.

At this point in time, Colleen Behm has fully recovered from her 05/08/19 incident. She is, referable to 05/08/19, fully capable of resuming her former work activities as described in her job description full time without restrictions and requires no specific medical care with regard to 05/08/19.

Thank you for referring Colleen Behm for a neurologic Independent Medical Examination. Ms. Behm left this evaluation in the same condition in which she arrived. The above-noted statements are made within a reasonable degree of medical certainty. Should you have further questions, please feel free to contact me.

Sincerely,

Paul M. Shipkin, MD

PMS/jc

(0906-022)

Behm v. Mack Trucks, et al.

MACK0258

JA000436

**Mack Trucks Lehigh Valley Operations**
**Voluntary Layoff/General Layoff**
**Frequently Asked Questions**

The following addresses the most frequently asked questions (FAQ) supplied by the Hourly Bargaining Unit Employees (HBU) that we received in reference to the upcoming Voluntary/General layoff.

1. Can we still sign up for Voluntary Layoff (VLO)?

    a. **Yes, those with 5+ years of seniority will have the opportunity to apply for VLO on the kiosk no later than January 24th, 2020 for this specific event.**

2. If an HBU employee was approved for Tuition Reimbursement and now I am laid off while still taking classes, will I be reimbursed although not actively at work?

    a. **Yes, if employees were approved and are currently enrolled in classes prior to the Layoff; the company will reimburse in accordance with the contract.**

3. What are the tuition reimbursement benefits while out on GLO/VLO?

    a. **In accordance with the contract, the tuition benefit is $1500.00 per calendar year for trade school.** Master Art. 28 sec 87 (d) pg. 72

4. If I am not laid off and I am currently on first shift, what is the chance I will be assigned to the second shift?

    a. **During a rate change there will be reduction and based on seniority employees will be moved to other shifts.**

5. How will the effected people be notified if they will be laid off?

    a. **Those effected by the general layoff will be notified as early as possible. Prior to the actual release date employees will receive information.**

6. For those placed on General Layoff, will they be subjected to recall?

    a. **Yes**


EXHIBIT
32

Behm v. Mack Trucks, et al.                                      MACK0360

7. Is the 75 Voluntary Layoff (VLO) part of the 230 General Layoff (GLO) or separate?

    a. **The 75 VLO is in addition to the 230 General Layoffs.**

8. If I am laid off, how long will my Medical Benefits last?

    a. **See Chart Below**

| Year(s) of Seniority on Last Day Worked Prior to Layoff | Maximum Number of Months for Which Coverage Will be Provided Without Cost to Employees |
|---|---|
| Less than 1 | 0 |
| 1 but less than 4 | 6 |
| 4 but less than 5 | 8 |
| 5 but less than 6 | 10 |
| 6 and over | 12 |

9. If I am laid off, how long will my SUB benefits last?

    a. **See Chart Below**

| Seniority | Weeks Eligible |
|---|---|
| 1-2 years | 13 |
| 3-10 years | 26 |
| 10+ years | 52 |

10.  People who would be out on layoff; will they receive profit sharing?

   a. Yes, those working throughout the 2019 plan year will receive profit sharing as applicable per the collective bargaining agreement.

# LVO News



Lehigh Valley Operations



A NEWSLETTER FOR EMPLOYEES WITHIN GROUP TRUCKS OPERATIONS, LEHIGH VALLEY OPERATIONS

January 28, 2020   Week 5.2

# Special Announcement

In our message about Lehigh Valley Operations (LVO) upcoming rate reduction and layoffs shared with you on Wednesday, January 8, we announced that: "We anticipate the last working day for those affected by the layoff will be Friday, February 28."

On Friday, January 10, we issued a communication in *LVO News* announcing that we would be facing a shortage of Allison Transmissions for both the Vehicle 1 and Vehicle 2 production lines. This shortage is caused by the supplier's allocation of transmissions across the truck market.

Due to the continued shortages from Allison Transmissions, we will need to take additional steps to preserve our schedule and ensure that we meet customer commitments. We have taken the decision to adjust the rate reduction from Week 2009 to Week 2008. As a result, the last working day for the employees being placed on general layoff has been moved to Friday, February 21. However, the last working day for employees going on voluntary layoff will remain Friday, February 28.

We continue to work closely with UAW leadership to determine the best options as we adjust our production rates and manpower to the needs of the market and the delivery schedules of our suppliers. Thank you for your continued commitment to Mack Trucks as we work through this difficult process. We will continue to provide you with updates as we move forward.

Behm v. Mack Trucks, et al.                                                MACK0363

2/4/2020                                          Mall - White Ayesha - Outlook

FMLA Rights and Responsibilities Colleen Behm

White Ayesha <ayesha.white@volvo.com>
Tue 2/4/2020 4:06 PM
To: 'colleenbehm@yahoo.com' <colleenbehm@yahoo.com>
Cc: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>

📎 1 attachments (232 KB)
FMLA Notice of Rights and Responsibilities form Colleen Behm.pdf;

Hi Colleen,

We have received your request for fmla and have determined that you are NOT eligible
to apply for fmla.

Unfortunately, you have not met the required number of hrs worked (1250) to be eligible.

Should you have any questions or concerns, please contact Annette McAllister, your hr
business partner, for assistance.

Kind Regards,

Ayesha White
HR Coordinator
Human Resources – Macungie

Mack Trucks Inc
Lehigh Valley Operations
Phone: 610-966-8905
Mobile/SMS: 484-387-7690
Email: ayesha.white@volvo.com



EXHIBIT
33

Behm v. Mack Trucks, et al.                                      MACK0100

JA000441

## Notice of Eligibility and Rights & Responsibilities
(Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 8/31/2021

In general, to be eligible an employee must have worked for an employer for at least 12 months, meet the hours of service requirement in the 12 months preceding the leave, and work at a site with at least 50 employees within 75 miles. While use of this form by employers is optional, a fully completed Form WH-381 provides employees with the information required by 29 C.F.R. § 825.300(b), which must be provided within five business days of the employee notifying the employer of the need for FMLA leave. Part B provides employees with information regarding their rights and responsibilities for taking FMLA leave, as required by 29 C.F.R. § 825.300(b), (c).

**[Part A – NOTICE OF ELIGIBILITY]**

TO: _Colleen Behm - 460939_
        Employee

FROM: _Ayesha White_
        Employer Representative

DATE: _2/4/2020_

On _2/4/2020_ , you informed us that you needed leave beginning on _2/4/20_ for:

____ The birth of a child, or placement of a child with you for adoption or foster care;

_✓_ Your own serious health condition;

____ Because you are needed to care for your ____ spouse; ____ child; ____ parent due to his/her serious health condition.

____ Because of a qualifying exigency arising out of the fact that your ____ spouse; ____ son or daughter; ____ parent is on covered active duty or call to covered active duty status with the Armed Forces.

____ Because you are the ____ spouse; ____ son or daughter ____ parent; ____ next of kin of a covered servicemember with a serious injury or illness.

This Notice is to inform you that you:

____ Are eligible for FMLA leave (See Part B below for Rights and Responsibilities);

_✓_ Are not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):

    ____ You have not met the FMLA's 12-month length of service requirement. As of the first date of requested leave, you will have worked approximately ____ months towards this requirement.

    _✓_ You have not met the FMLA's hours of service requirement.

    ____ You do not work and/or report to a site with 50 or more employees within 75 miles.

If you have any questions, contact _Kaitlyn O'Neill_ or view the
FMLA poster located in _Posting Boards throughout the plant._

**[PART B–RIGHTS AND RESPONSIBILITIES FOR TAKING FMLA LEAVE]**

As explained in Part A, you meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the applicable 12-month period. However, in order for us to determine whether your absence qualifies as FMLA leave, you must return the following information to us by _____ . (If a certification is requested, employers must allow at least 15 calendar days from receipt of this notice; additional time may be required in some circumstances.) If sufficient information is not provided in a timely manner, your leave may be denied.

____ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request ____ is/ ____ is not enclosed.

____ Sufficient documentation to establish the required relationship between you and your family member.

____ Other information needed (such as documentation for military family leave): _____

_____

_____

____ No additional information requested.

Page 1                 CONTINUED ON NEXT PAGE              Form WH-381 Revised February 2013

Behm v. Mack Trucks, et al.                                  MACK0101

JA000442

If your leave does qualify as FMLA leave you will have the following responsibilities while on FMLA leave (only checked blanks apply):

_____ Contact _____ at _____ to make arrangements to continue to make your share of the premium payments on your health insurance to maintain health benefits while you are on leave. You have a minimum 30-day (or, indicate longer period, if applicable) grace period in which to make premium payments. If payment is not made timely, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work.

_____ You will be required to use your available paid _____ sick, _____ vacation, and/or _____ other leave during your FMLA absence. This means that you will receive your paid leave and the leave will also be considered protected FMLA leave and counted against your FMLA leave entitlement.

_____ Due to your status within the company, you are considered a "key employee" as defined in the FMLA. As a "key employee," restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us. We _____ have/_____ have not determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us.

_____ While on leave you will be required to furnish us with periodic reports of your status and intent to return to work every _____. (Indicate interval of periodic reports, as appropriate for the particular leave situation).

If the circumstances of your leave change, and you are able to return to work earlier than the date indicated on the this form, you will be required to notify us at least two workdays prior to the date you intend to report for work.

If your leave does qualify as FMLA leave you will have the following rights while on FMLA leave:

• You have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period calculated as:

_____ the calendar year (January—December).

_____ a fixed leave year based on _____

_____ the 12-month period measured forward from the date of your *first* FMLA leave usage.

_✓_ a "rolling" 12-month period measured backward from the date of any FMLA leave usage.

• You have a right under the FMLA for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered servicemember with a serious injury or illness. This single 12-month period commenced on _____
• Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work.
• You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)
• If you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered servicemember's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
• If we have not informed you above that you must use accrued paid leave while taking your unpaid FMLA leave entitlement, you have the right to have your _____ sick, _____ vacation, and/or _____ other leave run concurrently with your unpaid leave entitlement, provided you meet any applicable requirements of the leave policy. Applicable conditions related to the substitution of paid leave are referenced or set forth below. If you do not meet the requirements for taking paid leave, you remain entitled to take unpaid FMLA leave.

_____ For a copy of conditions applicable to sick/vacation/other leave usage please refer to _____ available at: _____

_____ Applicable conditions for use of paid leave: _____

_____

_____

_____

_____

Once we obtain the information from you as specified above, we will inform you, within 5 business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please do not hesitate to contact:

Kaitlyn O'Neill _____ at 610.666.8016

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to provide employees with notice of their eligibility for FMLA protection and their rights and responsibilities. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(b), (c). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THIS WAGE AND HOUR DIVISION.

Form WH-381 Revised February 2013

Behm v. Mack Trucks, et al.                                                          MACK0102

JA000443



Form Name:            FMLA Intake ONKIOSK
Submission Time:      February 4, 2020 1:01 pm
Unique ID:            577989407

| Reason for FMLA | Employee's own Serious Health Condition |
|---|---|
| Employee Name | Colleen Behm |
| SAP | 450939 |
| Email | colleenbehm@yahoo.com |
| Supervisor | Javier Miranda |
| Shift | Shift 1 |
| Date of Hire | Jan 02, 2018 |
| Phone Number | 6105870522 |
| Date FMLA Requested | Feb 04, 2020 |
| Date FMLA Due | Feb 19, 2020 |
| Proper Certification Form Provided | Yes - Upon Submission Certification Form is Available via Print |
| Disclosure | I hereby certify that the personal information I have entered is true and accurate. I understand that should the information be found falsified, discipline will be applied accordingly. |
| Signature | Signature image not available. |
| Number | 15 |
| Today's Date | Feb 04, 2020 01:00 PM |
| Total Hours Worked | 1149.4 |
| Approved | No |
| Eligible to Apply for FMLA | No |
| Notice of Rights & Responsibilities provided to employee | Yes |
| Date Rights & Responsibilities provided to employee | Feb 04, 2020 |

Unique ID: 577989407

Behm v. Mack Trucks, et al.                                    MACK0103

JA000444

| | |
|---|---|
| How Rights & Responsibilities were sent | Email |
| HRBP | Kaitlyn O'Neil |
| Notification of Denial Reason | Not Enough Hours Worked |
| Notification of Approval VIA Email | Employee |

Unique ID: 577869407

Behm v. Mack Trucks, et al.

MACK0104

JA000445

Form Name:           Shift Change Request(ON)KIOSK
Submission Time:     February 17, 2020 8:09 pm
Browser:             Chrome 78.0.3904.97 / Windows
IP Address:          10.78,138.221
Unique ID:           582816066
Location:

## Shift Change Request

| | |
|---|---|
| Name | Colleen Behm |
| SAP | 450939 |
| Email | colleenbehm@yahoo.com |
| Seniority Date | Jan 02, 2018 |
| I wish to exercise my seniority by requesting a change from | Shift 2 |
| to the following new shift | Shift 1 |
| Current Department Number | 1223 - Production |
| Current Classification | Production Technician Cab1 Line |
| Current Supervisor | Not Listed |
| Disclosure | I hereby certify that the personal information I have entered is true and accurate. I understand that should the information be found falsified, discipline will be applied accordingly. |
| Signature | |
| Today's Date | Feb 17, 2020 08:07 PM |

**EXHIBIT**

**34**

tabbies

03/18/20 12:33 PM  Green Hills Family   Fax# (610)-777-5575      Page 3 of 8 #72759

MR. 3/18/2020

## SHORT TERM DISABILITY BENEFIT CLAIM FORM

ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT
IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION

**PART A       EMPLOYEE'S STATEMENT**
All Questions Must Be Completed by Employee – Claim Form Must Be Returned By: _____

| Full Name | Badge# | Social Security Number | Date of Birth |
|---|---|---|---|
| Colleen Sara Behm | 4500939 | 188 170 1481 | 05/22/1989 |

Address Street: 916 Halsey Ave   City or Town: West Lawn   State: PA   Zip: 19609

If accident occurred, give Date ____ 20__   Describe in Space Provided Below: Sept. 2019

Is the stabness or injury due to your employment with this Company? ☒ Yes ☐ No   If "Yes", give full particulars in space provided below, on separate sheet: in space behm?

Is the sickness or injury due to your employment with another employer? ☐ Yes ☒ No   If Yes, give full particulars below.

Were you employed by another employer (full or part-time) when disability commenced? ☐ Yes ☒ No   If Yes, give full particulars below and name of employer.

What day you did not perform any work because of disability: March 4, 20 20 left work early?

Date you were first treated by physician in present disability ____ 20__

If recovery has occurred, give date ____ 20__

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care institutions, and to insurers, medical or hospital service and prepaid health plans, employers and group policyholders, contract holders or benefit plan administrators.

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment related information regarding the patient. THIS INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE REDISCLOSED TO AN INDEPENDENT CLAIMS ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF THE COMPANY AND TO ANY COMPANY WORKERS' COMPENSATION CARRIERS FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the sharing of the authorization is for the term of coverage of the policy or contract under which a claim for health benefits has been submitted.

I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original.

If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to recover such overpayment from any disability payment that would otherwise be due and authorize the right to reduce future disability benefits, if any, or to recoup such overpayment by withholding monies from any disability payment.

Date: March 5 20 20   Employee's Signature

ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE
SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.

IMPORTANT – Attending Physician must complete reverse side of this form.

** Procedure upon return from sick leave**
If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

**PART B       EMPLOYER'S STATEMENT**

| Full Name of Employee | Social Security Number |
|---|---|

| Employee Date of Hire | Was coverage in force When disability began | ☐ Yes ☐ No | Occupation |
|---|---|---|---|

| Was employee laid off or was lay off prior to beginning of this disability? | ☐ Yes ☐ No If "Yes" give date ____ 20__ | Did the sickness or injury arise out of the Employee's employment? | ☐ Yes ☐ No | If "Yes" state reason in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement. |
|---|---|---|---|---|

| Are there any circumstances which would cause you to question the validity of the claim? | ☐ Yes ☐ No If "Yes" give reason in space provided below | Hourly rate Or monthly salary | Amount of weekly A & B benefit |
|---|---|---|---|

| List Employee withholding election for federal taxes (e.g. M-1) | List Holidays paid during sick leave | List number of Occasional sick days used this year |
|---|---|---|

| Date Employee was first absent from work in present disability ____ 20__ | Date work was resumed ____ 20__ |
|---|---|

Date ____ 20__   Employer Representative _____

Additional Space For Employer/Employee or use (Attach additional sheets for more information) Never cleared to return to work. Hostile work environment, harassment, discrimination, sexism, targeting, hippa violations, victimisation, unfair treatment, emotional distress causing increase in anxiety and migraines.

EXHIBIT 35

Behm v. Mack Trucks, et al.                                    MACK0168

JA000447

## REIMBURSEMENT AGREEMENT

### To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated _03/05/20_, provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

    (1)  Payments received from any or all of the benefits sources enumerated above, and

    (2)  Salary Continuation and/or Accident and Sickness benefit payments made by you

which exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree, that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Disease Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program, or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

_03/05/20_
DATE

EMPLOYEE SIGNATURE

_Colleen Sara Behm_
EMPLOYEE NAME (PRINTED/TYPED)

_450939_
BADGE NO.

Behm v. Mack Trucks, et al.

MACK0169

JA000448

"Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts."

PART C          ATTENDING PHYSICIAN'S STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION
TO THE ATTENDING PHYSICIAN: Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for the additional information.

1. PATIENT'S FULL NAME:  Colleen Sara Behm

2. DIAGNOSIS AND CONCURRENT CONDITIONS:          IF PREGNANCY, APPROXIMATE DATE COMMENCED:
Concussion 366.0105 Migraine 443.009 Jansen Na G44.219
CORRESPONDING ICD-9 CODE:  Sensor of muscle stiffness   DATE:
*ICD = International Classification of Diseases

3. a. Was surgery performed?      Yes   ☑ No
   b. Type of Surgical Procedure:
   c. Date of Surgery:

5. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT CONDITION:
   DATE:  5.13.19

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL, AFTER FIRST DATE EXAMINED (if not applicable, state "NONE"):
   DATE:

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:
   DATE:

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
    ____ Yes  ____ No   If "YES" describe condition and date:

12. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?  ☑ Yes  ____ No
    IF YES, FROM  5.13.19  TO

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK? An approximate date must be specified.
    Regular work—Date  June 7 2020              Restricted work (items 16)—Date

4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?
   ____ Yes  ____ No

6. DATE A/SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED?
   Illness Appeared Date:
   ☑ Accident Happened Date:  5.12.19
   If Accident, Describe Nature of Accident:
   assault - injury to face ; blood following
   concussion at work

9. WAS PATIENT HOSPITALIZED?      Yes   ☑ No
   If Yes, Date Admitted            Date Discharged
   Name of Hospital

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
    ____ Yes  ____ No   If "NO", Explain:
    IS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?   If "YES"
    ☑ Yes  ____ No      June 6 2020
    Date of Referral:
    Name of Physician:  Dr. Bozozowski

13. WAS PATIENT PARTIALLY DISABLED? (If you are completing this item, please fill specific restrictions in the "Remarks", Section below along with the estimated duration of the restrictions.)
    IN YES, FROM                   TO

15. ATTENTION: ATTENDING PHYSICIAN
If you are releasing an employee to return to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work Assignments, we request that you identify any/all of the Accident and Sickness items:
   (i)   Any medical restrictions and/or specific limitations applicable to the employee.
   (ii)  Any type of work the employee is able to perform.
   (iii) Any type of work the employee is unable to perform.
   If you have any questions regarding this request or the scope of job functions please contact the Human Resources Service Center.

Attending Physician Remarks (Use additional sheet if necessary)

3.12.20    Kim Ravenzahn          K Ravenzahn DO
DATE       PHYSICIAN'S NAME (Print)     SIGNATURE              DEGREE
1903 Morgantown Rd    Reading                 PA          19607
STREET ADDRESS         CITY OR TOWN           STATE        ZIP CODE
( 610 ) 222 4046              ( 610 )  777  5575
TELEPHONE NO.                    FAX NO.

If assistance is needed in completing this form, please contact the Medical Department at
Phone: 610.966.9878

RETURN THIS COMPLETED FORM TO:
Mack Trucks, Inc
Lehigh Valley Operations
7000 Alburtis Road
Macungie, PA 18062
Fax 1-610-966-8882

Behm v. Mack Trucks, et al.                          MACK0170

JA000449



**Macungie Health Office**
**Lehigh Valley Operations**
**7000 Alburtis Road**
**Macungie, Pa 18062-9631**
**PHONE# (610) 966-8878; FAX# (610) 966-8882**

### DIAGNOSIS TREATMENT PLAN

**PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882**
**ASAP AT COMPLETION OF VISIT. THANK YOU!**

DATE: _____    PATIENT'S NAME (print): Colleen S. Behm

DIAGNOSIS: Concussion S06.0x05   Migraine G43.D09
TREATMENT PLAN:  Tension HA G44.219   Strain of muscle Shoulder D

 got clearance to return to work from Neurologist Specialist
_____
_____
_____

DIAGNOSTIC STUDIES: _____

RETURN VISIT DATE: _____

*PHYSICIAN SIGNATURE:  KimRavenzahn
*Requires MD, DO or DPM signature ONLY

PRINT PHYSICIAN'S NAME: Kim Ravenzahn

PHYSICIAN'S ADDRESS: 1903 Morgantown Rd
Reading PA 19607

PHYSICIAN'S PHONE #: 610 777 4040

Diagnosis treatment plan: Updated 8/18/16

Behm v. Mack Trucks, et al.                                    MACK0171

MEDICAL DEPARTMENT
LEHIGH VALLEY OPERATIONS
PHYSICAL CAPABILITIES CHECKLIST

Print Patient's Name: Colleen S. Behm          Date Completed: _____

Dominant Hand: Right _____   Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping / Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

PLEASE CIRCLE APPROPRIATE EXTREMITY:   RIGHT HAND   LEFT HAND   BOTH HANDS

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | | | | |
| • Push / Pull | | | | | |
| • Fine Manipulation | | | | | |
| • Keyboard Operation | | | | | |
| • Foot Controls | | | | | |

**LIFTING / CARRYING:**
◊ Sedentary     10 lbs. max. & occasionally carrying small objects; this does not mean seated work.
                Please address in sitting, standing, etc. in miscellaneous activities.
◊ Light         20 lbs. max.; frequently up to 10 lbs.
◊ Medium        50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs.

Estimated Length of Disability: _____          Date released to RTW: June 7 2020

Any medication that would prevent RTW activities? _____ Yes _____ No   Explain: _____

Comments / Explanation: _____

Physician's Signature: _____



Macungie Health Office
Lehigh Valley Operations
7000 Alburtis Road
Macungie, Pa 18062-9631
PHONE# (610) 966-8878; FAX# (610) 966-8882

DIAGNOSIS TREATMENT PLAN

PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU!

DATE: 3/25/2020   PATIENT'S NAME (print): Colleen Behm

DIAGNOSIS: Migraines, anxiety

TREATMENT PLAN: has follow-up ⊼
neurology in June 2020 - cont.
current meds

DIAGNOSTIC STUDIES: _____

RETURN VISIT DATE: 1-2 months

*PHYSICIAN SIGNATURE: _____ DO
*Requires MD, DO or DPM signature ONLY

PRINT PHYSICIAN'S NAME: _____

PHYSICIAN'S ADDRESS: _____

PHYSICIAN'S PHONE #: _____

Diagnosis treatment plan: Updated 9/10/10

Behm v. Mack Trucks, et al.                                    MACK0152

JA000452

MEDICAL DEPARTMENT
LEHIGH VALLEY OPERATIONS
PHYSICAL CAPABILITIES CHECKLIST

**MACK**

Print Patient's Name: _Colleen Behm_     Date Completed: _3/25/2020_

Dominant Hand: Right ✓   Left ___

_N/A as of currently unable_

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| • LIFTING & REACHING: | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| • USE OF VIBRATORY TOOLS: | | | | | | |
| • MISCELLANEOUS ACTIVITIES: | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping / Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

PLEASE CIRCLE APPROPRIATE EXTREMITY:   RIGHT HAND   LEFT HAND   BOTH HANDS

| • REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | | | | |
| • Push / Pull | | | | | |
| • Fine Manipulation | | | | | |
| • Keyboard Operation | | | | | |
| • Foot Controls | | | | | |

**LIFTING / CARRYING:**

| ◊ Sedentary | 10 lbs. max. & occasionally carrying small objects; this does not mean seated work. |
|---|---|
| | Please address in sitting, standing, etc., in miscellaneous activities. |
| ◊ Light | 20 lbs. max.; frequently up to 10 lbs. |
| ◊ Medium | 50 lbs. max.; frequently up to 20 lbs.; constant 10 lbs. |

Estimated Length of Disability: _____   Date released to RTW: _____

Any medication that would prevent RTW activities? ____ Yes ____ No  Explain: _____

Comments / Explanations: _____

Physician's Signature: _____

Behm v. Mack Trucks, et al.                    MACK0153

JA000453



Date: 3/19/2020


Colleen Behm
216 Halsey Ave.
West Lawn, PA  19609

Dear Colleen,

The purpose of this letter is to provide information on your requested A&S benefits.  We
have received your claim for A&S benefits for what might be a request from 5/13/2019
with a RTW date of 6/07/2020.  Please be advised that your A&S has been **denied**
because of the following requirement:

- We are in need of current dates as you had returned to work on Friday, 9/6/2019
  and continued to work up until last day worked, Wednesday, 3/4/2020, which is
  180 days since RTW 9/6/2019.
- We are in need of updated Diagnosis and Concurrent Conditions, since you were
  working for more than 14 days per the A&S guidelines.


Sincerely,


Your Human Resource Department


Cc: HRBP

Mack Trucks Inc.
7000 Alburtis Road
Macungie, PA 18062



**EXHIBIT**

36

Behm v. Mack Trucks, et al.                                             MACK0055

JA000454

From:

Apr. 2. 2020  2:33PM                                                          No. 9096    P. 3/3

04/03/2020 14:02    #817 P.001/002

*"Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts."*

**PART C       ATTENDING PHYSICIANS STATEMENT – ONLY THE DOCTOR CAN COMPLETE THIS PORTION**

*TO THE ATTENDING PHYSICIAN:* Your patient has applied for or may be eligible for weekly disability income benefits. Your answers to the questions below will assist us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for additional information.

RECEIVED APR 0 2 2020

1. PATIENT'S FULL NAME: Colleen Sarah Behm

2. DIAGNOSIS AND CONCURRENT CONDITION: Migraine HA,
   IF PREGNANCY, APPROXIMATE DATE COMMENCED:
   DATE:

   CORRESPONDING ICD/A* CODE: Anxiety, G43.009; F41.1
   *ICDA—Nomenclature International Illnesses

3. a. Was surgery performed?           Yes  X  No

   b. Type of Surgical Procedure:

   c. Date of Surgery:

4. IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?

   ___ Yes  X  No

5. DATE PATIENT WAS FIRST EXAMINED BY YOU FOR THIS CURRENT CONDITION:

   DATE: 5/29/19

6. DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
   Sickness Appeared Date: _____

   X  Accident Happened Date: 3/4/20, 5

   If Accident, Describe Nature of Accident: assault.

7. DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL AFTER FIRST DATE EXAMINED (If not applicable, state "NONE"):

   DATES: 7/18/19, 8/30/19, 2/21/20, 3/5/20, 3/6/20
   3/11/20

8. PATIENT'S NEXT SCHEDULED APPOINTMENT IS:

   DATE: 1-2 mnths.

9. WAS PATIENT HOSPITALIZED?        Yes  (No)

   If Yes: Date Admitted: _____  Date Discharged: _____

   Name of Hospital: _____

10. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
    ___ Yes  X  No   If "YES" describe condition and date:

11. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?
    X Yes  ___ No   If "NO", Explain:

    WAS PATIENT EVER REFERRED TO ANOTHER PHYSICIAN?
    X Yes  ___ No   If "YES":
    Date of Referral: 5/29/19
    Name of Physician: Dr. Porzozowski

11. WAS PATIENT CONTINUOUSLY TOTALLY DISABLED AND UNDER YOUR CARE?  X Yes  ___ No

    IF YES, FROM: 3/4/2020  TO 6 months

13. WAS PATIENT PARTIALLY DISABLED (If you are completing this item, please list specified dates) In the "Remarks", Section below along with the estimated duration of the restriction.)

    IF YES, FROM _____ TO _____

14. IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK: An approximate date must be specified.

    Regular work—Date: 6 months, 9/4/2020        Restricted work (see No. 15)—Date:

15. ATTENTION: ATTENDING PHYSICIAN
    If you are releasing an employee to return (to work, and that employee continues to have a medical condition which would prevent or restrict his/her performance of regular work Assignments, we require that you clearly identify on this Accident and Sickness form:
    (i)  Any restrictions/limitations and/or specific limitation applicable to the employee.
    (ii) Any type of work the employee is able to perform.
    (iii) Any type of work the employee is unable to perform.
    If you have any questions regarding the request or the scope of job function please contact the Human Resources Service Center.

    Attending Physician Remarks: (Use additional sheet if necessary)
    pt. still getting HA 3-4 times per week

    4/3/2020                K.M.Pauporzahndo        K.Pauporzahndo        PA 1960
    DATE                    PHYSICIAN'S NAME (Print)  SIGNATURE              Rolb   DEGREE

    1903 Morgantown Rd.                  Rolp
    STREET ADDRESS                       CITY or TOWN        STATE              ZIP CODE

    ( 610 ) 777-4040              ( 610 ) 777-5575
    TELEPHONE NO.                  FAX NO.

    If assistance is needed in completing this form, please contact the Medical Department at
    Phone: 610.966.8878

    RETURN THIS COMPLETED FORM TO:
    Mack Trucks, Inc
    Lehigh Valley Operations
    7000 Alburtis Road
    Macungie, PA 18062
    fax 1-610-966-8882

EXHIBIT
37

O'Neill Kaitlyn
_____

| | |
|---|---|
| From: | O'Neill Kaitlyn |
| Sent: | Tuesday, April 7, 2020 6:50 AM |
| To: | colleen behm |
| Subject: | RE: A&S |

Hi Colleen,

Dee from payroll should be reaching out to you soon about you're A&S.  We got the paperwork and it's been approved.

Kaitlyn

From: colleen behm <colleenbehm@yahoo.com>
Sent: Monday, April 6, 2020 6:49 PM
To: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
Subject: Re: A&S

Hey,

Just touching base about my A&S. I was hoping you could give me some clarity on what's going on.

Colleen Behm

> On Apr 2, 2020, at 12:56 PM, O'Neill Kaitlyn <kaitlyn.oneill@volvo.com> wrote:

Hi Colleen,

We are waiting on a response from your doctor's office yet to clarify 2 things on the paperwork for us, once we hear back from them we will be able to review it again.

Regards,
Kaitlyn

From: colleen behm <colleenbehm@yahoo.com>
Sent: Thursday, April 2, 2020 9:03 AM
To: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
Subject: Re: A&S

What's the final determination for my A&S ?

Colleen Behm

> On Mar 30, 2020, at 12:20 PM, O'Neill Kaitlyn <kaitlyn.oneill@volvo.com> wrote:

1



EXHIBIT
tabbies
38

It came through this time.

Regards,
Kaitlyn

From: colleen behm <colleenbehm@yahoo.com>
Sent: Monday, March 30, 2020 11:32 AM
To: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
Subject: Re: A&S

Here is the copy I have, I also called my doctor to have them fax it over also.

On Monday, March 30, 2020, 11:19:33 AM EDT, O'Neill Kaitlyn
<kaitlyn.oneill@volvo.com> wrote:


Hi Colleen,


I'm not sure what happened then, but I check with dispensary that vey same day and told
them to watch for it.  At this time we have not received a copy of the paperwork.  Can you
contact them to re-try sending it to us?


Regards,

Kaitlyn


From: colleen behm <colleenbehm@yahoo.com>
Sent: Monday, March 30, 2020 11:15 AM
To: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
Subject: Re: A&S


CAUTION: This email originated from outside of the organization. Read more here:
phishing.beaware.volvo.net

They faxed it right in front of me.

Colleen Behm


        On Mar 30, 2020, at 10:41 AM, O'Neill Kaitlyn
        <kaitlyn.oneill@volvo.com> wrote:

2

Behm v. Mack Trucks, et al.                                    MACK0329

JA000457

Hi Colleen,

I wanted to let you know that the A&S paperwork from your doctor still has not arrive to us. It didn't go to HR's fax or the dispensary's fax. Do you know if they had a delay in sending it?

Kaitlyn O'Neill, CLRL

Mack Trucks, Inc

Human Resources Business Partner

Phone: 610-966-8016

Mobile: 610-390-2766

Email: kaitlyn.oneill@volvo.com

This email message (including its attachments) is confidential and may contain privileged information and is intended solely for the use of the individual and/or entity to whom it is addressed. If you are not the intended recipient of this e-mail you may not disseminate, distribute or copy this e-mail (including its attachments), or any part thereof. If this e-mail is received in error, please notify the sender immediately by return e-mail and make sure that this e-mail (including its attachments), and all copies thereof, are immediately deleted from your system. Please further note that when you communicate with us via email or visit our website we process your personal data. See our privacy policy for more information about how we process it: https://www.volvogroup.com/en-en/privacy.html

This email message (including its attachments) is confidential and may contain privileged information and is intended solely for the use of the individual and/or entity to whom it is addressed. If you are not the intended recipient of this e-mail you may not disseminate, distribute or copy this e-mail (including its attachments), or any part thereof. If this e-mail is received in error, please notify the sender immediately by return e-mail and make sure that this e-mail (including its attachments), and all copies thereof, are immediately deleted from your system. Please further note that when you communicate with us via email or visit our website we process your personal data. See our privacy policy for more information about how we process it: https://www.volvogroup.com/en-en/privacy.html

This email message (including its attachments) is confidential and may contain privileged information and is intended solely for the use of the individual and/or entity to whom it is addressed. If you are not the intended recipient of this e-mail you may not disseminate, distribute or copy this e-mail (including its attachments), or any part thereof. If this e-mail is received in error, please notify the sender immediately by return e-mail and make sure that this e-mail (including its attachments), and all copies thereof, are immediately deleted from your system. Please further note that when you communicate with us via email or visit our website we process your personal data. See our privacy policy for more information about how we process it: https://www.volvogroup.com/en-en/privacy.html

This email message (including its attachments) is confidential and may contain privileged information and is intended solely for the use of the individual and/or entity to whom it is addressed. If you are not the intended recipient of this e-mail you may not disseminate, distribute or copy this e-mail (including its attachments), or any part thereof. If this e-mail is received in error, please notify the sender immediately by return e-mail and make sure that this e-mail (including its attachments), and all copies thereof, are immediately deleted from your system. Please further note that when you communicate with us via email or visit our website we

3

Behm v. Mack Trucks, et al.

MACK0330

JA000458

process your personal data. See our privacy policy for more information about how we process it: https://www.volvogroup.com/en-en/privacy.html

4

Behm v. Mack Trucks, et al.

MACK0331

JA000459

May. 26. 2020  2:23PM   NEUROLOGY DOB STE 210          No. 2646   P. 1

**A&S**                                   **MACK**

Mack Trucks, Inc.
Lehigh Valley Ops.
7000 Alburtis Road
Macungie, PA 18062-9521
Phone: 610-966-8083

Name: _Colleen S. Behm_ SAP: 450939    Date: 05/22/2020

We are sorry to hear that you are ill and want to wish you a speedy recovery. If there is anything we can do to help you medically, please do not hesitate to contact the dispensary at 610-966-8878.

Please note that any Accident & Sickness benefits in conjunction with lost time from work will only be processed if your absence is approved by an MD, DO, DDS, DPM or Psychiatrist. Any other practitioner(s) will not be accepted, which includes a Nurse Practitioner and/or Physician's Assistant.

In order for your claim to be processed efficiently, the Short Term Disability Benefits Claim Form enclosed, must be filled out completely, signed by an MD, and faxed to the Mack Macungie Medical office, 610-966-8882, or it may cause a delay in your payment of benefits.

Please note that it is your responsibility to provide HR with a copy of your return to work release upon returning to work. If you do not have this release with you, we will NOT be able to return you to work until that release is obtained. The work release should state the effective date of return with or without restrictions. If there are any restrictions attached to your release, they need to be as specific and as detailed as possible. Please be certain to convey this to your treating physician.

As a reminder, under the contract (Master Contract/Article I - Section 27 (c)(8)), FMLA runs concurrent with six weeks (up to 240 hours) of accident and sickness benefits. An FMLA Certification of Health Care Provider for Employee's Serious Health Condition is enclosed. Your doctor should complete the attached form and return it to our office with 15 days.

FMLA RETURN DATE: ___/___/___
(15 days from receipt of A&S/FMLA request)

Once again, we wish you a speedy recovery. If you should have any questions or concerns, please do not hesitate to call me at 610-966-8083.

Sincerely,

RECEIVED
MAY 26 2020
MACUNGIE MEDICAL

Macungie Human Resources

7attachments

EXHIBIT
39

... TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

PART A EMPLOYEE'S STATEMENT
All Questions Must Be Completed by Employee ~ Claim Form Must Be Returned By:

| Full Name | Colleen S. Behm | Employee # | 456939 | Social Security Number | 188 176 1481 | Date of Birth | 05/22/1989 |

| Address |
| Street | 2116 Halsey Ave. | City Zip Town | West Lawn | State | PA | Zip | 19609 |

If accident occurred give Date: March 4, 2020
Is the sickness or injury due to your employment with the Company? Yes __ No X
If "Yes" give full particulars in space provided below or on separate sheet.

Is the sickness or injury due to your employment with another employer? __ Yes X No
If "Yes" give full particulars below.

Were you disabled by another employer (full or part-time) while disability was incurred? __ Yes X No
If "Yes" give full particulars below and name of employer.

Date last worked March 17, 2020
Date you were first treated by physician for present disability March 5, 2020
If recovery has occurred give date _____ , 20 ____

**AUTHORIZATION TO RELEASE INFORMATION**

May 22, 2020

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.**

IMPORTANT—Attending Physician must complete reverse side of this form.

**Procedure upon return from sick leave**

If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your supervisor and the Human Resources Service Center.

PART B EMPLOYER'S STATEMENT

| Full Name of Employee | Colleen Sara Behm | | Social Security Number |

| Employer | Was coverage in force | | Occupation |
| Date of Hire | When disability began __ Yes __ No | | |

| Was employee laid off or was laid off employment prior to beginning of the disability? __ Yes __ No | If "Yes" give date ____ 20 | Did the sickness or injury arise out of the Employee's employment? __ Yes __ No | If "Yes" give reason in space provided below or on Workers' Compensation front page below. Employee must complete Reimbursement Agreement |

| Are there any circumstances which would raise your of doubt as to the validity of the claim? __ Yes | If "Yes" give reason in space provided below | Hourly rate Or Monthly rate | Amount of weekly A & S benefit |

| List Employee withholding election for current issue (exp. M-1) | List Holidays paid during sick leave | List number of unutilized sick days used last year |

| Date Employee was first absent from work in present disability ____ 20 | Date work was resumed ____ 20 | |

| Date ____ 20 | Employer Representative: | |

Additional Space For Employee/Employer Use (Attach additional sheets if space is limited)

Behm v. Mack Trucks, et al.                MACK0143

May. 26. 2020  2:25PM    NEUROLOGY DOB STE 210          No. 2646   P. 3

6103760745                                    00184 bill   05-13-2020        4/7

"Notice to all parties completing this form: If it is fraudulent to fill out this form with information you know to be false or to omit information: Criminal and/or civil penalties can result from such acts."

## PART-C   ATTENDING PHYSICIANS STATEMENT — ONLY THE DOCTOR CAN COMPLETE THIS PORTION

*TO THE ATTENDING PHYSICIAN:* To be eligible for weekly disability income benefits, Your employee in the application holds will need us in determining if these benefits are payable. Please answer ALL applicable items, otherwise the form will be returned to you for additional information.

Colleen Sam Behm

DIAGNOSIS ... PINEAL concussion
POST concussion syndrome memory loss
migraine HA w/the aura, post-traumatic stress
COMPLICATIONS ICD-9 CODE: F07.81, G44.301, R41.840
HPA: ... F43.10  G47.00

IN PREGNANCY, APPROXIMATE DATE CONFINEMENT:
DELIVERY: _____    9/2/2020

PATIENT NOW PREGNANT:   Yes  ☒No

IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?
☒Yes   No

DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED:
DATE: 8/2/19

Sickness Appeared Date: 5/8/19
Accident Happened Date: 5/8/19

If Accident, Describe Nature of Accident:
STRUCK HEAD WHEN STOOD UP AT WORK CAUSING NAUSEA, LIGHTHEADED SYMPTOMS WORSENED 2 WORK SENSE CONCUSSED 2 DAYS LATER

DATES OF SERVICE IN DOCTOR'S OFFICE OR HOSPITAL: WHEN FIRST DATE EXAMINED:
DATE: 8/1/19  APPt      Pain DOCTOR
                      oN 5/18/19

HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
 Yes   ☒No   If "YES" describe condition and date:
SEVERE concussion Car Accident 2013 resulting in fractured clavicle & ribs, ruptured spleen & punctured lungs

HAS SURGERY BEEN PERFORMED?   Yes  (No)
If Yes, Date Admitted _____  Date Discharged _____
Name of Hospital _____

HAS PATIENT BEEN REFERRED TO ANOTHER PHYSICIAN?
 Yes   ☒No   If "YES":
Date Referral _____
Name of Physician _____

DATES PATIENT TOTALLY UNABLE TO WORK:
FROM AUGUST 22, 2019  TO TODAY & BEYOND

IF ABLE, FROM _____  TO _____

DATE PATIENT WILL BE ABLE TO RETURN TO:
Regular work — Date: 1/2/21        Rehab/Light work (list No 16) — Date:

**ATTENTION ATTENDING PHYSICIAN**
If you are releasing an employee to return to work, and that employee contributes to have a medical condition which would prevent the proper performance of regular work...

PHYSICIANS SIGNATURE REQUIRED

5/22/2020        Lawrence Brzozowski, MD    L Brzozowski    MD
DATE              PHYSICIAN'S NAME (Print)      SIGNATURE       DEGREE
301 S 7th Ave Suite 210    West Reading    PA    19611
STREET ADDRESS            CITY OR TOWN      STATE   ZIP CODE
484, 628 4651e           (484, 628 4457)
TELEPHONE NO.            FAX NO.

RETURN THIS COMPLETED FORM TO:
Mack Trucks, Inc
Lehigh Valley Operations
7000 Alburtis Road
Macungie, PA 18062

Behm v. Mack Trucks, et al.                    MACK0144

JA000462

May. 26. 2020  2:25PM    NEUROLOGY DOB STE 210                 No. 2646   P. 4

## REIMBURSEMENT AGREEMENT

**To: Mack Trucks, Inc. Or An Insurance Carrier Acting On Its Behalf**

With respect to the weekly disability benefit payments made to me by you in connection with my claim dated _____, provided by my employer, Mack Trucks, Inc., and in accordance with Appendix B, Article II, Section 4(g), I understand that the amount of such benefit for any week or partial week of disability shall be reduced, if applicable, by the amount of benefit payments received for such week or partial week from Workers' Compensation and/or any Occupational Disease Law or Act which provides benefits for the time lost from work due to disability.

If I am awarded any or all of the benefits enumerated above for any week or partial week for which you have paid me a disability benefit, I agree to repay, in full and in one payment, upon receipt of such award monies, the amount by which the sum of:

    (1)  Payments received from any or all of the benefits sources enumerated above, and

    (2) Salary Continuation and/or Accident and Sickness benefit payments made by you

which exceeds the Salary Continuation and/or Accident and Sickness benefit payments made for the same period, up to the amount of said Salary Continuation and/or Accident and Sickness payments.

I further agree, that I will notify you immediately upon my receiving notice that I have been awarded Workers' Compensation benefits and/or any Occupational Disease Law or Act benefits provided for time lost from work due to disability. Should my claim be compensable, I further agree either to repay Mack Trucks, Inc., all amounts paid on my behalf under the group health benefits program, or Mack Trucks, Inc. shall be subrogated out of any Workers' Compensation agreement or award up the amount paid.

May 22, 2020
DATE

_____
EMPLOYEE SIGNATURE

Colleen S. Behm
EMPLOYEE NAME (PRINTED/TYPED)

450929
BADGE NO.

May. 26. 2020  2:26PM   NEUROLOGY DOB STE 210                    No. 2646   P. 5
6103700745                                         02:57 p.m.  05-19-2020    6/7

**Macungie Health Office**
**Lehigh Valley Operations**
**7000 Alburtis Road**
**Macungie, Pa 18062-9631**
**PHONE# (610) 966-8878; FAX# (610) 966-8882**

**DIAGNOSIS TREATMENT PLAN**

PLEASE FAX COMPLETED FORM BELOW TO FAX # (610) 966-8882
ASAP AT COMPLETION OF VISIT. THANK YOU

DATE: 5/20/2020    PATIENT'S NAME (print): Colleen Behm

DIAGNOSIS: (1) MULTIPLE CONCUSSIONS (2) POST CONCUSSION SYNDROME, MANIFEST BY INCREASED MIGRAINE HEADACHES, IRRITABILITY, POOR MEMORY, ANXIETY, POST TRAUMA STRESS DISORDER WITH WEIGHT GAIN AND INSOMNIA WITH CONDITION WORSENED AND RECOVERY PROLONGED BY WORK FORCING HER TO RETURN TO WORK BEFORE SYMPTOM ABATEMENT.

TREATMENT PLAN: (1) CONTINUE SEEING THERAPIST FOR PTSD
(2) INCREASE AMITRIPTYLINE TO 100 mg hs (3) ANAPROX DS 550mg ADDITIVE FOR MIGRAINE HEADACHES
(3) NEED TO IMPROVE SLEEPING TO 7/8 hrs.
(4) NO WORK TILL SYMPTOMS ABATE
(5) IF MIGRAINES DO NOT IMPROVE IN 2 mo ADD CCAP BLOCKER
(6) KEEP MENTALLY AND PHYSICALLY BUSY AS TOLERATED TO DISTRACT PT AND
(7) DECREASE STRESS

DIAGNOSTIC STUDIES: CT OF FACE 5/11/19 - (?) JAW CONTUSION

RETURN VISIT DATE: JULY 2020

PHYSICIAN SIGNATURE: L. Bryzowski MD
FOR USE IN PHYSICIAN OFFICE HEALTH CARE ONLY

PRINT PHYSICIAN'S NAME: Lawrence Bryzowski, MD

PHYSICIAN'S ADDRESS: 361 S 7th Ave Suite 210
West Reading PA 19611

PHYSICIAN'S PHONE #: 484-628-4465.

Diagnosis treatment plan   Updated 5/18/10

Behm v. Mack Trucks, et al.                                    MACK0146

JA000464

May. 26. 2020  2:26PM   NEUROLOGY DOB STE 210                     No. 2646   P. 6
6103708745                                        03:41 n.m.  05-13-2020        7/7

## MEDICAL DEPARTMENT
### LEHIGH VALLEY OPERATIONS
### PHYSICAL CAPABILITIES CHECKLIST

Print Patient's Name: __Colleen Behm__     Date Completed: __5/22/20__

Dominant Hand: Right __X__   Left _____

| | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never | N/A |
|---|---|---|---|---|---|---|
| **LIFTING & REACHING:** | | | | | | |
| • Floor to Waist | | | | | | |
| • Waist to Shoulder | | | | | | |
| • Shoulder Height or Higher | | | | | | |
| **USE OF VIBRATORY TOOLS:** | | | | | | |
| **MISCELLANEOUS ACTIVITIES:** | | | | | | |
| • Sitting | | | | | | |
| • Standing | | | | | | |
| • Walking | | | | | | |
| • Bending | | | | | | |
| • Twisting | | | | | | |
| • Stooping / Squatting | | | | | | |
| • Kneeling | | | | | | |
| • Climbing | | | | | | |
| • Crawling | | | | | | |
| • Driving: Lift Truck / Tractor Trailer / Car | | | | | | |

PLEASE CIRCLE: RIGHT HAND or LEFT HAND or RIGHT HAND and LEFT HAND

| REPETITIVE TASKS | Constant 67-100% | Frequent 34-66% | Occasional 6-33% | Seldom 0-5% | Never |
|---|---|---|---|---|---|
| • Grip / Grasp | | | | | |
| • Push / Pull | | | | | |
| • Fine Manipulation | | | | | |
| • Keyboard Operation | | | | | |
| • Foot Controls | | | | | |

**LIFTING / CARRYING:**
◊ Sedentary     10 lbs. max. & occasionally carrying small objects. This does not mean often seated work
                Please address in sitting, standing, etc., in miscellaneous activities.
◊ Light         20 lbs. max., frequently up to 10 lbs.
◊ Medium        50 lbs. max., frequently up to 20 lbs., constant 10 lbs.

Estimated Length of Disability: __3-6 months or longer__     Date released to RTW: _____

Any modification that would prevent RTW activities?   Yes __X__ No   Explain _____

Comments / Explanation: __PT NOT ABLE TO PERFORM ANY OR ABOVE__
__ACTIVITIES WITHOUT EXACERBATION HER CONDITION__

Physician's Signature: __K Byjursh__

Behm v. Mack Trucks, et al.                                MACK0147

MR 2/3/2021

**Tower Health Medical Group**
TOWER HEALTH
Advancing Health. Transforming Lives.

Neurology West Reading Tower
Health Medical Group
301 S. 7th Ave
Suite 210
West Reading PA 19611-1450
Phone: 484-628-4656
Fax: 484-628-4657

February 3, 2021

| Patient: | Colleen Sara Behm |
| Date of Birth: | 5/22/1989 |

To Whom It May Concern:

Colleen Behm was seen for an appointment on
2/3/2021. She may return to work on 2/16/21.
Please contact my office with any questions or
concerns.

Sincerely,

Lawrence Brzozowski, MD
Tower Health Medical Group Neurology

RECEIVED
FEB 0 3 2021
MACUNGIE MEDICAL

**EXHIBIT**
tabbies
40

Behm v. Mack Trucks, et al.

MACK0138

Aug. 4. 2020  3:03PM    NEUROLOGY DOB STE 210                No. 3697   P. 2

**Tower Health Medical Group**
TOWER HEALTH

Neurology Tower Health Medical Group
301 S. 7th Ave
Suite 210
West Reading PA 19611-1460
Phone: 484-628-4656
Fax: 484-628-4657

AR
8/5/2020

Colleen Sara Behm
216 Halsey Ave
Reading PA 19609

August 4, 2020

Patient:         Colleen Sara Behm
MR Number:        1096985
Date of Birth:    5/22/1969

To whom it may concern,

The above named person is under my care.  She was in the office on 7/27/2020 and will be returning on 10/19/2020.  It is may recommendation that she stays out of work until my next evaluation at her next follow up visit. If there are any questions, please call the office at 484-628-4656.

Sincerely,

LAWRENCE A BRZOZOWSKI, MD
Neurology Tower Health Medical Group

FORM# RH5401



RECEIVED
AUG 0 4 2020
MACUNGIE MEDICAL

EXHIBIT
41



Behm v. Mack Trucks, et al.                          MACK0141

JA000467

Oct. 14. 2020 10:19AM    NEUROLOGY DOB STE 210    No. 4979   P. 2

HR. (701) 14/2020



Neurology West Reading Tower Health Medical Group
301 S. 7th Ave
Suite 210
West Reading PA 19611-1450
Phone: 484-628-4666
Fax 484-628-4667

RECEIVED
OCT 1 4 2020
MACINGHE MEDICAL

Colleen Sara Behm
216 Halsey Ave
Reading PA 19609

October 14, 2020

Patient:            Colleen Sara Behm
MR Number:       1095895
Date of Birth:     5/22/1989

To whom it may concern,

    The above named person is under my care.  She was in the office on 7/27/2020 and due to a schedule change her follow up appointment have been rescheduled to 11/17/2020.  It is may recommendation that she stays out of work until my next evaluation at her next follow up visit. If there are any questions, please call the office at 484-628-4666.

Sincerely,

LAWRENCE A BRZOZOWSKI, MD
Neurology West Reading Tower Health Medical Group

FORM# RH5461

Behm v. Mack Trucks, et al.

MACK0140

JA000468

Nov. 17, 2020  1:45PM    NEUROLOGY DOB STE 210           No. 5710   P. 2

*AVC :9|18|2020*

**Tower Health
Medical Group**
TOWER HEALTH
Advancing Health Transforming Lives.

Neurology West Reading Tower Health Medical Group
301 S. 7th Ave
Suite 210
West Reading PA 19611-1460
Phone: 484-628-4650
Fax: 484-628-4657

RECEIVED
NOV 17 2020
MACUNGIE MEDICAL

Colleen Sara Behm
216 Halsey Ave
Reading PA 19609

November 17, 2020

Patient:            Colleen Sara Behm
MR Number:          1085695
Date of Birth:      5/22/1968

To whom it may concern,

The above named person is under my care. She was in the office on 11/17/20 and her follow up appointment is on 02/01/21. It is my recommendation that she stays out of work until my next evaluation at her next follow up visit. If there are any questions, please call the office at 484-628-4658.

Sincerely,

LAWRENCE A BRZOZOWSKI, MD
Neurology West Reading Tower Health Medical Group

FORM# RH5461

**O'Neill Kaitlyn**

| | |
|---|---|
| From: | colleen behm <colleenbehm@yahoo.com> |
| Sent: | Monday, February 8, 2021 1:30 PM |
| To: | O'Neill Kaitlyn |
| Subject: | Resignation |

CAUTION: This email originated from outside of the organization.

Hello Kaitlyn, Please consider this as my formal resignation. My last day of employment will be February 15, 2021.

Colleen Behm

**EXHIBIT**

tabbies®  42

1



Where

Do you want region or international

International

313-926-5492. Say you are with Mack they will then put you in contact with Dave Snyder

EXHIBIT
43

Can I ask what's up

Well I know people have less seniority than me on first and I cannot do 2nd shift. I spoke to unemployment today and told them I was on 1st for 2 years and that they placed me on second and I stressed to them that I can't do second shift and that I'm able and available to work my normal shift and have children and a domestic violence case so they said mack needs to either offer me work on first shift or allow me to collect unemployment or temporarily lay

Plaintiff 000424

at the seniority list while she was on the phone with me and said Schmidt said I'm to stay on second

My anxiety and migraines have been through the roof so I contemplated taking A&S but that's just a temporary solution

I had to call out Thursday and Friday for illness and today for no child care...

So why haven't you reached out to me

I've been in contact with Cruz but all he says is to be patient

So are you mad at me?

I have text messages from him making heavy moves towards me a couple months ago but I feel since I didn't entertain his advances that



Can you give me a day to look into it

I know you've been busy with everything

But I'm always willing to help so let me look into ok

Okay I'll hold off on Detroit but my points are racking up because of this whole ordeal

Do you have fmla

Nope

I'm like 100 hours away from being qualified

Do you have the hours for it

Ok

Wed, Feb 26, 3:11 PM

Plaintiff 000426

JA000473





Yes 1250

HR... me to have a meeting with me Monday

Ugh on points?

Yep, they are saying I have 7 when I have 5 because of court, me being sick and then Jana being sick. Only once I called off because I had to figure out daycare because I was going to second

So fuck hr

lol ok

I have all my court printouts. And doctors notes. Will they take those points away or do I need to hire an attorney. They can't make me come to work for those

Well if we do a grievance a lawyer

Plaintiff 000428

Plaintiff 000429

JA000476



COREY L. BEHM          Defendant              PACSES Case Number 5511117401
                                              Other State ID Number

### ORDER OF COURT - APPEAR AT A MODIFICATION CONFERENCE

◯ Initial Conference     ◯ Rescheduled Conference

You, COREY LEE BEHM, Respondent have been sued in Court to modify an existing support order. You, COREY LEE BEHM, Respondent, and You, COLLEEN SARA BEHM Petitioner, are ordered to appear in person at DOMESTIC RELATIONS OFFICE C/O BERKS CO SERVICES CENTER  6TH FL, 633 COURT ST, READING, PA. 19601-4316 on the 28TH DAY OF JANUARY, 2020 at 10:00AM for a conference and remain until dismissed by the Court. If the Petitioner of this action fails to appear as provided in this Order, this petition may be dismissed. If the Respondent of this action fails to appear as provided in this Order, an Order for Modification may be entered against the Respondent

You are further required to bring to the conference:

1. A true copy of your most recent Federal Income Tax Return including W-2s, as filed.
2. Your pay stubs for the preceding six (6) months.
3. The Income Statement and the appropriate Expense Statement, if required, attached to this order completed as required by Rule 1910.11 (c).
4. Verification of child care expenses
5. Proof of medical coverage which you may have or may have available to you
6. If a physician has determined that a medical condition affects your ability to earn income you must obtain a Physician Verification Form from the domestic relations section, sign it, have it completed by your doctor, and bring it with you to the conference.
   If you intend to offer the Physician Verification Form as evidence at any record proceeding, you must comply with the timeframes established by PA Rule of Civil Procedure 1910.29(b)(2).
7. Information relating to professional licenses, and:
8. Other

_____

_____

_____

**Conference/Hearing**
**Case #5511117401**
**Behm, Colleen vs Behm, Corey**

**Your case with Corey Behm is scheduled for a conference to determine whether the support order is to be modified.**

## When

Tuesday January 28, 2020, 10:00 AM



CALHOON, BRENT, PA
1900 Morgantown Road
Reading, PA 19607-9620

WORK/SCHOOL EXCUSE

Date: 02/21/20

PATIENT NAME: Cooper B Sleva

Please excuse the above patient from work/school from 02/20/2020 to 02/23/2020 due to illness/injury.

The patient may return to work/school on 02/24/2020.

Due to current privacy laws, the medical reason for his/her absence will not be provided unless requested by the patient.

Sincerely,

*Brent Calhoon*
*Brent Calh—PA-C*

Electronically signed by Brent Calhoon for Karen Sieger L 02/21/2020 at 10:47 am

Children's Clinic of Wyomissing
2240 Ridgewood Road, Suite 105
Wyomissing, PA 19610
(610) 376-8691 / Fax (610) 376-8745

450939

02/28/2020

To Whom It May Concern

JANA BELIM is a patient of this practice and was seen today at our office.
Please excuse his/her parent or guardian from any work missed on
_____ as a result of this visit.

Thank You,



Thank You,

Timothy C Tust MD F A A P

RECEIVED
FEB 14 2020
McGUNGER MEDICAL

Phone 610-376-8601          Fax 610-376-0745

Ok the subpoenas are what I need

In the Court of Common Pleas of Berks County, Pennsylvania
DOMESTIC RELATIONS SECTION

COLLEEN S BEHM                          Docket Number: 00000000
                    Plaintiff
                                        PACSES Case Number 051110001
RODNEY L BEHM                           Other State ID Number
                    Defendant

ORDER OF COURT

You, COLLEEN SARA BEHM, plaintiff/defendant of

are ordered to appear at DRS HEARING OFFICERS
C/O BERKS CO SERVICES CENTER, 13TH FL -1055 RM TC-D 633 COURT ST, READING, PA
19601-4316
before a hearing officer of the Domestic Relations Section, on the MARCH 2, 2020 at
9:00AM for a hearing:

You are further required to bring to the hearing:
  1. A true copy of your most recent Federal Income Tax Return including W-2s, as filed;
  2. Your pay stubs for the preceding six (6) months ,
  3. The Income Statement and the appropriate Expense Statement, if required, attached to this
     order, completed as required by Rule 1910 11 (c)
  4. Verification of child care expenses,
  5. Proof of medical coverage which you may have, or may have available to you,
  6. If a physician has determined that a medical condition affects your ability to earn income you
     must obtain a Physician Verification Form from the domestic relations section, sign it, have it
     completed by your doctor and bring it with you to the conference.
     If you intend to offer the Physician Verification Form as evidence at any record proceeding, you
     must comply with the timeframes established by PA Rule of Civil Procedure 1910.29(b)(2);
  7. Information relating to professional licenses, and,
  8. Other

dispensary never got medical clearance for me to return to work when I came back in September

So they have had me working with NO medical clearance

Ok I'm in a meeting

Thu, Mar 5, 11:55 AM

No worries

I'm sorry I was off yesterday. And today is out of control

I believe it. Lol

What are you thinking about the whole medical clearance thing

I didn't think they could do that

Me neither. I contacted an attorney and I'm at my doctors now getting new A&S papers and I'm not coming

Plaintiff 000434

was that I was following up with my neurologist in November

But I was forced to come back in September

O boy

Yep. Mack officially messed up

Yes I would agree

Plus they refused to take off my points for court and asked me what sickness me and my daughter had with a doctors note which is a hipaa violation

And then kept prying if it was the flu until I told her to stop and I wasn't releasing my health or daughters health info

I will look into that

JA000482



why they had me working with no clearances

No nothing on that

Ugh. Okay.

It's been crazy with the virus

Oh I believe it! You better stay safe!

Are they going to close at all ?

I will. You too!!! I don't know yet

7000EOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Colleen Behm | (610) 587-0522 | 5/22/89 |

| Street Address | City, State and ZIP Code |
|---|---|
| 216 Halsey Avenue | West Lawn, PA 19609 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Mack Trucks, Inc. | >50 | 610-351-8800 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7000 Alburtis Road | Macungie, PA 18062 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| United Auto Workers Local 677 | >50 | (610) 797-7722 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2101 Mack Blvd., #1 | Allentown, PA 18103 |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN |
|---|---|---|---|---|
| ☒ RETALIATION | ☐ AGE | ☒ DISABILITY | ☐ OTHER (*Specify below.*) | |

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 1/1/2019 | 7/22/2020 |

☒ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

Respondant Mack Trucks, Inc., hired Ms. Behm on January 2, 2018 as a production
flex technician. In October 2018, Ms. Behm was out work on short term disability
due to anxiety she suffered as a result of domestic violence. When she returned to
work in January of 2019, Ms. Behm started being targeted by superiors that began
writing her up for unwarranted reasons. On May 8, 2019 Ms. Behm suffered a work-
related head injury. Ms. Behm struck her head on a metal bracket while working in
a sleeper cab. Later that evening, Ms. Behm went to Reading Emergency Room and was
discharged with a concussion and scalp contusion.

**EXHIBIT**
**44**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

| Jul 22, 2020 | *Colleen Behm (Jul 22, 2020 11:49 EDT)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |
|---|---|---|
| Date | Charging Party Signature | Colleen Behm
E-signed 2020-07-22 11:49AM EDT
colleenbehm@yahoo.com |

Adobe Sign Transaction Number: CBJCHBCAABAAQTQ4NG6sL6LSuIzhJArML2III3A5pCK0hv

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

### PENNSYLVANIA HUMAN RELATIONS COMMISSION                    and EEOC

State or local Agency, if any

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

In May of 2019, Ms. Behm procured a protection from abuse order against her husband. On May 11, 2019, she was assaulted by her husband. Ms. Behm was struck more than a dozen times resulting in a large laceration to the back of her head. Ms. Behm saw a neurologist, Dr. Lawrence A. Brzozowski, for her head injuries and was taken out of work until November 2019. Mack Trucks, Inc., insisted Ms. Behm see a neurologist of their choosing, Paul M. Shipkin, M.D., for an Independent Medical Evaluation. Dr. Shipkin found Ms. Behm capable of returning to work full time with no restrictions referable to her May 8, 2019 work-related injuries only. On May 10, 2020, Ms. Behm received a Notice of Ability to Return to Work form clearing her to return to work related to injuries sustained during her May 8, 2019 work-related accident. Ms. Behm's workers' compensation claim was denied on May 23, 2019.

Ms. Behm's migraines from her injuries were getting more intense as well as her anxiety from PTSD. In March of 2020, Ms. Behm was taken out of work again by Dr. Brzozowsk. Ms. Behm is now diagnosed with post-concussive syndrome due to returning to work too early. As a result of her marital abuse, Ms. Behm had to attend numerous court hearings for the assault and was threatened by Mack Trucks, Inc., that if more work was missed she would be fired, which is a violation of the Pennsylvania Crime Victims Act. During this time, Ms. Behm missed five days of work due to her daughter being sick as well as herself. Ms. Behm provided Mack Trucks, Inc., with doctors' notes for her missed days of work. Ms. Behm was questioned multiple times on the reasoning for her missed work. For the first two years of employment, Ms. Behm worked first shift. After her return from medical leave, Ms. Behm was placed on second shift with only one days notice. Ms. Behm stressed to Mack Trucks, Inc., and her Union Representative, that she could not work that shift because of child care issues. Mack Trucks, Inc., did not change her back to first shift.

Ms. Behm's union representative, Cruz Rivera, made several sexual advances towards Ms. Behm. Mr. Rivera would send text messages to Ms. Behm at all hours of the day and night including while he was the bar. Mr. Rivera told her to feel free to flirt with him and that it's not very often a pretty woman works for the company. Ms. Behm repeatedly told him to keep the conversation professional. Ms. Behm made a complaint to the union chairman, Kevin Fronheiser, about Mr. Rivera's advancements. No actions were taken against Mr. Rivera. Ms. Behm feels that because she did not entertain Mr. River's advancements, he did not fight for her to get her first shift back December 2019.

In light of the above, Respondents (Mack Trucks, Inc. and United Auto Workers Local 677) actions violated Ms. Behm's rights under Title VII of the Civil Rights Act of 1964, and under the Americans with Disabilities Act.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency R |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

| Jul 22, 2020 | *Colleen Behm (Jul 22, 2020 11:49 EDT)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
|---|---|---|
| Date | Charging Party Signature | **Colleen Behm** E-signed 2020-07-22 11:49AM EDT colleenbehm@yahoo.com |

Adobe Sign Transaction Number: CBJCHBCAABAAQTQ4KGaL6tSulzhJV-ML2iNXVSpCF

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:  Colleen S. Behm
216 Halsey Avenue
West Lawn, PA 19609

From:  Philadelphia District Office
801 Market Street
Suite 1000
Philadelphia, PA 19107

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2020-04926 | Legal Unit,<br>Legal Technician | (267) 589-9707 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

- [ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.
- [ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.
- [ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.
- [ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge
- [X] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.
- [ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.
- [ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_Jamie R. Williamson_

March 11, 2021

Enclosures(s)

Jamie R. Williamson,
District Director

(Date Issued)

cc:
Robert Lippitt
VOLVO GROUP NORTH AMERICA
7900 National Service Road, Cc2-7
Greensboro, NC 27409

Graham F Baird, Esq,
Two Penn Center, Suite 1240
1500 Jfk Boulevard
Philadelphia, PA 19102

**EXHIBIT**
45

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| MACK TRUCKS, INC. | : | No.    21-2500 |
| And | : | |
| UNITED AUTO WORKERS LOCAL 677 | : | |
| Defendant. | : | |

**EXHIBIT**

tabbies 46

### CIVIL ACTION COMPLAINT

**I.  Parties and Reasons for Jurisdiction.**

1.     Plaintiff, COLLEEN BEHM (hereinafter "Plaintiff") is an adult individual residing at the above address.

2.     Defendant, MACK TRUCKS, INC., (hereinafter "Mack") is a business corporation organized by and operating under the laws of the Commonwealth of Pennsylvania and having a principal place of business at the above captioned address.

3.     Defendant, UNITED AUTO WORKERS LOCAL 677, (hereinafter "UAW") is a union organized by and operating under the laws of the Commonwealth of Pennsylvania and having a principal place of business at the above captioned address. Both Defendants are hereinafter referred to collectively as "Defendants."

4.     At all times material hereto, Defendants qualified as Plaintiff's employer pursuant to the Americans with Disabilities Act, the Pennsylvania Human Relations Act and as defined under Pennsylvania common law.

JA000487

5.      This action is instituted pursuant to the Americans with Disabilities Act, the

Family and Medical Leave Act and the Pennsylvania Human Relations Act.

6.      Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343.

7.      Supplemental jurisdiction over the Plaintiff's state law claim is conferred pursuant

to 28 U.S.C. § 1367.

8.      Plaintiff has exhausted her administrative remedies prior to bringing this civil

rights claim.  [Exh. A.]

9.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this

district because Defendants conduct business in this district, and because a substantial part of the

acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

Plaintiff was working in the Eastern District of Pennsylvania at the time of the illegal actions by

Defendants as set forth herein.

**II. Operative Facts.**

10.     On or about January 2, 2018, Defendant, MACK hired Plaintiff as a production

flex technician.

11.     In or around October of 2018, Plaintiff took a medical leave from work and

collected short term disability as a result of anxiety due to a domestic violence situation she

suffered.

12.     In or around January of 2019, Plaintiff returned to work in her full capacity.

13.     Upon her return to work, Plaintiff was targeted by her superiors who began to

write her up for unwarranted reasons.

14.     On or about May 8, 2019, Plaintiff suffered a work-related head injury.

15. Plaintiff was working in a sleeper cab and struck her head on a metal bracket while performing her job duties.

16. Plaintiff went to Reading Hospital emergency room and was subsequently discharged with a concussion and scalp contusion.

17. During this time, Plaintiff procured a protection from abuse order against her husband.

18. On or about May 11, 2019, Plaintiff was assaulted by her husband, who struck her than a dozen times resulting in a large laceration to the back of her head.

19. Plaintiff saw a neurologist, Dr. Lawrence Brzozowski, for her head injuries who placed her out of work until November of 2019.

20. Defendant Mack insisted Plaintiff be evaluated by a neurologist of their choosing, Dr. Paul Shipkin, for an independent medical evaluation.

21. Dr. Shipkin found Plaintiff capable of returning to work full time with no restrictions, referable to her May 8, 2019 workplace-related injuries ONLY.

22. On or about May 10, 2019, which was prior to her assault, Plaintiff received a notice of ability to return to work form clearing her to return to work related to the injuries sustained during her May 8, 2019 work-related accident.

23. On or about May 23, 2019, Plaintiff's worker's compensation claim was denied.

24. Following her injuries, Plaintiff began to suffer migraines that were increasing in severity, as well as worsening anxiety and PTSD.

25. In or around March of 2020, Plaintiff was ordered out of work again by Dr. Brzozowksi due to the worsening of her symptoms.

26.     Plaintiff was subsequently diagnosed with post-concussive syndrome, stemming from being forced to return to work too early.

27.     As a result of her domestic violence situation and assault, Plaintiff was required to attend numerous court hearings, as well as missing several days of work due to both her own and her daughter's illness.

28.     Defendant Mack warned Plaintiff that if more work was missed, she would be fired.

29.     Defendant Mack questioned Plaintiff multiple times on the reasoning for her missed work, even after she provided doctor's notes for her missed days.

30.     Additionally, following her return from her medical leave, Plaintiff was moved from her first shift schedule to second shift with only one day's notice.

31.     Plaintiff informed Defendant Mack and Defendant UAW's union representative that she was unable to work that shift due to childcare issues.

32.     Defendant Mack refused to change her schedule back to first shift.

33.     Additionally, Defendant UAW's union representative, Cruz Rivera, made several sexual advances towards Plaintiff.

34.     Mr. Rivera would send text messages to Plaintiff at all hours of the day and night, including while he was at the bar, telling Plaintiff to "feel free to flirt with [Mr. Rivera]" and that it's "not very often a pretty woman works for [Defendant Mack]".

35.     Plaintiff responded several times that she was not interested and to keep the conversation professional, however Mr. Rivera persisted.

36.     Plaintiff made a complaint to Defendant UAW's union chairman, Kevin Fronheiser regarding Mr. Rivera's inappropriate advances; however, upon information and belief, no action was taken to address the situation.

37.     Due to this situation, Plaintiff felt that Mr. Rivera failed to properly represent her as union representative with Defendant Mack.

38.     As a result of Defendants' retaliatory behavior and unwillingness to engage in accommodating Plaintiff's disability, she resigned on or about February 15, 2021.

39.     Defendants' primary motivation for retaliating against Plaintiff was her complaint about sexual harassment, the fact that she required an accommodation for her disability and/or that she filed a worker's compensation claim.

40.     As a direct and proximate result of Defendants' conduct in toward Plaintiff, she sustained great economic loss, future lost earning capacity, lost opportunity, loss of future wages, as well emotional distress, humiliation, pain and suffering and other damages as set forth below.

**III.  Causes of Action.**

## COUNT I– AMERICANS WITH DISABILITIES ACT
### (42 U.S.C.A. § 12101 et seq)
### (Plaintiff v. Defendant, MACK)

41.     Plaintiff incorporates paragraphs 1-40 as if fully set forth at length herein.

42.     At all times material hereto, and pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq., an employer may not discriminate against an employee based on a disability.

43.     Plaintiff is a qualified employee and person within the definition of Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq.

44.      Defendant, MACK is an "employer" and thereby subject to the strictures of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq.

45.      At all times material hereto, Plaintiff had a qualified disability, as described above.

46.      Defendant failed to accommodate or otherwise engage Plaintiff in a meaningful back and forth towards the development of a reasonable accommodation.

47.      Defendant, MACK's conduct toward Plaintiff is an adverse action, was taken as a result of her disability and constitutes a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq,.

48.      As a proximate result of Defendant, MACK's conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, future lost earning capacity, lost opportunity, loss of future wages, loss of front pay, loss of back pay, liquidated damages as well as emotional distress, humiliation, pain and suffering, consequential damages and Plaintiff has also sustained work loss, loss of opportunity, and a permanent diminution of his earning power and capacity and a claim is made therefore.

49.      As a result of the conduct of Defendant, MACK's owners/management, Plaintiff hereby demands punitive damages. .

50.      Pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq Plaintiff demands attorneys fees and court costs.

### COUNT II– VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Hostile Work Environment; 42 U.S.C.A. § 2000 et seq)
### (Plaintiff v. Defendants)

51.      Plaintiff incorporates paragraphs 1-50 as if fully set forth at length herein.

52.      Defendant, MACK employs fifteen (15) or more employees.

53.     As described above, Plaintiff was subjected to unwelcome sexual advances, language, innuendo, statements, and/or other conduct by her co-worker/union representative, all while being employed by Defendant.

54.     The aforementioned actions and conduct were severe, pervasive and continuous, and created a hostile work environment for Plaintiff.

55.     Defendants' conduct, as set forth above, violated Title VII of the Civil Right Act of 1964.

56.     As a proximate result of Defendants' conduct, Plaintiff sustained significant damages including by not limited to: great economic loss, future lost earning capacity, lost opportunity, lost future wages, loss of front pay and back pay, as well as emotional distress, humiliation, personal injury type damages, pain and suffering, consequential damages, as well as a work loss, loss of opportunity and a permanent diminution of her earning power and capacity, and a claim is made therefore.

### COUNT III– VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
#### (Retaliation; 42 U.S.C.A. § 2000 et seq)
#### (Plaintiff v. Defendant MACK)

57.     Plaintiff incorporates paragraphs 1-56 as if fully set forth at length herein.

58.     Defendant, MACK constructively terminated and took other adverse action against Plaintiff's employment in retaliation for her complaints and/or opposition to the sexual harassment.

59.     Defendant, MACK's conduct, as set forth above, violated Title VII of the Civil Rights Act of 1964.

60.     As a proximate result of Defendant's conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, future lost earning capacity, lost opportunity, loss of future wages, loss of front pay, loss of back pay, as well as emotional distress, humiliation, pain and suffering, consequential damages and Plaintiff has also sustained

work loss, loss of opportunity, and a permanent diminution of her earning power and capacity and a claim is made therefore.

　　　61.　　As a result of the conduct of Defendant, MACK's owners/management, Plaintiff hereby demands punitive damages.

　　　62.　　Pursuant to the Title VII of the Civil Rights Act of 1964, et seq Plaintiff demands attorneys fees and court costs.

### COUNT IV—PENNSYLVANIA HUMAN RELATIONS ACT
### 43 Pa.C.S.A. §951, et seq.
### (Plaintiff v. Defendants)

　　　63.　　Plaintiff incorporates paragraphs 1-62 as if fully set forth at length herein.

　　　64.　　As set forth above, Plaintiff is a member of a protected class.

　　　65.　　Defendant, MACK constructively terminated Plaintiff's employment.

　　　66.　　As set forth above, Defendants created a sexually hostile work environment for Plaintiff.

　　　67.　　As set forth above, a motivating factor in the decision to terminate Plaintiff's employment is Plaintiff's disability.

　　　68.　　As such, Defendants violated the Pennsylvania Human Relations Act, 43 Pa.C.S.A. §951, et seq.

　　　69.　　As a proximate result of Defendants' conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, future lost earning capacity, lost opportunity, loss of future wages, loss of front pay, loss of back pay, as well as emotional distress, humiliation, pain and suffering, consequential damages and Plaintiff has also sustained work loss, loss of opportunity, and a permanent diminution of earning power and capacity and a claim is made therefore.

70.    Plaintiff demands attorneys' fees and court costs.

### COUNT V– BREACH OF DUTY OF FAIR REPRESENTATION
### (Plaintiff v. Defendant, UAW)

71.    Plaintiff incorporates paragraphs 1-70 as if fully set forth at length herein.

72.    As described above, Defendant UAW neglected its obligation to protect Ms. Behm as required under the CBA.

73.    As described above, Defendant UAW failed to diligently protect or Ms. Behm with regards to her employment with Defendant MACK.

74.    Defendant UAW's actions were inexcusable, arbitrary and were done in bad faith.

75.    Defendant UAW breached its duty to act honestly and in good faith and to avoid arbitrary conduct.

76.    Defendant UAW breached its duty of fair representation that it owed to Plaintiff, Behm.

77.    As a proximate result of Defendant, UAW's conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, future lost earning capacity, lost opportunity, loss of future wages, loss of front pay, loss of back pay, loss of tips as well as personal injury, emotional distress, humiliation, pain and suffering, consequential damages and Plaintiff has also sustained work loss, loss of opportunity, and a permanent diminution of her earning power and capacity and a claim is made therefore.

**IV.  Relief Requested.**

**WHEREFORE,** Plaintiff, COLLEEN BEHM demands judgment in her favor and against Defendants, MACK TRUCKS, INC. and UNITED AUTO WORKERS LOCAL 677, in an amount in excess of $150,000.00 together with:

A.   Compensatory damages, including but not limited to: back pay, front pay, past lost

    wages, future lost wages. Lost pay increases, lost pay incentives, lost opportunity, lost

    benefits, lost future earning capacity, injury to reputation, mental and emotional

    distress, pain and suffering;

B.   Punitive damages;

C.   Liquidated damages;

D.   Attorneys fees and costs of suit;

E.   Interest, delay damages; and,

F.   Any other further relief this Court deems just proper and equitable.


                                    **LAW OFFICES OF ERIC A. SHORE, P.C.**

                                    BY:___s/ Graham F. Baird_____
                                        **GRAHAM F. BAIRD, ESQUIRE**
                                        Two Penn Center
                                        1500 JFK Boulevard, Suite 1240
                                        Philadelphia, PA 19102

                                        Attorney for Plaintiff, Colleen Behm

Date:_8/6/2021

## 2018 W-2 and EARNINGS SUMMARY 

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail.
The reverse side includes general information that you may also find helpful.

**W-2** Employee Reference Copy
Wage and Tax Statement
**2018**
OMB No. 1545-0008

| CopyC for employee's records | | | |
|---|---|---|---|
| d_Control number | Dept. | Corp. | Employer_use_only |
| 129270 HCN3/VLJ 041222 | A | 159 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416

Batch #02171

a/f Employee's name, address, and ZIP code
COLLEEN BEHM
1904 VAN REED RD APT G4
WYOMISSING PA 19610

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 22-1582040 | 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 |
| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| 32881.44 | 1060.60 |
| 3 Social security wages | 4 Social security tax withheld |
| 32993.39 | 2045.59 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 32993.39 | 478.40 |
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| b92e-f884-bd25-dbb6 | |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| | C 4.40 |
| 14 Other | 12b D 111.95 |
| 2045 SUI | 12c DD 11058.43 |
| 7881.80 ACCSK | 12d |
| | 13 Stat emp/Ret.plan/3rd party sick pay X |
| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
| PA 1106 9465 | 25187.19 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 778.22 | 25187.19 |
| 19 Local income tax | 20 Locality name |
| 253.51 | 390303 |

This section reflects information submitted by your employer.

| — Gross Pay — | 33411.91 | — Social Security Tax Withheld — | 2045.59 | — PA State Income Tax — | 778.22 |
|---|---|---|---|---|---|
| | | Box 4 of W-2 | | Box 17 of W-2 | |
| Fed. Income Tax Withheld | 1060.60 | Medicare Tax Withheld | 478.40 | Local Income Tax | 253.51 |
| Box 2 of W-2 | | Box 6 of W-2 | | Box 19 of W-2 | |
| | | | | SUI/SDI/FLI | 20.05 |
| | | | | Box 14 of W-2 | |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | PA. State Wages, Tips, Etc. Box 16 of W-2 | 390303 LOWER Local Wages, Tips, Etc. Box 18 of W-2 |
|---|---|---|---|---|---|
| Gross Pay | 33,411.91 | 33,411.91 | 33,411.91 | 33,411.91 | 33,411.91 |
| Plus GTL (C-Box 12) | 4.40 | 4.40 | 4.40 | | |
| Less Misc. Non Taxable Comp. | N/A | N/A | N/A | 7,801.80 | 7,801.80 |
| Less 401(k) (D-Box 12) | 111.95 | N/A | N/A | N/A | N/A |
| Less Other Cafe 125 | 422.92 | 422.92 | 422.92 | 422.92 | 422.92 |
| Reported W-2 Wages | 32,881.44 | 32,993.39 | 32,993.39 | 25,187.19 | 25,187.19 |

3. Employee W-4 Profile. To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

COLLEEN BEHM
1904 VAN REED RD APT G4
WYOMISSING PA 19610

Social Security Number: 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
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 5
STATE: 5
LOCAL:

* All PA local wages and withholding for Act 32 are reported to the employee work location PSD code.

© 2018 ADP, LLC

**EXHIBIT**
47

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 32881.44 | 1060.60 |
| 3 Social security wages | 4 Social security tax withheld |
| 32993.39 | 2045.59 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 32993.39 | 478.40 |
| d Control number | Dept. Corp. Employer use only |
| 129270 HCN3/VLJ 041222 | A 159 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| b92e-f884-bd25-dbb6 | |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| | C 4.40 |
| 14 Other | 12b D 111.95 |
| 2045 SUI | 12c DD 11058.43 |
| 7881.80 ACCSK | 12d |
| | 13 Stat emp/Ret.plan/3rd party sick pay X |

a/f Employee's name, address, and ZIP code
COLLEEN BEHM
1904 VAN REED RD APT G4
WYOMISSING PA 19610

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| PA 1106 9465 | 25187.19 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 778.22 | 25187.19 |
| 19 Local income tax | 20 Locality name |
| 253.51 | 390303 |

**W-2** Federal Filing Copy
Wage and Tax Statement
**2018**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 32881.44 | 1060.60 |
| 3 Social security wages | 4 Social security tax withheld |
| 32993.39 | 2045.59 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 32993.39 | 478.40 |
| d Control number | Dept. Corp. Employer use only |
| 129270 HCN3/VLJ 041222 | A 159 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| b92e-f884-bd25-dbb6 | |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| | C 4.40 |
| 14 Other | 12b D 111.95 |
| 2045 SUI | 12c DD 11058.43 |
| 7881.80 ACCSK | 12d |
| | 13 Stat emp/Ret.plan/3rd party sick pay X |

a/f Employee's name, address, and ZIP code
COLLEEN BEHM
1904 VAN REED RD APT G4
WYOMISSING PA 19610

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| PA 1106 9465 | 25187.19 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 778.22 | 25187.19 |
| 19 Local income tax | 20 Locality name |
| 253.51 | 390303 |

**W-2** PA.State Filing Copy
Wage and Tax Statement
**2018**
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 32881.44 | 1060.60 |
| 3 Social security wages | 4 Social security tax withheld |
| 32993.39 | 2045.59 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 32993.39 | 478.40 |
| d Control number | Dept. Corp. Employer use only |
| 129270 HCN3/VLJ 041222 | A 159 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| b92e-f884-bd25-dbb6 | |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| | C 4.40 |
| 14 Other | 12b D 111.95 |
| 2045 SUI | 12c DD 11058.43 |
| 7881.80 ACCSK | 12d |
| | 13 Stat emp/Ret.plan/3rd party sick pay X |

a/f Employee's name, address, and ZIP code
COLLEEN BEHM
1904 VAN REED RD APT G4
WYOMISSING PA 19610

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| PA 1106 9465 | 25187.19 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 778.22 | 25187.19 |
| 19 Local income tax | 20 Locality name |
| 253.51 | 390303 |

**W-2** City or Local Filing Copy
Wage and Tax Statement
**2018**
OMB No. 1545-0008
Copy 2 to be filed with employee's City or Local Income Tax Return.

---

Behm v. Mack Trucks, et al.

MACK0380

## 2019 W-2 and EARNINGS SUMMARY



This blue section is your Earnings Summary which provides more detailed information on the generation of your W-2 statement and W-4 profile. The reverse side includes instructions and other general information.

**W-2** Employee Reference Copy
Wage and Tax Statement
**2019**
OMB No. 1545-0008
Copy C for employee's records

| d Control number | Dept. | Corp. | Employer use only |
| --- | --- | --- | --- |
| 129270 NCN3/VLJ 041222 | | A | 161 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO    NC 27409-9416

Batch #01551

e/f Employee's name, address, and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

| b Employer's FED ID number | a Employee's SSA number |
| --- | --- |
| 22-1582040 | 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 |
| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| 34233.87 | 984.98 |
| 3 Social security wages | 4 Social security tax withheld |
| 36336.50 | 2252.86 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 36336.50 | 526.88 |
| 7 Social security tips | 8 Allocated tips |

| 11 Nonqualified plans | 12a See instructions for box 12 |
| --- | --- |
| | C 8.05 |
| 14 Other | 12b D 2432.63 |
| 22.48 SUI | 12c DD 20726.15 |
| 339.80 SURPY | 12d |
| 9051.48 ACC6K | 13 Stat emp/Ret. plan/3rd party sick pay X |

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
| --- | --- |
| PA 1106 9465 | 27277.05 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 838.49 | 27277.05 |
| 19 Local income tax | 20 Locality name |
| 273.10 | 390303 |

1. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | PA State Wages, Tips, Etc. Box 16 of W-2 | 390303 LOWER Local Wages, Tips, Etc. Box 18 of W-2 |
| --- | --- | --- | --- | --- | --- |
| Gross Pay | 37,790.45 | 37,790.45 | 37,790.45 | 37,790.45 | 37,790.45 |
| Plus GTL (C-Box 12) | 8.05 | 8.05 | 8.05 | N/A | N/A |
| Less Misc. Non Taxable Comp. | N/A | 330.00 | 330.00 | 9,381.40 | 9,381.40 |
| Less 401(k) (D-Box 12) | 2,432.63 | N/A | N/A | N/A | N/A |
| Less Other Cafe 125 | 1,132.00 | 1,132.00 | 1,132.00 | 1,132.00 | 1,132.00 |
| Reported W-2 Wages | 34,233.87 | 36,336.50 | 36,336.50 | 27,277.05 | 27,277.05 |

2. Employee Current W-4 Profile. To make changes, file a new W-4 with your payroll department.

COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

Social Security Number: 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
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 5
STATE: 5
LOCAL:

* All PA local wages and withholding for Act 32 are reported to the employee work location PSD code.

© 2018 ADP, LLC

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| --- | --- |
| 34233.87 | 984.98 |
| 3 Social security wages | 4 Social security tax withheld |
| 36336.50 | 2252.86 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 36336.50 | 526.88 |

| d Control number | Dept. | Corp. | Employer use only |
| --- | --- | --- | --- |
| 129270 NCN3/VLJ 041222 | | A | 161 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO    NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
| --- | --- |
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |

| 11 Nonqualified plans | 12a See instructions for box 12 |
| --- | --- |
| | C 8.05 |
| 14 Other | 12b D 2432.63 |
| 22.48 SUI | 12c DD 20726.15 |
| 330.80 SURPY | 12d |
| 9051.48 ACC6K | 13 Stat emp/Ret. plan/3rd party sick pay X |

e/f Employee's name, address and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
| --- | --- |
| PA 1106 9465 | 27277.05 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 838.49 | 27277.05 |
| 19 Local income tax | 20 Locality name |
| 273.10 | 390303 |

**W-2** Federal Filing Copy
Wage and Tax Statement
**2019**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| --- | --- |
| 34233.87 | 984.98 |
| 3 Social security wages | 4 Social security tax withheld |
| 36336.50 | 2252.86 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 36336.50 | 526.88 |

| d Control number | Dept. | Corp. | Employer use only |
| --- | --- | --- | --- |
| 129270 NCN3/VLJ 041222 | | A | 161 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO    NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
| --- | --- |
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |

| 11 Nonqualified plans | 12a See instructions for box 12 |
| --- | --- |
| | C 8.05 |
| 14 Other | 12b D 2432.63 |
| 22.48 SUI | 12c DD 20726.15 |
| 330.80 SURPY | 12d |
| 9051.48 ACC6K | 13 Stat emp/Ret. plan/3rd party sick pay X |

e/f Employee's name, address and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
| --- | --- |
| PA 1106 9465 | 27277.05 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 838.49 | 27277.05 |
| 19 Local income tax | 20 Locality name |
| 273.10 | 390303 |

**W-2** PA.State Filing Copy
Wage and Tax Statement
**2019**
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| --- | --- |
| 34233.87 | 984.98 |
| 3 Social security wages | 4 Social security tax withheld |
| 36336.50 | 2252.86 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 36336.50 | 526.88 |

| d Control number | Dept. | Corp. | Employer use only |
| --- | --- | --- | --- |
| 129270 NCN3/VLJ 041222 | | A | 161 |

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO    NC 27409-9416

| b Employer's FED ID number | a Employee's SSA number |
| --- | --- |
| 22-1582040 | 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 |
| 7 Social security tips | 8 Allocated tips |

| 11 Nonqualified plans | 12a See instructions for box 12 |
| --- | --- |
| | C 8.05 |
| 14 Other | 12b D 2432.63 |
| 22.48 SUI | 12c DD 20726.15 |
| 330.80 SURPY | 12d |
| 9051.48 ACC6K | 13 Stat emp/Ret. plan/3rd party sick pay X |

e/f Employee's name, address and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
| --- | --- |
| PA 1106 9465 | 27277.05 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 838.49 | 27277.05 |
| 19 Local income tax | 20 Locality name |
| 273.10 | 390303 |

**W-2** City or Local Filing Copy
Wage and Tax Statement
**2019**
OMB No. 1545-0008
Copy 2 to be filed with employee's City or Local Income Tax Return.

## 2020 W-2 and EARNINGS SUMMARY 

**W-2** Employee Reference Copy **2020**
Wage and Tax Statement

This blue section is your Earnings Summary which provides more detailed information on the generation of your W-2 statement. The reverse side includes instructions and other general information.

d Control number Dept. Corp. Employer use only
129270 NCN3/VLJ 041222    A    143

c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416

Batch #01949

a/f Employee's name, address, and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

b Employer's FED ID number   a Employee's SSA number
22-1582040                   XXX-XX-4810

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | PA. State Wages, Tips, Etc. Box 16 of W-2 | 390303 LOWER Local Wages, Tips, Etc. Box 18 of W-2 |
|---|---|---|---|---|---|
| Gross Pay | 31,073.97 | 31,073.97 | 31,073.97 | 31,073.97 | 31,073.97 |
| Plus GTL (C-Box 12) | 3.11 | 3.11 | 3.11 | N/A | N/A |
| Less Misc. Non Taxable Comp. | N/A | 7,238.68 | 7,238.68 | 20,346.56 | 20,346.56 |
| Less 401(k) (D-Box 12) | 801.84 | N/A | N/A | N/A | N/A |
| Less Other Cafe 125 | 396.00 | 396.00 | 396.00 | 396.00 | 396.00 |
| Reported W-2 Wages | 29,879.24 | 23,442.40 | 23,442.40 | 10,331.41 | 10,331.41 |

2. Employee Name and Address.

COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609

* All PA local wages and withholding for Act 32 are reported to the employee work location PSD code.

© 2020 ADP, Inc.

1 Wages, tips, other comp.   2 Federal income tax withheld
29879.24                     681.22
3 Social security wages      4 Social security tax withheld
23442.40                     1453.43
5 Medicare wages and tips    6 Medicare tax withheld
23442.40                     339.91
7 Social security tips       8 Allocated tips

10 Dependent care benefits
11 Nonqualified plans        12a See instructions for box 12
                             C    3.11
14 Other                     12b  801.84
        1430 SUI             12c DD 23782.42
        330.00 SUBPY         12d
        20341.58 AC0SK       13 Stat emp/Ret.plan/3rd party sick pay
                                  X
15 State Employer's state ID no.  16 State wages, tips, etc.
PA 1106 9465                       10331.41
17 State income tax          18 Local wages, tips, etc.
318.27                            10331.41
19 Local income tax          20 Locality name
103.65                            390303

**W-2** Wage and Tax Statement **2020**
Copy B to be filed with employee's Federal Income Tax Return.

---

1 Wages, tips, other comp.   2 Federal income tax withheld
29879.24                     681.22
3 Social security wages      4 Social security tax withheld
23442.40                     1453.43
5 Medicare wages and tips    6 Medicare tax withheld
23442.40                     339.91
d Control number   Dept.   Corp.   Employer use only
129270 NCN3/VLJ 041222             A    143
c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416
b Employer's FED ID number   a Employee's SSA number
22-1582040                   XXX-XX-4810
7 Social security tips       8 Allocated tips
10 Dependent care benefits
11 Nonqualified plans        12a
                             C    3.11
14 Other                     12b  801.84
        1430 SUI             12c DD 23782.42
        330.00 SUBPY         12d
        20341.58 AC0SK       13 Stat emp/Ret.plan/3rd party sick pay
                                  X
a/f Employee's name, address, and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609
15 State Employer's state ID no.  16 State wages, tips, etc.
PA 1106 9465                       10331.41
17 State income tax          18 Local wages, tips, etc.
318.27                            10331.41
19 Local income tax          20 Locality name
103.65                            390303

**W-2** Federal Filing Copy **2020**
Wage and Tax Statement
Copy B to be filed with employee's Federal Income Tax Return.

---

1 Wages, tips, other comp.   2 Federal income tax withheld
29879.24                     681.22
3 Social security wages      4 Social security tax withheld
23442.40                     1453.43
5 Medicare wages and tips    6 Medicare tax withheld
23442.40                     339.91
d Control number   Dept.   Corp.   Employer use only
129270 NCN3/VLJ 041222             A    143
c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416
b Employer's FED ID number   a Employee's SSA number
22-1582040                   XXX-XX-4810
7 Social security tips       8 Allocated tips
10 Dependent care benefits
11 Nonqualified plans        12a
                             C    3.11
14 Other                     12b  801.84
        1430 SUI             12c DD 23782.42
        330.00 SUBPY         12d
        20341.58 AC0SK       13 Stat emp/Ret.plan/3rd party sick pay
                                  X
a/f Employee's name, address, and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609
15 State Employer's state ID no.  16 State wages, tips, etc.
PA 1106 9465                       10331.41
17 State income tax          18 Local wages, tips, etc.
318.27                            10331.41
19 Local income tax          20 Locality name
103.65                            390303

**W-2** PA.State Filing Copy **2020**
Wage and Tax Statement
Copy 2 to be filed with employee's State Income Tax Return.

---

1 Wages, tips, other comp.   2 Federal income tax withheld
29879.24                     681.22
3 Social security wages      4 Social security tax withheld
23442.40                     1453.43
5 Medicare wages and tips    6 Medicare tax withheld
23442.40                     339.91
d Control number   Dept.   Corp.   Employer use only
129270 NCN3/VLJ 041222             A    143
c Employer's name, address, and ZIP code
MACK TRUCKS INC
MACK TRUCKS INC
7900 NATIONAL SERVICE RD
GREENSBORO NC 27409-9416
b Employer's FED ID number   a Employee's SSA number
22-1582040                   XXX-XX-4810
7 Social security tips       8 Allocated tips
10 Dependent care benefits
11 Nonqualified plans        12a
                             C    3.11
14 Other                     12b  801.84
        1430 SUI             12c DD 23782.42
        330.00 SUBPY         12d
        20341.58 AC0SK       13 Stat emp/Ret.plan/3rd party sick pay
                                  X
a/f Employee's name, address, and ZIP code
COLLEEN BEHM
216 HALSEY AVE
WEST LAWN PA 19609
15 State Employer's state ID no.  16 State wages, tips, etc.
PA 1106 9465                       10331.41
17 State income tax          18 Local wages, tips, etc.
318.27                            10331.41
19 Local income tax          20 Locality name
103.65                            390303

**W-2** City or Local Filing Copy **2020**
Wage and Tax Statement
Copy 2 to be filed with employee's City or Local Income Tax Return.

Behm v. Mack Trucks, et al.                                MACK0382

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000011374 |

## Earnings Statement

| | |
|---|---|
| Period Beginning: | 12/28/2020 |
| Period Ending: | 01/03/2021 |
| Pay Date: | 01/08/2021 |

Taxable Marital Status:     Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| **Gross Pay** | | $ | 489.10 | 489.10 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | PA Withholding Tax | | 1.00- |
| | LOWER MACUNGIE TOWNSHIP W/H Tax | | |
| | | | |
| | Other | | |
| | Safety Shoes | 140.00 | |
| | Union Dues | 51.48- | |
| | **Net Pay** | $ | 576.62 |
| | Checking 1 | | 576.62- |
| | **Net Check** | $ | 0.00 |

| Important Notes | |
|-----------------|---|
| Other Benefits and | |
| Information | this period    year to date |



**EXHIBIT**
**48**

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

| | |
|---|---|
| Advice number: | 0000011374 |
| Period Beginning: | 12/28/2020 |
| Period Ending: | 01/03/2021 |
| Pay Date: | 01/08/2021 |

Pay to the
order of     **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | $0.00 |
|--------------|---------------------------|-------|

## NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.                                          MACK0383

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000021357 |

# Earnings Statement

Period Beginning:     01/04/2021
Period Ending:         01/10/2021
Pay Date:                01/15/2021

Taxable Marital Status:     Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| **Gross Pay** | | $ | 489.10 | 978.20 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | PA Withholding Tax | | 2.00– |
| | LOWER MACUNGIE TOWNSHIP W/H Tax | | |

| | Other | | |
|--|-------|--|--|
| | **Net Pay** | $ | 488.10 |
| | Checking 1 | | 488.10– |
| | **Net Check** | $ | 0.00 |

| Important Notes | | |
|-----------------|--|--|
| Other Benefits and | | |
| Information | this period | year to date |

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

Advice number:        0000021357
Period Beginning:     01/04/2021
Period Ending:         01/10/2021
Pay Date:                01/15/2021

Pay to the
order of      **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | **$0.00** |
|--------------|---------------------------|-----------|

# NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.

MACK0384

JA000501

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000031300 |

## Earnings Statement

| | |
|---|---|
| Period Beginning: | 01/11/2021 |
| Period Ending: | 01/17/2021 |
| Pay Date: | 01/22/2021 |

Taxable Marital Status:     Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| Gross Pay | | $ | 489.10 | 1,467.30 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | PA Withholding Tax | | 3.00- |
| | LOWER MACUNGIE TOWNSHIP W/H Tax | | |
| | | | |
| | Other | | |
| | Net Pay | $ | 488.10 |
| | Checking 1 | | 488.10- |
| | Net Check | $ | 0.00 |

Important Notes

Other Benefits and
Information                    this period        year to date

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

| | |
|---|---|
| Advice number: | 0000031300 |
| Period Beginning: | 01/11/2021 |
| Period Ending: | 01/17/2021 |
| Pay Date: | 01/22/2021 |

Pay to the
order of     **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | **$0.00** |
|---|---|---|

# NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.                                MACK0385

JA000502

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000041351 |

## Earnings Statement

Period Beginning: 01/18/2021
Period Ending: 01/24/2021
Pay Date: 01/29/2021

Taxable Marital Status:  Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| Gross Pay | | $ | 489.10 | 1,956.40 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | PA Withholding Tax | | 4.00- |
| | LOWER MACUNGIE TOWNSHIP WH Tax | | |

| | Other | | |
|---|-------|---|---|
| | Net Pay | $ | 488.10 |
| | Checking 1 | | 488.10- |
| | Net Check | $ | 0.00 |

Important Notes

Other Benefits and
Information          this period      year to date

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

Advice number: 0000041351
Period Beginning: 01/18/2021
Period Ending: 01/24/2021
Pay Date: 01/29/2021

Pay to the
order of   **COLLEEN BEHM**
This Amount:   **NO AND 00/100 DOLLARS**                                    **$0.00**

## NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.                                    MACK0386

JA000503

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLI | 129270 | 041222 | MC2 | 0000061348 |

## Earnings Statement

| | |
|---|---|
| Period Beginning: | 02/01/2021 |
| Period Ending: | 02/07/2021 |
| Pay Date: | 02/12/2021 |

Taxable Marital Status:    Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| Gross Pay | | $ | 489.10 | 2,934.60 |

**Important Notes**

Other Benefits and
Information          this period       year to date

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | PA Withholding Tax | | 6.00- |
| | LOWER MACUNGIE TOWNSHIP W/H Tax | | |
| | | | |
| | Other | | |
| | Net Pay | $ | 488.10 |
| | Checking 1 | | 488.10- |
| | Net Check | $ | 0.00 |

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

| | |
|---|---|
| Advice number: | 0000061348 |
| Period Beginning: | 02/01/2021 |
| Period Ending: | 02/07/2021 |
| Pay Date: | 02/12/2021 |

Pay to the
order of     **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | $0.00 |
|--------------|---------------------------|-------|

## NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.                                    MACK0388

JA000504

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000071374 |

# Earnings Statement

Period Beginning:  02/08/2021
Period Ending:  02/14/2021
Pay Date:  02/19/2021

Taxable Marital Status:  Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 489.10 | |
| Gross Pay | | $ | 489.10 | 3,423.70 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | PA Withholding Tax | | 7.00- |
| | LOWER MACUNGIE TOWNSHIP Withldtax | | |

| | Other | | |
|--|-------|--|--|
| | Net Pay | $ | 488.10 |
| | Checking 1 | | 488.10- |
| | Net Check | $ | 0.00 |

Important Notes

| Other Benefits and Information | this period | year to date |
|-------------------------------|-------------|--------------|

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

| Advice number: | 0000071374 |
|----------------|------------|
| Period Beginning: | 02/08/2021 |
| Period Ending: | 02/14/2021 |
| Pay Date: | 02/19/2021 |

Pay to the
order of  **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | | **$0.00** |
|--------------|---------------------------|--|-----------|

# NON-NEGOTIABLE
(THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.

MACK0389

JA000505

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000091399 |

## Earnings Statement

Period Beginning: 02/22/2021
Period Ending: 02/28/2021
Pay Date: 03/05/2021

Taxable Marital Status:     Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA  19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| ASN | | | 97.82 | |
| Vac Payout | | | 2,592.34 | |
| Gross Pay | $ | | 2,690.16 | 6,113.86 |

| Deductions | Statutory | this period | year to date |
|------------|-----------|-------------|--------------|
| | Federal Withholding Tax | 570.31- | 570.31- |
| | Social Security Tax | 160.73- | 160.73- |
| | Medicare Tax | 37.59- | 37.59- |
| | SUI/SDI Tax | 1.56- | 1.56- |
| | PA Withholding Tax | 79.58- | 79.58- |
| | LOWER MACUNG W/H Tax | 25.92- | 25.92- |
| | PA Withholding Tax | | 8.00- |
| | LOWER MACUNGIE TOWNSHIP W/Hold Tax | | |

| | Other | | |
|---|-------|---|---|
| | Union Dues | 51.48- | |
| | Net Pay | $ | 1,761.99 |
| | Checking 1 | | 1,761.99- |
| | Net Check | $ | 0.00 |

Important Notes

Other Benefits and
Information                              this period      year to date

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

Advice number:          0000091399
Period Beginning:       02/22/2021
Period Ending:          02/28/2021
Pay Date:               03/05/2021

Pay to the
order of     **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | **$0.00** |
|--------------|---------------------------|-----------|

# NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.                                    MACK0390

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. |
|-----|------|-------|-------|-----------|
| VLJ | 129270 | 041222 | MC2 | 0000165413 |

# Earnings Statement

Period Beginning:    04/19/2021
Period Ending:    04/19/2021
Pay Date:    04/26/2021

Taxable Marital Status:    Married

**COLLEEN BEHM**
**216 HALSEY AVE**
**WEST LAWN, PA 19609**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Profit Sharing | | | 121.28 | |
| Gross Pay | | $ | 121.28 | 6,235.14 |

| Deductions | Statutory | this period | year to date |
|------------|-----------|-------------|--------------|
| | Federal Withholding Tax | 26.68- | 596.99- |
| | Social Security Tax | 7.51- | 168.24- |
| | Medicare Tax | 1.76- | 39.35- |
| | SUI/SDI Tax | 0.07- | 1.63- |
| | PA Withholding Tax | 3.72- | 83.30- |
| | LOWER MACUNG W/H Tax | 1.21- | 27.13- |
| | PA Withholding Tax | | 8.00- |

| | Other | |
|--|-------|--|
| | Un Union Dues | 1.76- |
| | Net Pay | $ | 78.57 |
| | Checking 1 | 78.57- |
| | Net Check | $ | 0.00 |

Important Notes

Other Benefits and
Information    this period    year to date

Note: This is only a record of a prior payment/adjustment. This is not an image of the actual statement. The actual statement may be found in iReports/iPay.

Advice number:    0000165413
Period Beginning:    04/19/2021
Period Ending:    04/19/2021
Pay Date:    04/26/2021

Pay to the
order of    **COLLEEN BEHM**

| This Amount: | **NO AND 00/100 DOLLARS** | $0.00 |
|--------------|---------------------------|-------|

# NON-NEGOTIABLE
### (THIS IS NOT A CHECK)

Behm v. Mack Trucks, et al.    MACK0391



EARNING STATISTICS

**All time** $967.20 ∧

01 Sep 08:00 pm        05 Oct 04:05 am        07 Nov 11:10 am

📅     From  Sep 1, 2021  To  Nov 7, 2021

⊘ SUBSCRIPTIONS                          $643.20

⊘ TIPS                                   $84.00

⊘ POSTS                                  $0.00

⊘ MESSAGES                               $240.00

⊘ REFERRALS                              $0.00

⊘ STREAMS                                $0.00

TOTAL        GROSS $1209.00        NET $967.20

**EXHIBIT**
49

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| MACK TRUCKS, INC., ET AL | : | No.    21-2500 |
| Defendant. | : | |

## RULE 26 DISCLOSURES

Plaintiff, COLLEEN BEHM ("Plaintiff") by and through her undersigned attorneys, hereby serves the following R. 26 Disclosures upon Defendants, MACK TRUCKS, INC. and UNITED AUTO WORKERS LOCAL 677  (collectively referred to as "Defendants").  These disclosures will be supplemented as new information becomes available to Plaintiff as investigation and discovery are ongoing.

### A. PERSONS WITH KNOWLEDGE.

Pursuant to FED. R. CIV. P. 26(a)(1)(A), the following individuals may have discoverable information that Plaintiff may use to support her claims:  Plaintiff, Defendants and their employees, management, members and representatives and individuals identified in Plaintiff's complaint, including Plaintiff, Colleen Behm, employees of Defendants, including Cruz Rivera, Kevin Fronkeiser, Joshua Knappenberger, Kenneth Virgil and Dr. Paul Shipkin. Plaintiff's treating physicians, doctors and therapists, including Dr. Lawrence Brzozowski, her therapist, Jill Sniveley are expected to have information concerning Plaintiff's disability, medical treatment, accommodations requests and her ability to work.  Other individuals who worked for Defendant are also expected to have information relating to Plaintiff's employment and the reasons for separation from employment.  Plaintiff reserves the right to supplement these

1

EXHIBIT
50

JA000509

disclosures in accordance with the Federal Rules of Civil Procedure and any applicable case management order as investigation and discovery are continuing.

**B. DOCUMENTS**

Pursuant to FED. R. CIV. P. 26(a)(1), Plaintiff may use the following categories of documents, electronically stored information and other materials to support her claims against Defendant, as follows: documents created by Defendant related to Plaintiff's employment and claims; employment records and documented communications relating to and between Plaintiff and her supervisors, managers and co-workers; any medical records relating to Plaintiff's medical condition, any requests for accommodations and documents reflecting communications relating to those requests, employment files and documents related to other employees similarly situated to Plaintiff; evidence of mitigation efforts and Plaintiff's employment documents, including but not limited to the employee handbook.

**C. DAMAGES**

Pursuant to FED. R. CIV. P. 26(a)(1), Plaintiff seeks damages, as set forth in her complaint, including but not limited to lost wages and economic damages, lost future earnings, lost opportunity, front pay, back pay, as well as punitive damages, liquidated damages, interest, attorneys fees and costs. Plaintiff also seeks damages for emotional distress caused by Defendant's termination of her employment. To date, Plaintiff has sustained approximately $21,964 in lost wages and economic loss.

**D. INSURANCE**

Not applicable.

LAW OFFICES OF ERIC A. SHORE, P.C.

BY: _____/s/Graham F. Baird_____
**GRAHAM F. BAIRD, ESQUIRE**
Attorney for Plaintiff, Colleen Behm

Date: August 31, 2021

2

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No.    21-2500 |
| MACK TRUCKS, INC., ET AL | : | |
| | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

On August 31, 2021 the undersigned served the foregoing Rule 26 Disclosures via e-mail upon Counsel for Defendants:

Eileen K. Keefe, Esq.
Jackson Lewis, P.C.
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102
Eileen.Keefe@Jacksonlewis.com

And

Cassie R. Ehrenberg, Esq.
Cleary, Josem & Trigiani, LLP
Constitution Place
325 Chestnut Street,
Suite 200
Philadelphia, PA 19106
CEhrenberg@cjtlaw.org

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:____/s/Graham F. Baird_____
    **GRAHAM F. BAIRD, ESQUIRE**
    Two Penn Center
    1500 JFK Boulevard,  Suite 1240
    Philadelphia, PA 19110
    Attorney for Plaintiff, Colleen Behm

3

JA000511

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No.    21-2500 |
| MACK TRUCKS, INC., ET AL | : | |
| | : | |
| Defendant. | : | |

### PLAINTIFF'S ANSWERS TO INTERROGATORIES OF DEFENDANT, MACK TRUCKS, INC.

Plaintiff, COLLEEN BEHM ("Plaintiff") by and through her undersigned attorneys, hereby serves the following Answers to the Interrogatories of Defendant, MACK TRUCKS, INC. (collectively referred to as "Mack Trucks"). These answers will be supplemented as new information becomes available to Plaintiff as investigation and discovery are ongoing.

Answer to Interrogatory No. 1:  Colleen Sara Behm 216 Halsey Avenue, West Lawn, PA 19609.  DOBL May 22, 1989 in Pottstown, Pennsylvania.  Drivers License No.: 28-617-761, Maiden Name:  Colleen Sara John.

Answer to Interrogatory No. 2:  Plaintiff attended Governor Mifflin High School, graduated class of 2007 in Shillington, PA.  Plaintiff attended courses at Berks Technical Institute 2012, 2013 and 2014 studying Criminal Justice.  Plaintiff attended online courses with the American Academy McAllister Institute in a course of funeral directing.

Answer to Interrogatory No. 3:  Plaintiff has not obtained any statements in this matter from any witness or other source.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.



EXHIBIT
51

1

Answer to Interrogatory No. 4:  See Plaintiff's computation of damages set forth in the R.
26 disclosures.   Investigation and discovery is continuing and Plaintiff reserves the right to
supplement this Answer.

Answer to Interrogatory No. 5:  Plaintiff identifies the following medical providers in
response to Interrogatory No. 5.

| | |
|---|---|
| Green Hills Family Medicine<br>Family Doctor<br>Kimberly Rauenzahn<br>Brent Calhoon<br>1903 Morgantown Road<br>Reading, PA 19607<br>610-777-4040 | Muallem & Strieb OB/GYN<br>1330 Penn Avenue<br>Wyomissing, PA 19610 |
| Family Medicine Tower Health<br>Evan Nakib<br>950B North Wyomissing Blvd.<br>3rd Floor<br>Wyomissing, PA 19610<br>610-898-5280 | Berks Plastic Surgery<br>50 Commerce Drive<br>Wyomissing, PA 19610<br>610-320-0200 |
| Smith Chiropractic & Wellness Center<br>3443 West Penn Avenue<br>Reading, PA 19608<br>610-678-8600 | Grove Dental Group<br>2228 State Hill Road<br>Wyomissing, PA 19610<br>610-379-3494 |
| Tower Health Pulmonary Medicine<br>Cecilia M. Smith<br>301 S. 7th Avenue<br>Suite 340<br>Reading, PA 19611 | Emkey Arthritis & Osteoporosis Clinic<br>1200 Broadcasting Road<br>Suite 200<br>Reading, PA 19610<br>610-374-8133 |
| Oncologist<br>William M. Parrish<br>1160 Manheim Pike<br>Suite 200<br>Lancaster, PA 17601<br>717-735-1972 | Orthopedic Doctor<br>Nathan Tiedeken<br>2201 Ridgewood Road<br>Wyomissing, PA 19610<br>610-396-5163 |
| Concern-Professional Services<br>Counseling Services | Mental Health Counselor<br>Jill Snively |

2

JA000513

| | |
|---|---|
| 1120-C Hobart Avenue<br>Wyomissing, PA 19610<br>610-371-8035 | 2650 Westview Drive<br>Wyomissing, PA 19610<br>610-334-5595 |
| Tower Health Medical Group Neurology<br>Lawrence Brzowski<br>301 S. 7th Avenue<br>Suite 210<br>Reading, PA 19611<br>484-628-4656 | Orthopedic Associates of Reading<br>Craig O'Neill<br>850 Knitting Mls Way<br>Wyomissing, PA 19610<br>610-373-8671 |
| Tower Health Medical Group OB/GYN<br>Deborah Consoli<br>4885 Demoss Road<br>Suite 101<br>Reading, PA 19606<br>610-898-7000 | |

Answer to Interrogatory No. 6:

| | |
|---|---|
| Concern-Professional Services<br>Counseling Services<br>1120-C Hobart Avenue<br>Wyomissing, PA 19610<br>610-371-8035 | Mental Health Counselor<br>Jill Snively<br>2650 Westview Drive<br>Wyomissing, PA 19610<br>610-334-5595 |

Answer to Interrogatory No. 7:  Plaintiff was convicted of DUI in 2013, she received ARD.

Answer to Interrogatory No. 8:  Plaintiff was involved in a foreclosure action in 2010 or 2011.

Answer to Interrogatory No. 9:  Plaintiff applied for employment with the following employers:

Amcor—Plaintiff was hired and resigned after 2 days due to rude employees and the failure of Amcor to follow Covid 19 regulations.

Uline—Plaintiff had two interviews but was ultimately not hired;

Ocean Spray—Plaitniff had a phone interview but was not hired.

Coca-Cola—Plaintiff applied, never heard back;

Behr Paint—Plaintiff applied, never heard back;

3

Nestle—Plaintiff applied, never heard back;

Ashley Furniture—Two interviews, ultimately not hired;

Liberty Excavating—Phone interview, not hired;

Stanley Black and Decker—Plaintiff currently in the hiring process.

Investigation and discovery are continuing and Plaintiff reserves the right to supplement these answers.

Answers to Interrogatory No. 10:  Plaintiff worked for Amcor for two days.  Plaintiff is an independent contractor with the website Only Fans.  By way of further answer, see Plaintiff's income statements attached to her Responses to Requests for Production.

Answer to Interrogatory No. 11:  Objection.  Plaintiff objects to this interrogatory on the grounds that it seeks information, outside the scope of discovery, is harassing and is not reasonably calculated to lead to the discovery of admissible evidence.  Without waiver of the foregoing, Plaintiff has a Facebook page:  Colleen Behm; Youtube:  Colleen B, Instagram:  Wild flower and __goatxx__xx; and Plaintiff has an Only Fans:  goat__xx.

Answers to Interrogatory No. 12:  Plaintiff believes Cruz Rivera made admissions. Plaintiff explains as follows:

I moved from the Mack-in-Motion area to the Fuel Tanks kitting area on G-Line in the beginning half of December 2019. My new reporting supervisor was Javier Meranda, I approached Mr. Meranda during my first week in his area at work, to ask who my new union representative would be, and he told me right there it was Cruz Rivera. I told Mr. Meranda that I have upcoming court dates that require me to miss work and I need to speak with my new union representative. Mr. Meranda came back to me within an hour or two that same day with Cruz Rivera's cell phone number stating Mr. Rivera was expecting communication with me. I thanked him, and later that day I sent Mr. Rivera a text message introducing myself and explaining my upcoming court dates I had. He said he would come speak to me in person the following day, so I told him that I was working in kitting for fuel tanks and that I will see him tomorrow. The next day Mr. Rivera came to see me within the first couple hours of work. Working beside me was Isaac, who would witness some of my in-person interactions with Mr. Rivera. Mr. Rivera introduced himself, as Cruz, we shook hands, and I began to tell him my court dates that were scheduled on Wednesday January 15, 2020, that I have the option to attend over phone so I do not miss work but was for 2:30 pm, which is near the end of my shift so I wanted my superiors to know so I would not get

4

in trouble for being on a phone call. A court date on January 16, 2020 that I needed to attend in person. A court date on January 28, 2020 that I needed to attend in person, and I provided Mr. Rivera copies of my paperwork, proving said court dates. (attached) He told me he will put my papers in a folder to keep on record and to touch base with him a day or two before each court date so he can personally reach out to HR. He told me not to worry and since they were court mandated I would not be penalized whatsoever. I thanked him, and went about my day as normal. I would see Mr. Rivera often on G-line because he was the union representative for the area that I worked in, but what would throw me off-guard was how often he would come to my actual working area. The first couple times were what I seemed as harmless, just him being a good union representative, asking how I am doing, if I am having any troubles, and to feel free to reach out whenever. What seemed harmless began to be followed by comments and text messages when he would leave my work area. He would say, "you look nice today", "you smell good", "it's not every day you get to work beside a good looking woman", "you must be driving the men nuts", etc. I would ignore him a majority of the time, and he would state to tell him if I would like him to stop being so forward, which I absolutely always did. I would on numerous occasions that I would "like for him to keep it professional", "I have so much going on, that I don't want to deal with this stuff at work", and to "just don't". Than sometime around holiday vacation for Christmas, and New Year's, he reached out to me in the evening (not during work) and told me he was out with some "old-timers" from Mack, swapping stories and having a great time. He would continue to make advances towards me, and was reminded to keep it professional and do not contact me while I am home with my children. He then contacted me in early hours of the morning, the next morning, while I was driving into work, apologizing, I tried to be nice and tell him its ok and to please keep it professional like I had been asking, and that same day at work he came to me and yet again continued. He was relentless, and made going to work stressful. I dreaded seeing him.

Mr. Rivera was present when I had been approached by my supervisor, Mr. Meranda, and my father-in-law at the time supervisor (name unknown) over a disagreement with my father-in-law over ear drops. Kevin Fronheiser (union chairman) was also present. This occurred mid to the end of January.

By end of January, early February I was moved from kitting area fuel tanks back to Mack in Motion. There had already been talk for numerous weeks about a lay-off and people being moved to second shift. I stressed on numerous occasions to Mr. Rivera that I could not work second shift due to being on first for my whole Mack career so far, and that I am the primary care taker of my daughter. With that being said, I also stated that her daycare is only open from 6 am-6 pm, I live almost an hour away and only have help in the mornings from my mother to get her to daycare and have no additional help after that. That second shift would be nearly impossible for me to work and that I have my son Wednesday-Sundays also. I begged and pleaded that Mr. Rivera help me. Throughout the next coming weeks, contact was minimal with Mr. Rivera, sometimes resulting in me having to flag him down when I would see him on the floor at work. He would tell me everything was fine, he has been in contact with Mr. Schmidt (who handled placement of employees) and that I was not to worry and that I am for sure, with absolute certainty staying on first shift. Mr. Rivera told me this for weeks. On Thursday February 13, 2020, in the last hour of my shift I was instructed to go to the cafeteria located at the end of L-Line to see HR and Richard Schmidt. I went as instructed. I was told I was being demoted from Production Flex to

5

Production and asked which line I would like to work on. I hesitantly said if I had to pick that I would like to work in kitting on L-Line. I was told that it wasn't a definite and I was then instructed to report to second shift Monday. I stressed immediately that I could not work second shift due to caring for my daughter, and the only response was "well, if you are unable than you will no longer be employed by Mack". I got up silently, in complete shock. I got ahold of Mr. Rivera right away, and he said that there has to be a mistake and he will look into it. Upon clocking out I broke into tears. I took the next day off to try and attempt to figure out how in the world I was going to do this. I reached out to Mr. Rivera where he only stated to reach out to my new union representative on arrival to second shift. That was my last interaction with Mr. Rivera.

The interactions would take place at Mack Trucks, Macungie Plant located at
7000 Alburtis Road
Macungie, PA 18062

And while I was at home located at
216 Halsey Avenue
West Lawn, PA 19609

Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 13:  Plaintiff has discussed the facts of her complaint and employment with:  Kenneth Virgil, kevin Fronheiser, Joshua Knappenberger, Desiree Willaism, Derek Jones, Jill Snively (Therapist) and Joanna Weaver.

Answer to Interrogatory No. 14:  See individuals identified above and in the Plaintiff's Rule 26 Disclosures.  Plaintiff will produce a witness list in advance of trial as required by the applicable case management order.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 15:  To date, Plaintiff has not obtained any consulting or testifying expert in this matter.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 16:  Plaintiff consulted with her undersigned attorneys in regards to these Answers.

JA000517

Answer to Interrogatory No. 17:  See Plaintiff's complaint and her medical records. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 18:  During interactions with Mr. Rivera, Plaintiff could not complain to HR because employees must request a meeting with HR through their Union Rep. and Union Rep. is always present during those interactions.  Mr. Rivera was Plaintiff's Union Rep.

Once placed on second shift, Plaintiff reached out to Kevin Fronheiser (union chairman) for help, and told him everything. He did nothing for Plaintiff.

Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.

LAW OFFICES OF ERIC A. SHORE, P.C.

BY: _____/s/Graham F. Baird_____
GRAHAM F. BAIRD, ESQUIRE
Attorney for Plaintiff, Colleen Behm

Date: November 17, 2021

7

JA000518

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No.   21-2500 |
| MACK TRUCKS, INC., ET AL | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

On November 17, 2021 the undersigned served the foregoing Answers to Interrogatories via e-mail upon Counsel for Defendants:

Eileen K. Keefe, Esq.
Jackson Lewis, P.C.
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102
Eileen.Keefe@Jacksonlewis.com

And

Cassie R. Ehrenberg, Esq.
Cleary, Josem & Trigiani, LLP
Constitution Place
325 Chestnut Street,
Suite 200
Philadelphia, PA 19106
CEhrenberg@cjtlaw.org

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:    /s/Graham F. Baird
**GRAHAM F. BAIRD, ESQUIRE**
Two Penn Center
1500 JFK Boulevard,  Suite 1240
Philadelphia, PA 19110
Attorney for Plaintiff, Colleen Behm

8

JA000519

9

JA000520

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| MACK TRUCKS, INC., ET AL | : | No.   21-2500 |
| Defendant. | : | |

**PLAINTIFF'S ANSWERS TO INTERROGATORIES OF DEFENDANT,
UNITED AUTO WORKERS, LOCAL 677**

Plaintiff, COLLEEN BEHM ("Plaintiff") by and through her undersigned attorneys, hereby serves the following Answers to the Interrogatories of Defendant, UNITED AUTO WORKERS, LOCAL 677 (referred to as "Union"). These answers will be supplemented as new information becomes available to Plaintiff as investigation and discovery are ongoing.

Answer to Interrogatory No. 1:  Colleen Sara Behm Maiden Name:  Colleen Sara John. Plaintiff has not been know by any other names.

Answer to Interrogatory No. 2:  Plaintiff has not filed any other actions or matters related to the allegations or defenses at issue in this matter.

Answer to Interrogatory No. 3:  Plaintiff has discussed the facts of her complaint and employment with:  Kenneth Virgil, Kevin Fronheiser, Joshua Knappenberger, Desiree Willaism, Derek Jones, Jill Snively (Therapist) and Joanna Weaver.

Answer to Interrogatory No. 4:  See Plaintiff's Complaint.  By way of further answer, Plaintiff is uncertain as to the exact dates that she was on medical leave from her employer. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.

1

Answer to Interrogatory No. 5:  Yes, Mr. Rivera engaged in additional sexually suggestive, inappropriate workplace advances towards Plaintiff.  Plaintiff explains as follows:

I moved from the Mack-in-Motion area to the Fuel Tanks kitting area on G-Line in the beginning half of December 2019. My new reporting supervisor was Javier Meranda, I approached Mr. Meranda during my first week in his area at work, to ask who my new union representative would be, and he told me right there it was Cruz Rivera. I told Mr. Meranda that I have upcoming court dates that require me to miss work and I need to speak with my new union representative. Mr. Meranda came back to me within an hour or two that same day with Cruz Rivera's cell phone number stating Mr. Rivera was expecting communication with me. I thanked him, and later that day I sent Mr. Rivera a text message introducing myself and explaining my upcoming court dates I had. He said he would come speak to me in person the following day, so I told him that I was working in kitting for fuel tanks and that I will see him tomorrow. The next day Mr. Rivera came to see me within the first couple hours of work. Working beside me was Isaac, who would witness some of my in-person interactions with Mr. Rivera. Mr. Rivera introduced himself, as Cruz, we shook hands, and I began to tell him my court dates that were scheduled on Wednesday January 15, 2020, that I have the option to attend over phone so I do not miss work but was for 2:30 pm, which is near the end of my shift so I wanted my superiors to know so I would not get in trouble for being on a phone call. A court date on January 16, 2020 that I needed to attend in person. A court date on January 28, 2020 that I needed to attend in person, and I provided Mr. Rivera copies of my paperwork, proving said court dates. (attached) He told me he will put my papers in a folder to keep on record and to touch base with him a day or two before each court date so he can personally reach out to HR. He told me not to worry and since they were court mandated and I would not be penalized whatsoever. I thanked him, and went about my day as normal. I would see Mr. Rivera often on G-line because he was the union representative for the area that I worked in, but what would throw me off-guard was how often he would come to my actual working area. The first couple times were what I seemed as harmless, just him being a good union representative, asking how I am doing, if I am having any troubles, and to feel free to reach out whenever. What seemed harmless began to be followed by comments and text messages when he would leave my work area. He would say, "you look nice today", "you smell good", "it's not every day you get to work beside a good looking woman", "you must be driving the men nuts", etc. I would ignore him a majority of the time, and he would state to tell him if I would like him to stop being so forward, which I absolutely always did. I would on numerous occasions that I would "like for him to keep it professional", "I have so much going on, that I don't want to deal with this stuff at work", and to "just don't". Than sometime around holiday vacation for Christmas, and New Year's, he reached out to me in the evening (not during work) and told me he was out with some "old-timers" from Mack, swapping stories and having a great time. He would continue to make advances towards me, and was reminded to keep it professional and do not contact me while I am home with my children. He then contacted me in early hours of the morning, the next morning, while I was driving into work, apologizing, I tried to be nice and tell him its ok and to please keep it professional like I had been asking, and that same day at work he came to me and yet again continued. He was relentless, and made going to work stressful. I dreaded seeing him.

2

JA000522

Mr. Rivera was present when I had been approached by my supervisor, Mr. Meranda, and my father-in-law at the time supervisor (name unknown) over a disagreement with my father-in-law over ear drops. Kevin Fronheiser (union chairman) was also present. This occurred mid to the end of January.

By end of January, early February I was moved from kitting area fuel tanks back to Mack in Motion. There had already been talk for numerous weeks about a lay-off and people being moved to second shift. I stressed on numerous occasions to Mr. Rivera that I could not work second shift due to being on first for my whole Mack career so far, and that I am the primary care taker of my daughter. With that being said, I also stated that her daycare is only open from 6 am-6 pm, I live almost an hour away and only have help in the mornings from my mother to get her to daycare and have no additional help after that. That second shift would be nearly impossible for me to work and that I have my son Wednesday-Sundays also. I begged and pleaded that Mr. Rivera help me. Throughout the next coming weeks, contact was minimal with Mr. Rivera, sometimes resulting in me having to flag him down when I would see him on the floor at work. He would tell me everything was fine, he has been in contact with Mr. Schmidt (who handled placement of employees) and that I was not to worry and that I am for sure, with absolute certainty staying on first shift. Mr. Rivera told me this for weeks. On Thursday February 13, 2020, in the last hour of my shift I was instructed to go to the cafeteria located at the end of L-Line to see HR and Richard Schmidt. I went as instructed. I was told I was being demoted from Production Flex to Production and asked which line I would like to work on. I hesitantly said if I had to pick that I would like to work in kitting on L-Line. I was told that it wasn't a definite and I was then instructed to report to second shift Monday. I stressed immediately that I could not work second shift due to caring for my daughter, and the only response was "well, if you are unable than you will no longer be employed by Mack". I got up silently, in complete shock. I got ahold of Mr. Rivera right away, and he said that there has to be a mistake and he will look into it. Upon clocking out I broke into tears. I took the next day off to try and attempt to figure out how in the world I was going to do this. I reached out to Mr. Rivera where he only stated to reach out to my new union representative on arrival to second shift. That was my last interaction with Mr. Rivera.

The interactions would take place at Mack Trucks, Macungie Plant located at
7000 Alburtis Road
Macungie, PA 18062

And while I was at home located at
216 Halsey Avenue
West Lawn, PA 19609

Investigation and discovery is continuing and Plaintiff reserves the right to supplement
this response.

Answer to Interrogatory No. 6:  Please see Plaintiff's Answer to Interrogatory No. 5.

JA000523

Answer to Interrogatory No. 7: Please see Plaintiff's Answer to Interrogatory No. 5, set forth above and Plaintiff's Complaint. By way of further answer, this Interrogatory seeks responses to a legal conclusion. Plaintiff is alleging that Mr. Rivera sexually harassed her and created a hostile working environment, Plaintiff makes no claim in the complaint that Rivera, or her union breached their fiduciary duty to the Plaintiff.

Answer to Interrogatory No. 8: Please see Plaintiff's Answer to Interrogatory No. 5, set forth above and Plaintiff's Complaint. By way of further answer, this Interrogatory seeks responses to a legal conclusion.

Answer to Interrogatory No. 9: Please see Plaintiff's Answer to Interrogatory No. 5, set forth above and Plaintiff's Complaint. By way of further answer, this Interrogatory seeks responses to a legal conclusion. Plaintiff believes that the sexual harassment from Mr. Rivera and her complaints of sexual harassment against Mr. Rivera resulted in retaliation against her from the Union, including a lack of diligence in protecting her leaves, or otherwise preventing the Defendant Mack Trucks from terminating her employment. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.

Answer to Interrogatory No. 10: Please see Plaintiff's Answer to Interrogatory No. 5, set forth above and Plaintiff's Complaint. By way of further answer, this Interrogatory seeks responses to a legal conclusion. Plaintiff believes that the sexual harassment from Mr. Rivera and her complaints of sexual harassment against Mr. Rivera resulted in retaliation against her from the Union, including a lack of diligence in protecting her leaves, or otherwise preventing the Defendant Mack Trucks from terminating her employment. At this time, there is no claim that Defendant Mack Trucks breached the CBA. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.

4

Answer to Interrogatory No. 11:  Plaintiff is uncertain as to whether any grievance was filed by or on her behalf against Defendant Mack Trucks, inc.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 12:  Plaintiff is uncertain as to whether any grievance was filed by or on her behalf against Defendant Mack Trucks, inc.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this response.

Answer to Interrogatory No. 13:  No.

Answer to Interrogatory No. 14:  No.  By way of further answer.  Please see Plaintiff's Answer to Interrogatory No. 5, set forth above and Plaintiff's Complaint.  By way of further answer, this Interrogatory seeks responses to a legal conclusion.  Plaintiff is alleging that Mr. Rivera sexually harassed her and created a hostile working environment, Plaintiff makes no claim in the complaint that Rivera, or her union breached their fiduciary duty to the Plaintiff.

Answer to Interrogatory No. 15:  Plaintiff identifies the following medical providers in response to Interrogatory No. 15.

| | |
|---|---|
| Green Hills Family Medicine<br>Family Doctor<br>Kimberly Rauenzahn<br>Brent Calhoon<br>1903 Morgantown Road<br>Reading, PA 19607<br>610-777-4040 | Muallem & Strieb OB/GYN<br>1330 Penn Avenue<br>Wyomissing, PA 19610 |
| Family Medicine Tower Health<br>Evan Nakib<br>950B North Wyomissing Blvd.<br>3rd Floor<br>Wyomissing, PA 19610<br>610-898-5280 | Berks Plastic Surgery<br>50 Commerce Drive<br>Wyomissing, PA 19610<br>610-320-0200 |
| Smith Chiropractic & Wellness Center<br>3443 West Penn Avenue<br>Reading, PA 19608 | Grove Dental Group<br>2228 State Hill Road<br>Wyomissing, PA 19610 |

5

JA000525

| | |
|---|---|
| 610-678-8600 | 610-379-3494 |
| Tower Health Pulmonary Medicine<br>Cecilia M. Smith<br>301 S. 7th Avenue<br>Suite 340<br>Reading, PA 19611 | Emkey Arthritis & Osteoporosis Clinic<br>1200 Broadcasting Road<br>Suite 200<br>Reading, PA 19610<br>610-374-8133 |
| Oncologist<br>William M. Parrish<br>1160 Manheim Pike<br>Suite 200<br>Lancaster, PA 17601<br>717-735-1972 | Orthopedic Doctor<br>Nathan Tiedeken<br>2201 Ridgewood Road<br>Wyomissing, PA 19610<br>610-396-5163 |
| Concern-Professional Services<br>Counseling Services<br>1120-C Hobart Avenue<br>Wyomissing, PA 19610<br>610-371-8035 | Mental Health Counselor<br>Jill Snively<br>2650 Westview Drive<br>Wyomissing, PA 19610<br>610-334-5595 |
| Tower Health Medical Group Neurology<br>Lawrence Brzowski<br>301 S. 7th Avenue<br>Suite 210<br>Reading, PA 19611<br>484-628-4656 | Orthopedic Associates of Reading<br>Craig O'Neill<br>850 Knitting Mls Way<br>Wyomissing, PA 19610<br>610-373-8671 |
| Tower Health Medical Group OB/GYN<br>Deborah Consoli<br>4885 Demoss Road<br>Suite 101<br>Reading, PA 19606<br>610-898-7000 | |

Answer to Interrogatory No. 16: See Plaintiff's computation of damages set forth in the R. 26 disclosures. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Answer.

JA000526

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No.   21-2500 |
| MACK TRUCKS, INC., ET AL | : | |
| | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

On December 17, 2021 the undersigned served the foregoing Answers to Union Interrogatories via e-mail upon Counsel for Defendants:

Eileen K. Keefe, Esq.
Jackson Lewis, P.C.
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102
Eileen.Keefe@Jacksonlewis.com

And

Cassie R. Ehrenberg, Esq.
Cleary, Josem & Trigiani, LLP
Constitution Place
325 Chestnut Street,
Suite 200
Philadelphia, PA 19106
CEhrenberg@cjtlaw.org

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:    /s/Graham F. Baird
   **GRAHAM F. BAIRD, ESQUIRE**
   Two Penn Center
   1500 JFK Boulevard,  Suite 1240
   Philadelphia, PA 19110
   Attorney for Plaintiff, Colleen Behm

8

JA000527

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| MACK TRUCKS, INC., ET AL | : | No.   21-2500 |
| Defendant. | : | |

**PLAINTIFF'S RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**
**OF DEFENDANT, MACK TRUCKS, INC.**

Plaintiff, COLLEEN BEHM ("Plaintiff") by and through her undersigned attorneys, hereby serves the following Responses to the Requests for Production of Documents of Defendant, MACK TRUCKS, INC. (collectively referred to as "Mack Trucks"). These responses will be supplemented as new information becomes available to Plaintiff as investigation and discovery are ongoing.

Response to Request for Production of Documents Nos. 1-10: See attached documents. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 11-12: Plaintiff has no documents in her possession or under her control responsive to this Request. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents Nos. 13: Objection. Plaintiff objects to this Request on the grounds that it is harassing, unduly burdensome, seeks irrelevant materials and if not proportional to the needs of the litigation.

**EXHIBIT**

**52**

1

Response to Request for Production of Documents Nos. 14-16:  See attached documents. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 17:  Plaintiff has no documents in her possession or under her control responsive to this Request.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 18-24:  Plaintiff has no documents in her possession or under her control responsive to this Request.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 25-27:  See attached documents. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 28:  Plaintiff has no documents in her possession or under her control responsive to this Request.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents Nos. 29-30:  Plaintiff has not retained any consulting or testifying expert in regards to this matter, as such Plaintiff has no documents in her possession or under her control responsive to this Request.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 31:  Plaintiff has no documents in her possession or under her control responsive to this Request.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

JA000529

Response to Request for Production of Documents No. 32-34:  See attached documents. Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

Response to Request for Production of Documents No. 35:  Plaintiff has produced all documents she has responsive to Defendant, Mack's requests for production of documents in this matter.  Investigation and discovery is continuing and Plaintiff reserves the right to supplement this Response.

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:_____/s/Graham F. Baird_____
GRAHAM F. BAIRD, ESQUIRE
Attorney for Plaintiff, Colleen Behm

Date: November 17, 2021

3

JA000530

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN BEHM | : | JURY DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| MACK TRUCKS, INC., ET AL | : | No.   21-2500 |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

On November 17, 2021 the undersigned served the foregoing Responses to Requests for Production of Documents via e-mail upon Counsel for Defendants:

Eileen K. Keefe, Esq.
Jackson Lewis, P.C.
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102
Eileen.Keefe@Jacksonlewis.com

And

Cassie R. Ehrenberg, Esq.
Cleary, Josem & Trigiani, LLP
Constitution Place
325 Chestnut Street,
Suite 200
Philadelphia, PA 19106
CEhrenberg@cjtlaw.org

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:     /s/Graham F. Baird
   **GRAHAM F. BAIRD, ESQUIRE**
   Two Penn Center
   1500 JFK Boulevard,  Suite 1240
   Philadelphia, PA 19110
   Attorney for Plaintiff, Colleen Behm

4

JA000531



Behm v. Mack Trucks, et al.                    MACK0785



coreythebutcherbehm

48 likes

coreythebutcherbehm I love you ___wild_flower

View all 3 comments

August 15

Behm v. Mack Trucks, et al.
MACK0786



Bohm v. Mack Trucks, et al.                    MACK0787



1:22   📶 4G⁵ 76% 🔋

♡ ○ ◁                                    🔖

**188 likes**

**__goat__xx** Everyone has their own reasons for plastic surgery. I am a very shy person to be completely honest. My marriage made me extremely insecure with the cheating and abuse but after my breast augmentation it boosted my confidence. Buuuuut then i started breaking myself down because my upper body seemed bigger than my lower body. Sooo with that being said I got insecure again. I'm going to be undergoing a BBL (Brazilian Butt lift) next month and I couldn't be any more excited. Time to even out my body frame and feel better! Ladies, don't think for a second that doing something for yourself to boost your self esteem is wrong. Go get crazy hair. Go chop your hair off. Go get that tattoo. Go get that piercing. Go travel the world. Go do whatever makes you happy and will boost your confidence. Besides drugs and alcohol. Those are never the answer 😅 thank you for all your support. I'll keep you all posted on my Pre-Op. my surgery. && recovery. 🖤

View all 14 comments

February 25



__goat__xx                              ⋮

🏠  🔍  ⊕  ♡  👤

||| ○ ‹

Behm v. Mack Trucks, et al.                MACK0789



**188 likes**

**__goat__xx** Everyone has their own reasons for plastic surgery. I am a very shy person to be completely honest. My marriage made me

JA000536

1:23 🖼️                              📶 4G 📶 76% 🔋

← **Posts**



♡   ○   ◁                              🔖

**147 likes**

**__goat__xx** Posty Concert 🖤🫧

View all 4 comments

February 23

🏠   🔍   ⊕   ♡   👤

|||      ◻️      ‹

Behm v. Mack Trucks, et al.          MACK0701

1:26

June 11, 2019

__goat__xx



**201 likes**

**__goat__xx** Now that the talented photographer
@fromtherooftops_photography shared it... more

June 8, 2019

__goat__xx

Behm v. Mack Trucks, et al.                    MACK0792

10:05

__goat__xx Forgiveness is the fragrance the violet sheds on the heel that has crushed it.... more

July 21

__goat__xx



Liked by **marie__chapel** and **302 others**

__goat__xx maybe life isn't about avoiding the bruises. maybe it's about collecting the sca... more

July 21



234 likes

__goat__xx just me & my girlfriend @desiree.slays

@chadharnish

July 25

Bohm v. Mack Trucks, et al.                    MACK0794