**In the Matter Of:**

*COLLEEN BEHM vs*

*MACK TRUCKS, INC.*

---

*KAITLYN O'NEILL*

*March 23, 2022*

---



JA000541

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                        *  *  *
 3

 4   COLLEEN BEHM,            : NO. 21-2500
                   Plaintiff  :
 5                            :
          vs.                 :
 6                            :
     MACK TRUCKS, INC, et al.,  :
 7                Defendants :

 8                      *  *  *

 9         Zoom deposition of KAITLYN O'NEILL,

10   beginning at 11:00 a.m., on Wednesday, March 23,

11   2022, before Karen A. Stevens, Court Reporter and

12   Notary Public, there being remotely present:

13

14

15

16

17

18

19

20

21                   LEXITAS
              999 Old Eagle School Road
22                   Suite 118
               Wayne, PA 19087
23               888-267-1200

24
```

Kaitlyn O'Neill - March 23, 2022

2

```
 1  A P P E A R A N C E S :

 2

 3          GRAHAM BAIRD, ESQUIRE
            LAW OFFICES OF ERIC A. SHORE
            1500 J.F.K. Blvd.
 4          Philadelphia, Pennsylvania  19102
            grahamb@ericshore.com
 5          -- Representing the Plaintiff

 6

 7

 8          RANDY MOODY, ESQUIRE
            JACKSON LEWIS, P.C.
 9          15 South Main Street, Suite 700
            Greenville, South Carolina 29601
10          randy.moody@jacksonlewis.com
            -- Representing the Defendants
11

12

13          VIDEO TECHNICIAN: Blair Zielke

14

15

16

17

18

19

20

21

22

23

24
```

Kaitlyn O'Neill - March 23, 2022

```
                                                              3
1                     I N D E X

2                        * * *

3    WITNESS:  Kaitlyn O'Neill

4    QUESTIONED BY:                          PAGE

5    Mr. Baird                                4

6

7

8                   E X H I B I T S

9                        * * *

10

11   NUMBER              DESCRIPTION          MK'D.

12                    (None marked.)

13

14

15

16

17

18

19

20

21

22

23

24
```

Kaitlyn O'Neill - March 23, 2022

4

```
 1              (It is hereby stipulated by and

 2         between counsel for the respective

 3         parties that sealing, filing and

 4         certification are waived; and that all

 5         objections, except as to the form of the

 6         questions, be reserved until the time of

 7         trial.)

 8                        *  *  *

 9                   KAITLYN O'NEILL,

10         after having been first duly sworn, was

11         examined and testified as follows:

12                        *  *  *

13    BY MR. BAIRD:

14         Q    Miss O'Neill.  My name is Graham Baird.  I

15    represent Colleen Behm in a lawsuit she filed

16    against Mack Trucks.  Today we are here for your

17    deposition.  My understanding is you were present

18    for Mr. Kerchner's first deposition; is that

19    correct?

20         A    Correct.

21         Q    Okay.  Do you need me to go through the

22    instructions that I gave Mr. Kerchner?

23         A    No, I don't think so.

24         Q    Okay.  Have you ever given deposition
```

Kaitlyn O'Neill - March 23, 2022

5

```
 1   testimony before?

 2        A    No.

 3        Q    Okay.  Have you ever testified in court

 4   before in a matter involving Mack Trucks?

 5        A    No.

 6        Q    Can you describe for me your educational

 7   background, Miss O'Neill?

 8        A    I have a high school diploma, a Bachelor's

 9   Degree and a Master's Degree.

10        Q    What discipline is your Bachelor's Degree

11   in?

12        A    Business Administration.

13        Q    Where did you obtain that degree?

14        A    Penn State University.

15        Q    In State College?

16        A    No.  At the Berks Campus.

17        Q    Okay.  When did you get that degree?

18        A    I graduated in 2011.

19        Q    Where did you obtain your Master's Degree?

20        A    Also Penn State University, World Campus.

21        Q    When did you obtain that Master's Degree?

22        A    I believe I finished that program in 2015.

23        Q    That's one instruction that I'll give to

24   you.  We don't want you to guess, but if you feel
```

Kaitlyn O'Neill - March 23, 2022

6

1  comfortable making an estimate as to time or

2  distance or, you know, something of that nature,

3  that's fine.  Okay?  Just let me know you're making

4  an estimate.  Okay?

5       A     Yes, okay.

6       Q     I have the feeling you're making somewhat

7  of an estimate on that 2015 year, correct?

8       A     Correct, yes.

9       Q     What discipline is that Master's Degree

10 in?

11      A     Organizational Development and Change.

12      Q     Do you have any other certifications?

13      A     I do.  I have a labor certification, a

14 human resources certification and I am pending a

15 diversity and inclusion certification.

16      Q     Where did you obtain the HR certification

17 from?

18      A     Michigan State University.

19      Q     When did you get that?

20      A     That was completed in 2020.

21      Q     Tell me about that certification.  What

22 did you need to do to obtain that?

23      A     It was online learning and there was a

24 roughly eight-week program and every week there was

Kaitlyn O'Neill - March 23, 2022

7

1    learning and testing on it.  And then there was a

2    final exam as well to pass to get the certificate.

3        Q    Do you remember when you took that final

4    test to obtain that certification?

5        A    I do not.

6        Q    Do you know, is there a specific or proper

7    name for that certification?

8        A    Certified Human Resources Specialist.

9        Q    Are you currently employed?

10       A    Yes.

11       Q    Who do you work for?

12       A    Mack Trucks.

13       Q    How long have you worked for Mack Trucks?

14       A    This will be year five.  I started in

15   November of 2017.

16       Q    When you were first hired by Mack Trucks

17   in November of 2017 what was your position?

18       A    I was hired as an HR coordinator.

19       Q    What does an HR coordinator do?  What did

20   an HR coordinator do at the time you were hired?

21       A    I supported the HR business partners, I

22   would yield employee questions, run reports,

23   paperwork, multiple things.  But mostly roles that

24   would support anything that the HR director or HR

JA000548

Kaitlyn O'Neill - March 23, 2022

8

1   business partners or labor manager may need.

2        Q    Have you held any other positions with

3   Mack Trucks?

4        A    Just my current role of HR business

5   partner.

6        Q    What does an HR business partner do?

7        A    Deals with employee relations, workforce

8   planning, recruitment, succession planning.

9   Anything our team support would need with questions,

10  counseling, anything along those lines.  It's very

11  broad.

12       Q    Is there a specific location or department

13  where you're assigned as the business partner?

14       A    I currently am supporting our IT group,

15  our production quality group, vehicle one finish,

16  both first and second shift, I support our final

17  department, all three shifts, Mack defense and CAC.

18       Q    What is Mack defense?

19       A    That is our facility that is building

20  trucks for the military.

21       Q    What is CRC?

22       A    CAC.

23       Q    I'm sorry.

24       A    It's customer adaptation center.

Kaitlyn O'Neill - March 23, 2022

9

1      Q    What's that center do?

2      A    It's a very small group that does special

3  work on trucks for very specific items that

4  customers have requested.

5      Q    How many other business partners share the

6  assignment that you are currently assigned to?

7      A    Do you mean in the groups that I

8  specifically support?

9      Q    Yes.

10     A    It is just me.  The other HR business

11  partners have other groups.

12     Q    How many employees are you currently

13  supporting, give or take?

14     A    It has to be close -- I'm going to

15  estimate anywhere between possibly 800 to a thousand

16  right now.

17     Q    Do you have any assistants?

18     A    No.

19     Q    There are no HR coordinators who support

20  you?

21     A    No.

22     Q    Who do you report to?

23     A    The HR director, Tim Newman.

24     Q    Do you have an office?

Kaitlyn O'Neill - March 23, 2022

10

1      A     I share an open concept space with my

2    peers.

3      Q     Okay.  Your peers are the other business

4    partners; is that right?

5      A     Correct.

6      Q     Where is that open concept shared space

7    located?

8      A     It is in the front of the Macungie

9    facility on the first floor.

10     Q     Are you responsible for fielding

11   complaints of sexual harassment?

12     A     Yes.

13     Q     Have you ever fielded a complaint of

14   sexual harassment directly from an employee?

15     A     Yes.

16     Q     Have you ever fielded a complaint of

17   sexual harassment from a union rep speaking on

18   behalf of an employee?

19     A     Yes.

20     Q     How many times have you fielded a sexual

21   harassment complaint directly from an employee, not

22   through their union rep?

23     A     To be honest, I don't know that I have a

24   number on that.  I would really have to dig through

11

1    notes or files.  I don't have a number.

2         Q    But there would be a way to find that out

3    if you were requested to do so?

4         A    Yes.

5         Q    Okay.  Sitting here today, if you can't

6    make an estimate, that's perfectly fine, just let me

7    know.  But sitting here today would you say that has

8    happened to you more than 10 times?

9         A    I honestly cannot say.

10        Q    Same questions as to someone complaining

11   through their union rep.  Can you say how many times

12   you have fielded sexual harassment complaints from a

13   union rep speaking on behalf of someone else to you?

14        A    That I would say would be the more

15   frequent process.  It's more frequent to come from

16   the supervisor or the union rep.

17        Q    Okay.  Do you know how many times you have

18   fielded complaints or received complaints of sexual

19   harassment from a union rep or supervisor talking on

20   behalf of another employee?

21        A    Without taking time to look, I don't know

22   the number.

23        Q    Did Miss Colleen Behm ever make a

24   complaint directly to you regarding sexual

Kaitlyn O'Neill - March 23, 2022

12

1    harassment?

2         A     No, she did not.

3         Q     Did Miss Behm ever make a complaint of

4    sexual harassment through her union rep, to your

5    knowledge?

6         A     Not to my knowledge.

7         Q     It's my understanding given the documents

8    that I've reviewed in this case that you had some

9    interaction with Miss Behm during her employment

10   with Mack Trucks; is that right?

11        A     Correct.

12        Q     Okay.  Did Miss Behm ever complain to you

13   about anything involving Cruz Rivera?

14        A     She did not.

15        Q     Has any employee at Mack Trucks ever made

16   any complaints to you about Cruz Rivera?

17        A     Not that I can recall.

18        Q     Do you know who Cruz Rivera is?

19        A     I do.

20        Q     Is he currently employed with Mack Trucks?

21        A     Yes, he is.

22        Q     Do you know what his role is at Mack

23   Trucks?

24        A     He is currently an acting union rep.

Kaitlyn O'Neill - March 23, 2022

13

1    Q    Does he also have another

2 production-related job that he performs, to your

3 knowledge?

4    A    While they are a working union rep they do

5 not perform any type of work on the line.  They are

6 just strictly the rep.  So right now it would just

7 be his representative role.

8    Q    How often would you say you interact with

9 Mr. Rivera in his role as a union rep?

10    A    It is almost daily.  If not, maybe twice a

11 week.

12    Q    Do you ever interact with Mr. Rivera

13 outside of work?

14    A    No.

15    Q    Have you ever interacted with Miss Behm

16 outside of work?

17    A    No.

18    Q    I am going to share my screen with you,

19 Miss O'Neill, and ask you to review some documents

20 and I will have some questions about these

21 documents.  Okay?  For each document I will identify

22 them by their Bates number.

23    A    Okay.

24    Q    For the purpose of the deposition.  Bear

Kaitlyn O'Neill - March 23, 2022

14

1   with me a minute.  This is a document that is marked

2   as Mack 1420, 1421 and 1422.  This is a document

3   that was produced by Mack Trucks for this lawsuit.

4   Miss O'Neill, do you recognize this document?

5        A    I do.

6        Q    Can you tell me what this is?

7        A    This is a report from an investigator that

8   we had look into for Colleen.

9        Q    Do you know who the investigator is?

10       A    This specific agent that they're referring

11  to, no.  The coordinator, I forget his name, but

12  there was one person that we spoke to about details.

13       Q    Do you know who that person is?

14       A    I am drawing a blank on his name.

15       Q    Okay.  When you used the term we, who do

16  you mean by we?

17       A    The company.

18       Q    Okay.  Now, did you ask that this report

19  be provided?

20       A    Provided for today?

21       Q    No.  Just in the course of looking into

22  Miss Behm did you ask for this report or ask for the

23  investigation?

24       A    Okay.  We had been made aware by employees

Kaitlyn O'Neill - March 23, 2022

15

1    that they believed Colleen to be engaging in

2    activities outside of work while she was on a leave.

3    And I asked my boss if we should proceed with

4    something like this and it was approved, so we moved

5    forward.

6         Q    Okay.  And your boss is Tim Newman,

7    correct?

8         A    Correct.

9         Q    So is it fair to say that you and Tim

10   Newman had discussions about whether to investigate

11   Miss Behm's activities while she was out on a leave?

12        A    Yes.

13        Q    Did anybody else -- was anybody else

14   involved in those conversations?

15        A    Possibly John Tolame, who was the labor

16   manager at the time, but I'm not a hundred percent

17   confident.

18        Q    What does a labor manager do?

19        A    They are a person that works very closely

20   with the union representatives.  They would be

21   someone present at negotiations when they happen and

22   they handle higher level union items, such as

23   grievance levels three or higher, arbitration, high

24   level labor items.

Kaitlyn O'Neill - March 23, 2022

16

1     Q     What kind of information did you receive

2   concerning Miss Behm's activities while she was out

3   on a leave?

4     A     It was stated that there were reports of

5   her working at a strip club and, yeah, just that she

6   was working at a strip club, but they weren't sure

7   which one.

8     Q     And where did that information come from?

9     A     That information came from Kevin

10  Fronheiser, who was the shop chair.

11    Q     Do you know where he obtained that

12  information?

13    A     If my memory serves me right, from the

14  shop floor and that was it.

15    Q     From other employees in the shop floor?

16    A     Correct.

17    Q     Okay.  If you want, you can look at this

18  surveillance report.  Just tell me.  I'll do this as

19  best I can.  Tell me if I need to scroll up or down

20  so you can read it.  If you're aware of the contents

21  of it and you don't need to read it again to answer

22  questions, that's fine too.

23    A     As I look at it I believe I'm pretty

24  familiar with it.

Kaitlyn O'Neill - March 23, 2022

17

1      Q    Thank you.  Did this report corroborate

2  any of Mr. Fronheiser's information that he

3  provided?

4      A    Can you rephrase that for me?  I'm not

5  sure I understand.

6      Q    Well, Mr. Fronheiser informed I believe

7  you -- let's start there.  Did Mr. Fronheiser tell

8  you directly that Miss Behm was, according to him,

9  working at a strip club?

10     A    Yes.

11     Q    Did this report that you had requested

12 corroborate any of that information?

13     A    We went with -- when he said that it was

14 reported that she was working at a strip club he

15 provided us what he thought was the name of it and

16 we provided that to the agent services.  But beyond

17 that we didn't have much detail and none of this was

18 shared with Kevin after it was done.

19     Q    Did the investigator see Miss Behm

20 performing any work at all outside of -- during her

21 leave time?

22     A    According to the report, no.

23     Q    According to the report, the agent was

24 parked outside of Miss Behm's home, correct?

Kaitlyn O'Neill - March 23, 2022

18

1      A      Correct.

2      Q      Did you ever have any other conversations

3   with Mr. Fronheiser about whether Miss Behm was

4   working at a strip club?

5      A      No.

6      Q      Do you know why Mr. Fronheiser was

7   providing you with this information that he had come

8   by?

9      A      The reason or motive as to why he shared

10  that with me, I don't know.

11     Q      Okay.  I'll stop sharing my screen for a

12  moment.  Do you recall an incident where Miss Behm

13  was injured at work?

14     A      I heard about it afterwards when it had

15  been reported with medical.

16     Q      My understanding is that that injury

17  occurred sometime in mid May of 2019.  Does that

18  sound right to you?

19     A      That does sound fairly accurate, yes.

20     Q      I know that you were present for my

21  client's deposition where she testified that she had

22  hit her head working in or around one of the cabs.

23  Do you remember that?

24     A      Yes.

Kaitlyn O'Neill - March 23, 2022

19

1      Q    Without getting into the medical diagnosis

2   of my client, is that your understanding what had

3   happened, she hit her head?

4      A    That was what medical had stated in the

5   report.

6      Q    Okay.  Do you know whether Miss Behm had

7   left work on the date that she had hit her head

8   while working on the line?

9      A    Without looking at a report or a system I

10   couldn't say a hundred percent.

11      Q    Okay.  Bear with me a minute.  I'm going

12   to share my screen again.  Miss O'Neill, I'm going

13   to show you a string of E-mails identified as Mack

14   812, 813 and 814.  You were involved in some of

15   those E-mails and some of these E-mails you were not

16   involved in.  Okay?  Let's take a look at Mack 0813.

17   I think what we are going to have to do is start at

18   the bottom of these E-mails and go up, because that

19   keeps them in chronological order.  I'd ask you to

20   take a look at this and tell me to scroll up as you

21   are reading.  Fair enough?

22      A    Yep.

23      Q    Thank you.

24      A    Okay, you can scroll.  Okay.  Okay.  All

Kaitlyn O'Neill - March 23, 2022

20

1   right.  Is there anything else?

2        Q    That's it.  So if we start at the bottom

3   E-mail, this is an E-mail from Diane King to you and

4   Dee Markell.  Do you see that?

5        A    Uh-huh, yes.

6        Q    Who is Dee Markell?

7        A    She was an HR coordinator payroll person

8   for us.

9        Q    Is she still employed by Mack Trucks?

10       A    No, she's not.

11       Q    Do you know why her employment -- she's no

12  longer employed with Mack Trucks?

13       A    She took a job at another facility to be

14  closer to family.

15       Q    Do you know when she did that?

16       A    She left in January of 2022, so just this

17  year.

18       Q    Okay.  This E-mail -- who is Diane King?

19       A    She works in the dispensary as an

20  assistant, slash, secretary I would call it.

21       Q    Is she still employed by Mack Trucks?

22       A    Yes, she is.

23       Q    Here she writes to you, I spoke with

24  Michelle from employee's doctor. and I'll represent

Kaitlyn O'Neill - March 23, 2022

21

1   to you that the employee we are talking about here

2   is Miss Behm.  She said that Brent Calhoun filled

3   out her paperwork and he initialed it.  I do see the

4   initials of BC above the date.  They confirmed

5   everything on their end.  Did I read that correctly?

6        A    Yes.

7        Q    Okay.  And if you look at the date of this

8   E-mail, this is around the time when Miss Behm was

9   injured and was scheduled to come back to work.

10  Would you agree with that?

11           MR. MOODY:  Objection to form.  Did you

12      hear me?

13           MR. BAIRD:  Yes, we did.

14           MR. MOODY:  Okay.  I wasn't sure.

15  BY MR. BAIRD:

16       Q    You can answer if you understand my

17  question, Miss O'Neill.

18       A    I would say that August of 2019 is not

19  when she was injured, but when she was already out

20  of work.

21       Q    Okay.  You are correct about that.  She

22  was injured in or around May of 2019, right?

23       A    Correct.

24       Q    And do you know whether Miss Behm was out

Kaitlyn O'Neill - March 23, 2022

22

1   of work for that entire period from mid May until

2   August 15th?

3       A    She would have been out on her short-term

4   disability.

5       Q    Do you know why she was out on short-term

6   disability, what her injury was?

7       A    I believe from memory she was claiming

8   concussion.

9       Q    And she was being treated by a

10  neurologist; is that right?

11      A    I cannot confirm or deny that.

12      Q    Okay.  Your E-mail in response to this

13  says, I'm curious.  How can we move ahead with

14  getting a second opinion done?  Do you see that?

15      A    Yes.

16      Q    Why did you want to obtain a second

17  opinion?

18      A    We were wondering why a concussion would

19  keep her out of work for such an extended time.

20      Q    Are you referring to Mack Trucks when you

21  say we?

22      A    Yes.

23      Q    Okay.  Then the next E-mail in response to

24  yours is from Gloria Pesola.  Can you tell me who

Kaitlyn O'Neill - March 23, 2022

23

```
1   that is?
2        A    She -- I would call her our Workers' Comp
3   case manager.
4        Q    Did Miss Behm make a Workers' Compensation
5   claim associated with her concussion?
6        A    When she reported to medical stating that
7   she hit her head on the cab, medical would
8   automatically go through the process of filing a
9   Workers' Comp claim, which they did.
10       Q    Do you know whether Miss Behm was ever
11  paid Workers' Compensation benefits?
12       A    She was not, because the claim was denied.
13       Q    Do you know why the claim was denied?
14       A    From the report that I had read and been
15  made aware of, it was due to not following up with
16  the required steps for going to an in-network
17  doctor.
18       Q    So going back to this E-mail, Miss Pesola
19  says, Hi Kaitlyn.  It would take a while to get a
20  second opinion from a neuro specialist.  Also,
21  concussions are so subjective that I'm not sure we
22  would get a favorable opinion anyway, due to the
23  subjectivity of the diagnosis, et cetera.  My
24  thoughts are to get surveillance on her to see what
```

JA000564

Kaitlyn O'Neill - March 23, 2022

24

1    she's doing on a personal level.  If she's going to

2    a second job, getting paid, et cetera, that would be

3    grounds for termination.  Did you take any action in

4    response to Miss Pesola's E-mail?

5        A    If I look at the dates and trying to

6    recall what we just looked at with the surveillance,

7    I believe they're around the same time.

8        Q    I'll represent to you that the

9    surveillance report was done, according to the

10   report, on September 28, 2020.  That's when it was

11   authored.

12       A    So it was much later.  Okay.

13       Q    Yeah.

14       A    But I think with this we just simply

15   followed through with the second opinion.

16       Q    Your reply to Miss Pesola is, I know she's

17   modeling but it's no -- if she is getting paid for

18   it.  She could be charging money or she may not be.

19   Okay.  Now, how did you know that Miss Behm was

20   modeling at this time?

21       A    I believe it was around the time that

22   Kevin had said about her working at a strip club

23   that I did a Google search.  I found her online

24   account and the photos were visible.

Kaitlyn O'Neill - March 23, 2022

25

1       Q     Do you know what website she was hosting

2   the photos on?

3       A     Instagram.

4       Q     Then Dr. Muto says, I am not sure it is

5   significant that she is being paid.  To me it's the

6   activity she is engaged in.  And Miss Pesola says,

7   Agreed.  So looking at this thread of E-mails, did

8   you take any other action with regards to Miss Behm

9   other than to procure a second opinion from a

10  neurologist?

11      A     No.

12      Q     At this time were you skeptical as to

13  whether Miss Behm was injured?

14      A     This with the reports of her working at a

15  strip club and then finding the photos, we were

16  starting to wonder what her condition was.

17      Q     Okay.  Were there any (inaudible) on the

18  photos that you looked at with regards to the

19  Instagram account?

20      A     Sorry, what was that?

21      Q     It's kind of a clumsy question.  I'm going

22  to try to make it as understandable as I can.  Could

23  you identify looking at her Instagram accounts when

24  the photographs were taken or posted?

26

1      A    Yes.   On Instagram it does put dates.   It

2  might say posted seven days ago or I believe on

3  Instagram if it's over a week out they give you the

4  very specific date.   So, yes, it was very easy to

5  identify when things were posted.

6      Q    And that's as to when the photographs were

7  posted, correct?

8      A    Correct.

9      Q    Okay.   Is it your testimony that it's

10  around this time in August of 2019 that

11  Mr. Fronheiser had come to you with information

12  about Miss Behm working at a strip club?

13      A    I do not remember the specific time of

14  year or date when Mr. Fronheiser brought it to my

15  attention.   I don't know when it was.

16      Q    Did you ever make any notes from that

17  conversation with Mr. Fronheiser?

18      A    I do not believe I did.   I would have to

19  look.

20      Q    Okay.   Did you ever receive information

21  from any other sources besides Mr. Fronheiser and

22  looking on Google as to Miss Behm's activities

23  outside of work?

24      A    From my memory, no.

Kaitlyn O'Neill - March 23, 2022

27

1      Q     Did you ever contact Miss Behm to ask her

2   if she was working at a strip club?

3      A     I did not.

4      Q     Did you ever talk to Miss Behm about her

5   modeling?

6      A     I believe it came up in conversation when

7   I had to contact her about I believe it was

8   incomplete short-term disability paperwork, A and S

9   paperwork, or something along the lines that maybe

10  needed more detail and it went into discussion.

11     Q     Okay.  Prior to receiving this information

12  about -- from Kevin Fronheiser and reviewing Miss

13  Behm's Instagram account, were there any other

14  reasons why you were skeptical about her injury or

15  the amount of time she was on leave?

16     A     We -- myself talking to Dr. Muto I had

17  asked for his professional opinion on how long

18  someone with a concussion might be out of work and

19  we -- him and I, Dr. Muto and I, we were starting to

20  wonder why a concussion would have kept her out of

21  work from May through August or beyond.

22     Q     Okay.  If I understand you, it was -- you

23  had had conversations with Dr. Muto about the amount

24  of time that Miss Behm was out with regards to a

Kaitlyn O'Neill - March 23, 2022

28

1    concussion and whether a concussion would require

2    someone to be out of work that long.  Is that fair

3    to say?

4         A    Correct.

5         Q    Do you remember with any level of

6    specificity as to what Dr. Muto said to you about

7    his opinion regarding the length of time someone

8    would be out with a concussion?

9         A    I don't remember the specifics of the

10   conversation.

11        Q    Do you remember anything generally about

12   that conversation?

13        A    Honestly, no.  It's been so long ago.

14        Q    And was Miss Behm being paid during this

15   period of leave from May until August?

16        A    Yes.

17        Q    How was she being paid?

18        A    A and S payment.  So it's partial, not

19   full pay.  It's partial.

20        Q    A and S is accident and sickness, correct?

21        A    Correct.

22        Q    Is that a benefit directly from Mack

23   Trucks or is that a benefit provided by Mack Trucks

24   through an insurance company?

JA000569

Kaitlyn O'Neill - March 23, 2022

29

1      A     Accident and sickness benefit is

2   negotiated and part of the benefit contract between

3   the union and the company.

4      Q     Okay.  Do you have any knowledge as to

5   Dr. Muto's specialty or credentials?

6      A     I do not.

7      Q     All right.  Bear with me a moment.  I'm

8   going to go to another E-mail.  This is Mack 830.

9   This is an E-mail from you to John Tolame, Gloria

10  Pesola and Alan Muto, dated August 29, 2019.  Do you

11  see that?

12     A     Yes.

13     Q     This E-mail says, Hello.  I was just

14  wondering if we can find a closer neurologist for

15  Colleen Behm to see.  I feel that having to send an

16  employee all the way down to Jenkintown,

17  parenthesis, Greater Philly area, parenthesis, is

18  just difficult.  Is there not someone in the Lehigh

19  Valley that we can get her in with?  Also, what

20  happens when I call and speak with Colleen about us

21  having set up a second opinion doctor appointment

22  for her and she refuses to go?  What do we do?  Did

23  I read that correctly?

24     A     Yes.

30

1      Q    Is this -- does this E-mail reference the

2   second opinion that we were discussing earlier?

3      A    It does.

4      Q    What was the purpose in obtaining a second

5   opinion from your perspective?

6      A    I believe it would have came from the

7   conversation with Dr. Muto on his professional

8   opinion about how long someone typically would be

9   out of work for a concussion and could return back

10  and work, but then also from -- with talking with my

11  boss and John Tolame about should we move ahead with

12  a second opinion to see if we could get her back to

13  work.

14     Q    Do you ever -- do you know whether you

15  ever had a phone call with Colleen about setting up

16  a second opinion for her to go see another

17  neurologist?

18     A    Once we had the appointment confirmed for

19  the second opinion, yes, I did call her about it.

20     Q    Did the second opinion neurologist, was

21  that a person in Jenkintown as referenced in this

22  E-mail or was someone found closer to the Lehigh

23  Valley?

24     A    The second opinion specialist was in

Kaitlyn O'Neill - March 23, 2022

31

1    Jenkintown, Pennsylvania.

2         Q    Okay.  Sitting here today do you remember

3    anything that you talked with Colleen about when you

4    asked her to go see another neurologist for a second

5    opinion?

6         A    I said to her we were company paying for

7    her to go see a specialist because we are trying to

8    get her the resources that she may need to recover

9    from her injury and we wanted to work with her and

10   give her resources.

11        Q    Okay.  Did she say anything in response to

12   that?

13        A    I truly do not remember what her response

14   was.

15        Q    Was she angry with you on the phone?

16        A    Most conversations with Colleen there was

17   a little bit of shortness, but I don't know that she

18   was angry, yelling.

19        Q    Did she refuse or agree to go see the

20   second opinion doctor?

21        A    I know she did not agree with me on the

22   phone and I believe she said she was going to reach

23   out to her union rep before she made a decision.

24        Q    Do you know who her union rep was at that

Kaitlyn O'Neill - March 23, 2022

32

1   time?

2        A    I do not know.

3        Q    Do you know whether she eventually went to

4   go see the second neurologist?

5        A    She did.

6        Q    Did that neurologist provide you an

7   opinion?

8        A    They did, yes.

9        Q    Do you remember what that opinion said,

10  your recollection?  The report will speak for

11  itself, but do you remember what it said?

12       A    It said they did not find anything that

13  would have her limited to not being able to perform

14  work and their professional opinion was that she was

15  okay and they essentially gave her no restrictions.

16       Q    So the second opinion that you retained

17  from the neurologist in Jenkintown, that

18  doctor released Miss Behm to return to work without

19  restriction.  Is that fair to say?

20       A    Correct.

21       Q    And was that return -- did Miss Behm

22  return to work immediately after that second

23  opinion?

24       A    Yes.

Kaitlyn O'Neill - March 23, 2022

33

1    Q    Did you have any conversations with

2   Miss Behm about her return to work from the

3   concussion injury after that second opinion was

4   provided?

5    A    I remember the day of her appointment with

6   the second opinion she had called me and said, I'm

7   ready to come back to work, and I said, That's

8   great.  Once we get the release from the doctor

9   officially we'll let you know when you should come

10  in, see medical to get your -- to be cleared and

11  then we'll get you your assignment.  And I believe

12  she showed up the very next day.

13   Q    I'm going to ask you to look at another

14  E-mail.  This E-mail is identified as Mack 0839.  Do

15  you see that?

16   A    Yes.

17   Q    This E-mail is dated March 4, 2020 from

18  you to Alan Muto, Gloria Pesola and Kathy Shiffert,

19  CC Richard Schmidt.  Do you see that?

20   A    Yes.

21   Q    Can you tell me who Kathy Shiffert is?

22   A    She's a nurse of ours.

23   Q    Does she work in the dispensary?

24   A    She does.

Kaitlyn O'Neill - March 23, 2022

34

1      Q     Who is Richard Schmidt?

2      A     He is our manpower coordinator.  That's

3  the best title I can give you.

4      Q    Is Mr. Schmidt -- at this time was

5  Mr. Schmidt responsible in making sure that the

6  staffing levels at the factory were appropriate and

7  there were people there to work?

8      A    That's not his primary responsibility.

9  His primary responsibility as a manpower coordinator

10  is to insure the correct -- or handling all of the

11  contractual moves.  That's what he is responsible

12  for and then he will let us know if we need more

13  people, where his gaps are.

14      Q    Is he a union representative or in the

15  union?

16      A    No, he's not.

17      Q    This E-mail from you says, Hello.  I just

18  wanted to start an E-mail communication to share

19  that Colleen had mentioned to people that if she

20  goes on and(sic) shift she will apply for A and S,

21  as she doesn't want to be working that shift.  She

22  already has missed seven days of work since

23  2/14/2020 right when she went to second shift.  And

24  I know you sent her home today due to headache and

JA000575

Kaitlyn O'Neill - March 23, 2022

35

1    pills she takes.  I'd like us to be careful and

2    monitor what, quote, illnesses, quote, she's

3    claiming, as I think she may try anything to get out

4    of working second shift.  Regards, Kaitlyn.  I read

5    that correctly?

6         A    Yes.

7         Q    Who were the people that Colleen had

8    mentioned that she does not want to go on second

9    shift?

10        A    If my memory serves me correctly, it was

11   her supervisor, Arven Curtis at the time, that said

12   he had heard this from her peers in that work area.

13        Q    Did you say Urvan Curtis?

14        A    Arven, A-R-V-E-N.

15        Q    Thank you.  Did you hear that from anyone

16   else besides Mr. Curtis?

17        A    I do not believe so.

18        Q    Do you remember anything about that

19   conversation with Mr. Curtis?

20        A    Not more than she just wasn't able or

21   wanting to work on second shift.

22        Q    Do you know why Miss Behm was moved to

23   second shift?

24        A    Yes.  In February of 2020 we had a large

Kaitlyn O'Neill - March 23, 2022

36

1    general layoff and we laid off I think the number

2    was roughly 220 employees.  So that had

3    significantly affected who was working where and

4    with it being a seniority shop, her seniority was no

5    longer able to hold her shift, due to all of the

6    movements and large reduction in workforce.

7        Q    So it's your recollection Miss Behm was

8    moved to second shift as the result of a layoff and

9    attendant staffing needs that were required as a

10   result of that layoff.  Is that fair?

11       A    Correct.

12       Q    Did Miss Behm ever tell you directly that

13   she did not want to be on second shift?

14       A    No.

15       Q    Did she ever tell you that she had some

16   childcare issues that made her employment on second

17   shift a hardship to her?

18       A    I do not recall that she did.

19       Q    Did she ever report to you that she had

20   been assaulted by her husband?

21       A    I don't believe she directly did.  I

22   believe the way I had learned of that was by seeing

23   the A and S paperwork that was submitted back in

24   2019.

Kaitlyn O'Neill - March 23, 2022

37

1      Q    Is there a reason why you put the word

2  illnesses in quotation marks in this E-mail?

3      A    Yes.  Because A and S is for accident and

4  sickness and if she was stating to her peers that

5  she did not want to work second shift, that would

6  not be an illness or accident.

7      Q    Okay.  But if she was suffering from some

8  kind of injury or illness, that would be covered

9  under A and S, correct?

10     A    Correct.

11          MR. MOODY:  Objection to form.  Mr. Baird,

12      are we getting close to taking a quick break?

13          MR. BAIRD:  Sure, let's take a break for

14      10 minutes.

15                    * * *

16          (Whereupon, a brief recess was taken.)

17                    * * *

18  BY MR. BAIRD:

19     Q    Miss O'Neill, I'm going to share my screen

20  and ask you about some more E-mails.  Bear with me a

21  minute.  This E-mail is marked as Mack 0848.  This

22  is from Alan Muto to you and John Tolame, carbon

23  copying Miss Pesola and Miss Shiffert.  This says,

24  John, we were just notified that Colleen Behm,

Kaitlyn O'Neill - March 23, 2022

38

1    parenthesis, 450939, parenthesis -- is that number

2    an employee number for Miss Behm?

3        A    Yes.  We call it an SAP number.

4        Q    Okay -- is scheduled to return to work

5    2/16/21.  It appears that she's been out of work

6    since 5/12/2019.  Is that accurate?

7        A    That date I believe -- that date matches

8    one of her A and S paperwork, but she was would not

9    have been able to have been out that long on A and

10   S.  You only get 52 weeks on A and S.

11       Q    In fact, Miss Behm had returned to work in

12   September of 2019; is that right?

13       A    If my memory serves me right, yes.

14       Q    She returned after the neurologist

15   provided the second opinion and cleared her to

16   return to work, correct?

17       A    Correct.

18       Q    The next sentence says, Her A and S

19   paperwork varies from WR to predominately NWR.  Do

20   you know what those abbreviations stand for?

21       A    I believe work-related to

22   non-work-related.

23       Q    Okay.  She was referred to Dr. Shipkin for

24   a second opinion at our request.  Miss O'Neill, to

Kaitlyn O'Neill - March 23, 2022

39

```
1    your knowledge is Dr. Shipkin the neurologist she

2    saw in Jenkintown?

3         A    Yes.

4         Q    He determined on September 17, 2019 that

5    she was completely resolved and could return to work

6    full duty.  However, I do not see that she ever

7    returned to work.  I am also unaware if she is on or

8    has been approved for long-term disability.  Colleen

9    was hired January 2nd, 2018.  She first went out of

10   work around August 13th, 2018 until November 8th,

11   2018, then December 5th, 2018 she again went out of

12   work until January 18, 2019.  She then went out of

13   work May 13, 2019 to present.  Therefore, a rough

14   calculation indicates that she has worked

15   approximately one year out of three.  It appears

16   that she hasn't worked long enough to develop any

17   skills.  Please review and discuss what would be our

18   next step.  Miss O'Neill, do you have any knowledge

19   as to what Dr. Muto was looking at to give him the

20   idea that Miss Behm had never returned to work since

21   May of 2019?

22        A    I do not know what he would have been

23   looking at.

24        Q    Did you ever reply to this E-mail, to your
```

40

1  knowledge?

2      A    Off the top of my head, no, I don't know

3  if I did.  I might have.

4      Q    Okay.  I'm going to have you look at

5  another E-mail, marked as Mack 0849.  This is an

6  E-mail -- well, I'll ask you to look at this and

7  tell me when you're ready to talk about it.

8      A    (Witness complies.)

9      A    Okay.

10      Q    Can you tell me what this is?  Is this an

11  E-mail or is this something else?

12      A    This looks like it would have been a Skype

13  incident message communication back and forth

14  between myself and Diane King.

15      Q    Okay.  Do you know what date this occurred

16  on?

17      A    I do not.

18      Q    There was a reference in an earlier E-mail

19  about I think Miss King telephoning Colleen Behm's

20  doctor about some paperwork.  Do you remember that

21  E-mail?

22      A    About -- is that in the first one you had

23  shown me?

24      Q    Yes, it was.

Kaitlyn O'Neill - March 23, 2022

41

1        A     About the signature.

2        Q     Right.

3        A     Okay.

4        Q     If you don't know, that's perfectly fine,

5   but can you tell me if this conversation was related

6   to that earlier E-mail, where Miss King telephoned

7   Colleen's doctors to find out about some paperwork,

8   do you know?

9        A     I truly do not know.

10       Q     All right.  I'm going to have you look at

11  another E-mail.  Okay.  I'll share my screen again.

12  This E-mail is marked Mack 0968.  Miss O'Neill, can

13  you look at this and I'll have a couple questions

14  for you?

15       A     Okay.

16       Q     This is an E-mail thread between you and

17  Daniel Daly.  Is that right?

18       A     Yes.

19       Q     Who is Mr. Daly.

20       A     He's the second shift business team

21  leader.

22       Q     Is that a position within the HR

23  department for Mack Trucks?

24       A     No.  That is an operations role.

Kaitlyn O'Neill - March 23, 2022

42

1     Q    And you had E-mailed him on February 25th

2  of 2020 saying, Hi, Dan.  Just a heads up that

3  Colleen Behm called out again today taking her to

4  six points.  She also called me again today asking

5  about why her Article Nine wasn't approved.  She is

6  claiming that she has more seniority over people on

7  first.  What is an Article Nine?

8     Q    Article Nine is a section of the contract

9  that is transfer of shift.

10    Q    When you are saying that Miss Behm is

11 asking about why her Article Nine wasn't approved,

12 can you tell me what you are -- what you remember

13 about that conversation with Miss Behm?

14    A    I don't remember the specific

15 conversation.

16    Q    Do you know what about Article Nine

17 requires approval or denial?

18    A    You have to have more seniority than the

19 least senior person on the shift you want to go to

20 within your department and classification.

21    Q    Okay.  Did you have any access to

22 documents or computer files which would indicate to

23 you who has more seniority or not within the union?

24    A    I have access to it, but I do not go in

43

1    there and I don't work with it.  That is Richard

2    Schmidt's area of business and expertise.

3        Q    All right.  Did you have any knowledge

4    around this time in February of 2020 as to whether

5    Miss Behm had more seniority or less seniority over

6    people on first shift?

7        A    Specifics it would take for me to sit and

8    look at it.  But I do know at this time this was the

9    week where the layoff was happening and the exercise

10   had been done with all the employees affected about

11   where their new assignments would be, which is when

12   she was moving to second shift.

13       Q    During this phone call did she mention any

14   issues with regards to childcare and any

15   interference that would have about second shift?

16       A    I do not recall.

17       Q    Okay.  The next sentence you wrote, So

18   she -- since she is at six points who knows what she

19   will try to claim injury-wise in work or out of work

20   to get placed out completely.  Can you tell me

21   whether you're -- let me ask it this way.  Is there

22   any reason that you believed Miss Behm would try to

23   claim an injury where one does not exist at this

24   time?

Kaitlyn O'Neill - March 23, 2022

44

1      A     Just that her history of being in and out

2   of work and knowing that she wanted to Article Nine

3   back to first shift.  Other than that, that would

4   have just been our knowledge.

5      Q     If you discover or Mack Trucks discovers

6   an employee committing fraud as to the A and S

7   program, that would be grounds for termination of

8   that employee, correct?

9      A     Correct.

10     Q     Have you ever terminated any employee for

11  committing fraud as to the A and S program, to your

12  recollection?

13     A     Yes.

14     Q     Was Miss Behm ever terminated as a result

15  of committing fraud as to the A and S program?

16     A     No.

17     Q     How many times has an employee that you

18  were involved -- strike that.  How many times can

19  you remember an employee being terminated by Mack

20  Trucks as a result of fraud within the A and S

21  program?

22     A     I know of the one that I dealt with

23  specifically.  There was one.  But I don't know,

24  without looking, how many others.

JA000585

Kaitlyn O'Neill - March 23, 2022

45

1     Q   At the time of you sending this E-mail in

2  February of 2020 Miss Behm had not been accused by

3  Mack Trucks of committing fraud, correct?

4     A   Correct.

5     Q   Mr. Daly replied to this E-mail and said,

6  At this point with movement to second shift, if

7  there are any people on day shift with less time

8  they are most likely temps.  Do you see that?

9     A   Yes.

10     Q   Were there temps brought in as a result of

11  the layoff?

12     A   No, there was no temporary workers brought

13  in.

14     Q   Do you know what Mr. Daly is referring to

15  with regards to people on day shift with less time

16  being most likely temps?

17     A   I am not well versed, but we do have what

18  we call temporary bids.  So it's an X amount of

19  time, it's not a permanent position and when that

20  time is up they would move back to their, what we

21  call, home spot position.

22     Q   Okay.  I'm going to ask you to look at an

23  E-mail marked as Mack 0978.  This is an E-mail to

24  Diane King, Dee Markell and Kathy Shiffert and I

JA000586

Kaitlyn O'Neill - March 23, 2022

46

1    can't see who it's from.  It looks like you signed

2    it, so there may be an issue with regards to the

3    copying of this document or something didn't

4    transfer over.  Take a look at this, Miss O'Neill,

5    and I'm just going to have a couple questions about

6    it.

7          A    Okay.

8          Q    Looking at the very first E-mail where it

9    says, Hi, Kathy, and then it's signed Kaitlyn, would

10   you agree with me that you probably sent that, did

11   send that?

12         A    Yes.

13         Q    This appears to have been sent on

14   March 31, 2020 and it says, Hi, Kathy.  Can you

15   please help Dee and I figure out what they are

16   trying to explain with when the condition started?

17   It's almost appearing that she was assaulted on May

18   11, 2019 and March 4th, 2020 if that is what they

19   are saying.  I'm not sure that is the case, as I

20   think the new condition that Colleen is trying to

21   claim in -- that might be a typo -- is migraines, in

22   parenthesis, which she is claiming never went away

23   from her attack on May 11th, 2019.  Did I read that

24   right?

Kaitlyn O'Neill - March 23, 2022

47

1      A     Yes.

2      Q     Did you ever talk to Colleen about any

3   assaults that she had been the victim of?

4      A     To my knowledge, I don't think there was a

5   direct conversation about that.

6      Q     And when you refer to "they" in this

7   E-mail are you referring to Miss Behm and her

8   doctors or her doctor's office, do you know, or

9   can't you remember?

10     A     I would think I was referring to the

11  doctor's office.  Did Miss Behm ever present you

12  with documents regarding court appearances that she

13  was attending for protection from abuse orders?

14     A     If she did it would have been at an

15  attendance meeting.

16     Q     Okay.  Do you know whether court

17  appearances are excused under the Mack Trucks

18  attendance policy?

19     A     Under the Mack Trucks attendance policy it

20  is excused if you are subpoenaed.

21     Q     Okay.  At the time of this E-mail was it

22  your belief that Miss Behm was making up medical

23  issues because she did not want to be on second

24  shift?

Kaitlyn O'Neill - March 23, 2022

48

1        A    This E-mail was for clarification, because

2    corporate won't process something with that far back

3    of a date.  So this was clarification on the actual

4    condition to insure that we could process the A and

5    S.

6        Q    I'm sorry, Miss O'Neill, your last answer

7    came through garbled at the beginning.  Can you say

8    that again?  I'm sorry.

9        A    Sure.  This communication in the E-mail

10   here, this was asking for clarification, because

11   when we send A and S paperwork to be processed for

12   payment they need specific and recent dates for

13   proper processing to not cause errors.  And if we

14   were given dates from a year out we would have had

15   issues.  So that E-mail was just to get

16   clarification on the condition and the start date of

17   it.

18       Q    So it's your testimony, then, that at this

19   time you did not believe Miss Behm was making up

20   medical conditions, correct?

21       A    Correct.  Because we weren't sure what she

22   was stating on the paperwork, as it had many

23   different dates and conditions.

24       Q    Was Miss Behm's employment terminated by

49

1    Mack Trucks?

2         A    No.   Colleen Behm resigned herself.

3         Q    Did you have any conversation with her

4    about her resignation?

5         A    No.   She submitted her resignation via

6    E-mail directly to me.

7         Q    Did you have any exit meeting with her?

8         A    No.

9         Q    Have you had any conversations with her

10   since the time of her resignation?

11        A    Shortly after her time of resignation I

12   remember she E-mailed me asking about when her

13   vacation payout would be.   But beyond that there was

14   no other conversation since.

15        Q    I'll share my screen again.   I'd like you

16   to look at another E-mail.   This is Mack 1175.   This

17   is an E-mail from Dee Markell to you, dated

18   April 1st, 2020.   It says, Hi, Kaitlyn.   I was just

19   checking to see if you got a response on the A and

20   S.   I'm doubting the will call the doctor -- I think

21   Miss Markell is saying she will call the doctor, but

22   neither here nor there -- as this is on their share

23   point.   And then there is -- appears to be some kind

24   of chart here, graph or spreadsheet input into the

Kaitlyn O'Neill - March 23, 2022

50

1    E-mail.  Do you see that?

2         A    Yes.

3         Q    Do you know where that spreadsheet comes

4    from?

5         A    I do not.  I've never seen this before,

6    like that file or that chart.

7         Q    Okay.  Under Other there is a blue circle

8    in ink and it says, OOW migraine.  I interpret that

9    to say out of work migraine.  Then in red it says,

10   Do not call.  Do you see that?

11        A    Yes.

12        Q    Have you ever seen anything like that

13   before?

14        A    No.

15             MR. MOODY:  Mr. Baird, you broke up on the

16        start of that.  What number are we looking at?

17             MR. BAIRD:  Sorry, Randy.  That's 1175.

18             MR. MOODY:  No worries.  We are dealing

19        with technology.

20   BY MR. BAIRD:

21        Q    I think I have one more for you, Miss

22   O'Neill.  This one is going to be Mack 1202.  Do you

23   see this document, Miss O'Neill?

24        A    Yes, I do.

Kaitlyn O'Neill - March 23, 2022

51

```
1        Q    Can you tell me what this is?
2        A    This is an instant message Skype
3   conversation between myself and Kevin Fronheiser.
4        Q    You write, Hey, can you please have a
5   conversation with Colleen Behm that she needs to
6   remain professional and polite during her
7   communication with us?  If she continues to interact
8   in a rude way I will discipline her for harassment.
9   I'm trying to work with her as professionally as I
10  can, but her inappropriate tone and rude manner is
11  not needed or appropriate.  Did I read that
12  correctly?
13       A    Yes.
14       Q    Do you remember what Miss Behm did to
15  prompt this communication to Mr. Fronheiser?
16       A    It would have been a time when I called
17  her on the phone.  What I called her, or if she
18  called me, a phone conversation happened.  Specifics
19  of it I don't necessarily recall.  But as I stated
20  before, many times when Colleen would be
21  communicating with me it wasn't far from rude,
22  short, just inappropriate, yeah, tone.  It was very
23  frequent anytime we would communicate that she would
24  be short or, you know, rude with me.
```

Kaitlyn O'Neill - March 23, 2022

52

```
 1        Q     To your recollection, that was her tone
 2   and general manner in her communications with you.
 3   Is that fair?
 4        A     Yes.
 5        Q     Did she ever use profanity with you?
 6        A     In an E-mail, I don't believe so.  On the
 7   phone, I can't remember many of the specifics of the
 8   conversations, so I cannot say yes or no.
 9        Q     Did you ever write up Miss Behm for any
10   inappropriate communications with you?
11        A     No, I did not.
12        Q     Bear with me, Miss O'Neill.  I have to
13   find one other document.  This document is Mack
14   1179, 1180.  It's a two-page document.  Okay.  This
15   is an E-mail from Miss Pesola to Patrick O'Connell.
16   Can you tell me who Mr. O'Connell is?
17        A     I cannot.  I don't think I know who that
18   is.
19        Q     Okay.  You are not carbon copied on this
20   E-mail, correct?
21        A     Correct.
22        Q     Dr. Muto, Miss Shiffert and Miss King are
23   carbon copied on this.  And this is of high
24   importance from Miss Pesola.  Just wanted you to see
```

JA000593

Kaitlyn O'Neill - March 23, 2022

53

1    what we received today on Colleen Behm, WC390E11428.

2    Do you know what that number means or?

3              MR. MOODY:  I lost sound.

4              MR. BAIRD:  Okay.  He doesn't hear us.

5         let's go off the record.

6                        *  *  *

7              (Whereupon, a brief off-the-record

8           discussion was held.)

9                        *  *  *

10   BY MR. BAIRD:

11        Q    We'll start over.  This one is Mack 1179

12   and 1180.  Miss O'Neill, you're not copied on this

13   E-mail.  Do you see that?

14        A    Yes.

15        Q    It says, Just wanted you to see what we

16   received today on Colleen Behm.  WC390E11428.  Does

17   that number mean anything to you?

18        A    That I believe would be her Workers' Comp

19   case number.

20        Q    Okay.  It says, I know this claim is

21   denied.  However, I wanted you to be aware that on

22   her most recent A and S form, which is attached, she

23   has checked that this sickness, slash, injury is due

24   to her employment with the company.  Also look at

Kaitlyn O'Neill - March 23, 2022

54

1    the complaints listed on the bottom of this form.

2    Ellipses, hostile work environment, harassment, et

3    cetera.  Did I read that correctly?

4         A    Yes.

5         Q    Then it says, Please advise if we need to

6    do anything or discuss with Tony Salvino.  Do you

7    know who Mr. Salvino is?

8         A    I believe he's the Workers' Comp attorney.

9         Q    All right.  Then this is the form, to my

10   knowledge, that's attached as Mack 1180.  It does

11   have some writing down below referencing, Never

12   cleared to return to work.  Hostile work

13   environment, harassment, discrimination, sexism,

14   targeting HIPAA violations, victimization, unfair

15   treatment and emotional distress, causing increase

16   in anxiety and migraines.  Did I read that

17   correctly?

18        A    Yes.

19        Q    Did you ever take any investigation into

20   what Miss Behm was referring to here?

21        A    When I saw this page of the A and S I

22   don't recall specifically when I saw it, but as soon

23   as I saw it I reached out to her supervisor, her

24   current one and her previous one, and asked if she

Kaitlyn O'Neill - March 23, 2022

55

```
 1   had ever mentioned anything.  They said they were

 2   not aware.  I also reached out to Kevin Fronheiser,

 3   because I wasn't sure who her union rep was.  I

 4   asked Kevin if she had ever brought anything to his

 5   attention, and he said no, he had not heard of

 6   anything.  So I did pretty much instantly ask for

 7   any information that someone would have had on this

 8   and nothing came of it.  No one had anything.

 9        Q    Did you reach out to Miss Behm about this?

10        A    I don't know that I did.

11        Q    Do you know whether you did or not?

12        A    A hundred percent I don't know.  I'd have

13   to look.

14        Q    Okay.  Where would you look to determine

15   whether you had reached out to Miss Behm in

16   reference to what she had written on the paper?

17        A    I would check E-mails, our investigation

18   files.  I would look in those areas.

19        Q    Okay.  When you reached out to

20   Mr. Fronheiser did he discuss with you who Miss

21   Behm's union representation was at that time?

22        A    I don't recall that he did.

23        Q    Do you remember which supervisors you

24   spoke with to investigate what Miss Behm had written
```

Kaitlyn O'Neill - March 23, 2022

56

1  down on this paper?

2      A    I had reached out to Arven Curtis and I'm

3  blanking on who the other supervisor would have

4  been, but I know Arven Curtis was I believe the

5  first person I had asked.

6      Q    During your employment with Mack Trucks

7  can you remember any other instances in which you

8  obtained surveillance on an employee utilizing the A

9  and S program?

10     A    Yes.  The case where we did terminate

11 employment for fraud essentially for the person

12 claiming it.

13     Q    Okay.  Was that the reason for termination

14 with regards to that person?  Was it fraud or is

15 there another word that was used by Mack?

16          MR. MOODY:  Objection to form.  You can

17      answer.

18          THE WITNESS:  I believe the word would

19      have been fraud, because in the contract it

20      states.  So, yes, I believe that would be the

21      term we used.

22 BY MR. BAIRD:

23     Q    Do you remember who that person was who

24 was terminated?

Kaitlyn O'Neill - March 23, 2022

57

```
 1        A     I know the first name is Paul.  I don't
 2   remember the last name.
 3        Q     Do you remember when that employee was
 4   terminated?
 5        A     2018.
 6        Q     Were there any other employees that you
 7   can think of who you had obtained surveillance on
 8   for any reason besides Paul and Miss Behm?
 9        A     I did not request -- I did request the
10   surveillance on another employee on A and S, Fawn
11   Owenberg.
12        Q     F-A-W-N?
13        A     Yes.
14        Q     Was Fawn terminated?
15        A     No.
16        Q     Does Fawn still work for Mack Trucks?
17        A     Yes.
18        Q     Is she on A and S currently?
19        A     I would have to look.
20             MR. BAIRD:  That's all the questions I
21        have, Miss O'Neill.  I appreciate your time.
22        Mr. Moody may have some follow-up questions for
23        you.
24             MR. MOODY:  I don't have any questions for
```

58

1    you, Miss O'Neill.  Everyone have a great day.

2         THE COURT REPORTER:  Do you both want

3    copies?

4         MR. BAIRD:  Yes.

5         MR. MOODY:  I'll take copies and she will

6    read and sign.

7                     * * *

8            (Witness excused.)

9                     * * *

10       (Whereupon, the Zoom deposition concluded

11     at 12:45 p.m.)

12                    * * *

13

14

15

16

17

18

19

20

21

22

23

24

Kaitlyn O'Neill - March 23, 2022

59

1                C E R T I F I C A T I O N

2


3

         I, Karen A. Stevens, a Court Reporter
4    and Notary Public, do hereby certify the
     foregoing to be a true and accurate transcript
5    of the proceedings in this matter, as
     transcribed from the stenographic notes taken
6    by me.

7                       _____

8                       Karen A. Stevens
                        Court Reporter
9                       Notary Public

10

11

12

13

14        (The foregoing certification of this
     transcript does not apply to any reproduction
15   of the same by any means, unless under the
     direct control and/or supervision of the
16   certifying reporter.)

17

18

19

20

21

22

23

24

JA000600

Kaitlyn O'Neill - March 23, 2022

60

```
1                       - - -

2               INSTRUCTIONS TO WITNESS

3                       - - -

4

5

6          Read your deposition over carefully.  It is
    your right to read your deposition and make changes
7   in form or substance.  You should assign a reason in
    the appropriate column on the ERRATA SHEET for any
8   change made.

9

10         After making any change in form or
    substance, and which have been noted on the
11  following ERRATA SHEET, along with the reason for
    change, sign your name on the ERRATA SHEET and date
12  it.

13

14

15         Then sign your deposition at the end of
    your testimony in the space provided.  You are
16  signing it subject to the changes you have made in
    the ERRATA SHEET, which will be attached to the
17  deposition before filing.  You must sign in the
    space provided.  The witness need not be a Notary
18  Public.  Any competent adult may witness your
    signature.

19

20

21

22

23

24
```

JA000601

61

1                    SIGNATURE PAGE

2                         OF

3                  KAITLYN O'NEILL

4

5          I hereby acknowledge that I have read the

6      aforegoing deposition dated March 23, 2022, and

7      that the same is a true and correct

8      transcription of the answers given by me to the

9      questions propounded, except for the changes,

10     if any, noted on the attached ERRATA SHEET.

11

12  SIGNATURE

13

14  _____

15  Kaitlyn O'Neill

16

17  _____

18  WITNESSED BY:                    DATE

19

20  _____        _____

21

22

23

24

62

1                           ERRATA SHEET

2      PAGE            LINE                    CORRECTION

3

4      _____-_____

5      _____-_____

6      _____-_____

7      _____-_____

8      _____-_____

9      _____-_____

10     _____-_____

11     _____-_____

12     _____-_____

13     _____-_____

14     _____-_____

15     _____-_____

16     _____-_____

17     _____-_____

18     _____-_____

19     _____-_____

20     _____-_____

21     _____-_____

22     _____-_____

23     _____-_____

24     _____-_____

Kaitlyn O'Neill - March 23, 2022

**0**

**0813** 19:16
**0839** 33:14
**0848** 37:21
**0849** 40:5
**0968** 41:12
**0978** 45:23

**1**

**10** 11:8 37:14
**11** 46:18
**1175** 49:16 50:17
**1179** 52:14 53:11
**1180** 52:14 53:12 54:10
**11th** 46:23
**1202** 50:22
**12:45** 58:11
**13** 39:13
**13th** 39:10
**1420** 14:2
**1421** 14:2
**1422** 14:2
**15** 2:9
**15th** 22:2
**17** 39:4
**18** 39:12
**19102** 2:4
**1st** 49:18

**2**

**2/14/2020** 34:23
**2/16/21** 38:5
**2011** 5:18
**2015** 5:22 6:7
**2017** 7:15,17
**2018** 39:9,10,11 57:5

**2019** 18:17 21:18,22 26:10 29:10
36:24 38:12 39:4,12,13,21 46:18,23
**2020** 6:20 24:10 33:17 35:24 42:2
43:4 45:2 46:14,18 49:18
**2022** 20:16
**220** 36:2
**25th** 42:1
**28** 24:10
**29** 29:10
**29601** 2:9
**2nd** 39:9

**3**

**31** 46:14

**4**

**4** 3:5 33:17
**450939** 38:1
**4th** 46:18

**5**

**5/12/2019** 38:6
**52** 38:10
**5th** 39:11

**7**

**700** 2:9

**8**

**800** 9:15
**812** 19:14
**813** 19:14
**814** 19:14
**830** 29:8
**8th** 39:10

**A**

**A-R-V-E-N** 35:14
**abbreviations** 38:20
**abuse** 47:13
**access** 42:21,24
**accident** 28:20 29:1 37:3,6
**account** 24:24 25:19 27:13
**accounts** 25:23
**accurate** 18:19 38:6
**accused** 45:2
**acting** 12:24
**action** 24:3 25:8
**activities** 15:2,11 16:2 26:22
**activity** 25:6
**actual** 48:3
**adaptation** 8:24
**Administration** 5:12
**advise** 54:5
**affected** 36:3 43:10
**agent** 14:10 17:16,23
**agree** 21:10 31:19,21 46:10
**Agreed** 25:7
**ahead** 22:13 30:11
**Alan** 29:10 33:18 37:22
**amount** 27:15,23 45:18
**and(sic)** 34:20
**angry** 31:15,18
**anxiety** 54:16
**anytime** 51:23
**appearances** 47:12,17
**appearing** 46:17
**appears** 38:5 39:15 46:13 49:23
**apply** 34:20
**appointment** 29:21 30:18 33:5
**approval** 42:17
**approved** 15:4 39:8 42:5,11

approximately 39:15

April 49:18

arbitration 15:23

area 29:17 35:12 43:2

areas 55:18

Article 42:5,7,8,11,16 44:2

Arven 35:11,14 56:2,4

assaulted 36:20 46:17

assaults 47:3

assigned 8:13 9:6

assignment 9:6 33:11

assignments 43:11

assistant 20:20

assistants 9:17

attached 53:22 54:10

attack 46:23

attendance 47:15,18,19

attendant 36:9

attending 47:13

attention 26:15 55:5

attorney 54:8

August 21:18 22:2 26:10 27:21
28:15 29:10 39:10

authored 24:11

automatically 23:8

aware 14:24 16:20 23:15 53:21 55:2

**B**

Bachelor's 5:8,10

back 21:9 23:18 30:9,12 33:7 36:23
40:13 44:3 45:20 48:2

background 5:7

Baird 2:2 3:5 4:13,14 21:13,15 37:11,
13,18 50:15,17,20 53:4,10 56:22
57:20 58:4

Bates 13:22

BC 21:4

Bear 13:24 19:11 29:7 37:20 52:12

beginning 48:7

behalf 10:18 11:13,20

Behm 4:15 11:23 12:3,9,12 13:15
14:22 17:8,19 18:3,12 19:6 21:2,8,24
23:4,10 24:19 25:8,13 26:12 27:1,4,
24 28:14 29:15 32:18,21 33:2 35:22
36:7,12 37:24 38:2,11 39:20 42:3,10,
13 43:5,22 44:14 45:2 47:7,11,22
48:19 49:2 51:5,14 52:9 53:1,16
54:20 55:9,15,24 57:8

Behm's 15:11 16:2 17:24 26:22
27:13 40:19 48:24 55:21

belief 47:22

believed 15:1 43:22

benefit 28:22,23 29:1,2

benefits 23:11

Berks 5:16

bids 45:18

bit 31:17

Blair 2:13

blank 14:14

blanking 56:3

blue 50:7

Blvd 2:3

boss 15:3,6 30:11

bottom 19:18 20:2 54:1

break 37:12,13

Brent 21:2

broad 8:11

broke 50:15

brought 26:14 45:10,12 55:4

building 8:19

business 5:12 7:21 8:1,4,6,13 9:5,10
10:3 41:20 43:2

**C**

cab 23:7

cabs 18:22

CAC 8:17,22

calculation 39:14

Calhoun 21:2

call 20:20 23:2 29:20 30:15,19 38:3
43:13 45:18,21 49:20,21 50:10

called 33:6 42:3,4 51:16,17,18

Campus 5:16,20

carbon 37:22 52:19,23

careful 35:1

Carolina 2:9

case 12:8 23:3 46:19 53:19 56:10

causing 54:15

center 8:24 9:1

certificate 7:2

certification 4:4 6:13,14,15,16,21
7:4,7

certifications 6:12

Certified 7:8

cetera 23:23 24:2 54:3

chair 16:10

Change 6:11

charging 24:18

chart 49:24 50:6

check 55:17

checked 53:23

checking 49:19

childcare 36:16 43:14

chronological 19:19

circle 50:7

claim 23:5,9,12,13 43:19,23 46:21
53:20

claiming 22:7 35:3 42:6 46:22 56:12

clarification 48:1,3,10,16

classification 42:20

cleared 33:10 38:15 54:12

client 19:2

client's 18:21

close 9:14 37:12

closely 15:19

closer 20:14 29:14 30:22

**club**  16:5,6 17:9,14 18:4 24:22 25:15 26:12 27:2

**clumsy**  25:21

**Colleen**  4:15 11:23 14:8 15:1 29:15, 20 30:15 31:3,16 34:19 35:7 37:24 39:8 40:19 42:3 46:20 47:2 49:2 51:5, 20 53:1,16

**Colleen's**  41:7

**College**  5:15

**comfortable**  6:1

**committing**  44:6,11,15 45:3

**communicate**  51:23

**communicating**  51:21

**communication**  34:18 40:13 48:9 51:7,15

**communications**  52:2,10

**Comp**  23:2,9 53:18 54:8

**company**  14:17 28:24 29:3 31:6 53:24

**Compensation**  23:4,11

**complain**  12:12

**complaining**  11:10

**complaint**  10:13,16,21 11:24 12:3

**complaints**  10:11 11:12,18 12:16 54:1

**completed**  6:20

**completely**  39:5 43:20

**complies**  40:8

**computer**  42:22

**concept**  10:1,6

**concluded**  58:10

**concussion**  22:8,18 23:5 27:18,20 28:1,8 30:9 33:3

**concussions**  23:21

**condition**  25:16 46:16,20 48:4,16

**conditions**  48:20,23

**confident**  15:17

**confirm**  22:11

**confirmed**  21:4 30:18

**contact**  27:1,7

**contents**  16:20

**continues**  51:7

**contract**  29:2 42:8 56:19

**contractual**  34:11

**conversation**  26:17 27:6 28:10,12 30:7 35:19 41:5 42:13,15 47:5 49:3, 14 51:3,5,18

**conversations**  15:14 18:2 27:23 31:16 33:1 49:9 52:8

**coordinator**  7:18,19,20 14:11 20:7 34:2,9

**coordinators**  9:19

**copied**  52:19,23 53:12

**copies**  58:3,5

**copying**  37:23 46:3

**corporate**  48:2

**correct**  4:19,20 6:7,8 10:5 12:11 15:7,8 16:16 17:24 18:1 21:21,23 26:7,8 28:4,20,21 32:20 34:10 36:11 37:9,10 38:16,17 44:8,9 45:3,4 48:20, 21 52:20,21

**correctly**  21:5 29:23 35:5,10 51:12 54:3,17

**corroborate**  17:1,12

**counsel**  4:2

**counseling**  8:10

**couple**  41:13 46:5

**court**  5:3 47:12,16 58:2

**covered**  37:8

**CRC**  8:21

**credentials**  29:5

**Cruz**  12:13,16,18

**curious**  22:13

**current**  8:4 54:24

**Curtis**  35:11,13,16,19 56:2,4

**customer**  8:24

**customers**  9:4

**D**

**daily**  13:10

**Daly**  41:17,19 45:5,14

**Dan**  42:2

**Daniel**  41:17

**date**  19:7 21:4,7 26:4,14 38:7 40:15 48:3,16

**dated**  29:10 33:17 49:17

**dates**  24:5 26:1 48:12,14,23

**day**  33:5,12 45:7,15 58:1

**days**  26:2 34:22

**dealing**  50:18

**Deals**  8:7

**dealt**  44:22

**December**  39:11

**decision**  31:23

**Dee**  20:4,6 45:24 46:15 49:17

**Defendants**  2:10

**defense**  8:17,18

**degree**  5:9,10,13,17,19,21 6:9

**denial**  42:17

**denied**  23:12,13 53:21

**deny**  22:11

**department**  8:12,17 41:23 42:20

**deposition**  4:17,18,24 13:24 18:21 58:10

**describe**  5:6

**DESCRIPTION**  3:11

**detail**  17:17 27:10

**details**  14:12

**determine**  55:14

**determined**  39:4

**develop**  39:16

**Development**  6:11

**diagnosis**  19:1 23:23

**Diane**  20:3,18 40:14 45:24

**difficult**  29:18

**dig**  10:24

**diploma**  5:8

**direct**  47:5

**directly** 10:14,21 11:24 17:8 28:22 36:12,21 49:6

**director** 7:24 9:23

**disability** 22:4,6 27:8 39:8

**discipline** 5:10 6:9 51:8

**discover** 44:5

**discovers** 44:5

**discrimination** 54:13

**discuss** 39:17 54:6 55:20

**discussing** 30:2

**discussion** 27:10 53:8

**discussions** 15:10

**dispensary** 20:19 33:23

**distance** 6:2

**distress** 54:15

**diversity** 6:15

**doctor** 20:24 23:17 29:21 31:20 32:18 33:8 40:20 49:20,21

**doctor's** 47:8,11

**doctors** 41:7 47:8

**document** 13:21 14:1,2,4 46:3 50:23 52:13,14

**documents** 12:7 13:19,21 42:22 47:12

**doubting** 49:20

**drawing** 14:14

**due** 23:15,22 34:24 36:5 53:23

**duly** 4:10

**duty** 39:6

---

**E**

---

**E-MAIL** 20:3,18 21:8 22:12,23 23:18 24:4 29:8,9,13 30:1,22 33:14,17 34:17,18 37:2,21 39:24 40:5,6,11,18, 21 41:6,11,12,16 45:1,5,23 46:8 47:7, 21 48:1,9,15 49:6,16,17 50:1 52:6,15, 20 53:13

**E-MAILED** 42:1 49:12

**E-MAILS** 19:13,15,18 25:7 37:20 55:17

**earlier** 30:2 40:18 41:6

**easy** 26:4

**educational** 5:6

**eight-week** 6:24

**Ellipses** 54:2

**emotional** 54:15

**employed** 7:9 12:20 20:9,12,21

**employee** 7:22 8:7 10:14,18,21 11:20 12:15 21:1 29:16 38:2 44:6,8, 10,17,19 56:8 57:3,10

**employee's** 20:24

**employees** 9:12 14:24 16:15 36:2 43:10 57:6

**employment** 12:9 20:11 36:16 48:24 53:24 56:6,11

**end** 21:5

**engaged** 25:6

**engaging** 15:1

**entire** 22:1

**environment** 54:2,13

**ERIC** 2:3

**errors** 48:13

**ESQUIRE** 2:2,8

**essentially** 32:15 56:11

**estimate** 6:1,4,7 9:15 11:6

**eventually** 32:3

**exam** 7:2

**examined** 4:11

**excused** 47:17,20 58:8

**exercise** 43:9

**exist** 43:23

**exit** 49:7

**expertise** 43:2

**explain** 46:16

**extended** 22:19

---

**F**

---

**F-A-W-N** 57:12

**facility** 8:19 10:9 20:13

**fact** 38:11

**factory** 34:6

**fair** 15:9 19:21 28:2 32:19 36:10 52:3

**fairly** 18:19

**familiar** 16:24

**family** 20:14

**favorable** 23:22

**Fawn** 57:10,14,16

**February** 35:24 42:1 43:4 45:2

**feel** 5:24 29:15

**feeling** 6:6

**fielded** 10:13,16,20 11:12,18

**fielding** 10:10

**figure** 46:15

**file** 50:6

**filed** 4:15

**files** 11:1 42:22 55:18

**filing** 4:3 23:8

**filled** 21:2

**final** 7:2,3 8:16

**find** 11:2 29:14 32:12 41:7 52:13

**finding** 25:15

**fine** 6:3 11:6 16:22 41:4

**finish** 8:15

**finished** 5:22

**floor** 10:9 16:14,15

**follow-up** 57:22

**forget** 14:11

**form** 4:5 21:11 37:11 53:22 54:1,9 56:16

**forward** 15:5

**found** 24:23 30:22

**fraud** 44:6,11,15,20 45:3 56:11,14,19

**frequent** 11:15 51:23

**Fronheiser** 16:10 17:6,7 18:3,6 26:11,14,17,21 27:12 51:3,15 55:2,20

**Fronheiser's** 17:2

---

Kaitlyn O'Neill - March 23, 2022

**front** 10:8

**full** 28:19 39:6

---

**G**

**gaps** 34:13

**garbled** 48:7

**gave** 4:22 32:15

**general** 36:1 52:2

**generally** 28:11

**give** 5:23 9:13 26:3 31:10 34:3 39:19

**Gloria** 22:24 29:9 33:18

**Google** 24:23 26:22

**graduated** 5:18

**Graham** 2:2 4:14

**grahamb@ericshore.com** 2:4

**graph** 49:24

**great** 33:8 58:1

**Greater** 29:17

**Greenville** 2:9

**grievance** 15:23

**grounds** 24:3 44:7

**group** 8:14,15 9:2

**groups** 9:7,11

**guess** 5:24

---

**H**

**handle** 15:22

**handling** 34:10

**happen** 15:21

**happened** 11:8 19:3 51:18

**happening** 43:9

**harassment** 10:11,14,17,21 11:12,
19 12:1,4 51:8 54:2,13

**hardship** 36:17

**head** 18:22 19:3,7 23:7 40:2

**headache** 34:24

**heads** 42:2

**hear** 21:12 35:15 53:4

**heard** 18:14 35:12 55:5

**held** 8:2 53:8

**Hey** 51:4

**high** 5:8 15:23 52:23

**higher** 15:22,23

**HIPAA** 54:14

**hired** 7:16,18,20 39:9

**history** 44:1

**hit** 18:22 19:3,7 23:7

**hold** 36:5

**home** 17:24 34:24 45:21

**honest** 10:23

**honestly** 11:9 28:13

**hostile** 54:2,12

**hosting** 25:1

**HR** 6:16 7:18,19,20,21,24 8:4,6 9:10,
19,23 20:7 41:22

**human** 6:14 7:8

**hundred** 15:16 19:10 55:12

**husband** 36:20

---

**I**

**idea** 39:20

**identified** 19:13 33:14

**identify** 13:21 25:23 26:5

**illness** 37:6,8

**illnesses** 35:2 37:2

**immediately** 32:22

**importance** 52:24

**in-network** 23:16

**inappropriate** 51:10,22 52:10

**inaudible** 25:17

**incident** 18:12 40:13

**inclusion** 6:15

**incomplete** 27:8

**increase** 54:15

**information** 16:1,8,9,12 17:2,12
18:7 26:11,20 27:11 55:7

**informed** 17:6

**initialed** 21:3

**initials** 21:4

**injured** 18:13 21:9,19,22 25:13

**injury** 18:16 22:6 27:14 31:9 33:3
37:8 43:23 53:23

**injury-wise** 43:19

**ink** 50:8

**input** 49:24

**Instagram** 25:3,19,23 26:1,3 27:13

**instances** 56:7

**instant** 51:2

**instantly** 55:6

**instruction** 5:23

**instructions** 4:22

**insurance** 28:24

**insure** 34:10 48:4

**interact** 13:8,12 51:7

**interacted** 13:15

**interaction** 12:9

**interference** 43:15

**interpret** 50:8

**investigate** 15:10 55:24

**investigation** 14:23 54:19 55:17

**investigator** 14:7,9 17:19

**involved** 15:14 19:14,16 44:18

**involving** 5:4 12:13

**issue** 46:2

**issues** 36:16 43:14 47:23 48:15

**items** 9:3 15:22,24

---

**J**

**J.F.K.** 2:3

**JACKSON** 2:8

**January** 20:16 39:9,12

**Jenkintown** 29:16 30:21 31:1 32:17

Kaitlyn O'Neill - March 23, 2022

39:2

**job** 13:2 20:13 24:2

**John** 15:15 29:9 30:11 37:22,24

---

**K**

**Kaitlyn** 3:3 4:9 23:19 35:4 46:9 49:18

**Kathy** 33:18,21 45:24 46:9,14

**Kerchner** 4:22

**Kerchner's** 4:18

**Kevin** 16:9 17:18 24:22 27:12 51:3 55:2,4

**kind** 16:1 25:21 37:8 49:23

**King** 20:3,18 40:14,19 41:6 45:24 52:22

**knowing** 44:2

**knowledge** 12:5,6 13:3 29:4 39:1,18 40:1 43:3 44:4 47:4 54:10

---

**L**

**labor** 6:13 8:1 15:15,18,24

**laid** 36:1

**large** 35:24 36:6

**LAW** 2:3

**lawsuit** 4:15 14:3

**layoff** 36:1,8,10 43:9 45:11

**leader** 41:21

**learned** 36:22

**learning** 6:23 7:1

**leave** 15:2,11 16:3 17:21 27:15 28:15

**left** 19:7 20:16

**Lehigh** 29:18 30:22

**length** 28:7

**level** 15:22,24 24:1 28:5

**levels** 15:23 34:6

**LEWIS** 2:8

**limited** 32:13

**lines** 8:10 27:9

**listed** 54:1

**located** 10:7

**location** 8:12

**long** 7:13 27:17 28:2,13 30:8 38:9 39:16

**long-term** 39:8

**longer** 20:12 36:5

**looked** 24:6 25:18

**lost** 53:3

---

**M**

**Mack** 4:16 5:4 7:12,13,16 8:3,17,18 12:10,15,20,22 14:2,3 19:13,16 20:9, 12,21 22:20 28:22,23 29:8 33:14 37:21 40:5 41:12,23 44:5,19 45:3,23 47:17,19 49:1,16 50:22 52:13 53:11 54:10 56:6,15 57:16

**Macungie** 10:8

**made** 12:15 14:24 23:15 31:23 36:16

**Main** 2:9

**make** 11:6,23 12:3 23:4 25:22 26:16

**making** 6:1,3,6 34:5 47:22 48:19

**manager** 8:1 15:16,18 23:3

**manner** 51:10 52:2

**manpower** 34:2,9

**March** 33:17 46:14,18

**marked** 3:12 14:1 37:21 40:5 41:12 45:23

**Markell** 20:4,6 45:24 49:17,21

**marks** 37:2

**Master's** 5:9,19,21 6:9

**matches** 38:7

**matter** 5:4

**means** 53:2

**medical** 18:15 19:1,4 23:6,7 33:10 47:22 48:20

**meeting** 47:15 49:7

**memory** 16:13 22:7 26:24 35:10 38:13

**mention** 43:13

**mentioned** 34:19 35:8 55:1

**message** 40:13 51:2

**Michelle** 20:24

**Michigan** 6:18

**mid** 18:17 22:1

**migraine** 50:8,9

**migraines** 46:21 54:16

**military** 8:20

**minute** 14:1 19:11 37:21

**minutes** 37:14

**missed** 34:22

**MK'D** 3:11

**modeling** 24:17,20 27:5

**moment** 18:12 29:7

**money** 24:18

**monitor** 35:2

**Moody** 2:8 21:11,14 37:11 50:15,18 53:3 56:16 57:22,24 58:5

**motive** 18:9

**move** 22:13 30:11 45:20

**moved** 15:4 35:22 36:8

**movement** 45:6

**movements** 36:6

**moves** 34:11

**moving** 43:12

**multiple** 7:23

**Muto** 25:4 27:16,19,23 28:6 29:10 30:7 33:18 37:22 39:19 52:22

**Muto's** 29:5

---

**N**

**nature** 6:2

**necessarily** 51:19

**needed** 27:10 51:11

**negotiated** 29:2

**negotiations** 15:21

**neuro** 23:20

**neurologist** 22:10 25:10 29:14 30:17,20 31:4 32:4,6,17 38:14 39:1

**Newman** 9:23 15:6,10

**non-work-related** 38:22

**notes** 11:1 26:16

**notified** 37:24

**November** 7:15,17 39:10

**number** 3:11 10:24 11:1,22 13:22
36:1 38:1,2,3 50:16 53:2,17,19

**nurse** 33:22

**NWR** 38:19

**O**

**O'CONNELL** 52:15,16

**O'NEILL** 3:3 4:9,14 5:7 13:19 14:4
19:12 21:17 37:19 38:24 39:18 41:12
46:4 48:6 50:22,23 52:12 53:12 57:21
58:1

**Objection** 21:11 37:11 56:16

**objections** 4:5

**obtain** 5:13,19,21 6:16,22 7:4 22:16

**obtained** 16:11 56:8 57:7

**obtaining** 30:4

**occurred** 18:17 40:15

**off-the-record** 53:7

**office** 9:24 47:8,11

**OFFICES** 2:3

**officially** 33:9

**online** 6:23 24:23

**OOW** 50:8

**open** 10:1,6

**operations** 41:24

**opinion** 22:14,17 23:20,22 24:15
25:9 27:17 28:7 29:21 30:2,5,8,12,16,
19,20,24 31:5,20 32:7,9,14,16,23
33:3,6 38:15,24

**order** 19:19

**orders** 47:13

**Organizational** 6:11

**Owenberg** 57:11

**P**

**P.C.** 2:8

**p.m.** 58:11

**paid** 23:11 24:2,17 25:5 28:14,17

**paper** 55:16 56:1

**paperwork** 7:23 21:3 27:8,9 36:23
38:8,19 40:20 41:7 48:11,22

**parenthesis** 29:17 38:1 46:22

**parked** 17:24

**part** 29:2

**partial** 28:18,19

**parties** 4:3

**partner** 8:5,6,13

**partners** 7:21 8:1 9:5,11 10:4

**pass** 7:2

**Patrick** 52:15

**Paul** 57:1,8

**pay** 28:19

**paying** 31:6

**payment** 28:18 48:12

**payout** 49:13

**payroll** 20:7

**peers** 10:2,3 35:12 37:4

**pending** 6:14

**Penn** 5:14,20

**Pennsylvania** 2:4 31:1

**people** 34:7,13,19 35:7 42:6 43:6
45:7,15

**percent** 15:16 19:10 55:12

**perfectly** 11:6 41:4

**perform** 13:5 32:13

**performing** 17:20

**performs** 13:2

**period** 22:1 28:15

**permanent** 45:19

**person** 14:12,13 15:19 20:7 30:21
42:19 56:5,11,14,23

**personal** 24:1

**perspective** 30:5

**Pesola** 22:24 23:18 24:16 25:6 29:10
33:18 37:23 52:15,24

**Pesola's** 24:4

**Philadelphia** 2:4

**Philly** 29:17

**phone** 30:15 31:15,22 43:13 51:17,
18 52:7

**photographs** 25:24 26:6

**photos** 24:24 25:2,15,18

**pills** 35:1

**Plaintiff** 2:5

**planning** 8:8

**point** 45:6 49:23

**points** 42:4 43:18

**policy** 47:18,19

**polite** 51:6

**position** 7:17 41:22 45:19,21

**positions** 8:2

**possibly** 9:15 15:15

**posted** 25:24 26:2,5,7

**predominately** 38:19

**present** 4:17 15:21 18:20 39:13
47:11

**pretty** 16:23 55:6

**previous** 54:24

**primary** 34:8,9

**Prior** 27:11

**proceed** 15:3

**process** 11:15 23:8 48:2,4

**processed** 48:11

**processing** 48:13

**procure** 25:9

**produced** 14:3

**production** 8:15

**production-related** 13:2

**profanity** 52:5

professional  27:17 30:7 32:14 51:6

professionally  51:9

program  5:22 6:24 44:7,11,15,21
56:9

prompt  51:15

proper  7:6 48:13

protection  47:13

provide  32:6

provided  14:19,20 17:3,15,16 28:23
33:4 38:15

providing  18:7

purpose  13:24 30:4

put  26:1 37:1

**Q**

quality  8:15

question  21:17 25:21

QUESTIONED  3:4

questions  4:6 7:22 8:9 11:10 13:20
16:22 41:13 46:5 57:20,22,24

quick  37:12

quotation  37:2

quote  35:2

**R**

Randy  2:8 50:17

randy.moody@jacksonlewis.
com  2:10

reach  31:22 55:9

reached  54:23 55:2,15,19 56:2

read  16:20,21 21:5 23:14 29:23 35:4
46:23 51:11 54:3,16 58:6

reading  19:21

ready  33:7 40:7

reason  18:9 37:1 43:22 56:13 57:8

reasons  27:14

recall  12:17 18:12 24:6 36:18 43:16
51:19 54:22 55:22

receive  16:1 26:20

received  11:18 53:1,16

receiving  27:11

recent  48:12 53:22

recess  37:16

recognize  14:4

recollection  32:10 36:7 44:12 52:1

record  53:5

recover  31:8

recruitment  8:8

red  50:9

reduction  36:6

refer  47:6

reference  30:1 40:18 55:16

referenced  30:21

referencing  54:11

referred  38:23

referring  14:10 22:20 45:14 47:7,10
54:20

refuse  31:19

refuses  29:22

related  41:5

relations  8:7

release  33:8

released  32:18

remain  51:6

remember  7:3 18:23 26:13 28:5,9,11
31:2,13 32:9,11 33:5 35:18 40:20
42:12,14 44:19 47:9 49:12 51:14 52:7
55:23 56:7,23 57:2,3

rep  10:17,22 11:11,13,16,19 12:4,24
13:4,6,9 31:23,24 55:3

rephrase  17:4

replied  45:5

reply  24:16 39:24

report  9:22 14:7,18,22 16:18 17:1,
11,22,23 19:5,9 23:14 24:9,10 32:10
36:19

reported  17:14 18:15 23:6

REPORTER  58:2

reports  7:22 16:4 25:14

represent  4:15 20:24 24:8

representation  55:21

representative  13:7 34:14

representatives  15:20

Representing  2:5,10

request  38:24 57:9

requested  9:4 11:3 17:11

require  28:1

required  23:16 36:9

requires  42:17

reserved  4:6

resignation  49:4,5,10,11

resigned  49:2

resolved  39:5

resources  6:14 7:8 31:8,10

respective  4:2

response  22:12,23 24:4 31:11,13
49:19

responsibility  34:8,9

responsible  10:10 34:5,11

restriction  32:19

restrictions  32:15

result  36:8,10 44:14,20 45:10

retained  32:16

return  30:9 32:18,21,22 33:2 38:4,16
39:5 54:12

returned  38:11,14 39:7,20

review  13:19 39:17

reviewed  12:8

reviewing  27:12

Richard  33:19 34:1 43:1

Rivera  12:13,16,18 13:9,12

role  8:4 12:22 13:7,9 41:24

roles  7:23

rough  39:13

roughly  6:24 36:2

rude  51:8,10,21,24

run  7:22

Kaitlyn O'Neill - March 23, 2022

## S

**Salvino** 54:6,7

**SAP** 38:3

**scheduled** 21:9 38:4

**Schmidt** 33:19 34:1,4,5

**Schmidt's** 43:2

**school** 5:8

**screen** 13:18 18:11 19:12 37:19 41:11 49:15

**scroll** 16:19 19:20,24

**sealing** 4:3

**search** 24:23

**secretary** 20:20

**section** 42:8

**send** 29:15 46:11 48:11

**sending** 45:1

**senior** 42:19

**seniority** 36:4 42:6,18,23 43:5

**sentence** 38:18 43:17

**September** 24:10 38:12 39:4

**serves** 16:13 35:10 38:13

**services** 17:16

**set** 29:21

**setting** 30:15

**sexism** 54:13

**sexual** 10:11,14,17,20 11:12,18,24 12:4

**share** 9:5 10:1 13:18 19:12 34:18 37:19 41:11 49:15,22

**shared** 10:6 17:18 18:9

**sharing** 18:11

**Shiffert** 33:18,21 37:23 45:24 52:22

**shift** 8:16 34:20,21,23 35:4,9,21,23 36:5,8,13,17 37:5 41:20 42:9,19 43:6, 12,15 44:3 45:6,7,15 47:24

**shifts** 8:17

**Shipkin** 38:23 39:1

**shop** 16:10,14,15 36:4

**SHORE** 2:3

**short** 51:22,24

**short-term** 22:3,5 27:8

**Shortly** 49:11

**shortness** 31:17

**show** 19:13

**showed** 33:12

**shown** 40:23

**sickness** 28:20 29:1 37:4 53:23

**sign** 58:6

**signature** 41:1

**signed** 46:1,9

**significant** 25:5

**significantly** 36:3

**simply** 24:14

**sit** 43:7

**sitting** 11:5,7 31:2

**skeptical** 25:12 27:14

**skills** 39:17

**Skype** 40:12 51:2

**slash** 20:20 53:23

**small** 9:2

**sound** 18:18,19 53:3

**sources** 26:21

**South** 2:9

**space** 10:1,6

**speak** 29:20 32:10

**speaking** 10:17 11:13

**special** 9:2

**specialist** 7:8 23:20 30:24 31:7

**specialty** 29:5

**specific** 7:6 8:12 9:3 14:10 26:4,13 42:14 48:12

**specifically** 9:8 44:23 54:22

**specificity** 28:6

**specifics** 28:9 43:7 51:18 52:7

**spoke** 14:12 20:23 55:24

**spot** 45:21

**spreadsheet** 49:24 50:3

**staffing** 34:6 36:9

**stand** 38:20

**start** 17:7 19:17 20:2 34:18 48:16 50:16 53:11

**started** 7:14 46:16

**starting** 25:16 27:19

**State** 5:14,15,20 6:18

**stated** 16:4 19:4 51:19

**states** 56:20

**stating** 23:6 37:4 48:22

**step** 39:18

**steps** 23:16

**stipulated** 4:1

**stop** 18:11

**Street** 2:9

**strictly** 13:6

**strike** 44:18

**string** 19:13

**strip** 16:5,6 17:9,14 18:4 24:22 25:15 26:12 27:2

**subjective** 23:21

**subjectivity** 23:23

**submitted** 36:23 49:5

**subpoenaed** 47:20

**succession** 8:8

**suffering** 37:7

**Suite** 2:9

**supervisor** 11:16,19 35:11 54:23 56:3

**supervisors** 55:23

**support** 7:24 8:9,16 9:8,19

**supported** 7:21

**supporting** 8:14 9:13

**surveillance** 16:18 23:24 24:6,9 56:8 57:7,10

**sworn** 4:10

**system** 19:9

---

**T**

**takes** 35:1

**taking** 11:21 37:12 42:3

**talk** 27:4 40:7 47:2

**talked** 31:3

**talking** 11:19 21:1 27:16 30:10

**targeting** 54:14

**team** 8:9 41:20

**TECHNICIAN** 2:13

**technology** 50:19

**telephoned** 41:6

**telephoning** 40:19

**temporary** 45:12,18

**temps** 45:8,10,16

**term** 14:15 56:21

**terminate** 56:10

**terminated** 44:10,14,19 48:24 56:24
57:4,14

**termination** 24:3 44:7 56:13

**test** 7:4

**testified** 4:11 5:3 18:21

**testimony** 5:1 26:9 48:18

**testing** 7:1

**things** 7:23 26:5

**thought** 17:15

**thoughts** 23:24

**thousand** 9:15

**thread** 25:7 41:16

**Tim** 9:23 15:6,9

**time** 4:6 6:1 7:20 11:21 15:16 17:21
21:8 22:19 24:7,20,21 25:12 26:10,13
27:15,24 28:7 32:1 34:4 35:11 43:4,8,
24 45:1,7,15,19,20 47:21 48:19
49:10,11 51:16 55:21 57:21

**times** 10:20 11:8,11,17 44:17,18
51:20

**title** 34:3

**today** 4:16 11:5,7 14:20 31:2 34:24
42:3,4 53:1,16

**Tolame** 15:15 29:9 30:11 37:22

**tone** 51:10,22 52:1

**Tony** 54:6

**top** 40:2

**transfer** 42:9 46:4

**treated** 22:9

**treatment** 54:15

**trial** 4:7

**trucks** 4:16 5:4 7:12,13,16 8:3,20 9:3
12:10,15,20,23 14:3 20:9,12,21 22:20
28:23 41:23 44:5,20 45:3 47:17,19
49:1 56:6 57:16

**two-page** 52:14

**type** 13:5

**typically** 30:8

**typo** 46:21

---

**U**

**Uh-huh** 20:5

**unaware** 39:7

**understand** 17:5 21:16 27:22

**understandable** 25:22

**understanding** 4:17 12:7 18:16
19:2

**unfair** 54:14

**union** 10:17,22 11:11,13,16,19 12:4,
24 13:4,9 15:20,22 29:3 31:23,24
34:14,15 42:23 55:3,21

**University** 5:14,20 6:18

**Urvan** 35:13

**utilizing** 56:8

---

**V**

**vacation** 49:13

**Valley** 29:19 30:23

**varies** 38:19

**vehicle** 8:15

**versed** 45:17

**victim** 47:3

**victimization** 54:14

**VIDEO** 2:13

**violations** 54:14

**visible** 24:24

---

**W**

**waived** 4:4

**wanted** 31:9 34:18 44:2 52:24 53:15,
21

**wanting** 35:21

**WC390E11428** 53:1,16

**website** 25:1

**week** 6:24 13:11 26:3 43:9

**weeks** 38:10

**wondering** 22:18 29:14

**word** 37:1 56:15,18

**work** 7:11 9:3 13:5,13,16 15:2 17:20
18:13 19:7 21:9,20 22:1,19 26:23
27:18,21 28:2 30:9,10,13 31:9 32:14,
18,22 33:2,7,23 34:7,22 35:12,21
37:5 38:4,5,11,16 39:5,7,10,12,13,20
43:1,19 44:2 50:9 51:9 54:2,12 57:16

**work-related** 38:21

**worked** 7:13 39:14,16

**workers** 45:12

**Workers'** 23:2,4,9,11 53:18 54:8

**workforce** 8:7 36:6

**working** 13:4 16:5,6 17:9,14 18:4,22
19:8 24:22 25:14 26:12 27:2 34:21
35:4 36:3

**works** 15:19 20:19

**World** 5:20

**worries** 50:18

**WR** 38:19

**write** 51:4 52:9

**writes** 20:23

**writing** 54:11

**written** 55:16,24

**wrote** 43:17

## Y

**year**  6:7 7:14 20:17 26:14 39:15
  48:14

**yelling**  31:18

**yield**  7:22

## Z

**Zielke**  2:13

**Zoom**  58:10

**From:** Pesola Gloria (Consultant)
**Mail received time:** Fri, 16 Aug 2019 15:20:47
**Sent:** Fri, 16 Aug 2019 15:20:46
**To:** Muto Alan (Consultant)  O'Neill Kaitlyn  King Diane
**Cc:** Ptolemy John
**Subject:** RE: RE: Colleen Behm A&S
**Importance:** Normal
**Sensitivity:** None

---

Agreed

**From:** Muto Alan (Consultant) <alan.muto@consultant.volvo.com>
**Sent:** Friday, August 16, 2019 8:22 AM
**To:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>; Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>; King Diane <diane.king@volvo.com>
**Cc:** Ptolemy John <john.ptolemy@volvo.com>
**Subject:** RE: RE: Colleen Behm A&S

I am not sure it is significant that she is being paid. To me it is the activity she is engaged in.

**Alan Muto, D.O.**
Attending Physician
Mack Trucks Health Center

**Mack Trucks**
**Health Center**
7000 Alburtis Road
Macungie, PA 18062
Telephone: 610-966-8878
Email: alan.muto@consultant.volvo.com



This email message and any attachments may contain confidential information and may be privileged. If you are not the intended recipient or otherwise not authorized to receive this message, you are prohibited to use, copy, disclose or take any action based on this email or any information contained herein. If you are not the intended recipient, please advise the sender immediately by replying to this email and permanently delete this message and any attachments from your system.

**From:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
**Sent:** Friday, August 16, 2019 8:14 AM
**To:** Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>; King Diane <diane.king@volvo.com>
**Cc:** Ptolemy John <john.ptolemy@volvo.com>; Muto Alan (Consultant) <alan.muto@consultant.volvo.com>
**Subject:** RE: RE: Colleen Behm A&S

I know she is modeling but it's know if she is getting paid for it.  She could be charging money or she may not be.

**From:** Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>

**Sent:** Friday, August 16, 2019 8:13 AM
**To:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>; King Diane <diane.king@volvo.com>
**Cc:** Ptolemy John <john.ptolemy@volvo.com>; Muto Alan (Consultant) <alan.muto@consultant.volvo.com>
**Subject:** RE: RE: Colleen Behm A&S

Hi Kaitlyn:

It will take a while to get a 2nd opinion from a neuro specialist.  Also, concussions are so subjective, that I am not sure we would get a favorable opinion anyway due to the subjectivity of the diagnosis, etc.  My thoughts are to get surveillance on her to see what she is doing on a personal level.  If she is going to a 2nd job, getting paid, etc. that would be grounds for termination.

Thoughts everyone?

Thanks,
Gloria

**From:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
**Sent:** Thursday, August 15, 2019 10:13 AM
**To:** King Diane <diane.king@volvo.com>
**Cc:** Ptolemy John <john.ptolemy@volvo.com>; Muto Alan (Consultant) <alan.muto@consultant.volvo.com>; Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>
**Subject:** RE: RE: Colleen Behm A&S

I'm curious, how can we move ahead with getting a second opinion done?

Kaitlyn

**From:** King Diane <diane.king@volvo.com>
**Sent:** Thursday, August 15, 2019 10:06 AM
**To:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>; Markell Dee <dee.markell@volvo.com>
**Subject:** RE: Colleen Behm A&S

Spoke with Michelle from EE's doctor. She said that Brent Calhoun filled out her paperwork and he initialed it. I do see the initials of BC above the date, they conformed everything on their end.

Diane King
Administrative Medical Assistant
Mack Trucks Health Center

**Mack Trucks**
**Health Center**
7000 Alburtis Road
Macungie, PA 18062
Telephone: 610-966-8878
Email: Diane.King@volvo.com



Behm v. Mack Trucks, et al.                                                MACK0813
                                                                        **JA000616**

**From:** Ptolemy John
**Mail received time:**   Fri, 10 May 2019 15:57:38
**Sent:** Fri, 10 May 2019 15:57:37
**To:** Pesola Gloria (Consultant)Newman Timothy (d)
**Cc:** Muto Alan (Consultant)
**Subject:** RE: Restrictions for Colleen Behm Attached
**Importance:** Normal
**Sensitivity:** None

---

Gloria,

Maria and Annette are coming over to take her over to maintenance.

Hopefully we can sort this out.

John

-----Original Message-----
From: Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>
Sent: Friday, May 10, 2019 9:48 AM
To: Newman Timothy (d) <timothy.d.newman@macktrucks.com>
Cc: Muto Alan (Consultant) <alan.muto@consultant.volvo.com>; Ptolemy John <john.ptolemy@volvo.com>
Subject: RE: Restrictions for Colleen Behm Attached

Tim:

As expected she is giving us a major problem going back to work.   She is here with her union rep.   States she was told by ER to stay home & rest and she has a migraine and does not want to be around noise or lights.

I think we need someone from HR here to speak with her and her union rep.   She called Dr. Muto a veterinarian and talked about me when I wasn't in the room, etc.

Thanks,
Gloria

-----Original Message-----
From: Newman Timothy (d) <timothy.d.newman@macktrucks.com>
Sent: Friday, May 10, 2019 9:26 AM
To: Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>
Subject: Re: Restrictions for Colleen Behm Attached

Drew Kuhn

Sent from my iPhone

> On May 10, 2019, at 9:25 AM, Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com> wrote:
>
> Ok, Tim.   Thank you.   Where and who (supervisor) should she report to?
>
> Thanks,
> Gloria

Behm v. Mack Trucks, et al.

**From:** O'Neill Kaitlyn
**Mail received time:** Thu, 29 Aug 2019 18:22:07
**Sent:** Thu, 29 Aug 2019 18:22:06
**To:** Ptolemy John Newman Timothy (d)
**Cc:** Pesola Gloria (Consultant) Muto Alan (Consultant)
**Subject:** 2nd opinion Dr - C.Behm
**Importance:** Normal
**Sensitivity:** None

---

Hello

I was just wondering if we can find a closer neurologist for Colleen Behm to see?  I feel that having to send an employee all the way down to Jenkintown (greater Philly area) is just difficult.  Is there not someone in the Lehigh Valley area that we can get her in with?

Also, what happens when I call and speak with Colleen about us having set up a 2nd opinion dr appt for her and she refuses to go, what do we do?

_Kaitlyn O'Neill, CLRL_
Mack Trucks, Inc
Human Resources Business Partner
Phone: 610-966-8016
Mobile: 610-390-2766
Email: kaitlyn.oneill@volvo.com

**From:** O'Neill Kaitlyn
**Sent:** Wednesday, March 4, 2020 7:57:54 PM
**To:** Muto Alan (Consultant) Pesola Gloria (Consultant) Shiffert Kathy
**Cc:** Schmidt Richard
**Subject:** Colleen Behm
**Importance:** Normal
**Sensitivity:** None

Hello

I just wanted to start an email communication to share that Colleen had mentioned to people that if she goes on and shift she will apply for A&S, as she doesn't want to be working that shift.
She already has missed 7 days of work since 2/14/2020 (right when she went to 2nd shift) and I know you sent her home today due to headache and pills she takes.

I'd like us to be careful and monitor what "illnesses" she is claiming as I think she may try anything to get out of working 2nd shift.

Regards,
Kaitlyn

Sent via the Samsung Galaxy S9, an AT&T 5G Evolution capable smartphone
Get Outlook for Android

**From:** Muto Alan (Consultant)
**Sent:** Friday, February 5, 2021 8:55:23 AM
**To:** Ptolemy John  O'Neill Kaitlyn
**Cc:** Shiffert Kathy  Pesola Gloria (Consultant)
**Subject:** Colleen Behm
**Importance:** Normal
**Sensitivity:** None

---

John,
We were just notified that Colleen Behm (450939) is scheduled to RTW 2/16/21. It appears she has been OOW since 5/12/2019. Her A&S paperwork varies from WR to predominately NWR. She was referred to Dr. Shipkin for a second opinion at our request, He determined on 9/17/2019 that she was completely resolved and could RTW full duty. However, I do not see that she ever returned to work. I am also unaware if she is on or been approved for LTD. Colleen was hired 1/2/2018. She first went OOW around 8/13/2018 until 11/8/2018 then 12/5/2018 she again went OOW until 1/18/2019. She then went OOW 5/13/2019 to present. Therefore, a rough calculation indicates that she has worked approximately one year out of three. It appears that she hasn't worked long enough to develop any skills. Please review and discuss what would be our next step.

**Alan Muto, D.O.**
Attending Physician
Mack Trucks Health Center

**Mack Trucks**
**Health Center**
7000 Alburtis Road
Macungie, PA 18062
Telephone: 610-966-8878
Email: alan.muto@consultant.volvo.com



This email message and any attachments may contain confidential information and may be privileged. If you are not the intended recipient or otherwise not authorized to receive this message, you are prohibited to use, copy, disclose or take any action based on this email or any information contained herein. If you are not the intended recipient, please advise the sender immediately by replying to this email and permanently delete this message and any attachments from your system.

**From:** O'Neill Kaitlyn
**To:** King Diane  O'Neill Kaitlyn
**Subject:** Conversation with King Diane
**Importance:** Normal
**Sensitivity:** None

---

**O'Neill Kaitlyn 8:38 AM:**

Hi Diane
I was wondering if you or someone else there in medical can call the doctors office on Colleen Behm's paperwork that Dee just emailed us about.   We think it's slightly suspicious with handwriting and fax numbers.  I would like to know if they had recent communication from Colleen requesting updated paperwork or not.

**King Diane 8:42 AM:**

Kaitlyn I will speak to Gloria reg. this. Will let you know the out come

**O'Neill Kaitlyn 8:42 AM:**

okay thank you

**King Diane 8:42 AM:**

no problem

**From:** Daley Daniel
**Sent:** Tuesday, February 25, 2020 5:45:22 PM
**To:** O'Neill Kaitlyn
**Subject:** RE: Colleen Behm
**Importance:** Normal
**Sensitivity:** None

---

At this point with the movement to 2nd shift, if there are any people on dayshift with less time, they are most likely temps.

Dan

---

**From:** O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
**Sent:** Tuesday, February 25, 2020 3:19 PM
**To:** Daley Daniel <daniel.daley@volvo.com>
**Subject:** Colleen Behm

Hi Dan

Just a heads up that Colleen Behm called out again today – taking her to 6 points.

She also called me again today asking about why her article 9 wasn't approved  - she is claiming that she has more seniority over people on first.
So she since she is at 6 points who knows what she will try to claim injury wise in work or out of work to get placed out completely.  We'll just need to monitor her

_____

*Kaitlyn O'Neill, CLRL*
Mack Trucks, Inc
Human Resources Business Partner
Phone: 610-966-8016
Mobile: 610-390-2766
Email: kaitlyn.oneill@volvo.com

**Sent:** Tuesday, March 31, 2020 12:58:01 PM
**To:** King DIaneMarkell DeeShiffert Kathy
**Subject:** RE: colleen Behm A&S
**Importance:** Normal
**Sensitivity:** None

---

Hi Kathy,

Can you please help Dee and I figure out what they are trying to explain with when the condition started.   It's almost appearing that she was assaulted on 5/11/19 and 3/4/2020, is that what they are saying?   I'm not sure that is the case as I think the new condition that Colleen is trying to claim in migraines and anxiety (which she is claiming never went away from her attack on 5/11/2019).

Can we ask the doctor to clarify better and to initial when they make updates to the paperwork?

Kaitlyn

-----Original Message-----
From: King DIane <diane.king@volvo.com>
Sent: Tuesday, March 31, 2020 12:15 PM
To: Markell Dee <dee.markell@volvo.com>; Administration Macungie Human Resources <Adm.macungiehr@volvo.com>
Cc: O'Neill Kaitlyn <kaitlyn.oneill@volvo.com>
Subject: colleen Behm A&S

Here is another copy of Colleen Behm's ;paperwork.

This email and any attachments may be confidential or legally privileged.  If you received this message in error or are not the intended recipient, you should destroy the email message and any attachments or copies, and you are prohibited from retaining, distributing, disclosing or using any information contained herein.  Please inform us of the erroneous delivery by return email.  Thank you for your cooperation.


Diane King
Administrative Medical Assistant
Mack Trucks Health Center

Mack Trucks
Health Center
7000 Alburtis Road
Macungie, PA 18062
Telephone: 610-966-8878
Email: Diane.King@volvo.com


-----Original Message-----
From: Diane King <diane.king@volvo.com>
Sent: Tuesday, March 31, 2020 12:08 PM
To: King DIane <diane.king@volvo.com>
Subject: Message from "RNP002673F1572B"


Behm v. Mack Trucks, et al.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **From:** | Markell Dee | | | | | | | | | |
| **Sent:** | Wednesday, April 1, 2020 2:54 PM | | | | | | | | | |
| **To:** | O'Neill Kaitlyn | | | | | | | | | |
| **Subject:** | Colleen Behm status? | | | | | | | | | |

Hi Kaitlyn,

I was just checking to see if you got a response on the A&S....
I am doubting the will call the doctor.

As this is on their Share point.

| NAME | SAP # | REASON | Category | DX Code | FDA | EST. RTW per PCP | MD Guidelines - Median RTW Date | Actual RTW | Transitional Duty Start Date | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| BEHM, COLLEEN | 450939 | MIGRAINE | Gynecological | G44.219 G43.009 | 5/11/2019 | 6/7/2020 | | | | OOW MIGRAINE  **DO NOT CALL** |

Best Regards,
*Dee Markell*
HR Coordinator
Human Resources

Mack Trucks / Lehigh Valley Operations
7000 Alburtis Road
Macungie, PA  18062

Phone:  610-966-8837
Mobile:  484-793-5860
Email:  dee.markell@volvo.com



Behm v. Mack Trucks, et al.

MACK1175
JA000624

| | |
|---|---|
| **From:** | Pesola Gloria (Consultant) |
| **Sent:** | Wednesday, March 18, 2020 1:58 PM |
| **To:** | O'Connell, Patrick J |
| **Cc:** | Pesola Gloria (Consultant); Muto Alan (Consultant); Shiffert Kathy; King Dlane |
| **Subject:** | Colleen Behm WC390E11428 |
| **Attachments:** | 20200318131412285.pdf |
| | |
| **Importance:** | High |

Hey Pat:

Just wanted you to see what we received today on Colleen Behm WC390E11428.  I know this claim is denied; however, I wanted you to be aware that on her most recent A&S form which is attached she has checked that this sickness/injury is due to her employment with the company.  Also, look at the complaints listed on the bottom of this form....hostile work environment; harassment, etc.

Please advise if we need to do anything or discuss with Tony Salvino.  I know that our HR team will be reaching out to their employment law attorney as well.

Thank you,
Gloria

-----Original Message-----
From: Gloria Pesola <gloria.pesola@consultant.volvo.com>
Sent: Wednesday, March 18, 2020 1:14 PM
To: Pesola Gloria (Consultant) <gloria.pesola@consultant.volvo.com>
Subject: Message from "RNP002673F1572B"

This E-mail was sent from "RNP002673F1572B" (MP C3504ex).

Scan Date: 03.18.2020 13:14:12 (-0400)

Behm v. Mack Trucks, et al.                                      MACK1179
                                                                JA000625

*HR. 3/18/2020*

## SHORT TERM DISABILITY BENEFIT CLAIM FORM

**ANY ATTEMPT TO ALTER, MISLEAD OR FALSIFY REQUESTED INFORMATION WILL RESULT IN SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION**

**PART A          EMPLOYEE'S STATEMENT**
All Questions Must Be Completed by Employee – Claim Form Must Be Returned By: _____

Full Name: Colleen Sara Behm   Badge# 450939   Social Security Number: 188 170 4810   Date of Birth: 05/22/1989

Address Street: 216 Halsey Ave   City or Town: West Lawn   State: PA   Zip: 19609

If accident occurred, give Date ____ 20___ &  Describe in Space Provided Below: Sept. 2019

Is the sickness or injury due to your employment with the Company? X Yes / No   If "Yes", give full particulars in space provided below, or on separate sheet. *in space below*

Is the sickness or injury due to your employment with another employer? Yes / X No   If, Yes, give full particulars below.

Were you employed by another employer (full or part-time) when disability commenced? Yes / X No   If Yes, give full particulars below and name of employer.

First day you did not perform any work because of disability: March 4, 20 20 *left work early*

Date you were first treated by physician in present disability ____ 20___

If recovery has occurred, give date ____ 20___

### AUTHORIZATION TO RELEASE INFORMATION

To all physicians and other medical professionals, hospitals and other medical-care institutions, and to insurers, medical or hospital service and prepaid health plans, employers and group policyholders, contract holders or benefit plan administrators.

You are authorized to provide the Company with information concerning medical care, advice, treatment or supplies provided the patient, and any other employment related information regarding the patient. THIS INFORAMTION WILL BE USED FOR THE PURPOSE OF EVALUATING AND ADMINISTERING CLAIMS FOR BENEFITS AND MAY BE REDISCLOSED TO AN INDEPENDENT CLAIMS ADMINISTRATOR OR AGENCY ACTING ON THE BEHALF OF OR TO ANY COMPANY WORKERS' COMPENSATION CARRIERS FOR THE PURPOSE OF EVALUATING A WORKERS' COMPENSATION CLAIM.

I understand that the duration of the authorization is for the term of coverage of the policy or contract under which a claim for health benefits has been submitted. I understand that I have a right to receive a copy of this authorization upon request. I agree that a photographic copy of this authorization is as valid as the original. If I receive a disability benefit payment greater than that which should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any; or to recoup such overpayment by withholding monies from any Company compensation that would otherwise be due me.

Date: March 5, 20 20   Signature

**ANY EMPLOYEE WHO ENGAGES IN GAINFUL EMPLOYMENT WHILE ON A SICK LEAVE MAY BE SUBJECT TO DISCIPLINARY ACTION, UP TO AND INCLUDING DISCHARGE.**

**IMPORTANT – Attending Physician must complete reverse side of this form.**

** Procedure upon return from sick leave**
If you are returning to work with medical restrictions, you must report to the Medical Department for placement. If you return without medical restrictions, please forward your work release to your Supervisor and the Human Resources Service Center.

**PART B          EMPLOYER'S STATEMENT**

Full Name of Employee: ____   Social Security Number: ____

Employee Date of Hire: ____   Was coverage in force When disability began: Yes / No   Occupation: ____

Was employee laid off or was lay off contemplated prior to beginning of this disability? Yes / No   If "Yes" give date ____ 20___   Did the sickness or injury arise out of the Employee's employment? Yes / No   If "Yes" state reasons in space provided below why Workers' Compensation is not payable. Employee must complete Reimbursement Agreement.

Are there any circumstances which would cause you to question the validity of the claim? Yes / No   If "Yes" give reasons in space provided below

Hourly rate Or monthly salary: ____   Amount of weekly A & S benefit: ____

List Employee withholding election for federal taxes (e.g., M-1): ____   List Holidays paid during sick leave: ____   List number of Occasional sick days used this year: ____

Date Employee was first absent from work in present disability ____ 20___   Date work was resumed ____ 20___

Date ____ 20___   Employer Representative ____

Additional Space For Employee/Employer Use (Attach additional sheets for more information): Never cleared to return to work, Hostile work environment, harassment, discrimination, sexism, targeting, hipaa violations, victimisation, unfair treatment, emotional distress causing increase in anxiety and migraines.

RECEIVED MAR 18 2020 RETAIL MANAGEMENT A...

**From:**              O'Neill Kaitlyn
**Sent:**              Wednesday, March 25, 2020 12:04 PM
**To:**                Fronheiser Kevin; O'Neill Kaitlyn
**Subject:**           Conversation with Fronheiser Kevin


O'Neill Kaitlyn 11:38 AM:

hey can you please have a conversation with COlleen Behm that she needs to remain professional and polite during her communication with us?  if she continues to interact in a rude way i will discipline her for harassment.  i'm trying to work with her as professionally as i can but her inappropriate tone and rude manner is not needed or appropriate

Fronheiser Kevin 11:54 AM:

ya she got that way with me too

O'Neill Kaitlyn 11:55 AM:

like i'm trying to work with her as best i can but the rude behavior with everyone is just not appropriate now or ever

Fronheiser Kevin 11:57 AM:

i hear you   and thank you

O'Neill Kaitlyn 11:57 AM:

no problem.  it's not like we are trying to be difficult but just trying to stay consistent and follow processes

Fronheiser Kevin 11:59 AM:

i know    its crazy

Behm v. Mack Trucks, et al.                                                              MACK1202
                                                                                        JA000627



September 28, 2020

**SURVEILLANCE REPORT**

**Subject:  Colleen Behm**
**Surveillance Date(s):  09/24/20; 09/25/20; 09/26/20**

**DAY 1 – Thursday, September 24, 2020**

**2:00 p.m.**  Agent departs office for West Lawn, Pennsylvania.
**3:15 p.m.**  Agent arrives at 216 Halsey Avenue in West Lawn.
Upon arrival, there are no vehicles observed in the driveway of the residence.
**3:40 p.m.**  Agent departs for the subject's suspected place of employment,
Utopia Cabaret, located at 395 West Benjamin Franklin Highway in
Douglassville.
**4:15 p.m.**  Agent arrives at Utopia Cabaret in Douglassville.  Upon arrival, the
subject's vehicle is not observed in the parking lot of the venue.
**4:30 p.m.**  The agent enters the establishment in search of the subject.
During the agent's time inside, the subject is not observed dancing or working
in any capacity.
**5:26 p.m.**  The agent exits the establishment and departs for 216 Halsey
Avenue.

*A licensed and bonded private detective agency dedicated to finding the truth since 1988.*

5531 Memorial Road  •  Allentown  PA  18104  •  Tel 610.821.9112

Email: worldwideci@verizon.net  •  www.confidentialinv.com

Behm v. Mack Trucks, et al.                                          MACK1420

JA000628

**5:56 p.m.**  The agent returns to the subject's residence located at 216 Halsey Avenue.  Upon arrival, the agent observes a green Toyota RAV4 parked in the street near the residence, but the subject's vehicle is not present.  The agent sets up surveillance at a nearby location.

**6:35 p.m.**  The agent drives past the subject's residence and observes her vehicle, a grey Nissan Rogue (PA Lic. No:  #KCF-3202) parked in the driveway.

**7:05 p.m.**  No further activity is observed.  Surveillance is terminated.

**8:15 p.m.**  Agent returns to the office.


**Total Hours Day 1:  6.25 Hours**
**Total Mileage Day 1:  126.6**
**Total Expenses Day 1:  $30.75**


**Day 2 – Friday,** September **25, 2020**

**5:00 p.m.**  Agent departs for West Lawn, Pennsylvania.

**6:15 p.m.**  Agent arrives at 216 Halsey Avenue in West Lawn.  Upon arrival, the subject's grey Nissan Rogue (PA Lic. No:  KCF-3202) is observed parked in the driveway of the residence.

**6:20 p.m.**  A female fitting the subject's description is exits the front door of the residence with three children, a boy and a girl, appearing to be 12 – 13 and 5 – 6 years old, respectively, and a toddler appearing to be approximately 2 – 3 years old.  The older children are observed carrying backpacks.  The female and the children remain on the front porch and in the front yard area of the residence for approximately fifteen minutes.

**6:35 p.m.**  A black sports sedan with heavily tinted windows approaches the residence and the older children are observed picking up their backpacks and entering the vehicle.  The vehicle departs the residence shortly thereafter and the female returns to the residence with the youngest child.  The agent observes minimal movement within the residence over the next several hours.

**10:00 p.m.**  No further activity is observed.  Surveillance is terminated.

**11:00 p.m.**  Agent returns to the office.


*A licensed and bonded private detective agency dedicated to finding the truth since 1988.*

5531 Memorial Road  •  Allentown  PA  18104  •  Tel 610.821.9112

Email: worldwideci@verizon.net  •  www.confidentialinv.com


Behm v. Mack Trucks, et al.                                              MACK1421

**Total Hours Day 2:  6 Hours**
**Total Mileage Day 2:  89 Miles**


**Day 3 – Saturday, September 26, 2020**

**6:00 p.m.**  Agent departs office for West Lawn, Pennsylvania.
**7:20 p.m.**  Agent arrives at 216 Halsey Avenue in West Lawn.  Upon arrival, the grey Nissan Rogue (PA Lic. No:  KCF-3202) is observed parked in the driveway and lights are visible within the residence.
**10:15 p.m.**  No additional activity is observed.  The agent departs for Utopia Cabaret in Douglassville.
**10:45 p.m.**  Agent arrives at the Utopia Cabaret and enters the establishment.  It is close to last call at this time, so the agent orders food and drink before close.  During his time inside, the subject is not observed dancing or working in any capacity.
**11:15 p.m.**  Surveillance is terminated.
**12:15 a.m.**  Agent returns to the office.


**Total Hours Day 3:  6.25 Hours**
**Total Mileage Day 3:  104 Miles**
**Total Expenses Day 3:  $23.00**


*A licensed and bonded private detective agency dedicated to finding the truth since 1988.*

5531 Memorial Road  •  Allentown  PA  18104  •  Tel 610.821.9112

Email: worldwideci@verizon.net  •  www.confidentialinv.com


Behm v. Mack Trucks, et al.                                        MACK1422

                                                                    JA000630

**In the Matter Of:**

*COLLEEN BEHM vs*

*MACK TRUCKS, INC.*

---

*CARL KERCHNER*

*March 23, 2022*

---



JA000631

```
                                                          1
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                        * * *
 3

 4   COLLEEN BEHM,              : NO. 21-2500
                   Plaintiff  :
 5                             :
             vs.               :
 6                             :
     MACK TRUCKS, INC, et al., :
 7                 Defendants :

 8                      * * *

 9         Zoom deposition of CARL KERCHNER,

10   beginning at 10:00 a.m., on Wednesday, March 23,

11   2022, before Karen A. Stevens, Court Reporter and

12   Notary Public, there being remotely present:

13

14

15

16

17

18

19

20

21                    LEXITAS
               999 Old Eagle School Road
22                   Suite 118
                  Wayne, PA 19087
23                  888-267-1200

24
```

2

```
 1   A P P E A R A N C E S :

 2

 3          GRAHAM BAIRD, ESQUIRE
            LAW OFFICES OF ERIC A. SHORE
            1500 J.F.K. Blvd., Suite 1240
 4          Philadelphia, Pennsylvania  19102
            grahamb@ericshore.com
 5          -- Representing the Plaintiff

 6

 7

 8          RANDY MOODY, ESQUIRE
            JACKSON LEWIS, P.C.
 9          15 South Main Street, Suite 700
            Greenville, South Carolina 29601
10          randy.moody@jacksonlewis.com
            -- Representing the Defendants
11

12

13          VIDEO TECHNICIAN: Blair Zielke

14

15

16          Also Present: Kaitlyn O'Neill

17

18

19

20

21

22

23

24
```

Carl Kerchner - March 23, 2022

```
                                                              3
 1                     I N D E X

 2                       * * *

 3   WITNESS:  Carl Kerchner

 4   QUESTIONED BY:                          PAGE

 5   Mr. Baird                                 5

 6

 7

 8                   E X H I B I T S

 9                       * * *

10

11   NUMBER             DESCRIPTION          MK'D.

12                    (None marked.)

13

14

15

16

17

18

19

20

21

22

23

24
```

Carl Kerchner - March 23, 2022

4

1           (It is hereby stipulated by and

2      between counsel for the respective

3      parties that signing, sealing, filing and

4      certification are waived; and that all

5      objections, except as to the form of the

6      questions, be reserved until the time of

7      trial.)

8        THE COURT REPORTER:  The attorneys

9   participating in this deposition acknowledge

10  that I am not physically present in the

11  deposition room and that I will be reporting

12  this deposition remotely.  They further

13  acknowledge that, in lieu of an oath

14  administered in person, I will administer the

15  oath remotely, pursuant to Governor Wolf's

16  Order of March 21, 2020.  The parties and their

17  counsel consent to this arrangement and waive

18  any objections to this manner of reporting.

19  Please indicate your agreement by stating your

20  name and your agreement on the record.

21      MR. BAIRD:  My name is Graham Baird, for

22  the Plaintiff.  I agree.

23      MR. MOODY:  Randy Moody, for Defendants.

24  I agree.

JA000635

Carl Kerchner - March 23, 2022

5

```
 1                    * * *

 2                CARL KERCHNER,

 3       after having been first duly sworn, was

 4       examined and testified as follows:

 5                    * * *

 6           E X A M I N A T I O N

 7                    * * *

 8       THE COURT REPORTER:  Are the usual

 9    stipulations okay?

10       MR. BAIRD:  That's fine.  Only objections

11    as to the form of the question.  The witness

12    can read and sign, reserve the right to if he

13    so desires.

14 BY MR. BAIRD:

15    Q   Mr. Kerchner, good morning.  My name is

16 Graham Baird and I'm a lawyer and I represent

17 Colleen Behm in a lawsuit that she's filed against

18 Mack Trucks.  Today we are here for your deposition,

19 sir.  Have you ever given a deposition before?

20    A   No.

21    Q   Who else is in the room with you where you

22 are?

23    A   Right now it's myself and Kaitlyn O'Neill.

24    Q   Okay.  Is there anyone else in the room
```

Carl Kerchner - March 23, 2022

6

1    besides you and Miss O'Neill?

2        A    No.

3        Q    Do you have any electronic devices that

4    you are looking at right now besides the laptop or

5    whatever you're using to participate here on the

6    Zoom?

7        A    No.

8        Q    Okay.  A deposition's a question and

9    answer session.  I'm just going to ask you a few

10   questions that involve your interactions with Miss

11   Behm and perhaps others during your employment with

12   Mack Trucks.

13       A    Okay.

14       Q    And your legal obligation is to provide

15   answers to those questions to the best you can.

16   Okay?

17       A    All right.

18       Q    When you are responding to my question I

19   would ask that you respond verbally.  Sometimes it

20   is difficult for the court reporter to take down two

21   people talking at once, so I would ask that you wait

22   until I ask my full question before you answer and

23   I'll certainly do my best not to talk over you when

24   you're answering.  Is that fair?

Carl Kerchner - March 23, 2022

7

```
 1        A     Sure.

 2        Q     I'm hearing a little bit of feedback and

 3    I'm wondering where that's coming from.

 4        A     We are in a small room, so that could be

 5    where it's coming from.

 6        Q     I'll try to speak as clear as I can so

 7    there is no echo.  You can take a break whenever you

 8    want, Mr. Kerchner, from my questions.

 9        A     Okay.

10        Q     Just ask for one.  Okay?

11        A     Okay.

12        Q     Don't guess at anything.  If you don't

13    know, you don't know.  If you don't remember, you

14    don't remember.

15        A     Okay.

16        Q     Don't guess or make assumptions.  Do you

17    understand that?

18        A     Yes, absolutely.

19        Q     Terrific.  If you don't hear one of my

20    questions, if you don't understand one of my

21    questions, please tell me and I will try and ask it

22    again.  Okay?

23        A     Okay.

24        Q     If Mr. Moody, who is the lawyer for Mack
```

Carl Kerchner - March 23, 2022

8

1    Trucks, objects to one of my questions, don't

2    answer.  Let him place his objection on the record

3    and then you can answer after he does so.  Okay?

4         A    Okay.

5         Q    Mr. Kerchner, what is your current age?

6         A    My current age is 52.

7         Q    Are you employed?

8         A    Yes.

9         Q    Where are you employed?

10        A    I am employed with Mack Trucks in

11   Macungie, Pennsylvania.

12        Q    What is your current job position with

13   Mack Trucks?

14        A    My current job position is production tech

15   on engine two.

16        Q    What do you do as a production tech on

17   engine two?

18        A    I actually do left-side transmission

19   install.

20        Q    Okay.  How long have you held that

21   position, sir?

22        A    A couple of months.

23        Q    What did you do before you were assigned

24   to that position?

JA000639

Carl Kerchner - March 23, 2022

9

1      A    I was the inspector at the end of the cab

2   two line.

3      Q    What did you do in that position?

4      A    That position is you inspect the final

5   product of the cab, do some data entry in computers

6   for defects and so on and so forth and that was

7   pretty much it.

8      Q    Are you currently a member of any labor

9   union?

10     A    Just the one that we have to have for

11  working here, which is UAW 677.

12     Q    Okay.  How long have you been employed at

13  Mack Trucks?

14     A    Since September 11th of 1998.

15     Q    Was Mack Trucks a union shop when you

16  started?

17     A    Yes.

18     Q    And was it the same Union, UAW 677, back

19  then?

20     A    Yes.

21     Q    Have you ever had any representative or

22  leadership roles in the union?

23     A    Yes.  I was a -- I actually had all three

24  cab lines.  I was the union rep for all three cab

Carl Kerchner - March 23, 2022

10

1    lines and I also had the trainers.

2         Q    What did you do as a union rep?  Explain

3    that to me.

4         A    Okay.  So various roles.  The first and

5    foremost is to make sure both sides, company and

6    union, follow the current contract agreement between

7    the union and the company.  Further than that, it

8    goes to when I was the rep I had approximately 200

9    people that were under my district, so that can

10   entail all kinds of problems to where we need to

11   come out to HR if people need days off or

12   bereavement if somebody passed away.  You know, you

13   kind of -- it's hard to sum it up in a short

14   little -- you do a lot of stuff.

15              You have a lot of interaction with

16   the people out there because, as you well know and

17   everybody else here, you have things, it's life,

18   stuff happens.  And so you do a lot.  You try and

19   take care of a lot of problems that arise on the

20   floor, whether it's between employees or employee

21   and supervisor or it could be a various boatload of

22   things that you have to take care of.  Pay issues,

23   if their pay wasn't right we come out to HR or send

24   an E mail and say, Hey, Kaitlyn O'Neill was short

11

1    eight hours of pay this week, things of that nature.

2         Q    Okay.  Did you ever serve as a union

3    representative for Colleen Behm?

4         A    Yes.

5         Q    Do you remember anything about any actions

6    that you took on behalf of Miss Behm or the company

7    with regards to her employment?

8         A    There was I can tell you right now there

9    was three interactions with her that I can remember

10   right now.  Would you like me to divulge what the

11   three were or --

12        A    That's great.  Please do.

13        A    So one of the instances was Colleen, Miss

14   Behm, was going to be married.  She was going to

15   have the service at her home, so she had required --

16   or not required, requested to have off Friday and

17   Monday to be able to set up and break down for her

18   home wedding, which her supervisor, and I do not

19   remember who the supervisor was at the time because

20   they kind of get shuffled around in here and like I

21   said I have three different lines and three sets of

22   supervisors.  So long and short of it was the

23   supervisor had denied her the days off, so of course

24   when that happens then the union rep gets called,

Carl Kerchner - March 23, 2022

12

1   which Colleen did call me.  I came down to her,

2   asked her what was going on, had given me the

3   situation of requested days.  It was going to be a

4   home wedding and she needed Friday and the following

5   Monday for setting up and breaking down of all the

6   tables and chairs and whatever else they rented for

7   their wedding.

8              So I got nowhere with the supervisor,

9   so I wound up coming out to HR, which at that time,

10  again, I don't remember if I went to the HR business

11  partner first, which I think it was, and that would

12  have been Kaitlyn at the time.

13              THE WITNESS:  Were you there?

14  BY MR. BAIRD:

15      Q    You can't ask for help to testify.  If you

16  know, you know.  If you can't remember, that's okay

17  too.

18      A    Okay.  Well, I came to HR, wound up

19  talking to Tim Newman about it.  Tim said -- I

20  explained the situation, he says, Okay, we'll go out

21  and talk to her about it.  So we did.  At that time

22  she was not on my line, because she was flexed.

23  They could bounce her around.  So at that time she

24  was on the chassis line.  We found out where she was

JA000643

13

1    and went to talk to her.  The interaction with that

2    was I said to Colleen, I've got Tim Newman here.  He

3    wants to talk to you about your days off for your

4    wedding.  So I stepped back and let them talk, but

5    stayed there and listened to what was going on.  And

6    he told her he was going to give her the Friday and

7    Monday off with no points assessed.  Because we have

8    an attendance policy with points if you call off,

9    take off, et cetera.  So that's where we were at

10   with that.  He told her she could have off the

11   Friday and Monday.  From there I asked her if

12   everything is okay, she said yep, and I proceeded to

13   move on to take care of the rest of the things for

14   the day.

15        Q    Did she thank you for helping her with

16   that first interaction?

17        A    I would say probably, but I can't say a

18   hundred percent yes or no, because of the amount of

19   people and amount of content that you have to deal

20   with day after day.  It kind of blurs together.  So

21   for me, when I was done with her I was like just

22   okay, you know, clean slate.  We are off to the next

23   person.  What's the next issue?

24        Q    Understood.

Carl Kerchner - March 23, 2022

14

1        A      That was the first interaction.  I've seen

2   her like in normal cordial stuff, Good morning, how

3   you doing?  Do you have any issues?  But that was

4   the first real thing where she needed assistance

5   with, didn't get something that she felt she needed

6   to have off.

7        Q      Do you mind if I ask you a few questions

8   about that first interaction?

9        A      Sure.

10       Q      You said Colleen called you.  Did she call

11  you on your cell phone, personal cell phone?

12       A      Again, I don't remember that, because my

13  personal cell phone, I didn't really give my number

14  out.  Some people on the floor had it before I

15  became a rep, so some people would reach out to me

16  through that.  I don't remember if it was a phone

17  message on my desk phone or if it was one of the

18  people on the cab line said, Hey, Colleen's looking

19  to talk to you.  They have her on the chassis line.

20  I can't be a hundred percent on that one.

21       Q      As I understand it there could be numerous

22  ways in which an employee could contact you as a

23  union rep to come assist them with some issue they

24  had, be it possibly your personal phone, call you on

Carl Kerchner - March 23, 2022

15

1   your desk phone or word of mouth from other

2   employees telling you that they need to talk to you?

3       A    Correct.

4       Q    And you said that you went to the HR.  Do

5   you know, was there an HR office on site of the

6   Macungie factory?

7       A    Ever since I've been employed here, yes,

8   they have been on site.  It has changed over the

9   years for location, but it has always been on site.

10      Q    Okay.  Tell me about the location of HR

11  during that first interaction with Miss Behm.

12      A    I'm pretty sure it was out here at the

13  front of the building where they are currently.  I

14  don't know if this is the north side of the building

15  or not.  It's the front part of the facility.

16      Q    Is there a trailer or is it an office

17  within the building?

18      A    Within the building, this one is an

19  office.  The prior place before this was I guess a

20  trailer out there that they had made into cubicles

21  or offices out there.  But it was only if you walk

22  out of the plant to the trailer it was probably less

23  than a two-minute walk, if that.  It was very close

24  in proximity.

Carl Kerchner - March 23, 2022

16

1      Q     What about the proximity of the HR office

2  as it sits now?  How close is that to the factory

3  floor in terms of walking wise?

4      A     You can walk right in.  You can't walk

5  into the HR department, but you walk in off of the

6  production floor and come down a corridor and go to

7  the security person, let them know, I have an

8  appointment with Kaitlyn at 10 o'clock and they

9  either call or bring you back and ring you through.

10     Q     Have you ever needed to call an HR

11  representative off site of the factory?

12     A     I don't ever recall calling them off site.

13  Were there times where I was the rep and --

14     Q     Go ahead.  I'm sorry.

15     A     Okay.  I thought somebody said something.

16  There has been times when you're a rep they give you

17  a laptop and we were using Skype at the time for an

18  instant message thing back and forth or Kaitlyn and

19  I would do a lot either through the phone and/or

20  E-mails as well.  So it all depended.  If Kaitlyn

21  wasn't there she'd say, I'm not in the plant today,

22  but I'm working from home.  So we did everything

23  over Skype or she would say call me on my work cell

24  phone and we'd discuss it that way.

Carl Kerchner - March 23, 2022

17

1      Q    If you don't mind, Mr. Kerchner, can you

2   tell me about the second interaction you recall

3   involving Miss Behm?

4      A    Okay.  The second interaction was I was

5   requested to come to the dispensary, which is the

6   medical facility here in the plant.  Colleen was

7   working on the L cab line as a flex person, wound up

8   bumping her head.  I believe she went out to be

9   diagnosed by a doctor, had come back and she had

10   requested me to come along with her into the

11   dispensary because she had to see the doctor, which

12   was not uncommon for me.  I've been in there with

13   various other people when I was the rep.  They

14   requested that I come in.  You have to sign a form

15   for the HIPAA stuff and all that protocol, which we

16   did.

17            So when we went in there we were

18   sitting in a private room waiting for Dr. Muto to

19   come in.  He came in and I believe there was a nurse

20   with him.  It might have been Cathy, but I can't be

21   a hundred percent sure on that.  But also there was

22   two HR representatives that came in as well.  One

23   was Dee Markell and the other was Marta, and I'm

24   going to butcher her last name, Albalotta I think is

Carl Kerchner - March 23, 2022

18

1  her last name.  So when we were in there of course I

2  pretty much sat back and let them do their thing.  I

3  sat there and observed them and if I needed to ask

4  any questions that I thought maybe she didn't ask

5  or, you know, maybe she missed something.  So we sat

6  there and it was back and forth about her being able

7  to return to work.

8      Q    Do you remember anything specifically

9  about that back and forth about Miss Behm being able

10  to return to work?

11     A    So I don't remember the exact specifics

12  back and forth because it was a lot of -- I'm saying

13  it's a tiny room.  There's an exam table in there,

14  two chairs like I'm sitting on now and a wash basin

15  type thing.  It's small.  So there was probably six

16  people in the room, so it was tight and people

17  talking, it was loud.  All I know is it was back and

18  forth and, from what I remember, Colleen was upset

19  that they were going to have her return to work

20  because she was diagnosed with a concussion at the

21  time and I believe she was having some effects from

22  the concussion; headache, light sensitivity, all

23  that other stuff that goes with that.

24                 At the end of the day, from what I

JA000649

19

1    can remember, can't be a hundred percent but I'm

2    like 95 percent, is they wound up letting her go

3    home that day.  They sent her home.  After that,

4    again the amount of people I had to deal with and

5    the volume of things, I can't tell you was she out

6    for one day, three days, five months?  I'm not -- I

7    can't even be close to guessing on how long she was

8    out.  I didn't monitor that stuff.

9         Q    Okay.  Do you remember anything about

10   Dr. Muto's examination of Colleen?

11        A    No, that I do not.

12        Q    Did you -- you were in the room when he

13   was examining her, though, correct?

14        A    I was in the room.  This was after she

15   came back from being diagnosed from somebody else.

16   So I can't be a hundred percent sure if he did

17   anything, like check to see if her pupils were

18   dilated.  I can't remember.

19        Q    Did you observe Miss Behm's original

20   injury?

21        A    I was not there when it happened, no.  I

22   was told about it after the fact.

23        Q    Do you remember who told you about it?

24        A    No, I do not.  Somebody on the line out

Carl Kerchner - March 23, 2022

20

1   there, like I said, she was flex, so she could be

2   anywhere in the plant, honestly.  If nobody is

3   out -- I don't know if you're familiar how flex

4   works.  If there is nobody out she just goes on

5   repair and helps people out.  And I can't even be

6   sure, was she on an actual job when she hit her head

7   or was she doing repair?  That I don't know either.

8        Q    Fair enough.  What happens when someone is

9   injured while working on the line?  Does the line

10  stop?

11       A    Depending what kind of an injury.  If you

12  have somebody that -- I don't want to be gruesome

13  here, but there's people that have been in between

14  the rear axles of the truck and they fire it up and

15  put it in gear and that person gets sucked down in

16  between the wheels.  Yeah, they're going to have to

17  shut the line off.  Personally myself, when I worked

18  on the cab line I turned to get out of the truck and

19  split my knee open, so I grabbed a rag and walked

20  over to the dispensary.  No, they don't turn the

21  line off for that.  It depends on the severity of

22  it.

23       Q    And do you remember when your injury

24  occurred?

Carl Kerchner - March 23, 2022

21

1      A    No.  That was a lot of years before that.

2      Q    Have you had any other injuries at work

3  besides splitting your knee open?

4      A    Yeah.  I had a Workman's Comp claim on my

5  elbow, which they had to do surgery on it.

6      Q    Was that -- I'm sorry.  Was that a

7  situation where your elbow, was that a repetition

8  injury?

9      A    It wound up being tennis elbow.  They had

10  to go in and reattach the ligament.

11      Q    Did you miss some time from your job as a

12  result of that injury?

13      A    Sure.

14      Q    Do you remember about how much?

15      A    No.  That was even further back.  That was

16  a lot of years ago.

17      Q    Okay.  Did Mack Trucks treat you

18  negatively as a result of you missing time from your

19  injury?

20      A    As?  Explain what you mean by negatively.

21      Q    Did Mack Trucks take any actions against

22  you that you believed were motivated by the fact

23  that you missed time from your injury?

24      A    No.

JA000652

Carl Kerchner - March 23, 2022

22

1    Q    Did Mack Trucks in any way rush you to

2  return to work?

3    A    I don't know if they per se rush you.

4  There's been probably some cases where -- you talk

5  to a bunch of people as a rep.  I'd say, Listen,

6  it's your body.  Only you know how you feel.  I

7  can't make anybody change when you come back.  I

8  have nothing to do with that.  All I can tell you is

9  do the job.  If you can't do it you got to go back

10  down to the dispensary.  They have got to make that

11  call.  I can't do anything with that.

12    Q    Understood.  Do you remember anything that

13  Miss Behm said toward Dr. Muto or any of the other

14  individuals in the room, Dee Markell, for example,

15  during the time when she was -- when you were

16  observing her have the conversation in that

17  dispensary?

18    A    I do not remember anything that was said.

19  All I can tell you is at one point it did get a

20  little heated in there between the people that were

21  involved in there.  As of what was said back and

22  forth, I have no recollection of anything that was

23  said back and forth besides Dr. Muto at the end

24  saying, Okay, fine, we are going to send you back

JA000653

Carl Kerchner - March 23, 2022

23

1   home.  And that was pretty much the end of it.

2       Q    Do you remember who was getting heated in

3   the room?

4       A    I know Colleen was upset.  I don't recall

5   really if Dr. Muto or the nurse -- like I said,

6   there was so much going on in there, it's a very

7   small room and as we are talking here you know if we

8   have a couple people talking, you don't catch it

9   all.  It's just noise at that point.  I'm not saying

10  they were full out screaming or nothing.  It was

11  just from talking it was a lot of noise.

12      Q    Understood.  Do you ever remember Colleen

13  referring to Dr. Muto as a veterinarian during that

14  interaction?

15      A    No, I can't remember her saying anything

16  of that.

17      Q    Have you ever heard Colleen refer to

18  Dr. Muto as a veterinarian?

19      A    Again, I cannot be a hundred percent yes

20  or no.  When you're a rep you talk so much during

21  the day.  There is so much content.  Like I said,

22  there's 200 people, so there is no way I can tell

23  you yes or no.

24      Q    When you say there's 200 people, are there

JA000654

Carl Kerchner - March 23, 2022

24

1   200 people that you are the representative for?

2        A    Yes.  At that time, yes, there was like

3   200 and change, maybe 210, give or take.  Because

4   people would bounce in and out with bids and getting

5   moved and flex people and all that other stuff.

6        Q    At that time you were the union rep for

7   the cab lines; is that correct?

8        A    Yes.  And that was district two.

9        Q    Okay.  What is the third interaction that

10  you had with Miss Behm?

11       A    The third interaction was after my term

12  was over as the rep I decided not to re-run and I

13  was going to go back to my job in production.  So

14  when I would walk down through my job in production

15  I would see Colleen in the morning.  And because I

16  was her rep we had a rapport, so it was always, Good

17  morning.  How you doing?  And she stopped me as I

18  was walking to my work station and she says, Can you

19  believe they're going to force me -- or she said,

20  I'm going second shift.  I said, Oh, is that -- did

21  you Article Nine?  Because I know she had kids and

22  she was going through some stuff outside of work.

23  And she's like, No.  They're forcing me to go second

24  shift.  I said, Yeah, but if they force you to go on

Carl Kerchner - March 23, 2022

25

1    second shift it's not a permanent thing.  When

2    people get bumped around they Article Nine from

3    shift to shift.

4                    I said, With your time you got enough

5    time.  You'll probably eventually get back on first

6    shift.  You're just going to have to buy your time

7    on second shift.  That was just being cordial back

8    and forth.  Even to this day, I've been out of being

9    a rep for five years now.  I still have people come

10   and talk to me on the line to ask me questions.

11   It's just -- that's part of that territory.

12        Q    Sure.

13        A    Other than that, I believe that was

14   probably the last time I talked to Colleen besides,

15   How you doing, or walking past her.  Other than

16   that, that was the last interaction I had with her.

17        Q    During that interaction were you still her

18   union rep or had you stopped being the union rep at

19   that time?

20        A    I was done being the rep.  Like I said, I

21   was walking to my work station.  And for three

22   years, for most of those three years I was a rep, I

23   was on that floor every day walking those lines to

24   make sure there was no issues going on.  You built a

Carl Kerchner - March 23, 2022

26

1   rapport with those people because you're there all

2   the time.  So I was absolutely not her rep at that

3   time.  And I remember that because where she was

4   working because she was flex, they had her over

5   there.  I'm like, What are you doing over here?

6   She's like, Well, they moved me over here and

7   they're making me go second shift.  And that whole

8   thing played out.

9       Q    Did she tell you why they were making her

10  go second shift?

11      A    If she did I don't remember what the

12  reason was.  I had just told her that they --

13  without being the rep and being able to dive into

14  it, I said it's probably that more seniors came to

15  this shift.  You're going to get bumped.  It happens

16  all the time.  It's a seniority shop.  That that's

17  how it goes.

18      Q    Do you know who took over as Miss Behm's

19  union representative after you had stopped acting in

20  that capacity?

21      A    If she would have been on the cab line, if

22  that's where she was working, that would have been

23  Cesar.  I just lost his last name.  His last name is

24  Gerena, G-E-R-N-N-A(sic), or something like that.

Carl Kerchner - March 23, 2022

27

```
1    He was actually my alternate when I was the standing
2    rep.  He wound up running when I didn't want to run
3    and he became the actual rep for the cab lines.
4    When I seen Colleen, when I passed her going to my
5    work station, I'm pretty sure she was tied to the
6    chassis line at that time and that rep at that time
7    would have been Louie Kurtz.
8         Q    Louie Kurtz, did you say?
9         A    K-U-R-T-Z, yes.  His actual real name was
10   Louis, but everybody called him Louie.
11        Q    Did you ever any conversations with
12   Mr. Gerena or Mr. Kurtz about Colleen?
13        A    No.
14        Q    Did you ever have any conversations with
15   Kaitlyn O'Neill about Colleen?
16        A    Again, I can't be a hundred percent just
17   because of the amount of volume.  So I probably had
18   a conversation with Kaitlyn about the days off that
19   she requested for the wedding and not uncommonly the
20   HR people out here a lot of times they were straight
21   up.  Listen, I can't make that call.  I'm going to
22   have to escalate that to Tim.  That's why I went to
23   Tim Newman about getting her off those two days to
24   be married.
```

JA000658

Carl Kerchner - March 23, 2022

28

1     Q    Understood.  Do you know a person named

2  Cruz Rivera?

3     A    I know who Cruz is.  I've never worked

4  with him.  Again, it's a cordial thing.  I know him

5  because he's a rep up there now.  I filled in for a

6  week or two.  Cesar had a family emergency that he

7  had to take care of, so I wound up meeting Cruz up

8  in the union office for those two weeks when I

9  worked up there filling in for Cesar.  But I never

10  really had any interactions with him.  I never

11  worked with him on the line.  He was never my rep, I

12  was never his rep, so that's the extent of it with

13  Cruz.

14     Q    Okay.  Do you know whether Mack Trucks

15  Inc. has an anti-sexual harassment policy?

16     A    I'm sure there is a sexual harassment

17  policy.

18     Q    Do you have any knowledge as to what that

19  policy entails, what it says?

20     A    Off the top of my head, no.  Is it easily

21  accessible?  Absolutely.  You can ask a supervisor

22  to print it for you.  Some time ago there used to be

23  a revolving type thing when they had a bunch of

24  packets in there and you could go in and grab that

JA000659

1   stuff.  Whenever a policy changes or anything like

2   that, Mack Trucks usually will send it out E-mail to

3   the supervisors and they would print it off and hand

4   it to the people on the line.

5       Q    As a union representative did you ever

6   field any complaints that you can remember involving

7   sexual harassment at Mack Trucks?

8       A    There were certain things as a rep that

9   get brought up to where people feel they weren't

10  talked to correctly or were treated some kind of a

11  way, which of course then you have to do your due

12  diligence as a rep, which I have, and Kaitlyn, have

13  sat down with a couple of them to where there was

14  people that were feeling uncomfortable from another

15  coworker.  There was a couple here that we had

16  brought it out.  I dealt with Marta with that one.

17  That was an engineer and a worker.  But an actual

18  charge?  Again, once it stops between me and an HR

19  business partner, that's pretty much where I'm done.

20  As a rep, yes, I sat through a bunch of intake

21  meetings where they ask what happened, what was

22  said, who was around.  Like that was status quo.  If

23  you came with something like that, they did a full

24  investigation on it.

Carl Kerchner - March 23, 2022

30

1    Q    When you say "they" who are you speaking

2  of?

3    A    HR.  Sorry.

4    Q    That's all right.

5    A    Like I said, for me and HR I had three or

6  four different business partners, because I had

7  three different lines and the trainers.  So

8  depending who it was on what line is that person who

9  I had to go to to bring the issue up or to get a

10  resolution, get an answer for her, like I said, to

11  get the days off.

12    Q    Do you have any awareness of what the

13  policy is of Mack Trucks regarding how a complaint

14  of sexual harassment is raised by a line worker?

15    A    I don't know what the policy says, but

16  there again as a rep, for me, and I'm speaking for

17  me, if somebody comes to you with something like

18  that you can't sit on that.  You have to take it

19  where it's got to go.  And that's what happened.

20  That's how I handled my district when I was the rep

21  in it.

22    Q    Do you have any understanding as to

23  whether Mack Trucks directs employees to complain to

24  their union rep or can an employee complain directly

Carl Kerchner - March 23, 2022

31

1  to HR at Mack Trucks?

2      A    I can't answer for that, because I'm not

3  part of HR.  I can tell you usually if it's

4  something like that, I'm going to say, and this is

5  just my opinion, majority of the people will go to

6  the rep.  I'm sure some people go to supervisors,

7  but to give you a percentage there is no way I would

8  be able to figure that out or give an educated

9  guess.  There is no rhyme or reason.

10      Q    Did Miss Behm ever make any complaints to

11  you about sexual harassment?

12      A    No.

13      Q    You mentioned Miss Behm with regards to

14  the third interaction you had with her, that she I

15  think you said was going through some stuff outside

16  of work.  Do you remember that?

17      A    Yeah.

18      Q    Do you remember when --

19      A    I think it was -- like I said, this is

20  after I was the rep.  So I know she was having

21  problems with it had to have been her husband at

22  that time, because that was the issue, was I believe

23  they were separated and she didn't have anybody to

24  watch the children on second shift and that's where

Carl Kerchner - March 23, 2022

32

1    the issue was going to lie for her.  Again, her and

2    I didn't specifically say that.  Like we didn't have

3    that straight-up conversation where she was saying

4    I'm having husband or marital problems.  It was

5    because I even asked her, You got kids.  What are

6    you -- how are you going to handle that?  And I

7    think she made the comment that she was concerned

8    because she didn't know what she was going to do

9    with them, being on second shift and trying to find

10   somebody to watch them.

11        Q    Have you talked to Miss Behm outside of

12   the workplace in the last year or two years?

13        A    No, sir.

14        Q    Have you talked with Miss Behm's

15   ex-husband, Corey, outside work in the last year or

16   two years?

17        A    No.  I've never talked to that man ever.

18   I know he worked here for a little bit of time.  I

19   know who he was, but he wasn't in my district, so,

20   no, I've never talked to him.

21        Q    Okay.  Bear with me, Mr. Kerchner.

22        A    Sure.

23        Q    Did you do anything to prepare for your

24   deposition today?

Carl Kerchner - March 23, 2022

33

1       A    As in which?

2       Q    Anything at all.

3       A    No, not really.  No.

4       Q    Did you look at any documents or

5   paperwork --

6       A    No.

7       Q    -- in preparation?

8       A    No.

9            MR. BAIRD:  I don't have any further

10      questions for you, Mr. Kerchner.  I appreciate

11      your time.  Thank you.  Mr. Moody may have some

12      questions.

13           MR. MOODY:  No, I don't have any questions

14      for you today.  Thank you, sir.

15                      * * *

16               (Witness excused.)

17                      * * *

18        (Whereupon, the Zoom deposition concluded

19        at 10:45 a.m.)

20                      * * *

21

22

23

24

JA000664

34

1

2                C E R T I F I C A T I O N

3


4

           I, Karen A. Stevens, a Court Reporter
5     and Notary Public, do hereby certify the
      foregoing to be a true and accurate transcript
6     of the proceedings in this matter, as
      transcribed from the stenographic notes taken
7     by me.

8                         _____

9                         Karen A. Stevens
                          Court Reporter
10                        Notary Public

11

12

13

14

15           (The foregoing certification of this
      transcript does not apply to any reproduction
16    of the same by any means, unless under the
      direct control and/or supervision of the
17    certifying reporter.)

18

19

20

21

22

23

24

**1**

**10** 16:8
**10:45** 33:19
**11th** 9:14
**1240** 2:3
**15** 2:9
**19102** 2:4
**1998** 9:14

**2**

**200** 10:8 23:22,24 24:1,3
**2020** 4:16
**21** 4:16
**210** 24:3
**29601** 2:9

**5**

**5** 3:5
**52** 8:6

**6**

**677** 9:11,18

**7**

**700** 2:9

**9**

**95** 19:2

**A**

**a.m.** 33:19
**absolutely** 7:18 26:2 28:21
**accessible** 28:21
**acknowledge** 4:9,13
**acting** 26:19

**actions** 11:5 21:21
**actual** 20:6 27:3,9 29:17
**administer** 4:14
**administered** 4:14
**age** 8:5,6
**agree** 4:22,24
**agreement** 4:19,20 10:6
**ahead** 16:14
**Albalotta** 17:24
**alternate** 27:1
**amount** 13:18,19 19:4 27:17
**and/or** 16:19
**answering** 6:24
**answers** 6:15
**anti-sexual** 28:15
**appointment** 16:8
**approximately** 10:8
**arise** 10:19
**arrangement** 4:17
**Article** 24:21 25:2
**assessed** 13:7
**assigned** 8:23
**assist** 14:23
**assistance** 14:4
**assumptions** 7:16
**attendance** 13:8
**attorneys** 4:8
**awareness** 30:12
**axles** 20:14

**B**

**back** 9:18 13:4 16:9,18 17:9 18:2,6,9,
12,17 19:15 21:15 22:7,9,21,23,24
24:13 25:5,7
**Baird** 2:2 3:5 4:21 5:10,14,16 12:14
33:9
**basin** 18:14
**Bear** 32:21

**behalf** 11:6
**Behm** 5:17 6:11 11:3,6,14 15:11 17:3
18:9 22:13 24:10 31:10,13 32:11
**Behm's** 19:19 26:18 32:14
**believed** 21:22
**bereavement** 10:12
**bids** 24:4
**bit** 7:2 32:18
**Blair** 2:13
**blurs** 13:20
**Blvd** 2:3
**boatload** 10:21
**body** 22:6
**bounce** 12:23 24:4
**break** 7:7 11:17
**breaking** 12:5
**bring** 16:9 30:9
**brought** 29:9,16
**building** 15:13,14,17,18
**built** 25:24
**bumped** 25:2 26:15
**bumping** 17:8
**bunch** 22:5 28:23 29:20
**business** 12:10 29:19 30:6
**butcher** 17:24
**buy** 25:6

**C**

**cab** 9:1,5,24 14:18 17:7 20:18 24:7
26:21 27:3
**call** 12:1 13:8 14:10,24 16:9,10,23
22:11 27:21
**called** 11:24 14:10 27:10
**calling** 16:12
**capacity** 26:20
**care** 10:19,22 13:13 28:7
**Carl** 3:3 5:2
**Carolina** 2:9

Carl Kerchner - March 23, 2022

**cases** 22:4

**catch** 23:8

**Cathy** 17:20

**cell** 14:11,13 16:23

**certification** 4:4

**Cesar** 26:23 28:6,9

**cetera** 13:9

**chairs** 12:6 18:14

**change** 22:7 24:3

**changed** 15:8

**charge** 29:18

**chassis** 12:24 14:19 27:6

**check** 19:17

**children** 31:24

**claim** 21:4

**clean** 13:22

**clear** 7:6

**close** 15:23 16:2 19:7

**Colleen** 5:17 11:3,13 12:1 13:2 14:10
17:6 18:18 19:10 23:4,12,17 24:15
25:14 27:4,12,15

**Colleen's** 14:18

**comment** 32:7

**Comp** 21:4

**company** 10:5,7 11:6

**complain** 30:23,24

**complaint** 30:13

**complaints** 29:6 31:10

**computers** 9:5

**concerned** 32:7

**concluded** 33:18

**concussion** 18:20,22

**consent** 4:17

**contact** 14:22

**content** 13:19 23:21

**contract** 10:6

**conversation** 22:16 27:18 32:3

**conversations** 27:11,14

**cordial** 14:2 25:7 28:4

**Corey** 32:15

**correct** 15:3 19:13 24:7

**correctly** 29:10

**corridor** 16:6

**counsel** 4:2,17

**couple** 8:22 23:8 29:13,15

**court** 4:8 5:8 6:20

**coworker** 29:15

**Cruz** 28:2,3,7,13

**cubicles** 15:20

**current** 8:5,6,12,14 10:6

---

**D**

**data** 9:5

**day** 13:14,20 18:24 19:3,6 23:21
25:8,23

**days** 10:11 11:23 12:3 13:3 19:6
27:18,23 30:11

**deal** 13:19 19:4

**dealt** 29:16

**decided** 24:12

**Dee** 17:23 22:14

**defects** 9:6

**Defendants** 2:10 4:23

**denied** 11:23

**department** 16:5

**depended** 16:20

**depending** 20:11 30:8

**depends** 20:21

**deposition** 4:9,11,12 5:18,19 32:24
33:18

**deposition's** 6:8

**DESCRIPTION** 3:11

**desires** 5:13

**desk** 14:17 15:1

**devices** 6:3

**diagnosed** 17:9 18:20 19:15

**difficult** 6:20

**dilated** 19:18

**diligence** 29:12

**directly** 30:24

**directs** 30:23

**discuss** 16:24

**dispensary** 17:5,11 20:20 22:10,17

**district** 10:9 24:8 30:20 32:19

**dive** 26:13

**divulge** 11:10

**doctor** 17:9,11

**documents** 33:4

**due** 29:11

**duly** 5:3

---

**E**

**E-MAIL** 29:2

**E-MAILS** 16:20

**easily** 28:20

**echo** 7:7

**educated** 31:8

**effects** 18:21

**elbow** 21:5,7,9

**electronic** 6:3

**emergency** 28:6

**employed** 8:7,9,10 9:12 15:7

**employee** 10:20 14:22 30:24

**employees** 10:20 15:2 30:23

**employment** 6:11 11:7

**end** 9:1 18:24 22:23 23:1

**engine** 8:15,17

**engineer** 29:17

**entail** 10:10

**entails** 28:19

**entry** 9:5

**ERIC** 2:3

**escalate** 27:22

Carl Kerchner - March 23, 2022

**ESQUIRE** 2:2,8

**eventually** 25:5

**ex-husband** 32:15

**exact** 18:11

**exam** 18:13

**examination** 19:10

**examined** 5:4

**examining** 19:13

**excused** 33:16

**Explain** 10:2 21:20

**explained** 12:20

**extent** 28:12

---

**F**

**facility** 15:15 17:6

**fact** 19:22 21:22

**factory** 15:6 16:2,11

**fair** 6:24 20:8

**familiar** 20:3

**family** 28:6

**feedback** 7:2

**feel** 22:6 29:9

**feeling** 29:14

**felt** 14:5

**field** 29:6

**figure** 31:8

**filed** 5:17

**filing** 4:3

**filled** 28:5

**filling** 28:9

**final** 9:4

**find** 32:9

**fine** 5:10 22:24

**fire** 20:14

**flex** 17:7 20:1,3 24:5 26:4

**flexed** 12:22

**floor** 10:20 14:14 16:3,6 25:23

**follow** 10:6

**force** 24:19,24

**forcing** 24:23

**foremost** 10:5

**form** 4:5 5:11 17:14

**found** 12:24

**Friday** 11:16 12:4 13:6,11

**front** 15:13,15

**full** 6:22 23:10 29:23

---

**G**

**G-E-R-N-N-A(SIC)** 26:24

**gear** 20:15

**Gerena** 26:24 27:12

**give** 13:6 14:13 16:16 24:3 31:7,8

**good** 5:15 14:2 24:16

**Governor** 4:15

**grab** 28:24

**grabbed** 20:19

**Graham** 2:2 4:21 5:16

**grahamb@ericshore.com** 2:4

**great** 11:12

**Greenville** 2:9

**gruesome** 20:12

**guess** 7:12,16 15:19 31:9

**guessing** 19:7

---

**H**

**hand** 29:3

**handle** 32:6

**handled** 30:20

**happened** 19:21 29:21 30:19

**harassment** 28:15,16 29:7 30:14 31:11

**hard** 10:13

**head** 17:8 20:6 28:20

**headache** 18:22

**hear** 7:19

**heard** 23:17

**hearing** 7:2

**heated** 22:20 23:2

**held** 8:20

**helping** 13:15

**helps** 20:5

**Hey** 10:24 14:18

**HIPAA** 17:15

**hit** 20:6

**home** 11:15,18 12:4 16:22 19:3 23:1

**honestly** 20:2

**hours** 11:1

**HR** 10:11,23 12:9,10,18 15:4,5,10 16:1,5,10 17:22 27:20 29:18 30:3,5 31:1,3

**hundred** 13:18 14:20 17:21 19:1,16 23:19 27:16

**husband** 31:21 32:4

---

**I**

**individuals** 22:14

**injured** 20:9

**injuries** 21:2

**injury** 19:20 20:11,23 21:8,12,19,23

**inspect** 9:4

**inspector** 9:1

**install** 8:19

**instances** 11:13

**instant** 16:18

**intake** 29:20

**interaction** 10:15 13:1,16 14:1,8 15:11 17:2,4 23:14 24:9,11 25:16,17 31:14

**interactions** 6:10 11:9 28:10

**investigation** 29:24

**involve** 6:10

**involved** 22:21

**involving** 17:3 29:6

**issue**  13:23 14:23 30:9 31:22 32:1

**issues**  10:22 14:3 25:24

---

**J**

**J.F.K.**  2:3

**JACKSON**  2:8

**job**  8:12,14 20:6 21:11 22:9 24:13,14

---

**K**

**K-U-R-T-Z**  27:9

**Kaitlyn**  2:16 5:23 10:24 12:12 16:8, 18,20 27:15,18 29:12

**Kerchner**  3:3 5:2,15 7:8 8:5 17:1 32:21 33:10

**kids**  24:21 32:5

**kind**  10:13 11:20 13:20 20:11 29:10

**kinds**  10:10

**knee**  20:19 21:3

**knowledge**  28:18

**Kurtz**  27:7,8,12

---

**L**

**labor**  9:8

**laptop**  6:4 16:17

**LAW**  2:3

**lawsuit**  5:17

**lawyer**  5:16 7:24

**leadership**  9:22

**left-side**  8:18

**legal**  6:14

**letting**  19:2

**LEWIS**  2:8

**lie**  32:1

**lieu**  4:13

**life**  10:17

**ligament**  21:10

**light**  18:22

**lines**  9:24 10:1 11:21 24:7 25:23 27:3 30:7

**Listen**  22:5 27:21

**listened**  13:5

**location**  15:9,10

**long**  8:20 9:12 11:22 19:7

**lost**  26:23

**lot**  10:14,15,18,19 16:19 18:12 21:1, 16 23:11 27:20

**loud**  18:17

**Louie**  27:7,8,10

**Louis**  27:10

---

**M**

**Mack**  5:18 6:12 7:24 8:10,13 9:13,15 21:17,21 22:1 28:14 29:2,7 30:13,23 31:1

**Macungie**  8:11 15:6

**made**  15:20 32:7

**mail**  10:24

**Main**  2:9

**majority**  31:5

**make**  7:16 10:5 22:7,10 25:24 27:21 31:10

**making**  26:7,9

**man**  32:17

**manner**  4:18

**March**  4:16

**marital**  32:4

**marked**  3:12

**Markell**  17:23 22:14

**married**  11:14 27:24

**Marta**  17:23 29:16

**medical**  17:6

**meeting**  28:7

**meetings**  29:21

**member**  9:8

**mentioned**  31:13

**message**  14:17 16:18

**mind**  14:7 17:1

**missed**  18:5 21:23

**missing**  21:18

**MK'D**  3:11

**Monday**  11:17 12:5 13:7,11

**monitor**  19:8

**months**  8:22 19:6

**Moody**  2:8 4:23 7:24 33:11,13

**morning**  5:15 14:2 24:15,17

**motivated**  21:22

**mouth**  15:1

**move**  13:13

**moved**  24:5 26:6

**Muto**  17:18 22:13,23 23:5,13,18

**Muto's**  19:10

---

**N**

**named**  28:1

**nature**  11:1

**needed**  12:4 14:4,5 16:10 18:3

**negatively**  21:18,20

**Newman**  12:19 13:2 27:23

**noise**  23:9,11

**normal**  14:2

**north**  15:14

**number**  3:11 14:13

**numerous**  14:21

**nurse**  17:19 23:5

---

**O**

**O'NEILL**  2:16 5:23 6:1 10:24 27:15

**oath**  4:13,15

**objection**  8:2

**objections**  4:5,18 5:10

**objects**  8:1

**obligation**  6:14

**observe**  19:19

---

observed 18:3

observing 22:16

occurred 20:24

office 15:5,16,19 16:1 28:8

offices 2:3 15:21

open 20:19 21:3

opinion 31:5

Order 4:16

original 19:19

**P**

P.C. 2:8

packets 28:24

paperwork 33:5

part 15:15 25:11 31:3

participate 6:5

participating 4:9

parties 4:3,16

partner 12:11 29:19

partners 30:6

passed 10:12 27:4

past 25:15

pay 10:22,23 11:1

Pennsylvania 2:4 8:11

people 6:21 10:9,11,16 13:19 14:14, 15,18 17:13 18:16 19:4 20:5,13 22:5, 20 23:8,22,24 24:1,4,5 25:2,9 26:1 27:20 29:4,9,14 31:5,6

percent 13:18 14:20 17:21 19:1,2,16 23:19 27:16

percentage 31:7

permanent 25:1

person 4:14 13:23 16:7 17:7 20:15 28:1 30:8

personal 14:11,13,24

Personally 20:17

Philadelphia 2:4

phone 14:11,13,16,17,24 15:1 16:19, 24

physically 4:10

place 8:2 15:19

Plaintiff 2:5 4:22

plant 15:22 16:21 17:6 20:2

played 26:8

point 22:19 23:9

points 13:7,8

policy 13:8 28:15,17,19 29:1 30:13, 15

position 8:12,14,21,24 9:3,4

possibly 14:24

preparation 33:7

prepare 32:23

present 2:16 4:10

pretty 9:7 15:12 18:2 23:1 27:5 29:19

print 28:22 29:3

prior 15:19

private 17:18

problems 10:10,19 31:21 32:4

proceeded 13:12

product 9:5

production 8:14,16 16:6 24:13,14

protocol 17:15

provide 6:14

proximity 15:24 16:1

pupils 19:17

pursuant 4:15

put 20:15

**Q**

question 5:11 6:8,18,22

QUESTIONED 3:4

questions 4:6 6:10,15 7:8,20,21 8:1 14:7 18:4 25:10 33:10,12,13

quo 29:22

**R**

rag 20:19

raised 30:14

Randy 2:8 4:23

randy.moody@jacksonlewis. com 2:10

rapport 24:16 26:1

re-run 24:12

reach 14:15

read 5:12

real 14:4 27:9

rear 20:14

reason 26:12 31:9

reattach 21:10

recall 16:12 17:2 23:4

recollection 22:22

record 4:20 8:2

refer 23:17

referring 23:13

remember 7:13,14 11:5,9,19 12:10, 16 14:12,16 18:8,11,18 19:1,9,18,23 20:23 21:14 22:12,18 23:2,12,15 26:3,11 29:6 31:16,18

remotely 4:12,15

rented 12:6

rep 9:24 10:2,8 11:24 14:15,23 16:13, 16 17:13 22:5 23:20 24:6,12,16 25:9, 18,20,22 26:2,13 27:2,3,6 28:5,11,12 29:8,12,20 30:16,20,24 31:6,20

repair 20:5,7

repetition 21:7

reporter 4:8 5:8 6:20

reporting 4:11,18

represent 5:16

representative 9:21 11:3 16:11 24:1 26:19 29:5

representatives 17:22

Representing 2:5,10

requested 11:16 12:3 17:5,10,14 27:19

required 11:15,16

reserve 5:12

reserved 4:6
resolution 30:10
respective 4:2
respond 6:19
responding 6:18
rest 13:13
result 21:12,18
return 18:7,10,19 22:2
revolving 28:23
rhyme 31:9
ring 16:9
Rivera 28:2
roles 9:22 10:4
room 4:11 5:21,24 7:4 17:18 18:13, 16 19:12,14 22:14 23:3,7
run 27:2
running 27:2
rush 22:1,3

**S**

sat 18:2,3,5 29:13,20
screaming 23:10
sealing 4:3
security 16:7
send 10:23 22:24 29:2
seniority 26:16
seniors 26:14
sensitivity 18:22
separated 31:23
September 9:14
serve 11:2
service 11:15
session 6:9
set 11:17
sets 11:21
setting 12:5
severity 20:21

sexual 28:16 29:7 30:14 31:11
she'd 16:21
shift 24:20,24 25:1,3,6,7 26:7,10,15 31:24 32:9
shop 9:15 26:16
SHORE 2:3
short 10:13,24 11:22
shuffled 11:20
shut 20:17
side 15:14
sides 10:5
sign 5:12 17:14
signing 4:3
sir 5:19 8:21 32:13 33:14
sit 30:18
site 15:5,8,9 16:11,12
sits 16:2
sitting 17:18 18:14
situation 12:3,20 21:7
Skype 16:17,23
slate 13:22
small 7:4 18:15 23:7
South 2:9
speak 7:6
speaking 30:1,16
specifically 18:8 32:2
specifics 18:11
split 20:19
splitting 21:3
standing 27:1
started 9:16
stating 4:19
station 24:18 25:21 27:5
status 29:22
stayed 13:5
stepped 13:4
stipulated 4:1
stipulations 5:9

stop 20:10
stopped 24:17 25:18 26:19
stops 29:18
straight 27:20
straight-up 32:3
Street 2:9
stuff 10:14,18 14:2 17:15 18:23 19:8 24:5,22 29:1 31:15
sucked 20:15
Suite 2:3,9
sum 10:13
supervisor 10:21 11:18,19,23 12:8 28:21
supervisors 11:22 29:3 31:6
surgery 21:5
sworn 5:3

**T**

table 18:13
tables 12:6
talk 6:23 12:21 13:1,3,4 14:19 15:2 22:4 23:20 25:10
talked 25:14 29:10 32:11,14,17,20
talking 6:21 12:19 18:17 23:7,8,11
tech 8:14,16
TECHNICIAN 2:13
telling 15:2
tennis 21:9
term 24:11
terms 16:3
Terrific 7:19
territory 25:11
testified 5:4
testify 12:15
thing 14:4 16:18 18:2,15 25:1 26:8 28:4,23
things 10:17,22 11:1 13:13 19:5 29:8
thought 16:15 18:4

Carl Kerchner - March 23, 2022

**tied** 27:5

**tight** 18:16

**Tim** 12:19 13:2 27:22,23

**time** 4:6 11:19 12:9,12,21,23 16:17 18:21 21:11,18,23 22:15 24:2,6 25:4, 5,6,14,19 26:2,3,16 27:6 28:22 31:22 32:18 33:11

**times** 16:13,16 27:20

**tiny** 18:13

**today** 5:18 16:21 32:24 33:14

**told** 13:6,10 19:22,23 26:12

**top** 28:20

**trailer** 15:16,20,22

**trainers** 10:1 30:7

**transmission** 8:18

**treat** 21:17

**treated** 29:10

**trial** 4:7

**truck** 20:14,18

**Trucks** 5:18 6:12 8:1,10,13 9:13,15 21:17,21 22:1 28:14 29:2,7 30:13,23 31:1

**turn** 20:20

**turned** 20:18

**two-minute** 15:23

**type** 18:15 28:23

---

### U

**UAW** 9:11,18

**uncomfortable** 29:14

**uncommon** 17:12

**uncommonly** 27:19

**understand** 7:17,20 14:21

**understanding** 30:22

**Understood** 13:24 22:12 23:12 28:1

**union** 9:9,15,18,22,24 10:2,6,7 11:2, 24 14:23 24:6 25:18 26:19 28:8 29:5 30:24

**upset** 18:18 23:4

**usual** 5:8

---

### V

**verbally** 6:19

**veterinarian** 23:13,18

**VIDEO** 2:13

**volume** 19:5 27:17

---

### W

**wait** 6:21

**waiting** 17:18

**waive** 4:17

**waived** 4:4

**walk** 15:21,23 16:4,5 24:14

**walked** 20:19

**walking** 16:3 24:18 25:15,21,23

**wash** 18:14

**watch** 31:24 32:10

**ways** 14:22

**wedding** 11:18 12:4,7 13:4 27:19

**week** 11:1 28:6

**weeks** 28:8

**wheels** 20:16

**wise** 16:3

**Wolf's** 4:15

**wondering** 7:3

**word** 15:1

**work** 16:23 18:7,10,19 21:2 22:2 24:18,22 25:21 27:5 31:16 32:15

**worked** 20:17 28:3,9,11 32:18

**worker** 29:17 30:14

**working** 9:11 16:22 17:7 20:9 26:4, 22

**Workman's** 21:4

**workplace** 32:12

**works** 20:4

**wound** 12:9,18 17:7 19:2 21:9 27:2 28:7

---

### Y

**year** 32:12,15

**years** 15:9 21:1,16 25:9,22 32:12,16

---

### Z

**Zielke** 2:13

**Zoom** 6:6 33:18