**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COLLEEN BEHM, Plaintiff, | : | |
| v. | : | Civil No. 5:21-cv-02500-JMG |
| MACK TRUCKS, INC., Defendant. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.** **June 8, 2022**

## I. OVERVIEW

Plaintiff began working for Defendant on January 2, 2018. Over the next three years, Defendant allowed Plaintiff to spend about a year-and-a-half on paid medical leave. Plaintiff's final stretch of paid medical leave lasted eleven months. When her doctor cleared her to return to work, Plaintiff promptly emailed Defendant her resignation.

Plaintiff has now sued Defendant for discriminating against her based on her disability. Defendant has moved for summary judgment. For the reasons that follow, the Court grants Defendant's motion.

## II. FACTUAL BACKGROUND

### a. Allegations

Defendant manufactures heavy duty trucks. Plaintiff worked on Defendant's production line. DSUF ¶ 3; PSDF ¶ 3. Defendant's production workers are unionized, so their rights and duties on the job are controlled by a collective bargaining agreement ("CBA").

Plaintiff began working for Defendant on January 2, 2018. DSUF ¶ 3; PSDF ¶ 3. Eight months after she began working for Defendant, Plaintiff injured her shoulder and went out on

paid medical leave. DSUF ¶¶ 13–14; PSDF ¶¶ 13–14. After three months of leave, Plaintiff returned to work. DSUF ¶ 15; PSDF ¶ 15. Three weeks later, Plaintiff again applied for paid medical leave, this time for depression and anxiety related to domestic violence threats. DSUF ¶ 18; PSDF ¶ 18. Defendant approved Plaintiff's paid medical leave, and Plaintiff remained on paid leave for another month-and-a-half. DSUF ¶ 19; PSDF ¶ 19. Plaintiff returned to work on January 21, 2019. DSUF ¶ 19; PSDF ¶ 19. Just four months later, on May 8, 2019, Plaintiff was injured on the job when she hit her head on a bracket. DSUF ¶ 20; PSDF ¶ 20. Plaintiff was diagnosed with a concussion. DSUF ¶ 23; PSDF ¶ 23.

Plaintiff alleges that, the day she was injured, Defendant's medical department and human resources representatives "harassed" her by demanding that she immediately take an ambulance to the hospital, which would have prevented her from picking up her kids from school. DSUF ¶ 22. The parties agree, however, that Plaintiff did not take an ambulance immediately and instead went to the hospital only after she had picked up her kids from school. DSUF ¶ 22; PSDF ¶ 22.

Two days later, Defendant asked Plaintiff to come into the production facility's medical department for a follow-up appointment. DSUF ¶ 24; PSDF ¶ 24. Plaintiff's doctor had instructed her to rest for 48 hours following her concussion, and Defendant's request that Plaintiff come to the facility fell within that 48-hour rest period. DSUF ¶ 23; PSDF ¶ 23. Plaintiff was examined by a physician and a human resources representative for four hours. PSDF ¶ 25. After this evaluation, Defendant's medical department cleared Plaintiff to return to work with the aid of tinted glasses and noise suppressing earmuffs. DSUF ¶ 25; PSDF ¶ 25. Defendant offered Plaintiff a light-duty job wiping down carts, but Plaintiff refused the light-duty job, so Defendant sent her home. DSUF ¶ 26; PSDF ¶ 26.

The next day, May 11, 2019, Plaintiff received severe injuries to her head as a result of a domestic assault. DSUF ¶ 28; PSDF ¶ 28. The assault caused Plaintiff to suffer another concussion. DSUF ¶ 29; PSDF ¶ 29. Plaintiff applied for paid medical leave on May 13, 2019, and was approved. DSUF ¶ 30; PSDF ¶ 30.

Plaintiff remained out on leave for the rest of the summer. DSUF ¶ 32; PSDF ¶32. In August, Plaintiff's doctor referred her to a neurologist. DSUF ¶ 32; PSDF ¶ 32. The neurologist evaluated Plaintiff and instructed her that she should not return to work until November 7, 2019. Soon after Plaintiff's appointment with her neurologist, however, Defendant discovered that Plaintiff was modeling for photographers. DSUF ¶ 35; PSDF ¶ 35. After discovering Plaintiff's modeling photos, Defendant instructed Plaintiff to see another neurologist of Defendant's choosing for a second opinion. DSUF ¶ 36; PSDF ¶ 36. Plaintiff saw this second neurologist on September 5, 2019. DSUF ¶ 39; PSDF ¶ 39. The second neurologist cleared Plaintiff to return to work the next day, and Plaintiff did so return. DSUF ¶¶ 40–41; PSDF ¶¶ 40–41.

When Plaintiff returned to work, Defendant placed her in the "Mack in Motion" division. In this division, workers build carts and other containers that are used to move parts and tools more efficiently. DSUF ¶ 43; PSDF ¶ 43. Plaintiff alleges that this work was monotonous and undesirable and typically reserved for "misfits." PSDF ¶ 43. But the pay and hours for Mack in Motion were the same as those for Plaintiff's previous position. DSUF ¶ 44; PSDF ¶ 44.

After Plaintiff had worked in the Mack in Motion division for about three months, she was transferred back to the production line. DSUF ¶ 45; PSDF ¶ 45. Within a month, however, Defendant announced that it would be laying off over 220 employees in Plaintiff's facility. DSUF ¶¶ 47–49; PSDF ¶¶ 47–49.

As a result of the layoffs, Defendant had to move some workers from first shift to second shift, and the CBA required Defendant to reallocate shifts based on seniority. DSUF ¶ 50; PSDF ¶ 50. The CBA also provided that, as between two workers hired on the same day, seniority would be determined based on the last four digits of the workers' social security numbers. PSDF ¶ 10. Defendant had hired over 400 workers the same day it hired Plaintiff. DSUF ¶ 4; PSDF ¶ 4. Accordingly, seniority as between Plaintiff and these other workers would be determined not by Plaintiff's date of hire but by the last four digits of her social security number.

Plaintiff was moved to second shift and began working second shift on February 17, 2020. DSUF ¶ 54; PSDF ¶ 54. Plaintiff alleges that she was first told by her union representatives that she would be able to stay on first shift but was only later informed by her union representatives that she would be transferred to second shift. PSDF ¶ 51. Plaintiff alleges she received notice of her transfer only three days before she had to start working the new schedule. *Id.*

Her first day on second shift, Plaintiff requested a transfer back to first shift. DSUF ¶ 55; PSDF ¶ 55. Plaintiff informed Defendant that she could not work second shift because she could not find childcare. DSUF ¶ 53; PSDF ¶ 53. Plaintiff alleges that she also told her union representatives that she needed to change shifts for "a couple reasons," including "medical." DSUF ¶ 76; PSDF ¶ 76. But Plaintiff never told anyone in Defendant's management that she needed to change shifts for medical reasons. DSUF ¶ 80; PSDF ¶ 80. Defendant denied Plaintiff's request and stated that its reason for doing so was that Plaintiff did not have enough seniority to bump anyone from first shift. DSUF ¶ 57; PSDF ¶ 57.

After moving to second shift, Plaintiff missed work because she and her daughter were sick. DSUF ¶ 58; PSDF ¶ 58. Because of this absence, Defendant allegedly issued Plaintiff a

corrective action on March 3, 2020. DSUF ¶ 59. The next day, Plaintiff had a panic attack and left work early. DSUF ¶ 60; PSDF ¶ 60. The day after that, Plaintiff applied for paid medical leave. DSUF ¶ 61; PSDF ¶ 61. Plaintiff's application was initially denied but was then approved on April 7, 2020, with benefits paid retroactively to the beginning of Plaintiff's absence. DSUF ¶¶ 62–64; PSDF ¶¶ 62–64.

Plaintiff's neurologist certified that Plaintiff could not return to work for at least three months and subsequently extended Plaintiff's leave of absence until February 1, 2021. DSUF ¶¶ 65–66; PSDF ¶¶ 65–66. On February 1, 2021, Plaintiff's neurologist released Plaintiff to return to work on February 16, 2021. DSUF ¶ 67; PSDF ¶ 67. Rather than return to work, however, Plaintiff emailed Defendant her resignation on February 8, 2021. DSUF ¶ 68; PSDF ¶ 68.

**b. Procedural History**

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 22, 2020, alleging violations of Title VII and the Americans with Disabilities Act ("ADA"). DSUF ¶ 71; PSDF ¶ 71. Plaintiff received a dismissal and Notice of Rights from the EEOC, and Plaintiff filed this lawsuit against Defendant and her union on June 2, 2021. DSUF ¶¶ 72–73; PSDF ¶¶ 72–73. After filing this lawsuit, Plaintiff voluntarily dismissed her claims against her union and dismissed her claims under Title VII against Defendant. ECF Nos. 21, 22. As a result, the only claims remaining in this case are Plaintiff's claims for disparate treatment, failure to accommodate and retaliation under the ADA and Pennsylvania's Human Relations Act ("PHRA") and Plaintiff's hostile work environment claim on the basis of sex under the PHRA.[1] Neither party has addressed Plaintiff's sex-based hostile

[1] Plaintiff's Amended Complaint states a hostile work environment sex discrimination claim against Defendant under the PHRA. *See* Am. Compl. ¶ 66. Plaintiff did not dismiss this claim when she dismissed her Title VII claims against Defendant. *See* ECF No. 22 ("The two remaining claims before this Court [include] Count IV – Pennsylvania Human Relations Act.").

work environment claim in their briefing, so the Court will not pass any judgment upon this claim.

The parties completed discovery, and Defendant moved for summary judgment. ECF No. 25. Defendant's motion is presently before the Court.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations.

*Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV. ANALYSIS

The ADA and PHRA are interpreted co-extensively except with respect to the disabilities they cover. *White v. Aldridge Elec., Inc.*, 2022 WL 1003765, at *2 n. 5&6 (E.D. Pa. 2022); *see also Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 428 (W.D. Pa. 2014). But Defendant has not argued that Plaintiff's disability falls outside either statute's coverage, so the Court need not analyze the statutes' divergence on this issue. Accordingly, the Court will analyze Plaintiff's claims under case law construing the ADA, but the Court's analysis applies with equal force to Plaintiff's claims under the PHRA.

Plaintiff's claims of disability discrimination rest on two theories of discrimination: disparate treatment and failure to accommodate. Plaintiff also claims Defendant retaliated against her for requesting an accommodation. The Court will first address Plaintiff's disparate treatment and retaliation claims and then address Plaintiff's failure to accommodate claim.

### a. Disparate Treatment & Retaliation

To establish a *prima facie* claim for disparate treatment under the ADA, an employee must show that (1) she is a disabled person within the statute's coverage; (2) she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations by the employer; (3) she has suffered an adverse employment action; and (4) the adverse employment action was causally related to the employee's disability. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

To establish a *prima facie* case of retaliation under the ADA, an employee must show (1) that she engaged in protected employee activity; (2) that her employer took an adverse action

against her either after or contemporaneous with the employee's protected activity; and (3) that there was causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

In evaluating the causation element in a disparate treatment or retaliation claim, courts apply the *McDonnell Douglas* framework. First, the employee must come forward with evidence establishing a prima facie case. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Next, the employer must come forward with a legitimate, non-discriminatory reason for its adverse employment action. *Id.* If the employer does so, then the trier of fact must proceed to weigh the evidence and determine the ultimate issue: whether the employer's adverse action was in fact motivated by discriminatory or retaliatory intent.[2] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Plaintiff's disparate treatment and retaliation claims must fail. Although Plaintiff argues a variety of incidents constitute adverse employment actions, only Plaintiff's transfer to second shift meets the legal standard for an adverse employment action. But Defendant has come forward with a legitimate, non-discriminatory reason for transferring Plaintiff, and Plaintiff, for her part, has not come forward with sufficient evidence to cast doubt upon Defendant's legitimate, non-discriminatory reason. Because Plaintiff has not come forward with evidence supporting each element of her disparate treatment and retaliation claims, her claims must fail.

[2] The Third Circuit has not squarely addressed the standard of causation required under the ADA since the statute was amended in 2008. Most Courts of Appeal that have addressed this issue, however, have found that liability accrues under the amended ADA only after a showing of but-for causation. *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("We, therefore, join the conclusion reached by the Fourth, Sixth, and Seventh Circuits that the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action.").

Aside from Plaintiff's transfer to second shift, Plaintiff argues that the following actions taken by Defendant rise to the level of being adverse employment actions:

- Defendant's instruction that Plaintiff to take an ambulance to the hospital following her head injury;
- Defendant's requirement that Plaintiff undergo a four-hour medical evaluation within two days of her first concussion and direction that Plaintiff return to work based on the result of that evaluation;
- Defendant's order that Plaintiff return to work in September 2019 on the basis of a second neurologist's opinion despite Plaintiff's primary neurologist's contrary recommendation; and
- Defendant's placement of Plaintiff into the Mack in Motion division for about three months upon her return to work in September 2019.

Plaintiff also argues that her resignation should be treated as a constructive discharge and, therefore, as an adverse employment action.

None of these incidents rise to the level of being an adverse employment action. To be an adverse employment action, the employer's action must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment. *Drummer v. Trustees of Univ. of Pennsylvania*, 286 F. Supp. 3d 674, 680 n. 29 (E.D. Pa. 2017).

Defendant's instruction that Plaintiff go directly to the hospital following her head injury did not modify the terms of her employment. At most, this incident represents a disagreement between Defendant and Plaintiff about the safest course of action following a potentially serious workplace injury. Critically, Plaintiff *did not* ultimately follow Defendant's preference, and Defendant did not punish Plaintiff in any way for not following its preference. Such a short-lived

disagreement that produced no tangible work-related consequences cannot rise to the level of being an adverse employment action.

Defendant's insistence that Plaintiff undergo a follow-up evaluation by the company physician and, later, by an independent neurologist did not constitute an adverse employment action either. The CBA permits Defendant to conduct a follow-up medical evaluation before approving paid medical leave. Joint Appendix ("JA") 693–95. The CBA also authorizes Defendant to require an independent medical evaluation to resolve a dispute over the employee's ability to work and provides that the result of the independent evaluation is binding upon both parties. JA 771. Accordingly, Defendant was within its rights under the CBA to require second evaluations of Plaintiff's health soon after she was diagnosed with a concussion and again after Defendant had reason to believe Plaintiff could return to work from her four-month leave of absence. Plaintiff has not come forward with any evidence that Defendant's insistence on these medical evaluations was out of step with its ordinary practices.

Since Defendant acted within its rights under the CBA and because there is no evidence Defendant treated Plaintiff differently than any other employee who had applied for paid medical leave, Defendant's insistence on follow-up and second opinion medical evaluations was not an adverse employment action. *Place v. Abbott Lab'ys*, 215 F.3d 803, 809 (7th Cir. 2000) (finding second opinion medical evaluation not to constitute adverse employment action when the employer's request for the evaluation was consistent with company policy and practice); *Klatt v. Twp. of Moorestown*, No. CIV. 06-4320RBK, 2009 WL 77550, at *3 (D.N.J. Jan. 8, 2009) ("To be sure, the mere requirement of a medical examination to determine Plaintiff's fitness for duty was not an adverse employment action in itself."); *Harley v. McCoach*, 928 F. Supp. 533, 542 (E.D. Pa. 1996) (finding requirement to undergo medical evaluation not to constitute adverse

employment action); *see also McGlone v. Philadelphia Gas Works*, 733 F. App'x 606, 610 (3d Cir. 2018) (finding no adverse employment action where the employer followed its usual process in reassigning an employee to light duty work after the employee was injured).

Further, Plaintiff's assignment to the Mack in Motion division upon her return from medical leave was not an adverse employment action. Plaintiff received the same pay and hours in this position as she would have received while working on the production line. Plaintiff has testified that the work was monotonous and generally reserved for "misfits." But Plaintiff has not produced any evidence that the work was demeaning or humiliating. And Plaintiff's time working in Mack in Motion was short-lived—within three months, Plaintiff was back on the production line. Rather than constituting an adverse employment action, Defendant's decision to place Plaintiff in the Mack in Motion division was a reasonable attempt to ease Plaintiff back into the workforce with light duty work following her four-month medical leave of absence.

Similarly, Plaintiff's resignation cannot be treated as a constructive discharge or, therefore, as an adverse employment action.

First, Plaintiff was no longer an "otherwise qualified" individual at the time she resigned. By the time she resigned, Plaintiff had been absent and completely unable to work for eleven consecutive months because of her disability. An employee who cannot perform any job functions for almost an entire year is not an "otherwise qualified" individual. *Santiago v. Temple Univ.*, 739 F. Supp. 974, 979 (E.D. Pa. 1990), *aff'd,* 928 F.2d 396 (3d Cir. 1991) ("The law does not protect absenteeism or employees who take excessive leave and are unable to perform the prerequisites of their job."); *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA.").

Second, the conditions of Plaintiff's employment at the time of and for the months preceding her resignation were not sufficiently intolerable to constitute a constructive discharge. To prevail on a claim of constructive discharge, a plaintiff must show that her employer knowingly permitted discriminatory employment conditions "so intolerable" that a "reasonable person subject to them would have to resign." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (internal citation and quotation marks omitted). This inquiry is an objective one that focuses not on how the plaintiff experienced her work environment but on how a reasonable person would have. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), *as amended* (May 27, 1993).

Here, Plaintiff was on paid medical leave and not working for almost the entire year preceding her resignation. Plaintiff has not come forward with any evidence that she had any interactions with Defendant during this time, much less interactions that could cause the conditions of her employment to become intolerable. Accordingly, no reasonable jury could find that Plaintiff was constructively discharged from her position.

Plaintiff is correct, however, that her transfer to second shift could be considered an adverse employment action. Shift changes are regularly recognized as adverse employment actions. *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 235 (D.N.J. 2014) ("Even a mere schedule change to weekend work can qualify as an adverse employment action."). Plaintiff also testified in her deposition that her transfer to second shift caused a reduction in her wages by $1.00 per hour. Accordingly, a reasonable jury could conclude that Plaintiff's shift change represented a substantial change in the conditions of her employment and, therefore, an adverse employment action.

But Defendant has come forward with a legitimate, non-discriminatory reason for transferring Plaintiff to second shift. Specifically, Defendant has presented evidence that, because of Plaintiff's relatively low seniority, Defendant was required to transfer Plaintiff to second shift amidst substantial plant-wide layoffs under the CBA Defendant had negotiated with Plaintiff's union. Complying with a CBA's seniority provision is certainly a legitimate, non-discriminatory reason for changing an employee's shift. *Tillman v. Pepsi Bottling Grp., Inc.*, 538 F. Supp. 2d 754, 780 (D. Del. 2008).

Plaintiff has failed to come forward with sufficient evidence from which a reasonable jury could conclude that Defendant was truly motivated by discriminatory or retaliatory animus. To survive summary judgment on the element of causation, an employee must produce evidence that either indicates that the employer was truly motivated by illegal intent or casts "substantial doubt" upon the employer's proffered legitimate explanation. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

The record before this Court contains no direct evidence that Defendant was motivated by discriminatory or retaliatory animus. It does, however, contain some circumstantial evidence that Plaintiff argues casts doubt upon Defendant's proffered legitimate reason. First, Plaintiff testified during her deposition that she saw individuals that remained on first shift whose employee identification numbers were higher than Plaintiff's. JA 184:10–23. Second, Plaintiff testified that she knew of one "girl that went from second shift to first shift" despite having less seniority than Plaintiff. JA 184:24–185:5. Third, Plaintiff testified in her deposition that her union representatives showed her a seniority list some weeks prior to her shift change that indicated Plaintiff had enough seniority to remain on first shift. JA 184:24–184:16. Fourth,

Plaintiff has identified emails in which Defendant's human resources and medical personnel express doubt about Plaintiff's disability. JA 616.

Although this evidence casts some doubt upon Defendant's proffered reason for changing Plaintiff's shift, it does not cast doubt *substantial* enough for Plaintiff's claim to survive summary judgment.

First, even if a jury were to credit Plaintiff's testimony that she saw workers on first shift with employee identification numbers that were higher than her own, the jury would have no basis for concluding that those workers in fact had lower seniority than Plaintiff. Plaintiff has produced no evidence that employee identification numbers were allocated based on seniority. And even if a jury were to assume—without basis—that an employee's identification number were directly correlated with the employee's date of hire, Plaintiff has not produced any evidence suggesting that employee identification numbers reflected the differences in seniority attributable to workers' social security numbers for workers who were hired on the same date. Indeed, Plaintiff concedes that Defendant hired over 400 workers to Plaintiff's plant the same day Defendant hired Plaintiff. For a substantial number of Plaintiff's co-workers, then, the worker's social security number would be the driver of the worker's seniority rather than the worker's date of hire. No reasonable jury could rely on Plaintiff's testimony about employee identification numbers to conclude that Defendant's invocation of the CBA's seniority provision was pretextual when Plaintiff has failed to provide evidence from which a jury could infer a relationship between identification numbers and seniority.

Plaintiff's testimony that there was "one girl" who went from second to first shift despite having lower seniority than Plaintiff is too vague to support a jury finding that Defendant's

proffered reason is pretextual. Plaintiff did not identify this worker in any descriptive way, nor did Plaintiff indicate how she could have known this other worker's seniority.

Plaintiff's testimony that her union representatives showed her a seniority list indicating she had enough seniority to stay on first shift does not cast substantial doubt upon Defendant's proffered reason either. First, this testimony would likely be inadmissible at trial under the best evidence rule. FED. R. EVID. 1002. Second, Plaintiff has not produced any evidence that Defendant was involved in creating the list Plaintiff allegedly saw or that Defendant even knew about such a list. Indeed, Plaintiff testified that her *union representatives* showed her this list—Plaintiff did not mention any involvement on the part of Defendant. Without any evidence connecting this list to Defendant, no reasonable jury could rely on the list to impute an illegal motive to Defendant.

Finally, the emails to which Plaintiff cites as evidence of illegal intent simply cannot bear the weight Plaintiff places upon them. At no point in the exchange does any of Defendant's personnel indicate a desire to terminate Plaintiff *because of* her disability. Instead, and quite to the contrary, the representatives express doubt about whether Plaintiff is disabled and conclude that Plaintiff could be terminated for taking paid medical leave if she is not disabled. Evidence that an employer believed an employee was *not disabled* cannot support a conclusion that the employer intended to discriminate against an employee *because of* her disability.

Similarly, these emails in no way suggest that Defendant sought to retaliate against Plaintiff for availing herself of paid sick leave. These emails were exchanged *four months after* Defendant had already accommodated Plaintiff's request and granted her paid medical leave. And it is clear from the record that Defendant's email exchange was prompted by Defendant's discovery that Plaintiff was modeling for photographers while on paid medical leave. By

contrast, these emails contain no indication that Defendant began probing the legitimacy of Plaintiff's disability in an attempt to retaliate against her for applying for paid medical leave.

Plaintiff also argues the series of incidents that occurred after she received her first concussion and up to and including her shift change constitute a hostile work environment when viewed in their totality. But the Court is unpersuaded that any reasonable jury could agree.

An employee's work environment is hostile only if the employee is subjected to "severe or pervasive" discrimination. *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 2022 WL 152896, at *5 (E.D. Pa. 2022). This discrimination must be significant enough to alter the conditions of an employee's employment. *Id.* In applying this standard, courts must consider all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Id.*

The series of incidents Plaintiff points to as the basis for her hostile work environment claim occurred over a period of about eleven months. Taken together and construed in the light most favorable to Plaintiff, this series of incidents represents a contentious disagreement between an employer and an employee about the employee's ability to return to work after an injury that was followed, many months later, by a shift transfer that was disruptive to the employee's life. At every point, however, Defendant acted in accordance with the procedures prescribed by the CBA Defendant had negotiated with Plaintiff's union. And regardless of whether Defendant was reluctant to do so, Defendant *did* grant Plaintiff paid medical leave for four months during the approximately eleven-month time period in which Plaintiff claims to have experienced a hostile work environment. At no point did Defendant physically threaten Plaintiff or publicly humiliate her. The Court is doubtful that a reasonable jury could conclude that any of these incidents were

instances of discrimination that could support a hostile work environment claim. Even assuming that they were, however, the Court is confident that no reasonable jury could conclude these incidents were severe or pervasive enough to interfere with Plaintiff's work performance.

Because Plaintiff has failed to produce evidence upon which a reasonable jury could conclude she suffered an adverse employment action that was causally related to either her disability or her participation in protected activity, Plaintiff's claims of disparate treatment and retaliation under the ADA must fail.

**b. Failure to Accommodate**

To prevail on a claim for failure to accommodate, an employee must show that she requested an accommodation. *Campo v. Mid-Atl. Packaging Specialties, LLC*, 2021 WL 4453613, at *18 (E.D. Pa. Sept. 29, 2021). An employee's request for an accommodation need not be in writing, invoke any "magic words," or otherwise conform to any formalities. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). But the request must at least "make clear that the employee wants assistance for . . . her disability." *Id.* Put another way, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id.*

Plaintiff's failure to accommodate claim must fail because Defendant did not have notice that Plaintiff's request for a shift change was related to Plaintiff's disability.

Plaintiff arguably made two requests for accommodation. First, Plaintiff asked Defendant to move her from second shift to first shift. Second, Plaintiff requested another paid medical leave of absence. Defendant granted Plaintiff's request for paid medical leave of absence, so that request for accommodation cannot form the basis of Plaintiff's failure to accommodate claim. Instead, Plaintiff's claim must rely on Plaintiff's request for a shift change.

The problem, however, is that Plaintiff has admitted that she specifically told Defendant that she was requesting a shift change because of her childcare needs. DSUF ¶ 53; PSDF ¶ 53. Defendant could not have been on notice that Plaintiff desired to change shifts because of her disability when Plaintiff specifically told Defendant that she was requesting a shift change for a different reason. And, at the time Plaintiff made her request, there were no surrounding circumstances that would have put Defendant on notice that Plaintiff's disability was the true cause for her request. Defendant had been cleared to return to work without restrictions over five months before Plaintiff requested her shift change, and there is no indication that Plaintiff's disability interfered with her ability to work before she made her shift change request. And while Plaintiff may have told her union representatives that she was requesting a shift change "for a couple of reasons, not just medical," there is no evidence that the union representatives communicated this basis for the shift change request to Defendant. JA 276:25–277:24. Because Defendant did not have notice that Plaintiff's request for an accommodation was related to her disability, Defendant did not have a duty to accommodate Plaintiff's request. *Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 71 (3d Cir. 2019) (finding that an employee's request for assistance did not trigger the employer's duty to accommodate because the employee made her request for "personal" rather than disability-related reasons).

It does appear that Defendant received notice that Plaintiff could not work the second shift because of her disability *after* Defendant had already denied her shift change request. JA 619. But the same day Defendant received this notice, Plaintiff requested a paid medical leave of absence, and Defendant ultimately granted that leave of absence. Accordingly, by the time Defendant's duty to accommodate accrued, Plaintiff had changed her requested accommodation, and Defendant satisfied its duty by granting the request. *Capps v. Mondelez Glob., LLC*, 847

F.3d 144, 157 (3d Cir. 2017) (concluding that granting employee's requests for leave under the Family Medical Leave Act constitutes a reasonable accommodation).

Since Defendant was not on notice that Plaintiff desired an accommodation for her disability when Defendant denied Plaintiff's request for a shift change, and since Defendant granted Plaintiff's request for leave after receiving notice that Plaintiff's request was related to her disability, Plaintiff's failure to accommodate claim must fail.

## V. CONCLUSION

No reasonable jury could find that Plaintiff experienced an adverse employment action that was causally related to Defendant's discriminatory or retaliatory intent, so Plaintiff's claims under the ADA for disparate treatment and retaliation must fail. And no reasonable jury could find that Defendant was on notice that Plaintiff desired an accommodation for her disability when Defendant denied Plaintiff's request for a shift change, so Plaintiff's claim under the ADA for failure to accommodate must fail as well. Accordingly, the Court will enter summary judgment in Defendant's favor on Plaintiff's claims under the ADA and PHRA for disability discrimination and retaliation.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge